# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

VOTE FORWARD, *et al.*,

<em>Plaintiffs</em>,

v.

LOUIS DEJOY, in his official
capacity as the Postmaster General; and the
UNITED STATES POSTAL SERVICE,

<em>Defendants</em>.

Civil Case No. 1:20-cv-02405

## PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR PRELIMINARY INJUNCTION

Robert D. Fram
Diane Ramirez
COVINGTON & BURLING LLP
Salesforce Tower
415 Mission Street, Suite 5400
San Francisco, CA 94105-2533
(415) 591-6000
rfram@cov.com
dramirez@cov.com

John Fraser
COVINGTON & BURLING LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018-1405
(212) 841-1000
jfraser@cov.com

Shankar Duraiswamy
Megan C. Keenan
Sarah Suwanda
Virginia Williamson
James Smith
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001-4956
(202) 662-6000
sduraiswamy@cov.com
mkeenan@cov.com
ssuwanda@cov.com
vwilliamson@cov.com
jmsmith@cov.com

*Counsel for Plaintiffs*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................................... iii

INTRODUCTION ................................................................................................... 1

STATEMENT OF FACTS ....................................................................................... 4

I.     Defendants' Late/Extra Trip Policy Delays the Delivery of Mail Ballots. ......................... 4

     A.     The Late/Extra Trip Policy Causes Mail Delivery Delays of at Least One Day—And Potentially More. ............................................................ 4

     B.     Implementation of the Late/Extra Trip Policy Led to Nationwide Delays in Mail Delivery. ................................................................... 8

         1.     Defendants' Statements and Data Confirm Substantial Delays in Delivery Since the Announcement of the Late/Extra Trip Policy. ............. 8

         2.     Defendants' Public Statements Confirm That the Late/Extra Trip Policy Has Caused Delays. ....................................................... 10

         3.     The Experience of Postal Workers Confirms Defendants' Admissions That the Late/Extra Trip Policy Created Delays. .................. 11

     C.     Data on the Reduction in Late/Extra Trips Shows That the Delivery of a Substantial Portion of Mail Ballots Will Be Delayed. ........................................... 13

II.     The Delay Created by the Late/Extra Trip Policy Will Disenfranchise Voters. ............... 14

III.     The Late/Extra Trip Policy Reflects the Trump Administration's Animosity Toward Voting by Mail. ............................................................... 17

ARGUMENT ....................................................................................................... 20

I.     Plaintiffs Are Likely to Succeed on the Merits of Their Claim That Defendants' Late/Extra Trip Policy Imposes an Unconstitutional Burden on the Right to Vote. ........ 20

     A.     Defendants' Late/Extra Trip Policy Severely Burdens the Right to Vote. ........... 22

         1.     The Right to Vote Deserves Protection Against Undue Delay in the Delivery of Ballots. ....................................................... 22

         2.     Statistical Evidence Demonstrates that the Late/Extra Trip Policy Imposes a Substantial Burden on Plaintiffs' Right to Vote. .................... 23

　　　　3.　　The Right to Vote Is Burdened Under the Laws of the Specific States in Which Individual Plaintiffs Intend to Vote and In Which Organizational Plaintiffs Operate. ............................................ 24

　　　　4.　　The Late/Extra Trip Policy Imposes A Severe Burden on Voters for Whom Voting By Mail Is Their Only Option. .................................... 25

　　B.　　Defendants' Interests In Maintaining the Late/Extra Trip Policy Do Not Justify the Burden Imposed on Voters. ................................................. 26

　　　　1.　　The Efficiency Rationale Does Not Bear Scrutiny. .................................. 26

　　　　2.　　The Cost-Savings Justification Does Not Bear Scrutiny. ......................... 27

　　　　3.　　The Refusal To Accept Additional Funding While Insisting on Cost Cutting Demonstrates a Desire To Frustrate Mail Balloting. ........... 29

II.　　Plaintiffs Will Suffer Irreparable Harm Without a Preliminary Injunction. .................... 30

　　A.　　A Concrete Threat To the Right to Vote Constitutes Irreparable Injury to Individual Plaintiffs. .......................................................................... 30

　　B.　　Plaintiffs in This Case Will Suffer an Irreparable Injury To Their Right to Vote. ................................................................................................. 31

　　　　1.　　The Individual Plaintiffs Will Suffer Irreparable Injury. ........................... 31

　　　　2.　　Impairment to an Organization's Mission and Programs Constitutes Irreparable Injury. ................................................... 34

　　　　3.　　Organizational Plaintiffs in this Case Will Suffer an Irreparable Injury. ................................................................................................... 35

III.　　The Public Interest and the Balance of Equities Weighs in Favor of A Preliminary Injunction. ........................................................................................ 37

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*,
 570 U.S. 205 (2013)..................................................................................................20

*Anderson v. Celebrezze*,
 460 U.S. 780 (1983)............................................................................................20, 21

*Banks v. Booth*,
 No. 20-849, 2020 WL 1914896 (D.D.C. Apr. 19, 2020).........................................37

*Burdick v. Takushi*,
 504 U.S. 428 (1992)............................................................................................20, 21

*Christian Legal Soc'y v. Walker*,
 453 F.3d 853 (7th Cir. 2006) ..................................................................................38

*Common Cause Ind. v. Marion Cty. Election Bd.*,
 311 F. Supp. 3d 949, 972 (S.D. Ind. 2018)............................................................27

*Common Cause/Ga. v. Billups*,
 406 F. Supp. 2d 1326 (N.D. Ga. 2005)..............................................................30, 31

*Crawford v. Marion Cty. Election Bd.*,
 553 U.S. 181 (2008)................................................................................................21

*Doe v. Walker*,
 746 F. Supp. 2d 667 (D. Md. 2010) .......................................................................23

*Elrod v. Burns*,
 427 U.S. 347 (1976)................................................................................................30

*Fair Emp't Council of Greater Wash., Inc. v. BMC Mktg. Corp.*,
 28 F.3d 1268 (D.C. Cir. 1994) ...............................................................................34

*Fusaro v. Cogan*,
 930 F.3d 241 (4th Cir. 2019) .................................................................................21

*Gallagher v. N.Y. State Bd. of Elections*,
 No. 20 Civ. 5504 (AT), 2020 WL 4496849 (S.D.N.Y. Aug. 3, 2020) ...................23

*Giovani Carandola, Ltd. v. Bason*,
 303 F.3d 507 (4th Cir. 2002) .................................................................................30

*Havens Realty Corp. v. Coleman*,
    455 U.S. 363 (1982).........................................................................................34

*Jubilant DraxImage Inc. v. United States Int'l Trade Comm'n*,
    396 F. Supp. 3d 113 (D.D.C. 2019) .................................................................20

*League of Women Voters of Fla., Inc. v. Detzner*,
    314 F. Supp. 3d 1205 (N.D. Fla. 2018)............................................................22

*League of Women Voters of United States v. Newby*,
    838 F.3d 1 (D.C. Cir. 2016)........................................................................34, 37

*Libertarian Party v. D.C. Bd. of Elections & Ethics*,
    682 F.3d 72 (D.C. Cir. 2012) ...........................................................................21

*Nat'l Treasury Emps. Union v. United States*,
    101 F.3d 1423 (D.C. Cir. 1996) .................................................................34, 35

*Nken v. Holder*,
    556 U.S. 418 (2009).........................................................................................37

*Obama for Am. v. Husted*,
    697 F.3d 423 (6th Cir. 2012) ......................................................................22, 38

*Preston v. Thompson*,
    589 F.2d 300 (7th Cir. 1978) ...........................................................................30

*Price v. N.Y. State Bd. of Elections*,
    540 F.3d 101 (2d Cir. 2008).............................................................................22

*Reynolds v. Sims*,
    377 U.S. 533 (1964).........................................................................................20

*Shapiro v. Thompson*,
    394 U.S. 618 (1969).........................................................................................27

*Simms v. District of Columbia*,
    872 F. Supp. 2d 90 (D.D.C. 2012) ..................................................................37

*Soltysik v. Padilla*,
    910 F.3d 438 (9th Cir. 2018) ...........................................................................21

*State of Washington v. Trump*,
    No. 1:20-cv-03127 (E.D. Wash. Aug. 18, 2020) .............................................12

*United States v. Windsor*,
    570 U.S. 744 (2013).........................................................................................21

*Utah Republican Party v. Cox*,
   892 F.3d 1066 (10th Cir. 2018) ...........................................................21

*Weinberger v. Wiesenfeld*,
   420 U.S. 636 (1975) ............................................................................20

*Williams v. Rhodes*,
   393 U.S. 23 (1968) ..............................................................................20

*Winter v. Nat'l Res. Def. Council, Inc.*,
   555 U.S. 7 (2008) ..........................................................................20, 37

*Yick Wo v. Hopkins*,
   118 U.S. 356 (1886) ..............................................................................1

**Constitution**

U.S. Const., amend. I ...........................................................20, 30, 38

U.S. Const., amend. V ......................................................................20

U.S. Const., amend. XIV ..................................................................20

**Statutes**

39 U.S.C. § 101(a) .........................................................................4, 27

Ala. Code § 17-11-18 .......................................................................25

Ind. Code Ann. § 3-11.5-4-7 ...........................................................25

La. Stat. Ann. § 18:1308 ..................................................................25

**Regulation**

39 C.F.R. § 121.1 .............................................................................15

## INTRODUCTION

In ordinary years, this Nation depends on the United States Postal Service ("USPS") to timely deliver and return mail-in ballots so voters across the country can exercise the fundamental right to vote, a right "preservative of all rights." *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886). In this extraordinary year, the global COVID-19 pandemic has turned mail-in voting into the only feasible means by which millions of Americans can safely cast their ballots in the November 2020 election.

