**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| VOTE FORWARD; AMY BOLAN; AARON CARREL; DANTE FLORES-DEMARCHI; PAUL HUNTER; SEBASTIAN IMMONEN; KATHRYN MONTGOMERY; SEAN MORRISON; INDERBIR SINGH DATTA; MARTHA THOMPSON; LINDA ROBERSON; GARY YOUNG; VOCES UNIDAS DE LAS MONTAÑAS; COLORADO ORGANIZATION FOR LATINA OPPORTUNITY AND REPRODUCTIVE RIGHTS; PADRES & JÓVENES UNIDOS;<br><br>  Plaintiffs,<br><br>v.<br><br>LOUIS DEJOY, in his official capacity as the Postmaster General; and the UNITED STATES POSTAL SERVICE,<br><br>  Defendants. | Civ. Action No. 20-2405 (EGS) |

<u>**MEMORANDUM OPINION**</u>

Plaintiffs—eleven voter-eligible individuals and four organizations dedicated to seeking greater civic engagement in the November 2020 election—bring this lawsuit against Defendants Louis DeJoy ("Mr. DeJoy"), in his official capacity as Postmaster General of the United States, and the United States Postal Service ("USPS), alleging that a new USPS policy implemented in July 2020 violates Plaintiffs' constitutional right to vote and constitutes *ultra vires* agency action. *See*

Pls.' Am. Compl., ECF No. 15.[1] Plaintiffs seek a preliminary injunction with regard to their constitutional claim.

Upon consideration of the Plaintiffs' motion, the response, the reply thereto, the applicable law, and the entire record, the Court **GRANTS** Plaintiffs' motion.

**I. Background**

    **A. Factual Background**

        **1. The COVID-19 Pandemic**

Plaintiffs assert that the COVID-19 pandemic has increased reliance on mail delivered by the USPS. Pls.' Mem. Law Supp. Mot. Prelim. Inj. ("Pls.' Mot."), ECF No. 16-1 at 7. According to Plaintiffs, several states have adjusted their election procedures to allow for all eligible voters to vote by mail-in ballot in the November 2020 election:  43 states and the District of Columbia will permit all eligible voters to vote by mail, and 28 states will require that the ballots be received, rather than postmarked, by Election Day. *Id.* at 7-8 (citing news reports). In total, the adjustments made by many states in response to the COVID-19 pandemic will result in approximately 83% of all eligible voters having the opportunity to vote in this method. *Id.* (citing news reports). It is anticipated that

---

[1] When citing electronic filings throughout this Opinion, the Court cites to the ECF page number, not the page number of the filed document.

at least 80 million mail-in ballots will be submitted for the November election. *See* Hersh Decl., ECF No. 16-15 ¶ 14.

### 2. USPS Policy Changes

On July 10, 2020, USPS announced an "operational pivot" to make "immediate, lasting, and impactful changes in our operations and culture." Ex. 4 to Pls.' Mot., ECF No. 16-6 at 2. As most relevant here, the document stated that (1) "[a]ll trips will depart on time (Network, Plant and Delivery); late trips are no longer authorized or accepted"; (2) "[e]xtra trips are no longer authorized or accepted"; (3) "[c]arriers must begin on time, leave for the street on time, and return on time"; and (4) "no additional transportation will be authorized to dispatch mail to the Plant after the intended dispatch" (collectively, the "Late/Extra Trips Policy"). *Id*. The USPS knew that prohibiting these trips would result in delayed mail delivery: "One aspect of these changes that may be difficult for employees is that—temporarily—we may see mail left behind or mail in the workroom floor or docks . . . , which is not typical." *Id.* However, the document noted expectations that "operations will begin to run more efficiently and that delayed mail volumes will soon shrink significantly." *Id.* at 3. These changes were also confirmed in a USPS PowerPoint presentation, which explained that if "the [USPS processing] plants run late they will keep the mail for the next day. If [delivery units] get mail late and

your carriers are gone and you cannot get the mail out without
[overtime] it will remain for the next day." Ex. 5, ECF No. 16-7
at 5-6. Since the USPS policy took effect, USPS has eliminated
an average of 32,900 extra or late trips per week, Grimmer
Decl., ECF No. 16-11 ¶¶ 10-11, or a 75% drop in the number of
both types of trips, Pls.' Reply, ECF No. 24 at 11.

Due to the policy changes expressly prohibiting late trips
and extra trips, the ability to deliver mail in an efficient
manner can be inhibited at three different points in the
delivery chain. First, mail handlers deliver mail from the local
post office to a USPS processing plant; if the mail arrives at
the post office after the handler has already left for the
processing plant, the mail may wait at the post office until the
next day. Pls.' Mot., ECF No. 16-1 at 12-13. Second, once the
mail arrives at the processing plant, if it is not processed
prior to the mail handler's scheduled departure time from the
plant to the relevant delivery unit, it again may remain at the
plant until the next day. *Id.* at 13. Third, once the letter has
made it to the delivery unit, it still must arrive prior to the
mail carrier's trip to the final intended destination; if it
arrives after the mail carrier has left for her delivery route,
the letter may be delayed one day. *Id.* at 13. Thus, the USPS
policy changes may potentially delay certain mail items for up
to three days more than typical prior to the policy changes.

4

The USPS policy changes stand in contrast with prior
practices that allowed postal workers to conduct late trips or
extra trips "to delay or supplement their scheduled deliveries
to ensure that they have collected and transported all
outstanding mail at any given facility." Pls.' Mot., ECF No. 16-
1 at 10 (citing Ex. 3 to Pls.' Mot., ECF No. 16-5).

Defendants have clarified that late or extra trips are not
"banned"; however, they acknowledge that they continue "at a
reduced level." Suppl. Cintron Decl., ECF No. 21-3 ¶ 4. On
September 21, 2020, USPS also issued "Operational Instructions"
providing that "transportation, in the form of late or extra
trips that are reasonably necessary to complete timely mail
delivery, is not to be unreasonably restricted or prohibited.
Managers are authorized to use their best business judgment to
meet our service commitments." *See* Ex. 1 to Notice Suppl.
Material, ECF No. 30-1 at 4.

### 3.  USPS Postal Policy Changes Have Led To Nationwide Delays And Continue To Have A Nationwide Impact

USPS records indicate that nationally, on-time delivery of
First-Class Mail began to decline following implementation of
the USPS policy changes. On-time services scores are the
"measure of the frequency with which USPS is able to deliver
mail in the timeframe defined by its service standards." Pls.'
Reply, ECF No. 24 at 11; *see also* Suppl. Grimmer Decl., ECF No.

24-2 ¶¶ 5, 7. During the pre-policy period, from January 4, 2020
to July 4, 2020, the average USPS service score was 91.6%
nationally; however, the August 29, 2020 service score was 3.56
percentage points lower than the pre-policy average. Suppl.
Grimmer Decl., ECF No. 24-2 ¶ 5; *see also id.* (noting that the
August 29 service score was 2.96 percentage points lower than
the three-week period prior to the USPS policy implementation).
The overall decline in service scores is consistent across all
but one region in the United States, though the service scores
vary. For example, while the USPS "Capital Metro" area has a
service score that has declined 6.3 percentage points since
implementation of the USPS policy, the service score in the
"Southern" area has declined by only approximately two
percentage points. *See id.* ¶ 7. Moreover, services scores in 91%
of USPS districts around the United States are lower as compared
to the pre-policy average from January 4, 2020 to July 4, 2020.
*Id.* ¶¶ 8-9.

