UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

**Vote Forward, *et al*,**

Plaintiffs,

v.

Case No. 20-cv-2405

**DeJoy, *et al.*,**

Defendants.

**DEFENDANTS' OPPOSITION TO PLAINTIFF'S
EMERGENCY MOTION TO ENFORCE AND MONITOR
COMPLIANCE WITH PRELIMINARY INJUNCTION**

**INTRODUCTION**

In three related cases, this Court enjoined the Postal Service from enforcing a prohibition on late and extra trips. Consistent with and pursuant to these orders, the Postal Service has made clear to its managers and employees, in writing and oral instruction, on no fewer than five separate instances over the past month that such trips are *not* banned, but rather are authorized and should be used if they will effectuate timely delivery of the mail. And it has produced data showing that hundreds, often thousands, of such trips occur every day—indeed, there were 2,178 late trips and 740 extra trips yesterday alone. Defendants have indisputably complied with this Court's orders, which they treat with the utmost seriousness.

Nonetheless Plaintiffs in those three cases—*NAACP v. USPS*, 20-cv-2296 (EGS) (D.D.C.) ("*NAACP*"), *Richardson v. Trump*, 20-cv-2262 (EGS) (D.D.C.), and *Vote Forward v. DeJoy*, 20-cv-2405 (EGS) (D.D.C)—have filed identical motions claiming there are "substantial questions"

1

regarding whether Defendants have complied with this Court's orders. They ask the Court to order the Postal Service to produce burdensome and extraneous data, which, by its very nature would be of a lower and less reliable quality than the data currently produced, on an accelerated timeline. To be sure, Plaintiffs could have requested the production of such data at the preliminary injunction stage. But they have no basis whatsoever to suggest that such data is now *required* due to the Postal Service's supposedly non-compliance with this Court's orders.

To begin, Defendants take their compliance with the orders of this Court and those of other Courts in these related cases very seriously. That is why, whenever there was even a shadow of ambiguity regarding the scope of a court's order, Defendants have sought explicit clarification from the Court. *See, e.g.*, Defs.' Mot. Clarify Prelim Inj., ECF No. 83, *State of Washington v. Trump*, No. 20-cv-3127-SAB (E.D. Wash. Sept. 23, 2020); Defs.' Mem. Supp. Mot. for Clarification or Modification, ECF No. 60, *Jones v. USPS*, No. 20-cv-6516 (VM) (S.D.N.Y. Sept. 26, 2020); Defs.' Mot for Clarification, ECF No. 54, *State of New York v. Trump*, No. 20-cv-2340 (EGS); Mot. for Clarification and/or Reconsideration, *Pennsylvania v. DeJoy*, No. 20-cv-4096-GAM (E.D. Pa. Oct. 5, 2020). But no clarification was needed as to this Court's orders concerning extra or late trips because those provisions were explicit, and Defendants have indisputably complied with each of them.

First, Plaintiffs cannot show—and have not even seriously tried to show—that Defendants might be violating this Court's orders. All parties agree that this Court in all three cases enjoined the Postal Service from prohibiting late and extra trips. And all parties agree that the Postal Service, both before and after this Court issued its orders, has expressly instructed its employees on numerous occasions that such trips are not banned, but should be used when necessary. Indeed, all parties agree that such trips occur every day.

What Plaintiffs instead seem to be arguing is that this Court's orders, despite expressly applying to a ban on late and extra trips, reached further to target any guidance for when such trips might be helpful, and when such trips might be counterproductive to the expeditious delivery of the mail. But Plaintiffs do not cite to *any* provision of *any* of the three Orders that contains such a prohibition. Of course, Defendants could not fail to comply with language that is not in the text of an Order, let alone an Order that would be proper under Federal Rule of Civil Procedure 65(d). The Federal Rules require that an injunction clearly specify what conduct is prohibited—in this case, as this Court ordered explicitly, a ban on late and extra trips.

