**EXHIBIT INDEX**

| | |
|---|---|
| A | Clarifying Operational Instructions (Sept. 21, 2020) |
| B | Mandatory Stand-Up Talk (Sept. 24, 2020) |
| C | Additional Resources for Election Mail Beginning Oct. 1 (Sept. 25, 2020) |
| D | Supplemental Guidance Memorandum (Oct. 13, 2020) |
| E | Mandatory Stand-Up Talk (Oct. 16, 2020) |
| F | Daily Late and Extra Trips – October 1-22 (Oct. 23, 2020) |
| G | Third Supplemental Declaration of Robert Cintron |
| H | Declaration of Joshua Colin, PhD |
| I | Declaration of Arslan Saleem |

**<u>EXHIBIT A</u>**


**UNITED STATES**
**POSTAL SERVICE**

September 21, 2020

OFFICERS, PCES, AND PAY BAND MANAGERS

SUBJECT:  Clarifying Operational Instructions

The number one priority for Postmaster General DeJoy and the Postal Service between now and Election Day is the secure and on-time delivery of the nation's election mail.  Effective October 1, 2020, the Postal Service will make additional resources available in all areas of operations, including collection, processing, delivery, and transportation, to satisfy increased demand and unforeseen circumstances. These additional resources will include, as needed, additional staffing, additional transportation, and expanded mail processing windows and delivery trips, among others.  Further guidance on use of additional resources will be provided separately.

To address any misinformation and clear up any confusion about the status of the Postal Service's practices concerning Overtime, Hiring, Retail Hours, Collection Boxes, Late and Extra Trips, Mail Processing, and Election Mail, these Clarifying Operational Instructions detail practices as they currently stand related to those topics.

As you may also be aware, a federal district court recently issued an order imposing certain requirements for the handling of mail.  These Instructions are also intended to provide guidance to assist in carrying out the specific directives required by that order, as they relate to current operational practices.

The approach to the matters outlined in these Instructions will remain in effect until further notice and supersede any previous guidance provided on these specific topics that could be seen as conflicting with these Instructions, whether from Headquarters or the field.

## 1. Overtime

Postal Service Headquarters has not imposed, and will not impose, any nationwide changes that ban or newly restrict overtime prior to Election Day.  Overtime use has not been banned, nor have any caps been placed on overtime hours.  Front-line supervisors and managers will continue to schedule employees' work hours and oversee employee overtime, including planning for any needed prescheduled overtime, directing unscheduled overtime, and approving employee requests for overtime work based on the workload.  Supervisors will continue to set schedules with the goal of matching the expected earned work hours with appropriate staffing.  Management will continue to monitor the use of work hours and overtime so that it can identify and address problems that may be the cause of work not being performed within expected work hours or managed inefficiently.

The Postal Service's consistent practice in the past is to use justified and approved overtime hours where needed to deliver the mail on time, and that practice will continue.  Overtime has been, and will continue to be, utilized as necessary to fulfill our mission.  As will be discussed in more detail in the forthcoming guidance regarding the use of additional resources starting on October 1, use of overtime necessary to expeditiously move Election Mail should be approved.

## 2. Hiring

Postal Service Headquarters has not implemented a total hiring freeze. Because of the realignment of the Postal Service's reporting structure announced on August 7, 2020, Postal Service Headquarters has suspended hiring for EAS positions to ensure proper placement of any current employees that may be impacted by the restructuring. Although hiring of EAS positions has been suspended, there is a process in place to request exceptions to fill critical EAS positions.

The suspension of EAS hiring does not impact the filling of craft positions. Craft positions will continue to be filled pursuant to the applicable collective bargaining agreement. The Postal Service has hired, and will continue to hire, new employees to address staffing shortages caused by the COVID-19 pandemic and otherwise.

## 3. Retail Hours

Postal Service Headquarters has not directed or authorized a reduction in retail window hours. Evaluating retail hours is part of an annual process to optimize the Postal Service retail network. The Postal Service was in the process of gathering data to make decisions regarding retail hours based on customer demand. Given both congressional and public concern, the Postal Service will not be adjusting retail hours prior to the November 2020 elections.

There may be unforeseen circumstances beyond the Postal Service's control that necessitate the temporary change of retail hours or the temporary closure of a retail facility such as natural disasters, or conditions that reduce employee availability or create an unsafe environment for employees like the COVID-19 pandemic or civil unrest. However, local managers are not permitted to reduce retail hours without review and approval by both Area and Headquarters management.

There are Village Post Offices (VPO) and Contract Postal Units (CPU) that on occasion decide to terminate their contract or close due to uncontrollable circumstances. If the Postal Service is unable to negotiate an extension of services with these non-postal entities, there is no choice but to honor the contract termination. The Postal Service is currently in communication with those VPOs and CPUs that have indicated they intend to terminate their services prior to the November 2020 elections to determine whether an arrangement can be made to extend their services until after the elections.

## 4. Collection Boxes

Pursuant to the Postmaster General's August 18, 2020 directive, the Postal Service has suspended the removal of any additional collection boxes until after the 2020 elections. The Postal Service regularly reviews the need for, and location of, collection boxes in accordance with the Postal Service Postal Operations Manual. The purpose of these reviews is to ensure that mail collection within areas served by letter carriers is accomplished in a cost-efficient manner, while still meeting customers' needs. Over the last seven years, the Postal Service has removed an average of 3,100 collection boxes per year. This year, approximately 1,500 collection boxes have been removed.

Although the Postmaster General has suspended the removal of collection boxes between now and the November 2020 elections, it is important to note that there are instances where removal of a collection box is necessary. In the event of extreme weather conditions, collection boxes may be removed or covered to prevent damage. During events that involve national security, collection boxes along the transportation route may be temporarily removed for public safety. Similarly, localized events such as wildfires or civil unrest may necessitate a temporary removal of a collection box. These removals are temporary and collection boxes must be returned as soon as possible.

Between now and the November 2020 elections, it is critical that, if any collection boxes are damaged (for example, by hurricane or a car accident) and taken out of service, that they be replaced as soon as possible.  If a collection box is in an area that is restricted for security or safety reasons, any request to cover or remove a collection box must be raised through appropriate communication channels.  Communication between local office and District/Area/Headquarters channels is critical.  Postmaster/Station Managers must notify their District Manager when there is an issue with a collection box.  District Managers must notify Area Retail & Delivery Operations Vice Presidents, who must notify the Vice President of Delivery Operations to ensure all leadership is aware of the issue and can oversee the removal and subsequent replacement of the collection box.

Postal Service Headquarters is not planning to reinstall collection boxes that were removed as part of its routine review prior to the Postmaster General's statement concerning operational commitments issued on August 18, 2020.  To be clear however, no additional collection boxes should be removed until after the election, other than on a temporary basis, and only for the reasons described herein.

## 5.   Late and Extra Trips

Adherence to transportation schedules has long been a priority of the Postal Service.  Because noncompliance with transportation schedules was a chronic problem that was causing late deliveries and unnecessary costs, there has been an organizational focus on adhering to the transportation schedules over the last two years.

After the Postmaster General took office, he reemphasized the need to ensure that the Postal Service's trucks run on time and on schedule, with the goal of mitigating unnecessary late and extra trips.  This effort does not mean that mail should be left behind, (it should not), but rather that processing schedules should align with transportation schedules.  Moreover, the Postmaster General has not banned the use of late or extra trips; when operationally required, late or extra trips are permitted.

Consistent with the court order referenced above, transportation, in the form of late or extra trips that are reasonably necessary to complete timely mail delivery, is not to be unreasonably restricted or prohibited.  Managers are authorized to use their best business judgment to meet our service commitments.

