UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

```
 * * * * * * * * * * * * * * * *
TERESA RICHARDSON, et al.,          )  Civil Action
            Plaintiffs,             )  No. 20-cv-2262
vs.                                 )
DONALD J. TRUMP, et al.,            )
            Defendants.             )
 * * * * * * * * * * * * * * * *
VOTE FORWARD, et al.,               )
            Plaintiffs,             )  No. 20-cv-2405
vs.                                 )
LOUIS DEJOY, et al.,                )
            Defendants.             )
 * * * * * * * * * * * * * * * *
NATIONAL ASSOCIATION FOR THE        )
ADVANCEMENT OF COLORED PEOPLE       )  No. 20-cv-2295
            Plaintiff,              )
vs.                                 )  3:01 p.m.
UNITED STATES POSTAL SERVICE,       )  October 28, 2020
            Defendants.             )  Washington, D.C.
 * * * * * * * * * * * * * * * *
```

*(All parties appearing via video and/or telephonically)*

**TRANSCRIPT OF STATUS CONFERENCE**
**BEFORE THE HONORABLE EMMET G. SULLIVAN,**
**UNITED STATES DISTRICT COURT JUDGE**

**APPEARANCES:**

```
FOR RICHARDSON      DAVID BERG
PLAINTIFFS:         KATHRYN PAGE BERG
                    Berg & Androphy
                    120 West 45th Street, 38th Floor
                    New York, New York 10036

FOR VOTE FORWARD    SHANKAR DURAISWAMY
PLAINTIFFS:         Covington & Burling LLP
                    850 Tenth Street Northwest
                    Washington, D.C. 20001

FOR PLAINTIFF       ALLISON ZIEVE
NAACP:              Public Citizen Litigation Group
                    1600 20th Street Northwest
                    Washington, D.C. 20009
```

*(Appearances Continued)*

**APPEARANCES (Continued)**:


FOR PLAINTIFF: SAMUEL SPITAL
NAACP:              NAACP Legal Defense &
                    Educational Fund, Inc.
                    40 Rector Street, Fifth Floor
                    New York, New York 10006



FOR FEDERAL     JOSEPH BORSON
DEFENDANTS:     KUNTAL CHOLERA
                U.S. Department of Justice
                Civil Division
                Federal Programs Branch
                1100 L Street Northwest
                Washington, D.C. 20005



Court Reporter: Elizabeth Saint-Loth, RPR, FCRR
                 Official Court Reporter
                 Washington, D.C.  20001


            Proceedings reported by machine shorthand,
        transcript produced by computer-aided transcription.

1          **P R O C E E D I N G S**

2                    THE DEPUTY:  Your Honor, this is Civil Action

3     20-2262, Teresa Richardson, et al. versus Donald J. Trump,

4     et al.; also, Civil Action 20-2405, Vote Forward, et al.

5     versus Louis Dejoy, et al.; and Civil Action 20-2295,

6     National Association For the Advancement of Colored People

7     versus United Postal Service (sic), et al.

8                    Would the parties on the line please identify

9     yourselves for the record; and we'll start with plaintiffs'

10    counsel for all of the cases.

11                   MR. BERG:  Does it matter what order we go in --

12                   THE COURT:  Doesn't matter at all, no.

13                   MR. BERG:  This is David Berg with Kathryn Berg on

14    behalf of the Richardson plaintiffs.

15                   THE COURT:  Good afternoon, Chief Berg.

16                   MR. BERG:  Good afternoon, Judge.

17                   MS. ZIEVE:  Allison Zieve for the NAACP.

18    Sam Spital, my co-counsel, is on the line too.

19                   THE COURT:  Good afternoon, Counsel.

20                   MR. SPITAL:  Good afternoon.

21                   MR. DURAISWAMY:  I apologize, Your Honor.  I had a

22    slight technical issue there.

23                   This is Shankar Duraiswamy for the Vote Forward

24    plaintiffs.

25                   THE COURT:  Good afternoon, Counsel.

1          THE DEPUTY:  And defense counsel for all the

2     cases, please identify yourselves for the record.

3          MR. BORSON:  Good afternoon, Your Honor.

4          Joseph Borson, the Department of Justice, for the

5     United States Postal Service and the federal defendants.

6     Joining me is my co-counsel Kuntal Cholera as well.

7          THE COURT:  Good afternoon to you both, Counsel.

8          Thank you.

9          So that's everyone?

10          THE DEPUTY:  Yes.  That's everyone.

11          THE COURT:  Okay.  Let me thank the Government for

12     filing the data this morning.  I assume the plaintiffs have

13     had a chance to look at it and to probably, very briefly,

14     analyze the impact of the data.  So maybe it's more

15     appropriate -- there is no script here.  Maybe it's more

16     appropriate to hear from plaintiffs' counsel first.

