# Exhibit 1

1    October 31, 2020.  Judge Sullivan.  3:00.

2                (Excerpt Testimony of Michael Barber)

3                        DIRECT EXAMINATION

4        BY MR. BORSON:

5        Q    Mr. Barber, just to start, what is your role at

6    the Postal Service and how long have you been at the

7    Postal Service?

8        A    So I've been with the Postal Service for 30

9    years and my role, my current position, Vice President of

10   Processing and Maintenance Operation is I developed,

11   maintain postal policy as it relates to processing and

12   maintenance operations.  I support the execution of those

13   policies and procedures in the field.

14       Q    Thank you.  And in terms of your

15   responsibilities for processing plants and processing

16   operations specifically, can you just briefly describe

17   what processing operations in the Postal Service is?

18       A    So processing operations is the execution of --

19   when mail is passed through from collections into the

20   processing facility, when mail is entered into a

21   processing facility so it really becomes the four walls

22   where mail is entered in, we separate, sort, containerize

23   and prepare for transport to downstream facilities and

24   then ultimately to post offices and branches across the

25   country for delivery to customers.

1         The maintenance portion of that, of course,

2    would be in full support of the sortation equipment that

3    we maintain to do the processing of such mail.  So we sort

4    mail, both the letters and magazine for flat shaped sides.

5    We also sort packages as well.

6         Q    And with respect to election mail, can you

7    describe what role the processing facilities that you

8    oversee play with regard to that mail?  Why is what you do

9    important with regard to moving people's ballots?

10        A    We have tried and true processes that we've

11   established over the years for processing of election and

12   political mail.  Specific to election mail, we have

13   specific practices and policies on how we accept and enter

14   ballots.  We have interactions with Boards of Elections

15   across the country around the -- annually.  You know, so

16   it's not just at election time that we do that.  So we

17   interact with our Boards of Elections across the country

18   throughout the year in preparation for the next election.

19   So that's ongoing.

20        And then for the processing side, we do regular

21   training and education and messaging to our work force,

22   making sure that we're ready for having all of our signage

23   ready for how we isolate election and ballot mail.  We do

24   monitor our processing, sortation, depth of sort.  Any

25   issues that are identified, we have teams that work around

1    the clock to try to resolve those to make sure that we're

2    expediting the election mail timely.

3         Q    And then in terms of the processes that you have

4    for election mail, are there any measures that you're

5    putting in place in the last week of the election and why

6    are you putting those measures in place?

7         A    Yes.  So during the last week of the election,

8    we do put in some additional measures and those measures

9    are there for purpose of rescuing and I would call it more

10   of a rescue and recovered plan process.  As ballots get

11   entered in late to the postal network, you know, we do

12   have a service standard and if ballots are entered in

13   today and tomorrow and if they were left to go through the

14   regular and normal process that we have, they would be at

15   risk of not making it to their destination timely.

16         So we do a -- we changed our sort plans.  We

17   isolate ballots in different ways.  Either at a post

18   office we ask them to isolate and keep local ballots there

19   at the processing facility.  The first piece of equipment

20   that that ballot would be seen on now, we will isolate

21   that, capture it, do a manual sort and what we would call

22   rescue that to and expedite it to a Board of Election or a

23   post office that serves a Board of Election.  And then if

24   it's in the case where it is not a local ballot, then we

25   have a procedure in place where we would identify that and

1   sort it to a express mail network in an attempt to get it

2   to its final destination as quickly as possible.

3          THE COURT:  Mr. Barber, excuse me for a second.

4   You identified this process as rescue and.  And I just

5   didn't catch the second part of it.  The rescue and?

6          THE WITNESS:  It would be a rescue and recovery.

7   You know, it's the last minute.  Yeah.  Rescue and

8   recovery.  It is part of our extraordinary measures

9   effort.  But it is truly to capture those ballots that are

10  entered into our mail system late.

11         THE COURT:  Thank you.

12         BY MR. BORSON:

13     Q   And so with respect to the procedures, do you

14  also have extra transportation resources, extra

15  transportation plans to move these ballots as quickly as

16  possible in the last days?

17     A   We do.  We've established additional

18  transportation throughout this weekend into Monday and

19  Tuesday.  We also have identified with the logistics team

20  additional resources, standby resources should they be

21  needed.

22     Q   And just to be clear, you've been directing

23  additional resources towards processing election mail for

24  some time now.  Right?

25     A   Oh, yes.  Absolutely.  This has been for quite

1    some time now.  We've had additional resources and

2    heightened awareness and audits of mail flows.  We've had

3    the inspection service in our facilities.  The Office of

4    Inspector General has been in our facilities that are

5    assisting in ensuring that what we're seeing and finding

6    that we're reacting to appropriately.  So this has been

7    going on for months.  This is what we do every election.

8    Additional resources are applied.  Yes.

9            THE COURT:  When did this process start?  You

10   say quite some time.  When did it start?

11           THE WITNESS:  So I can tell you, we have -- it

12   is an annual operation.  This is not something that we

13   just start months or before an election.  So we have an

14   effort year round.  But specifically, I would say the

15   additional resources is when the ballots begin to ramp up.

16   So I would say towards the end of September, middle of

17   September, we saw an uptick in political and election

18   mail.  That's when we then begin to dispatch those

19   additional resources and begin to ramp them up along with

20   the volumes that we see begin to climb.  Ultimately, I

21   would say we've been in just the full deployment in the

22   last five weeks.

23           THE COURT:  What impact did the eight

24   injunctions have on additional process procedures?

25           THE WITNESS:  So I would say that we -- whatever

1    additional injunctions we've had, they have not deterred

2    or and I wouldn't say that they've changed the direction,

3    meaning I don't know that any of them have added any

4    additional benefit beyond what we had already deployed and

5    had in place and had been planning for.  So I don't see

6    those as being helpful or if anything we -- I wouldn't say

7    that it's been of any benefit.

8             THE COURT:  My question was somewhat unclear.

9    So I guess my question should -- my question should have

10   been were there additional services provided, efforts,

11   services, whatever you want to call it provided as a

12   result of the injunctions.  If I understood you correctly,

13   you're saying it was already employing those services.

14            THE WITNESS:  Yeah.  Definitely.  We did

15   increase the effort to ensure that we were in compliance

16   with whatever injunctions were put in place.  We did some

17   additional messaging.  We added whatever processes were

18   asked we added.  We understand the importance and value of

19   every election and this is definitely something that we've

20   been deploying extraordinary measures for, like I said,

21   definitely since the September timeframe.

22            THE COURT:  All right.  Thank you.

23            BY MR. BORSON:

24   Q    And then, Mr. Barber, what else -- what other

25   resources do you think they are available to deploy at

1    this time?  Is there anything that you could do that

2    you're not doing?

3         A    No.  We have deployed everything.  It's about

4    execution at this time.  If you think about the -- in the

5    just the remaining days, we have established very well

6    thought out, well tried and true processes that we've

7    used.  It's about execution.  Any change would add risk.

8    I think whatever resources we have, we are using and very

9    comfortable with the steps that we're taking.

10        Q    Thank you.  And in terms of additional

11   resources, are you referring to people resources, to

12   overtime or employees, to physical resources?  What are

13   you referring to there?

