## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

VOTE FORWARD,
    611 Pennsylvania Ave. SE #192
    Washington, DC 20003,

KELLEY EWING JR.
    423 Brandon Broad
    Norristown, PA 19403,

ROBERT P. GASPARRO
    1001 City Ave., EE126
    Wynnewood, PA 19096,

SEBASTIAN IMMONEN
    2715 Timberglen Dr. East
    Wexford, PA 15090

JAMES MCKAY
    85 11th Street, #2
    Pittsburgh, PA 15203,

ASHLEY MISNER
    1633 Trinity St.
    Pittsburgh, PA 15206,

MARY WALTON
    2401 Pennsylvania Ave., Apt. 3A7
    Philadelphia, Pennsylvania 19130,

LADONNA HOPKINS
    9616 San Bernardino Ave NE
    Albuquerque, NM 87109,

                    *Plaintiffs*,

    v.

LOUIS DEJOY, in his official
capacity as the Postmaster General,
    475 L'Enfant Plaza SW
    Washington, D.C. 20260-0546;

Civil Case No. 1:20-cv-02405-EGS

SECOND AMENDED COMPLAINT
FOR INJUNCTIVE AND
DECLARATORY RELIEF

1

and

UNITED STATES POSTAL SERVICE,
        475 L'Enfant Plaza SW
        Washington,  DC 20260-0546,

                              *Defendants.*

Plaintiffs  Vote Forward, Kelley E. Ewing Jr., Robert P. Gasparro, Sebastian Immonen, James McKay, Ashley Misner, Mary Walton, and LaDonna Hopkins, by and through their undersigned attorneys, bring this Complaint  against the above-named Defendants; their respective agents, officers, employees, and successors; and all persons acting in concert with each or any of them.  In support of this Complaint,  Plaintiffs  allege the following:

## INTRODUCTION

1.      Over the past year, tens of millions  of American voters have depended on the United States Postal Service ("USPS") to deliver their ballots  in elections taking  place in the midst of the global  COVID-19 pandemic.  In this unprecedented moment, the ability  to vote by mail has taken on new importance, as it is the only means by which many can exercise their constitutional  right to vote and have their vote counted.

2.      Although  the November 2020 General Election and January 2021 Georgia Senatorial Runoff Elections have passed, special and primary elections now approach in states throughout  the nation and, in particular, in Pennsylvania, New Mexico, and Texas (the "2021

Elections").  Thus, millions of Americans will soon seek to cast their ballot again.  And their right to vote in these elections remains fundamental.

3.     Nor has their need to vote by mail lessened.  The COVID-19 pandemic is hardly over.  COVID infection and death rates remain high, and the emergence of new, more easily transmissible variants of the virus portends surges in the months to come.  Against this backdrop, voting in person continues to expose voters to the very real possibility of deadly infection.  Especially for voters with co-morbidities or in high-risk groups, voting by mail remains the only safe and reasonable option.

4.     These voters must rely on USPS to ensure their ballots are delivered on time.  And since Pennsylvania, New Mexico, and Texas law require that ballots are delivered to Boards of Elections on or just after Election Day in order to be counted, time is of the essence.

5.     Accordingly, USPS's responsibility to efficiently and effectively deliver ballots is as important as ever.  Yet at every turn, Postmaster General Louis DeJoy and the USPS ("Defendants") have implemented policies and practices that have undermined USPS's ability to ensure the on-time delivery of mail ballots.

6.     Through a combination of court orders and negotiated agreements, Plaintiffs have previously secured policy changes and commitments that have reduced delivery delays that would disenfranchise voters in both the November 2020 General Election and the Georgia Runoff Election.  Now, as the 2021 Elections approach, there remains an acute need for these orders and agreements.  Defendants, however, are poised to return to their unconstitutional policies and practices.

7.     In particular, Defendants refuse to retreat from their policy banning late and extra delivery trips (the "Late/Extra Trip Policy" or the "Policy"), which they temporarily suspended

only after it was preliminarily enjoined by this Court. Under this Policy, a substantial volume of mail was left on the floor at postal facilities, risking a cascading delay in the delivery of Election Mail.[1] In implementing this Policy, Defendants failed to honor the statutory requirement of 39 U.S.C. § 3661 that changes in postal policy be approved by the Postal Regulatory Commission.

8.       And despite USPS's own admission that it failed to deliver many ballots to Boards of Elections in time to be counted in November, it appears ready to implement the same or lesser ballot processing practices in the 2021 Elections. This is in spite of the success of additional measures agreed to by the parties on December 23, 2020 and implemented in the January Runoff Election. The measures agreed to by the parties on December 23 include: early use of the Express Mail network, mandatory local turnaround, early implementation of hub-and-spoke delivery in post offices and delivery units, mandatory daily ballot sweeps and All-Clear certifications, mandatory coordination with Boards of Elections regarding delivery of ballots, required investigation of delayed ballots, and communication of these measures to relevant USPS personnel (collectively, the "Agreed-To Measures").[2]

9.       With the global pandemic still ongoing and the 2021 Elections approaching, voters are once again relying on USPS to timely deliver their ballots. Defendants have no justification for proceeding with the Late/Extra Trip Policy or backtracking from the Agreed-To Measures that they know to be effective. Experience has shown that these late and extra trips

---

[1] "Election Mail is any item mailed to or from authorized election officials that enables citizens to participate in the voting process, such as balloting materials, voter registration cards, absentee applications, and polling place notifications." *Election Mail and Political Mail Overview*, USPS, https://about.usps.com/postal-bulletin/2020/pb22551/html/cover_005.htm (last visited Mar. 4, 2021).

[2] These measures are discussed in further detail *infra*. *See infra* Section III.B.3.

and the Agreed-To Measures are both necessary to and successful in ensuring timely delivery of ballots, and moreover, that they are financially and practically feasible.

## JURISDICTION AND VENUE

10.     The Court has subject matter jurisdiction over Plaintiffs' claims under Article III of the Constitution, 28 U.S.C. §§ 1331 and 1339, and 39 U.S.C. § 409.  An actual and justiciable controversy exists between the parties within the meaning of 28 U.S.C. § 2201(a), and this Court may grant declaratory relief, injunctive relief, and other relief pursuant to 28 U.S.C. §§ 2201, 2202 and the Court's equitable powers.  Plaintiffs have no adequate remedy at law.

11.     Venue is proper in this district because Defendants reside in this judicial district and a substantial part of the acts or omissions giving rise to the claim occurred in this judicial district.  28 U.S.C. §§ 1391(c)(2), (e)(1).

## PARTIES

12.     Plaintiff Vote Forward is a 501(c)(4) nonprofit organization founded in 2019 that works to empower grassroots volunteers to help register voters from traditionally underrepresented communities and encourage them to vote.  Vote Forward builds tools to enable Americans across all 50 states to encourage their fellow citizens to participate in our democracy.

13.     To date, nearly 200,000 volunteers have used the Vote Forward platform to send hand-written "Please vote!" and "Please register to vote!" letters to fellow citizens.  In 2020, Vote Forward sent 17.6 million get-out-the-vote ("GOTV") letters to voters in advance of the November 2020 General Election and an additional 2.6 million letters to Georgia voters in the lead-up to the January 2021 Georgia Runoff Election.

14.     Vote Forward continues its mission to increase voter turnout and is in the process of launching similar GOTV letter-writing campaigns for the upcoming 2021 elections in New Mexico, Pennsylvania, and Texas.

15.     Vote Forward's mailing campaign has a particular emphasis on sending GOTV messages close to Election Day deadlines because prior letter-writing campaigns—including ones conducted by Vote Forward—have shown that GOTV messages are not as effective at increasing voter turnout if sent too early in the election cycle.

16.     The delays caused by USPS, however, have frustrated Vote Forward's mission of increasing voter turnout by forcing Vote Forward to change its timeline for mailing GOTV letters. Vote Forward's typical practice is to send such letters to potential voters as close to Election Day as possible, an approach that is based on careful and extensive data analyses regarding the most effective voter turnout practices. A continuing failure by USPS to timely deliver Election Mail will force Vote Forward to move up the timeline for sending these letters for the upcoming 2021 elections. But for USPS's delays, Vote Forward would launch its GOTV campaigns one week before the respective Election Day deadlines in Pennsylvania, New Mexico, and Texas. But because of concerns regarding the on-time delivery of Election Mail, Vote Forward will be forced to conduct its GOTV campaigns two weeks before the respective Election Day deadlines in certain upcoming 2021 elections.

17.     During the 2020 election cycle, Vote Forward diverted resources to (1) respond to an influx of inquiries from volunteers regarding when they should be mailing out their hand-written letters; and (2) assess whether sending "Please Vote!" letters much earlier than planned could negatively impact the effectiveness of its volunteers' GOTV letters on voter turnout. Should USPS fail to implement the Agreed-To Measures needed to expedite mail ballots, there is

a concrete and impending risk that Vote Forward will have to divert resources again when launching their 2021 GOTV campaigns.

18.     Plaintiff Kelley E. Ewing Jr. is registered as a permanent absentee voter in Montgomery County, Pennsylvania, where he has resided for the last 30 years. Mr. Ewing is 59 years old and has multiple health conditions, including diabetes, lupus, high blood pressure, and no spleen—which puts him in a high-risk category for COVID-19. Due to his ongoing health conditions and related concerns of voting in person due to COVID-19, he plans to vote by mail in the upcoming 2021 Pennsylvania primary and judicial election. Although Mr. Ewing wants to exercise his right to vote, he does not want to "trade [his] life" to do so. Mr. Ewing exercises his right to vote after sifting through information about the candidates, which often pushes him to vote close to Election Day. He anticipates that he will do so again in the upcoming 2021 Pennsylvania primary and judicial election.

19.     Plaintiff Robert P. Gasparro is registered to vote in Montgomery County, Pennsylvania, and has been registered to vote in that county for the past fifteen years. During the 2020 General Election, Mr. Gasparro voted by mail, and he plans to vote by mail in the upcoming 2021 Pennsylvania primary and judicial election on May 18. Mr. Gasparro votes by mail because, as a senior citizen during the COVID-19 pandemic, he believes that it is a safer option for him. Moreover, Mr. Gasparro closely follows news reports and ongoing investigations regarding potential candidates, and, as such, intends to cast his ballot by mail in the few days leading up to Election Day.

20.     Plaintiff Sebastian Immonen is an undergraduate student currently living in Rhode Island. He is a registered voter in Pennsylvania. Due to uncertainties caused by the pandemic and that he will likely be in Rhode Island during the upcoming Pennsylvania primary election on

May 18, Mr. Immonen plans to vote by mail.  In a prior primary election, Mr. Immonen mailed his ballot close to Election Day, and but for the temporary postmark extension deadline for that election, his ballot may not have been counted.  Mr. Immonen exercises his right to vote after sifting through information about the candidates, which often pushes him to vote close to Election Day.  He anticipates that he will do so again in the upcoming 2021 Pennsylvania primary and judicial election.

21.     Plaintiff James McKay resides in Pittsburgh, Pennsylvania, and has been registered to vote in Allegheny County for the last ten years.  He prefers to vote by mail to avoid large crowds during the pandemic and because of his relatively inflexible work schedule.  Typically, Mr. McKay casts his ballot in the days leading up to Election Day, which allows him to make an informed decision on candidates.  He anticipates doing the same in the upcoming 2021 Pennsylvania primary and judicial election, and will likely submit his ballot by mail, on his way to work, close to Election Day.

22.     Plaintiff Ashley Misner is a registered voter in Allegheny County, Pennsylvania, where she has resided since 2018.  As a mother of a young child whose husband works in the Intensive Care Unit of their local hospital, Ms. Misner voted by mail in the November 2020 General Election due to COVID-related health concerns.  Moreover, Ms. Misner exercises her right to vote by taking the time that is necessary to research her choice of candidates and tends to vote close to Election Day.  She anticipates that she will do so again in the upcoming 2021 Pennsylvania primary and judicial election, and will cast her ballot by dropping it off at a local USPS mailbox.

23.     Plaintiff Mary Walton is registered to vote in Philadelphia County, Pennsylvania, and has been registered to vote in that county for the past six years.  During the November 2020

8

General Election, Ms. Walton voted absentee, and she plans to vote by mail in the upcoming 2021 Pennsylvania primary and judicial election on May 18. Ms. Walton votes by mail because voting by mail allows her to have ample time to mark the ballot in a thoughtful manner, rather than having to make choices under pressure on a voting machine where it is easy to miss a name or misread a question. Moreover, as a former reporter, Ms. Walton closely follows news reports and ongoing investigations regarding potential candidates and thus intends to cast her ballot, by mail, close to Election Day.

24.     Plaintiff LaDonna Hopkins has been registered to vote in her hometown of Albuquerque, New Mexico, for twenty-nine years. She has been registered as both a Democrat and an Independent. Ms. Hopkins has a daughter and a second residence in St. Louis, Missouri, where she spends significant time. She anticipates being in St. Louis at the time that a special election to replace Representative Deb Haaland would take place and so intends to vote by mail. She has also avoided in-person voting during the COVID-19 pandemic due to health concerns. Ms. Hopkins votes late in the election cycle, as she wants to gather as much information as possible about the candidates on the ballot before she casts her vote. She anticipates waiting to cast her vote in the upcoming 2021 special election, as well.

## BACKGROUND

**I.    The Ongoing Threat of the COVID-19 Pandemic Makes Voting by Mail As Critical As Ever in the 2021 Elections.**

###    A.    The COVID-19 Pandemic Continues to Endanger In-Person Voters.

25.    On March 11, 2020, the World Health Organization ("WHO") declared a global pandemic resulting from the spread of COVID-19.[3] Just under a year later, the United States has recorded the highest number of confirmed COVID-19 cases in the world, with over 28 million infections and 513,071 deaths reported as of March 4, 2021.[4]

26.    In Pennsylvania, New Mexico, and Texas in particular, the situation remains dire. Pennsylvania has reported 943,448 COVID-19 cases and 24,214 deaths, with an average of 2,541 cases per day over the last week.[5] New Mexico, for its part, has seen 185,898 COVID-19 cases and 3,755 deaths, with an average of 302 cases per day over the past week.[6] And Texas has seen more than 2.6 million cases of COVID-19 and 44,627 deaths.[7] Over the last week, the state reported an average of 7,253 cases per day.[8]

---

[3] *Timeline: WHO's COVID-19 Response*, World Health Org. ("WHO"), https://www.who.int/emergencies/diseases/novel-coronavirus-2019/interactive-timeline (last visited Mar. 4, 2021).

[4] *WHO Coronavirus Disease (COVID-19) Dashboard*, WHO, https://covid19.who.int/ (last visited Mar. 4, 2021).

[5] *Pennsylvania Coronavirus Map and Case Count*, N.Y. Times (Mar. 4, 2021, 8:04 A.M. ET), https://www.nytimes.com/interactive/2020/us/pennsylvania-coronavirus-cases.html.

[6] *New Mexico Coronavirus Map and Case Count*, N.Y. Times (Mar. 4, 2021, 8:04 A.M. ET), https://www.nytimes.com/interactive/2020/us/new-mexico-coronavirus-cases.html.

[7] *Texas Coronavirus Map and Case Count*, N.Y. Times (Feb. 17, 2021, 7:52 A.M. ET), https://www.nytimes.com/interactive/2020/us/texas-coronavirus-cases.html.

[8] *Id.*

27.     The end is not imminent.   In recent weeks, new variants of the COVID-19 virus have emerged and have been identified throughout the United States.[9]  Texas has already reported its first case of a variant originating in South Africa, and all three states have reported cases involving a U.K. variant.[10]

28.     These variants spread more easily and quickly and thus may cause further increases in the number of COVID-19 cases.[11]  Indeed, experts predict that these variants could cause a fourth surge of the virus in the United States in the weeks to come.[12]

29.     These variants also call current understandings of COVID-19 immunity into question, as reports emerge of individuals who have already been infected with and recovered from the original strain of COVID-19 being re-infected with the South Africa variant.[13]

---

[9] *About Variants of the Virus That Causes COVID-19*, Ctrs. for Disease Control & Prevention ("CDC"), https://www.cdc.gov/coronavirus/2019-ncov/transmission/variant.html (last updated Feb. 12, 2021).

[10] *US COVID-19 Cases Caused by Variants*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/transmission/variant-cases.html (last updated Mar. 2, 2021); *see also About Variants of the Virus that Causes COVID-19*, CDC (Feb. 12, 2021), https://www.cdc.gov/coronavirus/2019-ncov/transmission/variant.html (identifying variant B.1.1.7 as the variant first detected in the U.K. and B.1.351 as the variant first detected in South Africa).