Forty-three states and the District of Columbia will permit all eligible voters to vote by mail for the November 2020 election.[1]  In five states—Colorado, Hawaii, Oregon, Washington, and Utah—elections are conducted almost entirely by mail.[2]  In total, at least 83% of eligible voters—approximately 190 million people—will have the opportunity to vote by mail-in ballot in the November 2020 election.[3]  Experts conservatively predict that 80 million mail ballots will be submitted, a number that far exceeds any previous election.[4]  Indeed, "[s]ome states anticipate 10 times the normal volume of election mail."[5]

---

[1] Juliette Love, Matt Stevens, & Lazaro Gamio, *Where Americans Can Vote by Mail in the 2020 Election*, N.Y. TIMES (last updated Aug. 14, 2020), https://rb.gy/fwss8l; Gov. Andy Beshear, *State of Emergency Relating to Kentucky Elections* (Aug. 14, 2020), Executive Order, https://www.sos.ky.gov/elections/Documents/2020GeneralElection/EO-GeneralElection.pdf  (expanded eligibility for absentee voting to "[a]ll Kentuckians who are concerned about contracting or spreading COVID-19").

[2] Lisa Lerer, *Washington: Where Everyone Votes by Mail*, N.Y. TIMES (Apr. 15, 2020), https://www.nytimes.com/2020/04/15/us/politics/washington-where-everyone-votes-by-mail.html.

[3] Kate Rabinowitz & Brittany Renee Mayes, *At Least 83% of American Voters Can Cast Ballots By Mail in the Fall*, WASH. POST (Aug. 20, 2020), https://rb.gy/no3arg.

[4] Juliette Love, Matt Stevens, & Lazaro Gamio, *Where Americans Can Vote by Mail in the 2020 Election*, N.Y. TIMES (last updated Aug. 14, 2020), https://rb.gy/fwss8l.

[5] Erin Cox, et al., *Postal Service Warns 46 States Their Voters Could Be Disenfranchised by Delayed Mail-In Ballots*, WASH. POST (Aug. 14, 2020), https://rb.gy/hgssi4 (emphasis added).

The impending flood of mail-in ballots this fall heightens the need for USPS to ensure the timely delivery of election mail.  Remarkably, however, USPS has moved to do the *opposite*:  it has curtailed the services on which mail balloting depends.

A new policy imposed by Postmaster General Louis DeJoy in July 2020 now prohibits previously-common "late" and "extra" mail delivery trips ("Late/Extra Trip Policy" or "Policy"), which are necessary to ensure the timely delivery of mail ballots.  Defendants openly admit that, contrary to past practice, mail will now be left behind on the workroom floor when the delivery trucks depart.  Such left-behind-mail will be delayed by at least one day—and potentially longer.

In the 28 states where ballots must be received—and not merely postmarked—by Election Day, that incremental delay can mean the difference between whether a ballot is counted or not. As many as eight million voters are expected to mail their completed ballots on the last weekend before the election.  Even if the Policy causes just a one-day delay for a relatively small percentage of these ballots, that would result in the disenfranchisement of hundreds of thousands of voters. The Policy could even affect election outcomes.  Many of the 28 states—such as Arizona, Colorado, Florida, Michigan, Pennsylvania, and Wisconsin—are expected to feature closely-contested Presidential and Senate races, and every state will have various state and local elections that are often decided by narrow margins.

By their own admission, Defendants' Policy has made a challenging situation worse.  A report last week by the USPS Inspector General stated that, during the primaries, a million ballots were at "high risk" of not being delivered timely to voters or returned timely to election boards.[6] Indeed, Defendants have openly declared that there is a serious risk that general election ballots

---

[6] Ex. 1, USPS, Office of Inspector Gen., *Processing Readiness of Election and Political Mail During the 2020 General Elections* (Aug. 31, 2020), https://rb.gy/uwdgdo.

will not be received by Election Day if they are not mailed a full week in advance.  Defendants'
new Policy transforms these risks into certainties.

The human implications are clear.  Millions of individuals can reasonably be estimated to
vote by mail on the Saturday before Election Day.  They may have done just that in previous years.
Or wanted to make sure they had the most recent information available before casting their ballots.
Or perhaps were simply too burdened by the tasks of everyday life during the work week to have
time to carefully consider their vote.  Perhaps they were generally familiar with how long it usually
takes for a local First-Class letter to be delivered and assumed that Saturday was safe.  In the lives
of millions, Saturday, October 31 is the day they will open up their mail at the kitchen table and
vote.  But because of the Late/Extra Trip Policy, that vote now faces a significant risk of being
discarded.

Such wide-scale disenfranchisement is not justified by any legitimate government interest.
Indeed, the Policy has actually undermined USPS's statutory mission of providing prompt,
reliable, and efficient service.  And any justification based on cost is belied by the relatively small
impact on the public fisc and Defendants' own insistence they have no need for additional funding.
Every indication suggests that the Policy was driven by the concern that President Trump's deputy
campaign manager articulated two weeks before the Policy was announced: "The president views
vote by mail as a threat to his election."[7]

Plaintiffs Vote Forward, Amy Bolan, Aaron Carrel, Dante Flores-deMarchi, Paul Hunter,
Sebastian Immonen, Kathryn Montgomery, Sean Morrision, Inderbir Singh Datta, Martha
Thompson, Linda Roberson, Gary Young, Voces Unidas de las Montañas ("Voces Unidas"),

---

[7] Bill Whitaker, *How the Coronavirus and Politics Could Impact Voting in the 2020 General
Election*, 60 MINUTES (June 28, 2020), https://rb.gy/feyeay.

Colorado Organization for Latina Opportunity and Reproductive Rights ("COLOR"), and Padres & Jóvenes Unidos file this memorandum in support of their motion for a preliminary injunction against Defendants Postmaster General Louis DeJoy and USPS.  Plaintiffs respectfully request that this Court preliminarily enjoin Defendants and their agents from continuing to implement the new Late/Extra Trip Policy because the Policy imposes undue burdens on Plaintiffs' and other voters' rights to vote in violation of the First and Fifth Amendments.

## STATEMENT OF FACTS

**I.      Defendants' Late/Extra Trip Policy Delays the Delivery of Mail Ballots.**

> **A.      The Late/Extra Trip Policy Causes Mail Delivery Delays of at Least One Day—And Potentially More.**

Consistent with its statutory mandate to ensure the "prompt, reliable, and efficient" delivery of mail, 39 U.S.C. § 101(a), postal workers have historically relied on a combination of on-time, late, and extra trips to ensure timely delivery of mail.  This is true for each step in the mail delivery process, from the sender's local "delivery unit" (the local post office) to a processing facility (called a "plant") to the recipient's local delivery unit (if the mail is not routed first to another processing facility in the network).[8]

Late and extra trips allow mail handlers to delay or supplement their scheduled deliveries to ensure that they have collected and transported all outstanding mail at any given facility.[9] Because mail is continuously received at postal facilities throughout the day, these late and extra

---

[8] *See* USPS, Fiscal Year 2012 Annual Report to Congress at 40 ("2012 Annual Report"), https://rb.gy/ajqric; Ex. 2, USPS, Postal Operations Manual 153, 190 (last updated July 7, 2016) ("Postal Operations Manual"), https://rb.gy/ly52or.

[9] Ex. 3, USPS, Office of the Inspector Gen., *Late and Extra Trips at the Philadelphia, PA, Processing and Distribution Center*, USPS (May 13, 2020), https://rb.gy/xpzqad.

trips ensure that mail is not left behind and is moved expeditiously from facility to facility.[10]   In the second half of 2019 alone, USPS reported 591,140 late trips and 176,940 extra trips from processing facilities to delivery units.[11]

On July 10, 2020, USPS announced a sharp departure from this long-standing practice.   In a document entitled "Mandatory Stand-Up Talk: All Employees," newly-appointed Postmaster General Louis DeJoy announced an "operational pivot" involving numerous "immediate, lasting, and impactful" policy changes.[12]   Explaining that "[e]very single employee will receive this information, no matter what job they perform," the document prescribed the following nationwide policy changes: (i) all "Network, Plant, and Delivery" trips must "depart on time"; (ii) late trips are "no longer authorized or accepted"; (iii) extra trips are "no longer authorized or accepted"; (iv) carriers "must begin on time, leave for the street on time, and return on time;" and (v) "no additional transportation will be authorized to dispatch mail to the Plant after the intended dispatch" (collectively, the "Late/Extra Trip Policy").[13]

Notably, the policy announcement stated that the resulting changes "may be difficult for employees" because "we may see mail left behind or on the workroom floor or docks . . . which is not typical."[14]   The new Policy allowing for piles of mail to be left behind stands in stark contrast

---

[10] *Id.*

[11] *Id.*

[12] Ex. 4, USPS, *Mandatory Stand-Up Talk: All Employees* (July 10, 2020), https://rb.gy/nw4wux.
[13] *Id.*

[14] *Id.*

to USPS's long-standing policy of instructing postal workers *not* to leave letters behind and to make multiple trips as needed to ensure that mail is timely delivered.[15]

The Late/Extra Trip Policy was reaffirmed days later in a USPS PowerPoint presentation entitled "PMGs expectations and plan," which stated that "plants are not to send mail late," and if the "plants are not on time *they will hold the mail for the next day*."[16]  The presentation also reiterated the new policy curtailing late trips by mail carriers, prohibiting mail carriers from leaving "any later" than "0900" (*i.e.*, 9:00 am), and stating that if the delivery units "get mail late and your carriers are gone and you cannot get the mail out without [overtime] *it will remain for the next day*."[17]

This ban on late and extra trips forces rigidity onto a process that requires flexible schedules and a fluid process to deliver mail on time.  There are at least three points in the delivery of completed ballots from the voter to the elections office where the Late/Extra Trip Policy can cause one day of delay.

*First*, after a ballot is delivered to the local post office, a mail handler has to deliver that ballot to a USPS processing plant.[18]  But if the ballot arrives at the local post office after the mail handler has already left for her scheduled trip to the processing plant, the Late/Extra Trip Policy does not allow the mail handler to make an extra trip to deliver the ballot to the processing plant

---

[15] Jacob Bogage, *Postal Service Memos Detail "Difficult" Changes, Including Slower Mail Delivery*, Wash. Post (July 14, 2020), https://rb.gy/orbz1c.