Defendant Mr. DeJoy has recognized that USPS made only "one
change" in early July 2020, and that change regarded his request
that "the team . . . run the transportation on time and mitigate
extra trips." Ex. 6 to Pls.' Mot., ECF No. 16-8 at 4. In the
August 13, 2020 letter to all USPS employees, Mr. DeJoy also
acknowledged delivery delays were "unintended consequences" of
the USPS policy changes. *See* Pls.' Mot., ECF No. 16-1 at 16

6

(citing USPS, *Path Forward: PMG Addresses Restructuring* (Aug. 13, 2020), https://rb.gy/y6tbre). Furthermore, in testimony before the House Committee on Oversight and Reform on August 24, 2020, Mr. DeJoy again recognized that the USPS policy changes were causing delivery delays and that it "expose[d] a need to realign some of [USPS's] processing and scheduling that caused mail to miss the scheduled transportation." *See* Ex. 8 to Pls.' Mot., ECF No. 16-10 at 10. Mr. DeJoy stated that because "production schedules within the plants were not aligned with the transportation schedules going out," "about 10% of the mail was not aligned." *See* Ex. 6 to Pls.' Mot., ECF No. 16-8 at 7.

### B. Procedural History

Plaintiffs filed this lawsuit on August 28, 2020. *See* Compl., ECF No. 1. On September 8, 2020, Plaintiffs filed an amended complaint against Defendants, *see* Am. Compl., ECF No. 15, and subsequently filed a motion for preliminary injunction requesting that the Court enjoin Defendants and their agents from implementing the USPS policy changes, *see* Pls.' Mot. Prelim. Inj., ECF No. 16. Defendants filed their opposition on September 15, 2020. *See* Defs.' Resp. Pls.' Mot. Prelim. Inj. ("Defs.' Opp'n"), ECF No. 21. Plaintiffs filed their reply brief on September 20, 2020. *See* Pls.' Reply Supp. Mot. Prelim. Inj. ("Pls.' Reply"), ECF No. 24. The motion is ripe for the Court's consideration.

## II. Legal Standard

"A plaintiff seeking a preliminary injunction must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest.'" *Aamer v. Obama*, 742 F.3d 1023, 1038 (D.C. Cir. 2014) (alteration in original) (quoting *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011)). Where the federal government is the opposing party, the balance of equities and public interest factors merge. *See Nken v. Holder*, 556 U.S. 418, 435 (2009). A preliminary injunction is an "extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) (citation omitted). "The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981). In this Circuit, the four factors have typically been evaluated on a "sliding scale," such that if "the movant makes an unusually strong showing on one of the factors, then it does not necessarily have to make as strong a showing on another factor." *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1291–92 (D.C. Cir. 2009).

In the wake of the Supreme Court's decision in *Winter v. Natural Resources Defense Council*, 555 U.S. 7 (2008), "the D.C. Circuit has suggested that a positive showing on all four preliminary injunction factors may be required." *Holmes v. FEC*, 71 F. Supp. 3d 178, 183 n.4 (D.D.C. 2014); *see also Sherley*, 644 F.3d at 393 ("[W]e read *Winter* at least to suggest if not to hold that a likelihood of success is an independent, free-standing requirement for a preliminary injunction." (citation and quotation marks omitted)). Nonetheless, "the Circuit has had no occasion to decide this question because it has not yet encountered a post-*Winter* case where a preliminary injunction motion survived the less rigorous sliding-scale analysis." *ConverDyn v. Moniz*, 68 F. Supp. 3d 34, 46 n.2 (D.D.C. 2014).

## III. Analysis

### A.  Plaintiffs Are Likely To Succeed On The Merits Of Their Constitutional Claim

#### 1.  Plaintiffs Likely Have Standing To Bring This Challenge

As a threshold matter, Defendants argue that Plaintiffs cannot establish that they are likely to succeed on the merits because Plaintiffs lack standing in this case. Defs.' Mot., ECF No. 21 at 31.

To establish standing, "a plaintiff must show (1) an 'injury in fact,' (2) a sufficient 'causal connection between the injury and the conduct complained of,' and (3) a

9

'likel[ihood]' that the injury 'will be redressed by a favorable decision.'" *Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2341 (2014) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992)). "These requirements apply whether an organization asserts standing to sue, either on its own behalf, or on behalf of its members." *Nat'l Treasury Emps. Union v. United States*, 101 F.3d 1423, 1427 (D.C. Cir. 1996) (citing *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378 (1982)). "Standing to seek . . . forward-looking injunctive relief requires [Plaintiff] to show that it is suffering an ongoing injury or faces an immediate threat of injury. For a future injury, that means submitting evidence showing that there is a substantial risk that the harm will recur." *Narragansett Indian Tribal Historic Pres. Office v. FERC*, 949 F.3d 8, 13 (D.C. Cir. 2020) (internal quotation marks, citations, and alterations in original omitted). However, only one plaintiff needs standing in order for a claim to go forward. *See Carpenters Indus. Council v. Zinke*, 854 F.3d 1, 9 (D.C. Cir. 2017) (citing *Mountain States Legal Found. v. Glickman*, 92 F.3d 1228, 1232 (D.C. Cir. 1996)).

Defendants argue that neither the "Organization Plaintiffs"—Vote Forward, Voces Unidas de las Montañas, COLOR, and Padres & Jóvenes Unidos—nor the individual Plaintiffs can establish that they have suffered an injury-in-fact. Defs.' Mot., ECF No. 21 at 31. Defendants do not allege that Plaintiffs

10

have not established causation or redressability for the

purposes of standing.

First, regarding organizational standing, the D.C. Circuit

recently articulated the test for determining whether an

organization satisfies the "irreparable harm" prong:

> An organization is harmed if the "actions taken by [the defendant] have 'perceptibly impaired' the [organization's] programs." *Fair Emp't Council of Greater Wash., Inc. v. BMC Mktg. Corp.*, 28 F.3d 1268, 1276 (D.C. Cir. 1994) (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379, 102 S. Ct. 1114, 71 L.Ed.2d 214 (1982)); *see also Nat'l Treasury Emps. Union v. United States*, 101 F.3d 1423, 1430 (D.C. Cir. 1996) (explaining that the initial question is whether "a defendant's conduct has made the organization's *activities* more difficult"). If so, the organization must then also show that the defendant's actions "directly conflict with the organization's mission." *Nat'l Treasury Emps. Union*, 101 F.3d at 1430. The second step is required to ensure that organizations cannot engage in activities simply to create an injury. *Id.*

*League of Women Voters v. Newby*, 838 F.3d 1, 8 (D.C. Cir. 2016).