To be clear, other courts *have* issued orders that could be read to apply to the guidelines that is the apparent basis of Plaintiffs' present motions. *See, e.g.*, Order ¶ 4(b), ECF No. 63, *Pennsylvania v. DeJoy*, No. 20-cv-2096 (GAM) (E.D. Pa.) (enjoining "continued implementation or enforcement of the Guidelines regarding transportation"). Accordingly, in those cases, Defendants moved weeks ago to clarify the scope and status of those guidelines in light of the confusion and disruption to service such an order would cause. *See* Mot. for Clarification, at 4, ECF No. 66, *Pennsylvania v. DeJoy*, No. 20-cv-2096 (GAM) (E.D. Pa.) (noting that provision related to guidelines "may create the impression that local offices must always permit late and extra trips without any limitation which unquestionably would negatively impact service."). And the U.S. District Court for the Eastern District of Pennsylvania agreed, and clarified its order to make clear that the guidelines were "supersed[ed] . . . to the extent they conflict" with the requirement that "[t]ransportation, in the form of late and extra trips is authorized and shall be used when reasonably necessary to meet service standards." Order, at 1-2, ECF No. 70, *Pennsylvania v. DeJoy*, No. 20-cv-2096 (GAM) (E.D. Pa.). This is the same instruction that the Postal Service sent out as early as September 21. It is difficult to see how Defendants could be acting in a

supposedly "non-compliant" fashion with the orders of this Court when they have been fully transparent about their position on this issue in public filings with district courts. Again, had there been any ambiguity on this issues in these case, Defendants would have moved to clarify them here as well, as it did with other issues that this Court recently decided in Defendants' favor. It is telling that, despite numerous courts having issued the same prohibition against a ban on extra and late trips, Plaintiffs in these cases are the only ones nationwide who have alleged non-compliance by Defendants.

Second, Plaintiffs request data so they can purportedly "assess" Defendants' compliance with this Court's order. But the data they seek would be irrelevant for such an exercise. Plaintiffs do not need daily, granular data productions to confirm that late and extra trips are indeed occurring, and that the Postal Service has sent multiple guidance documents confirming that employees may continue to use late and extra trips. In any event, Defendants are already providing, on a weekly basis, information on the number of late and extra trips that occur each day pursuant to the order of the United States District Court for the Eastern District of Pennsylvania. And that data has shown that late and trips have always occurred.

Nor would daily information on service scores (i.e., on-time performance) assist the Court in judging the Postal Service's compliance with an order prohibiting a ban on late and extra trips, as such scores are the product of a number of factors, as the United States District Court for the Southern District of New York has recognized. Moreover, daily service performance data is incomplete, subject to change, and overall, is simply not an accurate representation of the Postal Service's service performance. *See* Saleem Dec. ¶ 5. Rather, weekly data, of the sort already provided to Plaintiffs, "is much more representative and accurate." *Id.* It is difficult to see how either Plaintiffs or this Court would benefit from unrepresentative, inaccurate daily data,

4

particularly when such data would not actually demonstrate compliance (or noncompliance) with this Court's orders.

Finally, requiring the Postal Service to produce such data on a daily basis would be burdensome and interfere with the Postal Service's ability to gather the analytics it needs to steer an organization of 630,000 employees in the critical ten days before the Election. Plaintiffs suggest that their request is essentially costless. It is not. Plaintiffs continue to make unsupported accusations of noncompliance, with the result being that Defendants are constantly required to divert focus from preparing for an election to providing declarations about their efforts. Indeed, attempting to comply with Plaintiffs belated demand would consume the resources of the Postal Service's data analytics group, preventing it from providing other information to operationally support the Postal Service's Election Mail efforts. Plaintiffs' litigation tactics are directly contrary to their own purported goal of ensuring the timely and efficient delivery of Election Mail over the next ten days.

For these reasons, Plaintiffs' motions should be denied.

## ARGUMENT

Plaintiffs note that the Court has "inherent power to enforce its judgments," pursuant to which discovery may be appropriate if "significant questions regarding noncompliance have been raised." *Damus v. Nielsen*, 328 F.R.D. 1, 2-4 (D.D.C. 2018); *see also Heredia Mons v. Wolf*, No. 19-cv-1593 (JEB), 2020 WL 4201596, at *2 (D.D.C. July 22, 2020). The "significant question" requirement requires evidence of noncompliance, not merely speculation. *See id.* at *2-3 (in a case where court required defendant agency to provide individualized procedural protections to litigants, court concluded that there was affidavit evidence of litigants not receiving individualized process). Plaintiffs fail to raise any such questions, much less significant ones.