## 6.   Mail Processing

Pursuant to the Postmaster General's August 18, 2020 directive, and consistent with the order of the federal district court, no mail processing facilities will be closed or consolidated until after the November 2020 elections.  Moreover, the Postal Service has suspended all removal of letter and flat sorting machines until after the November 2020 elections.  During Fiscal Year 2020, approximately 700 letter and flat sorting machines were disconnected and/or removed.  These reductions were made pursuant to volume modeling and equipment reduction targets for various mail processing equipment sent to the Area Vice Presidents for review and implementation on May 15, 2020, consistent with longstanding Postal Service practice.  The reduction targets, which were based on significant volume reductions in letter and flats mail volume, and with the further decline due to COVID-19, were broad targets for reduction, with the final decisions regarding machine removal being determined after discussions between local management and Headquarters.  Postal Service Headquarters has determined not to make any further removal of equipment until after the November 2020 elections.

Because removed machines are generally dissembled for their usable parts, with such parts being removed to maintain or enhance other machines, there is no current plan to return removed machines to service.  Over the past month, however, a limited number of machines that were disconnected, but not dismantled and removed, have been put back into service.  We have more than sufficient capacity to process current and anticipated mail volumes with the existing machine fleet.

As of September 18, 2020, Headquarters has approved all requests to reconnect machines directed to the Headquarters Director of Processing Operations and has provided Regional Vice Presidents with authority to reconnect machines where doing so is necessary. Specifically, if it is determined that it is necessary to add processing capacity to fulfill our service commitments with regard to Election Mail, available processing equipment will be returned to service. Any requests to reconnect a sorting machine reduced since June 2020, because it is believed that the machine is necessary to ensure the timely processing and delivery of Election Mail should be made by the relevant installation head to the relevant Regional Vice President. Any request will be processed within three days, as required by the order of the federal district court.

### 7. Election Mail

The Postal Service and Postmaster General DeJoy have repeatedly reaffirmed their commitment to the timely delivery of Election Mail. Election Mail is defined as "any item mailed to or from authorized election officials that enables citizens to participate in the voting process." This includes ballots, voter registration forms, ballot applications, polling place notifications, and similar materials. This specific mail qualifies as Election Mail both when it is sent to voters from election officials at the state and local levels and when it is returned by voters to those officials. This is distinct from "political mail," which is sent by political candidates, political action committees, and similar organizations in order to engage in issue advocacy or to advocate for candidates or other things, such as initiatives, that may appear on a ballot. *See* Postal Bulletin 22551, July 30, 2020, at 4.

Consistent with the court order referenced above, we will continue to prioritize Election Mail that is entered as Marketing Mail regardless of the paid class. Election Mail identified by the official Election Mail logo or other Postal Service visibility tools will continue to be prioritized pursuant to our long-standing practice. In that regard, please continue to use standardized log sheets to track Election Mail through processing and continue to conduct daily "all clears" as previously instructed to ensure that all Election Mail is accounted for in the system and mail scheduled or "committed" to go out is processed accordingly. Election Mail entered as Marketing Mail should be advanced ahead of all other Marketing Mail and processed expeditiously to the extent feasible so that it is generally delivered in line with the First-Class Mail delivery standards. In that regard, to the extent necessary, please expand processing windows on letter and flat sorting equipment to ensure that all Election Mail received prior to the First-Class Mail Critical Entry Time is processed that same day. Please also continue to prioritize Election Mail, including ballots entered with Green Tag 191, when loading trucks.

Consistent with our long-standing practice, we recognize that it is sometimes not operationally feasible to deliver Election Mail entered as Marketing Mail in line with First-Class Mail delivery standards. This is particularly true with respect to Election Mail Marketing Mail volume that would require air transportation to meet First-Class Mail delivery standards, as this volume typically travels through our ground transportation network, and our systems do not permit Marketing Mail to travel by air. We intend to seek clarification on this item, to make sure that the court understands this limitation and that it is consistent with the court's order.

### 8. Nationwide Changes in Service

Under the applicable law, the Postal Service cannot make changes to the nature of Postal Services without first seeking an advisory opinion from the Postal Regulatory Commission. Consistent with the order of the federal district court referenced above, the Postal Service will not make any changes to our retail, delivery or processing operations, that will generally affect service on a nationwide, or substantially nationwide, basis, prior to the upcoming national election.

Thank you for your attention.  If you have any questions regarding Logistics and Processing Operations, please contact Mike Barber, Vice President, Processing and Maintenance Operations.  If you have any questions regarding Retail and Delivery Operations, please contact Joshua Colin, Vice President, Delivery Operations or Angela Curtis, Retail and Post Office Operations.

We are continuing to evaluate our legal obligations and will circulate updates as necessary.

Kristin A. Seaver
Chief Retail & Delivery Officer
  and Executive Vice President

David E. Williams
Chief Logistics & Processing Operations
  Officer and Executive Vice President

5

**<u>EXHIBIT B</u>**

# Mandatory Stand-Up Talk

## Sept. 24, 2020

## Ready to deliver Election Mail for the nation

The Postal Service's number one priority between now and Election Day is the secure, on-time delivery of the nation's Election Mail — and we are ready to deliver for our country.

There has been a lot of media coverage — including many reports with inaccurate information — about Election Mail. To clear up any confusion, and to ensure compliance with a recent court order requiring certain practices, management has been given operational instructions. These instructions will remain in effect until further notice. Specifically:

- **Overtime.** Front-line supervisors and managers will continue to schedule work hours based on workload. Overtime is authorized and instructed to be used as necessary to fulfill our mission and expeditiously move Election Mail.

- **Hiring.** The Postal Service has not implemented a total hiring freeze. EAS hiring was suspended August 7, because of the realignment of our reporting structure. This suspension does not impact hiring for craft positions. Craft positions will continue to be filled in accordance with collective bargaining agreements.

- **Retail Hours.** The Postal Service will not reduce retail hours before the November elections. Natural disasters, civil unrest, or lack of employee availability due to the coronavirus pandemic may necessitate temporary changes, but local managers are not permitted to reduce retail hours without review and approval by both Area and Headquarters management.

- **Collection Boxes.** The Postal Service has suspended the removal of any collection boxes until after the 2020 elections. There may be temporary removal or covering of boxes due to extreme weather, national security incidents, or local events such as wildfires or civil unrest. It is critical that any collection boxes damaged — for example, by hurricane or a car accident — be reported and replaced as soon as possible.

- **Late and Extra Trips.** Late or extra trips have not been banned; they should not be restricted if they are reasonably necessary to complete timely mail delivery. Managers are authorized to use their best business judgment to meet service commitments. Focusing on the transportation schedule does not mean that mail should be left behind — it should not. Instead, processing and transportation schedules should be aligned to help reduce late deliveries and unnecessary costs.

- **Mail Processing.** No mail processing facilities will be closed or consolidated, and no letter or flat sorting machines will be removed before the November elections. We have more than sufficient capacity to process current and anticipated mail volumes with our existing machine supply. Available machines will be returned to service if Headquarters or the Regional Vice President determine that doing so is necessary to fulfill our Election Mail service commitments.

- **Election Mail.** We will continue to expedite Election Mail that is entered as Marketing Mail, as is our long-standing practice. Election Mail entered as Marketing Mail should be advanced ahead of all other Marketing Mail and processed expeditiously. To make this possible, please expand processing windows on letter and flat sorting equipment to ensure that all Election Mail received prior to the First-Class Mail Critical Entry Time is processed that same day.

  Please also continue to prioritize Election Mail, including ballots entered with Green Tag 191, when loading trucks, and continue to use standardized log sheets to track Election Mail. Conduct daily "all clears" to ensure that all Election Mail is accounted for in the system and processed accordingly.