17          MR. DURAISWAMY:  I am happy to do that, Your

18     Honor.  I appreciate the Court's time.  We will try to be

19     efficient as we move through this.

20          So we have had a chance to look at the data.

21          Frankly, some of the issues we'd like to address

22     now are some process issues around the data and then what we

23     can do going forward.

24          So let me start with the data on the number of

25     late and extra trips; we do have that data.  We do not have

1     that data through yesterday.  And our understanding is that

2     the data does not become available until a little bit later

3     than 10:00 a.m. or so in the morning for the previous day.

4            So we had some discussion with counsel for USPS

5     about this.  And at least as to the late and extra trip

6     data, we're willing to extend the deadline for filing that

7     data until a little bit later in the day so that we can

8     actually get the data from the immediate preceding day, if

9     that makes sense.

10            THE COURT:  Sure.  That's fine.

11            And, believe me, there is flexibility on the part

12     of the Court as well.  If we need to schedule these status

13     hearings later in the afternoon, I don't have any problems

14     with that.

15            MR. DURAISWAMY:  Okay.  So I don't know if

16     Mr. Borson or Mr. Cholera wants to weigh in on that.  I knew

17     they were going to look at the issue of how quickly they can

18     get that late and extra trip data out.

19            THE COURT:  All right.  Mr. Borson.

20            MR. BORSON:  Thank you, Your Honor.

21            Yes.  Mr. Duraiswamy is right, that the late and

22     extra trip data can't be produced -- I think the data is not

23     available in any form until about 11 a.m. in the morning for

24     the date previous.  So we are looking into, with our client,

25     the earliest that they could provide that data and get it

1    reasonably available.  I don't know -- I don't know exactly

2    what that time is, but we can follow up as quickly as we

3    can.

4              THE COURT:  Again, if there is -- we're not trying

5    cases, so there is plenty of flexibility on the part of the

6    Court.  Maybe we can adjust this to one o'clock and five

7    o'clock; I don't know.  Whatever the attorneys agree to is

8    probably going to be fair and reasonable with the Court, so

9    try to reach some agreement on that.

10             Thank you, Mr. Borson.

11             Next one.

12             MR. DURAISWAMY:  Your Honor, with respect to the

13   service score data, what we have from the postal service is

14   not the same thing as the on-time service scores that are

15   produced on a weekly basis that we have up through

16   October 16.

17             What we have on a daily basis for the last few

18   days is a processing score.  And the difference between the

19   complete on-time score and the processing score is that the

20   processing score does not include what's referred to as the

21   first mile of the trip and the last mile of the trip; in

22   other words, it does not account for the time between

23   someone putting something in the mail and then getting to

24   the first processing point, and the time between the last

25   processing point and the delivery of the mail to the final

1    destination.

2         So we had -- because fundamentally what we're

3    trying to do is compare where USPS is now to where they were

4    previously.  What we need is historical data that allows us

5    to do an apples-to-apples comparison in terms of the

6    processing score so that we can see how it compares to the

7    processing score from earlier in the year; so that's one point.

8         The second point is:  What we do see in terms of

9    the processing scores is concerning, particularly the data

10   from yesterday, which seems to show a significant falloff

11   relative to preceding days; and that is especially

12   concentrated in certain areas, for instance, Baltimore with

13   a processing score of under 40 percent.  And my

14   understanding is that means that the processing time for a

15   piece of mail is less than -- 40 percent of the time it is

16   done within the service standard that is set forth in the

17   regulation; in other words, it's on time only 40 percent of

18   the time.

19        In Philadelphia, it's at about 43 percent; in

20   Detroit, it's at about 53 percent; in Colorado, Wyoming,

21   less than 50 percent.

22        So one thing -- we are not prepared to ask for it

23   right now, Your Honor; but one thing that we may seek as

24   early as tomorrow -- and that we think it's worth beginning

25   to talk about is at least a targeted approach to addressing

1    issues in particular areas that appear to be hot spots,

2    where there are particular concerns about timely processing

3    and timely delivery of the mail, which we think would be

4    more tailored and reflect the data that we're getting rather

5    than a, sort of, one-size-fits-all approach that may not

6    actually be focused on the specific problem areas.