14        A    Yes.  Resources.  So we are maximizing the full

15   use of any overtime usage and also the sharing of the

16   employee resource.  So across functional areas, if there's

17   any opportunity that we have an available employee that is

18   not scheduled to perform duties in their core operation,

19   they are being diverted to other operations that help to

20   support that effort.

21        Q    Thank you.  And then I just want to be mindful

22   of everyone's time.  So just to switch gears slightly, I

23   know the plaintiffs had asked about the Colorado, Wyoming

24   facility which I understand has lower performance scores

25   than the average.  Can you explain why that facility is

1    performing the way it's doing?

2        A    Yeah.  So it's not just one issue.  Right?

3    There's multiple aspects to what you see on that ballot

4    performance score.  Within Colorado, Wyoming, I will say

5    that that data set does not include ballots that are being

6    captured at the post offices locally and turned around.

7    So the data set while true is not -- it's lacking its full

8    context.  It does not have many ballots that are being

9    delivered locally not making it through the processing

10   plant that otherwise would show a success.

11        With that said, the Denver facility has had a

12   challenge with the pandemic effect on their availability.

13   So that has been an ongoing challenge.  Again we divert

14   resources.  We have hiring that has occurred.  But it does

15   take -- there is a learning curve for an employee, new

16   employees entering into that facility.  So they've had a

17   greater challenge than others.

18        Additionally, I would say in just the most

19   recent data sets that we've seen, the analysis shows that

20   specifically in Colorado, Wyoming and the Denver

21   facilities specifically, they did have some inclement

22   weather that has had an adverse effect on mail movement in

23   and out of that market since Saturday.  It has now since

24   cleared up and that issue does not exist any longer.

25        Q    And what sort of additional resources can be

1    provided in the Colorado, Wyoming area to remedy this?

2         A    So what they do is they do work across

3    functional.  We'll have retail and customer service

4    employees I spoke of that are not traditionally assigned

5    responsibilities within the processing plant.  They'll use

6    those resources.  They'll ask do we have clerks or

7    carriers from retail and delivery that can be assigned to

8    assist.  They also use administrative or other functional

9    area employees that may be available to assist on the work

10   force.

11        Q    And do they also use overtime?

12        A    Oh, yes, they absolutely do.  They're maximizing

13   their overtime for all resources.

14        Q    Thank you.  And then just one final question.  I

15   mean again, thinking with this plant specifically, are

16   there other things that could or should be done in the

17   lead-up to the election to make sure that every American's

18   ballot gets to be cast and counted or at least as close to

19   that as physically possible?

20        A    Yeah.  Not beyond what we've already employed.

21   It's about executing that and we have the effort that we

22   have this weekend with the additional monitoring,

23   additional 24/7 monitoring.  So we have a point of contact

24   that is available across the country that we staff that if

25   there's any issues that are identified by any of our

1    ballot monitors or any other employee, if there's any

2    concerns that are raised, that we're able to respond in a

3    quick, effective manner.  So it really is about executing

4    and following the plan.

5              MR. BORSON:  Thank you, Mr. Barber.  That's all

6    I have on direct.  Again I want to be mindful of his time

7    and I appreciate again you taking the opportunity.

8              THE COURT:  Thank you, counsel.

9    Cross-examination.

10             MR. DURAISWAMY:  Yes, Your Honor.

11                     CROSS-EXAMINATION

12             BY MR. DURAISWAMY:

13        Q    So, Mr. Barber, I believe you identified two

14   principal categories of extraordinary measures in terms of

15   processing operations for election mail.  The first being

16   the rescue and recovery and the other being the additional

17   use of additional transportation trips.  Is that fair in

18   terms of the overall categories?

19        A    Well, those are -- yes.  I think there's many

20   more aspects to the process.  But it does involve

21   logistics.  It does involve that we needed to add the

22   additional transportation on Sunday, for example.  We

23   don't normally have some of that transportation on Sunday

24   as we don't gather the mail from collection boxes on

25   Sundays.  But this Sunday as part of the extraordinary

1    measures, we will capture that volume from blue boxes on

2    Sunday from any retail or any other entry point that

3    customers may place mail to include ballots.  We added

4    that transportation to move it to processing facilities

5    and we added transportation to move that mail to delivery

6    units the following day which we would not normally have.

7         Q    Okay.  And with respect to the rescue

8    operations, Mr. Barber, that involves triaging election

9    ballots in particular at the point of entry to a

10   processing plant and then either separating through it

11   processing or turning it around without going through full

12   processing.  Is that a fair and accurate account?

13        A    That is fair and accurate.  We created specific

14   sort plan changes in each of our facilities to direct the

15   ballot that would normally go through its normal mail sort

16   to be able to capture it at its first point and reduce the

17   time that it's in a processing facility and get it to a

18   delivery unit.

19        Q    Okay.  And is there some documentation or

20   communication that was provided to processing facility

21   personnel regarding these extraordinary measures for

22   election mail?

23        A    Yes.  We did provide standard work instructions

24   and documents and expectations to each of the regional

25   vice presidents, division directors, plant managers and

1    all employees within all processing facilities with

2    information and then we did set up a series of touch

3    points to validate that our processes were in place.

4         Q    Okay.  I want to come back to that.  But what's

5    the service standard for a piece of mail that is sent from

6    and addressed to a location in the same district?

7         A    So you can't just say the same district because

8    it could be -- some districts are larger than others.  I

9    will say like the Rio Grande district.  It stretches from

10   El Paso to Corpus Christi and so the service standard

11   could be different within one district.

12        So you can have -- if it is a local turnaround,

13   what we would call is mail entered.  If it's in a blue

14   box, we are -- the service standard is two days within

15   that service area.  If it's outside of that service area,

16   it would be three-day service.

17        Q    And when you say the service area, what does

18   that mean?  Does that mean the defined areas of the postal

19   service or something else?

20        A    Yeah.  I guess to be more clear, it would be the

21   branches that that plant or facility services.  So it

22   could be -- I think it's within a six-hour range, a

23   six-hour drive time.  So you would take a plant and within

24   six hours, we're expecting a two-day service performance

25   on that.

1          Q     That's helpful.  What about a ballot that's sent

2     from and received in the same county or destined for the

3     same county which is presumably quite a bit of the

4     election ballots that are being sent or delivered?

5          A     Yeah.  The normal service standard, just an

6     example, Dallas to Dallas or Miami to Miami, that would be

7     a two-day service standard.  It's from the day it's

8     collected, pulled from a blue box, processed and delivered

9     to the customer, it is a two-day service standard.

10         Q     So it spends 24 hours or more in the processing

11    facility because it gets delivered the night that it's

12    collected.  It gets sent to the processing facility the

13    night that it's collected and then it doesn't get turned

14    around until late the following night or two mornings

15    later.  Is that right?

16         A     That is correct.  We have a portion of that --

17    there's a portion of that mail that gets delivered prior

18    to the service standard.  Those destinations that are

19    closer to the facility on occasion do receive that mail

20    overnight as opposed to within two days.  But that

21    would --

22         Q     That's helpful.  And I apologize for

23    interrupting.  I just want to be mindful of your time.  So

24    ballots that are collected on Monday, they -- that are

25    collected from a county and are supposed to go back to the

1   same county, the normal service standard would not

2   necessarily allow those ballots to be delivered until

3   Wednesday.  Correct?

4       A    That is correct.  And that was why we put in the

5   extraordinary measures.  We are going to trap and rescue

6   that.  We're going to find it right early on Monday night.