[11] *Id.*

[12] Karen Weintraub, *'It's Like We're Trying Our Best to Help the Virus': A Fourth Wave Is Looming if US Fails to Contain COVID-19 Variants, Experts Say*, USA Today (Feb. 16, 2021), https://www.usatoday.com/story/news/health/2021/02/16/covid-19-us-fourth-wave-variants-coronavirus/4460958001/.

[13] Grace Hauck & John Bacon, *Dr. Anthony Fauci Sees 'Sobering' Data on South Africa Variant; US Daily Cases Below 100K, But Danger Lurks: Latest COVID-19 Updates*, USA Today (Feb. 14, 2021), https://www.usatoday.com/story/news/health/2021/02/14/covid-news-valentines-day-message-hope-mardi-gras-celebrations/4475951001/.

30.     Meanwhile, Texas Governor Greg Abbott has declared the state "open" for business, lifting the mask mandate and allowing all businesses to operate at 100% capacity.[14] Public health experts have reacted with alarm, warning that easing restrictions now could lead to another spike in infection and death rates, especially given the emergence of these variants.[15]

31.     While people of all ages have contracted and died from COVID-19, the virus continues to pose additional and acute threats for individuals with preexisting medical conditions—such as kidney disease, heart disease, asthma, hypertension, and diabetes. These individuals face increased risks of serious complications from COVID-19, regardless of age.[16]

32.     The Centers for Disease Control and Prevention ("CDC") has also recognized that "[l]ong-standing systemic health and social inequities have put many people from racial and ethnic minority groups at increased risk of getting sick and dying from COVID-19."[17] The rate of hospitalization for COVID-19 cases in the United States is 2.9 times higher among Black persons than white persons, 3.2 times higher among Hispanic or Latinx persons, and 3.7 times

---

[14] Press Release, *Governor Abbott Lifts Mask Mandate, Opens Texas 100 Percent*, Office of the Tex. Governor (Mar. 2, 2021), https://gov.texas.gov/news/post/governor-abbott-lifts-mask-mandate-opens-texas-100-percent.

[15] Katie Shepherd, *As Texas and Mississippi Move to Open '100%' and Lift mask Mandates, Health Officials Warn: 'It's Still Too Early'*, Wash. Post (Mar. 3, 2021, 5:22 A.M. ET), https://www.washingtonpost.com/nation/2021/03/03/texas-mississippi-mask-mandate-backlash/.

[16] *People With Certain Medical Conditions*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html (last updated Feb. 22, 2021).

[17] *Health Equity Considerations and Racial and Ethnic Minority Groups*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/community/health-equity/race-ethnicity.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fneed-extra-precautions%2Fracial-ethnic-minorities.html (last updated Feb. 24, 2021).

higher among American Indian or Alaska Native persons.[18] Likewise, the rate of death from COVID-19 is 1.9 times higher among Black persons, 2.3 times higher among Hispanic or Latinx persons, and 2.4 times higher among American Indian or Alaska Native persons than it is among white persons.[19] In New Mexico, the disparities are particularly stark: the COVID-19 mortality rate for American Indian or Alaska Native persons in the state is about ten times as high as it is for white persons.[20]

33.     Although the Food and Drug Administration has issued Emergency Use Authorizations for three COVID-19 vaccines,[21] widespread vaccination is still months away. Pennsylvania has administered one dose of the vaccine to just 16% of its population, and both doses to just 7.4%.[22] Meanwhile, 30% of the doses allocated to the state so far have gone unused.[23] In New Mexico, 23% of the population has received one dose of the vaccine, but

---

[18] *COVID-19 Hospitalization and Death by Race/Ethnicity*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/covid-data/investigations-discovery/hospitalization-death-by-race-ethnicity.html (last updated Feb. 18, 2021).

[19] *Id.*

[20] Randall Akee & Sarah Reber, *American Indians and Alaska Natives Are Dying of COVID-19 at Shocking Rates*, Brookings Inst. (Feb. 18, 2021), https://www.brookings.edu/research/american-indians-and-alaska-natives-are-dying-of-covid-19-at-shocking-rates/.

[21] *See* Letter of Authorization from Denise Hinton, Chief Scientist, U.S. Food & Drug Admin., to Elisa Harkins, Pfizer, Inc. (reissued Feb. 25, 2021), https://www.fda.gov/media/144412/download; Letter of Authorization from Denise Hinton, Chief Scientist, U.S. Food & Drug Admin., to Carlota Vinals, ModernaTX, Inc. (Feb. 25, 2021), https://www.fda.gov/media/144636/download; Letter of Authorization from Denise Hinton, Chief Scientist, U.S. Food & Drug Admin., to Ruta Walawalkar, Janssen Biotech, Inc. (Feb. 27, 2021) https://www.fda.gov/media/146303/download.

[22] *See How the Vaccine Rollout Is Going in Your State*, N.Y. Times, https://www.nytimes.com/interactive/2020/us/covid-19-vaccine-doses.html (last updated Mar. 4, 2021).

[23] *Id.*

only 13% has received both, with 14% of the state's doses yet unused.[24]  And in Texas, only

14% of the population has received one dose of the vaccine and only 7.5% has received both.[25]

Meanwhile, 28% of the state's allocated doses are yet unused.[26]

34.     Furthermore, new virus variants and potential vaccine production problems could

further slow vaccination progress.[27]  Even under the best-case scenarios, widespread

administration of COVID-19 vaccines will not be completed until well into 2021—after several

of the upcoming elections.[28]  Experts acknowledge that even after widespread vaccination, life

will not immediately return to normal.  Dr. Fauci warns that Americans should still limit high-

risk activities, including public outings involving large numbers of people.[29]

35.     Thus, as the United States continues its work to control the pandemic, the public

must rely on now-familiar techniques to decrease transmission of COVID-19, including

practicing social distancing by avoiding close, in-person contacts; avoiding large gatherings;

wearing one or more masks in public; and practicing frequent and thorough handwashing.

---

[24] *Id.*

[25] *Id.*

[26] *Id.*

[27] Noah Weiland et al., *With Vaccine Delay, Biden Warns of Uncertain End to Pandemic*, N.Y. Times (Feb. 19, 2021), https://www.nytimes.com/2021/02/19/us/politics/coronavirus-vaccine.html.

[28] Christina Maxouris et al., *Dr. Fauci Shifts the Timeline on When the General Public Will Be Able to Get a Vaccine*, CNN Health (Feb. 17, 2021), https://www.cnn.com/2021/02/16/health/us-coronavirus-tuesday/index.html.

[29] Quentin Fottrell, *COVID-19 Fatalities Hit 500K in the U.S. When Will Life Return to Normal? Dr. Fauci Cautions, 'It Really Depends on What You Mean by Normality'*, MarketWatch (Feb. 23, 2021), https://www.marketwatch.com/story/will-we-still-be-wearing-masks-in-2022-when-will-life-return-to-normal-dr-fauci-cautions-it-really-depends-on-what-you-mean-by-normality-2021-02-22.

Indeed, in the face of emerging variants, experts are calling on Americans to double down on these precautions.[30]

## B.    Demand for Mail-In Voting Has Skyrocketed.

36.    During this ongoing health crisis, in-person voting presents an increased risk of infection to all voters and an intolerable risk of infection for voters who are particularly vulnerable to the illness.  The CDC, for example, has warned of the significant possibility of person-to-person COVID-19 transmission at polling sites and continues to encourage the use of "voting methods that minimize direct contact and reduce crowd size at polling locations," such as mail-in voting.[31]

37.    Mail-in voting remains the safest option for all voters.  For elderly voters, voters with pre-existing medical conditions, and voters from racial and ethnic minority groups, the ability to cast a ballot by mail is essential.  And even in ordinary years, casting a mail-in ballot may be the only realistic means of voting for voters with disabilities or those who are unable to get to the polls.

38.    Thus, as a result of the pandemic and its restrictions on in-person voting, the demand for mail-in voting—which has existed in the United States for decades—has skyrocketed.  According to polls conducted by the Pew Research Center, 46% of 2020 General Election voters voted by mail-in ballot.[32]  This shattered previous records, amounting to over 65

---

[30] Weintraub, *supra* note 12.

[31] *See Polling Locations and Voters*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/community/election-polling-locations.html (last updated Jan. 4, 2021).

[32] *Sharp Divisions on Vote Counts, as Biden Gets High Marks for His Post-Election Conduct: 3. The Voting Experience in 2020*, Pew Rsch. Ctr. (Nov. 20, 2020), https://www.pewresearch.org/politics/2020/11/20/the-voting-experience-in-2020/.

million Americans voting by mail.[33]  As a result, USPS was called upon to deliver 543 million pieces of Election Mail, representing a 96% increase over the amount of Election Mail it delivered in 2016.[34]  This included at least 135 million ballots in the course of the General Election.[35]

39.     Millions of voters in Pennsylvania, New Mexico, and Texas were among those who cast a mail-in ballot this fall.  In Pennsylvania, 2,640,405 voters voted by mail, a 1,161% increase from 2016.[36]  In New Mexico, approximately 322,259 voters cast mail-in ballots.[37] Even in Texas, which requires voters to provide an excuse to receive a mail-in ballot, approximately 2,692,317 voters returned one.[38]

40.     With the public health and safety need for voting by mail as clear as ever, there is every reason to expect that the demand for mail-in voting in the 2021 Elections will remain at historic heights.

---

[33] *See* Lazaro Gamio et al., *Record-Setting Turnout: Tracking Early Voting in the 2020 Election*, N.Y. Times (Nov. 12, 2020), https://nyti.ms/2LLL1v7.

[34] *2020 Post-Election Analysis: Delivering the Nation's Election Mail in an Extraordinary Year*, USPS 18 (Dec. 28, 2020), https://about.usps.com/newsroom/national-releases/2020/USPS_PostElectionAnalysis_12_28_20.pdf.

[35] *Id.* at 18–19.

[36] *Pennsylvania Election Results 2020*, NBC News (Jan. 28, 2021), https://www.nbcnews.com/politics/2020-elections/pennsylvania-results.

[37] *New Mexico Election Results 2020*, NBC News (Jan. 27, 2021), https://www.nbcnews.com/politics/2020-elections/new-mexico-results.   Forty-two percent of the total mail-in and early in-person ballots were mail-in ballots, or approximately 322,259 ballots. *See id.*

[38] *Texas Election Results 2020*, NBC News (Jan. 27, 2021), https://www.nbcnews.com/politics/2020-elections/texas-results.   Twenty-eight percent of the total mail-in and early in-person ballots returned were mail-in ballots, or approximately 2,692,317.   *See id.*

**C.     Voters in the Upcoming 2021 Elections Will Once Again Depend on Mail-In Voting.**

41.     Amidst the ongoing pandemic and a surge in mail-in voting, crucial primary and special elections in Pennsylvania, New Mexico, and Texas loom.

**1.     Pennsylvania**

42.     In 2021, Pennsylvania will hold statewide primary and general elections to fill Chief Justice Thomas Saylor's seat on the Pennsylvania Supreme Court, Judge Susan Gantman's seat on the Superior Court, and two openings on the Commonwealth Court, as well as general retention elections for two more Superior Court and two more Commonwealth Court seats.[39] The primary elections will take place on Tuesday, May 18, 2021, and the general election is scheduled for Tuesday, November 2, 2021.[40]

43.     Pennsylvania will also hold special elections coinciding with the May 18 primary elections to fill vacant seats in the General Assembly previously held by Commonwealth Senator

---

[39] Stephen Caruso, *With One Supreme Court Seat Up for Grabs, Pa.'s 2021 Judicial Elections Start to Take Shape*, Pa. Capital-Star (Feb. 12, 2021), https://www.penncapital-star.com/government-politics/with-one-supreme-court-seat-up-for-grabs-pa-s-2021-judicial-elections-start-to-take-shape/.

[40] *Upcoming Elections*, Votes PA, https://www.votespa.com/About-Elections/Pages/Upcoming-Elections.aspx (last visited Mar. 4, 2021).

John Blake (District 22),[41] the late Commonwealth Senator David Arnold (District 48),[42] and the late Commonwealth Representative Mike Reese (District 59).[43]

44.     Approximately 172,842 voters are currently registered to vote in District 22 and 174,817 in District 48.[44] Approximately 43,562 voters are currently registered in District 59.[45] Pennsylvania allows no-excuse absentee voting, 25 Pa. Stat. §§ 2602(w), 3146.1, 3150.11, and a significant proportion of its voters will likely opt to vote by mail in 2021. In the 2020 General Election, approximately 38% of Pennsylvania voters cast a mail-in ballot.[46]

45.     To be counted, all civilian mail-in ballots must be received by the county Board of Elections no later than 8 p.m. on Election Day (*i.e.*, May 18, 2021, for ballots in the primary and special elections, and November 2, 2021, for ballots in the general election). *Id.* §§ 3146.6(a), 3150.16(a). Ballots postmarked by Election Day but not yet received by election

---

[41] Borys Krawczeniuk, *Process for Replacing Sen. John Blake Unfolding*, Citizens' Voice (Mar. 1, 2021), https://www.citizensvoice.com/news/process-for-replacing-sen-john-blake-unfolding/article_1550723e-a384-5d73-903a-6dabe45c5696.html.

[42] Jan Murphy, *Special Election Date Set to Fill Seat Left Vacant by Sen. Dave Arnold's Death*, Pa. Live (Jan. 25, 2021), https://www.pennlive.com/news/2021/01/special-election-date-set-to-fill-seat-left-vacant-by-sen-dave-arnolds-death.html.

[43] Press Release, *Speaker Announces Special Election for the 59th District*, 59th Legis. Dist. (Jan. 12, 2021), http://www.repreese.com/News/18924/Latest-News/Speaker-Announces-Special-Election-for-the-59th-District-.

[44] *Voter Registration Statistics by Senate District*, Pa. Dep't of State, https://www.dos.pa.gov/VotingElections/OtherServicesEvents/VotingElectionStatistics/Documents/current%20VoterRegStatsBySenatorialDistricts.xlsx (last visited Mar. 4, 2021).

[45] *Voter Registration Statistics by House District*, Pa. Dep't of State, https://www.dos.pa.gov/VotingElections/OtherServicesEvents/VotingElectionStatistics/Documents/current%20VoterRegStatsByLegislativeDistricts.xlsx (last visited Mar. 4, 2021).

[46] *See Pennsylvania Election Results 2020*, NBC News (Jan. 28, 2021), https://www.nbcnews.com/politics/2020-elections/pennsylvania-results. There were 6,838,186 ballots cast in the presidential election. *See id.* If approximately 2,640,405 of these voted by mail, that suggests approximately 38.6% of voters cast mail-in ballots. *See id.*

officials will not be counted. Unlike in the November 2020 general election, no extension currently applies to mail-in ballots in the 2021 Pennsylvania elections.[47] Thus, any delays caused by USPS's Late/Extra Trip policy or ballot processing practices could result in a ballot's rejection.

### 2.   New Mexico

46.   New Mexico will likely hold its own special election to replace United States Representative Deb Haaland (District 1), who President Biden has selected to serve as U.S. Secretary of the Interior and who will resign from her House seat if confirmed.[48] Within ten days of Representative Haaland's vacancy, the governor must call for a special election that itself must be scheduled for no less than 77 days or more than 91 days after the vacancy date. N.M. Stat. § 1-15-18.1. There are approximately 437,379 registered voters eligible to vote in this District election.[49] In the November 2020 election, approximately 35% of New Mexico voters cast a mail-in ballot.[50]

---

[47] *Mail-in and Absentee Ballot*, Votes PA, https://www.votespa.com/Voting-in-PA/Pages/Mail-and-Absentee-Ballot.aspx (last visited Mar. 4, 2021) (noting the ballot return date as May 18, 2021 for the primary election and stating that "postmarks are not enough").

[48] *See* Nancy Cordes et al., *Biden Taps Deb Haaland to Be First Native American Interior Secretary*, CBS News (Dec. 17, 2020), https://www.cbsnews.com/news/deb-haaland-biden-interior-secretary-native-american/.

[49] *New Mexico Voter Registration Statistics by Congressional District*, N.M. Sec'y of State (Jan. 29, 2021), http://sos.state.nm.us/voting-and-elections/data-and-maps/voter-registration-statistics/2020-voter-registration-statistics/.

[50] *See New Mexico Election Results 2020*, NBC News (Jan. 27, 2021), https://www.nbcnews.com/politics/2020-elections/new-mexico-results.   There were 903,508 voters who cast a ballot in the presidential election. *See id.* If approximately 322,259 of these voters cast mail in ballots, *see supra* note 37, that suggests approximately 35.6% of voters cast mail-in ballots. *See id.*

47.     New Mexico also allows no-excuse absentee voting.  N.M. Stat. § 1-6-3.  To be counted, ballots must be received by 7 p.m. on Election Day.  *Id.* §§ 1-6-10(c), 1-12-8.2(A).  As in Pennsylvania, ballots received by USPS by this date, but not by the county clerk's office, will not be counted.  Even the shortest of USPS delays could therefore lead to a ballot's rejection.