[16] Ex. 5, *Leaked USPS PowerPoint Indicates PMG DeJoy Focus on Getting Operating Costs Under Control*, Alliance of Nonprofit Mailers (July 14, 2020), https://rb.gy/e6edvf ("July 14 USPS PMG Presentation") (emphasis added).

[17] *Id.* (emphasis added).

[18] *See* 2012 Annual Report at 40; Ex. 2, Postal Operations Manual at 153, 190.

that day.[19]  The mail handler must instead wait to deliver the ballot to the processing plant until the next day.

*Second*, once the ballot finally arrives at the processing plant, the mail shipment that contains the ballot must be sorted.  After being sorted, the ballot must be placed on a mail handler's truck for delivery from the processing plant to the elections office's local delivery unit.[20]  But if the ballot is not processed and sorted in time for the mail handler's scheduled departure time from the processing plant, the Late/Extra Trip Policy does not allow the mail handler to wait for all mail to be sorted before departure.  Instead, the mail handler must leave on time regardless of whether all relevant mail has been sorted, and cannot return to retrieve and transport the mail in an extra trip.[21]  Because of the Late/Extra Trip Policy, the ballot will now remain at the processing plant until the next day.[22]

*Third*, once the ballot makes it to the elections office's local delivery unit, a letter carrier has to deliver it to the elections office.[23]  But if the ballot arrives at the voter's local post office after the carrier's trip is scheduled to begin, the Late/Extra Trip Policy forbids the letter carrier from beginning her delivery route late.  Instead, the Late /Extra Trip Policy requires the letter carrier to wait to deliver the ballot until the next day.[24]

---

[19] Ex. 5, July 14 USPS PMG Presentation.

[20] *See* 2012 Annual Report at 40; Ex. 2, Postal Operations Manual at 153, 190.

[21] Ex. 5, July 14 USPS PMG Presentation.

[22] Ex. 4, USPS, *Mandatory Stand-Up Talk: All Employees* (July 10, 2020).

[23] *See* 2012 Annual Report at 40; Ex. 2, Postal Operations Manual at 153, 190.

[24] Ex. 5, July 14 USPS PMG Presentation.

Any given piece of mail is therefore subject to potential delay at each of these three steps (and more, if the mail must go to another processing facility).  Thus, even for local deliveries, the Late/Extra Trip Policy has the potential to delay the mail for up to three days.

**B.    Implementation of the Late/Extra Trip Policy Led to Nationwide Delays in Mail Delivery.**

The delays outlined above are not merely hypothetical.  Defendants' own statements and data, as well as numerous report from postal workers, confirm that the Late/Extra Trip Policy has caused substantial delays in mail delivery.

**1.    Defendants' Statements and Data Confirm Substantial Delays in Delivery Since the Announcement of the Late/Extra Trip Policy.**

On August 24, 2020 DeJoy testified to Congress that he only made "one change" in early July: he "asked the team to run the transportation on time and mitigate extra trips"—*i.e.*, the Late/Extra Trip Policy.[25]  As the USPS chart below shows, this led to an immediate and dramatic decline in "on-time" service scores during the weeks of July 11 and July 18.  And, as of the end of August, the on-time score remained far below what it was prior to DeJoy's implementation of the Late/Extra Trip Policy.

---

[25] Ex. 6, *Postmaster General Louis DeJoy Testimony Transcript August 24: House Oversight Hearing* at 3:49:09, Rev (Aug. 24, 2020), https://rb.gy/vszepr.



This data is especially striking because of the decline in mail volume during the COVID-19 pandemic, "where even though there's less mail, it's moving more slowly—much more slowly."[27]  And the fall in service scores cannot be attributed to personnel shortages caused by the pandemic, as the data show that there was no appreciable drop in on-time scores throughout the early months of the pandemic.  The service scores collapsed only following the announcement of DeJoy's Late/Extra Trip Policy on July 10, 2020.

USPS itself has spelled out the consequence of such delays for election mail.  On July 29, 2020, after DeJoy's policies went into effect and noticeable service delays took place, USPS sent letters to 46 states and the District of Columbia, expressly stating that USPS "cannot guarantee all ballots cast by mail for the November election will arrive in time to be counted."[28]  In particular,

---

[26] USPS, *Congressional Briefing: Transportation & Service Performance Updates* at 9 (Aug. 31, 2020), https://rb.gy/zpiomk.

[27] Congressional Progressive Caucus, *CPC Hearing on Attacks on the US Postal Service* at 1:29:14–1:29:25 (Aug. 20, 2020) (testimony of David Williams), https://rb.gy/uajdtn.

[28] Cox, *supra* note 5 (noting that USPS has "no objection" to the mail-in ballot plans of four states: Nevada, New Mexico, Rhode Island, and Oregon).

USPS suggested that, in states where mail ballots must be received by Election Day, voters should mail completed ballots by October 27, 2020 to arrive on time.

### 2.    Defendants' Public Statements Confirm That the Late/Extra Trip Policy Has Caused Delays.

Since implementing the Late/Extra Trip Policy, Defendants' public statements have repeatedly and consistently confirmed that the policy has caused delivery delays.

- On July 30, 2020, USPS spokesperson David Partenheimer acknowledged in a statement to the Washington Post that USPS's recent changes have resulted in "service impacts."[29]

- On August 13, 2020, in an internal USPS memorandum, DeJoy highlighted that extra trips had been reduced by 71%, and that that delivery slowdowns were "unintended consequences" of his new policies.[30]

- On August 21, 2020, in a hearing before the Senate Homeland Security and Governmental Affairs Committee, DeJoy again admitted that his recent changes are responsible for "some delays in the mail."[31]  Discussing implementation of his Late/Extra Trip Policy, DeJoy testified that "certainly there was a slowdown in the mail—when our production did not meet the schedule"; that "we feel bad about what the dip in our service, the level has been"; and that "we did not [do] as great a job as we should" in recovering from the "imbalances" created by the transition.[32]

- On August 24, 2020, in testimony to the House Oversight Committee, DeJoy reiterated that his new policies were directly responsible for delays in delivery, and

---

[29] Jacob Bogage, *Top Democrats Say Postmaster General Acknowledged New Policies That Workers Say Are Delaying Mail*, WASH. POST (Aug. 6, 2020), https://rb.gy/iiuqrj.

[30] *See* USPS, *Path Forward: PMG Addresses Restructuring* (Aug. 13, 2020), https://rb.gy/y6tbre.

[31] *See* Sam Levine, *USPS Chief Concedes Changes Causing Delays But Won't Restore Sorting Machines*, THE GUARDIAN (Aug. 21, 2020), https://rb.gy/fwtn0v; *see also* EX. 7, *Senate Hearing with Postmaster General Louis DeJoy August 21 Transcript* at 25:52–26:54, Rev (Aug. 21, 2020), https://rb.gy/7vwoyl.

[32] *See generally* EX. 7, *Senate Hearing with Postmaster General Louis DeJoy August 21 Transcript,* Rev (Aug. 21, 2020), https://rb.gy/7vwoyl.

"expose[d] a need to realign some of [USPS's] processing and scheduling that caused mail to miss the scheduled transportation . . . ."[33]

Notably, in his House testimony, DeJoy stated that because "production schedules within the plants were not aligned with the transportation schedules going out," "***about 10% of the mail was not aligned***."[34]  He explained that "[t]he production plants were getting done late, and the trucks were leaving."[35]  In plain English:  the mail was getting processed after the trucks had left— so it had to sit there until the next day.

### 3.    The Experience of Postal Workers Confirms Defendants' Admissions That the Late/Extra Trip Policy Created Delays.

Over the past two months, there have been countless reports from mail handlers across the country that the Late/Extra Trip Policy has directly led to mail delivery delays.  For example:

- Confirming the detrimental impact caused by the "pivot," a postal worker in Tennessee reported that "the new policy will not allow holding a truck for even five minutes so it can be loaded with mail," noting that even "Express Mail and Priority Mail are often left sitting on the docks because trucks have already left."[36]

- In Maine, postal workers reported leaving 80,000 letters behind because they were not permitted to wait 10 minutes for them to be processed.[37]

---

[33] *See* Ex. 8, USPS, *Statement of Postmaster General and Chief Executive Officer Louis DeJoy before the House Committee on Oversight and Reform* (Aug. 24, 2020).

[34] Ex. 6, *Postmaster General Louis DeJoy Testimony Transcript August 24: House Oversight Hearing* at 4:48:14, Rev (Aug. 24, 2020), https://rb.gy/vszepr.

[35] *Id.*

[36] Ben Hall, *Postal Trucks Sometimes Travel Across Country—With No Mail—After USPS Cuts*, AXIOS (Aug. 22, 2020), https://www.newschannel5.com/news/newschannel-5-investigates/postal-trucks-sometimes-travel-across-country-with-no-mail-after-usps-cuts.

[37] Reuben Schafir, *Postal Workers' Union Says Up to 80,000 Letters Were Held Back Monday in Southern Maine*, POSTAL TIMES (updated Aug. 11, 2020), https://rb.gy/8rlwsk.

- In the Midwest, there are "piles of undelivered mail sitting in a Cleveland distribution center" as well as in postal offices around the region.[38]

These anecdotes barely scratch the surface. There have been similar reports of delays in mail service since implementation of the Late/Extra Trip Policy, including in Alabama, California, Colorado, Connecticut, Illinois, Maryland, Michigan, Minnesota, Missouri, Nevada, New Mexico, Ohio, Oregon, Pennsylvania, Rhode Island, South Carolina, Texas, Utah, Vermont, Washington, Wisconsin, and Virginia.[39]

Multiple postal worker unions have affirmed that DeJoy's new policies are severely limiting mail transportation and causing mail to be left at sorting plants for days longer than is typical.[40] The American Postal Workers Union ("APWU"), "which represents more than 200,000 Postal Service employees and retirees, has received a number of reports from postal workers and customers" from mid-July to early August "that mail delivery has slowed and 'degraded.'"[41]

---

[38] Luke Broadwater, *Postal Crisis Ripples Across Nation as Election Looms*, N.Y. TIMES (Aug. 18, 2020), https://rb.gy/nzpxcc.