Citing Plaintiff Vote Forward as an example, Plaintiffs

argue that Defendants' policy changes have impaired Vote

Forward's programs by causing it to "redirect [its] limited

resources, which includes both [its] labor and [its] funds, to

address challenges caused by Defendants' Policy that were

unforeseen." Pls.' Mot., ECF No. 16-1 at 41. According to

Plaintiffs, as part of Vote Forward's mission to "empower

grassroots volunteers to help register voters from traditionally

underrepresented communities and encourage them to vote," *see*
Forman Decl., ECF No. 16-24 ¶ 2, Vote Forward "has built an
online platform through which volunteers throughout the country
are connected with and encouraged to mail hand-written letters
to fellow citizens imploring them to vote," Pls.' Reply, ECF No.
24 at 26 (citing Forman Decl., ECF No. 16-24 ¶¶ 4-5). While Vote
Forward had previously planned to mail the get-out-the-vote
letters on October 27, in line with its "data" suggesting that
letters mailed closer to Election Day are more successful, Vote
Forward has had to move up its mailing date as a direct result
of the USPS policy changes, threatening to "diminish the success
of the campaign." Pls.' Reply, ECF No. 24 at 26 (citing Forman
Decl., ECF No. 16-24 ¶¶ 6, 8). As a result, Plaintiffs allege
that Vote Forward has had to divert resources "to respond to an
influx of inquiries [from] volunteers regarding USPS's mailing
delays and to assess whether sending out [get-out-the-vote]
letters earlier than planned would negatively impact the
effectiveness of Vote Forward's letter-writing campaign." Pls.'
Mot., ECF No. 16-1 at 42. In addition, Vote Forward has had to
"expend[] multiple weeks of effort" to launch two new programs
as a result of the USPS policy changes:  one that "aims to
quantify the mailing delays associated with Defendant's
policies," and another that "seeks to ascertain the differential
impact on voter turnout if [get-out-the-vote] letters are sent

12

one week versus three weeks prior to an election," "at a total cost of approximately $50,000." *Id.*; Forman Decl., ECF No. 16-24 ¶¶ 9-11. Thus, Defendants' actions have "made the organization's activities more difficult," *Newby*, 838 F.3d at 8 (quoting *Nat'l Treasury Emps. Union*, 101 F.3d at 1430), as a result of the "direct conflict between the defendant's conduct and the organization's mission," *Abigail All. v. Eschenbach*, 469 F.3d 129, 133 (D.C. Cir. 2006) (citation omitted).

Contrary to Defendants' assertion, Plaintiffs' decision to "use[] its resources to counteract" such injury is not self-inflicted solely because it is voluntary. *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 919 (D.C. Cir. 2015) (quoting *PETA v. USDA*, 797 F.3d 1087, 1093 (D.C. Cir. 2015)); *see also Equal Rights Ctr. v. Post Props.*, 633 F.3d 1136, 1139 (D.C. Cir. 2011) (explaining that an injury is not a "self-inflicted . . . budgetary choice[]" merely by having been made willfully or voluntarily (quoting *Fair Emp't Council of Greater Wash., Inc.*, 28 F.3d at 1276). Rather, as long as the organization expends resources "to counteract the effects of the defendant['s]" challenged conduct, that diversion can suffice for Article III purposes. *Id.* at 1140. As stated above, Plaintiff Vote Forward has demonstrated that its expenditures—"such as the time and monetary expenses associated with Vote Forward's new programs to test the time it will take to deliver letters and to gauge the

effectiveness of a get-out-the-vote campaign weeks, rather than mere days, before Election Day"—were undertaken to directly counteract the harms caused by Defendants' actions. Pls.' Reply, ECF No. 24 at 28. In addition, although Defendants argue that Plaintiffs such as Vote Forward could not suffer an injury because they "educate and assist potential voters as part of their standard activities," Defs.' Opp'n, ECF No. 21 at 32, the fact that Defendants' actions undermined Vote Forward's ability to conduct its usual activities is sufficient to constitute a "drain on the organization's resources," not "simply a setback to the organization's abstract social interests." *Nat'l Ass'n of Home Builders v. EPA*, 667 F.3d 6, 11 (D.C. Cir. 2011) (quoting *Nat'l Taxpayers Union, Inc. v. United States*, 68 F.3d 1428, 1433 (D.C. Cir. 1995)); *see also Havens*, 455 U.S. at 379 (finding sufficient for organizational standing purposes that plaintiff alleged it had "been frustrated by defendants' racial steering practices in its efforts to assist equal access to housing through counseling and other referral services" and "had to devote significant resources to identify and counteract the defendant's [sic] racially discriminatory steering practices" (alteration in original)).

The Court also concludes that Plaintiffs have shown traceability and redressability. Regarding traceability, Plaintiffs have demonstrated that the implementation of the USPS

policy changes in July coincided with a significant decline in
USPS on-time service scores, and Defendants have acknowledged
that the only change USPS made in early July was in regard to
the policy regarding transportation and extra trips. Pls.'
Reply, ECF No. 24 at 12 (citing Ex. 6, ECF No. 16-8).
Defendants, however, argue that Plaintiffs cannot establish that
their injuries are solely the result of the USPS policy changes
because of the "simultaneous impact" of the COVID-19 pandemic.
Defs.' Mot., ECF No. 21 at 43-44. Defendants suggest instead
that staffing shortages due to the pandemic caused the decline
in USPS on-time service scores. *Id.* The Court is not persuaded.
As Plaintiffs point out, USPS data "show no relationship between
declines in on-time service scores and the time periods in which
USPS allegedly experienced staffing shortages." Pls.' Reply, ECF
No. 24 at 13. In fact, in comparison with prior months, the
average service scores actually increased in March at the moment
when Defendants allege staffing shortages were worsening. *Id.*
(citing Grimmer Decl., ECF No. 24-2 ¶ 13; Prokity Decl., ECF No.
21-2 ¶ 5). Furthermore, "declines in service scores continued
*after* the claimed staffing problems had abated." *Id.* (citing
Prokity Decl., ECF No. 21-2 ¶ 10). Based on the data figures,
the Court finds that Plaintiffs' claimed injuries are likely the
result of the USPS policy changes and may be remedied by
declaratory or injunctive relief.

Accordingly, Plaintiff Vote Forward has established a substantial likelihood of standing. Because the Court is satisfied that Vote Forward has standing, the Court need not address whether the other Plaintiffs also have standing in order to proceed.