5

## I.      Defendants have indisputably complied with this Court's Orders.

In each of these three related cases, the Court enjoined USPS's prohibition of late trips and extra trips:[1]

- In *NAACP* the Court ordered that "Defendants are hereby enjoined from enforcing the Transportation Policy Changes," Order, ECF No. 31, which it defined as "the *prohibition* on 'late trips' and 'extra trips' (collectively 'Transportation Policy Changes')", Mem. Op., at 6-7, ECF No. 32 (emphasis added).

- In *Richardson*, the Court ordered that "Defendants are hereby enjoined from enforcing the Late/Extra Trips Policy," Order, ECF No. 64, which it defined as "changes *prohibiting* 'late trips' and 'extra trips' ('Late/Extra Trips Policy')," Mem. Op, at 4, ECF No. 65 (emphasis added).

- In *Vote Forward*, the Court enjoined Defendants "from enforcing the Late/Extra Trips Policy," Order, ECF No. 31, which it defined as the requirement that "(1) '[a]ll trips will depart on time (Network, Plant And Delivery); *late trips are no longer authorized or accepted'; (2) "[e]xtra trips are no longer authorized or accepted'* (3) '[c]arriers must begin on time, leave for the street on time, and return on time'; and (4) 'no additional transportation will be authorized to dispatch mail to the Plant after the intended dispatch' (collectively, the 'Late/Extra Trips Policy')," Mem. Op., at 3, ECF No. 32 (emphasis added).

Pursuant to these injunctions, USPS cannot prohibit or ban late and extra trips. In recognition of this proscrption (one that has been ordered by multiple district courts in addition to this one), USPS has repeatedly reiterated to its employees that there is no ban on late and extra trips:

---

[1] In the fourth related case in this district, *State of New York v. Trump*, No. 20-cv-240 (EGS), the Court similarly "enjoined Defendants from enforcing . . . the prohibition of 'late trips' and 'extra trips.'" Order, at 1 ECF No. 62

- As early as September 21, USPS instructed its managers that: "the Postmaster General has not banned the use of late or extra trips; when operationally required, late or extra trips are permitted. . . . [T]ransportation, in the form of late or extra trips that are reasonably necessary to complete timely mail delivery, is not to be unreasonably restricted or prohibited. Managers are authorized to use their best business judgment to meet [USPS] service commitments." Supplemental Clarifying Instructions, at 3, [Ex A.]. USPS further specifically instructed that this guidance "supersede[s] any previous guidance . . . that could be seen as conflicting with these Instructions, whether from Headquarters or the field." *Id.* at 1.

o On September 24, USPS informed all of its employees that: "[l]ate or extra trips have not been banned; they should not be restricted if they are reasonably necessary to complete timely mail delivery." Stand-Up Talk, at 2 [Ex. B].

o On September 25, USPS not only explained that extra trips were *not* banned, but that they should affirmatively be used in certain circumstances: "Extra transportation resources are authorized and instructed to be used to ensure that Election Mail reaches its intended destination in a timely manner." Additional Election Mail Resources, at 2 [Ex. C].

o On October 13, USPS again emphasized that "late and extra trips are not banned," and that "[p]re-approval is not needed for late and extra trips." Moreover, "late and extra trips that would facilitate the on-time delivery of Election Mail are authorized and encouraged – we are committed to using such trips to deliver Election Mail on time." Supplemental Guidance Mem., at 3 [Ex. D.]

o On October 16, USPS issued a mandatory Stand-Up Talk to all employees, where it stated that "[l]ate and extra trips . . . should be used when they would facilitate the expeditious delivery of Election Mail" and that "[t]ransportation, in the form of late and extra trips is authorized and shall be used where reasonably necessary to meet service standards and service performance targets. The Postal Service shall use extra trips to meet service commitments when feasible." October Stand-Up Talk, at 1, 2 [Ex. E.]. The Postal Service further stated that "[a]ny conflicting guidance is superseded." *Id.* at 3.

USPS has therefore emphasized no fewer than *five* times that late and trips are not banned, and, rather, are authorized and should be used when necessary to meet the Postal Service's service targets. This guidance indisputably complies with this Court's orders.