The Postal Service and our Postmaster General have repeatedly reaffirmed our commitment to the timely delivery of Election Mail. You can help us meet that commitment and prove that we are ready to deliver. Our country and our customers are counting on us.

Thank you for your attention and thank you for your service to our customers every day.

# # #

**<u>EXHIBIT C</u>**



September 25, 2020

OFFICERS, PCES, AND PAY BAND MANAGERS

SUBJECT:  Additional Resources for Election Mail Beginning October 1

The November 3, General Election is fast approaching. While normal First-Class and Marketing Mail volumes are down considerably, the volume of Election Mail will be at an all-time high this season. COVID-19 has changed the way millions of people will vote this year, and many are turning to the United States Postal Service to deliver their ballots. Recognizing our important role in the democratic process, the Postmaster General has reiterated that our number one priority is the proper handling and timely delivery of all Election Mail, especially ballots.

Effective October 1, additional resources are being made available for District Managers, Postmasters, Division Directors, and Plant Managers to utilize, as they determine, to support the timely and expeditious handling of the increased volume of Election Mail, which is defined by the Postal Service as any item mailed to or from authorized election officials that enables citizens to participate in the voting process, such as ballots, voter registration cards, ballot applications, and polling place notifications. District Managers, Postmasters, Division Directors, and Plant Managers are authorized and instructed to use these additional resources to ensure that all Election Mail is prioritized and delivered on time. These resources are in addition to the existing processes and procedures for Election Mail.

These resources include, but are not limited to:

1. **Processing**

   As previously provided in the Clarifying Operational Instructions distributed on September 21, Election Mail entered as Marketing Mail should be advanced ahead of all other Marketing Mail and processed expeditiously to the extent feasible so that it is generally delivered in line with First-Class Mail delivery standards. Processing windows on letter and flat sorting equipment should be expanded as necessary to ensure that all Election Mail received prior to the First-Class Mail Critical Entry Time is processed that same day. Further, to the extent possible, Election Mail received after the Critical Entry Time should be processed and advanced as if it arrived prior to the Critical Entry Time, unless doing so would disrupt on-time service for Election Mail received prior to the Critical Entry Time.

   Other additional processing resources are also authorized and instructed to be used to ensure that Election Mail stays current and moving through the Postal Service's network. This includes, but is not limited to, early cancellations the week before Election Day to ensure all collected ballots are processed timely.

**2. Transportation**

Extra transportation resources are authorized and instructed to be used to ensure that Election Mail reaches its intended destination in a timely manner. This includes, but is not limited to, extra trips from all points of processing and delivery (e.g., retail units and plants), as necessary to connect Election Mail to its intended destination or the next stage in Postal Service processing.

**3. Delivery/Collections**

Extra delivery and collection trips are authorized and instructed to be used to ensure, to the best of our ability, that completed ballots entered on Election Day reach the appropriate election official by the state's designated deadline on Election Day. This includes, but is not limited to, early collections the week before Election Day to ensure all collected ballots are processed timely, and delivery of ballots found in collections on Election Day to election boards within states requiring ballots be returned by a designated time on Election Day.

**4. Overtime**

Overtime is authorized and instructed to be used to support these additional resources and the completion of the additional work, as needed.

In addition, to further support the timely delivery of Election Mail, and consistent with our practices in past election cycles, the use of extraordinary measures beyond our normal course of operations is authorized and expected to be executed by local management between October 26 and November 24, to accelerate the delivery of ballots, when the Postal Service is able to identify the mailpiece as a ballot.

These extraordinary measures include, but are not limited to, expedited handling, extra deliveries, and special pickups as used in past elections, to connect blank ballots entered by election officials to voters or completed ballots returned by voters entered close to or on Election Day to their intended destination (e.g., Priority Mail Express, Sunday deliveries, special deliveries, running collected ballots to Boards of Elections on Election Day, etc.).

We will continue to communicate closely with election officials to encourage them to send ballots earlier. We have also educated voters across the nation to request their ballots early (if they are required to request a ballot) and to return their ballots early, if they plan on using the mail for one or both legs of the journey.

Despite our best efforts to educate and communicate, however, we know that there will be entries of ballots to and from voters that will require us to take the extra steps set forth herein to ensure timely delivery. The additional resources available beginning October 1, and our robust practices and procedures that we employ every election cycle as described above, will help ensure that we are able

to do everything in our power to meet our customers' expectations that mail will be delivered in a timely manner when our customers use the mail to facilitate or participate in the electoral process.

Thank you for your hard work and dedication in delivering America's Election Mail.


_____          _____
Kristin A. Seaver                          David E. Williams
Chief Retail & Delivery Officer            Chief Logistics & Processing Operations
  and Executive Vice President               Officer and Executive Vice President

**<u>EXHIBIT D</u>**

Kristin A. Seaver, CHIEF RETAIL & DELIVERY OFFICER AND EXECUTIVE V.P.
David E. Williams, CHIEF LOGISTICS & PROCESSING OPERATIONS OFFICER AND EXECUTIVE V.P.


UNITED STATES
POSTAL SERVICE

October 13, 2020

TO:  Officers, PCES, Pay Band Managers, and EAS Employees

SUBJECT:  Supplemental Guidance Memorandum

On September 21, 2020, we issued Clarifying Operational Instructions about the Postal
Service's practices concerning Overtime, Hiring, Retail Hours, Collection Boxes, Late and Extra
Trips, Mail Processing, and Election Mail.  On September 25, 2020, we issued a Memorandum
entitled "Additional Resources for Election Mail Beginning October 1" which identified additional
resources being made available for District Managers, Postmasters, Division Directors, and
Plant Managers to utilize, as they determine, to support the timely and expeditious handling of
the increased volume of Election Mail.  We write today to supplement the Clarifying Operational
Instructions and the Additional Resources Memorandum in accordance with a recent federal
district court order, in order to reiterate our earlier guidance and to assist in carrying out the
specific directives required by the court order.

**Election Mail is the Postal Service's Number One Priority**

Proper handling and timely delivery of Election Mail is the Postal Service's number one priority.
As described below, and in the Clarifying Operational Instructions and the Additional Resources
Memorandum, many long-standing recommended practices about how to treat Election Mail are
now policy requirements and must be followed. District Managers, Postmasters, Division
Directors, and Plant Managers are instructed to ensure that all Election Mail is prioritized and
delivered on time.  To reiterate, and by way of example, it is Postal Service policy that:

- To the extent excess capacity permits, Election Mail should be prioritized, regardless of
  the paid class.  More detailed guidance on the prioritization of Election Mail is laid out in
  the Clarifying Operational Instructions and the Additional Resources Memorandum, and
  below.
- Specifically, Election Mail entered as Marketing Mail should be prioritized and advanced
  ahead of all other Marketing Mail and processed expeditiously so that it is generally
  delivered in line with First-Class Mail standards;
- Processing windows on letter and flat sorting equipment should be expanded as
  necessary to ensure that all Election Mail received prior to the First-Class Mail Critical
  Entry Time is processed that same day;
- To the extent possible, Election Mail received after the Critical Entry Time should be
  processed and advanced as if it arrived prior to the Critical Entry Time, unless doing so
  would disrupt on-time service for Election Mail received prior to the Critical Entry Time;
- Election Mail, including ballots with Green Tags 191, should be prioritized when loading
  trucks;
- All identifiable ballots returned by voters should be "cancelled" or "postmarked,"
  regardless of the method of payment of postage used, and early cancellations should be
  conducted the week before Election Day to ensure all collected ballots are processed
  timely;
- Employees must be aware that balloting materials are handled differently than other
  unpaid or shortpaid mailpieces.  Ballots addressed to an election office, with or without

sufficient postage, must be delivered.  Ballots must not be detained or held for postage payment.