7            That brings me to my third point, Your Honor.

8    We're particularly concerned about that for the next few

9    days for purposes of election mail.  And we do have

10   processing scores for election mail from the Government but

11   only at the nationwide level.  And so in order to help us to

12   understand if these particular hot spots that have low

13   processing scores for all mail also have low processing

14   scores for election mail, we need the election mail

15   processing score data at the more granular level, at the

16   area and district level.

17           My understanding from the Government is that's

18   something that they just were not able to put together today

19   but expect to be able to put together starting tomorrow.

20   And we would just -- I guess we want to confirm that and

21   also reiterate the need for that in order to fashion any

22   targeted relief between now and the election in particular.

23           THE COURT:  Very well.  Thank you, Counsel.

24           If you would like to submit a proposed order -- I

25   will hear from Government counsel.  But if you would like to

1     submit a proposed order at the conclusion of the hearing

2     asking for any precise additional relief, I would invite

3     both parties to try and work out an agreement.  If you can't

4     do that, then each party can file its own proposed

5     supplemental order.

6              Mr. Borson.

7              MR. BORSON:  Thank you, Your Honor.  I will try to

8     address all three of those.

9              THE COURT:  Sure.

10             MR. BORSON:  So Mr. Duraiswamy is correct, we had

11    some discussions right before the call and he asked me

12    follow-up questions about what data is available.  We have

13    sent those to our data people to get a better sense of that.

14    I have not heard back from them yet but, obviously, we will

15    work with plaintiffs' counsel to see if we can reach

16    agreement as soon as we get the technical information back.

17             So just to the three points.  On the issue of

18    apples to apples comparison, we began discussions to figure

19    out which of that -- what data we can get that would provide

20    that comparison to plaintiffs that is useful to them and

21    minimizes the burden on the postal service to the extent

22    possible.

23             I did want to clarify something that may have been

24    based on my incorrect statement to him at our previous call.

25             The way the postal service calculates these

1    scores -- as Mr. Duraiswamy mentioned, there are three

2    components.  There is the first mile, which is basically

3    what you put in your mailbox when it's picked up and brought

4    to the processing unit; there is the processing score which

5    is the bulk of when it's in the postal service's mail

6    stream; and then there is the last mile score, basically

7    when it's sent out for delivery.

8            The score in the daily data we have produced is

9    the processing score; and it's the percentage of mail pieces

10   that meet that processing score.  So it's not necessarily

11   the percentage of mail pieces that meet the overall service

12   score for that class of mail; so it's a comparison within

13   that one unit as opposed to within the entirety of the unit.

14   So I just wanted to clarify that.

15           So plaintiffs' point about targeted relief --

16   obviously we're happy to talk further about that and review

17   any proposal they may have.  It's the first we're hearing

18   about it, so we're happy to dig into that as well.

19           On the issue of more granular data on election

20   mail, plaintiffs' counsel is correct that we were not able

21   to get that together for today.  Our data folks are looking

22   into whether it's possible to produce that on a more

23   detailed granular level.  And, again, we'll get back as soon

24   as we confirm whether that is or is not possible.

25           THE COURT:  Great.  Thanks, Mr. Borson.

1          Does anyone else wish to say anything?

2          MR. DURAISWAMY:  Your Honor --

3          THE COURT:  So looking -- go ahead, Counsel.

4          MR. DURAISWAMY:  I am sorry.

5          I was going to say there are a couple other --

6   other than the data, there are a couple of other points that

7   we just want to touch on very quickly.

8          The communication that was in paragraph 1 of the

9   order has gone out.  As I understand it, it's gone out to

10  everybody who has a responsibility for late -- who holds the

11  relevant position as the people who received the

12  communication in July which should be sufficient for our

13  purposes; and the Government is working on the communication

14  in paragraph 2 which also should be sufficient for our

15  purposes.

16          And, finally, on the list of ballot deadlines, we

17  are conferring with the Government pursuant to the order and

18  working to get that done and out into the field by today.

19          THE COURT:  Great.  That's fine.

20          Does anyone else wish to say anything?

21          MR. BERG:  Yes, Your Honor.  This is David Berg on

22  the Richardson case.

23          THE COURT:  Mr. Berg.

24          MR. BERG:  Yes.  I have a question that perhaps

25  the Court can pose, if you think it is appropriate, to

1    Mr. Borson.

2            We now have what can be called "unreliable

3    information" -- that's what the Government tells us; and I

4    have no reason to doubt it.