7   We're going to capture it.  We're going to isolate it and

8   work it manually and get it straight.  So we're going

9   to -- we're not going to allow it to go through its

10  regular sortation.

11      Q    But as I understood it, Mr. Barber, you said

12  that extraordinary measure has been implemented since late

13  September.  Is that right?

14      A    No.  Not that portion of it.  No.  This is --

15  look, this is for mail that would be entered in.  That's

16  why we do this this weekend.  Right?  Is for mail that's

17  not entered in, this is an additional step that we

18  implement on the days before the election for ballots that

19  could be entered into our system after the expected

20  success date.

21      Q    And so that manual sort, that trapping process

22  and manual sort is something that you're doing only on

23  Monday night or have you started doing it already?

24      A    We started doing a portion of it last night on

25  Friday night.  So the example would be last night, part of

1    our operation was if you receive a ballot, for example,

2    that is going from Miami and it's going to Seattle.  Well,

3    there's no way to recover that other than if you put it --

4    extract it, put it in an express mail bag to fly it, then

5    it still has a chance to make it.  So any ballots that

6    were outside your service -- that you serviced for two

7    days starting last night, they captured those, put them in

8    express mail sacs and we flew that to its destination so

9    that it can make service.

10              Today, we will be extracting those that are

11   being entered today, Sunday, and we will do the same thing

12   Monday.  Monday night, we'll be doing the same thing.

13   Tuesday, we will have hourly sweeps then from most mails

14   coming in all the way up until -- each individual state's

15   Board of Election have a slightly different receipt times.

16   So we provided all of that information to every postal

17   facility across the country and they will make continuous

18   sweeps up until those times of the Board of Elections

19   still continue to accept.

20       Q    Has this been authorized or has it been

21   instructed that these efforts to ensure a one-day

22   turnaround for election mail from here through Monday and

23   Tuesday?

24       A    Yeah.  This is an expectation.  So it's an

25   instruction and an authorization.  Right?  Everybody --

15

1    we're authorized to use every resource available.  There

2    is no restriction.  You don't have to second guess or

3    anything and there are specific instructions.  So I would

4    say there's both.  There's that instruction and this is

5    how we're going to do this.  Here is the standard work.

6    Here's the procedure.  We are going to monitor, ensure

7    that we're following those within every facility.  If

8    they're not following them, we will follow up with you,

9    make sure that if there is something that wasn't

10   understood, we can get it corrected.  That started

11   occurring last night throughout the 24-hour monitoring.

12        Q    Sorry to interrupt you.  I have one followup

13   question.  With respect to tomorrow, are all of the

14   processing facilities operating at full operational

15   capacity in the same way that they would be on any other

16   day of the week?

17        A    They are.  Yes.  We are full operations.  Yes.

18        Q    And as far as transportation between facilities

19   for mail that needs to be processed through more than one

20   facility, is that also operating at least to the same

21   degree as it is today or Monday?

22        A    There is one slight change for Sunday night.  We

23   don't have -- there's a air network that is not available

24   to us on Sundays, Sunday nights.  So that would be the one

25   caveat on the logistics network site or the transportation

1   site.  But we did add the additional transportation within

2   our processing facilities and delivery units that we're

3   capable of, that we have that resource for.

4       Q    The express mail, the rescue and the placement

5   into express mail, is that something that's also mandatory

6   for every processing facility?

7       A    That is.  Yes.

8       Q    And there have been communications, written

9   communications that you'd be able to provide us reflecting

10  that instruction?

11      A    Yes.

12      Q    Okay.  We'll follow up with Mr. Borson about

13  that.  Is there a sweep in every facility at the end of

14  the day to determine the status of any election ballot --

15  A, to sort of identify the existence of any election

16  ballots and, B, to determine their status and ensure that

17  they are -- have completed their processing by the end of

18  the day?

19      A    Yes.  We have daily, all clears and sweeps and

20  to bolster that, I mentioned, you know, just to follow up,

21  we have the inspector service that they're auditing and

22  reviewing, did we complete the all clears effectively.

23  The same with the OIG, the Office of Inspector General

24  have the resources out there assisting with that

25  observation as well.

1      Q     And there are facilities that are not able to

2   certify all clears.  Is that right?

3      A     I don't know that I understand that question.

4   The not able to.  Every processing facility, we do -- they

5   do provide all clears.  You get an all clear and you if

6   you -- I think the example would be we've gotten -- we've

7   received feedback from an inspection service, review of

8   that all clear that they found a ballot in a manual

9   operation.  We investigate each and every one of those

10  that occurred and in some cases, the ballot was actually

11  just entered into the facility after an all clear had been

12  made.  So I think every facility is capable of performing

13  the sweeps and all cleared.

14     Q     Well, I guess my question is they have to

15  certify the all clear at the end of each day.  Right?

16     A     That is true.

17     Q     And you track the percentage of facilities that

18  have certified all clear.  Right?

19     A     We do.

20     Q     And that data shows that not every facility has

21  been certifying all clear over the last couple of weeks.

22  Correct?

23     A     We are not perfect.  That is true.

24     Q     Okay.  So what steps are taken to address the

25  individual facilities that are not certifying all clears?

1   What specifically is done?

2          A     So there is an investigation to every all clear.

3   There's a followup from their managers that are

4   responsible for those facilities.  I would say probably

5   Dane might be able to provide some insights into an

6   example of any of those from a operations side.

7          Q     And you get the all-clear certifications on a

8   daily basis for each facility.  Is that correct?

9          A     Yes.  There is and there is a roll up.  Yes.

10         Q     I just have one more question and again mindful

11  of time.  And we've noticed that all of these facilities

12  should be prioritizing election mail.  Correct?

13         A     Yes.

14         Q     We've noticed some facilities that have higher

15  processing scores for First Class Mail than for election

16  mail.  Can you think of any explanation for that?

17         A     Yeah.  I would say that my example that I

18  started out with is we're not measuring -- the service

19  performance that you're referencing is not apples to

20  apples.  The example is for ballots, we're trapping mail

21  and in fact we -- by doing what we're doing, we're making

22  our service performance look worse than it is because

23  we're not allowing those successful pieces to be measured

24  as a success.  And so we're -- but it's the right thing to

25  do.  By trapping that mail at a post office and getting it

1    delivered to the Board of Elections locally, that is not

2    part of the data set for service performance.  So that

3    does artificially deflate the service performance of

4    ballots simply because we're not allowing all of the

5    ballots to be measured.

6         Q    And sorry.  Is that because it doesn't get -- it

7    gets an entry processing scan, but not an exit processing

8    scan or because it gets neither?  That as soon as it's

9    identified, it doesn't even get an entry processing scan,

10   it just gets turned around?

11        A    It could be both.  So if it's turned around --

12   if it gets an entry and we trap it before it gets to the

13   destination scan, then that would also be excluded from

14   that measurement system.

15        Q    But most of the trapping would be even before

16   the initial entry scan.  Right?