### 3.     Texas

48.     Finally, in Texas, a special election will be held on May 1, 2021, to fill a vacancy in the United States House of Representatives left by the late Representative Ron Wright (District 6).[51]  *See* Tex. Const. art. XI, § 11 (vacancies must be filled within 120 days after the vacancy occurs); Tex. Elec. Code § 204.021.  In the November 2020 election, 339,992 voters cast ballots in District 6.[52]  Approximately 24% of Texans cast mail-in ballots in the 2020 General Election.[53]

49.     Texas requires an excuse for a voter to use a mail-in ballot.  In particular, to vote by mail, a voter must:  have a sickness or disability that prevents the voter from appearing at the polls on Election Day without a likelihood of needing personal assistance or injuring the voter's health; expect to be confined on Election Day due to childbirth; be 65 or older on Election Day; be confined in jail and not otherwise disqualified from voting; be a participant in a

---

[51] *See* Letter from Tex. Gov. Greg Abbott to Tex. Sec'y of State Ruth Hughs (Feb. 23, 2021), https://gov.texas.gov/uploads/files/press/PROC_CD_06_Wright_replacement_election_IMAGE_02-23-2021.pdf; Patrick Svitek, *Gov. Greg Abbott Sets May 1 Special Election to Fill Seat of Late U.S. Rep. Ron Wright*, Tex. Tribune (Feb. 23, 2021), https://www.texastribune.org/2021/02/23/ron-wright-special-election-tx-6/.

[52] *Texas Election Results: Sixth Congressional District*, N.Y. Times (last updated Feb. 22, 2021), https://www.nytimes.com/interactive/2020/11/03/us/elections/results-texas-house-district-6.html.

[53] *See Texas Election Results 2020*, NBC News (Jan. 27, 2021), https://www.nbcnews.com/politics/2020-elections/texas-results.  There were 11,149,473 ballots cast in the presidential election.  *See id.*  If approximately 2,692,317 of those were mail-in ballots, *see supra* note 38, that suggests approximately 24.1% of voters cast mail-in ballots.  *See id.*

confidentiality program for domestic violence victims; or expect to be absent from her county of residence on Election Day and during the entirety of the early voting period that remains after her ballot application is submitted. Tex. Elec. Code §§ 82.001–.004. Thus, the Texas voters who rely on USPS are frequently those for whom in-person voting poses the greatest threat.

50.     To be counted, Texas voters' mail-in ballots must be postmarked by 7 p.m. on Election Day and must arrive by 5 p.m. the day after the election or, if that date falls on a weekend or holiday, the next regular business day (*i.e.*, Monday, May 3, 2021, for an election held on Saturday, May 1, 2021). *Id.*, §§ 86.006–.007. Ballots received after this date are not counted. As a result, and despite the one-business day extension, any delays resulting from USPS's Late/Extra Trip Policy or ballot processing practices will result in otherwise on-time ballots not being counted.

51.     With these critical elections ahead, and the pandemic still surging, we can expect tens of thousands of voters to once again seek to cast their ballots by mail. And given these states' stringent ballot deadlines, voters will have to rely on USPS to ensure those ballots are delivered on time.

## II.     USPS Has a Statutory Obligation to Ensure Timely Delivery of Election Mail.

### A.     USPS Mandate and Operations

52.     USPS operates as "an independent establishment of the executive branch of the Government of the United States" that is overseen by a Board of Governors, including the Postmaster General. 39 U.S.C. §§ 201, 202(a)–(d). USPS and its Board of Governors are responsible for "maintain[ing] an efficient system of collection, sorting, and delivery of the mail nationwide." *Id.* § 403(b)(1).

53.     By statutory mandate, USPS must "provide prompt, reliable, and efficient services to patrons," and the costs of "maintaining the Postal Service shall not be apportioned to impair the overall value of such service to the people." *Id.* § 101(a).

54.     On average, USPS processes and delivers 472.1 million pieces of mail every day.[54] Most incoming mail is processed by postal workers at mail processing facilities ("processing plants"). Processing mail involves sorting the mail for transportation and delivery and, for certain types of mail, applying a postmark. Processed mail is dispatched in trucks from the processing plants to (a) non-local destinations, where it will undergo further processing, or (b) to delivery units, such as a post office or carrier station, for delivery to local destinations.

55.     When processed mail arrives at the delivery unit from the processing plant, clerks and carriers complete any final sequencing as needed, and carriers then deliver the processed mail and collect new mail on foot or by vehicle in a prescribed area.

56.     Mail can be collected in either of two ways: a carrier collects the mail on her route, or a clerk collects the mail at the post office. The mail collected by carriers and clerks is dispatched by truck from the delivery unit to the processing plant, where the cycle begins again.

57.     To ensure that every piece of mail goes out of the plant or delivery unit every day, late trips (trips taken later than initially scheduled) or extra trips (trips taken in addition to regularly scheduled trips) are frequently necessary. This is true for deliveries from the delivery unit to the processing plant, from the processing plant to the delivery unit, and, in certain circumstances, from the delivery unit to the recipient of the mail.

---

[54] *One Day in the Life of the U.S. Postal Service*, USPS Postal Facts, https://rb.gy/8tx3vm (last visited Mar. 4, 2021).

**B.** **Procedural Requirements for Enacting Changes to USPS Services**

58.     Congress has charged USPS with the responsibility to "plan, develop, promote, and provide adequate and efficient postal services at fair and reasonable rates and fees." *Id.* § 403(a); *see also id.* § 3661(a) ("The Postal Service shall develop and promote adequate and efficient postal services.").

59.     When "determining all policies for postal services, the Postal Service shall give the highest consideration to the requirement for the most expeditious collection, transportation, and delivery of important letter mail." *Id.* § 101(e).

60.     Before enacting any policies that have a nationwide impact on postal services, USPS has a statutory obligation to submit a proposal to the Postal Regulatory Commission, *id.* § 3661, an "independent establishment of the executive branch" that is "composed of 5 Commissioners, appointed by the President, by and with the advice and consent of the Senate," *id.* §§ 501, 502(a).

61.     In particular, pursuant to the Postal Reorganization Act, "[w]hen the Postal Service determines that there should be a change in the nature of postal services [that] will generally affect service on a nationwide or substantially nationwide basis," it must "submit a proposal, within a reasonable time prior to the effective date of such proposal, to the Postal Regulatory Commission requesting an advisory opinion on the change." *Id.* § 3661(b).  Under the Commission's Rules of Practice and Procedure, this time period should be "not less than 90 days before the proposed effective date of the change in the nature of postal services involved." 39 C.F.R. § 3020.112.

62.     After USPS submits a request to the Postal Regulatory Commission, the Commission must provide "an opportunity for hearing on the record under sections 556 and 557 of [the Administrative Procedure Act] . . . to the Postal Service, users of the mail, and an officer

of the Commission who shall be required to represent the interests of the general public." 39 U.S.C. § 3661(c). The public is entitled to submit comments in proceedings before the Commission. *Id.*

63. After the hearing, the Commission must provide an advisory opinion that "shall be in writing and shall include a certification by each Commissioner agreeing with the opinion that in his judgment the opinion conforms to the policies established under this title." *Id.*

64. Consistent with Section 3661's requirements, USPS has previously submitted proposed changes affecting the nature of postal services to the Commission within a reasonable time before the effective date of the proposal and has requested an advisory opinion from the Commission.[55]

### C.   USPS's Critical Role in Facilitating the Right to Vote

65. Since its earliest days, our Nation's postal system has enabled Americans to participate in electoral democracy.

66. During the Civil War, nearly 150,000 Union soldiers relied on the postal system to deliver ballots in the 1864 presidential election.[56] In the midst of World War II, U.S. soldiers depended on the postal system to cast their votes in the 1944 presidential election.[57] And in elections in between and since, soldiers stationed around the world have relied on postal voting to participate in elections at home.

---

[55] *See, e.g.*, *Advisory Opinion on Mail Processing Network Rationalization Service Changes*, Op. Postal Reg. Comm'n N2012-1 (Sept. 28, 2012), https://www.apwu.org/sites/apwu/files/resource-files/PRC%20advisory%20opinion%20on%20network%20rationaliztion%20plan.pdf.

[56] Alex Seitz-Wald, *How Do You Know Voting by Mail Works? The U.S. Military's Done It Since the Civil War*, NBC News (Apr. 19, 2020), https://www.nbcnews.com/politics/2020-election/how-do-you-know-voting-mail-works-u-s-military-n1186926.

[57] *Id.*

67.     So too have civilians.  As explained above, some 65 million Americans cast their vote by mail in the November 2020 General Election.  Five states hold elections primarily by mail,[58] an additional 34 states and Washington, D.C., allow residents to vote by mail regardless of their reasons for doing so,[59] and every other state permits voting by mail under some circumstances, such as for those with physical illness or disabilities that prevent a trip to the polling place or those who expect to work a shift of 10 hours or more on Election Day.[60]  Postal voting is now and has been integral to American elections for decades.

68.     "In determining all policies for postal services," USPS has a statutory obligation to provide "the highest consideration to the requirement for the most expeditious collection, transportation, and delivery of important letter mail." 39 U.S.C. § 101(e).  Consistent with that legal duty and its integral role in facilitating the vote-by-mail process, USPS must treat Election Mail—including both the ballots sent from the state to the voter, and the completed ballots returned by the voter to the state—as important letter mail.

---

[58] *See* Colo. Rev. Stat. § 1-5-401; Haw. Stat. § 11-101; Or. Rev. Stat. § 254.465; Wash. Rev. Code § 29A.40.010; Utah Code Ann. § 20A-3-302.

[59] *See* Alaska Stat. § 15.20.010; Ariz. Rev. Stat. § 16-541; Cal. Elec. Code § 3003; D.C. Mun. Regs. tit. 3, § 720; Fla. Stat. § 101.62; Ga. Code § 21-2-380; Idaho Code § 34-1001; 10 Ill. Comp. Stat. 5/19-1; Iowa Code § 53.1; Kan. Stat. Ann. § 25-1119(a); Me. Stat. tit. 21-a, § 751; Md. Elec. Law § 9-304; Mich. Comp. Laws § 168.759; Minn. Stat. § 203B.02; Mont. Code § 13-13-201; Neb. Rev. Stat. Ann. § 32-938; Nev. Rev. Stat. § 293.313; N.J. Rev. Stat. § 19:63-3; N.M. Stat. § 1-6-3; N.C. Gen. Stat. § 163-226; N.D. Cent. Code § 16.1-07-01; Ohio Rev. Code § 3509.02; 26 Okla. Stat. § 26-14-105; 25 Pa. Cons. Stat. § 3150.11; R.I. Gen. Laws § 17-20-2; S.D. Cod. Laws § 12-19-1; 17 Vt. Stat. Ann. tit. 17, § 2531; Va. Code Ann. § 24.2-700; Wis. Stat. § 6.86(1)(ac); Wyo. Stat. § 22-9-102.

[60] *See, e.g.*, *Absentee Voting Information*, Ala. Sec'y of State, https://www.sos.alabama.gov/alabama-votes/voter/absentee-voting  (last visited Mar. 4, 2021).

**III.    Defendants Have Repeatedly Shirked Their Obligation to Ensure Timely Delivery of Election Mail.**

69.     Upon being appointed Postmaster General, DeJoy immediately took action that diminished USPS's effectiveness in processing mail ballots—despite an imminent election that would involve unprecedented rates of mail voting. Specifically, DeJoy promulgated the Late/Extra Trip Policy that restricted postal workers' ability to make additional or late trips to ensure prompt delivery of late-arriving mail. And DeJoy implemented this new Policy without any regard for the procedural requirements to enact changes to USPS services. Even after this Court preliminarily enjoined the Policy, Defendants did not take timely action in response, changing course only when this Court entered a subsequent order compelling compliance. *See* Min. Order (Oct. 27, 2020). Even after that point, internal documents indicate that the Policy was only suspended.[61]

70.     Although the Court's injunction of the Late/Extra Trip Policy reduced the extent of election ballot delays and USPS belatedly took measures to improve its delivery speed, many ballots were still delivered after Election Day in the November 2020 General Election due to USPS's ballot processing failures. For example, USPS data indicates that in the Central Pennsylvania District alone, more than a thousand ballots were placed in the mail on or before the Saturday before Election Day but were not received until after Election Day. In Pennsylvania, an extended postmark deadline that was in place only for the November 2020 General Election allowed some of those ballots to be counted, but in 2021, none of those ballots will be counted.

---

[61] *See Deployment of Operational Changes,* USPS OIG 21 (Nov. 6, 2020), https://www.uspsoig.gov/sites/default/files/document-library-files/2020/21-014-R21.pdf ("OIG Report").

71.     Despite those failures, when the Georgia Runoff approached, Defendants initially did not adjust course or improve their efforts. Instead, they opted to again issue belated guidance substantially similar to that which proved inadequate in November, thus again risking the rejection of thousands of voters' ballots.

A.     **Prior to the November 2020 General Election, Defendants Disregarded Procedural Requirements and Implemented a Nationwide Late/Extra Trip Policy That Impaired USPS's Ability to Timely Deliver Election Mail.**

72.     On July 10, 2020, USPS released a document entitled "Mandatory Stand-Up Talk: All Employees" that unveiled DeJoy's "operational pivot" and prescribed numerous and "immediate" changes to long-standing USPS practice.[62] Specifically, the document listed the following nationwide policy changes: (i) all "Network, Plant, and Delivery" trips must "depart on time"; (ii) late trips are "no longer authorized or accepted"; (iii) extra trips are "no longer authorized or accepted"; (iv) carriers "must begin on time, leave for the street on time, and return on time"; and (v) "no additional transportation will be authorized to dispatch mail to the plant after the intended dispatch" (collectively, the "Late/Extra Trip Policy").[63]

73.     This Late/Extra Trip Policy ran contrary to prior USPS policies, which instructed postal workers *not* to leave letters behind and to make multiple trips as needed to ensure that mail is timely delivered.[64]

---

[62] Ex. 1, *Mandatory Stand-Up Talk: All Employees*, USPS (July 10, 2020), https://www.washingtonpost.com/context/internal-usps-document-tells-employees-to-leave-mail-at-distributioncenters/175dd1ae-e202-4777-877c-33442338d1cc/.

[63] *Id.*

[64] Jacob Bogage, *Postal Service Memos Detail "Difficult" Changes, Including Slower Mail Delivery*, Wash. Post (July 14, 2020), https://www.washingtonpost.com/business/2020/07/14/postal-service-trump-dejoy-delay-mail/.

74.     Notably, the document detailing the Late/Extra Trip Policy stated: "[o]ne aspect of these changes that may be difficult for employees is that—temporarily—we may see mail left behind or on the workroom floor or docks."[65]

75.     In enacting these dramatic policy changes on a nationwide basis, DeJoy and USPS completely ignored the statutory requirement to submit a proposal to the Postal Regulatory Commission. Defendants wholly disregarded the statutory approval process and failed to obtain an advisory opinion from the Postal Regulatory Commission prior to instituting these policy changes.

76.     Furthermore, although the operational pivot was purportedly designed to target "soaring costs" and improve operational efficiency, it failed to explain how the new policies effectuate those goals.[66]

77.     In practice, the Late/Extra Trip Policy threatened to create a chain of compounding delays at every step of the ballot delivery process. These delays could affect both the mailing of ballots from the state elections office to the voter and from the voter back to the elections office.

78.     *Delays inflicted on the mailing of blank ballots from the elections office to the voter.* There are three potential points where the Late/Extra Trip Policy could cause at least one day of delay in the delivery of ballots from the elections office to the voter.

79.     First, once the blank ballot is delivered to the local post office, a mail handler has to deliver that ballot to a processing plant. But if the ballot arrives at the local post office after the mail handler left for the processing plant, the Late/Extra Trip Policy would not allow the mail

---

[65] Ex. 1, *Mandatory Stand-Up Talk: All Employees*, USPS (July 10, 2020).

[66] *Id.*

handler to make an extra trip to deliver the blank ballot. The mail handler must instead wait to deliver the blank ballot to the processing plant until the next day—creating the risk of a one-day delay.

80.     Second, after the processing plant receives and sorts the mail shipment that contains the blank ballot, the ballot must be placed on the mail handler's truck for delivery from the processing plant back to the voter's local post office. But if the blank ballot is not processed in time for the mail handler's scheduled delivery from the processing plant to the post office, the Late/Extra Trip Policy requires the ballot to remain at the processing plant until the next day—creating the risk of a second one-day delay.