[39] *See, e.g.*, *State of Washington v. Trump*, No. 1:20-cv-03127 (E.D. Wash. Aug. 18, 2020), https://rb.gy/kgzuht; Andrew Brown & Andrew Miller, *Some SC Businesses Say They are Experiencing Delays Because of US Postal Service Changes*, THE POST AND COURIER (Aug. 14, 2020), https://rb.gy/ajupe6; Ellie Rushing, *Mail Delays are Frustrating Philly Residents, and a Short-Staffed Postal Service is Struggling to Keep Up*, PHILADELPHIA INQUIRER (Aug. 2, 2020), https://rb.gy/aryzbj; Lauren Walsh, *Central Alabama Experiences Some Mail, Package Delays as USPS, UPS Feel COVID-19 Impact*, ABC 33/40 NEWS (Aug. 12, 2020), https://rb.gy/6swim9; Ron Trevino, *USPS Delivery Delays Leave 82-Year-Old Texas Man Without Heart Medication for a Week*, WBNS (updated Aug. 17, 2020), https://rb.gy/5jbgiz; David Manoucheri, *People Wait Weeks, Months for Packages to be Delivered*, KCRA, (Aug. 15, 2020), https://rb.gy/jl5069; Ginna Roe, *Utah Diabetic Waiting for More Than a Week For Supplies By Mail*, KUTV, (Aug. 17, 2020), https://rb.gy/csiruo.

[40] Russell Berman, *What Really Scares Voting Experts About the Postal Service*, The Atlantic (Aug. 14, 2020), https://rb.gy/8khnth.

[41] Jessica Dean, Jessica Schneider, & Caroline Kelly, *Postal Service Says it has "Ample Capacity" to Handle Election After Trump Casts Doubt*, CNN POLITICS (Aug. 3, 2020), https://rb.gy/od2dwp (emphasis added).

According to postal workers, DeJoy's policies have resulted in "delivery delays of *at least two days* across the country."[42]  Specifically, postal workers have reported to APWU that "Monday mail isn't going out until Wednesday and that in some jurisdictions on some days, mail isn't going out at all."[43]  The cause of the delays is clear:  "They're ordering workers to leave mail for another day."[44]  Indeed, at one post office, a postal clerk reports that under these new policies, "some mail is arriving a day later at the processing facility, where it could be delayed again."[45]

### C.  Data on the Reduction in Late/Extra Trips Shows That the Delivery of a Substantial Portion of Mail Ballots Will Be Delayed.

USPS's own data further confirms the importance of late and extra trips to the timely delivery of mail.  As explained in the attached Declaration of Professor Justin Grimmer, in the month before the Late/Extra Trip Policy took effect, late and extra trips comprised 15.5% of all mail delivery trips. Ex. 9, Grimmer Decl. ¶ 11.[46]  The loss in mail delivery capacity resulting from the policy change is revealed by the following data published by USPS on August 31, 2020.

---

[42] *Id.*

[43] Berman, *supra* note 40.

[44] *Id.*

[45] Laura J. Nelson & Maya Lau, *'Like Armageddon': Rotting Food, Dead Animals and Chaos at Postal Facilities Amid Cutbacks*, L.A. Times (Aug. 20, 2020), https://www.latimes.com/california/story/2020-08-20/usps-cutbacks-post-office-chaos.

[46] *See also* Ex. 10, *USPS, Congressional Briefing: Transportation & Service Performance Updates* at 4–6 (Aug. 31, 2020), https://rb.gy/zpiomk.



This chart shows that since the nationwide Late/Extra Trips Policy took effect, the USPS has dropped from an average of 4,193 late trips per day to an average of 1,147 late trips per day, and from an average of 2,260 extra trips per day to average of 606 extra trips per day—reducing, on average, 4,700 trips every day and 32,900 trips per week.  *See* Ex. 9, Grimmer Decl. ¶ 9 & Ex. 2 thereto.  Late and extra trips now comprise only 4.7% of all mail delivery trips.  *Id.* ¶ 11.

## II.     The Delay Created by the Late/Extra Trip Policy Will Disenfranchise Voters.

The delays caused by the Late/Extra Trip Policy will result in the disenfranchisement of hundreds of thousands of voters.  In particular, the Policy will materially burden individuals' right

---

[47] *Id.* at 4.

to vote in the 28 states that require that ballots be received (rather than postmarked) by Election Day.[48]  *See* Ex. 11 (setting out the deadlines for specific states).

Assuming that completed ballots sent by voters are treated at First-Class Mail,[49] USPS regulations provide that the expected delivery time for most First-Class Mail delivered within the 48 contiguous states is 1–3 days.[50]  Absent Defendant's Late/Extra Trip Policy, a voter in one of the 28 states who mailed her completed ballot by First-Class Mail could have voted as late as Saturday, October 31 and, based on the 1–3 day First Class Mail delivery standard, have reasonable assurance that the ballot would arrive by Election Day.  But Defendants' Late/Extra Trip Policy will cause at least an *additional* one-day delay in delivery.

With that delay, ballots placed in the mail on the Saturday before the election are now at risk of being rejected because they were received *after* Election Day.  Millions of voters are expected to put their completed ballot in the mail on October 31, the Saturday before Election Day.

---

[48] These 28 states are Alabama, Arizona, Arkansas, Colorado, Connecticut, Delaware, Florida, Hawaii, Idaho, Indiana, Louisiana, Maine, Michigan, Missouri, Montana, Nebraska, New Hampshire, New Mexico, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Vermont, Wisconsin, and Wyoming.

[49] DeJoy testified before the House and Senate that Election Mail would be treated as First-Class mail. Ex. 7, *Senate Hearing with Postmaster General Louis DeJoy August 21 Transcript* at 37:33, Rev (Aug. 21, 2020), https://rb.gy/7vwoyl.  Note, however, that the guidance that USPS issued to states suggested that blank ballots sent to voters may be treated as Marketing Mail that is subject to a 3–10 day delivery timeline rather than the applicable First Class Mail timeline, *see, e.g.*, Ex. 12, USPS Letter to Pennsylvania at 2 (emphasis added).

[50] Code of Federal Regulations prescribes a 1–3 day timeframe for most mail delivered within the 48 contiguous states.  *See* 39 C.F.R. § 121.1.  Some recent USPS statements indicate that this regulatory requirement may in fact be carried out in practice, *see* USPS, Service Standards Map, https://postalpro.usps.com/ppro-tools/service-standards-maps (current as of July 1, 2020), but a recent USPS OIG report suggests that Election Mail treated as First-Class mail would be subject to a 2–5 day delivery standard.  *See* Ex. 1, USPS, Office of the Inspector Gen., *Processing Readiness of Election and Political Mail During the 2020 General Elections* (Aug. 31, 2020).

Ex. 13, Hersh Decl. ¶ 24.  But because of the Late/Extra Trip Policy, any voter who places their completed ballot in the mail after Friday, October 30 faces a significant risk of not having their vote counted.[51]

The risks of a prejudicial delay are even greater in the subset of these 28 states that have deadlines by which an individual may apply for an absentee ballot that are very shortly before Election Day.  *See* Ex. 11.  Because the Late/Extra Trip Policy creates delays to both the election official's mailing of a blank ballot to the voter *and* the voter's return of the completed ballot, in many cases, voters in 15 states will not receive their blank ballot in time to return it by the state's receipt-by-Election-Day deadline.   For example, Alabama, Maine, and Wisconsin have Application Deadlines of October 29.

Imagine a voter in one of these three states submits their application for a ballot on October 29, in compliance with the state's laws.  Then, assuming that a blank ballot is mailed to the voter that same day, the blank ballot likely would be received by the voter on October 30 or 31.  But just a one-day delay due to Defendants' policies would result in the voter's not receiving her ballot until October 31 or November 1.  As set forth above, a ballot cast on or after October 31 now has a heightened risk of not being received by the end of Election Day.  This dynamic will result in even more disenfranchisement in the eight states that have application deadlines later than October 29.[52]

---

[51] Note that, if the USPS Office of the Inspector General Report's 2–5 day delivery standard is correct, the incremental delay caused by the Late/Extra Trip Policy would likely disenfranchise many voters who put their ballots in the mail *even earlier* than Saturday, October 31.

[52] These eight states are Louisiana, Michigan, and South Carolina (Application Deadline of October 30); and Connecticut, Delaware, New Hampshire, South Dakota, and Wyoming (Application Deadline of November 2).

### III.   The Late/Extra Trip Policy Reflects the Trump Administration's Animosity Toward Voting by Mail.

In the lead-up to the 2020 election, President Trump has repeatedly asserted, without evidence, that voting by mail will lead to millions of fraudulent ballots being cast and will delegitimize the election outcome.[53]   His assault has been relentless, with more than 70 distinct attacks on voting by mail.[54]   And the President has openly stated that he opposes funding USPS as part of the COVID-19 stimulus packages *in order to* frustrate voters' ability to cast ballots by mail.[55]

On March 30, 2020, shortly after massive shutdowns across the country due to the COVID-19 pandemic, President Trump expressed his belief during a media interview that funding for voting by mail would promote "levels of voting that, if you ever agreed to it, you'd never have a Republican elected in this country again."[56]   A week later, he encouraged Republicans to "fight very hard when it comes to statewide voting by mail," asserting that "for whatever reason, [it] doesn't work out well for Republicans."[57]

At the time of those statements, the USPS Board of Governors was actively searching for a new Postmaster General.   The President makes appointments to the Board of Governors, whose

---

[53] *See generally* Amy Gardner, Josh Dawsey, & Paul Kane, *Trump Opposes Election Aid for States and Postal Service Bailout, Threatening Nov. 3 Vote*, WASH. POST (Aug. 13, 2020), https://rb.gy/gerlhf.

[54] *Id.*

[55] *See, e.g.*, Aaron Blake, *Trump Blurts out His True Motive on Mail-in Voting*, WASH. POST (Aug. 13, 2020), https://rb.gy/u6j6n7.