### 2. The Applicable Legal Standard

Prior to considering the merits, the parties disagree as to which legal standard should govern Plaintiffs' claim that the USPS policy changes impose an unconstitutional burden on the right to vote under the First and Fifth Amendments. Plaintiffs argue that the Court should apply the *Anderson-Burdick* framework, derived from *Anderson v. Celebrezze*, 460 U.S. 780 (1983) and *Burdick v. Takushi*, 504 U.S. 428 (1992), in this matter. Pls.' Mot., ECF No. 16-1 at 26. Under *Anderson*, *Burdick*, and their progeny, the United States Supreme Court has recognized that "'[e]lection laws will invariably impose some burden upon individual voters,' and that not all laws burdening the right to vote are subject to strict scrutiny." *Libertarian Party v. D.C. Bd. of Elections & Ethics*, 682 F.3d 72, 73-74 (D.C. Cir. 2012) (alteration in original) (quoting *Burdick*, 504 U.S. at 433-34). Instead, courts "must first consider the character and magnitude of the asserted injury" to the plaintiffs' right to vote against "the precise interests put forward by the [government] as justifications for the burden

16

imposed[,]" including "the legitimacy and strength of each of
those interests" and "the extent to which those interests make
it necessary to burden the plaintiff's rights." *Anderson*, 460
U.S. at 789. The level of scrutiny a court should apply depends
on the burden. When a voter's rights are "subjected to severe
restrictions, the regulation must be narrowly drawn to advance a
state interest of compelling importance." *Burdick*, 504 U.S. at
434 (internal quotation marks omitted). But when a voter's
rights are subjected only to "reasonable, nondiscriminatory
restrictions," "the State's important regulatory interests are
generally sufficient to justify the restrictions." *Id.* (internal
quotation marks omitted). If the restriction falls somewhere
between those two poles, then the court uses a flexible
analysis, "where the more severe the burden, the more compelling
the [government's] interest must be." *Soltysik v. Padilla*, 910
F.3d 438, 444 (9th Cir. 2018).

Defendants, for their part, argue that the *Anderson-Burdick*
framework does not apply here because that standard only
concerns the constitutionality of state election laws—not "a
non-election law that may have an attenuated, indirect effect on
the electoral process" or the "everyday actions" of federal
agencies. Defs.' Opp'n, ECF No. 21 at 36-37. In Defendants'
view, "[a]pplying the *Anderson-Burdick* balancing test to any
policy that has some impact on the electoral process would

17

produce odd results," including "that any deficiency in USPS service could give rise to a constitutional voting rights claim." *Id.* at 37. Defendants argue that because the *Anderson-Burdick* framework does not apply, Plaintiffs' claim must fail because Plaintiffs have not alleged stand-alone claims under either the First or Fifth Amendments, which encompass distinct requirements as compared to a claim alleged under *Anderson-Burdick*. *Id.* at 38.

Defendants further argue that even if the Court considers the USPS policy to constitute an "election law," the *Anderson-Burdick* framework still would not apply. *Id.* Rather, the Court would apply the rational basis test under *McDonald v. Board of Election Commissioners of Chicago*, 394 U.S. 802 (1969). In *McDonald*, the Supreme Court held that an Illinois statute that denied certain inmates mail-in ballots did not impose an unconstitutional burden on their right to vote. *Id.* at 807. Rather, the statute only restricted their asserted right to receive an absentee ballot, and they were therefore not "absolutely prohibited from voting by the State." *Id.* at 808 & n.7. The Supreme Court noted that "the record is barren of any indication that the State might not, for instance, possibly furnish the jails with special polling booths . . . or provide guarded transportation to the polls." *Id.* at 808 n.6. The Court further noted that a more rigid standard is proper only when the

18

policy or practice at issue categorically "den[ies] [plaintiffs] the exercise of the franchise . . . preclud[ing] [them] from voting." *Id.* at 807-08. Accordingly, the Supreme Court upheld the statute under rational basis review. *Id.* at 811. Defendants argue that *McDonald* is controlling because "Plaintiffs are claiming that USPS policies may deprive them of the ability to cast votes through mail-in ballots" and Plaintiffs' "position is not materially different from the county jail inmates . . . who were physically restricted from the polls." Defs.' Opp'n, ECF No. 21 at 39.

The Court finds that *McDonald* is inapposite. First, Defendants mischaracterize Plaintiffs' claim in this case. Plaintiffs do not broadly challenge the USPS policy changes as denying them the right to receive mail-in ballots, as was at issue in *McDonald*. Rather, Plaintiffs allege that Defendants' policy changes undermine the integrity of the November 2020 election by causing delays in the delivery of mail-in ballots, resulting in the risk that hundreds of thousands of voters will be disenfranchised. Second, "[t]he Supreme Court has expressly restricted [*McDonald*'s] applicability to cases in which there is no evidence showing that the challenged restriction will prohibit the plaintiff from voting." *Jones v. U.S. Postal Serv.*, No. 20-cv-6516 (VM), 2020 WL 5627002, at *15 (S.D.N.Y. Sept. 21, 2020). For example, in *Hill v. Stone*, the Supreme Court

explained that, in *McDonald*, "there was nothing in the record to indicate that the challenged Illinois statute had any impact" on the right to vote, but that the case had acknowledged that "[a]ny classification actually restraining the fundamental right to vote . . . would be subject to close scrutiny." *Hill v. Stone*, 421 U.S. 289, 300 n.9 (1974) (citing *McDonald*, 394 U.S. at 807-09). In other words, "[e]ssentially the Court's disposition of the claims in *McDonald* rested on failure of proof." *O'Brien v. Skinner*, 414 U.S. 524, 529 (1974). Because Plaintiffs have provided evidence that the USPS policy will inhibit many voters' ballots from being counted in the November 2020 election, *McDonald*'s rational basis test is inappropriate.

Whether the Court should consider Plaintiffs' claim under the *Anderson-Burdick* framework is not so straightforwardly dismissed, however. The Court first notes that Defendants' claim that the policy changes implemented by USPS only inadvertently or indirectly affect voting rights is unpersuasive, particularly in a year in which the global COVID-19 pandemic has forced many individuals to decide either to vote by mail-in-ballot or to not vote at all. *See Jones*, 2020 WL 5627002, at *14 ("The Court . . . disagrees with the Government that this case does not implicate 'the counting of votes.' To hold otherwise would be to ignore the facts at hand: a large number of voters will be exercising their right to vote in the November 2020 election by

placing their ballots in the mail. There is simply no reason for the Court to ignore the severe reality that the country is in the middle of a deadly pandemic . . . .") For the November 2020 election, 43 states and the District of Columbia will permit all eligible voters to vote by mail-in ballot, and 28 of those states will require that the ballots be received by Election Day. Pls.' Mot., ECF No. 16-1 at 7-8 (citing news reports). Furthermore, a "conservative" estimate predicts that 80 million ballots will be submitted by mail. *See* Hersh Decl., ECF No. 16-15 ¶ 14. In other words, for tens of millions of voters this year, the postal service "is literally the method by which the election is conducted." Pls.' Reply, ECF No. 24 at 16. The USPS policy thus directly impacts and controls the ability of millions of citizens to have their vote counted. Defendants themselves do not dispute their unique role within the electoral process and their "longstanding commitment to the timely delivery of Election Mail." Defs.' Opp'n, ECF No. 21 at 13. Even beyond delivering mail-in ballots, USPS conducts "extensive outreach to state and local election officials to support effective use of postal services to facilitate the distribution and return of ballots"; gives an "Election Mail Kit" to "approximately 11,500 state and local election officials"; and has established a separate "bipartisan Election Mail Committee to actively oversee USPS's support of Election Mail for the

21

Election." *Id.* at 12-13. This relationship between the USPS and the electoral process suggests a strong connection with the protection of voters' rights.