Nor is there any doubt that late and extra trips are still occurring. Pursuant to the order of the District Court for the Eastern District of Pennsylvania, USPS has provided data, which—as Plaintiffs acknowledge—indicates that USPS has had between 702 and 2,374 late trips per day and between 464 and 1,748 extra trips per day during the first half of October. *See* Daily Late and

7

Extra Trips Oct 1, 2020 – Oct. 15, 2020, ECF No. 76-2, *Pennsylvania v. USPS*, 20-cv-4096 (GAM).  Indeed, *yesterday*, October 22, 2020, there were 2,178 late trips, and 740 extra trips.  *See* Daily Late and Extra Trips Oct. 1, 2020 – Oct. 22, 2020 [Ex. F].

The Postal Service has thus demonstrated that (1) it has instructed its employees—repeatedly and explicitly—that late and extra trips are *not* prohibited, and (2) that the data makes clear that such trips are occurring hundreds, often thousands, of times per day.  There can be no question—much less a "significant question"—regarding Defendants' compliance with this Court's orders.[2]

## II. Plaintiffs fail to raise a "serious question" regarding Defendants' compliance efforts based on language that is not part of any court order.

Notably, Plaintiffs never seriously dispute that the Postal Service has instructed that late and extra trips are not banned and that they occur on a daily basis.  Rather, unable to overcome the plain language of the Court's orders and the obvious and undisputed facts that indicate that Defendants are complying with those orders, they make suppositions about what the Court supposedly required that are completely divorced from the actual text of its orders.

---

[2] In light of the fact that the Postal Service is complying with this Court's orders, as well as the burden that litigating these cases on an expedited basis places on the Postal Service's operational managers, who are also working to ensure the Nation's mail system meets the demands of the Election, Defendants respectfully submit that further accelerated motions practice in these and other related cases is not necessary and may ultimately be counterproductive to all parties' shared goal of ensuring the expeditious delivery of the mail, particularly Election Mail.  Indeed, Defendants note that the Plaintiffs in *New York* are the only ones who asked for expedited summary judgment briefing.  Given the multiple preliminary injunctions in place and the Postal Service's commitments to the proper handling and timely delivery of Election Mail, the only byproduct of such briefing, which in the main repeats the arguments already presented on their motion for preliminary injunction, is to burden the employees of the Postal Service, who must now devote time and attention to factual attestations rather than their job of ensuring timely delivery of Election Mail in this critical period.

*First*, Plaintiffs assert that the "Court . . . considered [the] additional operational instructions and guidelines that Defendants adopted on September 21, 24, and 25 and submitted for the Court's consideration." Mot. at 4.  Plaintiffs go on to conclude that "[b]y granting plaintiffs' motion, the Court made clear that these attempts at clarification were inadequate." *Id.* at 5.  They therefore reason that the Court must have been enjoining something else *other* than a prohibition on late and extra trips (even though it did not say so), and point to a set of guidelines issued in July 14, 2020 by Robert Cintron, Vice President, Logistics (the "Cintron Guidelines").  *See id.* at 4-5. These guidelines did not and do not ban late and extra trips, rather "[t]hey were intended to clarify pre-existing ambiguity concerning late and extra trips by describing when late/extra trips will and will not facilitate prompt delivery of mail."  Third Supp. Cintron Dec. ¶ 5 [Ex. G].  In any event, to the extent the Guidelines were interpreted in a more restrictive fashion, the Clarifying Operational Instructions made clear that late and extra trips are not banned.  *See* Ex. A.

But these points are ultimately irrelevant to the present motion, because this Court did not say anything about the Cintron Guidelines in its orders.  If the Court actually intended to enjoin every aspect of the Cintron Guidelines via its orders (and not just a ban on late and extra trips, to the extent the guidelines purportedly imposed such a ban—which it did not), such an injunction must comport with Rule 65(d), which requires "that a federal court frame its orders so those who must obey them will know what the court intends to require and what it means to forbid." *Common Cause v. Nuclear Regulatory Comm'n*, 674 F.2d 921, 927 (D.C. Cir. 1982) (quoting *Int'l Longshoremen's Ass'n, Local 1291 v. Philadelphia Marine Trade Ass'n*, 389 U.S. 64, 76 (1967)); *see also United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1137 (D.C. Cir. 2009) ("Because an injunction 'prohibits conduct under threat of judicial punishment, basic fairness requires that those enjoined receive explicit notice of precisely what conduct is outlawed.'") (quoting *Schmidt*

*v. Lessard*, 414 U.S. 473, 476 (1974)).  The Court's orders were specific in what they prohibit—a ban on late and extra trips—and neither identified nor even suggested that anything else was subject to their mandate.