- Furthermore, the Postal Service will utilize ballot monitors in each mail processing facility in order to ensure that as many ballots being returned by voters as possible are cancelled as required by our policy;
- Daily "all clears" should be used to ensure that all Election Mail is accounted for in the system and mail scheduled or "committed" to go out is processed accordingly;
- Standardized log sheets should be used to track Election Mail through processing;
- From October 26 through November 24, 2020, ballots may be manually separated and moved by air or according to Priority Mail Express delivery standards regardless of paid class;
- Extra delivery and collection trips are authorized and instructed to be used to ensure that completed ballots reach the appropriate election official by the state's designated deadline;
- Starting October 26 through November 24, 2020, the use of extraordinary measures beyond our normal course of operations is authorized and expected to be used to accelerate the delivery of identifiable ballots.  Please see below for examples of extraordinary measures that may and should be taken if necessary to ensure the expeditious delivery of ballots, which may also include manually separating ballots and moving them by air, consistent with practices used in past elections.

For additional discussion of the Postal Service's policy requirements concerning the treatment of Election Mail, please refer to the Clarifying Operational Instructions and the Additional Resources Memorandum referenced above.

**Recommended Practices and Resources for the Treatment of Election Mail**

Additional resources are available to support the timely and expeditious handling of Election Mail. These resources include, but are not limited to:

### 1. Processing

Election Mail entered as Marketing Mail should be advanced ahead of all other Marketing Mail and processed expeditiously to the extent feasible so that it is generally delivered in line with First-Class Mail delivery standards. Processing windows on letter and flat sorting equipment should be expanded as necessary to ensure that all Election Mail received prior to the First-Class Mail Critical Entry Time is processed that same day. Further, to the extent possible, Election Mail received after the Critical Entry Time should be processed and advanced as if it arrived prior to the Critical Entry Time, unless doing so would disrupt on-time service for Election Mail received prior to the Critical Entry Time.

Other additional processing resources are also authorized and instructed to be used to ensure that Election Mail stays current and moving through the Postal Service's network. This includes, but is not limited to, early cancellations the week before Election Day to ensure all collected ballots are processed timely.

## 2. Transportation

As described in more detail below, extra transportation resources are authorized and instructed to be used to ensure that Election Mail reaches its intended destination in a timely manner. This includes, but is not limited to, extra trips from all points of processing and delivery (e.g., retail units and plants), as necessary to connect Election Mail to its intended destination or the next stage in Postal Service processing.

## 3. Delivery/Collections

Extra delivery and collection trips are authorized and instructed to be used to ensure that completed ballots reach the appropriate election official by the state's designated deadline. This includes, but is not limited to, early collections the week before Election Day to ensure all collected ballots are processed timely, and delivery of ballots found in collections on Election Day to election boards within states requiring ballots be returned by a designated time on Election Day.

## 4. Overtime

As described in more detail below, overtime is authorized and instructed to be used to support these additional resources and the completion of the additional work.

As stated above, the use of extraordinary measures beyond our normal course of operations is authorized and expected to be executed by local management between October 26 and November 24, to accelerate the delivery of ballots, when the Postal Service is able to identify the mailpiece as a ballot.

Extraordinary measures that should be employed include, but are not limited to, expedited handling, extra deliveries, and special pickups as used in past elections, to connect blank ballots entered by election officials to voters or completed ballots returned by voters entered close to or on Election Day to their intended destination (e.g., Priority Mail Express, Sunday deliveries, special deliveries, running collected ballots to Boards of Elections on Election Day, etc.). These measures should be used freely and liberally.

We know that, as in past elections, there will be entries of ballots to and from voters that will require us to take the extra steps set forth herein to ensure timely delivery. The additional resources available, and our robust practices and procedures that we employ every election cycle, will help ensure that we are able to do everything in our power to meet our customers' expectations that mail will be delivered in a timely manner when our customers use the mail to facilitate or participate in the electoral process.

**Late and Extra Trips Are Not Banned and Should Be Used When They Would Facilitate the Expeditious Delivery of Election Mail**

To reiterate, late and extra trips are not banned. Pre-approval is not needed for late and extra trips. Authorizing late and extra trips that facilitate the on time delivery of Election Mail will not result in disciplinary action. To the contrary, late and extra trips that would facilitate the on-time delivery of Election Mail are authorized and encouraged—we are committed to using such trips to deliver Election Mail on time.

For example, if a truck needs to be held to receive Election Mail and that delay would not cause the truck to miss a later connection that might delay other Election Mail, the truck should be held until it can receive the Election Mail.  Additionally, as stated above, extra trips may be used from all points of processing and delivery (e.g., retail units and plants), as necessary to connect Election Mail to its intended destination or the next stage in Postal Service processing.

**Overtime Should Be Used to Deliver Election Mail**

Overtime, including penalty overtime, is authorized and instructed to be used to facilitate the timely delivery of Election Mail.  Further discussion regarding the use of overtime needed to expeditiously move Election Mail is communicated in the Clarifying Operational Instructions issued on September 21, 2020, and the Additional Resources Memorandum issued on September 25, 2020.

For example, if overtime would ensure that ballots can be processed and delivered in line with First-Class Mail delivery standards, or that a facility clears all of its Election Mail to the greatest extent possible, that overtime is authorized and instructed to be used.

**Report Violations of Election Mail Policies and Practices**

In the event that any of our current Election Mail policies and practices, including the guidance in this memorandum, are not being observed, or any employee has any concern regarding our ability to deliver Election Mail on time, please report any such concerns as soon as possible so they can be corrected promptly. In the first instance, reports should be made to the relevant ballot ambassador. If the relevant ballot ambassador is not available or is not known, reports should be made to a relevant union representative, who can refer reports of any Election Mail concerns to ballot ambassadors on the reporter's behalf. If the individual reporting the concern is unable to reach either a ballot ambassador or union representative, the individual should contact the relevant Election Mail coordinator; the contact information for all Election Mail coordinators is listed at https://about.usps.com/what/government-services/election-mail/pdf/political-election-mail-coordinators.pdf.

For example, please report any delayed ballots or any ballots that have not been prioritized, to the relevant ballot ambassador or the Election Mail coordinator.

**Recent Guidance, Including this Guidance, Should Be Explained to Your Direct Reports**

As soon as possible, please explain to each of your direct reports the policies and practices described here, including the reporting structure discussed above. Please also explain to each of your direct reports the policies and practices described in the Clarifying Operational Instructions and the Additional Resources Memorandum that are relevant to each direct report, taking into account their individual responsibilities. A copy of this memorandum will be posted on the Postal Service Intranet at blue.usps.gov and liteblue.usps.gov.

Headquarters will also be preparing and distributing a Mandatory Stand-Up Talk that will be pushed to all employees, discussing this memorandum.

**If You Have Questions About Recent Guidance, Ask**

To provide consistent guidance across the nation, if you have questions regarding Logistics and Processing Operations, please contact Mike Barber, Vice President, Processing and Maintenance Operations, at mike.l.barber@usps.gov.  If you have any questions regarding Retail and Delivery Operations, please contact Joshua Colin, Vice President, Delivery Operations, at joshua.d.colin@usps.gov or Angela Curtis, Vice President, Retail and Post Office Operations, at angela.h.curtis@usps.gov.


Kristin A. Seaver
Chief Retail & Delivery Officer
  and Executive Vice President

David E. Williams
Chief Logistics & Processing Operations
  Officer and Executive Vice President

5

**<u>EXHIBIT E</u>**

Postmasters, managers and supervisors please note:

This talk is to be posted in all facilities where employees have easy access and to be handed out to each employee where practicable.

# Mandatory Stand-Up Talk

## Oct. 16, 2020

## Election Mail and operational instructions update

As stated in previous talks, the Postal Service's number one priority between now and Election Day is the secure, on-time delivery of the nation's Election Mail.