5            Is there any data that they can provide us -- is

6    there any kind of information that they can provide us that

7    can assure us that election mail is actually being delivered

8    and that there is not a backlog that can give us the real

9    current status of election mail other than what --

10            THE COURT:  Mr. Borson.

11            MR. BORSON:  So, Your Honor, I think there are a

12    couple of sources; one is the daily all-clears that we have

13    been producing in the Southern District of New York and

14    Eastern District of Pennsylvania case, and that we will --

15    pursuant to yesterday's order -- be producing in these cases

16    when it's produced there which provides an assessment of

17    basically backlogs at the plants and facilities as well.  So

18    they do a sweep once a day to see if there are any ballots

19    that are missed or unaccounted for, and that's designed to

20    figure out that process.

21            I think the election mail score -- in terms of

22    identifying ballots that are identifiable as ballots -- at

23    least electronically that we have produced today is probably

24    the best available measure of that.  Certainly, on a weekly

25    basis, that is the data that the postal service uses which

1    is the data that's been produced in the Southern District of

2    New York.

3            So I do think, in that respect, it's not perfect

4    data; and I think we have explained why it's not perfect

5    data.  It's the data that we are providing to the best of

6    our ability.  But I think the combination of those two

7    metrics is probably the best way of getting a sense of

8    election mail that is identifiable as "election mail," and

9    how that's working its way through the system.

10           THE COURT:  All right.  Mr. Borson, I assume that

11   you are the principal attorney in all of these injunction

12   cases; is that correct?

13           MR. BORSON:  That's correct, Your Honor.

14           THE COURT:  What are other courts doing?  Are we

15   being consistent with what we're doing or not?

16           MR. BORSON:  Substantively or process-wise, Your

17   Honor?

18           THE COURT:  I guess both.  Both.

19           MR. BORSON:  So I think substantively -- the short

20   answer is basically yes.

21           We have worked really hard with plaintiffs working

22   cooperatively, including plaintiffs here I think, to try and

23   ensure that the guidance we give to the fields and court

24   orders are all consistent with one another so we are not

25   having a situation where one court is saying, Do X; and the

1    other court is saying, Don't do X.  So I think we've tried

2    to harmonize that guidance as well as we can.

3            I think, in terms of data -- I think the Southern

4    District of New York and the Eastern District of

5    Pennsylvania have both required weekly data; so the data in

6    this case is consistent but certainly more than we are

7    seeing in those cases.

8            This is the only set of cases where we're having

9    weekly status conferences.

10           So I do note there is a proceeding in the Southern

11   District of Florida that's focused really on, sort of, the

12   last 48, 72 hours before the election where it looks like we

13   may be moving closer to -- if not daily status conferences,

14   at least every other day status conferences; so I think it's

15   pretty much it.

16           I mean, sort of the big picture here is that the

17   last couple of months these cases have really been focused

18   on getting guidance and instructions out to the fields, both

19   to correct issues that the Court saw as hindering the

20   expeditious delivery of mail but, also, the postal services'

21   affirmative responsibilities and affirmative tasks to move

22   mail expeditiously, particularly election mail.  So we have

23   tried to harmonize that guidance to get that out and have

24   that as clear as we possibly can; and that's been the

25   substantive focus of all of these cases.

1          And then for the more procedural elements, there

2     have been -- some days the reporting requirements -- there

3     have certainly been inquiries we've had from various

4     plaintiffs that are moving on.  And there have been courts

5     that have been, sort of, overseeing this to lesser and

6     greater extents.

7          THE COURT:  All right.  Thank you, Mr. Borson.

8          I recognize it's probably a ton of work, but I

9     thank you and your colleagues; I sincerely appreciate your

10    efforts.  I am sure I state that on behalf of all of the

11    plaintiffs everywhere.

12         I am the novice here with respect to the data

13    analysis, so what is the plaintiffs' best suggestion for

14    concluding this hearing now?

15         And I will follow that up with a question, whether

16    or not there is a need for a supplemental order?  And, if

17    so, I should encourage you to work with defense counsel to

18    see if you can agree on the terms of a supplemental order.

19    If not, both sides can submit their proposed respective orders.

20         Counsel.

21         MR. DURAISWAMY:  Your Honor, speaking for the Vote

22    Forward plaintiffs -- I think it would be helpful to have a

23    supplemental order that requires some additional data that

24    puts in context the data that we're getting or at least

25    expect to receive tomorrow; and we're happy to confer with

1    the Government about that.  We started to confer on that,

2    frankly, before this call; and I know that they're doing

3    some work to better understand what data is available.