17        A    That is true.  There's trapping that occurs at

18   local post offices where there's local turnaround.  They

19   postmark it at the post office.  They hand it over to the

20   Board of Elections there locally.  Also an origin plant

21   could get it, trap it and then deliver it as well.  So it

22   would not get its destination.

23        Q    Okay.

24        A    So that's just one way that we know that it's

25   different in how you would see those two measurements.

1          MR. DURAISWAMY:  Okay.  I don't have any further

2     questions for you, Mr. Barber.

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Excerpt Testimony of Dane Coleman)

2

3                    DIRECT EXAMINATION

4          BY MR. BORSON:

5     Q    Mr. Coleman, thank you again for being here on

6  such short notice.  Just to begin to provide some context

7  for the Court, what is your title and what are your

8  responsibilities?

9     A    My title is a Regional Vice President of

10  Processing Operations for the eastern region and my

11  responsibility is oversight for implementation and

12  execution of all processing policies and programs for the

13  eastern side of the United States.

14     Q    So you're the person who has sort of operational

15  responsibility for processing plants in the eastern half

16  of the U.S.?

17     A    That is correct.

18     Q    Okay.  And that includes responsibilities

19  related to election mail and election mail processing?

20     A    Yes, sir.  Absolutely.

21     Q    Can you describe what to the extent not covered

22  by Mr. Barber what types of measures that your plants are

23  doing now in the lead-up to the election?

24     A    Well, the first thing we were doing -- I'm not

25  sure what Mike shared, what Mr. Barber shared -- but is

1    prioritizing the election and political mail, working it

2    as it comes in along with our First Class mail and our

3    other mail products.  But it is the complete

4    identification and prioritization of that volume so it can

5    move through our network quickly.

6            It is also opening up our operational

7    opportunities.  So our full operational windows and all of

8    our processing platforms, all of our machines, our manual

9    operations are end up operations so we can expand our

10   windows.  And then it's also aligning the resources with

11   our employees and maximizing all of the work hours that we

12   can muster.  So that as we expand the windows, we have

13   employees aligning with the right schedules at the right

14   times during those operational windows so we can expedite

15   the mail.

16           It's also making sure -- I'm sorry?

17   Q    No, no.  Please.

18   A    I was going to say it's also making sure that we

19   have the proper transportation aligned so as we finish

20   processing the volumes, even in those expanded windows,

21   both earlier and later, we have the proper transportation

22   in place so that we can keep a steady flow of the volume

23   out to our delivery and customer service.

24   Q    And when you say expand the windows, does that

25   mean process mail for a longer period of time than you

1    would normally?

2         A    That's exactly what we mean.  So we have

3    processing platforms, various processing platform machines

4    and hours of operation and as we move through the election

5    and political mail process during this timeframe, we look

6    to optimize those windows so we may not have to run the

7    machine the same amount of hours we expand those windows

8    where we may not had to induct mail for the same amount of

9    time we expand that.  And even the tours of duty are the

10   operational windows that the employees work.  We expand

11   them by also working employees longer work hours.

12        Q    So in terms of resources, are you holding

13   anything back at this point in terms of additional

14   resources you could be committing?

15        A    No.  Absolutely not.  We need all available

16   resources.  So employees are authorized and instructed,

17   local managers, plant managers, supervisors are instructed

18   work our employees as much as we need, utilize as much

19   overtime as necessary to get the job done.  No holding

20   back whatsoever.

21        Q    And is that something that's just been in place

22   today or has that been -- has that message been pretty

23   consistent for a while now?

24        A    That message has been consistent all through

25   this electoral process for sure.  We all recognize how

1    important it is to deliver our brand for the American

2    public.  So it's all hands on deck.  All resources

3    available needed.  And that's been going on for the entire

4    season.

5         Q    And in terms of changes at this time, to the

6    extent that there would be new processes or new

7    procedures, do you think that could go into effect and

8    still be constructive for the election or is it too late?

9         A    Well, these are processes that we have in place,

10   those that we historically and traditionally use and then

11   those extra measures, extraordinary measures that Mike

12   described, those are the processes that are necessary for

13   us to finish strong.  So I believe, you know, at this

14   point it's all about execution of the processes and the

15   extraordinary measures that we have in place.  That's the

16   key.

17        Q    Thank you.  And then just switching gears to

18   something that I know plaintiffs were interested in.

19   Obviously, we want all facilities to be processing mail as

20   expeditiously as possible.  I know there are some

21   districts where performance has lagged a little bit and I

22   wanted to talk about two that I know you have oversight

23   over and know something about, which is Detroit and

24   central Pennsylvania.

25             So turning first to Detroit, can you explain

1    what the situation is in that district and why the numbers
2    are what they are?
3         A    In the Detroit district, we have seen a
4    disproportionate amount of employee availability issues
5    where some directly COVID related and some COVID impact
6    related employees for various reasons, family,
7    responsibilities, have not reported the work.  So we've
8    seen an impact there in Detroit especially
9    disproportionally in a number of employees coming to work.
10   And obviously, although we are maximizing all opportunity,
11   hiring up as far as we can, leveraging resources from
12   everywhere, we have seen some impact as a result of that.
13   We're reacting to it, making the necessary adjustments and
14   I have the authority and also working with the team to
15   make sure we get them on.  But we do know and acknowledge
16   that we've had some impacts because of that.
17        Same thing in the central Pennsylvania district.
18   Historically, it has, you know, a tough market for hiring.
19   However, they have experienced employee availability
20   issues there, too, that have given the facilities
21   challenges.  So we offset that again, first of all,
22   maximizing every employee that is available.
23        We leveraged other facilities just processing
24   facilities for customer service, retail (inaudible)
25   centers across our supply chain where there are

1    opportunities to bringing other resources where they may

2    not be needed for, you know, extraordinary overtime in

3    those facilities, we will bring them over in both C PA and

4    in Detroit to help out there.

5            And then the other piece we do to manage the

6    workload is we will offload certain products or certain

7    inventory to other facilities who process the same

8    inventory.  That way we can focus on political and

9    election mail in those critical sites, getting the ballots

10   through so we can get them to delivery home to our

11   customers.

12       Q    Can you explain the last point?  What do you

13   mean by offloading inventory?

14       A    So what that means is that we have product in

15   shape, size and products that we work in every facility

16   and because these are all processing plants, there are --

17   all plants don't work the same product or all products,

18   but most plants work similar products and so we have the

19   ability to shift volumes into markets where there is less

20   volume, less inventory and we can move those products

21   there and we might move a different shape or a different

22   product so that the site that is having the most critical

23   challenges can focus on their core product.  In this case,

24   their political and election volumes that they need to

25   work.  We want to make sure we can help have that isolated

1    and control the inventory.  So we will offer other

2    products to facilities near and around them to assist with

3    their production.

4        Q    So if I'm understanding you correctly, what

5    you're basically saying is that you are putting in place

6    measures to compensate for these employee availability

7    issues and those include both hiring more employees, more

8    overtime, but also things like moving non-election mail to

9    other facilities so you can focus on election mail and

10   bringing in people from other parts of the postal service

11   to work in these plants.  Is that pretty much capturing it

12   all?

13       A    That's exactly it.  So it's, you know, a couple

14   of efforts there.  It's offloading product.  That takes

15   down the amount of inventory they have to work.  It is

16   maximizing the employees who are in the facility.  It is

17   expanding the operational window in the facility so they

18   can work the products longer and then it's bringing in

19   other resources in terms of employees.  We have found all

20   four of those strategies is the way to stabilize those

21   facilities.