81.     Third, once the blank ballot makes it back to the voter's local post office, a carrier has to deliver it to the voter. However, the Late/Extra Trip Policy forbids the carrier from beginning her delivery route late. Thus, if the blank ballot arrives at the voter's local post office after the carrier's trip has begun, the Late/Extra Trip Policy requires the carrier to wait to deliver the blank ballot until the next day—creating the risk of a third one-day delay.

82.     These delays were compounded for ballots being shipped to non-local destinations, which must go through more than one processing center in order for the ballot to travel from an election office to a voter. *See supra* section II.A.

83.     *Delays inflicted on the delivery of completed ballots from the voter to the elections office.* This process then repeats itself (in reverse) once the voter completes the ballot and attempts to mail it back to the election office—creating another three opportunities for delay. Each point of delay would be caused by the Late/Extra Trip Policy, which (for the reasons set forth above) bars the additional trips needed to complete the delivery of mail from one point in the chain to the next. In particular: First, there is the risk of a one-day delay in the transmission

29

of the ballot from the local delivery unit to the processing plant.  Second, there is the risk of a one-day delay once the mail is processed at the plant before it is delivered back to the local delivery unit.  Third, there is a further risk of a one-day delay when the mail is then transported from the local delivery unit to the elections office.

84.     As DeJoy has twice acknowledged in testimony to the House Oversight Committee, these delays are not simply theoretical.  On August 24, 2020, DeJoy testified that these policies were directly responsible for delays in delivery, and "expose[d] a need to realign some of [USPS's] processing and scheduling that caused mail to miss the scheduled transportation[.]"[67]  He reiterated this point in testimony before the Committee on February 24, 2021.[68]  And data from an August 12, 2020 USPS document titled "Service Performance Measurement: PMG Briefing" showed more than an 8% decrease in on-time First-Class Mail delivery, and similar declines for marketing mail and periodicals.[69]

85.     The Late/Extra Trip Policy was implemented under the adverse conditions of the COVID-19 pandemic, which magnified the impact of that policy.  In particular, COVID-19 has caused staffing shortages at USPS, especially among letter carriers.  As of August 2020, approximately 40,000 postal workers had to quarantine, over 6,000 had tested positive for

---

[67] *See* Press Release, *Statement of Postmaster General and Chief Executive Officer Louis DeJoy before the House Committee on Oversight and Reform*, USPS (Aug. 24, 2020), https://about.usps.com/newsroom/testimony-speeches/082420-pmg-statement.htm.

[68] Press Release, *Statement of Postmaster General and Chief Executive Officer Louis DeJoy Before the House Committee on Oversight and Reform,* USPS (Feb. 24, 2021), https://about.usps.com/newsroom/testimony-speeches/022421-statement-of-pmg-louis-dejoy-on-oversight-and-reform.htm  ("Feb. 24 House Testimony").

[69] *Service Performance Measurement: PMG Briefing*, USPS (Aug. 12, 2020), https://oversight.house.gov/sites/democrats.oversight.house.gov/files/documents/PMG%20Briefing_Service%20Performance%20Management_08_12_2020.pdf.

COVID-19, and 83 had died from contracting COVID-19.[70] When letter carriers are sick, quarantining, dealing with the absence of child care, or otherwise unable to complete their routes, the need for other carriers to make extra and off-shift trips to ensure that the mail is delivered is at its greatest.

86.     The 2020 General Election, which saw the highest number of mail-in ballots cast of all time,[71] as well as the 2021 Georgia Runoff Election, further increased the need for late, extra, and off-shift trips. The combination of the sheer expansion of mail-in ballots for the General Election and the critical importance of timely delivery of Election Mail heightened the importance of ensuring that postal workers have the flexibility and extended hours necessary to complete deliveries on schedule.

### 1.     The Impact of the Delays Inflicted by the Late/Extra Trip Policy

87.     Twenty-eight states, including Pennsylvania and New Mexico, currently have receipt-by-Election-Day deadlines.[72] In these states, even if a returned ballot is postmarked (*i.e.*, marked as received by USPS) on or before Election Day, it will not be counted unless it is *received by election officials* prior to or on Election Day.

---

[70] *Postmaster General Louis DeJoy Testimony Transcript August 24: House Oversight Hearing* at 4:57:39–4:57:55, Rev (Aug. 24, 2020), https://www.rev.com/blog/transcripts/postmaster-general-louis-dejoy-testimony-transcript-august-24-house-oversight-hearing.

[71] Drew DeSilver, *Most Mail and Provisional Ballots Got Counted in Past U.S. Elections - But Many Did Not*, Pew Rsch. Ctr. (Nov. 10, 2020), https://www.pewresearch.org/fact-tank/2020/11/10/most-mail-and-provisional-ballots-got-counted-in-past-u-s-elections-but-many-did-not/.

[72] *See Processing Readiness of Election and Political Mail During the 2020 General Election*, Report No. 20-225-R20, USPS OIG 23 (Aug. 31, 2020), https://www.oversight.gov/sites/default/files/oig-reports/20-225-R20.pdf.

88.     Defendants' Late/Extra Trip Policy would impact voters in states with receipt-by-Election-Day deadlines or deadlines soon after Election Day by compressing the timeline in which a voter must mail her completed ballot to ensure that her vote is counted.

89.     A simple example highlights the risks associated with this delay.  The 2021 statewide primary election in Pennsylvania will take place on Tuesday, May 18.  If a voter put her completed ballot in the mail on Saturday, May 15, ordinarily it would be delivered in 1–3 days and would therefore be received by the state's Election Day deadline.  However, the additional delay (conservatively estimated to be up to three days) caused by the Late/Extra Trip Policy would preclude voters from voting by mail on the Saturday before the election.  Put another way, any completed ballots mailed on Saturday, May 15, or later, would be at a substantial risk of not being received by the local election office by Election Day—thus rendering any such completed ballot invalid.

90.     Defendants' admissions are consistent with this timeline.   In letters that USPS sent to state election officials on July 29, 2020, Defendants stated that completed ballots for the 2020 General Election needed to be mailed by October 27, 2020 in order to be received by Election Day.  The need for a full week reflects the additional risk of a delay (on top of the normal First-Class standard of service) created by the Late/Extra Trip Policy.[73]

91.     In Texas, a completed ballot will be counted by election officials if it is postmarked on or before Election Day at 7 p.m. *and* received by 5 p.m. the day after the election.  Tex. Elec. Code § 86.007(a), (d-1)–(f); *id.* § 86.006(a), (a-1).  This limited, one-day extension does not remove the risk of late delivery.

---

[73] *See, e.g.*, Ex. 2, Letter from Thomas J. Marshall, USPS, to Sec'y Kathy Boockvar, Pa. 2 (July 29, 2020).

92.     Finally, some voters in Pennsylvania and New Mexico may not even receive their ballots until the Saturday before an election. In Pennsylvania, voters can request an absentee ballot through 5 p.m. the Tuesday before the election (*i.e.*, Tuesday, May 11 for the May 18 primary and special elections and Tuesday, October 26 for the November 2 general election). 25 Pa. Stat. § 3146.2a(a), (a.3); *id.* § 3150.12a(a). And in New Mexico, voters can request an absentee ballot through the Thursday immediately before the election. N.M. Stat. § 1-6-5(F). Given delays in both receiving blank and sending completed ballots associated with Defendants' Late/Extra Trip Policy (compounded by Defendants' deficient ballot processing practices), these voters could altogether miss the opportunity to have their mail-in votes counted.

93.     As set forth in Exhibit 2, in the nearly 50 letters that USPS General Counsel Thomas Marshall mailed to state election officials, Defendants admitted that their policies would cause delays that could disenfranchise voters who applied for absentee ballots as described. Specifically, USPS advised election officials prior to the November 2020 General Election that "if a voter submits a request [for an absentee ballot] at or near [October 27, 2020], and the ballot is transmitted to the voter by mail, there is a *significant risk* that the voter will not have sufficient time to complete and mail the completed ballot back to election officials in time for it to arrive by the state's return deadline."[74] Yet despite recognizing the "significant risk" of disenfranchisement, Defendants continued to implement policies that delay the delivery of First-Class Mail, including Election Mail, and—in the same breath—admitted that USPS "cannot adjust its delivery standards to accommodate the requirements of state election law."[75]

---

[74] *Id.* (emphasis added).

[75] *Id.*

94.     This position is all the more alarming given that Defendants' policy changes were instituted in violation of their statutory obligation to submit proposals to the Postal Regulatory Commission before implementation.  *See supra*, section II.A.

95.     In light of the ongoing pandemic, swarms of voters in both the November 2020 General and Georgia Runoff Elections opted to forgo voting in person in favor of voting by mail. Many will likewise rely on mail-in voting in upcoming elections in 2021. Consequently, Defendants' Late/Extra Trip Policy threatened and continues to threaten to disenfranchise voters *en masse*.

96.     Put simply, under the Late/Extra Trip Policy, voters who follow the rules are "set up for failure," based on policies beyond their control.[76]  A delay in delivery can mean that a "voter's right to vote . . . may hinge on random chance," such that if two ballots are mailed at the same time, at different post offices, whether either vote is counted depends "entirely on the speed at which their local post office delivered their votes." *Gallagher v. N.Y. State Bd. of Elections*, 477 F. Supp. 3d 19, 48 (S.D.N.Y. 2020).  The government cannot overlook or dismiss a "systemic problem that arbitrarily renders [thousands of] ballots invalid." *Id.* at 45.

97.     USPS data confirms that the risk of delays caused by the Late/Extra Trip Policy is not merely theoretical.  Indeed, internal USPS documents show that there was "a significant drop

---

[76] Pam Fessler & Elena Moore, *Signed, Sealed, Undelivered: Thousands Of Mail-In Ballots Rejected for Tardiness*, NPR (July 13, 2020), https://www.npr.org/2020/07/13/889751095/signed-sealed-undelivered-thousands-of-mail-in-ballots-rejected-for-tardiness.

in service standards across the board"[77] after the beginning of July "including in First-Class, Marketing, Periodicals, and Priority Mail":[78]



98.     As the above chart highlights, from the time DeJoy took over as Postmaster General through August 2020, USPS service scores were 8.10% lower than baseline. And the

---

[77] The Code of Federal Regulations prescribes a 1–3 day timeframe for most mail delivered within the 48 contiguous states, 39 C.F.R. § 121.1, and recent USPS statements indicate that this regulatory requirement is carried out in practice. *See* Service Standards Maps, USPS PostalPro (July 1, 2020), https://postalpro.usps.com/ppro-tools/service-standards-maps.   However, at USPS's 30(b)(6) deposition regarding the delivery of Georgia Election Mail, USPS's Mr. Robert Justin Glass, Manager of Operations Industrial Engineering at USPS's Washington, D.C. Headquarters, indicated that the service standard for the lower 48 states is 2–3 days. Ex. 3, Robert Justin Glass Dep. Tr. (Dec. 15, 2020) (hereinafter "Glass Dep. Tr."), at 28:4–7.

[78] Press Release, *New Postal Service Documents Show Nationwide Delays Far Worse Than Postal Service Has Acknowledged*, House Committee on Oversight and Reform (Aug. 22, 2020), https://oversight.house.gov/news/press-releases/new-postal-service-documents-show-nationwide-delays-far-worse-than-postal.

[79] *USPS Service Performance Measurement, PMG Briefing*, USPS (Aug. 12, 2020), https://oversight.house.gov/sites/democrats.oversight.house.gov/files/documents/PMG%20Briefing_Service%20Performance%20Management_08_12_2020.pdf.

majority of that drop resulted from a delay in processing—the service performance from USPS possession to last processing scan was 7.96% lower than baseline.[80]  A subsequent November 6, 2020 report by the USPS Office of the Inspector General ("OIG") showed even greater drops, with service scores for First-Class Single Piece mail declining 10.4%, from 90.1% to 79.7%—well below "the target of 96[%]."[81]  Scores for First-Class Presort mail declined 9.3% from 92.2% to 82.9%, again well below the 96% target.[82]

  99. The following chart, based on USPS data from the Eastern seaboard, shows a similar dramatic drop-off in timely deliveries in the immediate aftermath of the July 10 Late/Extra Trip Policy:



| District | WK 43 | RK | QTD | RK | YTD | RK | | District | WK 43 | RK | QTD | RK | YTD | RK |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Appalachian | 84.96 | 41 | 89.11 | 15 | 92.98 | 5 | | South Jersey | 86.99 | 25 | 88.01 | 28 | 91.82 | 20 |
| Central Pennsylvania | 72.86 | 63 | 79.47 | 65 | 90.91 | 42 | | Tennessee | 82.48 | 52 | 85.83 | 43 | 91.47 | 27 |
| Kentuckiana | 85.13 | 38 | 87.12 | 32 | 92.00 | 17 | | Western New York | 86.00 | 31 | 88.59 | 22 | 93.15 | 4 |
| Northern Ohio | 68.31 | 65 | 81.17 | 62 | 91.25 | 34 | | Western Pennsylvania | 90.01 | 5 | 90.50 | 6 | 93.60 | 1 |
| Ohio Valley | 71.08 | 64 | 80.77 | 63 | 90.35 | 49 | | Eastern | 79.07 | 7 | 84.60 | 6 | 91.59 | 2 |
| Philadelphia Metropo | 85.68 | 33 | 86.68 | 36 | 91.23 | 36 | | National Total | 84.23 | | 86.26 | | 90.76 | |

*Eastern Area First Class Composite*

AREAS INSPIRING MAIL

[83]

---

[80] *Id.*

[81] OIG Report, *supra* note 61, at 9.

[82] *Id.*

[83] *Eastern Area AIM Meeting - Service Update*, USPS (Aug. 4, 2020), https://postalpro.usps.com/node/8407 (including Figures 1 and 2). For Figures 1 to 4, "SPYL"

100.     The November 6, 2020 OIG Report noted that "[d]elayed mail reported in Postal Service systems for mail processing facilities increased 21 percent, from 2 billion pieces for the week ending July 10, 2020 to 2.4 billion pieces for the week ending July 31, 2020."[84]  Likewise, delayed mail at post offices "increased 143 percent, from 4.7 million for the week ending July 10, 2020, to 11.4 million for the week ending July 31, 2020."[85]  Delays persisted through August, as reflected by the data USPS released on August 31, 2020.[86]

101.     The cause of this deterioration in service was identified by the Postmaster General himself in his Congressional testimony.  In DeJoy's words, he only made "one change" in this time period that accounted for the drop-off in early July:  he "asked the team to run the transportation on time and mitigate extra trips" in July 2020—*i.e.*, the Late/Extra Trip Policy— and then the service scores significantly declined.[87]

102.     The USPS data released on August 31, 2020, helps to quantify the loss of capacity that the Late/Extra Trip Policy caused.  When the nationwide Late/Extra Trip Policy took effect, USPS dropped from an average of 4,193 late trips per day to an average of 1,147 late trips per

---

refers to "same period last year."  Additionally, FY2020 started on October 1, 2019, for USPS. Accordingly, Week 41 corresponds to the week of July 5.

[84] OIG Report, *supra* note 61, at 2.

[85] *Id.*

[86] *Congressional Briefing: Transportation & Service Performance Updates*, USPS 4 (Aug. 31, 2020), https://rb.gy/zpiomk.

[87] *Postmaster General Louis DeJoy Testimony Transcript August 24: House Oversight Hearing* at 3:49:09, Rev (Aug. 24, 2020), https://www.rev.com/blog/transcripts/postmaster-general-louis-dejoy-testimony-transcript-august-24-house-oversight-hearing.

day, and from an average of 2,260 extra trips per day to average of 606 extra trips per day. In other words, *every day*, USPS was conducting 4,700 fewer late and extra trips than usual.[88]

103.    Following DeJoy's "operational pivot," additional anecdotal reports of substantial delays and disruptions in mail service accumulated nationwide. According to postal workers, DeJoy's policies resulted in "delivery delays of *at least two days* across the country."[89]

104.    Multiple postal worker unions affirmed that DeJoy's new policies severely limited mail transportation and caused mail to be left at sorting plants for days longer than typical.[90] The American Postal Workers Union, "which represents more than 200,000 Postal Service employees and retirees, . . . received a number of reports from postal workers and customers" from mid-July to early August "that mail delivery ha[d] slowed and 'degraded.'"[91] Mark Dimondstein, the President of the American Postal Workers Union, reported that he heard from several postal workers "who sa[id] Monday mail isn't going out until Wednesday and that in some jurisdictions on some days, mail isn't going out at all."[92] Dimondstein made clear the cause of the delays: "They're ordering workers to leave mail for another day."[93] Indeed, at one

---

[88] *Congressional Briefing: Transportation & Service Performance Updates*, USPS (Aug. 31, 2020), https://rb.gy/zpiomk.