[56] *Id.*

[57] @realDonaldTrump, TWITTER (Apr. 8, 2020, 8:20 AM), https://twitter.com/realdonaldtrump/status/1247861952736526336?lang=en.

members in turn select the Postmaster General.[58]   Reports indicate that Secretary of the Treasury

Steven Mnuchin, as part of his "unprecedented" involvement in Postal Service affairs, played an

active role in selecting new Governors who would be aligned with the Secretary's views on the

selection of a new Postmaster General.[59]

On May 6, 2020, just five weeks after President Trump declared his opposition to mail-in

voting, the Board of Governors announced its "unanimous" selection of DeJoy—"a Republican

Party and Trump campaign megadonor"[60]—as Postmaster General, despite his having never

having worked at USPS.[61]   A few days before the selection was announced, David C. Williams,

the former USPS inspector general, resigned from his role as the Board's vice chairman.[62]

Williams subsequently testified that his resignation was prompted by concerns that the Board,

---

[58] USPS, *About the Board of Governors*, https://about.usps.com/who/leadership/board-governors/ (explaining that up to nine governors appointed by the President with the advice and consent of the Senate in turn select the Postmaster General).

[59] Kenneth P. Vogel et al., *Mnuchin Paved Way for Postal Service Shake-Up*, N.Y. TIMES (Aug. 22, 2020), https://rb.gy/hm9tgh.   For a report on the Board's search, Mnuchin invited two Trump appointees—Board chairman Robert M. Duncan and search committee head John M. Barger—to a meeting at the Treasury Department in early February.  *Id*.  *See also* Testimony of David C. Williams, Congressional Progressive Caucus Ad-Hoc Hearing on the Postal Service (Aug. 20, 2020), https://rb.gy/4b5mvo ("The Treasury Secretary also insisted that all Republican appointees on the Board of Governors and the Postal Regulatory Commission come to his office and kiss the ring, and receive his blessing before confirmation.").

[60] Lucy Tompkins, *Who Is Postmaster General Louis DeJoy?*, N.Y. TIMES (Sept. 2, 2020), https://rb.gy/uir5wk.

[61] Press Release, *Board of Governors Announces Selection of Louis DeJoy to Serve as Nation's 75th Postmaster General*, USPS (May 6, 2020), https://m.npmhu.org/media/news/body/0506-bog-announces-selection-of-louis-dejoy-to-serve-as-nations-75th-postmaster-general.pdf.

[62] Catie Edmondson, *Who Is David C. Williams?*, N.Y. TIMES (Aug. 20, 2020), https://rb.gy/sj7oz5.

which was supposed to be "an independent organization," "had become politicized," with "decision-making [that] was largely transferred to the Secretary of the Treasury."[63]

On June 15, 2020, DeJoy assumed his position as Postmaster General.  By that time, there could be no doubt about President Trump's avowed hostility to voting by mail.  Indeed, on June 28, 2020, Trump campaign senior counsel Justin Clark (who is now President Trump's deputy campaign manager) drove the point home in an interview on CBS, confirming the underlying rationale: "***The president views vote by mail as a threat to his election***."[64]  Twelve days later, DeJoy announced the Late/Extra Trips Policy.

Though DeJoy has defended his policy change as being justified by funding shortfalls, President Trump's public statements have revealed this assertion to be mere pretext.  The President has opposed stimulus package funding for USPS precisely *because* it would facilitate voting by mail.[65]  On August 13, 2020, in a Fox Business Network interview, President Trump explained: "They want three and a half billion dollars for the mail-in votes.  Universal mail-in ballots.  They want $25 billion, billion, for the Post Office.  Now they need that money in order to make the Post Office work so it can take all of these millions and millions of ballots. . . .  But if they don't get those two items that means you can't have universal mail-in voting because you *[sic]* they're not equipped to have it."[66]

---

[63] Testimony of David C. Williams, Congressional Progressive Caucus Ad-Hoc Hearing on the Postal Service at 33–34 (Aug. 20, 2020), https://rb.gy/4b5mvo.

[64] Bill Whitaker, *How the Coronavirus and Politics Could Impact Voting in the 2020 General Election*, 60 MINUTES (June 28, 2020), https://rb.gy/feyeay.

[65] *See* Aaron Blake, *Trump Blurts out His True Motive on Mail-in Voting*, WASH. POST (Aug. 13, 2020), https://rb.gy/u6j6n7.

[66] Ellie Kaufman et al., *Trump Says He Opposes Funding USPS Because of Mail-In Voting*, CNN (Aug. 13, 2020), https://rb.gy/fqhhjo.

**ARGUMENT**

"To secure a preliminary injunction, a plaintiff 'must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest.'" *Jubilant DraxImage Inc. v. United States Int'l Trade Comm'n*, 396 F. Supp. 3d 113, 119–20 (D.D.C. 2019) (quoting *Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). Here, all four points favor issuing the requested preliminary relief.

**I.     Plaintiffs Are Likely to Succeed on the Merits of Their Claim That Defendants' Late/Extra Trip Policy Imposes an Unconstitutional Burden on the Right to Vote.**

Plaintiffs are likely to succeed on the merits of their First and Fifth Amendment claim that Defendants' Late/Extra Trip Policy imposes an unconstitutional burden on the fundamental right to vote.  The United States Constitution guarantees that "all qualified voters have a constitutionally protected right to vote . . . and to have their votes counted." *Reynolds v. Sims*, 377 U.S. 533, 554 (1964).  This fundamental right to vote is rooted in "the right of individuals to associate for the advancement of political beliefs, and the right of qualified voters, regardless of their political persuasion, to cast their votes effectively." *Williams v. Rhodes*, 393 U.S. 23, 30 (1968).

These protections are typically articulated as First and Fourteenth Amendment rights in suits against state actors.  *See Anderson v. Celebrezze*, 460 U.S. 780, 787 (1983); *Burdick v. Takushi*, 504 U.S. 428, 434 (1992).  Here, the First and Fifth Amendments provide the same guarantees and forbid the federal government from imposing undue burdens on the right to vote: First Amendment claims are available against federal agencies, *see Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205 (2013).  The Supreme Court has explained that its "approach to Fifth Amendment equal protection claims has always been precisely the same as to equal protection claims under the Fourteenth Amendment." *Weinberger v. Wiesenfeld*, 420 U.S.

636, 638 n.2 (1975); *United States v. Windsor*, 570 U.S. 744, 774 (2013).  Accordingly, the same *Anderson-Burdick* framework has been applied in lawsuits brought against non-state government actors.  *See Libertarian Party v. D.C. Bd. of Elections & Ethics*, 682 F.3d 72, 73 (D.C. Cir. 2012) ("The Supreme Court's decision in *Burdick v. Takushi*, 504 U.S. 428, 112 S.Ct. 2059, provides the framework for our analysis.").

Under the *Anderson-Burdick* framework, courts "must first consider the character and magnitude of the asserted injury" to the plaintiffs' right to vote against "the precise interests put forward by the [government] as justifications for the burden imposed[,]" including "the legitimacy and strength of each of those interests" and "the extent to which those interests make it necessary to burden the plaintiff's rights." *Anderson*, 460 U.S. at 789.  "When a voter's rights are 'subjected to severe restrictions,'" those restrictions must survive strict scrutiny.  *Libertarian Party*, 682 F.3d at 74 (quoting *Burdick*, 504 U.S. at 434).  That is, they "'must be narrowly drawn to advance a state interest of compelling importance.'"  *Id.*  When the challenged restrictions impose "only 'reasonable, nondiscriminatory restrictions' upon the constitutional rights of voters, 'the [government's] important regulatory interests are generally sufficient to justify the restrictions.'" *Id.*  For restrictions that fall in between those two extremes, the *Anderson-Burdick* framework operates as a "sliding scale" test, "where the more severe the burden, the more compelling the [government]'s interest must be."  *Soltysik v. Padilla*, 910 F.3d 438, 444 (9th Cir. 2018); *see also Fusaro v. Cogan*, 930 F.3d 241, 257–58 (4th Cir. 2019); *Utah Republican Party v. Cox*, 892 F.3d 1066, 1077 (10th Cir. 2018).  Even restrictions imposing "slight burdens" must be "justified by relevant and legitimate [government] interests 'sufficiently weighty to justify the limitation.'" *Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 191 (2008) (citations omitted).

Defendants' Late/Extra Trip Policy seriously restricts Plaintiffs' and other voters' right to vote and to have their ballots counted.  For Plaintiffs and other voters in any of the 28 states that require mail ballots to be received by Election Day, the Late/Extra Trip Policy materially burdens the right to vote, and USPS's justifications for nonetheless implementing the Policy do not outweigh this burden.  For Plaintiffs and other voters for whom voting by mail is the *only* option— those voters at high health risk due to COVID-19 and those voters who have disabilities—the burden on voting is even greater: it is severe.  USPS's interest in implementing policies affecting these voters does not survive strict scrutiny.  In sum, any interest USPS has in implementing the Late/Extra Trip Policy during a public health crisis and a general election in which millions of eligible voters are expected to vote by mail does not justify the burden imposed on Plaintiffs and other voters.

**A.      Defendants' Late/Extra Trip Policy Severely Burdens the Right to Vote.**

**1.      The Right to Vote Deserves Protection Against Undue Delay in the Delivery of Ballots.**

It is well established that laws, rules, or policies that may disenfranchise otherwise eligible voters impose an undue burden on the right to vote.  *See, e.g.*, *Obama for Am. v. Husted*, 697 F.3d 423, 433 (6th Cir. 2012) (finding the "ability to cast a ballot [] impeded by" Ohio's elimination of in-person early voting during the three-day period before Election Day because "early voters tend to be members of demographic groups that may be unable to vote on Election Day or during the workday at local boards of elections because of work schedules"); *Price v. N.Y. State Bd. of Elections*, 540 F.3d 101, 109 (2d Cir. 2008) (observing "[i]t cannot be disputed that" a law prohibiting absentee ballots during county committee elections "would impose a substantial burden on voters physically unable to attend a polling station because they are hospitalized, homebound, or incarcerated"); *League of Women Voters of Fla., Inc. v. Detzner*, 314 F. Supp. 3d

1205, 1225 (N.D. Fla. 2018) (preliminarily enjoining Florida's Secretary of State from implementing or enforcing an early voting statute in a way that prohibited early voting at facilities related to, designed for, or affiliated with colleges or universities because the Secretary's prior ban on early voting in such facilities unduly burdened the voting rights of college students); *Doe v. Walker*, 746 F. Supp. 2d 667, 679–80 (D. Md. 2010) ("By imposing a deadline which does not allow sufficient time for absent uniformed services and overseas voters to receive, fill out, and return their absentee ballots, the state imposes a severe burden on absent uniformed services and overseas voters' fundamental right to vote.").