And although the Court acknowledges that the majority of cases apply the *Anderson-Burdick* test within the confines of a state election law, this aligns with the fact that "our country has a highly decentralized system of election administration, in which states and localities are primarily responsible for regulating and managing elections." *Jones*, 2020 WL 5627002, at *14 (citations omitted). Defendants correctly note, for example, that both *Anderson* and *Burdick* themselves concerned the constitutionality of state-level election laws and indicated that the balancing test applies when a court is considering a challenge to such laws. However, the Court is not persuaded that either case, or the cases that have followed, have so restricted application of the balancing framework to only that specific context. For example, courts within this Circuit have relied upon the *Anderson-Burdick* framework in analyzing "state" practices that allegedly burden parties' ability to cast their votes effectively under both the Fifth Amendment and the Fourteenth Amendment. *See, e.g.*, *Libertarian Party*, 682 F.3d at 74 (analyzing under *Burdick* plaintiffs' First and Fifth Amendment claims that the District "consistent with its regulations, never reported which individuals were penciled in

by voters choosing the write-in option or how many votes any such individual accrued"); *Turner v. D.C. Bd. of Elections & Ethics*, 77 F. Supp. 2d 25, 30, 33 (D.D.C. 1999) (RWR) (analyzing the constitutionality of Congress's 1998 District of Columbia Appropriations Act under *Burdick*, among other standards, where the Act barred the D.C. Board of Elections and Ethics from counting, releasing, and certifying the results of a referendum). *But see LaRouche v. Fowler*, 152 F.3d 974, 994 (D.C. Cir. 1998) (finding that the *Burdick* test was inappropriate in a challenge against the Democratic National Committee's internal rules because the test "was not designed for a case in which the First Amendment weighs on both sides of the balance"). Courts have also applied the *Anderson-Burdick* balancing test in the context of non-election laws. For example, in *Monserrate v. New York State Senate*, 599 F.3d 148 (2d Cir. 2010), the United States Court of Appeals for the Second Circuit addressed a First Amendment challenge to the New York Senate's decision to expel a senator who had been accused of domestic violence. *Id.* at 152-53. The Second Circuit found that the *Anderson-Burdick* line of cases was not limited to the pre-vote election law context, stating that the Supreme Court had "minimized the extent to which voting rights are distinguishable from ballot access cases" because "the rights of voters and the rights of candidates do not lend themselves to neat separation." *Id.* at

155 (internal citations and quotation marks omitted).
Accordingly, the Second Circuit applied the *Anderson-Burdick*
test in analyzing whether the senator's expulsion burdened
constitutional rights related to voting and political
association. *Id.; see also Peeper v. Callaway Cnty. Ambulance
Dist.*, 122 F.3d 619, 622-23 (8th Cir. 1997) (analyzing a board
resolution prohibiting a newly elected ambulance board member
from voting on certain matters because her husband worked for
the ambulance district under the *Anderson-Burdick* framework);
*Hussey v. City of Portland*, 64 F.3d 1260, 1262, 1264 (9th Cir.
1995) (applying the *Anderson-Burdick* framework in evaluating the
constitutionality of an "ordinance requiring non-residents to
consent to annexation as a condition of receiving a subsidy, or
reduction in hook-up costs, for mandated sewer connections,"
finding that consents were the "constitutional equivalent" of
voting).

Here, regardless of the intent behind the changes, the USPS
policy "will invariably impose some burden upon individual
voters" and their constitutional rights in an election year.
*Libertarian Party*, 682 F.3d at 73-74. The USPS directly affects
how Election Mail is handled and the speed with which Election
Mail arrives at its intended destination. While the USPS serves
many other functions, its role in handling ballots compels the
conclusion that USPS plays an active role in ensuring that

24

elections are conducted in a "fair and honest" manner, "rather than chaos." *Burdick*, 504 U.S. at 433 (citation omitted). Furthermore, the Court is not convinced that the *Anderson-Burdick* framework is limited to only state government and not federal government actions. To so find would effectively exclude, for example, any federal legislation impacting elections in the District of Columbia pursuant to Congress's plenary power over the District. *See* U.S. Const. art. I § 8; *Palmore v. United States*, 411 U.S. 389, 397 (1973). In addition, this case does not present the same concerns as the D.C. Circuit noted in *LaRouche v. Fowler*, 152 F.3d 974 (D.C. Cir. 1998), where the court noted that applying *Anderson-Burdick* to the rules of a non-state political party was inappropriate because "the presence of First Amendment interests on both sides of the equation makes inapplicable the test applied to electoral restrictions where the First Amendment weighs on only one side." *Id.* at 995.

Accordingly, the Court finds that Plaintiffs have established that the *Anderson-Burdick* framework likely applies to Plaintiffs' claim.

### 3. Plaintiffs Have Shown That They Are Likely To Succeed On The Merits Of Their Constitutional Claim

Plaintiffs argue that the USPS policy changes "impose[] undue burdens on Plaintiffs' and other voters' rights to vote in

violation of the First and Fifth Amendments." Pls.' Mot., ECF No. 16-1 at 10. The Court agrees that, under the *Anderson-Burdick* framework, Plaintiffs have shown that they are likely to succeed on the merits of their claim.

As explained above, under the *Anderson-Burdick* framework, the Court must determine whether "the character and magnitude of the asserted injury to the rights protected by the First and [Fifth] Amendments that the plaintiff seeks to vindicate" outweighs "the precise interests put forward by the State as justifications for the burden imposed by its rule," taking into account "the extent to which those interests make it necessary to burden the plaintiff's rights." *Burdick*, 504 U.S. at 433–34. Next, the court evaluates how much deference to afford to the government's interests. If voting rights are "subjected to severe restrictions, the regulation must be narrowly drawn to advance a state interest of compelling importance." *Burdick*, 504 U.S. at 434 (internal quotation marks omitted). But when a voter's rights are subjected only to "reasonable, nondiscriminatory restrictions," then courts apply a rational basis review. *Id.* (internal quotation marks omitted).

"It is beyond cavil that 'voting is of the most fundamental significance under our constitutional structure.'" *Burdick*, 504 U.S. at 433 (quoting *Ill. Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 184 (1979)). "Obviously included within the

right to choose, secured by the Constitution, is the right of qualified voters within a state to cast their ballots *and have them counted . . . .*" *United States v. Classic*, 313 U.S. 299, 315 (1941) (emphasis added). Thus, where a policy creates a situation where "[a] large number of ballots will be invalidated, and consequently, not counted based on circumstances entirely out of the voters' control," the "burden [on the right to vote] is exceptionally severe." *Gallagher v. N.Y. State Bd. of Elections*, No. 20-cv-5504, 2020 WL 4496849, at *16 (S.D.N.Y. Aug. 3, 2020); *see also Doe v. Walker*, 746 F. Supp. 2d 667, 679-80 (D. Md. 2010) ("By imposing a deadline which does not allow sufficient time for absent uniformed services and overseas voters to receive, fill out, and return their absentee ballots, the state imposes a severe burden on absent uniformed services and overseas voters' fundamental right to vote.").