Nor does the fact that the Cintron Guidelines were not immediately "revoked" indicate any possibility of noncompliance.  As discussed earlier, these Guidelines simply recognized that there are situations where late and extra trips would facilitate the expeditious delivery of mail, *see* Supp. Cintron Dec. ¶¶ 3, 6, 10, and there are times when late and extra trips *could actually harm performance*.  For example, if trucks are held at a processing and distribution center in order to wait for additional mail, this delay could cause the mail trucks to "arrive at an air transportation center too late to meet the scheduled departure time of the flight," *id.* ¶ 14, and thus would delay all of the mail on the truck.  These guidelines thus provide some guidance to managers—who, in any event, have discretion to "use their best business judgment to meet [USPS] service commitments," Ex. A, at 3—but are *not* a ban.  Indeed, was there any doubt at all, Mr. Cintron issued an email on October 16 "to reinforce what I believe recent communications from [Headquarters] have already made clear" that these guidelines "set no hard limitation on [late and extra] trips," and emphasizing that "[m]y guidelines may provide an effective tool for addressing any questions managers may have concerning when to run late and extras but they **should not** be read in a manner that conflicts with the attached Stand-Up Talk [that makes clear that such trips are authorized and should be used when operationally appropriate].  At all times, including during this election season, delayed trips and extra trips should be used as necessary to meet service performance standards and to ensure the timely delivery of election mail.  Managers shall use their best business judgment to meet service commitments and not leave mail behind."  Colin Dec. ¶ 17

(emphasis in original) [Ex. H]. Plaintiffs provide no reason why this email would not demonstrate the Postal Service's compliance, however the Court's orders are interpreted.

Indeed, one of the reasons Mr. Cintron issued this email is because the question of the status of his guidelines was front and center in a motion for clarification in the Eastern District of Pennsylvania. There, the Court enjoined the Defendants from "continued implementation or enforcement of the Guidelines regarding transportation sent by Robert Cintron." Order, ¶ 4(b), ECF No. 63. Defendants moved for clarification on this point on October 6, 2020, noting that USPS had made clear that the Guidelines were not a ban or restriction on late and extra trips, but simply guidance on when late and extra trips were helpful. *See* Mot. for Clarification, ECF No. 66, *Pennsylvania v. DeJoy*, 20-cv-4096 (GAM) (E.D. Pa.). And the Court agreed, ruling on October 9 that "[t]ransportation in the form of late and extra trips is authorized and shall be used when reasonably necessary to meet service standards and service performance targets," and that "[t]o the extent they conflict, the provisions of this Order shall supersede any prior guidance, including Guidelines regarding transportation sent by Robert Cintron." Order, at 1-2, ECF No. 70, *Pennsylvania v. DeJoy*, 20-cv-4096 (GAM) (E.D. Pa.). Defendants have therefore been crystal-clear about their interpretation of the scope of the guidelines (that they are a potentially helpful tool but are *not* binding), and had Plaintiffs thought that this construction conflicted with this Court's orders, they could have brought this to the Court's attention weeks ago. They did not.

*Second*, Plaintiffs argue that Defendants "made no efforts to comply" with this Court's orders "[f]or over two weeks." *See* Mot. at 5. But this is simply wrong. As described above, the Postal Service issued repeated instructions that late and extra trips were not banned, but rather were authorized when they would improve service, and those instructions have been in place throughout the entire period that the Court's orders were in effect—something Plaintiffs do not

11

deny. But more importantly, this argument is irrelevant to their present motion. Whatever the past conduct of Defendants, if they are indisputably in compliance in the present, then there is no need for the continued production of data to ensure that they remain in compliance.

*Third*, Plaintiffs say that "[t]he relevant data confirm Defendants' failure to comply with the Court's injunctions." *Id.* They point to the fact that USPS's service scores have not fully returned to their pre-July levels. *Id.* But this is not evidence of Defendants' noncompliance with an order enjoining a ban on late and extra trips. Rather, as the United States District Court for the District Court for the Southern District of New York explained, there are "a variety of issues – such as the COVID-19 pandemic, wildfires on the west coast, and inclement weather – which contribute to the [service] delays and are outside of USPS's control." Order, ECF No. 82, at 6, *Jones v. USPS*, No. 20-cv-6516-VM (Oct. 9, 2020). Nor does the fact that there were fewer late and extra trips in October than July call Defendants compliance with this Court's orders into question. *See* Mot. at 6. Just the opposite – it indicates that late and extra trips are not banned.