This provides some additional information to reinforce our commitment, to highlight some important Election Mail policies, and to ensure compliance with recent court orders.

**Proper handling and timely delivery of Election Mail is the Postal Service's number one priority.**

- To the extent excess capacity permits, Election Mail should be prioritized, regardless of the paid class.
- Election Mail entered as Marketing Mail should be prioritized and advanced ahead of all other Marketing Mail and processed expeditiously so that it is generally delivered in line with First-Class Mail standards.
- Processing windows on letter and flat sorting equipment should be expanded as necessary to ensure that all Election Mail received prior to the First-Class Mail Critical Entry Time is processed that same day.
- To the extent possible, Election Mail received after the Critical Entry Time should be processed and advanced as if it arrived prior to the Critical Entry Time, unless doing so would disrupt on-time service for Election Mail received prior to the Critical Entry Time.
- Election Mail, including ballots with Green Tags 191, should be prioritized when loading trucks.
- All identifiable ballots returned by voters should be "cancelled" or "postmarked," regardless of the method of payment of postage used, and early cancellations should be conducted the week before Election Day to ensure all collected ballots are processed timely.
- Balloting materials are handled differently than other unpaid or short-paid mailpieces. Ballots addressed to an election office, with or without sufficient postage, must be delivered. Ballots must not be detained or held for postage payment.
- Ballot monitors in each mail processing facility should ensure that as many ballots being returned by voters as possible are cancelled as required by our policy.
- Daily "all clears" should be used to ensure that all Election Mail is accounted for in the system and mail scheduled or "committed" to go out is processed accordingly.
- Standardized log sheets should be used to track Election Mail through processing.

- From October 26 through November 24, 2020, ballots may be manually separated and moved by air or according to Priority Mail Express delivery standards regardless of paid class.
- Extra delivery and collection trips are authorized and instructed to be used to ensure that completed ballots reach the appropriate election official by the state's designated deadline. This includes, but is not limited to, early collections the week before Election Day to ensure all collected ballots are processed timely, and delivery of ballots found in collections on Election Day to election boards within states requiring ballots to be returned by a designated time on Election Day.
- The use of extraordinary measures beyond our normal course of operations is authorized and expected to be executed by local management between October 26 and November 24, to accelerate the delivery of ballots.
- This includes: expedited handling, extra deliveries, and special pickups as used in past elections, to connect blank ballots entered by election officials to voters or completed ballots returned by voters entered close to or on Election Day to their intended destination (e.g., Priority Mail Express, Sunday deliveries, special deliveries, running collected ballots to Boards of Elections on Election Day, etc.).

**Late and Extra Trips Are Not Banned and Should Be Used When They Would Facilitate the Expeditious Delivery of Election Mail**

To reiterate, late and extra trips are not banned. Pre-approval is not needed for late and extra trips. Authorizing late and extra trips that facilitate the on-time delivery of Election Mail will not result in disciplinary action. To the contrary, late and extra trips that would facilitate the on-time delivery of Election Mail are authorized and encouraged—we are committed to using such trips to deliver Election Mail on time.

**Overtime Should Be Used to Deliver Election Mail**

Overtime, including penalty overtime, is authorized and instructed to be used to facilitate the timely delivery of Election Mail.

Such overtime shall be used to support all additional resources necessary to ensure that Election Mail is prioritized and delivered on time.

**Report Violations of Election Mail Policies and Practices**

In the event that any of our current Election Mail policies and practices are not being observed, or any employee has any concern regarding our ability to deliver Election Mail on time, please report any concerns as soon as possible so they can be corrected promptly.

Such reports can be made to a *ballot ambassador*. If the relevant ballot ambassador is not available or is not known, reports should be made to your *union representative*, who can refer reports to ballot ambassadors on your behalf.  If you are unable to reach either a ballot ambassador or union representative, please contact your Election Mail coordinator – who can be found at:  *https://about.usps.com/what/government-services/election-mail/pdf/political-election-mail-coordinators.pdf*.

**Additional Clarifying Guidance for Operations Not Specific to Election Mail**

- Transportation, in the form of late and extra trips is authorized and shall be used where reasonably necessary to meet service standards and service performance targets. The Postal Service shall use extra trips to minimize delays and to meet service commitments, except when not feasible. Managers shall use their best business judgment to meet service commitments and to not leave mail behind.

- All reasonable efforts should be made to ensure that all mail, including Election Mail, committed for a day is delivered that day. All requirements regarding carrier start and stop times should be consistent with the Postal Service's handbooks and manuals.

- Overtime, including penalty overtime, will be approved for the purpose of meeting service standards and service performance targets.

Please ensure compliance with these instructions, as well as the Clarifying Operational Instructions issued on September 21, 2020, and the Memorandum re: Additional Resources for Election Mail issued on September 25, 2020.  Any conflicting guidance is superseded.

# # #

# Mandatory Stand-Up Talk

**Oct. 16, 2020**

## Election Mail and operational instructions update

The Postal Service's number one priority between now and Election Day is the secure, on-time delivery of the nation's Election Mail. Today, I'm giving you information to reinforce our commitment, to highlight some important Election Mail policies, and to ensure our compliance with recent court orders.

There are also reminders about operational instructions for transportation, delivery commitments, and overtime, that are important after the election as well.

Please read the additional information posted (***MANGER GIVES DIRECTIONS WHERE TALK IS POSTED, OR ALTERNATIVELY, HANDS OUT PRINTED COPIES FOR EVERY EMPLOYEE***).

**With respect to Election Mail:**

- To the extent excess capacity permits, Election Mail should be prioritized, regardless of the paid class.
- Late and extra trips and overtime should be used when they would facilitate the expeditious delivery of Election Mail.
- The use of extraordinary measures beyond our normal course of operations is authorized and expected to be executed between October 26 and November 24, to accelerate the delivery of ballots.

If you see any of these practices not being observed or you have concerns about Election Mail, please report your concerns as soon as possible to your ballot ambassador, union representative, or Election Mail coordinator.

(continued on next page)

**With respect to operations generally:**

- Transportation, in the form of late and extra trips is authorized and shall be used where reasonably necessary to meet service standards and service performance targets. The Postal Service shall use extra trips to meet service commitments when feasible.

- All reasonable efforts should be made to ensure that all mail, including Election Mail, committed for a day is delivered that day.

- Overtime, including penalty overtime, will be approved for the purpose of meeting service standards and service performance targets.

Thank you for listening, and again please read the full information we have posted.

# # #

**EXHIBIT F**

**Daily Late Trips October 1, 2020 - October 22, 2020**

| Date | Late Trips | Extra Trips |
|------|-----------|-------------|
| 10-1 | 1420 | 526 |
| 10-2 | 1597 | 534 |
| 10-3 | 959 | 464 |
| 10-4 | 990 | 507 |
| 10-5 | 1521 | 681 |
| 10-6 | 1722 | 557 |
| 10-7 | 1664 | 573 |
| 10-8 | 1676 | 629 |
| 10-9 | 2407 | 640 |
| 10-10 | 1297 | 689 |
| 10-11 | 704 | 1594 |
| 10-12 | 1094 | 1749 |
| 10-13 | 2300 | 935 |
| 10-14 | 2375 | 783 |
| 10-15 | 2489 | 750 |
| 10-16 | 2605 | 729 |
| 10-17 | 1583 | 728 |
| 10-18 | 1524 | 655 |
| 10-19 | 2115 | 839 |
| 10-20 | 2308 | 664 |
| 10-21 | 2196 | 737 |
| 10-22 | 2178 | 740 |

**EXHIBIT G**

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **Commonwealth of Pennsylvania, State of California, State of Delaware, District of Columbia, State of Maine, Commonwealth of Massachussetts, and State of North Carolina**, <br><br> Plaintiffs, <br><br> v. <br><br> **Louis DeJoy, in his official capacity as United States Postmaster General, Robert M. Duncan, in his official capacity as Chairman of the Postal Service Board of Governors, and the United States Postal Service**, <br><br> Defendants. | Case No. 20-cv-4096 |

THIRD SUPPLEMENTAL DECLARATION OF ROBERT CINTRON

I, Robert Cintron, under penalty of perjury and in lieu of affidavit as permitted by 28 U.S.C.