4         As far as further, sort of, substantive relief --

5    at least from the Vote Forward plaintiffs' perspective, Your

6    Honor, I think we will be probably better prepared to

7    address that tomorrow once we have got some additional data.

8    And I do think we will want to likely address tomorrow, in

9    part, because some of that relief may involve certain

10   measures that can be undertaken over the weekend which we

11   understand are not currently being contemplated to be

12   undertaken over the weekend.

13        THE COURT:  All right.  Thank you, Counsel.

14        Any suggestions from anyone about the timing for

15   tomorrow's hearing?  Again, the Court is flexible.  And,

16   also, the filing of data for tomorrow?

17        MR. DURAISWAMY:  I think it would be helpful, Your

18   Honor, if we can get some clarity from the Government, I

19   think as soon as possible, on when they expect to file data

20   through -- current through today tomorrow to make sure that

21   we have it in advance of the Court's hearing.

22        But, from our perspective, the current deadlines

23   are fine; but I think that's a question for the Government.

24        THE COURT:  All right.  That makes sense.

25        The Court is available.  So see if you can work

1    out if there is a need to make an adjustment with respect to

2    the hearing and the production of data; we'll certainly

3    accommodate all of the parties.

4          Again, the Court is deeply appreciative of

5    everyone's efforts.  These are trying times.  But I can't

6    express -- I can't say enough things about the Court's

7    appreciation of the Government's efforts to comply with the

8    Court's order.

9          So anything further, Mr. Borson?

10          MR. BORSON:  Nothing further.

11          We'll confer with the plaintiffs about figuring

12    out what data can help contextualize this data which, I

13    think, is essentially what they're trying to get.  And we'll

14    also follow up in terms of the late and extra trips about

15    what production tomorrow -- what time production will be

16    useful in terms of getting the previous day's data.

17          THE COURT:  All right.  Thank you, very much.

18          On a lighter note, Mr. Berg, I passed on your

19    comment to Judge Lamberth who was deeply appreciative and

20    smiled.  What he told me was I think your dog Zoe stole the

21    show, though.  As you know, he is a native Texan.

22          MR. BERG:  Yes.  Not only do I know that -- not

23    only do I know that, Your Honor, I know that Judge Lamberth

24    went to the University of Texas Law School.

25          THE COURT:  That's right.

1          MR. BERG:  Which -- if you will pass on to him,

2     which -- as a University of Houston graduate, I said, the

3     University of Texas Law School will do in the absence of a

4     legal education; if you will just pass that onto him.

5          THE COURT:  I will tread carefully with that one.

6          MR. BERG:  Maybe I can retract that request, if

7     you don't mind.  Let me -- just forget about that, Your Honor.

8          THE COURT:  Well, it's against the law to probably

9     figure it out now, so -- be careful.

10         MR. BERG:  I am getting calls from people who want

11    me to handle their dog licensing cases so I just -- it's

12    crazy to me.

13         THE COURT:  All right.

14         MR. BERG:  Thank you, everyone.

15         THE COURT:  Everyone, be safe and healthy.  I

16    don't have anything else to say.

17         MR. BERG:  Thank you, Judge.

18         THE COURT:  Anyone else have anything you want to

19    say?

20         (No audible response.)

21         THE COURT:  All right.  Everyone, take care.

22         We'll talk again tomorrow at some point.  We're

23    scheduled for 3 but, again, we're flexible.

24         MR. BERG:  Thank you, Your Honor.

25         THE COURT:  Thank you, all.  All right.  Bye-bye.
           (Whereupon, the proceeding concludes, 3:23 p.m.)

CERTIFICATE


I, ELIZABETH SAINT-LOTH, RPR, FCRR, do hereby certify that the foregoing constitutes a true and accurate transcript of my stenographic notes, and is a full, true, and complete transcript of the proceedings to the best of my ability.


PLEASE NOTE:  This hearing was held telephonically in compliance with the COVID-19 pandemic stay-safer-at-home orders and is therefore subject to the limitations associated with the use of technology, including but not limited to telephone signal interference, static, signal interruptions, and other restrictions and limitations associated with remote court reporting via telephone, speakerphone, and/or videoconferencing capabilities.


This certificate shall be considered null and void if the transcript is disassembled in any manner by any party without authorization of the signatory below.

Dated this 28th day of October, 2020.


/s/ Elizabeth Saint-Loth, RPR, FCRR
Official Court Reporter