22       Q    What else could you do?

23       A    Those are major activities and those activities

24   prove to be a effective.  It takes all of those.  It takes

25   execution of that and that is, you know, certainly our

1    role and the role of our division directors is to make

2    sure we get those resources in place, talk with those

3    managers and their needs and we have found that when we

4    put in place all those strategies, there's an effective

5    way to manage the product.

6         Q    And in the lead-up to the election, is there

7    anything else that you think you could do, any more

8    resources that are available to be deployed or any other

9    steps that you could take?

10        A    No.  Nothing else out of what Mike has already

11   established.  I will say just in terms of the monitoring

12   process, we have found the ballot monitors and --

13             (Mr. Coleman's video connection was lost.)

14             BY MR. BORSON:

15        Q    I think when we were -- when you dropped off,

16   you were talking about the ballot monitor system and how

17   that was an effective use of resources.

18        A    Yeah.  I was just establishing what we've seen

19   in addition to the other things I laid out.  Having that

20   strong ballot monitoring process in place to make sure

21   every day we're looking at all of our operations.  Any

22   pinch points and closing gaps on where we have seen

23   challenges with ballots moving through the system, we have

24   found that to be an effective way to identify ballots --

25             (Mr. Coleman's audio was not clear.  He

1     disconnected and dialed in via phone.)

2           BY MR. BORSON:

3     Q    I think we were pretty much finishing up.  You

4     were talking about how the ballot monitoring process was

5     helpful.  Again in the lead-up to November 3rd and on

6     November 3rd itself, from your perspective what else can

7     be done that's not already being done?

8     A    There's nothing else I can add other than the

9     extraordinary measures Mike or Mr. Barber laid out that we

10    have implemented in these final days over this weekend

11    leading up to the election working with our customer

12    service retail and delivery partners, particularly around

13    the weekend, expediting any ballots, collecting, canceling

14    and processing volumes on Sunday which is different from

15    what we normally do so that we can turn ballots around

16    quickly on Monday.  Those measures in addition to what

17    we've already been doing is I believe adequate and I can't

18    think of anything else that we should be doing.  Again

19    it's about executing.

20    Q    And in terms of execution, my understanding --

21    you may have broken up a little bit -- is that you have

22    already communicated all the resources that you have to

23    work over the next couple of days, both mechanical and

24    personnel.  Is that correct?

25    A    Absolutely.  Every resource available to us in

1 the organization is being utilized to execute.

2    MR. BORSON:  Thank you.  Your Honor, I have

3 nothing further on direct if Mr. Duraiswamy would like to

4 go forward on cross.

5    THE COURT:  Mr. Duraiswamy?

6    MR. DURAISWAMY:  Thank you, Your Honor.  I'm

7 happy to start and then I probably don't have many

8 questions and hopefully can allow Mr. Coleman to get back

9 to his work relatively quickly.

10         CROSS-EXAMINATION

11  BY MR. DURAISWAMY:

12  Q Thank you, Mr. Coleman, for being here today.

13 We appreciate you making yourself available and appreciate

14 your efforts on these issues.

15    I wanted to ask specifically about certain of

16 the facilities that I believe are within the eastern part

17 of the United States and therefore fall within your

18 portfolio, so to speak.  The central Pennsylvania

19 facility, is that facility -- to your knowledge, is that

20 facility implementing the process that Mr. Barber talked

21 about where election ballots that are -- as soon as they

22 are received at the facility, they are identified and

23 either turned around for delivery if it's within the

24 district or put into an express mail automated flow if

25 it's outside the district?

1        A     Yes.  Our facilities in central Pennsylvania

2   have been instructed to do the same process and they are.

3        Q     Do you know when they received that instruction?

4        A     At -- specifically which instruction?  The

5   extraordinary measures for this weekend?

6        Q     No.  So there was -- one of the things that

7   Mr. Barber testified about I believe is that one of the

8   extraordinary measures that was authorized is to take

9   election ballots when they are received at a processing

10  facility, first of all, immediately identify them among

11  the mail that's come in and then take them from a separate

12  process including if it's a local delivery to just turn

13  them around without going through the full processing or

14  if it's not a local delivery, to put them into express

15  mail inventory or process.  First of all, is that your

16  understanding as to what one of the extraordinary measures

17  is?

18       A     That is my understanding.  And our facilities in

19  central Pennsylvania are administering those same

20  procedures.  Now some of those procedures have been in

21  place throughout the whole process, the whole election

22  process in terms of identifying them, having specific

23  hold-outs on our machines so we turn them around quickly.

24            I think what Mr. Barber was describing this

25  weekend which is different is now that we are so close,

1    the extraordinary measures also include for ballots that

2    are not turning around locally, but they are going out

3    abroad to another district within the United States using

4    express mail and central Pennsylvania districts are under

5    the same mandate.

6        Q    So I found a memo from October 13th that went

7    from Ms. Seaver and Mr. Williams and it's titled

8    Supplemental Guidance Memorandum and it relates to various

9    extraordinary measures for processing election mail.  Is

10   that to your -- are you familiar with that document?

11       A    I am very familiar with that document.

12       Q    And to your knowledge -- when Mr. Barber said

13   we've provided written instructions out to the field on

14   these measures, is that the memo that he's as you

15   understand it he's referring to?

16       A    Yes.  I do understand that to be the

17   Supplemental Guidance Memorandum, which was shared with

18   all of our processing plants including central

19   Pennsylvania.

20       Q    Okay.  One of the measures that's identified

21   there is from it says "from October 26th through

22   November 24, 2020, ballots may be manually separated and

23   moved by air or according to priority mail, express

24   delivery standards but regardless of paid class."  Are you

25   familiar with that measure?

1        A     Yes.  I am familiar with that measure.

2        Q     Okay.  Do you know if -- first of all, it wasn't

3   identified as mandatory in the memo.  Correct?  It said

4   may, this may be done?

5        A     That is correct.

6        Q     Okay.  And do you know if central Pennsylvania

7   has been doing this since October 26th?

8        A     They have been authorized to do that as

9   necessary since October 26th.  And again, moving through

10  the normal work processes that we have in place, it may

11  not have been necessary, for instance, to use the express

12  network then.  But, of course, now as we move closer, we

13  have to understand based on the service standards, we

14  needed to do that and that is when they would administer

15  that opportunity.

16       Q     Okay.  To your knowledge, was there any

17  follow-on memo issued to central Pennsylvania or any other

18  processing facility that said as you get closer starting

19  the weekend before the election, this is no longer

20  optional, but this is mandatory?

21       A     Yes.  And that was -- those were the

22  instructions based on -- you heard Mr. Barber's testimony.

23  Those instructions were given to all of our processing

24  plants.  As we've moved through this last week and to this

25  weekend, everyone was instructed this is what we must do

1    now.

2        Q    And was that a written instruction?

3        A    I'm trying to recall if it was specifically in

4    writing.  I know there were meetings, conferences held

5    with all of our processing plants explaining here are the

6    procedures going forward and now that we're at this

7    critical juncture, all extraordinary measures have to go

8    forward and here are the measures now that we must

9    implement.