[89] Jessica Dean et al., *Postal Service Says it has "Ample Capacity" to Handle Election After Trump Casts Doubt*, CNN (Aug. 3, 2020), https://www.cnn.com/2020/08/03/politics/postal-service-ample-capacity-election-trump/index.html (emphasis added).

[90] Russell Berman, *What Really Scares Voting Experts About the Postal Service*, The Atlantic (Aug. 14, 2020), https://www.theatlantic.com/politics/archive/2020/08/how-postal-service-preparing-election/615271/.

[91] Dean et al., *supra* note 8989.

[92] Berman, *supra* note 90.

[93] *Id.*

post office, a postal clerk reported that under these new policies, "some mail is arriving a day later at the processing facility, where it could be delayed again."[94]

105.    USPS publicly acknowledged its own fears regarding its ability to handle on-time delivery of Election Mail submitted close to Election Day. On July 29, 2020, after DeJoy's policies went into effect and noticeable service delays took place, USPS sent letters to 46 states and the District of Columbia, expressly stating that USPS "cannot guarantee all ballots cast by mail for the November election will arrive in time to be counted."[95]

106.    The July 29 letters warned that "there is a significant risk that, at least in certain circumstances, ballots may be requested in a manner that is consistent with your election rules and returned promptly, and yet not be returned in time to be counted."[96] To account for that risk, USPS "recommend[ed] that election officials use First-Class Mail to transmit blank ballots and allow 1 week for delivery to voters," even though many states' election laws permit voters to request a ballot within one week of Election Day.[97] These letters made clear the "grim possibility for the tens of millions of Americans eligible for a mail-in ballot this fall: Even if

---

[94] Laura J. Nelson & Maya Lau, *"Like Armageddon": Rotting Food, Dead Animals and Chaos at Postal Facilities Amid Cutbacks*, L.A. Times (Aug. 20, 2020), https://www.latimes.com/california/story/2020-08-20/usps-cutbacks-post-office-chaos.

[95] Erin Cox et al., *Postal Service Warns 46 States Their Voters Could Be Disenfranchised by Delayed Mail-In Ballots*, Wash. Post (Aug. 14, 2020), https://www.washingtonpost.com/local/md-politics/usps-states-delayed-mail-in-ballots/2020/08/14/64bf3c3c-dcc7-11ea-8051-d5f887d73381_story.html.

[96] Ex. 2, Letter from Thomas J. Marshall, USPS, to Sec'y Kathy Boockvar, Pa. 2 (July 29, 2020) (emphasis added).

[97] *Id.*

people follow all of their state's election rules, the pace of USPS delivery may disqualify their votes."[98]

107.    In a subsequent letter to USPS workers on August 13, 2020, DeJoy himself acknowledged that delivery slowdowns were "unintended consequences" of his new policies.[99] Critically, it was "not entirely clear how temporary the delays will be."[100] And delays continued. In particular, because of the Late/Extra Trip Policy, numerous pieces of mail were left behind at both processing plants and delivery centers, while the unavailability of overtime left workers with insufficient hours to process and deliver mail, leading to larger and larger piles of left-behind mail.[101]

### 2.    This Court Found That the Late/Extra Trip Policy Unduly Burdened Plaintiffs' Right to Vote.

108.    On August 28, 2020, Plaintiffs brought suit on the grounds that Postmaster General DeJoy's policies, including the Late/Extra Trip Policy, injected an intolerable risk of delay into the 2020 election and unconstitutionally burdened the right to vote.

109.    On September 8, 2020, Plaintiffs filed a motion for preliminary injunction, requesting that the Court enjoin Defendants from enforcing the Late/Extra Trip Policy on the grounds that the Policy risked disenfranchising thousands of voters without serving any

---

[98] Cox, *supra* note 95.

[99] *Id.*

[100] See Adam Clark Estes, *What's Wrong With the Mail*, Vox (Aug. 7, 2020), https://www.vox.com/recode/2020/8/7/21358946/postal-service-mail-delayselection-trump-mail-in-ballots.

[101] *See* Michael Sainato, *Postmaster General's Changes Causing Mail Delays, USPS Workers Say*, The Guardian (Aug. 16, 2020), https://www.theguardian.com/business/2020/aug/16/usps-mail-delays-postmaster-general-changes-workers; *see also* James Doubek, *Postal Workers Decry Changes And Cost-Cutting Measures*, KUOW (Aug. 11, 2020), https://kuow.org/stories/postal-workers-decry-changes-and-cost-cutting-measures.

legitimate government interest. Indeed, the Policy actually undermined USPS's statutory mission of providing prompt, reliable, and efficient service. And any justification based on cost was belied by the relatively small impact on the public fisc and Defendants' own insistence that they had no need for additional funding.

110.    On September 28, 2020, this Court granted Plaintiffs' motion for a preliminary injunction, finding that the July 2020 Policy Changes imposed undue burdens on the individual Plaintiffs' and other voters' right to vote, and that absent injunctive relief, Plaintiffs faced irreparable harm.[102]

111.    Accordingly, the Court unequivocally "ORDERED that pursuant to the Order, Defendants are HEREBY ENJOINED from enforcing the Late/Extra Trip Policy[.]"[103]

### 3.    Defendants Failed to Adequately Respond to the Court's Order.

112.    Even after this Court entered a preliminary injunction, Defendants failed to take *any* action in response for several weeks, because they believed "there wasn't anything to change."[104]

113.    Following this inaction, USPS's weekly on-time service scores for First-Class Mail dropped even lower—to 86.15% on October 3, 85.58% on October 10, and 80.85% on October 17.[105] And the number of late and extra trips during this period remained depressed, far below the levels that predated the July 2020 Policy.[106]

---

[102] *See Vote Forward v. DeJoy*, No. 20-2405, 2020 WL 5763869 (D.D.C. Sept. 28, 2020).

[103] Order 1 (Sept. 28, 2020), ECF No. 31.

[104] Robert Cintron Dep. Tr. (Oct. 15, 2020), at 158:24–159:15, ECF No. 33-4.

[105] USPS FY20 Q2 - FY 21 Q1 To-Date Service Performance For Market-Dominant Products 1 (Nov. 18, 2020), ECF No. 118-6.

[106] Late & Extra Trips Report (Nov. 18, 2020), ECF No. 118-1.

114.     As a result of Defendants' failure to comply with the Court's Order, Plaintiffs on October 22, 2020 filed an emergency motion to enforce and monitor compliance with the preliminary injunction.[107]

115.     On October 27, 2020, the Court granted Plaintiffs' emergency motion.  Among other things, the Court ordered Defendants to explicitly notify relevant USPS personnel that the July 14, 2020 guidelines on the use of late and extra trips were rescinded and to file with the Court each morning:  (1) daily data on the number of late and extra trips performed the preceding day; (2) updated data on the percentage of on-time deliveries; and (3) any other reports generated and produced to Congress, other courts, or other litigants.[108]

116.     Following the Court's Order, Defendants' service scores for First-Class Mail began to improve, rising from 81.57% on October 24 to 84.61% on October 31, and 85.40% on November 7.[109]  However, those scores were still well below USPS's service standard of 96%.

#### 4.     Defendants' Inadequate Ballot Processing Practices

117.     During the 2020 election cycle, Defendants—pursuant to court orders in other jurisdictions—belatedly issued memoranda on October 13, 20, and 28 that outlined the following extraordinary measures to improve the timely delivery of Election Mail.

118.     *Late and Extra Trips Statement.*  USPS's October 13 Memorandum "reiterate[d]" that "late and extra trips are not banned."[110]  However, this memorandum failed to state that the July 2020 guidelines were rescinded, revoked, or suspended.

---

[107] Pls.' Mot. to Enforce, ECF No. 33.

[108] Min. Order (Oct. 27, 2020).

[109] USPS FY20 Q2 - FY 21 Q1 To-Date Service Performance For Market-Dominant Products (Nov. 18, 2020), ECF No. 118-6, at 1.

[110] Ex. 4, Oct. 13 Mem., at 3.

119.    *The Hub-and-Spoke System.* USPS's October 20 Memorandum established a "hub-and-spoke" system intended to speed up the delivery of ballots to local and non-local Boards of Election by at least one day by eliminating their trip to the processing plant and scheduling drivers to deliver ballots directly from the delivery unit to the appropriate Board of Elections.[111]

120.    To implement the hub-and-spoke system, multiple delivery units were directed to use one central office as a "hub" for all of the ballots received by those delivery units, with the hub then scheduling drivers to deliver (or "spoke") ballots directly from the hub to the appropriate Board of Elections.[112]

121.    However, implementation of the hub-and-spoke system did not begin until the day before the election, and the system did not take full effect until Election Day.[113] Under the schedule laid out in the memorandum, ballots destined for local Boards of Elections would begin delivery using the hub-and-spoke system on November 2, 2020.[114] For ballots being delivered to non-local Boards of Elections, the hub-and-spoke system did not begin until Election Day, November 3.[115] As a result, all ballots sent more than two days before the election were still at risk of late delivery because they had to travel through the underperforming processing plants. And non-local ballots were at risk even if they were sent the day before the election.

---

[111] Ex. 5, Oct. 20 Mem., at 3; Glass Dep. Tr. at 207:14–208:1.

[112] *See* Glass Dep. Tr. at 140:17–21.

[113] Ex. 5, Oct. 20 Mem., at 3.

[114] *Id.*

[115] *Id.*

122.   *The Local Turnaround Option.*  USPS's October 20 Memorandum also established a "local turnaround" option, which could be requested by a local delivery unit.[116] Under this option, if a ballot was received by a local delivery unit that also serviced the Board of Elections for which it was destined, the delivery unit could postmark and mail that ballot directly to the Board of Elections without ever entering the ballot into the processing plant system.[117] By avoiding the processing plant, this option "would make delivery faster by at least one day."[118]

123.   Still, the local turnaround process only applied when the relevant voter and the Board of Elections to which she sent her ballot were both serviced by the same delivery unit. The fact that this option was *authorized* but not *mandatory* created the risk that a voter's completed ballot may not be expedited through the local turnaround option.[119]

124.   *The "Holdout" System at Processing Plants.*  USPS's October 28 Memorandum established a "direct holdout" process to be implemented at processing plants by October 30, 2020—four days before the election.[120]  Under this process, instead of sending the ballots through the entirety of the normal processing system, processing plants would identify ballots early in the sorting process and place the ballots in a bin corresponding to the Board of Elections to which they should be delivered.[121]

125.   The direct holdout process was intended to cut down on processing time by skipping additional rounds of sorting and allowing processing plants to submit a ballot to the

---

[116] *Id.* at 2.

[117] Glass Dep. Tr. at 146:17–147:5, 147:13–148:1.

[118] *Id.* at 220:4–10.

[119] *Id.* at 146:17–147:5;  Ex. 5, Oct. 20 Mem., at 2.

[120] Ex. 6, Oct. 28 Mem., at 2–3.

[121] Glass Dep. Tr. at 102:2–17.

Board of Elections the day after receiving it.[122]   Ballots with return envelopes designed in accordance with USPS recommendations—that is, those with an Intelligent Mail® barcode ("IMb"), the correct content identifier number ("CIN"), and the correct facing identification mark ("FIM")—should be tracked in the processing scores that USPS publishes, even if they were "held out."[123]   Thus, USPS processing scores should improve if the holdout process is effective in reducing processing time.[124]

126.    Altogether, many of the measures called for by these memoranda were merely "authorized," rather than required, thus leaving the rights of voters up to the whims of USPS personnel.  Other measures were implemented too late to stop many ballots from being funneled into the underperforming processing system, thus delaying ballot delivery.  USPS itself recognized the necessity of consistent and early implementation of extraordinary measures. Indeed, USPS leadership repeatedly acknowledged that extraordinary measures were necessary to ensure that mail-in ballots were delivered on time.

127.    In testimony before this Court, Kristin Seaver, USPS's Chief Retail and Delivery Officer, said that without expanding operations the weekend prior to Election Day, "we know we can't turn those ballots around in time for that Tuesday election depending on the service standard."[125]  These expanded operations include conducting pick-ups from blue USPS boxes on

---

[122] *Id.* at 102:2–17, 108:10–13.

[123] *Id.* at 246:19–247:12.

[124] *Id.*

[125] Ex. 7, Hr'g Tr. (Oct. 30, 2020), at 15:12–16.

Sunday, running additional transportation from post offices to processing plants on Sunday, and requiring plants to process outgoing mail on Sunday.[126]

128.    Michael Barber, USPS's Vice President of Processing and Maintenance Operation, likewise testified that "if [ballots] were left to go through the regular and normal process" the weekend before a Tuesday election, "they would be at risk of not making it to their destination timely."[127] In order to combat this risk, Mr. Barber suggested that USPS had to take measures including: "manual[ly] sort[ing]" local ballots at processing facilities and "expedit[ing them] to a Board of Election or a post office that serves a Board of Elections," identifying non-local ballots and placing them in the Express Mail network, implementing "additional transportation," and adding standby resources including "maximizing the full use of any overtime usage."[128]

129.    And USPS's Regional Vice President of Processing Operations, Dane Coleman, testified that "all available resources" are necessary to ensure Election Mail is delivered in a timely manner in the days prior to an election, including "utiliz[ing] as much overtime as necessary to get the job done."[129]

130.    Yet USPS did not implement those extraordinary measures simply because they thought those measures necessary. Kevin Bray, a USPS employee who oversaw mail processing for the 2020 General Election, testified that the October 20 Memorandum and the measures it put

---

[126] *Id.* at 12:10–13:13.

[127] Ex. 8, Hr'g Tr. (Oct. 31, 2020, 3pm) at 9:19–24.

[128] *Id.* at 10:5–12, 11:2–6, 12:20–14:1; *see also id.* at 13:23–14:10, 20:23 (testifying that extraordinary measures were required because ballots collected the day before an election and bound for a local BOE would not necessarily be delivered on time if USPS implemented "its regular sortation").

[129] *Id.* at 49:22–50:5.

forward "[were] being done because we were under some heat from the courts."[130] Indeed, he

was told that "we're going to have to do everything, move heaven and earth to deliver ballot

mail," because "[w]e don't want the courts to come back and say we didn't do everything we

could."[131]

131.   In particular, Bray testified that USPS thought it necessary to require processing

facilities to conduct daily ballot sweeps and certify that they were "All Clear" of Election Mail

because ballots could be found in unexpected places, sorted incorrectly, or sent to the wrong

destination.[132]   Given the importance of these sweeps, each plant was supposed to have a plan in

place to conduct sweeps on Election Day.[133]   However, Mr. Bray acknowledged that USPS did

not have any written documentation requiring that plan, nor did he verify whether plans were

indeed in place.[134]

132.   In practice, USPS's data confirms that numerous ballots continued to go through

processing plants with "unacceptable" processing scores in the lead-up to the November 2020

General Election.[135]   For example, consider the number of ballots funneled through the Atlanta

and Central Pennsylvania District processing plants, where the processing scores regularly fell

well below USPS's 96% service score standard:

---

[130] Ex. 9, Hr'g Tr. (Nov. 4, 2020) at 111:19–21.

[131] *Id*. at 112:1–4.

[132] *Id*. at 67:4–21, 77:6–9.

[133] *Id*. at 82:1–8.

[134] *Id*. at 82:9–14.