Courts have also found that a delivery delay may burden the right to vote.  As one court put it, a delay in delivery can mean that a "voter's right to vote . . . may hinge on random chance," with two ballots mailed at the same time, at different post offices, whether either vote is counted depends "entirely on the speed at which their local post office delivered their votes."  *Gallagher v. N.Y. State Bd. of Elections*, No. 20 Civ. 5504 (AT), 2020 WL 4496849, at *19–20 (S.D.N.Y. Aug. 3, 2020).  And the government cannot overlook or dismiss a "systemic problem that arbitrarily renders [thousands of] ballots invalid."  *Id.* at *17.

### 2. Statistical Evidence Demonstrates that the Late/Extra Trip Policy Imposes a Substantial Burden on Plaintiffs' Right to Vote.

As described above, the Late/Extra Trip Policy has significantly reduced USPS capacity, cutting 4,700 late and extra trips every day, which amounts to a reduction of an average of 32,900 trips per week.  *See* Ex. 9, Grimmer Decl. ¶ 9 & Ex. 2 thereto.  These late and extra trips formerly comprised 15.5% of all trips, and slashing them will hinder USPS's ability to deliver the mail on time.

In the context of the November 2020 election, where experts conservatively estimate that 80 million people are expected to vote by mail, this potential for delay is no small matter.  *See* Ex.

13, Hersh Decl. ¶ 14.  And for individuals who vote on the weekend before Election Day, the risk is particularly severe, because even a one-day delay can disqualify their ballot from counting. Given that between 3.7 and 9.3 percent of all individuals who vote by mail are expected to cast their ballot on the Saturday before the election, the range of potentially prejudiced voters is reasonably estimated to be on the order of three to eight million.  *Id.* ¶¶ 21–23.  Even if just five percent of these voters' ballots are delayed by the Late/Extra Trip Policy, that amounts to hundreds of thousands of voters who will be disenfranchised.

3. **The Right to Vote Is Burdened Under the Laws of the Specific States in Which Individual Plaintiffs Intend to Vote and In Which Organizational Plaintiffs Operate.**

The delay inflicted by the Late/Extra Trip Policy clearly burdens the right to vote in the 28 states that require mail ballots to be received by Election Day.  In a state like Colorado—where Plaintiffs Voces Unidas, COLOR, and Padres & Jóvenes Unidos strive to engage Latinx voters, and where thousands of members of COLOR and Padres & Jóvenes Unidos reside and vote—if a voter mails her completed ballot on the Saturday before Election Day, even just a one-day delay in mail delivery significant increases the risk of the ballot being rejected as untimely.  And a delay of just two days would make disenfranchisement a certainty.  This scenario is likely to play out in all 28 receipt-by-Election-Day deadline states—including Wisconsin (where Plaintiff Aaron Carrel resides and votes), Texas (where Plaintiff Dante Flores-deMarchi plans to vote), and Maine (where Plaintiff Martha Thompson plans to vote).  Thus, USPS's Policy seriously risks disenfranchising eligible voters.

Voters in Alabama and Indiana are likely to suffer even higher rates of disenfranchisement attributable to Defendants' Policy because their ballots must be received *by noon* on Election

Day.[67] And in Louisiana, mail ballots must be received on the day *before* the election.[68] Defendants' Policy thus places Louisiana voters—including Plaintiff Kathryn Montgomery—at an especially high risk of not having their votes counted.

These burdens will be further exacerbated in states that have Application Deadlines of October 29th or later.  Several individual Plaintiffs reside in these states, including Aaron Carrel (Wisconsin), Martha Thompson (Maine), and Kathryn Montgomery (Louisiana).  As set forth above, if each of them exercised their right to request a ballot by the applicable state deadline, they would not likely be able to mail their ballots until October 31, resulting in a significant risk that their completed ballots would not be received by the close of Election Day.

### 4. The Late/Extra Trip Policy Imposes A Severe Burden on Voters for Whom Voting By Mail Is Their Only Option.

The Late/Extra Trip Policy will have a particularly severe impact on two groups of voters.

*First*, the Policy will severely burden voters for whom COVID-19 poses an especially high health risk—and, in turn, for whom voting in person poses a risk of serious illness or death— because they have no alternative to effectuate their right to vote.  This includes older voters, voters with underlying medical conditions, and voters from racial and ethnic minority groups that the CDC has found to have a disproportionately high incidence of such co-morbidities.[69]

*Second*, the Late/Extra Trip Policy will severely burden voters with disabilities who cannot physically get to the polls at all, and would thereby rely on mail-in ballots even outside the strictures of the pandemic.

---

[67] Ala. Code § 17-11-18; Ind. Code Ann. § 3-11.5-4-7.

[68] La. Stat. Ann. § 18:1308 (mailed ballots must be received by day before election at 4:30 p.m.).

[69] CDC, *Coronavirus Disease 2019 (COVID-19): People With Certain Medical Conditions* (last updated Aug. 14, 2020), https://rb.gy/lwbqlw; CDC, *Health Equity Considerations and Racial and Ethnic Minority Groups* (last updated July 24, 2020), https://rb.gy/kvoquz.

**B.      Defendants' Interests In Maintaining the Late/Extra Trip Policy Do Not
Justify the Burden Imposed on Voters.**

Postmaster General DeJoy has offered two rationales for his sudden "operational Pivot"
in June: efficiency and cost.  Neither claimed interest justifies the burden Defendants' policy
imposes on voting rights.  Moreover, these proffered justifications are mere pretext for a policy
that is *designed* to impose a burden on voting rights.  The President has made clear that he views
mail-in voting as a threat to his re-election prospects, and both he and DeJoy have opposed the
very funding that could address Defendants' purported cost concerns.

### 1.      The Efficiency Rationale Does Not Bear Scrutiny.

In his recent Congressional testimony, DeJoy claimed that his Late/Extra Trip Policy was
intended to improve efficiency by ensuring that "the trucks leave on time": "Theoretically,
everyone should have got their mail faster. . . . [t]he analysis that we did was that if we move the
mail on schedule that all late deliveries would have been improved."[70]

In practice, the opposite happened.  On-time delivery performance immediately, and
sharply, deteriorated between early July and early August, as the Late/Extra Trip Policy came into
effect.[71]  DeJoy has conceded that his Late/Extra Trip Policy impacted overall service levels,
causing a "slowdown in the mail" and "dip in our service."[72]  Contrary to his later testimony, these
inefficiencies did not come as a surprise.  The "Mandatory Stand-Up Talk" announcing the policy
change expressly anticipated that "delayed mail volumes" would result, and that it "may be

---

[70] Ex. 7, *Senate Hearing with Postmaster General Louis DeJoy August 21 Transcript* at 1:22:42–
44.

[71] *See supra* pp. 8–14.

[72] Ex. 7, *Senate Hearing with Postmaster General Louis DeJoy August 21 Transcript* at 31:58,
45:46

difficult for employees" to "see mail left behind or mail on the workroom floor or docks . . . , which is not typical."[73]

The Policy change was expected to—and did in fact—undermine the ability of the Postal Service to fulfill its statutory duty to provide "prompt, reliable, and efficient services to patrons in all areas."  39 U.S.C. § 101(a).  That change cannot plausibly be justified on the basis of efficiency. Even if service disruptions caused by the Late/Extra Trip Policy eventually prove to be temporary—and to date, there is no evidence that they will—there is no reason to believe that the resulting burdens on voting rights are necessary or even reasonable, especially when incurred during the run-up to an election in which voting by mail will play such a prominent role.

### 2.    The Cost-Savings Justification Does Not Bear Scrutiny.

With respect to cost, DeJoy has emphasized the budgetary challenges faced by USPS and the need to enact policies with "a positive impact on cost savings that improved the business."[74] But any supposed cost savings from the Late/Extra Trip Policy cannot justify the burden on voting rights for three reasons.

*First,* while the government of course may take action to preserve the public fisc, it must not seriously burden fundamental rights, including the right to vote, in pursuing that objective. *See, e.g.*, *Shapiro v. Thompson*, 394 U.S. 618, 633 (1969) (recognizing that the government "has a valid interest in preserving the fiscal integrity of its programs," but "may not accomplish such a purpose by" violating its citizens' fundamental rights); *Common Cause Ind. v. Marion Cty. Election Bd.*, 311 F. Supp. 3d 949, 972 (S.D. Ind. 2018) (concluding that the government "cannot, of course, defeat every constitutional challenge to voting restrictions, no matter how capriciously

---

[73] Ex. 4, USPS, *Mandatory Stand-Up Talk: All Employees* (July 10, 2020).

[74] Ex. 7, *Senate Hearing with Postmaster General Louis DeJoy August 21 Transcript* at 24:17.

enacted, on the plea that fewer voters mean cheaper elections"), *vacated and remanded on mootness grounds*, 925 F.3d 928 (7th Cir. 2019).