Here, the Court finds that the "character and magnitude" of Plaintiffs' asserted injury to the right to vote is significant. Plaintiffs have provided sufficient evidence suggesting that Defendants' policy has caused and will continue to cause inconsistency and delays in the delivery of mail across the United States, placing at particular risk voters residing in one of the 28 states that require mail ballots to be received, not just post-marked, by Election Day. For example, Plaintiffs

27

explain that if a voter residing in one of those 28 states mails in her ballot on the Saturday before Election Day, a one-day delay "significant[ly] increases the risk of the ballot being rejected as untimely," and a two-day delay "would make disenfranchisement a certainty." Pls.' Mot., ECF No. 16-1 at 30. Furthermore, Plaintiffs simply cannot predict when their ballots will arrive at their intended destination. When they will arrive, and whether they will arrive in time to be counted, instead depends upon "arbitrary factors, such as the particular USPS branch that handles their ballots." *Jones*, 2020 WL 5627002, at *16; *see also* Supp. Grimmer Decl., ECF No 24-2 ¶¶ 5, 7 (listing "on-time" service scores varying across USPS areas in the United States). Indeed, USPS itself has acknowledged the threat of voter disenfranchisement that may result from delivery delays caused by Defendants' policy, warning in a July 29, 2020 letter to 46 states and the District of Columbia that USPS "cannot guarantee all ballots cast by mail for the November election will arrive in time to be counted." *See* Pls.' Mot., ECF No. 16-1 at 15. Thus, in a year in which it is estimated that 80 million citizens are anticipated to submit their votes via USPS, and between 3.7% and 9.3% of those are estimated to mail ballots on the Saturday before Election Day, the potential for voter disenfranchisement is immense. *See* Hersh Decl., ECF No. 16-15 ¶¶ 14, 21-23; *see also* Pls.' Mot., ECF No. 16-1 at 7 (citing

Juliette Love, Matt Stevens, & Lazaro Gamio, *Where Americans Can Vote by Mail in the 2020 Election*, N.Y. Times (last updated Aug. 14, 2020), https://rb.gy/fwss8l)).

Furthermore, while content neutral, Defendants' policy changes place an especially severe burden on those who have no other reasonable choice than to vote by mail, such as those who may be at a high risk of developing a severe case of COVID-19 should they become exposed to the virus at the polling place, and those who are not physically able to travel to the polls due to disability. *See* Pls.' Mot., ECF No. 16-1 at 31. For these individuals, mail-in voting is either the only choice or the only safe choice they have. Defendants, however, suggest that these individuals and others can avoid such injuries if they only choose to vote earlier. Defendants argue that there is no severe burden on Plaintiffs because any disenfranchisement would be due to "'their own failure to take [the] timely steps' necessary." Defs.' Opp'n, ECF No. 21 at 40 (alteration in original) (quoting *Rosario v. Rockefeller*, 410 U.S. 752, 758 (1973)). In Defendants' view, USPS "cannot be required by the Constitution to ensure that a voter's ballot arrive in the timeframe set by her state if that voter mails the ballot the day before the state's deadline." *Id.* This argument fails. In suggesting that voters should cast their ballots earlier than required, Defendants ignore Plaintiffs' "essential" interest in

making "informed choices among candidates for office." *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 346-47 (1995). As the Supreme Court has recognized, "[i]n election campaigns, particularly those which are national in scope, the candidates and the issues simply do not remain static over time." *Anderson*, 460 U.S. at 790. Many individuals, including Plaintiffs in this case, rely on the efficient delivery of their mail-in ballots so that they make take the time available to consider the issues and candidates in an election. *See, e.g.*, Datta Decl., ECF No. 16-23 ¶¶ 3-5. Accordingly, any argument that Plaintiffs inflict injury on themselves by not voting earlier does not significantly lessen their harms in this situation. In any event, Plaintiffs' arguments are in regard to voters who decide to send in their ballots three days in advance of Election Day, not one day.

Defendants also argue that the Plaintiffs' claim must fail because there is no constitutional right to vote by mail and states are not required to offer mail-in voting. Defs.' Opp'n, ECF No. 21 at 35. Defendants contend that "[i]f a State can prohibit mail-in voting . . . then USPS policies which may indirectly limit *when* a ballot must be mailed cannot be constitutionally suspect." *Id.* However, Defendants miss the point. Plaintiffs here are not alleging that Defendants are denying them a right to vote by mail. Rather, Plaintiffs are

alleging that the Defendants' policy changes undermine the integrity of the November 2020 election by causing delays in the delivery of mail-in ballots, resulting in thousands of votes not being counted. As the Supreme Court has explained, "[h]aving once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over that of another." *Bush v. Gore*, 531 U.S. 98, 104-05 (2000) (quoting *Harper*, 383 U.S. at 665). And that is precisely the issue. For example, if one of the individual Plaintiffs submits her ballot, but it does not make it to her local election office in time because of delays caused by the USPS policy, "her 'right to full and effective participation in the political processes of h[er] [Nation]'s legislative bodies' is impaired relative to that of both in-state and out-of-state voters with access to USPS branches functioning effectively." *Jones*, 2020 WL 5627002, at *21 (alteration in original) (quoting *Reynolds v. Sims*, 377 U.S. 506, 565 (1964)).

Defendants contend that the USPS policy changes do not impose a "severe" burden on voters because "USPS has not instituted a ban on late trips or extra trips," only a call for a "renewed focus on schedules." Defs.' Opp'n, ECF No. 21 at 40. Defendants argue that there is "little indication" that policy changes will cause delays in view of the "resources USPS is committing to Election Mail, and USPS's assurance that it has

31

the capacity to process the expected volume of Election Mail."
*Id.* However, even if Defendants did not institute a full "ban"
on late or extra trips, Defendants have not rebutted the
statistics that Plaintiffs have put forward indicating that the
nearly 75% drop in the number of late and extra trips has
resulted in "a material cut in USPS's capacity to timely deliver
mail." *See* Cintron Decl., ECF No. 21-1 ¶¶ 23-25; Pls.' Reply,
ECF No. 24 at 11; *see also* Grimmer Decl., ECF No. 16-11 ¶ 9
(stating that USPS cuts amounted to an average of 32,900 fewer
trips per week). Although Defendants suggest that the drop in
USPS's "on-time" deliveries were partly caused by staffing
shortages from COVID-19, the Court is persuaded by Plaintiffs'
analysis of USPS data showing "no relationship between declines
in on-time service scores and the time periods in which USPS
allegedly experienced staffing shortages." Pls.' Reply, ECF No.
24 at 13. Furthermore, as USPS has "itself forecast[ed] the
injuries" previously, it is "disingenuous" for USPS to claim
that there is "little indication" of delays in delivery of mail-
in ballots. *See Jones*, 2020 WL 5627002, at *12 (citation
omitted). The Court finds that such burdens on voters' right to
have their ballots counted suggests that a high level of
scrutiny is required.