It would, after all, make little sense to *require* USPS to use late and extra trips under all circumstances in an attempt to have the same number of late and extra trips as in July, as Plaintiffs seem to suggest. While late and extra trips can be useful under specific circumstances, if they are used "without any limitation" it "would lead to substantial delay in mail deliveries throughout the Nation," as mail trucks would regularly miss connections with air travel and long-haul tractor-trailers, exacerbating delays. Third Supp. Cintron Dec. ¶ 8.

Indeed, unlike other cases Plaintiffs cite where data might be useful to judge compliance, here the data Plaintiffs seek is simply irrelevant. These cases differ from *Heredia Mons* and *Damus*, which articulated the "significant question" basis for discovery to enforce a judgment, and discussed the type of data that could support such a showing. There, the Court had issued

injunctions with abstract requirements (in *Heredia Mons*, requiring that the Department of Homeland Security provide applicants individualized, fact-specific assessments and comport with procedural and substantive requirements, 2020 WL 4201596, at *1, and in *Damus*, the Court issued an order similarly requiring an individualized assessment for asylum seekers. 328 F.R.D. at 2-3). In order to judge compliance, the Court had to look at circumstantial evidence, and the Court therefore considered rates of very high denial, combined with affidavit evidence of summary denial without individualized assessment, as probative evidence that the policies were not being followed. *Heredia Mons*, 202 WL 4201596, at *3; *Damus*, 328 F.R.D. at 4-5). In these cases, by contrast, the Court's injunctions were not abstract, but direct: prohibiting the Postal Service from banning late and extra trips. The Postal Service has affirmatively shown that no such ban exists, and that late and extra trips continue every day, and thus there is simply no evidence that a ban is actually in place.

Moreover, the data would tell this Court nothing about whether the "Cintron guidelines" remain in effect, which is the only purported basis for Plaintiffs' requests. Even if this Court were to decide that its order required the revocation of the "Cintron guidelines" in their totality, such an injunction would be resolved by instructions to the field (instructions that, as the Postal Service has explained in public filings, would have a negative impact on the delivery of the mail, *see* Third Supp. Cintron Dec.). It is entirely unclear why data would then be needed, as Defendants would unquestionably be in compliance with even Plaintiffs' own, creative reading of this Court's orders.

Plaintiffs have raised no questions, much less a "significant question," regarding the Postal Service's compliance with this Court's order, and their motion should be denied on that basis alone.

**III. The relief Plaintiffs seek has nothing to do with ensuring compliance with this Court's orders.**

Plaintiffs also make no serious attempt to demonstrate why the relief they seek—extensive, daily data—is possibly necessary to assist the Court in determining whether the Postal Service has continued a ban on late and extra trips.  The Postal Service is already providing extensive data pursuant to the orders of other district courts, including weekly updates on service performance standards for First-Class Mail, Marketing Mail, and Periodicals; "separate, unmerged 2-day and 3-5 day weekly service reports for both pre-sort and single-piece First-Class Mail, and variance reports," and a summary of "any and all data collected by USPS Headquarters regarding USPS's handling of Election Mail at the Headquarters level and compliance with USPS policies regarding Election Mail."  Order ¶ 6, *Jones v. USPS*, ECF No. 57, No. 20-cv-651 (VM) (S.D.N.Y. 2020). The Postal Service is also providing weekly submissions on the rate that the Postal Service incurred overtime and the number of late and local trips.  *See* Order ¶ 5, ECF No. 63, *Pennsylvania v. DeJoy*, 20-cv-4096 (GAM).  And as Plaintiffs acknowledge, these late and extra trips have consistently occurred since the Court issued its injunctions.  Nor do Plaintiffs provide any basis for why they need such late and extra trip data provided *every day*, particularly given that the Postal Service has consistently demonstrated, as recently as yesterday, that such late and extra trips continue.

Nor would producing daily service score information provide information on whether USPS is complying with an injunction regarding such late and extra trips.  As discussed above, even weekly service scores do not indicate whether the Postal Service is complying with this Court's injunction; daily, lower-quality reporting of that same information would provide even less assistance.  Indeed, Plaintiffs have made no attempt to target their request, as they seek "any other reports and metrics on mail delivery timelines," Proposed Order ¶ 3, ECF No. 3, a request that, if taken seriously, could involve millions of different data points for specific pieces of mail.