§ 1746, state as follows:

1. I am aware that the U.S. District Court for the Eastern District of Pennsylvania issued an Order granting the motion for preliminary injunction in the above case on September 28, 2020.  I submit this declaration to address the Postal Service's ongoing compliance with the Clarifying Operational Instructions (Instructions) issued September 21, 2020, and to explain the reasons that further guidance to over 20,000 field supervisors and managers revoking or disclaiming prior guidance over transportation poses a substantial risk of confusion likely to have an adverse effect on operations, including the delay of a greater volume of mail.

1

2. I am currently employed as Vice President, Logistics at Postal Service Headquarters in Washington, D.C., and base this declaration on information available to me in the course of my official duties and responsibilities at the United States Postal Service ("Postal Service"), including oversight of nationwide transportation schedules and mail processing operations, and information provided to me by other Postal Service officials.

2. I have submitted two declarations to this Court:  (1) Declaration dated September 8, 2020, previously submitted in *Jones v. USPS*, No. 20-cv-6516 (S.D.N.Y.); and (2) Supplemental Declaration dated September 15, 2020, filed September 15, 2020. Attached as Exhibit 1 is a second Supplemental Declaration dated September 23, 2020,  previously submitted in *Washington v. Trump*, No. 1:20-CV-03127-SAB (E.D. Wash.).

3.  The Clarifying Operational Instructions the Postal Service issued on September 21, 2020, along with the September 24, 2020 Stand Up Talk and September 25 Additional Resources Memo, reflect current Postal Service policy regarding when late and extra trip are reasonably necessary, including during the November 2020 Election season.  The Instructions inform supervisors and managers nationwide that late and extra trips are not to be unreasonably restricted or prohibited, mail should not be left behind, and overtime is not subject to any new restrictions and will be utilized as necessary.  The Postal Service's policy does not set rigid rules for determining when any late or extra trips are necessary.

4. To the best of my knowledge, prior to July 14, 2020, Postal Service Headquarters had no written policy or guidelines concerning the use of late and extra trips.

Instead, Headquarters provided advice on best Postal Service practices regarding trips during weekly meetings that were conducted for over two years, with myself and my Operations staff.  I have also provided similar advice in response to specific inquiries.  The best practices discussed during the weekly calls  and in response to specific inquiries was consistent with the Guidelines subsequently issued on July 14, 2020.  Field personnel throughout the nation generally followed that advice, but adherence varied from facility to facility, and some local divisions or facilities may have relied on different locally-created or locally-implemented written or unwritten criteria.

5.  On July 14, 2020, following questions that arose during and after a July 10 meeting with Area Vice Presidents, Headquarters issued the Guidelines to help supervisors and managers determine whether to delay trips or to utilize extra trips.  The July 14 Guidelines did not supplant any prior national guidance.  They were intended to clarify pre-existing ambiguity concerning late and extra trips by describing when late/extra trips will and will not facilitate prompt delivery of mail.  The Guidance, which Headquarters provided as a tool for managers and supervisors in making decisions about late and extra trips, make clear that extra trips and late trips should be used when reasonably necessary, such as during emergencies and when a flight containing mail arrives late.

6.  The Guidelines describe when late/extra trips will and will not facilitate prompt delivery and improve service performance.  They list various circumstances that may lead to a need for delayed or extra trips and, for each, the questions to consider when deciding whether the delay or extra trip is reasonably necessary.  The Guidelines help

3

inform what "reasonably necessary" means and are not rigid rules.  During day-to-day nationwide operations involving thousands of facilities and transportation routes, extra trips may be reasonably necessary even where the particular circumstances of mail delivery on any given day are not specifically listed in the Guidelines.

7. The Stand Up Talk the Postal Service issued on September 23, 2020, and the Additional Resources Memorandum issued September 25, 2020, are consistent with the Clarifying Instructions and make clear that the Postal Service encourages the use of any delayed or extra trips necessary to ensure timely delivery of Election Mail.

8. If the Postal Service, in early October, were to issue additional or revised Guidelines or to instruct thousands of field personnel not to follow the Guidelines, so soon after the recent Instructions, there would be a great risk that the additional communication to the field personnel would be confusing and would have an adverse effect on operations nationwide.  If the Postal Service were to disavow the Guidelines, it would produce uncertainty and confusion, and may create the impression that local offices are free to or must permit late and extra trips without any limitation.  That would lead to substantial delay in mail deliveries throughout the Nation. For example, each day we send large amounts of mail by tractor-trailers to airports and to long-haul centers (where the mail is consolidated on different trucks going to different cities). If a tractor-trailer truck must leave a processing and distribution center at 4:00 a.m. in order to transport the mail to an airport or a long-haul consolidation center by 5:00 a.m., requiring that the tractor-trailer leave late (because a small amount of mail was not yet processed and loaded into the tractor-trailer) would cause the entire tractor-trailer load of mail to miss the air/long-haul

connection and consequently delay mail delivery.

9.      Even if new guidelines only re-emphasized existing guidelines there is some risk of adverse effects.  Due to the size of the Postal Service's operations, Headquarters' issuance of written guidance and sometimes unwritten guidance can prompt confusion at the field level as to the extent to which the guidance constitutes a change in usual day-to-day operations, causing delay in the Postal Service's ability to fully implement changes designed to improve performance.  As various offices attempt to focus on new instructions or adjust to new guidance, there is a risk that late deliveries will occur.

10. The Guidelines were intended to clarify confusion arising from misinterpretation of messages regarding the reemphasis on reduction of late and extra trips in July 2020, including making clear that extra and late trips were not banned.  If there was confusion before the Guidelines and that confusion was causing delays of mail, there is likely to be further confusion from additional guidance retracting those Guidelines, and after the Instructions recently provided, which would have an adverse effect on operations.

11. At the present time, many thousands of supervisors and managers in the field are allowing late and extra trips in order to facilitate timely delivery of mail each day. For example, from September 21 through October 4, the Postal Service ran from approximately 914 to 1596 daily late trips and approximately 459 to 671 extra trips daily.  This shows that the Guidelines are having the desired effect (i.e., late and extra trips are being used), and that no further guidance or instruction is needed, especially when new instructions likely will lead to confusion and misunderstandings only a month before election.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed at Washington, D.C. on this 5th day of October 2020.

_____
Robert Cintron

**<u>EXHIBIT H</u>**

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **Commonwealth of Pennsylvania, State of California, State of Delaware, District of Columbia, State of Maine, Commonwealth of Massachussetts, and State of North Carolina**, <br><br> Plaintiffs, <br><br> v. <br><br> **Louis DeJoy, in his official capacity as United States Postmaster General, Robert M. Duncan, in his official capacity as Chairman of the Postal Service Board of Governors, and the United States Postal Service**, <br><br> Defendants. | Case No. 20-cv-4096 |

### DECLARATION OF JOSHUA COLIN, Ph.D.

I, Dr. Joshua Colin, under penalty of perjury and in lieu of affidavit as permitted by 28 U.S.C. § 1746, state as follows:

1. I submit this declaration in response to this Court's October 9, 2020 Order directing that Defendants "provide Plaintiffs and this Court with an affidavit detailing their efforts to notify all USPS employees, via their supervisors and managers, of these provisions [set forth in Paragraph 3 of the Order] and the Postal Service's commitment to and enforcement of them."