10       Q    Okay.  And yesterday, the Postal Service

11   provided us with a survey of extraordinary measures that

12   are being implemented at the retail and delivery levels,

13   separate from the processing operations.  Have you all

14   done anything like that for the facilities under your

15   purview to determine whether these extraordinary measures

16   are in fact being implemented at the various processing

17   facilities?

18       A    Yes.  The sites were required to certify that

19   they understand the memo and have implemented those

20   measures.

21       Q    And you've received certifications for all of

22   the sites at least that are within your purview?

23       A    Yes.  I would have to, you know, go back and

24   check the records for every specific site.  But I'm 100%

25   convinced all sites were instructed to certify and I

1    believe we have certification.

2        Q    Do you know offhand if you have a certification

3    for central Pennsylvania?

4        A    I believe we have certification from central PA.

5    I don't want to misspeak, but it's my belief that we do.

6        Q    Okay.  You're not certain, but you think it's

7    possible?

8        A    Yes.  I believe they have certified.  They have

9    certified.  They understand the instructions.  I'm pretty

10   much a hundred percent sure that they've certified.  I

11   just don't want to misspeak without the documentation in

12   front of me.  That's all.

13       Q    Okay.  But there's a written document somewhere

14   that would tell us that.  Right?

15       A    All plants were required to certify that they

16   understand the extraordinary measures.

17       Q    Were they required implementing the

18   extraordinary measures?

19       A    Say that again.

20       Q    You just said that they are required to certify

21   that they understand the extraordinary measures.  Have

22   they been required to certify that they are implementing,

23   actively implementing the extraordinary measures to your

24   knowledge?

25       A    Yes.  That is the certification.  They are

1    certifying that they are implementing the extraordinary

2    measures.

3         Q     And when were these certifications requested and

4    provided?

5         A     Those certifications were established as the --

6    in conjunction with the memorandums, the memos being sent

7    out to all plants.

8         Q     So then it would be in conjunction with the

9    October 13 memo?

10        A     Yes.

11        Q     Okay.  And I believe that's -- I believe -- is

12   that certification that you are referring to pursuant to

13   the court order in a different case?  Is it pursuant to a

14   court order in another case to your knowledge?

15        A     Again, and I don't want to get the, you know,

16   the different court orders mistaken.  So I don't want to

17   misspeak there.  I'm saying in conjunction with those

18   letters and the memorandum issued by Ms. Seaver and

19   Mr. Williams, all plants were required and did certify

20   that they implement and understand, implement as well as

21   understand the measures.

22        Q     Okay.  Let me ask you about another item that's

23   in the list of measures.  Well, actually, I'm not sure

24   it's necessarily in the memo.  But the process whereby a

25   ballot is -- we just talked about the process whereby a

1    ballot is put into the express mail system.  It's manually

2    sorted and then put into the express mail system.  Right?

3        A    Yes.

4        Q    There's a different process if it's a local

5    ballot.  Right?  It's within the district.  It can be

6    manually sorted and then returned essentially right away.

7    Is that correct?

8        A    That is correct.

9        Q    Would it be overnight?

10       A    Yes.  In those cases where the ballots could be

11   actually like the measures that we are putting forward

12   this weekend, they can be trapped in collections and

13   turned around immediately in one day.

14       Q    Okay.  And it's your understanding that the

15   October 13 memo instructed all processing facilities to do

16   that?

17       A    No.  That's not what I'm articulating.  I'm

18   articulating as we move forward and to put those

19   extraordinary measures in place now, all sites are

20   turning -- have a process where they can turn around a

21   ballot overnight at this point.  However, as we move

22   through, as you heard Mr. Barber testify, we have a

23   process for identifying some of those ballots may make it

24   overnight.  Many of those ballots made it according to our

25   two-day service standard as you heard Mr. Barber testify.

1        Q     Right.  And so this process that's now rolling

2    out with the overnight turnaround for local ballots,

3    that's something that's not -- that wasn't communicated in

4    the October 13th memo, but it's something that's been

5    discussed orally.  Is that your understanding?

6        A     Yes.  That has been discussed in certain cases

7    as well as you heard Mr. Barber testify that we have local

8    units that have also are able to trap those ballots and

9    turn them around.

10       Q     Right.  And I'm putting aside the local units

11   for the moment.  I just want to focus on the processing

12   facilities.

13       A     Yes.

14       Q     So do you know if that's being done at the

15   following facilities, specifically central Pennsylvania,

16   Detroit, and northern New England?

17       A     Yes.  All of those facilities have the process

18   in place where upon the ballots being collected and going

19   through our cancellation process, they then can be trapped

20   in the origin process.  The local Board of Election

21   address is identified and sorted and then sorted back in

22   the destinating mail stream.  But I was trying to imply --

23   yes?

24       Q     Go ahead, sir.  I didn't mean to interrupt you.

25       A     No.  What I was just suggesting is that you

1    heard Mr. Barber describe in some cases those ballots then

2    make it through the destinating sort overnight.  In other

3    cases, it's according to the two-day service standard.

4        Q    There are cases in which it's according to the

5    two-day service standard even for when the destination is

6    within the district?

7        A    Yes.  As you heard Mr. Barber testify, the

8    two-day service standard for ballots even within a

9    district -- in a district is two days.  However, the

10   opportunity and what we have been implementing is where it

11   can be trapped in the origin processing and it's held out

12   in the designating sort.  The opportunity where practical

13   to turn that around in our processing overnight is what

14   has been going forward.

15        What I was suggesting is that the extraordinary

16   measures as you heard Mr. Barber testify that we could not

17   do the entire time was not practical.  But the

18   extraordinary measures that we have put in place this

19   weekend is every single ballot that we're able to trap but

20   identifies for the Board of Elections because it meant

21   changing the sort plan that has been implemented so we can

22   capture those ballots this close to the election.

23        Q    And I guess I'm a little bit uncertain, but I

24   want to make sure I understand the distinction between

25   what you said is something that would have already been

1    happening and something that's happening starting this

2    weekend.  Is the thing that's happening starting this

3    weekend that a ballot is identified when it's processed in

4    a way that it is -- if it's a local ballot, it's turned

5    around in one day or is the thing that's happening this

6    weekend that ballots are being identified as they come in

7    in a way that they weren't being identified before?

8        A    They are able to be identified as we've adjusted

9    those sort plans and captured even at the extraordinary

10   measure at an earlier state of the process so it can be

11   turned around overnight.  That's different extraordinary

12   from our normal practices.  Would not be practical all the

13   time.  But as an extraordinary measure, you know, as we

14   get to the end here, that's what has been implemented.

15       Q    And, Mr. Coleman, is that something that -- have

16   you had communications with people at the three facilities

17   that I mentioned, central P.A., Detroit and northern New

18   England and I will actually add one, Philadelphia, as well

19   to know for certain that they are doing that?

20       A    Yes.  So our process -- again all facilities

21   were instructed.  All facilities were a part of our

22   conference so that they understood the instruction and all

23   facilities were required to certify again that they have

24   those measures in place.

25       Q    Okay.  And are you able to say or do you have

41

1    confidence that every facility will be able to do this on

2    Monday night to do a one-night turnaround for ballots that

3    have a local destination?