[135] Glass Dep. Tr. at 250:9–17.

| Date | Area | District | Measured Volume: Inbound Ballot | Processing Score: Inbound Ballot | Processing Score Plus 1: Inbound Ballot | Processing Score Plus 2: Inbound Ballot | Processing Score Plus 3: Inbound Ballot |
|---|---|---|---|---|---|---|---|
| 10/24/2020 | Capital Metro | Atlanta | 17326 | 84.89% | 95.35% | 98.71% | 98.92% |
| 10/26/2020 | Capital Metro | Atlanta | 18003 | 89.44% | 94.66% | 97.46% | 98.51% |
| 10/27/2020 | Capital Metro | Atlanta | 10334 | 39.68% | 97.78% | 98.72% | 99.20% |
| 10/28/2020 | Capital Metro | Atlanta | 18106 | 94.97% | 96.49% | 98.98% | 99.24% |
| 10/29/2020 | Capital Metro | Atlanta | 15279 | 93.10% | 94.59% | 95.20% | 96.52% |
| 10/30/2020 | Capital Metro | Atlanta | 8218 | 78.23% | 93.25% | 94.03% | 94.50% |
| 10/31/2020 | Capital Metro | Atlanta | 7681 | 57.09% | 94.88% | 98.27% | 98.27% |
| 11/2/2020 | Capital Metro | Atlanta | 6550 | 61.47% | 89.40% | 94.79% | 95.63% |
| 11/3/2020 | Capital Metro | Atlanta | 1713 | 81.03% | 91.13% | 94.75% | 96.32% |

136

| Date | Area | District | Measured Volume: Inbound Ballot | Processing Score: Inbound Ballot | Processing Score Plus 1: Inbound Ballot | Processing Score Plus 2: Inbound Ballot | Processing Score Plus 3: Inbound Ballot |
|---|---|---|---|---|---|---|---|
| 10/24/2020 | Eastern | Central Pennsylvania | 28343 | 78.46% | 90.50% | 98.91% | 99.36% |
| 10/26/2020 | Eastern | Central Pennsylvania | 53224 | 78.76% | 92.10% | 99.30% | 99.49% |
| 10/27/2020 | Eastern | Central Pennsylvania | 15329 | 56.14% | 95.72% | 97.88% | 99.20% |
| 10/28/2020 | Eastern | Central Pennsylvania | 37818 | 83.25% | 83.76% | 98.90% | 99.44% |
| 10/29/2020 | Eastern | Central Pennsylvania | 40279 | 69.17% | 96.93% | 97.19% | 99.51% |
| 10/30/2020 | Eastern | Central Pennsylvania | 21604 | 64.02% | 93.53% | 97.49% | 97.82% |
| 10/31/2020 | Eastern | Central Pennsylvania | 15375 | 52.21% | 90.66% | 97.59% | 98.95% |
| 11/2/2020 | Eastern | Central Pennsylvania | 26141 | 68.85% | 89.79% | 93.94% | 95.10% |
| 11/3/2020 | Eastern | Central Pennsylvania | 9905 | 60.05% | 88.97% | 97.38% | 98.70% |

137

133.    As a result, ballots in these districts were delayed. Mr. Bray himself recognized that, even with the October Memoranda's measures in place, approximately 1,400 ballots delivered on Election Day in the Central Pennsylvania District were delivered outside of USPS's service standard.[138] He acknowledged that this should not have happened "based on the

---

[136] Ex. 10, USPS Variance Data Sorted by District 8 (Nov. 6, 2020).

[137] *Id.* at 14.

[138] Ex. 9, Hr'g Tr. (Nov. 4, 2020) at 93:15–24.

extraordinary measures that were put in place."[139]   Likewise, at USPS's 30(b)(6) deposition

regarding the delivery of Georgia Election Mail, USPS's Mr. Robert Justin Glass, Manager of

Operations Industrial Engineering at USPS's Washington, D.C. Headquarters, admitted that

some "ballots that were mailed on time did not make it" during the November 2020 General

Election, as USPS's performance was "by no means, perfect."[140]

134.    After reviewing USPS's low processing scores, this Court ordered that USPS

facilities in Districts "whose Election Mail processing scores for completed ballots returned by

voters (Inbound Ballots) were below 90 percent for at least two days from October 26 to 28"

must "implement the 'Delivery' measures outlined in USPS's 'Extraordinary Measures

Memorandum' dated October 20, 2020 unless the implementation of any of the extraordinary

measures, at a district or facility level, would create a significant risk of reducing the timely

delivery of Inbound Ballots."[141]   On November 1, the Court entered an order requiring USPS to,

among other things:  redistribute its October 28 Memorandum with the instruction that "special

procedures must be put in place to ensure we deliver every ballot possible by the cutoff time on

Election Day"; use the Express Mail network to expedite ballots; clear all ballots with local

destinations the same day or by the next morning; and ensure that post offices and processing

plants were postmarking all ballots.[142]

---

[139] *Id.* at 93:19–24; *see also id.* at 94:6–7 ("I don't know why [these ballots were delivered late] and there's no excuse. It should never have happened.").

[140] Glass Dep. Tr. at 128:8–10.

[141] Min. Order (Oct. 30, 2020).

[142] Order 1–2 (Nov. 1, 2020), ECF No. 66.

**B.** **USPS Policies Failed To Ensure Timely Ballot Delivery Prior to the Parties' December 23 Agreement.**

135.    The November 2020 General Election passed, but voters' need to vote by mail did not. Neither did USPS's obligation to those voters. And so, in recognition of Defendants' prior reluctance to comply with this Court's orders and its continued poor performance in the Atlanta District in particular, Plaintiffs sought this Court's leave to conduct discovery related to the impending Georgia Runoff Election.[143] This Court granted that leave on November 19, 2020, and Plaintiffs served their discovery requests and Rule 30(b)(6) deposition notice the next day.

136.    Georgia Boards of Elections began mailing absentee ballots to voters on November 18,[144] and by December 4, more than a million Georgians had requested an absentee ballot and more than 60,000 had cast their ballot.[145] With the November 2020 General Election behind them, Defendants should have been poised to execute their learnings and improve on their performance in the fast-approaching January Runoff Election.

137.    Yet for weeks, Defendants put off issuing guidance for the January Runoff. And their efforts to prepare for the Runoff Election were insufficient in other respects, too. At USPS's 30(b)(6) deposition, Robert Justin Glass agreed that "processing scores for inbound [ballots] in Atlanta [we]re consistently below national averages" and were "unacceptable."[146] However, despite this assessment and USPS's poor performance in Georgia generally, he did not

---

[143] *See* Notice of Pls.' Proposal for Further Proceedings & Proposed Order, ECF No. 113.

[144] Stephanie Saul, *With All Eyes on Senate Runoff in Georgia, Here's How Residents Can Vote*, N.Y. Times (Nov. 17, 2020), https://www.nytimes.com/2020/11/17/us/politics/georgia-senate-runoff-voting.html.

[145] Georgia Votes, https://www.georgiavotes.com/index-apps.php (last updated Jan. 5, 2021).

[146] Glass Dep. Tr. at 248:21–249:2, 250:17.

discuss the source of ballot delays with Georgia personnel.[147]  Nor did he perform "any specific analysis on why Atlanta's processing score was under" any other District's scores.  And he further acknowledged that because he had "not done anything to investigate that specifically," he did not know any "reasons why Atlanta [wa]s underperforming the national average."[148]

### 1.  USPS Guidance for the Georgia Runoff Substantially Mirrored Its Guidance That Had Proven Ineffective in Atlanta in November.

138.  Finally, in December, USPS issued its guidance for the Georgia Runoff.  But despite the demonstrated failure of USPS's October guidance in Atlanta during the November 2020 General Election, the persistence of the COVID-19 pandemic, the added challenges of processing and delivering Election Mail during USPS's peak season, and the time taken to develop it, the guidance Defendants issued substantially mirrored that issued during the November election.

139.  In particular, Defendants issued two memoranda in preparation for the Georgia Runoff: a December 8 Memorandum that corresponded to the October 20 Memorandum, and a December 14 Memorandum that corresponded to the October 28 Memorandum.[149]

140.  The December 8 Memorandum stated that it was provided to "ensure that Retail and Delivery Units in and serving the State of Georgia will deploy the *same extraordinary measures* that [they] deployed for the November 3, 2020, general election."[150]  This included the following.

---

[147] *Id.* at 131:13–132:4.

[148] *Id.* at 249:6–20.

[149] *See id.* at 139:12–20, 230:4–231:6.

[150] Ex. 11, Dec. 8 Mem., at 1 (emphasis added).

141.   *The January 4 "Local" Hub-and-Spoke System.*  As a result of various court orders, the hub-and-spoke system became mandatory.[151]  Accordingly, beginning January 4, "all offices that service or are in close proximity to a local BOE in Georgia" were required to "establish a 'hub and spoke' process for running ballots to the local BOE. Ballots [we]re to be postmarked in the local retail unit, then hubbed to the BOE, so that they arrive[d] prior to the cut-off for the day and no later than 7:00 p.m. on Tuesday, January 5."[152]  Mr. Glass explained that this instruction was meant to "mandate[] the delivery units [to] speed up delivery by cutting out the trips to the processing plant," and speed up the delivery process by at least one day.[153]

142.   *The January 5 "Non-Local" Hub-and-Spoke System.*  The memoranda also required USPS to implement a "non-local" hub-and-spoke system starting January 5, wherein "carriers will pull ballots from their collection mail and hand them over to their supervisor. Supervisors will exchange ballots around the city, and after the exchange, a designated supervisor [will] make[] delivery to the BOE no later than 7:00 p.m.," using "pre-identified drivers and vehicles staged to run trips."[154]

143.   *The Local Turnaround Option.*  As in November, the December 8 Memorandum also included a local turnaround option, instructing that "[l]ocal offices that serve or are in close proximity to a [Board of Elections] in Georgia are authorized to postmark . . . and deliver ballots rather than having ballots placed into the automation flow."[155]  This local turnaround process

---

[151] Glass Dep. Tr. at 194:7–17.

[152] Ex. 11, Dec. 8 Mem., at 3.

[153] Glass Dep. Tr. at 207:14–19.

[154] Ex. 11, Dec. 8 Mem., at 3; *see also* Glass Dep. Tr. at 152:2–21.

[155] Ex. 11, Dec. 8 Mem., at 3.

started taking place on Monday, December 14, but it was merely "authorized" to be used, rather than made mandatory.[156] Moreover, delivery units that did not serve or were not in close proximity to Boards of Election were not required to participate. Consequently, large numbers of ballots continued to be sent through the underperforming plant system.[157]

144. *The Holdout Process at Processing Plants.* The December 14 Memorandum focused on the direct holdout process. In general, Mr. Glass testified, processing plants were "following . . . the same procedures" and had not made "any changes from what was done in November to what [wa]s being done in preparation for the January Runoff for processing."[158] The "only additional [processing] measure that [was] in place concerning Election Mail at this time," he said, was the use of Express Mail to deliver ballots from Fort Orange Press in Albany, New York to Georgia for use in the Runoff.[159]

145. *Additional Measures to Address the High Volume of Packages During the Holiday Peak Season.* Mr. Glass also testified about certain measures that USPS was implementing at that time in response to its "peak season" (from Thanksgiving to New Year's), which overlapped with mail balloting for the Georgia Runoff Election.[160] To accommodate the influx of mailpieces and the resultant congestion during peak season, USPS was performing "some Sunday collections" as part of normal peak season practices and making additional late

---

[156] *Id.*; Glass Dep. Tr. at 211:22–212:3.

[157] *See* Ex. 12, USPS Election Mail Service Scores by Origin District 6–7 (Dec. 22, 2020) (ballots originating from Atlanta District through December 21).

[158] Glass Dep. Tr. at 174:10–15.

[159] *Id.* at 260:17–261:4.

[160] *See id.* at 187:18–188:7, 258:10–11.

and extra trips to accommodate the season's "gargantuan load," especially because "the packages have never been higher due to COVID."[161]

### 2. USPS's Ballot Processing Practices Threatened to Disenfranchise Georgia Runoff Voters.

146. Thus, in the midst of a spike in coronavirus infection rates in Georgia, despite the poor processing scores and late ballots in Georgia in the November 2020 General Election, and despite the added burden of peak season in the middle of the Georgia Runoff, USPS largely reissued its prior guidance, which had resulted in the late delivery of ballots.

147. Predictably, as was the case after similar guidance was issued in November, the processing scores for Inbound Ballots in the Georgia Districts continued to fall well below USPS's standard for the timely delivery of mail, as shown in the Atlanta District numbers below:

| Date | District | Measured Volume: Inbound Ballots | Processing Score: Inbound Ballots | 1 Extra Day: Inbound Ballots | 2 Extra Days: Inbound Ballots | 3 Extra Days: Inbound Ballots |
|---|---|---|---|---|---|---|
| 12/8/2020 | ATLANTA | 11723 | 46.40% | 99.31% | 99.56% | 99.56% |
| 12/9/2020 | ATLANTA | 13586 | 86.29% | 86.29% | 99.00% | 99.07% |
| 12/10/2020 | ATLANTA | 12965 | 49.13% | 95.77% | 95.77% | 98.12% |
| 12/11/2020 | ATLANTA | 15670 | 67.96% | 91.31% | 98.44% | 98.44% |
| 12/12/2020 | ATLANTA | 10521 | 62.85% | 73.22% | 82.39% | 98.84% |
| 12/14/2020 | ATLANTA | 8564 | 68.88% | 89.62% | 92.60% | 96.80% |
| 12/15/2020 | ATLANTA | 6544 | 77.51% | 95.48% | 97.94% | 98.14% |
| 12/16/2020 | ATLANTA | 4604 | 94.09% | 94.09% | 97.52% | 98.15% |
| 12/17/2020 | ATLANTA | 4084 | 73.41% | 98.70% | 98.75% | 99.31% |
| 12/18/2020 | ATLANTA | 8750 | 67.33% | 95.97% | 99.28% | 99.28% |
| 12/19/2020 | ATLANTA | 3686 | 74.91% | 80.03% | 95.93% | 97.23% |
| 12/21/2020 | ATLANTA | 7464 | 79.39% | 90.57% | 94.65% | 98.49% |
| 12/22/2020 | ATLANTA | 4338 | 79.35% | 93.13% | 96.04% | 96.43% |
| 12/23/2020 | ATLANTA | 3876 | 90.09% | 90.20% | 94.35% | 97.24% |

[162]

---

[161] *Id*. at 204:20–22, 262:4–20, 264:8–9.

[162] Ex. 13, USPS Inbound Election Mail Service Scores - Destined to GA (Jan. 12, 2021) (ballots destinating in Atlanta District for December 8 through 23).

148.     USPS claimed that, during this period, all offices serving a Board of Elections had been authorized to begin using the "local turnaround" process. However, USPS's own data shows that thousands of ballots were still going through the backlogged processing plants during that same time period.[163]

149.     This backlog posed a material threat to timely delivery of ballots in the January Runoff. In Georgia, as in the Pennsylvania and New Mexico elections, mail-in ballots must arrive at county Boards of Election by the close of polls on Election Day to be counted—and thus were due on January 5, 2021.[164]

150.     Like the Late/Extra Trip Policy before them, Defendants' deficient ballot processing practices thus threatened to impact all Georgia voters who voted by mail by compressing the timeline in which a voter had to mail her completed ballot to ensure that her vote was counted. This was particularly true for voters who sought to vote on the basis of information available as of the weekend before Election Day.

151.     An example demonstrates the risks caused by this delay. By Defendants' own admission, routing ballots into processing facilities adds at least one additional day to ballot delivery that could be saved by using either the hub-and-spoke system or local turnaround.[165] Assume that a voter in Atlanta, Georgia had submitted her completed ballot by First-Class Mail on Saturday, January 2. In the ordinary course, that ballot, having been mailed prior to the implementation of the hub-and-spoke system, would have gone to a processing plant. Under USPS's own expected delivery and processing standards, that ballot could have been delivered in

---

[163] Ex. 12, USPS Election Mail Service Scores by Origin District 6–7 (Dec. 22, 2020) (ballots originating from Atlanta District through December 21).

[164] Ga. Code Ann. § 21-2-386(a)(1)(F).

[165] Glass Dep. Tr. at 207:14–208:1;  220:4–10.

1–3 days, *i.e.*, by January 5 (Election Day). However, the processing scores in the Atlanta District for completed ballots sent from the voter to the Board of Elections ("Inbound Ballots") demonstrated that there was a serious risk that her ballot would not be delivered within the 1–3 day service standard. If that ballot was one of the substantial percentage of ballots for which USPS did not meet its service standard, that ballot would have been delivered on January 6 or later. Put another way, there was a substantial risk that any completed ballots mailed on January 2 or later would not be received by the local election office by Election Day—*thus rendering those ballots invalid*.

### 3. The Parties Agreed to Additional Measures Targeted to Address Delayed Ballot Delivery.

152. On December 23, 2020, the parties reached an agreement to make the measures discussed in the December 8 and 14 Memoranda mandatory and to add additional measures targeted to address USPS's deficient performance in the Atlanta District.[166] Those measures included:

153. *Early Use of the Express Mail Network*. In the three days prior to the Runoff Election—January 2 through 4—USPS was required to place all ballots that were subject to a three-day service standard into the Express Mail network.[167] When ballots are treated as Express Mail, they are subject to a one- or two-day delivery standard,[168] and this measure can thus save one to two days' delivery time, enabling ballots sent on the Saturday or even Monday before a Tuesday election to make it to the Board of Elections on time. This improved upon the

---

[166] *See* Notice of Joint Agreement, Ex. A, ECF No. 162.1 (hereinafter "Dec. 23 Agreement"); *id.* ¶ 1.

[167] *Id.* ¶ 3(a).

[168] Glass Dep. Tr. at 78:13–15.