*Second,* to the degree that cost can be considered, the claimed savings—viewed in context of overall USPS operations—are *de minimis*, especially over the brief period leading up to the election.  DeJoy's policy announcement indicated that late and extra trips cost USPS "around $200 million in added expenses."[75]  Even on an annual basis, that cost is less than one-third of one percent of the agency's 2019 operating revenue of $71.1 billion.[76]  But over the relevant two-month period from mid-September to mid-November, the cost savings is only $33 million— approximately 0.05% of USPS's annual revenue.  In defending his policy change before Congress, DeJoy asked in exasperation: "Am I the only one in this room that understands we have a $10 billion a year loss?"[77]  The more important question is whether DeJoy understands that his Pivot's claimed savings of $33 million over two months will make *no* material dent in that deficit.

*Third,* as DeJoy's recent congressional testimony confirms, the short-term financial position of USPS—through the 2020 election and into 2021—is sound.  Senator Johnson noted before DeJoy's testimony that "[d]ue to a surge in package delivery rather than being down the Postal Service's revenue is actually $1.5 billion higher this year than during the same period last

---

[75] Ex. 4, USPS, *Mandatory Stand-Up Talk: All Employees* (July 10, 2020).

[76] USPS, Press Release, U.S. Postal Service Reports Fiscal Year 2019 Results (Nov. 14, 2019), https://about.usps.com/newsroom/national-releases/2019/1114-usps-reports-fiscal-year-2019-results.htm.

[77] Ex. 14, *House Oversight and Reform Committee Holds Hearing on Postal Service Operational Changes*, CQ Transcripts (Aug. 24, 2020), https://rb.gy/t8xbxx.

year."[78]  And in the House, Representative Comer emphasized that with "nearly $15 billion cash on hand," USPS "can operate until at least August of 2021."[79]  Notably, DeJoy did not dispute these claims.  Instead, he affirmed that USPS has "plenty of operating capital right now to get through November, yes, and handle the election."[80]  Needless to say, it is difficult to reconcile DeJoy's embrace of the urgent need to drive costs out and "increase revenue"[81] with his opposition to any short-term funding from Congress.

### 3.    The Refusal To Accept Additional Funding While Insisting on Cost Cutting Demonstrates a Desire To Frustrate Mail Balloting.

It appears that the real objective of the Late/Extra Trip Policy is to frustrate the mail-in voting process at the very moment when it is critical to ensure the right to vote.  As noted above, since the end of March, President Trump has repeatedly made clear that he opposes voting by mail because he believes that it would be politically disadvantageous.  *See supra* 17–19.  Indeed, President Trump opposes any increase in USPS funding precisely because he believes "they need that money in order to make the Post Office work so it can take all of these millions and millions of ballots."[82]

Postmaster General DeJoy shares President Trump's opposition to short-term Congressional funding, claiming that no additional funding is necessary for the agency to operate

---

[78] Ex. 15, *Senate Homeland Security and Governmental Affairs Committee Hearing on USPS Operations During COVID-19 and the Elections*, CQ Transcripts (Aug. 21, 2020), https://rb.gy/qnt654.

[79] Ex. 14, *House Oversight and Reform Committee Holds Hearing on Postal Service Operational Changes*.

[80] *Id.*; *see also* Ex. 15, *Senate Homeland Security and Governmental Affairs Committee Hearing*.

[81] Ex. 14, *House Oversight and Reform Committee Holds Hearing on Postal Service Operational Changes*.

[82] Ellie Kaufman et al., *Trump Says He Opposes Funding USPS Because of Mail-In Voting*, CNN (Aug. 13, 2020), https://rb.gy/fqhhjo.

through the November election.  Yet at the same time—purportedly on the basis of cost concerns—DeJoy has imposed and declined to suspend a Late/Extra Trip Policy that will burden the fundamental right to vote by risking unnecessary delays in the delivery of mail-in ballots.  Absent another plausible justification, DeJoy's insistence on maintaining the Late/Extra Trip Policy and his opposition to additional funding from Congress appear to be driven by the President's political calculations.

## II.     Plaintiffs Will Suffer Irreparable Harm Without a Preliminary Injunction.

### A.     A Concrete Threat To the Right to Vote Constitutes Irreparable Injury to Individual Plaintiffs.

Absent an injunction that prevents Defendants from implementing the Late/Extra Trip Policy, the individual Plaintiffs and organizational Plaintiffs' members will suffer the irreparable harm of an undue burden on their constitutional right to vote.  Specifically, absent an injunction, the Late/Extra Trip Policy will continue to cause delays through Election Day that will effectively disenfranchise individual voters.  Defendants have made it clear, through their testimony to Congress, that they intend to continue implementing the Late/Extra Trip Policy.[83]

Courts have found that even a *threatened* "loss of First Amendment rights, for even minimal periods of time, unquestionably constitutes irreparable injury."  *Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507, 520–21 (4th Cir. 2002); *see also Preston v. Thompson*, 589 F.2d 300, 303 n.3 (7th Cir. 1978) ("The existence of a continuing constitutional violation constitutes proof of an irreparable harm."); *Elrod v. Burns*, 427 U.S. 347, 373, (1976) (where plaintiff had proven a probability of success on the merits, the threatened loss of First Amendment freedoms "unquestionably constitutes irreparable injury"); *Common Cause/Ga. v. Billups*, 406 F. Supp. 2d

---

[83] *See* Ex. 6, *Postmaster General Louis DeJoy Testimony Transcript August 24: House Oversight Hearing* at 3:49:09.

1326 (N.D. Ga. 2005) (granting a motion enjoining the state of Georgia from applying its photo ID requirement because it unduly burdened the fundamental right to vote).

Here, the threat is clear and immediate.  This was reiterated as recently as August 31, 2020, when Defendants advised Congress that they do not intend to halt Late/Extra Trip Policy despite the evidence of its negative effect on service performance.[84]  An injunction is therefore necessary to prevent Defendants from implementing the Late/Extra Trip Policy.

> **B.**     **Plaintiffs in This Case Will Suffer an Irreparable Injury To Their Right to Vote.**

As detailed below, each individual Plaintiff has a sound reason to mail their ballot on a day that is close to the election.  For each of the individual Plaintiffs, however, doing so puts them at risk that their vote will not be counted.  In particular, absent the Late/Extra Trip Policy, a ballot placed in the mail on Saturday, October 31, that was given First-Class treatment would have likely arrived at its destination by November 3.  But even assuming just a one-day delay, the voter cannot be assured that their ballot will arrive by Election Day.

> **1.**     **The Individual Plaintiffs Will Suffer Irreparable Injury.**

*Plaintiff Aaron Carrel* resides and votes in Wisconsin.  Ex. 16, Decl. of A. Carrel, ¶ 1. Wisconsin has an Application Deadline of October 29 and a receipt-by-Election Day deadline for completed ballots.  Mr. Carrel requested his absentee ballot for the general election on July 2, 2020, but he has not yet received it.  *Id.* ¶ 4.  He intends to vote by mail close to Election Day, perhaps on the weekend before Election Day, because he is undecided about who to vote for in his local congressional race and wants time to fully understand the candidates' positions.  *Id.* ¶¶ 8–9. During the primaries, Mr. Carrel mailed his ballot in several weeks ahead of the deadline but

---

[84] Ex. 10, USPS, *Congressional Briefing: Transportation & Service Performance Updates* at 5.

subsequently regretted his vote when he learned about the candidates' position towards social justice events that erupted in the state over the summer. *Id.* ¶¶ 5–7. If Mr. Carrel casts his vote on the Saturday before Election Day, October 31, he would likely be disenfranchised as a result of Defendants' Policy. The Late/Extra Trip Policy therefore forces Mr. Carrel to choose between mailing his vote earlier and risk casting a vote he may later regret, or casting a vote he is sure about later in time at the risk of being disenfranchised.

*Plaintiff Martha Thompson* is a resident of Maine. Ex. 17, Decl. of M. Thompson, ¶ 1. Maine has a receipt-by-Election Day deadline. Ms. Thompson is a college student who is spending the fall semester working at organic farms in various states across the country. *Id.* ¶ 4. She intends to vote by mail regardless of whether she is back in Maine or in a different state, due in part to the uncertainties of where she will be in October. *Id.* ¶ 6. She intends to vote close to Election Day due to these uncertainties, and because she is unsure when she will receive the absentee ballot that she requested.

*Plaintiff Katheryn Montgomery* is an 81-year-old resident of Louisiana. Ex. 18, Decl. of K. Montgomery, ¶ 1. Ms. Montgomery requested her absentee ballot but has not yet received it. She prefers to vote in person because she likes to mingle with her friends and neighbors at the polling place. *Id.* ¶ 2. This year, Ms. Montgomery intends to vote by mail because she is concerned about potential exposure and contraction of COVID-19. Given her age, she believes that she is at a higher risk of developing severe complications if she were to contract the virus. *Id.* ¶ 4. Ms. Montgomery believes she will have to wait until closer to Election Day to mail her ballot because there is a very important race for District Attorney in her parish, and she understands that the candidates' positions will likely evolve and be revealed as the race progresses. *Id.* ¶ 5. The

deadline for receipt of a mail-in ballot in Louisiana is 4:30 p.m. on November 2, one day before Election Day.

*Plaintiff Sebastian Immonen* is a registered voter of Pennsylvania and is currently a college student living in Rhode Island.  Ex. 19, Decl. of S. Immonen,  ¶¶ 1–2.  He has not yet requested his ballot because there is a possibility his college will close, and he will be forced to go home if COVID-19 cases spike as students continue to move on campus.  He understands that he has until October 27th to request his ballot, and he wants to wait until he has more certainty about where will be so he can request the ballot and have it arrive at the correct address.  *Id.* ¶ 3.  Because he will be unable to request his ballot until he has certainty about where he will be living, he may be unable to return a completed ballot until close to Election Day.  *Id.* ¶¶  3–4.  Even if his college closes and he has to return home, Mr. Immonen intends to vote by mail because he is concerned that voting in person will place his family at risk of contracting COVID-19.  His family is caring for his grandmother and his grandfather, who is in the hospital, so he does not want to place them at risk by having to be in close proximity to other people at a polling place.  *Id.* ¶ 6.  Pennsylvania has a receipt-by-Election Day deadline.