Against such injuries, Defendants assert that the policy
changes are "intended to increase efficiency" and "minimize

unnecessary costs." Defs.' Opp'n, ECF No. 21 at 41. Defendants

contend that these "general regulatory interests" survive the

*Anderson-Burdick* inquiry under a rational basis review. *Id.*

(quoting *Libertarian Party*, 682 F.3d at 77). In Defendant's

view, the fact that the USPS policy changes were actually

inefficient in the short term or that cost savings may be

minimal does not mean that they were any less legitimate. *Id.*

Defendants argue that "the proffered justifications for the USPS

policy at issue are sufficient to justify the indirect, minimal

burden it may impose on voters." *Id.* Plaintiffs dispute that

Defendants' justifications are sufficient to justify the burden

imposed on voters. Plaintiffs argue that the USPS policy changes

were in fact *inefficient* and that the mail delivery slow-downs

were expected because the policy's purpose was to "undermine the

ability of the Postal Service to fulfill its statutory duty to

provide 'prompt, reliable, and efficient services to patrons in

all areas.'" Pls.' Mot., ECF No. 16-1 at 32-33 (quoting 39

U.S.C. § 101(a)). Plaintiffs also contend that Defendants' cost

savings rationale is insufficient because (1) case precedent

establishes that the government may not burden fundamental

rights in its quest to save costs; (2) the cost savings are

minimal over the period leading up to Election Day; and (3)

Defendant Mr. DeJoy has confirmed that the USPS's financial

position is sound. *Id.* at 33-35.

Defendants are correct that the government generally need not justify itself with "elaborate, empirical verification" of its interests in a rational basis review. *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 364 (1997). However, the Court finds that the bar is higher here. Given the severity of Plaintiffs' harms, the Court must instead determine whether Plaintiffs' injuries are outweighed by Defendants' justifications under at least an intermediate level of scrutiny, if not strict scrutiny. The Court finds that Defendants do not meet either.

The Court respects that the federal government, and USPS in particular, have legitimate interests in maintaining efficient programs and in saving money; however, these interests do not justify the resulting harms Plaintiffs face. As stated above, the burden the USPS policy changes place on Plaintiffs' constitutional right to vote and have their vote counted is significant. At risk is disenfranchisement in the November election of potentially hundreds of thousands of individuals. These harms justify a high level of scrutiny, yet Defendants only generally assert that "compliance with pre-set schedules is intended to increase efficiency" and minimize "administrative costs." Defs.' Opp'n, ECF No. 21 at 41 (quoting *Libertarian Party*, 682 F.3d at 77). Defendants' reasons for administrative cost savings are insufficient: as the Supreme Court has

34

explained, the "vindication of conceded constitutional rights cannot be made dependent upon any theory that it is less expensive to deny than to afford them." *Watson v. City of Memphis*, 373 U.S. 526, 537 (1963). Furthermore, Defendants have failed to provide any reasons regarding why implementation of the USPS policy changes were necessary during a nationwide election season in the middle of a pandemic, particularly in view of Defendants' express acknowledgement that they anticipated "mail left behind or mail on the workroom floor or docks." Ex. 4, ECF No. 16-6 at 2. And despite Defendants' assertions to the contrary, as of the end of August, USPS service scores remain lower that the pre-policy average. *See* Suppl. Grimmer Decl., ECF No. 24-3 ¶ 5.

Accordingly, the Court finds that Plaintiffs are likely to succeed on their constitutional claim.

### B. Plaintiffs Face Irreparable Harm

"The failure to demonstrate irreparable harm is 'grounds for refusing to issue a preliminary injunction, even if the other three factors . . . merit such relief.'" *Nat'l Mining Ass'n v. Jackson*, 768 F. Supp. 2d 34, 50 (D.D.C. 2011) (RBW) (quoting *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006)). "In this Circuit, a litigant seeking a preliminary injunction must satisfy 'a high standard' for irreparable injury." *ConverDyn*, 68 F. Supp. 3d at 46 (quoting

35

*Chaplaincy of Full Gospel Churches*, 454 F.3d at 297). The movant must demonstrate that it faces an injury that is "both certain and great; it must be actual and not theoretical," and of a nature "of such imminence that there is a clear and present need for equitable relief to prevent irreparable harm." *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (quotation marks and emphasis omitted). Furthermore, similar to the test for organizational standing, an organization faced irreparable harm where (1) the "actions taken by [the defendant] have 'perceptibly impaired' the [organization's] programs," *League of Women Voters*, 838 F.3d at 8 (alteration in original) (quoting *Fair Emp't Council of Greater Wash.*, 28 F.3d at 1276), and (2) "the defendant's actions 'directly conflict with the organization's mission," *id.* (quoting *Nat'l Treasury Emps. Union*, 101 F.3d at 1430).

The Court finds that both the individual Plaintiffs and the Organization Plaintiffs face irreparable harm absent a preliminary injunction.

### 1. The Individual Plaintiffs Face Irreparable Harm

The individual Plaintiffs argue that the USPS policies puts their vote at risk of not being counted if they choose to send in their ballot on a day that is close to Election Day. Prior to the implementation of the USPS policy, the individual Plaintiffs would have been able to reasonably expect that a ballot placed

in the mail on October 31, the Saturday prior to Election Day, would have arrived at its intended destination by November 3, based on the 1 to 3 day First Class Mail delivery standard. Pls.' Mot., ECF No. 16-1 at 37. Now, however, even with just a one-day delivery delay caused by the USPS policy changes, there is a significant risk that a voter's ballot will not be counted. *Id.*

In response, Defendants argue that the individual Plaintiffs' preference to wait to send in their ballots until closer to Election Day because they want to avoid regretting their decision or because they want to "wait until they have all the information they need" is insufficient and too speculative to establish an irreparable harm. Defs.' Opp'n, ECF No. 21 at 42 (alterations omitted). In other words, "'if their plight can be characterized as disenfranchisement at all, it was not caused by' USPS but rather 'their own failure to take [the] timely steps' necessary." *Id.* (alteration in original) (quoting *Rosario*, 410 U.S. at 758). Furthermore, Defendants assert that "in light of service improvements and ongoing efforts to timely delivery [sic] Election Mail," Plaintiffs cannot show that their ballots would not be received in time. *Id.* at 42-43.

The Court finds that the individual Plaintiffs have sufficiently shown they will likely suffer irreparable harm absent a preliminary injunction. As described above, Plaintiffs

37

have provided ample evidence showing that, due to delays in the
delivery of mail, there is a substantial risk that Plaintiffs
will suffer an undue burden on their constitutional right to
vote. *See Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir.
2012) ("A restriction on the fundamental right to vote . . .
constitutes irreparable injury."); *Cardona v. Oakland Unified
Sch. Dist., Cal.*, 785 F. Supp. 837, 840 (N.D. Cal. 1992)
(explaining abridgement "or dilution of a right so fundamental
as the right to vote constitutes irreparable injury"). There is
"no do-over and no redress" once the election has passed. *League
of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 247
(4th Cir. 2014). Defendants' suggestion that Plaintiffs need
only vote earlier than planned also does not remedy the harms
Plaintiffs would face in being forced to make a decision on how
to vote before they have all of the information they require.
*Cf. McIntyre*, 514 U.S. at 346–47 ("In a republic where the
people are sovereign, the ability of the citizenry to make
informed choices among candidates for office is essential, for
the identities of those who are elected will inevitably shape
the course that we follow as a nation."). Finally, regarding
Defendants' assertion that Plaintiffs have failed to show the
likelihood of delivery delays, as Plaintiffs have pointed out,
Defendants' own data suggests that USPS's service scores have
not bounced back since the implementation of the policy changes,

and Defendants have provided no other information suggesting
that that will change prior to Election Day. *See* Pls.' Reply,
ECF No. 24 at 10-13; *see also* Grimmer Decl., ECF No. 16-11;
Suppl. Grimmer Decl., ECF No. 24-2.