Saleem Dec. ¶ 9.  Moreover, "[t]he Postal Service has a variety of teams, all of which produce internal reports," *id.* which are not centrally located.  Moreover, many of these reports are ad-hoc data that "can be useful for internal operational purposes but is not useful for evaluating overall mail performance."  *Id.* ¶ 4.  Rather, to the extent Plaintiffs are seeking to understand the Postal Service's performance, the validated data that Defendants are already providing pursuant to other court orders—including specific to Election Mail—would be the most useful.

Ultimately, Plaintiffs seek to launch a burdensome fishing expedition for data without any real connection to evaluating Defendants' compliance with this Court's injunction – the basis for any discovery in this context.  *See Damus v. Nielsen*, 328 F.R.D. 1, 3-4 (D.D.C. 2018).

**IV.     The relief Plaintiffs seek is not feasible and would hinder the Postal Service in the last days before the Election.**

Plaintiffs' requests for data should be denied for another reason: it would not produce accurate, reliable information, and in attempting to do so, it would consume Postal Service resources at precisely the time when the Postal Service should be focused on ensuring the expeditious delivery of Election Mail.

As the Postal Service has explained, "daily performance data is incomplete, subject to change, and overall, is not an accurate representation of the Postal Service's service performance." Saleem Dec. ¶ 5 [Ex. I].  Same-day reporting, for example, "would be incomplete and misleading" because if a mailpiece that was scheduled to be delivered on a Wednesday, but was actually delivered on a Friday, "that delay would not be apparent from the Wednesday daily data and would only be incorporated into the Postal Service's data after it was delivered on Friday.  As such, weekly data produced several days after the close of the week is much more representative and accurate."  *Id.*  Similarly, "individual days during the week tend to exhibit unique and differential performance patterns that would be misleading and unhelpful when taken out of a longer-term

15

service picture." *Id.* ¶ 8.  Service performance data is also subject to change for a variety of other reasons, including data updates, quality controls, and other issues which "can cause sizable changes in the data, which makes daily data less informative for tracking trends in service compared to the longer-term data the Postal Service is already providing." *Id.* ¶ 6.  The Postal Service has a "complex and sophisticated data validation process" for its weekly reporting, which allows it "to correct data errors before they are erroneously relied upon." *Id.* ¶ 7.  This validation takes time to complete, and "the sooner service performance data is reported, the more incomplete and unrepresentative it is." *Id.*

Providing such unvalidated, incomplete, and unrepresentative data would not assist the Court in judging Defendants' compliance (assuming such data was even relevant, which it is not). But even attempting to produce such reports would be a significant burden on the Postal Service in the lead up to the election.  The Enterprise Analytics Corporate Reporting Organization, which is the "sole provider of official service scores," currently produced "over 100 such scores and reports per week . . . which is extremely time consuming." *Id.* ¶ 12.  "[R]equiring the Postal Service to produce more frequent, lower quality data reports would impose a new burden that would divert important managerial and other resources." *Id.*  Indeed, producing daily reporting would consume the majority of the time of the people currently producing such service performance data.  "Little benefit would be gained for the court or the public in exchange for providing this information, given that the daily data would be incomplete and unrepresentative . . . and inferior to the weekly data already being provided." *Id.* ¶ 13.  Moreover, key personnel would be diverted from "working on critical data analysis to support the Postal Service's commitment to on-time delivery of all mail in general, and Election Mail in particular, for millions

of people and voters across the country." *Id.* Plaintiffs have shown no basis for why such an exercise is justified.

## **CONCLUSION**

For the aforementioned reasons, this Court should deny Plaintiffs' motions.

Dated: October 23, 2020         Respectfully submitted,

JEFFREY BOSSERT CLARK
Acting Assistant Attorney General

ERIC R. WOMACK
Assistant Director, Federal Programs Branch

*/s/ Kuntal Cholera*
JOSEPH E. BORSON (Va. Bar No. 85519)
KUNTAL CHOLERA
ALEXIS ECHOLS
DENA M. ROTH
JOHN J. ROBINSON
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L. Street, NW
Washington D.C. 20005
(202) 514-1944
Joseph.Borson@usdoj.gov

*Attorneys for Defendants*