2. This Declaration is based on information available to me during the course of my duties and responsibilities as Vice President, Delivery Operations for the United States Postal Service, and on information provided to me by other Postal Service officials and employees.

1

3.  As set forth more fully below, the Postal Service has sought to disseminate the relevant provisions of the Order to Postal Service personnel.

4.  On October 14, 2020, the Postal Service issued a Supplemental Guidance Memorandum to Officers, employees in the Postal Career Executive Service (PCES), PayBand Managers,[1] and Executive and Administrative Schedule ("EAS") employees, in compliance with this Court's Order adopting and incorporating the orders of September 25, 2020 and September 29, 2020, entered by the U.S. District Court for the Southern District of New York in *Jones v. U.S. Postal Service*, No. 20 Civ. 6516 (S.D.NY. Sept. 29, 2020). A copy of the Supplemental Guidance Memorandum is attached as Exhibit 1. The Memorandum supplemented the previously issued Clarifying Operational Instructions and Additional Resources Memorandum drafted in accordance with a recent federal district court order to reiterate the Postal Service's earlier guidance and to assist in carrying out the specific directives required by the court order.

5.  In further compliance with this Court's order, on October 16, 2020, the Postal Service issued a two-part Mandatory Stand-Up Talk ("SUT") on Election Mail and operational instructions. A copy of the two-part SUT is attached as Exhibit 2. The Postal Service instructed Postmasters, Managers and Supervisors that the two-page mandatory talk must be read to all employees beginning upon receipt and continuing until all tours have received the talk. The Postal Service also directed that the accompanying three-page mandatory talk must be posted in a prominent location for all employees to read, or alternatively, where practical, printed out and copies given to each employee.

---

[1] PayBand employees include a small number of employees in technical and managerial positions in an intermediate pay schedule between PCES and EAS.

6. Even before October 14, 2020, the Postal Service had sought to clarify operational instructions to the extent there was confusion, to instruct its employees not to continue various actions the Postal Service engaged in prior to August 18, 2020, until after the November 2020 election, and to inform employees that the Postal Service is committed to undertake numerous efforts in support of its current priority—the secure, timely delivery of Election Mail.

7. Following the Postmaster General's August 18, 2020 statement that various actions would not be continued until after the November election, the Postal Service began preparation of instructions to its nationwide managerial workforce seeking to reiterate and reinforce the commitments made by the Postmaster General.

8. On September 17, 2020, the U.S. District Court for the Eastern District of Washington issued a preliminary injunction order in *Washington v. Trump*, No. 20-cv-3127 (E.D. Wash. Sept. 17, 2020), enjoining the Postal Service from various actions relating to processing, delivery, and transportation of mail, and specifically Election Mail.

9. In response to the September 17, 2020 Order, the Postal Service revised its planned clarifying instructions to ensure that they both reinforced the Postmaster General's commitments and aligned with the Eastern District of Washington Court's Order.  On September 21, 2020, the Postal Service issued Clarifying Operational Instructions ("Instructions") about the Postal Service's practices concerning Overtime, Hiring, Retail Hours, Collection Boxes, Late and Extra Trips, Mail Processing, and Election Mail to Officers, PCES, and PayBand Managers, with a directive that the Instructions be distributed to Executive and Administrative Schedule ("EAS") employees.  The Instructions, attached as Exhibit 3, explain that overtime is not banned and that late and

extra trips are not banned.  In addition, they provide directives including that overtime should be used for timely mail delivery, that late and extra trips should be used to complete timely mail delivery, and that there would be no changes in retail hours and no removal of processing machines or collection boxes until after the Election except for limited circumstances such as for security reasons; that managers are to use their best business judgment to meet service commitments, and that Election Mail entered as Marketing Mail will be prioritized and processed as First-Class Mail regardless of paid class to the extent feasible.

10. On September 21, 2020, the U.S. District Court for the Southern District of New York issued a preliminary injunction requiring, inter alia, that the Postal Service to treat all Election Mail as First-Class Mail or Priority Mail Express to the extent that excess capacity permits; pre-approve all overtime that has been or will be requested for the time period beginning October 26, 2020 and continuing through November 6, 2020; clarify that late and extra trips are not banned, do not require pre-approval, and will not result in disciplinary action; and clarify that late and extra trips that facilitate the prompt delivery of Election Mail are encouraged.  The Court directed the parties to confer and submit terms of a Proposed Order.  Following the parties' conferences, on September 25, 2020 the Court entered an Order adopting the terms of a proposed order to which the parties had agreed, subject to further consideration of the Defendants' motion for clarification as to one term relating to overtime.

11. On September 24, 2020, the Postal Service issued a Mandatory "Ready to Deliver Election Mail for the Nation" Stand-up Talk ("SUT"), reinforcing the Instructions, and distributed it to all employees.  A copy of the September 24 SUT is attached as Exhibit 4.

4

12. On September 25, 2020, the Postal Service issued a Memorandum entitled "Additional Resources for Election Mail Beginning October 1" to Officers, PCES, and PayBand Managers, with instructions that the recipients provide the information to EAS employees. The Memorandum is attached as Exhibit 5. Consistent with the Postmaster General's commitment to engage standby resources in all areas of our operations starting October 1, Headquarters authorized and instructed District Managers, Postmasters, Division Directors, and Plant Managers to use additional resources being made available to support the timely and expeditious handling of Election Mail, including processing, transportation, delivery/collections, overtime, and extraordinary measures.

13. On September 29, 2020, the U.S. District Court for the Southern District of New York, issued an amended order clarifying its September 25, 2020, with respect to the remaining term (overtime).

14. On October 5, 2020, Postmaster Louis DeJoy distributed a video message to all Postal Service employees discussing the importance of delivering Election Mail and highlighting the commitments the Postal Service has made to deliver timely Election Mail, highlighting various additional commitments set forth in the September 25, Additional Resources Memorandum.

15. On October 9, 2020, following consideration of plaintiffs' motion and the parties' further conferences regarding the terms of additional guidance to be issued to Postal Service employees, the U.S. District Court for the Southern District of New York issued an amended Order adopting a Supplemental Guidance Memorandum, meant to work in conjunction with the Instructions and Additional Resources Memorandum.

16. Further, as explained above, on October 14, 2020, the Supplemental Guidance Memorandum was provided to all Officers, PCES, Pay Band Managers and EAS employees.  In addition, on that date the Postmaster General issued a video message to all employees reiterating that each employee serves an important role in ensuring that all Election Mail is timely delivered.

17. As also explained above, on October 16, 2020, the Postal Service issued a mandatory two-part Stand-Up Talk discussing the topics covered in the Supplemental Guidance Memorandum for all employees, to be provided to all employees. Also, on October 16, 2020, Robert Cintron, Vice President of Logistics, notified Area Vice Presidents and Managers of Operations Support that the guidelines he provided to the same group of individuals in field operations on July 14, 2020, which discussed the necessary use of late and extra trips, and should not be read in a manner that conflicts with the October 16, 2020 Stand-Up Talk.  His email stated:

> This is to reinforce what I believe recent communications from HQ have already made clear:  The guidelines provided to field operations in July regarding late and extra trips set no hard limitations on these trips, as made clear by a recently circulated Stand-Up Talk (attached).  My guidelines may provide an effective tool for addressing any questions managers may have concerning when to run lates and extras, but they **should not** be read in a manner that conflicts with the attached Stand-Up Talk.  At all times, including during this election season, delayed trips and extra trips should be used as necessary to meet service performance standards and to ensure the timely delivery of election mail.  Managers shall use their best business judgment to meet service commitments and to not leave mail behind.