4         A    I have confidence that those procedures that are

5    in place when executed and they will be executed will be

6    able to capture those ballots.  That's the intent.  That's

7    the way it has been set up and our facilities know how to

8    do this.  They know how to trap those ballots.

9         Q    And, Mr. Coleman, you have confidence that the

10   facilities can identify and trap ballots as soon as they

11   come in and if they're not local ballots, immediately put

12   them into the express mail system?

13        A    Yes, sir.  I'm absolutely confident.

14        Q    Okay.  And I want to ask you now about the all

15   clears.  So in the October 13 memo, it says --

16             THE COURT:  Can I just ask a question?

17             MR. DURAISWAMY:  Of course, Your Honor.

18             THE COURT:  Mr. Coleman, at some point when will

19   you be able to certify, you know, in a declaration or an

20   affidavit that the system worked as designed and there

21   were no ballots left behind?

22             THE WITNESS:  Sir, I don't know if I'll be able

23   to certify with 100% accuracy that there were no ballots

24   left behind.  I'm not sure that I would be able to do

25   that.  What I'm certifying is that we have a clear process

1    in place, Your Honor, where our intent is to absolutely

2    capture every ballot.  I would not be able to -- I'm not

3    sure with a degree of 100% certainty, Your Honor, that I

4    could certify that every single ballot was captured.  But

5    what I am certifying, we have identified a process to

6    capture every single ballot.

7             THE COURT:  All right.  Maybe I understood

8    something earlier, but I thought that there were

9    inspections to make sure that the facilities were clear at

10   some point.  Is that correct?

11            THE WITNESS:  Yes.  That is absolutely correct,

12   Your Honor.  There are ballot monitoring processes that do

13   it.  There is the inspection service as well as the OIG,

14   all of those processes and the all clear and certification

15   process, Your Honor, that all ballots have gone --

16            THE COURT:  All right.  So then you identified

17   those persons who would be in the position to certify that

18   no ballots were left behind?

19            THE WITNESS:  Yes, sir, Your Honor.  Through our

20   all clear process and the certification process that each

21   facility performs every day, that is the mechanism that

22   all -- there were no ballots left behind.

23            THE COURT:  All right.  Thank you very much.

24   That helps me understands this process.  Thank you.

25            At some point, I may issue an order requiring

1    someone in each facility to make that certification

2    under -- in an affidavit or declaration so that for

3    purposes of the record in this case at some point.  But I

4    want to hear from the lawyers about that issue.  Thank you

5    very much, Mr. Coleman.  Go right ahead, counsel.  Sorry

6    to interrupt you.

7            MR. DURAISWAMY:  No worries, Your Honor.  That's

8    actually quite helpful.  You are a step ahead of me.

9            BY MR. DURAISWAMY:

10       Q    In fact, the issue I was going to turn to next

11   is the all clear, Mr. Coleman, that you just referenced.

12   So the October 13 memo says "daily all clears should be

13   used to ensure that all election mail is accounted for in

14   the system and that mail scheduled or committed to go out

15   is processed accordingly."

16            What does that mean exactly?  What does it mean

17   that the all clear indicates that election mail is

18   accounted for in the system and it is being processed

19   accordingly?

20       A    What that simply means is that as part of the

21   all-clear process, the employees of the plant facility is

22   designed by the plant manager and their staff.  They do an

23   all-clear process.  They walk their floors.  They go

24   through every operation to make sure there are no ballots

25   left behind, that all political and election mail has been

1    processed and that has been sent out according to our

2    standards and according to our processes and procedures.

3    And that is the all-clear process.

4         It is a pretty comprehensive process where they

5    go through every operation, walk those floors.  Any

6    possible place that a ballot may have gone through our

7    processes and just certify there are none left there.  So

8    they check the manual operations.  They check all the

9    machine platforms, check every platform that we have in

10   the --

11   Q     That's very helpful.  I have two sort of

12   followup questions about this or two issues that I want to

13   follow up related to this.  The first is I believe I asked

14   Mr. Barber, but is it consistent with your understanding

15   that when you get the all-clear certifications, you have

16   not received a hundred percent all clear certifications

17   for the processing facilities on a daily basis?  Is that

18   right?

19   A     Yeah.  There may be occasion if we did not get

20   an all-clear proper certification, we then do an action

21   review with that plant just to make sure was there any gap

22   in the process or some reason why they did not give a

23   proper all clear.  We mitigate that immediately to make

24   sure the all-clear process is adhered to.  So there are

25   times if there was a gap, we'll go back and investigate

1    that and mitigate it immediately.

2        Q    Understood.  And you have that data, the daily

3    data by facility as to whether they provided the all-clear

4    certification or not?

5        A    That information is tracked through our

6    political mail election committee.  Yes.

7        Q    A second question on the all clears is they're

8    not -- when they certify they're all clear, what they're

9    certifying is that they've looked around the facility and

10    they've identified all the ballots and the ballots are

11    going through the normal process for processing.  Correct?

12    They're not -- well, correct.  Is that right?

13        A    That is correct.  They're also certifying that

14    if any ballots were identified, then they take measures,

15    prompt measures to have those ballots expedited out to the

16    appropriate Board of Election.

17        Q    So that was sort of my next question.  I guess

18    when you said -- when you described this earlier, you said

19    they are certifying that they're being processed within

20    the standard.  But that's -- when you say that, that means

21    the normal processing standard, delivery standard.  Not an

22    expedited standard.  Right?

23        A    No.  I mean they're certifying that they --

24    every ballot that was processed through our procedure

25    which includes the extraordinary measure is not left

1    behind in the building.  They are certifying that they

2    have worked through our entire process including the

3    extraordinary measure process and no ballots were found.

4    If a ballot were found, they're also certifying they took

5    the extraordinary measures to make sure that ballot was

6    taken to the delivery unit and handed off to the

7    appropriate Board of Elections.

8         Q     What's the time of day that the certification is

9    provided?

10        A     The certifications are typically done in the

11   morning after all processing has been completed for the

12   night and dispatches have been made.  The walks-through

13   occurs to make sure there was nothing left behind, all

14   processes have been checked, all mail has been dispatched

15   and that way, if there's something else that has been

16   discovered, the mitigation plan has been put in place to

17   make sure they move.

18        Q     And so when you receive a certification -- and I

19   apologize if I'm just not totally getting it, but I want

20   to make sure I understand the significance of that.  If

21   you receive an all-clear certification, does that mean

22   that all election mail that is at the facility has been

23   identified to go out to its next destination that morning

24   whether it's a local delivery unit or another processing

25   facility?

1        A     Yes.   That's correct.   It means that all

2   political and election mail has either been processed and

3   already dispatched or has been identified dispatched and

4   they know that it's going out.

5        Q     When you say identified dispatch and they know

6   that it's going out, I mean does that mean that morning or

7   does it mean it could be -- I guess I'm trying to get a

8   sense that if that means they are certifying that those

9   ballots are now -- are leaving the facility so they're not

10  staying at the facility for another day.   That they just

11  take one night to process.

12       A     They're certifying that the volume and the

13  ballots that came through that night including through

14  that process and whether it was over night or whether it

15  came through in two days, however that ballot was received

16  in the designating mail stream, it is going out for

17  delivery that day.   For the most part, it has already been

18  dispatched and if it's not dispatched, awaiting dispatch.