December Memoranda, which required use of Express Mail only for missent ballots, blank ballots, or ballots destined outside the local service area and not projected for on-time delivery.[169]

154.   *Mandatory Local Turnaround*.  All post offices in the Atlanta District that served a Georgia Board of Elections were now required, rather than merely authorized, to participate in local turnaround—that is, to postmark and deliver ballots directly to the relevant BOE, rather than placing them in the automation flow—beginning December 23.[170] On dates when USPS was not operating or the BOE was not open, post offices were to deliver ballots the next day on which both USPS and the relevant BOE were open. *Id*. Implementation of local turnaround allows ballots to avoid processing plants and thus "make[s] delivery faster by at least one day."[171]

155.   *Early Implementation of Local Hub-and-Spoke*.  Rather than wait until the day before Election Day, beginning on Saturday, January 2, post offices and delivery units servicing or in close proximity to a BOE in the Atlanta District were required to implement a hub-and-spoke system to deliver Inbound Ballots to any open local BOEs.[172] This agreed-to measure improved upon the December Memoranda by adding an extra day of local hub-and-spoke implementation in the Atlanta District, thus "mandat[ing] the delivery units [to] speed up

---

[169] *See* Ex. 11, Dec. 8 Mem., at 3; Ex. 14, Dec. 14 Mem., at 6.

[170] Dec. 23 Agreement ¶ 3(b); Ex. 11, Dec. 8 Mem., at 4.

[171] Glass Dep. Tr. at 220:4–10.

[172] Dec. 23 Agreement ¶ 3(c).

delivery by cutting out the trips to the processing plant," and speeding up the delivery process by at least one day.[173]

156.    *Early Implementation of Non-Local Hub-and-Spoke.*  Likewise, rather than wait until Election Day, beginning on Monday, January 4, post offices and delivery units in the Atlanta District were to implement a non-local hub-and-spoke system to transport ballots to Boards of Elections using pre-identified drivers and vehicles staged to run trips.[174]  Defendants were required to ensure that all post offices and delivery units in the Atlanta District were prepared to implement if it was reasonably possible to deliver ballots prior to BOE closure on January 4 and identify to Plaintiffs any facilities that were unable to participate and why.[175]  This improved upon the December Memoranda by adding an extra day of non-local hub-and-spoke implementation in the Atlanta District, again decreasing delivery time for all captured ballots by at least a day.[176]

157.    *Mandatory Ballot Sweeps and All-Clear Certifications.*  From December 28 through January 5, each processing facility serving a Georgia ZIP code was required to implement a daily morning sweep of the facility to identify any Inbound Ballots and ensure they were dispatched or staged for expedited delivery.[177]  On January 4 and 5, each facility was also to conduct an afternoon sweep to identify any Inbound Ballots and ensure they were expedited for delivery.[178]  On January 5, this sweep was to take place at a time sufficient for ballots to be

---

[173] Glass Dep. Tr. at 207:14–19.

[174] Dec. 23 Agreement ¶ 3(e).

[175] *Id.* ¶ 3(f).

[176] Glass Dep. Tr. at 207:14–19.

[177] Dec. 23 Agreement ¶ 4(a).

[178] *Id.* ¶ 4(b).

delivered to the BOEs by 7 p.m.[179]  After every sweep, processing plants were required to report to USPS Headquarters the total number of ballots identified and confirm that they had been expedited for delivery.[180]  From December 29 to January 5, each processing facility serving Georgia ZIP codes was also required to clear its local ballots daily and provide an "All Clear" certification by 10 a.m.[181]  Defendants then provided the number of ballots identified in the sweeps and documentation of the All-Clear certifications to Plaintiffs.[182]

158.    These measures provided important additional accountability mechanisms. While USPS had previously employed ballot sweeps and All-Clear certifications, internal USPS reports indicate that they were not always used consistently.[183]  In August 2020, OIG reported that five of seven USPS processing facilities audited in the lead-up to the spring 2020 primaries either did not complete, improperly completed, or delayed completion of All-Clear certification requirements; two of seven certified that they were clear of Election and Political Mail when they were not; and zero of seven used the proper checklists to ensure their ballot sweeps were thorough.[184]  Requiring additional internal and external reporting of ballots located and certifications completed fostered stronger accountability for these necessary practices.

159.    *Mandatory Ballot Delivery Coordination with Georgia BOEs.*  USPS was also required to make arrangements with BOEs to deliver all Inbound Ballots by 7 p.m. on January

---

[179] *Id.*

[180] *Id.* ¶ 4(c).

[181] *Id.* ¶ 4(d).

[182] *Id.* ¶¶ 4(c)–(d).

[183] *See Processing Readiness of Election and Political Mail During the 2020 General Elections*, Report No. 20-225-R20, USPS OIG (Aug. 31, 2020), https://www.oversight.gov/sites/default/files/oig-reports/20-225-R20.pdf.

[184] *Id.*

5.[185] Defendants were to provide Plaintiffs with documentation of the details of these arrangements.[186] These arrangements were not specifically called for by the December Memoranda.

160.  *Investigation of Delayed Ballots.* USPS was required to promptly investigate all plausible reports of delayed ballots and make their best effort to expedite any delayed ballots for delivery by 7 p.m. on January 5.[187] This, too, was not specifically called for by the December Memoranda.

161.  *Communication of Agreement Requirements.* USPS was to communicate the agreement's requirements in writing and orally to managerial and supervisory personnel at facilities serving Georgia ZIP codes and to other necessary USPS personnel.[188] USPS then provided Plaintiffs with the required written communications.[189]

162.  This Court incorporated the terms of the parties' agreement into a binding Court order.[190]

163.  These measures kept many ballots out of underperforming processing plants and ensured that they were timely delivered to Boards of Elections.  Together, the measures could speed delivery times by two or more days, thus allowing weekend voters whose ballots might previously have been denied to have their vote counted.

---

[185] Dec. 23 Agreement ¶ 5.

[186] *Id.*

[187] *Id.* ¶ 7.

[188] *Id.* ¶ 6.

[189] *Id.*

[190] Min. Order (Dec. 24, 2020).

**IV.**   **Defendants Refuse To Implement Practices Necessary To the Timely Delivery of Election Mail.**

164.   With elections again approaching, voters' rights once more hinge on USPS's timely delivery of ballots. But now there are far fewer measures in place to ensure that timely delivery. While the Late/Extra Trip Policy was suspended under this Court's preliminary injunction order, that order has now been dissolved, and Defendants may—and indeed, appear poised to—reinstate that Policy. Likewise, while the Agreed-To Measures outlined in the December 23 Agreement and incorporated in this Court's subsequent order were in place for the Georgia Runoff, Defendants have refused Plaintiffs' request to reinstitute those measures in the lead-up to the 2021 elections.

165.   In keeping with their concern about the impact USPS's ballot delivery practices had on voters' rights in the November General and Georgia Runoff Elections, Plaintiffs sent a letter to Defendants on February 15, 2021, requesting that they implement constitutionally necessary practices in the lead-up to the 2021 elections.[191] In particular, Plaintiffs underscored that consistent implementation of late and extra trips and the measures agreed to in the December 23 Agreement prior to these elections had previously proven necessary to ensure that USPS did not unduly burden the right to vote.[192] Plaintiffs thus asked Defendants to commit not to reinstate their Late/Extra Trip Policy and to continue implementation of the Agreed-To Measures in upcoming elections.[193]

---

[191] *See* Ex. 15, Letter from Shankar Duraiswamy, Counsel for Plaintiffs, to Joseph E. Borson, Counsel for Defendants (Feb. 15, 2021) ("February 15 Letter").

[192] *Id.*

[193] *Id.*

166.    On February 19, 2021, Defendants responded, indicating that they would not comply with Plaintiffs' request.[194]

167.    Moreover, Postmaster DeJoy's recent public statements indicate that USPS anticipates reinstating its Late/Extra Trip Policy in some form. In a statement before the House Committee on Oversight and Reform on February 24, 2021, DeJoy reiterated his support for the Late/Extra Trip Policy.[195] He noted that he started his tenure at USPS by "directing that we be more disciplined by running our trucks on time and on schedule, and that we should eliminate unnecessary extra trips."[196] And despite acknowledging that the Late/Extra Trip Policy "temporarily impacted mail and package service performance," he emphasized that "[r]unning on time and on schedule is the only way that our network can work in the manner that is intended[.]"[197] At no point did DeJoy suggest that USPS ever suspended its Late/Extra Trip Policy, modified its approach to late or extra trips, or relinquished its commitment to this Policy.

168.    USPS's recent organizational operations also demonstrate its continued commitment to the Late/Extra Trip Policy. On November 6, 2020, the USPS OIG released a report evaluating operational changes within USPS.[198] It noted that after his appointment, Postmaster General DeJoy implemented three operational and organizational changes, including an initiative to "eliminate all late and extra trips outside of regularly scheduled transportation

---

[194] *See* Ex. 16, Email from Kuntal Cholera, Counsel for Defendants, to Shankar Duraiswamy, Counsel for Plaintiffs, (Feb. 19, 2021).

[195] Feb. 24 House Testimony, *supra* note 68.

[196] *Id.*

[197] *Id.*

[198] *See* OIG Report, *supra* note 61.

service" that began on July 10, 2020—the Late/Extra Trip Policy.[199]   The OIG Report concluded

that these changes "resulted in a significant drop in the quality and timeliness of mail delivery"

and were "[i]mplemented without completing a study or analysis of the impact of the changes on

mail service, even though critical employee availability issues were being felt as pandemic cases

rose following the July 4 holiday weekend."[200]   Despite this evaluation, the report noted that the

Policy was merely "suspended."[201]

169.    And USPS is apparently taking steps to ensure that late and extra trips are, at

minimum, infrequently used.  On January 11, 2021, the OIG released reports auditing the use of

late and extra trips at USPS processing centers in Los Angeles, California and Richmond,

Virginia.[202]   The OIG stated that it "conducted th[ese] audit[s] to provide U.S. Postal Service

management with timely information on operational risks" and in response to the Postmaster

General's "eliminat[ion of] unnecessary late and extra trips outside of regularly scheduled

transportation service."[203]   While USPS management objected that late and extra trips were not

banned or organizational changes mandated, the OIG maintained that it merely repeated "what

---

[199] *Id.* at 1.

[200] *Id.*

[201] *Id.* at 21.

[202] *See Late and Extra Trips at the Los Angeles, CA, Processing and Distribution Center*, USPS
OIG (Jan. 11, 2021), https://www.uspsoig.gov/sites/default/files/document-library-files/2021/21-
028-R21.pdf ("Los Angeles Audit Report"); *Late and Extra Trips at the Richmond, VA,
Processing and Distribution Center*, USPS OIG (Jan. 11, 2021),
https://www.uspsoig.gov/sites/default/files/document-library-files/2021/21-029-R21.pdf
("Richmond Audit Report").

[203] Los Angeles Audit Report at 1; Richmond Audit Report at 1.

management stated in their comments"—namely, that "the Postal Service would eliminate unnecessary late and extra trips outside of regularly scheduled transportation service."[204]

170.   More broadly, far from committing to take necessary measures to ensure the timely delivery of Election Mail, Defendants evidently intend to further slow the delivery of all mail under a forthcoming ten-year strategic plan designed to cut costs within USPS. On February 24, 2021, Postmaster DeJoy confirmed in testimony before the House Oversight Committee that this plan includes reductions in air transport of mail.[205] It also includes changes to First-Class Mail service standards, including cutting back on the two-day service standard for local mail.[206] According to reports, the plan would eliminate the two-day service standard for letters and envelopes sent locally by First-Class Mail and instead apply the three-to-five day service standard currently applicable to non-local mail.[207]

171.   Moreover, Defendants have issued no further guidance on any extraordinary measures in place for elections beyond the Georgia Runoff—though such elections are rapidly

---

[204] Richmond Audit Report at 8, 10.

[205] Jacob Bogage, *DeJoy Confirms his USPS Plan May Include Slower First-Class Mail*, Wash. Post (Feb. 24, 2021 at 1:32 p.m.), https://www.washingtonpost.com/business/2021/02/24/dejoy-hearing-usps-live-updates/ (quoting DeJoy's statement that "[i]f we in fact get the relief that we need in terms of time, we will put more mail on the ground"); *see also* Feb. 24 House Testimony, *supra* note 6868 (indicating that the plan will include solutions to "the reliability of air transportation[, which] is subject to a number of factors outside of the Postal Service's control. Surface transportation is more reliable and cost-effective . . . .").

[206] Bogage, *supra* note 206 (quoting DeJoy's confirmation that USPS was "evaluating all service standards" and that the plan would include two-day mail but "some percentage of where the reach is right now may change"); *see also* Feb. 24 House Testimony, *supra* note 6868 (noting that the "persistent gap between actual service performance and the service targets for First-Class Mail . . . is also a consequence of establishing service standards that are not achievable through efficient and effective operations, and an organizational reluctance to change those service standards to be more realistic in the face of past political resistance to operational changes").

[207] Jacob Bogage & Hannah Denham, *Postmaster General's New Plan for USPS is Said to Include Slower Mail and Higher Prices*, Wash. Post (Feb. 24, 2021 at 11:19 a.m.), https://www.washingtonpost.com/business/2021/02/24/dejoy-hearing-usps-live-updates/.

approaching. Thus, at best, Defendants seem prepared to implement only their deficient November ballot processing practices; worse, they may plan to implement no extraordinary measures whatsoever.

### A.    Defendants' Refusal to Implement Measures Necessary to the Timely Delivery of Election Mail Unduly Burdens the Right to Vote.

172.    Defendants' apparent commitment to reinstating the Late/Extra Trip Policy flies in the face of this Court's previous determination that Plaintiffs are likely to succeed in showing the Policy unduly burdens the right to vote. Defendants' return to deficient ballot processing practices implemented prior to the parties' December 23 Agreement similarly imposes an unconstitutional burden.

173.    In the midst of the ongoing COVID-19 pandemic, and in light of emerging variants of the virus and the country's slow vaccination progress, the public health and safety need for voting by mail remains.

174.    USPS has already tested its Late/Extra Trip Policy and its typical ballot processing practices in similar moments. That Policy and those practices proved insufficient to meet voters' demand for mail balloting. Under the Late/Extra Trip Policy, millions of mail pieces were left behind and USPS's service scores declined precipitously.[208]   Under USPS's typical ballot processing practices, thousands of ballots were channeled into backlogged and underperforming processing facilities, subjecting them to needless delay. *See supra* section III.A.4.

---

[208] OIG Report, *supra* note 6161, at 2 (noting that "[d]elayed mail reported in Postal Service systems for mail processing facilities increased 21 percent" following implementation of the Late/Extra Trip Policy "from 2 billion pieces for the week ending July 10, 2020 to 2.4 billion pieces for the week ending July 31, 2020").

175.    The delays created by this Policy and these practices pose a severe threat to the timely delivery of ballots in the upcoming Pennsylvania, New Mexico, and Texas elections.

176.    In particular, sending ballots through overwhelmed processing plants, rather than implementing mandatory local turnaround and early hub-and-spoke processes, creates a concrete and impending risk that Saturday voters' ballots will not make it through the processing plants in time for delivery on these states' Election Days.

177.    This problem can be avoided through full implementation of late and extra trips and mandatory implementation of the Agreed-To Measures. Full implementation of late and extra trips can reduce ballot delivery times by up to three days. And mandatory implementation of the December 23 measures can save at least an additional day by enabling Saturday voters' ballots to avoid the processing plant through implementation of local turnaround or hub-and-spoke processes or even an additional one to two days through use of the Express Mail network—thus enabling Saturday voters' ballots be delivered on time.

178.    Instead, Defendants' anticipated measures force voters to make a choice: vote by mail and risk their ballots not being counted due to untimely USPS delivery or vote in person during the midst of the COVID-19 pandemic. Both options impose severe burdens on voters. And as this Court has recognized, in the context of the COVID-19 pandemic, many others face an even starker choice: "either to vote by mail-in-ballot or . . . not vote at all." *Vote Forward*, 2020 WL 5763869, at *7. In particular, Defendants' ballot processing practices and Late/Extra Trips Policy "place an especially severe burden on those who have no other reasonable choice than to vote by mail, such as those who may be at a high risk of developing a severe case of COVID-19 should they become exposed to the virus at the polling place, and those who are not

physically able to travel to the polls due to disability." *Id.* at *9. If they wish to vote at all, these voters have no option but to chance a mail-in ballot's late delivery.

179.     And no matter the context, Defendants' Policy ensures that all those who choose to vote by mail are subjected to the burdens of a system in which their ballot may be counted, or may not, based on such arbitrary factors as the processing facility their ballot is routed through—or whether it is routed through one at all. *See Gallagher*, 477 F. Supp. 3d at 47 (rejecting as unconstitutional a policy that meant that "[w]hether an individual's vote will be counted . . . depend[s] on something completely arbitrary—their place of residence and by extension, the mailbox or post office where they dropped off their ballot"). As this Court has recognized, "where a policy creates a situation where '[a] large number of ballots will be invalidated, and consequently, not counted based on circumstances entirely out of voters' control,' the 'burden [on the right to vote] is exceptionally severe.'" *Vote Forward*, 2020 WL 5763869, at *8 (alterations in original) (quoting *Gallagher*, 477 F. Supp. 3d at 43).