*Plaintiff Amy Bolan* is a resident and registered voter of Hawaii.  She usually votes by mail because it gives her greater flexibility in researching candidates and ballot initiatives.  Ex. 20, Decl. of A. Bolan, ¶ 2.  Hawaii has a receipt-by-Election Day deadline.  She intends to mail her ballot close to Election Day, possibly the weekend before the election, because she wants time to research the many local candidates and issues on the ballot.  She relocated back to Hawaii recently after attending school on the mainland, so she is less familiar with the local races and issues as she was in the past.  *Id.* ¶ 5.

Plaintiff InderBir Datta is a resident and registered voter of Oregon.  Ex. 21, Decl. of I. Datta, ¶ 2.  Oregon is conducting the election primarily by mail and has a receipt-by-Election Day deadline.  Mr. Datta intends to mail his completed ballot close to Election Day, on October 27th or October 28th at the earliest.  *Id.* ¶ 4.  He is concerned about a number of issues and ballot initiatives that will be on the ballot, such as local tax measures, and he needs time to fully understand the impact of each initiative and proposal.  *Id.*  Furthermore, he wants to have as much information as possible before casting a vote for any particular candidate due to the nature of evolving local and state elections.  Thus, he wants to wait to mail his ballot until he has all the information he needs to make decisions on how to vote.  *Id.*

### 2.     Impairment to an Organization's Mission and Programs Constitutes Irreparable Injury.

An organizational plaintiff seeking a preliminary injunction must make two showings to demonstrate irreparable harm.  First, the harm must be "certain and great," "actual and not theoretical," and so "imminen[t] that there is a clear and present need for equitable relief to prevent irreparable harm."  Second, the harm "must be beyond remediation."  *League of Women Voters of United States v. Newby*, 838 F.3d 1, 7–8 (D.C. Cir. 2016) (granting preliminary injunction where organizational plaintiff's goal to register voters was impaired by the state's proof-of-citizenship requirement).  An organization is harmed if the "actions taken by [the defendant] have 'perceptibly impaired' the [organization's] programs."  *Fair Emp't Council of Greater Wash., Inc. v. BMC Mktg. Corp.*, 28 F.3d 1268, 1276 (D.C. Cir. 1994) (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)); *see also Nat'l Treasury Emps. Union v. United States*, 101 F.3d 1423, 1430 (D.C. Cir. 1996) (explaining that the initial question is whether "a defendant's conduct has made the organization's *activities* more difficult").  If so, the organization must then also show that the

defendant's actions "directly conflict with the organization's mission."   *Nat'l Treasury Emps. Union*, 101 F.3d at 1430.

Here, Defendants' Policy directly conflicts with the mission, goals, and get-out-the vote programs of the organizational Plaintiffs, including Vote Forward and Voces Unidas.  The Policy has caused Plaintiffs to redirect their limited resources, which includes both their labor and their funds, to address challenges caused by Defendants' Policy that were unforeseen.  For the same reasons discussed, *see infra* pp. 35–37, the threat is clear and immediate.  Absent an injunction, Defendants will not cease implementation of the Late/Extra Trip Policy and the organizational Plaintiffs' activities and programs will continue to be impaired.

### 3.   Organizational Plaintiffs in this Case Will Suffer an Irreparable Injury.

*Plaintiff Vote Forward* is a non-profit organization whose core mission is to empower grassroots volunteers to help register voters from traditionally underrepresented communities and encourage them to vote.  Ex. 22, Decl. of Vote Forward, ¶ 2.  As part of its 2020 get-out-the-vote ("GOTV") goal, Vote Forward aims to send 10 million hand-written letters to potential voters in a number of states in late October, *i.e.*, close to Election Day.  *Id.*  ¶¶ 5–6.  Vote Forward's mailing campaign has a particular emphasis on sending GOTV messages close to Election Day because prior experiments—including experiments by Vote Forward—have shown that GOTV messages are not effective at increasing voter turnout if sent too early in the election cycle.  *Id.* ¶ 6.

The delays caused by USPS's Policy, however, have frustrated Vote Forward's mission of increasing voter turnout by forcing Vote Forward to move up its timeline for mailing GOTV letters—contrary to its goal of mailing out letters to potential voters close to Election Day.  *Id.* ¶¶ 7–8.  Indeed, Defendants' Policy raises a serious risk that Vote Forward's letter-writing

campaign to increase voter turnout close to Election Day will be severely limited in its effectiveness. *Id.* ¶ 8.

Moreover, in response to USPS's Policy, Vote Forward has diverted resources to respond to an influx of inquiries of volunteers regarding USPS's mailing delays and to assess whether sending out GOTV letters earlier than planned would negatively impact the effectiveness of Vote Forward's letter-writing campaign. *Id.* ¶ 9. Specifically, Vote Forward has launched two programs in response to Defendant's Policy. One program, "Mailbox-to-Mailbox: Assessing USPS," aims to quantify the mailing delays associated with Defendant's policies. *Id.* ¶ 10. The other program, a controlled experiment in Florida, seeks to ascertain the differential impact on voter turnout if GOTV letters are sent one week versus three weeks prior to an election. *Id.* ¶ 11.

*Plaintiff Voces Unidas* is a non-profit organization dedicated to increasing civic engagement of the Latino population in three rural Colorado counties. For the November election, Voces Unidas is mounting get-out-the-vote campaigns. Ex. 23, Decl. of Voces Unidas, ¶¶ 1–2. The delays caused by USPS's Policy have frustrated the organization's goals and have caused it to redirect its limited resources to tackle the challenges caused by the Policy. Specifically, the delays caused by the Policy have eroded the Latino communities' trust in USPS because the communities have already experienced delays in receiving essential items by mail. *Id.* ¶ 5. If people believe their ballot will be delayed and will not be counted, they will not take the time and effort to cast a ballot in the first place. *Id.*

As a result, Voces Unidas will be spending additional time and resources to rebuild the communities' trust in USPS and the electoral process. *Id.* ¶ 6. Worse, the delays caused by the Policy have shortened the timeline that Voces Unidas previously thought it had to complete its campaigns. *Id.* ¶ 7. Indeed, as an organization that is effectuating a get-out-the-vote campaign in

one of the five states that conduct its election primarily by mail (Colorado), the Late/Extra Trip Policy imposes a serious burden on their activities, which now includes redirecting its time and resources to initiate outreach and canvassing efforts earlier than anticipated and in a more intense manner in order to encourage people who were previously used to voting close to Election Day to mail out their ballot much earlier.  *Id.*

In order to address the challenges caused by USPS's Policy, Voces Unidas calculates that it will need to spend $50,000 to $80,000 in addition to its original budget in order to be effective. *Id.* ¶ 8.  The organization will spend this additional money on additional canvassers to intensify the campaign earlier than previously anticipated and to pay for additional advertising and dissemination of information to the communities it serves.  *Id.*  Voces Unidas believes these additional resources are necessary in order to effectively restore people's confidence in USPS and also convince people that they need to mail their completed ballot out earlier in order to ensure their votes will be counted.

III.     **The Public Interest and the Balance of Equities Weighs in Favor of A Preliminary Injunction.**

Courts considering a request for a preliminary injunction also evaluate whether the balance of equities and public interest favor the requested relief.  *See Winter*, 555 U.S. at 20.  When the Government is the party opposing the injunction, the two factors "merge."  *Nken v. Holder*, 556 U.S. 418, 435 (2009).

Here, a preliminary injunction is without question in the public interest.  Although the government generally has an interest in carrying out its authorized functions, *see Banks v. Booth*, No. 20-849, 2020 WL 1914896, at *12 (D.D.C. Apr. 19, 2020), "[i]t is always in the public interest to prevent the violation of a party's constitutional rights."  *Simms v. District of Columbia*, 872 F. Supp. 2d 90, 105 (D.D.C. 2012); *see also League of Women Voters v. Newby*, 838 F.3d 1, 12 (D.C.

Cir. 2016) ("There is generally no public interest in the perpetuation of unlawful agency action."). Relatedly, courts have found that "injunctions protecting First Amendment freedoms are always in the public interest." *Christian Legal Soc'y v. Walker*, 453 F.3d 853, 859 (7th Cir. 2006). And "[t]he public interest . . . favors permitting as many qualified voters to vote as possible." *Husted*, 697 F.3d at 437. Preliminarily enjoining Defendants from implementing their Late/Extra Trip Policy would serve all of these goals. Doing so would prevent USPS from violating Plaintiffs' constitutional rights and would allow as many qualified voters as possible to vote by mail and have their votes counted.

## CONCLUSION

For the reasons stated, Plaintiffs respectfully request that this Court enjoin Defendants Louis DeJoy, Postmaster General of the United States, and the United States Postal Service, together with any officers, agents, and employees thereof, until further order of this Court from implementing the Late/Extra Trip Policy announced in the July 10, 2020 document entitled "Mandatory Stand-Up Talk: All Employees," *see* Ex. 4, USPS, *Mandatory Stand-Up Talk: All Employees* (July 10, 2020), because the Policy unreasonably burdens the fundamental right to vote and to have one's vote counted.

Respectfully submitted,

_/s Shankar Duraiswamy_

| | |
|---|---|
| Robert D. Fram | Shankar Duraiswamy |
| Diane Ramirez | Megan C. Keenan |
| COVINGTON & BURLING LLP | Sarah Suwanda |
| Salesforce Tower | Virginia Williamson |
| 415 Mission Street, Suite 5400 | James Smith |
| San Francisco, CA 94105-2533 | COVINGTON & BURLING LLP |
| (415) 591-6000 | One CityCenter |
| rfram@cov.com | 850 Tenth Street, NW |
| dramirez@cov.com | Washington, DC 20001-4956 |
| | (202) 662-6000 |
| John Fraser | sduraiswamy@cov.com |
| COVINGTON & BURLING LLP | mkeenan@cov.com |
| The New York Times Building | ssuwanda@cov.com |
| 620 Eighth Avenue | vwilliamson@cov.com |
| New York, NY 10018-1405 | jmsmith@cov.com |
| (212) 841-1000 | |
| jfraser@cov.com | |

Date:  September 8, 2020