The individual Plaintiffs have thus asserted irreparable
harm.

### 2. The Organization Plaintiffs Face Irreparable Harm

The Organization Plaintiffs argue that they have also
demonstrated that irreparable harm is clear and immediate
because the USPS policy has "caused Plaintiffs to redirect their
limited resources, which includes both their labor and their
funds, to address challenges caused by Defendants' Policy that
were unforeseen." Pls.' Mot., ECF No. 16-1 at 41. In response,
Defendants argue that any claimed injury to the Organization
Plaintiffs' resources are insufficient because they have not
established that mail delays were solely a result of the USPS
policy as opposed to COVID-19. Defs.' Opp'n, ECF No. 21 at 43.
Defendants assert that COVID-19 caused significant staffing
shortages beginning in March 2020, and, although the shortages
began to recover in June, "the availability for July again began
to decrease, with availability falling to its lowest levels in
the week of July 11, 2020." *Id.* (citing Prokity Decl., ECF No.
21-2 ¶¶ 4-5). Thus, given these "simultaneous" impacts,
Plaintiffs cannot claim that the USPS policy was the sole cause

of their injury. *Id.* at 43-44. Defendants also contend that any future harms are not "certain and great." *Id.* at 44 (quoting *Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health & Human Servs.*, No. 20-cv-1630 (JEB), 2020 WL 5232076, at *38 (D.D.C. Sept. 2, 2020)).

Here, the Organization Plaintiffs have shown a likelihood of suffering irreparable harm. "As the D.C. Circuit has confirmed, '[o]bstacles' that 'unquestionably make it more difficult for [an organization] to accomplish [its] primary mission . . . provide injury for purposes both of standing and irreparable harm.'" *Whitman-Walker Clinic, Inc.*, 2020 WL 5232076, at *38 (alterations in original) (quoting *League of Women Voters*, 838 F.3d at 9). As described, the USPS policy changes have likely impaired and will likely continue to impair Plaintiff Vote Forward's ability to provide its services, undermining its mission. Plaintiff Voces Unidas has asserted similar harms to its programs: to counteract the harms caused by the USPS policy changes, Voces Unidas—an organization "dedicated to increasing civic engagement of the Latino population in three rural Colorado counties" through get-out-the-vote campaigns—estimates it will need to spend between $50,000 to $80,000 beyond its original budget through hiring "additional canvassers to intensify the campaign earlier than previously anticipated and to pay for additional advertising and dissemination of

information to the communities it serves." Pls.' Mot., ECF No.
16-1 at 42-43 (citing Voces Unidas Decl, ECF No. 16-25); *cf.
Food & Water Watch, Inc.*, 808 F.3d at 920 (explaining that an
organization suffers an injury where it "expend[s] resources to
educate its members and others" and those "operational costs
[go] beyond those normally expended"). Furthermore, the Court
has already determined that Plaintiffs' harms were the result of
the implementation of the USPS policy changes, not staffing
shortages, and, as stated above, "that harm is irreparable"
because after the November election passes, "there can be no do
over and no redress." *League of Women Voters*, 838 F.3d at 9
(quoting *League of Women Voters of N.C.*, 769 F.3d at 247).

### C. The Balance of Equities and Public Interest Favor an Injunction

The balance-of-equities factor directs the Court to "balance
the competing claims of injury and . . . consider the effect on
each party of the granting or withholding of the requested relief."
*ConverDyn*, 68 F. Supp. 3d at 52 (quoting *Winter*, 555 U.S. at 24).
"When the issuance of a preliminary injunction, while preventing
harm to one party, causes injury to the other, this factor does not
weigh in favor of granting preliminary injunctive relief." *Id.*; *see
also Serono Labs., Inc. v. Shalala*, 158 F.3d 1313, 1326 (D.C. Cir.
1998). By contrast, the balance of equities may favor a preliminary
injunction that serves only "to preserve the relative positions of
the parties until a trial on the merits can be held." *Rufer v. FEC*,

64 F. Supp. 3d 195, 206 (D.D.C. 2014) (CRC) (quoting *Camenisch*, 451
U.S. at 395). "The purpose of . . . interim relief is not to
conclusively determine the rights of the parties, *Univ. of Tex. v.
Camenisch*, 451 U.S. 390, 395 (1981), but to balance the equities as
the litigation moves forward. In awarding a preliminary injunction
a court must also 'conside[r] . . . the overall public interest,'
*Winter*, [555 U.S.] at 26." *Trump v. Int'l Refugee Assistance
Project*, 137 S. Ct. 2080, 2087 (2017) (second alteration in
original).

Plaintiffs contend that the balance of the equities and the
public interest favor a preliminary injunction because it is in
the public interest to prevent constitutional violations and to
allow eligible citizens to vote. Pls.' Mot., ECF No. 16-1 at 43-
44. Defendants do not contest the equities in Plaintiffs' favor.
Rather, Defendants argue that the public interest and the
balance of the equities disfavor granting relief because (1)
"USPS is currently undertaking extensive efforts to facilitate
the timely delivery of Election Mail"; (2) "the Individual
Plaintiffs have an opportunity to avoid any harm by mailing in
their ballots without delay"; (3) the July 10 "Stand-Up Talk"
"does not represent official USPS policy"; and (4) granting
relief "could require the Court to act as an overseer of the
agency's day-to-day activities. Defs.' Opp'n, ECF No. 21 at 44-
45.

Here, the balance of the equities and the public interest favor an injunction. "By definition, '[t]he public interest . . . favors permitting as many qualified voters to vote as possible." *League of Women Voters of N.C.*, 769 F.3d at 247-48 (quoting *Husted*, 697 F.3d at 437). It is also clearly in the public interest to require that USPS implement policies that do not infringe upon constitutional rights. *League of Women Voters*, 838 F.3d at 12 ("There is generally no public interest in the perpetuation of unlawful agency action."). Nor does the proposed injunction contemplate that the Court would become involved in overseeing the day-to-day operations of the USPS. And while it may be true that the "Stand-Up Talk" itself may not be an official policy, Defendants do not contest that they have implemented changes regarding transportation and extra trips, and the Court has the authority to adjust the requested relief as appropriate. *See Richmond Tenants Org. v. Kemp*, 956 F.2d 1300, 1308 (4th Cir. 1992) ("It is well established . . . that a federal district court has wide discretion to fashion appropriate injunctive relief . . . .").

## IV. Conclusion

For the foregoing reasons, the Court **GRANTS** the Plaintiffs' motion for a preliminary injunction. Any request to stay this decision pending appeal will be denied for substantially the

same reasons as those articulated in this Opinion. An

appropriate Order accompanies this Memorandum Opinion.

      **SO ORDERED.**

Signed:    **Emmet G. Sullivan**
             **United States District Judge**
             **September 28, 2020**