18. In addition to the above efforts, throughout September and to date, Postal Service officials continue to communicate with managers throughout its nationwide operations through various more informal means, including weekly or biweekly teleconferences with management within its Operations Areas and telephone conferences concerning any

questions that arise regarding Postal Service operations, to further the Postal Service's mission of timely delivering all Election Mail.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

*Joshua D. Colin Phd*
DR. JOSHUA COLIN

Executed at Washington, D.C. on this 16th day of October 2020.

**EXHIBIT I**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Vote Forward, et al., <br><br> Plaintiffs, <br><br> v. <br><br> Louis DeJoy, in his official capacity, et al., <br><br> Defendants. | No. 20-cv-2405 (EGS) |

## DECLARATION OF ARSLAN SALEEM

I, Arslan Saleem, under penalty of perjury and in lieu of affidavit as permitted by 28 U.S.C. § 1746, hereby declare as follows:

1.     I am currently employed by the United States Postal Service ("Postal Service") as Manager, Service Program Measurement. My work falls within the Corporate Reporting division of the Enterprise Analytics function of the Postal Service Technology Department. The mission of Corporate Reporting is to develop and manage a robust digital intelligence platform to promote operational efficiency and provide actionable data and tracking analytics. I have worked for the Postal Service in the Technology Department for approximately seven years.

2.     In my position, I evaluate the Postal Service's service performance data and report information, both internally and externally, that is used to track adherence to the Postal Service's published service performance standards for all types of mail. I also maintain, and adjust if necessary, the business rules that are used by the organization to measure the amount of service time taken to deliver mail, by piece and type, so that accurate, reliable information is

used to monitor our service performance standards. Business rules are logical rules that the Postal Service applies universally to calculate mail performance and ensure consistency, for example, which scans start and stop the clock for delivery performance.

3.      The Postal Service has both market-dominant products and competitive products, as they are defined by the Postal Regulatory Commission (PRC). Once a quarter, I provide validated service performance reports on our market-dominant products to the PRC. My office also reports service performance data to operational managers internally, to monitor and control service performance at the local level. To further improve operational efficiency, I provide ad hoc analytical reports to operations management and other teams upon request, investigate root causes of service performance failures, and provide training on tools offered to management by our office.

4.      This type of ad-hoc data can be useful for internal operational purposes but is not useful for evaluating overall mail performance. For example, I have provided ad-hoc data on packages potentially impacted by hazardous spills, such as mercury. This dataset is not statistically significant or useful for tracking the likelihood of spills, but is useful for pulling packages processed on the machine where the spill took place, so they can be pulled out of the mailstream immediately to prevent potential injuries.

5.      Daily service performance data and Election Mail performance data exists at the National, Area, and District level. However, daily performance data is incomplete, subject to change, and overall, is not an accurate representation of the Postal Service's service performance. For example, single-piece First-Class mailpieces, which include ballots being returned through the mail to election officials by voters, typically have a two to five day service standard. Same-day reporting on the performance of, for instance, all single-piece First-Class

mailpieces delivered on a specific day would be incomplete and misleading. For example, if a piece was scheduled to be delivered on Wednesday, but was actually delivered on Friday, that delay would not be apparent from the Wednesday daily data and would only be incorporated into the Postal Service's data after it was delivered on Friday. As such, weekly data produced several days after the close of the week is much more representative and accurate.

6.      Service performance data is subject to change for a variety of other, more complicated reasons, as well. As an illustrative, but not comprehensive list: (1) data updates submitted by mailers (*e.g.* duplicate barcoded manifests) and mail preparation errors (*e.g.* inaccurate mail nesting, when mailers say mail is in one container but it is in another) may cause measurement data for certain mailpieces to fail data quality checks, causing these mailpieces to be excluded from measurement and resulting in a change to the National, Area, and District's scores for the associated time period; (2) data updates submitted by mailers (*e.g.*, transportation updates, appointment updates, Customer/Supplier Agreement updates) may cause a change in the service performance score of the associated mailpieces, for example when a mailer retroactively corrects the date and time they mailed a piece; and (3) additional scans received (*e.g.*, Change-of-Address scans) may cause mailpieces to be excluded from measurement or may cause a change to their service performance score. These can cause significant changes in the data, which makes daily data less informative for tracking trends in service compared to the longer-term data the Postal Service is already providing.

7.      These types of data issues, among many others, are addressed through the complex and sophisticated data validation processes employed by the Postal Service to produce its quarterly reports to the PRC (and the weekly reports the Postal Service is now providing to Congress). These validation processes involve the application of logical rules, testing to ensure

the consistency of the data, and investigating and correcting any inconsistencies with the way the data is being pulled or systemic issues with our logical rules and data systems. This allows us to correct data errors before they are erroneously relied upon. The Postal Service has determined that thorough data validation takes time to complete. In short, the sooner service performance data is reported, the more incomplete and unrepresentative it is.

8.     Moreover, the Postal Service has observed that individual days during the week tend to exhibit unique and differential service performance patterns that would be misleading and unhelpful when taken out of a longer-term service picture; Sundays, in particular (on which mail is not delivered), tend to distort service performance scores early in the following week. As such, Mondays typically have a greater volume of mail, and correspondingly lower service scores. Because different days of the week have different associated trends, it is more useful and representative to look at data from the full week. For these reasons and numerous others, the weekly service performance reports that the Postal Service is currently providing to Congress at the end of each week represent data that is significantly more representative and reliable—and therefore of greater value.

9.     In terms of other data the Postal Service collects each day, the Postal Service processes and delivers hundreds of millions of mailpieces. Each mailpiece receives multiple scans which equate to billions of records of data each day. It would be impractical and cost prohibitive to provide this data. The Postal Service has a variety of teams, all of which produce different internal reports. I am not aware of all reports produced, and doubt any employee is. It would be impractical and cost prohibitive to provide those, or even fully locate every internal report that exists.

10.     The Postal Service is currently providing to Congress and in various court proceedings on a weekly basis the data the Postal Service uses to evaluate its own service performance. This is the data the Postal Service has selected as most useful data for evaluating its service performance. As such, other data provided would inherently be less useful for evaluating service performance.

11.     My team is currently providing, in response to orders from other courts, three categories of validated Election Mail processing scores, as well as the overall service performance scores which are used internally by the Postal Service to track its performance. These scores are validated as described above and are more valuable than daily performance scores for the purpose of tracking performance. Other teams within the Postal Service are also providing data which the Postal Service uses to evaluate Election Mail performance, such as All-Clear Reports.

12.     The Enterprise Analytics Corporate Reporting organization is the sole provider of official service scores to all stakeholders including: internal to the Postal Service, the Postal Regulatory Commission, Congress, and in response to Freedom of Information Act requests. We produce approximately 100 such scores and reports per week when combining those for internal and external use, which is extremely time consuming. Requiring the Postal Service to produce more frequent, lower quality data reports would impose a new burden which would divert important managerial and other resources in this organization.

13.     I estimate that if I were required to validate and produce the daily data described, it would consume a majority of my team's daily resources. My team consists of ten Postal Service employees, including me, plus contractors. While there are many other employees in Corporate Reporting, my team is solely responsible for producing service performance scores.

Little benefit would be gained for the Court or the public in exchange for providing this information, given that the daily data would be incomplete and unrepresentative for the reasons described above, and inferior to the weekly data already being provided. As such, rather than working on critical data analytics to support the Postal Service's commitment to on-time delivery of all mail in general, and Election Mail in particular, for millions of people and voters across the country, I would be fully occupied producing data that would not provide any meaningful benefit in terms of understanding the Postal Service's performance.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this 23rd day of October, 2020.

*Arslan Saleem*  10-23-2020
ARSLAN SALEEM