19  They are certifying all ballots are going out that day.

20  No ballots will be left behind for that day because again

21  there will be new ballots coming in that day to be

22  processed for the following day.

23       Q     Okay.   So let me just try to synthesize this.

24  Are you confident, Mr. Coleman, that all ballots that are

25  collected on a given day and delivered to a processing

1    facility that day or by that evening can be turned around

2    for delivery back to the local delivery unit or onto an

3    express mail transportation flow that would leave that

4    facility by the next morning?

5         A    In the current measures as we've described that

6    we put forward for extraordinary measures now, that is

7    accurate.  I'm not saying that is -- yes.

8         Q    Okay.  So if the judge were to issue an

9    instruction to every processing facility that USPS has to

10   do these things, that would not be -- that would just be a

11   sort of telling them to do what they are already doing or

12   what they're already supposed to be doing.  Right?

13        A    No.  I don't want to imply that again, sir.  If

14   you listen to Mr. Barber's testimony, we have the process

15   that -- our normal process which includes a two-day

16   service standard for ballots.  If you listen to

17   Mr. Barber's testimony, extraordinary measures are being

18   put in place to trap those ballots now as we collect mail

19   today, as we collect mail on Sunday to turn around those

20   ballots.  But I don't want to imply that, you know, that

21   an order would simply affect anything differently than

22   what we're already doing.  I'm saying the process as we

23   know it as in place is implemented and is working, that's

24   what I'm saying.

25        Q    I understand that.  I think maybe we're on the

1   same page and maybe I was being unclear with the question.

2   That's sort of exactly what I'm asking.  If the judge was

3   to issue that order, it wouldn't be asking them to do

4   anything other than what they're already doing.  It would

5   really -- from your perspective, it would be redundant.

6   Is that a fair --

7        A    No.  That's not my characterization.  My

8   characterization is as you heard Mr. Barber describe

9   again, we have our set process.  It's a process that

10   works.  It's a process that has been implemented.  It is

11   the standard that we move by.  What we are trying to do as

12   we move forward in these last couple days is to ensure

13   every ballot that comes through our network and comes in

14   for local delivery, we can trap those ballots, isolate

15   them and turn around those ballots as quickly as we can to

16   our delivery unit.  That's what I'm saying, sir.

17        Q    And again --

18             THE COURT:  Let me just chime in.  I think,

19   Mr. Coleman, what the attorney is saying is then if the

20   Court were to issue an order and certify that what you

21   just said did in fact happen, that would not be a problem.

22   Right?

23             THE WITNESS:  I'm not sure I'm following you.

24   Your Honor, could you say that again, please, sir?

25             THE COURT:  You just explained the process that

1    the postal service is going through for the next couple of

2    days.  You capture, you process, you deliver.  And it's

3    set up to be successful, correct, where no ballot is left

4    behind.  Correct?

5            THE WITNESS:  Correct, sir.

6            THE COURT:  All right.  So I think what the

7    attorney is asking for is that if the Court were to issue

8    an order saying okay, having followed that process to each

9    person in charge of a facility or with the responsibility

10   to certify, having followed that process that you just

11   described, Mr. Coleman, the Court would be saying tell us

12   whether the process was successful or not.

13           THE WITNESS:  Yes.  I'm sorry.  But my

14   connection dropped out again.  I know you guys can hear me

15   audio.

16           THE COURT:  Yeah.  We can hear you.  Yeah.  Not

17   a problem.

18           THE WITNESS:  All right.

19           THE COURT:  So the question I guess is whether

20   or not that would be problematic just to tell us whether

21   the system worked or not.  Not to get you to do anything

22   other than follow the system, but just tell us, no, judge,

23   the system broke down, these are the reasons why or the

24   system worked in every facility and no ballot was left

25   behind.

1              THE WITNESS:  I'm not sure the value of that,

2    sir.  What I'm describing is the process that we have in

3    place --

4              THE COURT:  It's extremely valuable, I can tell

5    you that.  It would have some value.  It will have some

6    merit.  I'm not trying to trick you.  But you've explained

7    the very detailed process that from the postal system's

8    perspective ensures timely delivery of election ballots.

9    Correct?

10             THE WITNESS:  Yes, sir.

11             THE COURT:  All right.  And all I'm saying and

12   again, it's not a trick question.  I'm not trying to trick

13   you or anything.  All I'm saying is that the Court --

14   well, you can assume the Court is going to issue an order

15   that says the Court wants the appropriate person in each

16   facility to certify that indeed the process worked, it was

17   followed to the letter of the process, letter of the law

18   or whatever and no ballots were left behind that timely

19   proceeded by the Postal Service.  Not a trick

20             THE WITNESS:  Yeah.  No.  I understand your

21   question, Your Honor.  I'm just saying certainly, all of

22   our -- you know, our process, we want to be able to give

23   feedback that our process work and that is our absolute

24   intent, sir, that every ballot that we trap will go out.

25             THE COURT:  All right.  Fair enough.  Did I

1    steal your question and re-cast it a different way,

2    counsel?

3            MR. DURAISWAMY:  Your Honor, I think we're

4    getting at the same thing and I think --

5            THE COURT:  Go right ahead.  Go right ahead.  I

6    cut you off.  Go ahead.

7            MR. DURAISWAMY:  That's fine, Your Honor.

8            BY MR. DURAISWAMY:

9        Q    I think -- I guess I just want to return to one

10   point that I think is maybe a more specifically factual

11   question to ask you, Mr. Coleman, which is you have every

12   reason to expect that these facilities will be

13   implementing these measures at least as of today and

14   through Election Day to ensure a one-night turnaround of

15   election mail.  Is that fair?

16       A    It is factual, sir, that those processes that we

17   put in place to trap those ballots to turn them around

18   immediately to delivery to affect them being tendered to

19   Boards of Elections.  That is factual.

20       Q    Okay.  And, Mr. Coleman, I want -- I'm mindful

21   of the time and I probably left perhaps no time for my

22   colleagues to ask questions.  But I do want to ask one

23   more thing about postmarking.  There are a number of

24   states as you are probably aware that provide extensions

25   for ballots to be received by election boards if they're

1    postmarked by either November 2nd or November 3rd.  When

2    election mail comes to a processing facility, it has to be

3    postmarked.  Correct?

4         A    Yes.

5         Q    Okay.  And it --

6         A    That is correct.

7         Q    In some cases, it's possible that extraordinary

8    measures implemented at the retail or delivery level will

9    have already resulted in that ballot being postmarked.

10   Correct?

11        A    That's possible.  Yes, sir.

12        Q    But is there a process in place at the facility,

13   at the processing facility to ensure that it's not been

14   postmarked, that it is postmarked immediately in the same

15   day that it arrives?

16        A    Absolutely.  Any balances that come in from a

17   delivery unit, our process is that it goes through our

18   cancellation platform so that it receives a cancellation.

19        Q    And that would be part of the triage process

20   where election mail is -- the ballots are immediately

21   identified.  Then they get immediately postmarked or

22   canceled.  Is that right?

23        A    That is correct.

24             MR. DURAISWAMY:  Okay.  I do not have any more

25   questions for you, Mr. Coleman.  But thank you very much

1    for your time.

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25