**B.     Defendants Have Failed to Assert a Plausible Interest That Would Justify Their Refusal to Take Measures Necessary to Timely Ballot Delivery.**

180.     Defendants have provided no legitimate interest to justify their refusal to implement the Agreed-To Measures or commit not to reinstate the Late/Extra Trip Policy. And they cannot. Historically, Defendants have relied upon three rationales to justify their actions: (1) the purported risk to the efficient delivery of ballots that arises upon any change of policy; (2) a desire to contain costs; and (3) the alleged efficacy of their existing measures. These justifications cannot withstand scrutiny, and none outweighs the burden that Defendants' actions impose on the right to vote.

181.     *Efficiency Rationale.* In his 30(b)(6) deposition, Mr. Glass explained that USPS originally chose not to implement the hub-and-spoke process on the early date later called for by

the parties' December 23 Agreement because "when we change processes, we introduce a risk of failure. We introduce a risk that somebody is not going to follow that new process correctly," thus "introduc[ing] new confusion into the step."[209] Defendants cannot now claim this same concern justifies their Late/Extra Trip Policy or ballot processing practices. Indeed, the Late/Extra Trip Policy is itself a change from the status quo. And Defendants have already implemented the Agreed-to Measures in the Georgia Runoff Election that Plaintiffs now seek to implement again. Moreover, the Agreed-to Measures are simply extensions of the measures already used by USPS—none are "new," and none can introduce "new confusion."

182.    *Cost Rationale.* With respect to any alleged cost justification, it bears emphasizing that the government cannot preserve the fiscal integrity of its programs at the expense of citizens' constitutional rights. *See, e.g.*, *Shapiro v. Thompson*, 394 U.S. 618, 633 (1969) (although the government "has a valid interest in preserving the fiscal integrity of its programs," it "may not accomplish such a purpose by" violating its citizens' fundamental rights); *Frontiero v. Richardson*, 411 U.S. 677, 690 (1973) ("[A]lthough efficacious administration of governmental programs is not without some importance, 'the Constitution recognizes higher values than speed and efficiency.'"). And regarding the implementation of extraordinary measures, Mr. Glass admitted that he "d[idn't] know" if "he, or anyone in his office has actually done a cost-benefit analysis using data to determine what the costs [of taking additional measures] would be."[210] Defendants cannot claim that the burdens imposed by their Policy and practices are justified by cost considerations when Defendants themselves have not even considered whether the benefits of the Policy and practices outweigh the risks.

---

[209] Glass Dep. Tr. at 209:18–22.

[210] *Id.* at 200:10–14.

183.   *Efficacy.*  Defendants have also at points claimed that the measures Plaintiffs call for are not necessary to ensure timely delivery, or even that the Late/Extra Trip Policy and USPS's typical ballot processing practices are themselves necessary to timely delivery.  Their own data and statements demonstrate otherwise.

184.   In his Congressional testimony, DeJoy has repeatedly described the purpose of his Late/Extra Trip Policy as improving service and increasing the number of deliveries made on time.[211]  But the USPS OIG found that USPS "did not conduct an analysis of the impact of the operational initiatives," including that Policy, "on mail service performance."[212]  Likewise, it "did not pilot test or otherwise consider the impact of the changes even though critical employee availability issues were being felt as pandemic cases rose following the July 4 holiday weekend."[213]  Any claim that USPS may make about that Policy's necessity is unmoored from evidence.

---

[211] *See, e.g.*, *Senate Hearing with Postmaster General Louis DeJoy August 21 Transcript,* Rev (Aug. 21, 2020), https://www.rev.com/blog/transcripts/senate-hearing-with-postmaster-general-louis-dejoy-august-21-transcript ("But the change that I made was run to our schedule, run to our transportation schedule. . . . Once we get all the mail on those trucks, that 97% to 98% of the mail that we move around the country will be getting to its destination point on time."); *id.* ("We're considering dramatic changes to improve the service to the American people."); *id.* ("I worked with the existing management team to create a new organization that would look to move forward and give us self-help and drive improvements in our service, drive cost out of the system, and grow revenues."); *id.* ("The analysis that we did was that if we move the mail on schedule that all late deliveries would have been improved."); *id.* ("And if we adhere to our schedules, that will improve performance."); *see also Read: Louis DeJoy's Opening Statement at Today's Senate Committee Hearing*, Politico (Aug. 21, 2020), https://www.politico.com/news/2020/08/21/louis-dejoys-opening-statement-senate-hearing-399941 ("While the improvements are dramatic, this effort did expose a need to realign some of our processing and scheduling that caused mail to miss the scheduled transportation, and has temporarily impacted mail and package service performance.").

[212] OIG Report, *supra* note 61, at 8.

[213] *Id.*

185.     Indeed, it is contrary to the evidence.  The USPS service score data discussed previously shows that delivery delays increased dramatically in the immediate aftermath of the Late/Extra Trip Policy.  *See supra*, section III.A.1.  And DeJoy himself has acknowledged as much in his Congressional testimony, conceding that "certainly there was a slowdown in the mail when-- our production did not meet the schedule,"[214] and that his change to late and extra trips practices "temporarily impacted mail and package service performance."[215]  This by itself demonstrates that these processes are insufficient to ensure timely ballot delivery.

186.     When asked in his deposition if USPS has "any data to show that the mail will be slowed down if you implement these [extraordinary] measures" sooner, Mr. Glass admitted that he did not.[216]  And Mr. Glass further acknowledged that "in November, there were ballots that were collected more than two days before the election that, ultimately, were not delivered until after November 3rd," when they could no longer be counted.[217]

187.     Because Defendants' Policy and practices impose a severe burden on voting rights that cannot be justified by any possible interest, they are unconstitutional.

### C.     Defendants' Failure to Comply with Statutory Requirements in Formulating the Late/Extra Trip Policy Would Infect Efforts to Reinstate It.

188.     Finally, even if Defendants could show that their Late/Extra Trip Policy does not unconstitutionally burden the right to vote—which they cannot—the reinstatement of that Policy would suffer from the same infirmities as its promulgation.  Namely, absent any effort by USPS

---

[214] *Senate Hearing with Postmaster General Louis DeJoy August 21 Transcript*, Rev (Aug. 21, 2020), https://www.rev.com/blog/transcripts/senate-hearing-with-postmaster-general-louis-dejoy-august-21-transcript.

[215] Feb. 24 House Testimony, *supra* note 6868.

[216] Glass Dep. Tr. at 201:15–22.

[217] *Id.* at 208:22–209:4.

to comply with the commands of 39 U.S.C. § 3661, implementation of that Policy is in violation of law.

## CAUSES OF ACTION

### COUNT I

**(*Ultra Vires* Agency Action — Violating the Clear Command of Section 3661 of the Postal Reorganization Act)**

189.    Plaintiffs re-allege and incorporate by reference each allegation contained in the preceding paragraphs as though fully set forth herein.

190.    USPS has a clear, indisputable, and non-discretionary duty to request an advisory opinion from the Postal Regulatory Commission before making "any change in the nature of postal services which will generally affect service on a nationwide or substantially nationwide basis." 39 U.S.C. § 3661(b) ("When the Postal Service determines that there should be a change in the nature of postal services which will generally affect service on a nationwide or substantially nationwide basis, it shall submit a proposal, within a reasonable time prior to the effective date of such proposal, to the Postal Regulatory Commission requesting an advisory opinion on the change.").

191.    USPS's discharge of its duty to request an advisory opinion initiates a notice and comment period. After USPS's request, the Commission must offer "an opportunity for hearing on the record" under the process established by the Administrative Procedure Act for the benefit of and to receive comments on the proposal from "the Postal Service, users of the mail, and an officer of the Commission who shall be required to represent the interests of the general public." *Id*. § 3661(c).

192.    Plaintiffs are "users of the mail" under 39 U.S.C. § 3661(c).

193.    Defendants' Late/Extra Trip Policy affected postal services on a nationwide or substantially nationwide basis. Moreover, Defendants have refused to commit not to reinstate this Policy and have expressly left open the option that they will do so.

194.    Defendants did not request of the Postal Regulatory Commission an advisory opinion "prior to" implementing the Late/Extra Trip Policy, violating the clear and indisputable command of § 3661.

195.    Defendants acted *ultra vires* when they issued the Late/Extra Trip Policy described herein without abiding the clear and indisputable command of § 3661.

196.    Defendants' failure to comply with § 3661 in the formulation of this Policy infects any effort they have made and may make to reinstate it without first requesting an advisory opinion from the Postal Regulatory Commission. Moreover, Defendants' threat to reinstitute the Policy without submitting it to the Postal Regulatory Commission for notice and comment constitutes an ongoing violation of § 3661.

197.    As users of the mail, Plaintiffs have a clear and indisputable right to Defendants' compliance with the requirements of § 3661.

198.    Because of Defendants' actions in violation of § 3661, Plaintiffs have been denied the opportunity to comment during a hearing under procedures required by § 3661(c) on the Late/Extra Trip Policy and other changes affecting postal services on a nationwide or substantially nationwide basis, as described herein, before their implementation.

199.    Nonstatutory judicial review is available in this Court.[218]

---

[218] There is no possibility for judicial review by this Court or another Court under the Administrative Procedure Act or any other specific or general statutory review provision. *See Mittleman v. Postal Reg. Comm'n*, 757 F.3d 300, 305 (D.C. Cir. 2014) ("[W]e have observed that the Postal Service is exempt from review under the Administrative Procedure Act." (quotation marks omitted)).

200.     The Postal Regulatory Commission may receive complaints about Defendants' failure to comply with § 3661.  However, § 3661 sets out no requirement that a user of the mail pursue relief before the Commission prior to filing suit.  Moreover, the Commission is under no obligation to resolve complaints until they have been pending for 90 days.  *See* 39 U.S.C. § 3662(b)(1).  This Court's review would thus forestall irreparable injury to voters because the Pennsylvania primary and special elections are only 75 days away, and the Texas special election only 58 days away.  This Court's review is also warranted and required because it can offer remedies not available before the Commission and for reasons of judicial economy.

201.     Plaintiffs will suffer irreparable injury if the changes described herein take effect without Defendants' compliance with § 3661.

202.     The public interest favors declaring unlawful the changes to postal services that Defendants have implemented without observing the requirement of § 3661.

203.     For these reasons, Plaintiffs are entitled to (1) a declaration that Defendants acted unlawfully by adopting changes in violation of § 3661; (2) an order directing Defendants to "submit a proposal . . . to the Postal Regulatory Commission requesting an advisory opinion on the" changes described herein; and (3) an injunction barring Defendants and their agents from implementing the Late/Extra Trip Policy without first receiving an advisory opinion from the Postal Regulatory Commission.

## COUNT II

### (Undue Burden on the Right to Vote in Violation of the U.S. Constitution)

204.     Plaintiffs re-allege and incorporate by reference each allegation contained in the preceding paragraphs as though fully set forth herein.

205.     The United States Constitution guarantees that "all qualified voters have a constitutionally protected right to vote . . . and to have their votes counted." *Reynolds v. Sims*, 377 U.S. 533, 554 (1964).

206.     This fundamental right to vote is rooted in "the right of individuals to associate for the advancement of political beliefs, and the right of qualified voters, regardless of their political persuasion, to cast their votes effectively." *Williams v. Rhodes*, 393 U.S. 23, 30 (1968). These protections are typically articulated as First and Fourteenth Amendment rights in suits against state actors. *Anderson v. Celebrezze*, 460 U.S. 780, 787 (1983); *Burdick v. Takushi*, 504 U.S. 428, 434 (1992). Here, the First and Fifth Amendments provide the same guarantees and forbid the federal government from imposing undue burdens on the right to vote.

207.     Under the *Anderson-Burdick* line of cases, the government cannot unreasonably burden the right to vote—if the character and magnitude of the injury inflicted upon voting rights outweighs the state interests justifying the challenged restriction, then the restriction is unconstitutional. This Court has already determined that the *Anderson-Burdick* framework applies to Plaintiffs' constitutional claim in this case. *Vote Forward*, 2020 WL 5763869, at *8.

208.     Defendants' actions, as described herein, including their threatened reimplementation of the Late/Extra Trip Policy and refusal to implement the Agreed-To Measures, unreasonably and severely burden the right to vote and will continue to do so by causing delays that effectively disenfranchise voters.

209.     In evaluating burdens on the right to vote, a "majority of the *Crawford* Court determined that '[i]t matters . . . whether the effects of a facially neutral and nondiscriminatory

law are unevenly distributed across identifiable groups.'" *League of Women Voters of Fla., Inc., v. Detzner*, 314 F. Supp. 3d 1205, 1216 (N.D. Fla. 2018).[219]

210.    The burden imposed by the Late/Extra Trip Policy and the lack of Agreed-To Measures is especially severe for individuals who have no reasonable alternative method to exercise their right to vote, including (i) voters with disabilities who cannot physically get to their polling place; and (ii) voters who face increased risk of serious illness or death from voting during the COVID-19 pandemic, such as voters with underlying medical conditions, older voters, and voters from racial and ethnic minority groups. Many of these voters remain unvaccinated.

211.    Defendants' actions are not justified by any legitimate governmental interest. As a result of the actions described herein, Defendants have violated and continue to violate the U.S. Constitution's protections against undue burdens on the right to vote.

---

[219] *See also Weinberger v. Wiesenfeld*, 420 U.S. 636, 638 n.2 (1975) (explaining that Supreme Court's "approach to Fifth Amendment equal protection claims has always been precisely the same as to equal protection claims under the Fourteenth Amendment").

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs request that this Court enter a judgment against Defendants and award Plaintiffs the following relief:

A.  A declaration that USPS has violated the requirements of 39 U.S.C. § 3661 by making a change or changes "in the nature of postal services which will generally affect service on a nationwide or substantially nationwide basis," as described herein, without first requesting an advisory opinion of the Postal Regulatory Commission, thereby denying "users of the mail" the opportunity to participate in a "hearing on the record" before the Postal Regulatory Commission about the proposed changes before implementation;

B.  An order compelling USPS to discharge its duty to request an advisory opinion of the Postal Regulatory Commission on any and all proposed "changes in the nature of postal services which will generally affect service on a nationwide or substantially nationwide basis," as described herein, before implementing any such proposed changes;

C.  Preliminary and permanent injunctions barring Defendants and their agents, officers, employees, and successors, and all persons acting in concert with each or any of them or under their direction from implementing any and all "changes in the nature of postal services which will generally affect service on a nationwide or substantially nationwide basis" that are planned, were adopted, and/or have been implemented without the Postal Service discharging its duty to request an advisory opinion of the Postal Regulatory Commission regarding any such proposed changes;

D.  Vacatur of any agency action, order, notice, decision, or policy statement issued by Defendants or their agents, officers, employees, and successors, or any persons acting in concert with each or any of them or acting under their direction that implement or purport to implement any and all "changes in the nature of postal services which will generally affect service on a nationwide or substantially nationwide basis," as described herein, that are planned, were adopted, and/or have been implemented without USPS discharging its duty to request an advisory opinion of the Postal Regulatory Commission regarding such proposed changes;

E.  A declaration that Defendants' Late/Extra Trip Policy and ballot processing practices in the absence of the Agreed-To Measures, as described herein, violate the First Amendment to the United States Constitution.

F.  A declaration that Defendants' Late/Extra Trip Policy and ballot processing practices in the absence of the Agreed-To Measures, as described herein, violate the Fifth Amendment to the United States Constitution.

G.  Preliminary and permanent injunctions barring Defendants and their agents, officers, employees, and successors, and all persons acting in concert with each or any of them or under their direction from implementing the Late/Extra Trip Policy and enjoining USPS from processing election ballots without the Agreed-to Measures in place in any district where a relevant election is taking place;

H.  Appointment of an independent monitor to oversee Defendants' compliance with the terms of the Court's order;

I.  Award Plaintiffs reasonable costs, including reasonable attorneys' fees; and

J.  Any and all additional relief that this Court deems just and proper.

Respectfully submitted,

_/s Shankar Duraiswamy_

Shankar Duraiswamy (D.C. Bar No. 501702)
Daniel Auten (D.C. Bar No. 1614072)
Sarah Suwanda (D.C. Bar No. 1685531)
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001-4956
(202) 662-6000
sduraiswamy@cov.com
dauten@cov.com
ssuwanda@cov.com

Robert D. Fram
COVINGTON & BURLING LLP
Salesforce Tower
415 Mission Street, Suite 5400
San Francisco, CA 94105-2533
(415) 591-6000
rfram@cov.com

Date: March 9, 2021