# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

VOTE FORWARD,
    611 Pennsylvania Ave. SE #192
    Washington, DC 20003~~;~~,

~~AMY BOLAN,~~
~~719 12th~~KELLEY EWING JR.
    423 Brandon Broad
    Norristown, PA 19403,

ROBERT P. GASPARRO
    1001 City Ave~~.~~., EE126
    ~~Honolulu, HI 96816;~~

~~AARON CARREL,~~
    ~~2 N Roby Rd.~~
    ~~Madison, WI 53726;~~

~~DANTE FLORES-DEMARCHI,~~
    ~~1217 N Shary Rd.~~
    ~~Mission, TX 78572;~~

~~PAUL HUNTER,~~
    ~~415 Tillingham Ct.~~
    ~~Johns Creek, GA 30022;~~

~~SEBASTIAN IMMONEN,~~
    Wynnewood, PA 19096,

SEBASTIAN IMMONEN
    2715 Timberglen Dr. East
    Wexford, PA 15090~~;~~

~~KATHRYN MONTGOMERY,~~
~~2519 N Rampart~~JAMES MCKAY
    85 11th Street, #2
    Pittsburgh, PA 15203,

ASHLEY MISNER
    1633 Trinity St.
    ~~New Orleans, LA 70117;~~

~~SEAN MORRISON,~~
    ~~425 Monroe Ave.~~

-   Civil Case No. 1:20-cv-02405-EGS

    SECOND AMENDED COMPLAINT FOR INJUNCTIVE AND

    DECLARATORY RELIEF

~~Helena, MT 59601;~~

~~INDERBIR SINGH DATTA,~~
~~14060 SW Sexton Mountain Dr.~~
~~Beaverton, OR 97008;~~

~~MARTHA THOMPSON,~~
~~123 Woodfield Rd.~~
~~Portland, ME;~~

~~LINDA ROBERSON,~~
~~3326 University~~Pittsburgh, PA
15206,

MARY WALTON
2401 Pennsylvania ~~Ave., Apt.~~
~~209~~3A7
~~Madison, WI 53705;~~

~~GARY YOUNG,~~
~~3326 University Ave., Apt. 209~~
~~Madison, WI 53705;~~

~~VOCES UNIDAS DE LAS MONTAÑAS,~~
~~1001 Grand Ave., Suite 107~~
~~Glenwood Springs, CO 81601;~~

~~COLORADO ORGANIZATION FOR~~
~~LATINA OPPORTUNITY AND~~
~~REPRODUCTIVE RIGHTS,~~
~~P.O. Box 40991~~
~~Denver, CO 80204;~~

~~and~~

~~PADRES & JÓVENES UNIDOS,~~
~~4130 Tejon St., Suite C~~
~~Denver, CO 80211,~~Philadelphia,
Pennsylvania 19130,

LADONNA HOPKINS
9616 San Bernardino Ave NE
Albuquerque, NM 87109,

                              *Plaintiffs*,

v.

LOUIS DEJOY, in his official
capacity as the Postmaster General,
         475 L'Enfant Plaza SW
         Washington, D.C. 20260-0546;

and

UNITED STATES POSTAL SERVICE,
         475 L'Enfant Plaza SW
         Washington, DC 20260-0546,

*Defendants.*

Plaintiffs Vote Forward, ~~Amy Bolan, Aaron Carrel, InderBir Datta, Dante Flores-deMarchi, Paul Hunter~~Kelley E. Ewing Jr., Robert P. Gasparro, Sebastian Immonen, ~~Kathryn Montgomery, Sean Morrison, Martha Thompson, Linda Roberson, Gary Young, Voces Unidas de las Montañas, Colorado Organization for Latina Opportunity~~James McKay, Ashley Misner, Mary Walton, and ~~Reproductive Rights ("COLOR"), and Padres & Jóvenes Unidos~~LaDonna Hopkins, by and through their undersigned attorneys, bring this Complaint against the above-named Defendants; their respective agents, officers, employees, and successors; and all persons acting in concert with each or any of them.  In support of this Complaint, Plaintiffs allege the following:

### INTRODUCTION

~~1.       Even in ordinary years, the reliable delivery of mail ballots by the United States Postal Service ("USPS") is critical to our democracy.  And this is no ordinary year.~~

1.       Over the past year, tens of millions of American voters have depended on the United States Postal Service ("USPS") to deliver their ballots in elections taking place in the

3

midst of the global COVID-19 pandemic.  In this unprecedented moment, the ability to vote by mail has taken on new importance, as it is the only means by which many can exercise their constitutional right to vote and have their vote counted.

2.      Although the November 2020 General Election and January 2021 Georgia Senatorial Runoff Elections have passed, special and primary elections now approach in states throughout the nation and, in particular, in Pennsylvania, New Mexico, and Texas (the "2021 Elections").  Thus, millions of Americans will soon seek to cast their ballot again.  And their right to vote in these elections remains fundamental.

3.      Nor has their need to vote by mail lessened.  The COVID-19 pandemic is hardly over.  COVID infection and death rates remain high, and the emergence of new, more easily transmissible variants of the virus portends surges in the months to come.  Against this backdrop, voting in person continues to expose voters to the very real possibility of deadly infection.  Especially for voters with co-morbidities or in high-risk groups, voting by mail remains the only safe and reasonable option.

4.      These voters must rely on USPS to ensure their ballots are delivered on time.  And since Pennsylvania, New Mexico, and Texas law require that ballots are delivered to Boards of Elections on or just after Election Day in order to be counted, time is of the essence.

2.      Accordingly, USPS's reliability has never been taken for granted:  it is safeguarded by this nation's laws.  Statutory obligations and procedures protect USPS from political influence and prevent capricious shifts in policy, whether by artfully crafted press release, tweet, or shifting congressional testimony.

3.      These safeguards are all the more responsibility to efficiently and effectively deliver ballots is as important as ever.  Yet at this moment, when a presidential election hangs in the balance.  A public health crisis has prompted states to make the

4

~~unprecedented decision to enable 83% of all Americans who are eligible to vote—approximately 190 million people—to vote by mail.  USPS's capabilities are central to this most consequential election:  USPS is tasked with no less than delivering democracy.~~

5. ~~Since his appointment as~~every turn, Postmaster General ~~in May 2020, Defendant~~Louis DeJoy ~~has~~and the USPS ("Defendants") have implemented policies and practices that have undermined USPS's ability to ensure the on-time delivery of mail ballots.  ~~In particular, on July 10,~~

6. Through a combination of court orders and negotiated agreements, Plaintiffs have previously secured policy changes and commitments that have reduced delivery delays that would disenfranchise voters in both the November 2020~~, Postmaster DeJoy announced a ban on~~ General Election and the Georgia Runoff Election.  Now, as the 2021 Elections approach, there remains an acute need for these orders and agreements.  Defendants, however, are poised to return to their unconstitutional policies and practices.

~~4.~~ In particular, Defendants refuse to retreat from their policy banning late and extra delivery trips (the "Late/Extra Trip Policy~~").~~" or the "Policy"), which they temporarily suspended only after it was preliminarily enjoined by this Court.  Under this ~~policy~~Policy, a substantial volume of mail ~~will be~~was left on the floor at postal facilities, risking a cascading delay in the delivery of Election Mail.[1]  In ~~his testimony before the House of~~

---

[1] "Election Mail is any item mailed to or from authorized election officials that enables citizens to participate in the voting process, such as balloting materials, voter registration cards, absentee applications, and polling place notifications." *Election Mail and Political Mail Overview*, USPS, https://about.usps.com/postal-bulletin/2020/pb22551/html/cover_005.htm (last visited Mar. 4, 2021).

Representatives on August 24, 2020, DeJoy was boldly unrepentant in standing by the Late/Extra Trip implementing this Policy.

5.    Similarly, although the number of decommissioned mail sorting machines skyrocketed under his tenure, DeJoy has unapologetically refused to restore the hundreds of processing machines decommissioned since his first day as Postmaster General in June 2020.  The total number of sorting machines removed under DeJoy's tenure alone could have processed over 1.6 million ballots an hour in the months leading up to the November 2020 election, but DeJoy has testified that he will not reinstate them.

6.    The Late/Extra Trip Policy and the failure to restore decommissioned sorting machines (collectively, the "Challenged Policies") have also taken place in tandem with Postmaster General DeJoy's unequivocal failure to reverse certain additional policies that negatively impact mail delivery.  He has left the authorization of overtime during the election to the discretion of local managers.  He has offered vague assurances that further resources will be made available to facilitate the delivery of Election Mail.

7.    Throughout this process, Defendants have failed to honor the statutory requirement of 39 U.S.C. § 3661 that changes in postal policy be approved by the Postal Regulatory Commission ("PRC").  These procedures exist for a reason:  to prevent the poorly articulated, ill-explained, and shifting policy pronouncements that have marked DeJoy's brief tenure as Postmaster General..

8.    One voice, however, has been quite clear on the subject of mail balloting.  President Trump has repeatedly and emphatically stated his opposition to mail

~~balloting, baselessly asserting that it is part of a nefarious plan by his opponents to steal the election.~~

~~9.     In this historic moment, Defendants should be redoubling their efforts to facilitate the right to vote and provide a clear articulation of their policies and the basis for them.  Instead, DeJoy has ignored USPS's statutory obligations, obfuscated the implementation and cessation of numerous policies, and unreasonably burdened the right to vote.  His policies cannot stand.~~

8.     And despite USPS's own admission that it failed to deliver many ballots to Boards of Elections in time to be counted in November, it appears ready to implement the same or lesser ballot processing practices in the 2021 Elections.  This is in spite of the success of additional measures agreed to by the parties on December 23, 2020 and implemented in the January Runoff Election.  The measures agreed to by the parties on December 23 include:  early use of the Express Mail network, mandatory local turnaround , early implementation of hub-and-spoke delivery in post offices and delivery units, mandatory daily ballot sweeps and All-Clear certifications, mandatory coordination with Boards of Elections regarding delivery of ballots, required investigation of delayed ballots, and communication of these measures to relevant USPS personnel (collectively, the "Agreed-To Measures").[2]

9.     With the global pandemic still ongoing and the 2021 Elections approaching, voters are once again relying on USPS to timely deliver their ballots.  Defendants have no justification for proceeding with the Late/Extra Trip Policy or backtracking from the Agreed-To Measures that they know to be effective.  Experience has shown that these late and extra trips

---

[2] These measures are discussed in further detail *infra*.  *See infra* Section III.B.3.

and the Agreed-To Measures are both necessary to and successful in ensuring timely delivery of ballots, and moreover, that they are financially and practically feasible.

## JURISDICTION AND VENUE

10.     The Court has subject matter jurisdiction over Plaintiffs' claims under Article III of the Constitution, 28 U.S.C. §§ 1331 and 1339, and 39 U.S.C. § 409.  An actual and justiciable controversy exists between the parties within the meaning of 28 U.S.C. § 2201(a), and this Court may grant declaratory relief, injunctive relief, and other relief pursuant to 28 U.S.C. §§ 2201, 2202 and the Court's equitable powers.  Plaintiffs have no adequate remedy at law.

11.     Venue is proper in this district because Defendants reside in this judicial district and a substantial part of the acts or omissions giving rise to the claim occurred in this judicial district.  28 U.S.C. § §§ 1391(c)(2), (e)(1).

## PARTIES

12.     Plaintiff Vote Forward is a 501(c)(4) nonprofit organization founded in 2019 that works to empower grassroots volunteers to help register voters from traditionally underrepresented communities and encourage them to vote.  Vote Forward builds tools to enable Americans across all 50 states to encourage their fellow citizens to participate in our democracy. To date, more than 165,000 volunteers have used the Vote Forward platform and hand-written more than 8 million "Please vote!" and "Please register to vote!" letters to fellow citizens.  Vote Forward's overall 2020 get-out-the-vote ("GOTV") goal is to send 10 million letters in late October.  As a result of recent disruptions and delays in mail delivery by USPS, the organization has had to redirect significant organizational resources to the work of responding to a deluge of questions and concerns from our volunteers about the impact of those delays on their efforts.  The organization has also

~~launched two entirely new programs to understand the scope of current mail delays, and~~

~~to investigate their likely impact on the efficacy of the GOTV program.~~

13.     To date, nearly 200,000 volunteers have used the Vote Forward platform to send hand-written "Please vote!" and "Please register to vote!" letters to fellow citizens.  In 2020, Vote Forward sent 17.6 million get-out-the-vote ("GOTV") letters to voters in advance of the November 2020 General Election and an additional 2.6 million letters to Georgia voters in the lead-up to the January 2021 Georgia Runoff Election.

14.     Vote Forward continues its mission to increase voter turnout and is in the process of launching similar GOTV letter-writing campaigns for the upcoming 2021 elections in New Mexico, Pennsylvania, and Texas.

15.     Vote Forward's mailing campaign has a particular emphasis on sending GOTV messages close to Election Day deadlines because prior letter-writing campaigns—including ones conducted by Vote Forward—have shown that GOTV messages are not as effective at increasing voter turnout if sent too early in the election cycle.

16.     The delays caused by USPS, however, have frustrated Vote Forward's mission of increasing voter turnout by forcing Vote Forward to change its timeline for mailing GOTV letters.  Vote Forward's typical practice is to send such letters to potential voters as close to Election Day as possible, an approach that is based on careful and extensive data analyses regarding the most effective voter turnout practices.  A continuing failure by USPS to timely deliver Election Mail will force Vote Forward to move up the timeline for sending these letters for the upcoming 2021 elections.  But for USPS's delays, Vote Forward would launch its GOTV campaigns one week before the respective Election Day deadlines in Pennsylvania, New Mexico, and Texas.  But because of concerns regarding the on-time delivery of Election Mail, Vote

Forward will be forced to conduct its GOTV campaigns two weeks before the respective Election Day deadlines in certain upcoming 2021 elections.

17.    During the 2020 election cycle, Vote Forward diverted resources to (1) respond to an influx of inquiries from volunteers regarding when they should be mailing out their hand-written letters; and (2) assess whether sending "Please Vote!" letters much earlier than planned could negatively impact the effectiveness of its volunteers' GOTV letters on voter turnout. Should USPS fail to implement the Agreed-To Measures needed to expedite mail ballots, there is a concrete and impending risk that Vote Forward will have to divert resources again when launching their 2021 GOTV campaigns.

13.    Plaintiff Kelley E. Ewing Jr. is registered as a permanent absentee voter in Montgomery County, Pennsylvania, where he has resided for the last 30 years.  Mr. Ewing is 59 years old and has multiple health conditions, including diabetes, lupus, high blood pressure, and no spleen—which puts him in a high-risk category for COVID-19.  Due to his ongoing health conditions and related concerns of voting in person due to COVID-19, he plans to vote by mail in the upcoming 2021 Pennsylvania primary and judicial election.  Although Mr. Ewing wants to exercise his right to vote, he does not want to "trade [his] life" to do so.  Mr. Plaintiff Aaron Carrel lives in Madison, Wisconsin.  He is a registered voter who voted by mail in the Wisconsin primary election.  He lives with a relative who is immunocompromised, and he intends to vote by mail in the general election because voting in person would put his family member at risk of contracting COVID-19.

14.    Plaintiff Amy Bolan lives in Honolulu, Hawaii.  She is 25 years old and has been a registered voter of the state since she was 18.  Ms. Bolan is voting by mail in the general election because Hawaii conducts its elections primarily by mail.  She plans to mail her completed ballot close to Election Day because she is unsure who she will vote

~~for in local elections, and would like more time to learn the platforms of the local~~
~~candidates.~~

18.      ~~Plaintiff Martha Thompson is from Portland, Maine and is a registered~~
~~voter in the state.  She is a college student and will be traveling throughout the fall~~
~~semester as part of a program where she works on organic farms in various states.  She~~
Ewing exercises his right to vote after sifting through information about the candidates, which
often pushes him to vote close to Election Day.  He anticipates that he will do so again in the
upcoming 2021 Pennsylvania primary and judicial election.

~~15.~~      Plaintiff Robert P. Gasparro is registered to vote in Montgomery County,
Pennsylvania, and has been registered to vote in that county for the past fifteen years.  During the
2020 General Election, Mr. Gasparro voted by mail, and he **plans to vote by mail** ~~close to~~
~~Election Day because she is unsure what state she will be in by mid-October.~~

~~16.~~      ~~Plaintiff Paul Hunter lives in Johns Creek, Georgia and has been a~~
~~registered voter in the state since 2010.  He voted by mail in the primaries and plans to~~
~~vote by mail in the general election because he is concerned that voting in person poses~~
~~risks to his health given the pandemic.~~

~~17.~~      ~~Plaintiff InderBir Datta lives in Beaverton, Oregon.  He recently moved to~~
~~Oregon and is undecided about all the local candidates on the ballot for the general~~
~~election.  He plans to vote by mail close to Election Day because he wants to be able to~~
~~consider all information about local candidates, including information that may arise~~
~~closer to Election Day.~~ in the upcoming 2021 Pennsylvania primary and judicial election on
May 18.  Mr. Gasparro votes by mail because, as a senior citizen~~, Mr. Datta also plans to vote~~
~~by mail because his spouse is on an immunosuppressant and his family has been~~

~~keeping strict quarantine~~ during the COVID-19 pandemic. ~~He does not want to vote in person and risk his family's health.~~

~~18.    Plaintiff Dante Flores-deMarchi is a college student in Rhode Island.  He is from the Rio Grande Valley and is registered to vote in Texas.  He plans to vote by mail because he expects to be living in Rhode Island.  In the event his college closes due to the pandemic, he will return to Texas but is concerned about having to vote in person because the county he resides in has been a COVID-19 hotspot.~~

19.    ~~Plaintiffs Gary Young and Linda Roberson are husband and wife from Hollywood, Florida.  They left Florida due to concerns with high number of COVID-19 cases in Florida and are currently living in Madison, Wisconsin.  Mr. Young and Ms. Roberson are registered to vote in Florida and plan to vote by mail.~~ he believes that it is a safer option for him.  Moreover, Mr. Gasparro closely follows news reports and ongoing investigations regarding potential candidates, and, as such, intends to cast his ballot by mail in the few days leading up to Election Day.

20.    Plaintiff Sebastian Immonen is an undergraduate student currently living in Rhode Island.~~-~~  He is a registered voter in Pennsylvania.~~-~~  Due to uncertainties caused by the pandemic~~,~~ ~~he intends~~ and that he will likely be in Rhode Island during the upcoming Pennsylvania primary election on May 18, Mr. Immonen plans to vote by mail ~~regardless of whether he is able to stay in the dorms in Rhode Island, or whether he has to return to Pennsylvania if the dorms close.  He intends to request.~~  In a prior primary election, Mr. Immonen mailed his ~~absentee~~ ballot ~~closer~~close to Election Day ~~once he has a better understanding of what state he will be in during late October.~~  and but for the temporary postmark extension deadline for that election, his ballot may not have been counted.  Mr. Immonen exercises his right to vote after sifting through information about the candidates, which often pushes him to

vote close to Election Day.  He anticipates that he will do so again in the upcoming 2021 Pennsylvania primary and judicial election.

21.    ~~Plaintiff Kathryn Montgomery is a resident and registered voter of Louisiana.  She is 81 years old and plans to vote by mail.  She prefers to vote in person because she loves to see the election process unfold, but because of the ongoing COVID-19 pandemic and the need to minimize her risk of exposure to the virus, she decided to vote by mail.  Ms. Montgomery intends to vote close to Election Day because she is undecided on which candidate to vote for in her local district attorney race.~~

21.    ~~Plaintiff Sean Morrison is a resident and registered voter of Montana.  He has previously voted by mail in prior elections and intends to vote by mail in the upcoming general election.~~ Plaintiff James McKay resides in Pittsburgh, Pennsylvania, and has been registered to vote in Allegheny County for the last ten years.  He prefers to vote by mail to avoid large crowds during the pandemic and because of his relatively inflexible work schedule.  Typically, Mr. McKay casts his ballot in the days leading up to Election Day, which allows him to make an informed decision on candidates.  He anticipates doing the same in the upcoming 2021 Pennsylvania primary and judicial election, and will likely submit his ballot by mail, on his way to work, close to Election Day.

22.    Plaintiff Ashley Misner is a registered voter in Allegheny County, Pennsylvania, where she has resided since 2018.  As a mother of a young child whose husband works in the Intensive Care Unit of their local hospital, Ms. Misner voted by mail in the November 2020 General Election due to COVID-related health concerns.  Moreover, Ms. Misner exercises her right to vote by taking the time that is necessary to research her choice of candidates and tends to vote close to Election Day.  She anticipates that she will do so again in the upcoming 2021

Pennsylvania primary and judicial election, and will cast her ballot by dropping it off at a local USPS mailbox.

23.     Plaintiff Mary Walton is registered to vote in Philadelphia County, Pennsylvania, and has been registered to vote in that county for the past six years.  During the November 2020 General Election, Ms. Walton voted absentee, and she plans to vote by mail in the upcoming 2021 Pennsylvania primary and judicial election on May 18.  Ms. Walton votes by mail because voting by mail allows her to have ample time to mark the ballot in a thoughtful manner, rather than having to make choices under pressure on a voting machine where it is easy to miss a name or misread a question.  Moreover, as a former reporter, Ms. Walton closely follows news reports and ongoing investigations regarding potential candidates and thus intends to cast her ballot, by mail, close to Election Day.

24.     Plaintiff LaDonna Hopkins has been registered to vote in her hometown of Albuquerque, New Mexico, for twenty-nine years.  She has been registered as both a Democrat and an Independent.  Ms. Hopkins has a daughter and a second residence in St. Louis, Missouri, where she spends significant time.  She anticipates being in St. Louis at the time that a special election to replace Representative Deb Haaland would take place and so intends to vote by mail.  She has also avoided in-person voting during the COVID-19 pandemic due to health concerns.  Ms. Hopkins votes late in the election cycle, as she wants to gather as much information as possible about the candidates on the ballot before she casts her vote.  She anticipates waiting to cast her vote in the upcoming 2021 special election, as well.

22.     Mr. Morrison intends to mail his ballot close to Election Day because he does not currently know his preferences for all of the ballot issues and non-partisan races and may need time to evaluate and investigate them before he casts his ballot.

23.    Plaintiff Voces Unidas de las Montañas ("Voces Unidas") is a nonprofit organization that seeks to elevate the voices of Latinos in three rural Colorado counties through civic engagement.  Latinos represent 30% of the population in Garfield and Eagle counties and 10% of the population in Pitkin county.  The rural communities Voces Unidas serves rely heavily on USPS for both every day communication and for the exercise of their civic rights, including the right to vote.  The delays caused by USPS's policies threaten to frustrate Voces Unidas's mission to elevate the voices of Latinos.  Moreover, the delays caused by USPS's policies have undermined Latinx and rural communities' trust in USPS, causing Voces Unidas to have to expend its limited resources on campaigns to regain the communities' trust in the post office and in the electoral system.  Voces Unidas expects to devote resources for additional education and outreach to this effect.

24.    Plaintiff Colorado Organization for Latina Opportunity and Reproductive Rights ("COLOR") is a grassroots nonprofit organization founded in 1998 that works to enable Latino individuals and their families to lead safe, healthy and self-determined lives.  COLOR is headquartered in Denver, Colorado and works across seven different cities including Denver Metro, Leadville, Telluride, Lamar, Silverthorne, Trinidad and Glenwood Springs.  The organization has over 11,000 members.  Colorado Latinos remain the hardest hit by COVID-19, being over-represented in the essential worker population and in death rates.  COLOR canvassers have worked non-stop, phone banking from their homes to ensure the community gets out the vote.  Even in a state where elections are conducted entirely by mail, creating voting plans has been challenging when the community faces widespread job loss, illness, and housing issues.  Recent changes in USPS policies have created an additional challenge.  As a result of

recent disruptions and delays in mail delivery by USPS, COLOR has needed to redirect significant organizational resources to ensure its members and communities are voting early so their ballots are received in a timely manner. This requires additional resources for phone banking, mailers, and digital outreach. COLOR is "all hands on deck" to ensure the community is informed of delays and is being proactive about returning ballots early to ensure votes are counted.

25.     Plaintiff Padres & Jóvenes Unidos is a nonprofit organization building a movement of working-class Latinx and immigrant youth and families leading community-based solutions to expose and dismantle the root causes of systemic discrimination, racism, economic inequity, and institutional injustice. Founded in 1992 and headquartered in Denver, Colorado, Padres & Jóvenes Unidos has over 1,000 members across the Denver Metro Area. To advance its core mission, the organization has engaged the community in using their voice by participating in local and national elections. Padres & Jóvenes Unidos's civic engagement work is aimed at increasing voter turnout, educating about electoral issues, voter suppression, and disenfranchisement with an overall goal of building power for our most vulnerable communities. The effects of the USPS policies have frustrated the mission of Padres & Jóvenes Unidos and required the organization to redirect significant organizational resources to inform members about how to effectuate their right to vote amidst the disruptions and delays in mail delivery.

26.     Defendant USPS is an independent establishment of the executive branch of the U.S. Government. *See* 39 U.S.C. § 101. USPS is charged with the obligation of providing postal services to the citizens of the United States, and it maintains postal service facilities throughout the United States, including in the District of Columbia.

~~USPS headquarters are located at 475 L'Enfant Plaza, S.W., Washington, D.C. 20260-0546.~~

~~27.     Defendant Louis DeJoy is the Postmaster General of the USPS.  DeJoy is sued in his official capacity.~~

## BACKGROUND

~~I.~~     **The ~~Increased Importance~~Ongoing Threat of the COVID-19 Pandemic Makes Voting by Mail ~~Has Been Met With Animosity from the Federal Government Under the Trump Administration.~~**

~~A.~~**I.**   ~~Voting by Mail Is~~**As** Critical ~~to~~**As Ever in** the ~~November 2020 Election.~~**2021 Elections.**

**A.     The COVID-19 Pandemic Continues to Endanger In-Person Voters.**

~~28.~~25.  On March 11, 2020, the World Health Organization ("WHO") declared a global pandemic resulting from the spread of COVID-19. ~~Two days~~[3] Just under a year later, ~~President Trump announced that the outbreak of COVID-19 in~~the United States ~~constituted a national emergency.  By April 2020, the United States~~has recorded the highest number of confirmed COVID-19 cases in the world, ~~and as of August 2020, it has reported~~with over ~~five~~28 million ~~COVID-19 cases, including 177,332~~infections and 513,071 deaths reported as of March 4, 2021.[4]

26.     In Pennsylvania, New Mexico, and Texas in particular, the situation remains dire. Pennsylvania has reported 943,448 COVID-19 cases and 24,214 deaths, with an average of

_____

[3] *Timeline: WHO's COVID-19 Response,* World Health Org. ("WHO"), https://www.who.int/emergencies/diseases/novel-coronavirus-2019/interactive-timeline (last visited Mar. 4, 2021).

[4] ~~WHO,~~ *WHO Coronavirus Disease (COVID-19) Dashboard* ~~(last visited Aug. 27, 2020),~~, WHO, https://covid19.who.int~~/~~ (last visited Mar. 4, 2021).

2,541 cases per day over the last week.[5]  New Mexico, for its part, has seen 185,898 COVID-19 cases and 3,755 deaths, with an average of 302 cases per day over the past week.[6]  And Texas has seen more than 2.6 million cases of COVID-19 and 44,627 deaths.[7]  Over the last week, the state reported an average of 7,253 cases per day.[8]

27.     The end is not imminent.  In recent weeks, new variants of the COVID-19 virus have emerged and have been identified throughout the United States.[9]  Texas has already reported its first case of a variant originating in South Africa, and all three states have reported cases involving a U.K. variant.[10]

28.     These variants spread more easily and quickly and thus may cause further increases in the number of COVID-19 cases.[11]  Indeed, experts predict that these variants could cause a fourth surge of the virus in the United States in the weeks to come.[12]

---

[5] *Pennsylvania Coronavirus Map and Case Count*, N.Y. Times (Mar. 4, 2021, 8:04 A.M. ET), https://www.nytimes.com/interactive/2020/us/pennsylvania-coronavirus-cases.html.

[6] *New Mexico Coronavirus Map and Case Count*, N.Y. Times (Mar. 4, 2021, 8:04 A.M. ET), https://www.nytimes.com/interactive/2020/us/new-mexico-coronavirus-cases.html.

[7] *Texas Coronavirus Map and Case Count*, N.Y. Times (Feb. 17, 2021, 7:52 A.M. ET), https://www.nytimes.com/interactive/2020/us/texas-coronavirus-cases.html.

[8] *Id.*

[9] *About Variants of the Virus That Causes COVID-19*, Ctrs. for Disease Control & Prevention ("CDC"), https://www.cdc.gov/coronavirus/2019-ncov/transmission/variant.html (last updated Feb. 12, 2021).

[10] *US COVID-19 Cases Caused by Variants*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/transmission/variant-cases.html (last updated Mar. 2, 2021); *see also About Variants of the Virus that Causes COVID-19*, CDC (Feb. 12, 2021), https://www.cdc.gov/coronavirus/2019-ncov/transmission/variant.html (identifying variant B.1.1.7 as the variant first detected in the U.K. and B.1.351 as the variant first detected in South Africa).

[11] *Id.*

[12] Karen Weintraub, *'It's Like We're Trying Our Best to Help the Virus': A Fourth Wave Is Looming if US Fails to Contain COVID-19 Variants, Experts Say*, USA Today (Feb. 16, 2021),

29.     These variants also call current understandings of COVID-19 immunity into question, as reports emerge of individuals who have already been infected with and recovered from the original strain of COVID-19 being re-infected with the South Africa variant.[13]

30.     Meanwhile, Texas Governor Greg Abbott has declared the state "open" for business, lifting the mask mandate and allowing all businesses to operate at 100% capacity.[14] Public health experts have reacted with alarm, warning that easing restrictions now could lead to another spike in infection and death rates, especially given the emergence of these variants.[15]

31.     While people of all ages have contracted and died from COVID-19, the virus posescontinues to pose additional and acute threats for individuals with preexisting medical conditions—such as kidney disease, heart disease, asthma, hypertension, and diabetes—who. These individuals face increased risks of serious complications from COVID-19, regardless of age.[16]

29.32.  The Centers for Disease Control and Prevention ("CDC") has also recognized that "[l]ong-standing systemic health and social inequities have put many people from racial and

---

https://www.usatoday.com/story/news/health/2021/02/16/covid-19-us-fourth-wave-variants-coronavirus/4460958001/.

[13] Grace Hauck & John Bacon, *Dr. Anthony Fauci Sees 'Sobering' Data on South Africa Variant; US Daily Cases Below 100K, But Danger Lurks: Latest COVID-19 Updates*, USA Today (Feb. 14, 2021), https://www.usatoday.com/story/news/health/2021/02/14/covid-news-valentines-day-message-hope-mardi-gras-celebrations/4475951001/.

[14] Press Release, *Governor Abbott Lifts Mask Mandate, Opens Texas 100 Percent*, Office of the Tex. Governor (Mar. 2, 2021), https://gov.texas.gov/news/post/governor-abbott-lifts-mask-mandate-opens-texas-100-percent.

[15] Katie Shepherd, *As Texas and Mississippi Move to Open '100%' and Lift mask Mandates, Health Officials Warn: 'It's Still Too Early'*, Wash. Post (Mar. 3, 2021, 5:22 A.M. ET), https://www.washingtonpost.com/nation/2021/03/03/texas-mississippi-mask-mandate-backlash/.

[16] CDC, *Coronavirus Disease 2019 (COVID-19): People With Certain Medical Conditions* (last updated Aug. 14, 2020),, CDC, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html (last updated Feb. 22, 2021).

ethnic minority groups at increased risk of getting sick and dying from COVID-19."[17]  The

~~number~~rate of ~~known~~hospitalization for COVID-19 cases in the United States is 2.~~6~~9 times

higher among Black persons than white persons, ~~and~~ ~~3~~ 2.8 times higher among Hispanic or

Latinx persons, and 3.7 times higher among American Indian or Alaska Native persons.[18]

Likewise, the rate of death from COVID-19 is 1.9 times higher among Black persons, 2.3 times

higher among Hispanic or Latinx persons, and 2.4 times higher among American Indian or

Alaska Native persons than it is among white persons.[19]  In New Mexico, the disparities are

particularly stark:  the COVID-19 mortality rate for American Indian or Alaska Native persons in

the state is about ten times as high as it is for white persons.[20]

    ~~30.    There is currently no approved medication or vaccine for COVID-19, and~~

~~medical experts and government agencies generally agree that a vaccine will not be~~

~~available to the public in 2020.[21]~~

---

[17] ~~CDC,~~ *Health Equity Considerations and Racial and Ethnic Minority Groups* ~~(last updated July 24, 2020).,~~ CDC, https://www.cdc.gov/coronavirus/2019-ncov/community/health-equity/race-ethnicity.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fneed-extra-precautions%2Fracial-ethnic-minorities.html (last updated Feb. 24, 2021).

[18] *COVID-19 Hospitalization and Death by Race/Ethnicity,* CDC, https://www.cdc.gov/coronavirus/2019-ncov/covid-data/investigations-discovery/hospitalization-death-by-race-ethnicity.html (last updated Feb. 18, 2021).

[19] *Id.*

[20] ~~CDC,~~Randall Akee & Sarah Reber, *American Indians and Alaska Natives Are Dying of COVID-19* ~~Hospitalization and Death by Race/Ethnicity~~ ~~(last updated Aug.~~at Shocking Rates, Brookings Inst. (Feb. 18, ~~2020~~2021), https://www.~~cdc.gov/coronavirus/2019-ncov/~~brookings.edu/research/american-indians-and-alaska-natives-are-dying-of-~~covid-data/investigations-discovery/hospitalization-death-by-race-ethnicity.html~~19-at-shocking-rates/.

[21] ~~HHS, *Fact Sheet Explaining Operation Warp Speed*, (June 16, 2020), https://www.hhs.gov/about/news/2020/06/16/fact-sheet-explaining-operation-warp-speed.html; Gisela Crespo, US gets Reality Checks on COVID-19 Vaccine, Duration of Symptoms, CNN (July 24, 2020), https://www.cnn.com/2020/07/24/health/us-coronavirus-friday/index.html.~~

33.   ~~In the interim, experts have identified techniques that are effective in decreasing~~Although the Food and Drug Administration has issued Emergency Use Authorizations for three COVID-19 vaccines,[22] widespread vaccination is still months away. Pennsylvania has administered one dose of the vaccine to just 16% of its population, and both doses to just 7.4%.[23]  Meanwhile, 30% of the doses allocated to the state so far have gone unused.[24]  In New Mexico, 23% of the population has received one dose of the vaccine, but only 13% has received both, with 14% of the state's doses yet unused.[25]  And in Texas, only 14% of the population has received one dose of the vaccine and only 7.5% has received both.[26] Meanwhile, 28% of the state's allocated doses are yet unused.[27]

34.   Furthermore, new virus variants and potential vaccine production problems could further slow vaccination progress.[28]  Even under the best-case scenarios, widespread administration of COVID-19 vaccines will not be completed until well into 2021—after several

---

[22] *See* Letter of Authorization from Denise Hinton, Chief Scientist, U.S. Food & Drug Admin., to Elisa Harkins, Pfizer, Inc. (reissued Feb. 25, 2021), https://www.fda.gov/media/144412/download; Letter of Authorization from Denise Hinton, Chief Scientist, U.S. Food & Drug Admin., to Carlota Vinals, ModernaTX, Inc. (Feb. 25, 2021), https://www.fda.gov/media/144636/download; Letter of Authorization from Denise Hinton, Chief Scientist, U.S. Food & Drug Admin., to Ruta Walawalkar, Janssen Biotech, Inc. (Feb. 27, 2021) https://www.fda.gov/media/146303/download.

[23] *See How the Vaccine Rollout Is Going in Your State*, N.Y. Times, https://www.nytimes.com/interactive/2020/us/covid-19-vaccine-doses.html (last updated Mar. 4, 2021).

[24] *Id.*

[25] *Id.*

[26] *Id.*

[27] *Id.*

[28] Noah Weiland et al., *With Vaccine Delay, Biden Warns of Uncertain End to Pandemic*, N.Y. Times (Feb. 19, 2021), https://www.nytimes.com/2021/02/19/us/politics/coronavirus-vaccine.html.

of the upcoming elections.[29]  Experts acknowledge that even after widespread vaccination, life will not immediately return to normal.  Dr. Fauci warns that Americans should still limit high-risk activities, including public outings involving large numbers of people.[30]

31.35.  Thus, as the United States continues its work to control the pandemic, the public must rely on now-familiar techniques to decrease transmission of COVID-19, including practicing social distancing by avoiding close, in-person contacts;. avoiding large gatherings;. wearing one or more masks in public;. and practicing frequent and thorough handwashing. Indeed, in the face of emerging variants, experts are calling on Americans to double down on these precautions.[31]

**B.**     As a result of the pandemic and its restrictions on in-person voting, the demand**Demand** for mail-in voting—which has existed in the United States for decades—has skyrocketed. **Mail-In Voting Has Skyrocketed.**

36.     During the COVID-19 pandemicthis ongoing health crisis, in-person voting presents an increased risk of infection to all voters, and an intolerable risk of infection for voters who are particularly vulnerable to the illness.  The CDC, for example, has warned of the significant possibility of person-to-person COVID-19 transmission at polling sites and continues

---

[29] Christina Maxouris et al., *Dr. Fauci Shifts the Timeline on When the General Public Will Be Able to Get a Vaccine*, CNN Health (Feb. 17, 2021), https://www.cnn.com/2021/02/16/health/us-coronavirus-tuesday/index.html.

[30] Quentin Fottrell, *COVID-19 Fatalities Hit 500K in the U.S. When Will Life Return to Normal? Dr. Fauci Cautions, 'It Really Depends on What You Mean by Normality'*, MarketWatch (Feb. 23, 2021), https://www.marketwatch.com/story/will-we-still-be-wearing-masks-in-2022-when-will-life-return-to-normal-dr-fauci-cautions-it-really-depends-on-what-you-mean-by-normality-2021-02-22.

[31] Weintraub, *supra* note 12.

to encourage the use of "voting methods that minimize direct contact and reduce crowd size at polling locations," such as mail-in voting.[32]

~~32.~~37.  Mail-in voting remains the safest option for all voters.  For elderly voters, voters with pre-existing medical conditions, and voters from racial and ethnic minority groups, the ability to cast a ballot by mail is essential.  And even in ordinary years, casting a mail-in ballot may be the only realistic means of voting for voters with disabilities or those who are unable to get to the polls.

~~33.      The CDC, for example, has warned of the significant possibility of person-to-person COVID-19 transmission at polling sites and has encouraged the use of "voting methods that minimize direct contact and reduce crowd size at polling locations," such as mail-in voting.[33]~~

~~34.      Consistent with the CDC's guidance, states have expanded mail-in voting access to ensure that eligible voters can vote both safely and securely during the 2020 primary and general election cycle.~~

~~35.      As of August 15, 2020, 43 states and the District of Columbia will permit all eligible voters to vote by mail during the COVID-19 pandemic.[34]  And 26 states and the District of Columbia have modified their election procedures to make voting by mail~~

---

[32] *See Polling Locations and Voters*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/community/election-polling-locations.html (last updated Jan. 4, 2021).

~~[33] See CDC, *Coronavirus Disease 2019 (COVID-19): Recommendations for Election Polling Locations* (last updated June 22, 2020), https://www.cdc.gov/coronavirus/2019-ncov/community/election-polling-locations.html.~~

~~[34] Juliette Love, Matt Stevens, & Lazaro Gamio, *Where Americans Can Vote by Mail in the 2020 Election*, N.Y. Times (last updated Aug. 14, 2020), https://www.nytimes.com/interactive/2020/08/11/us/politics/vote-by-mail-us-states.html.~~

more accessible during the pandemic.[35]  For example, Alabama, Massachusetts, New Hampshire, Kentucky, and West Virginia have expanded the scope of existing state election laws establishing absentee ballot eligibility for illness, injury, or disability to include all eligible voters concerned about, or taking preventative measures because of, COVID-19.

36.    Because of the pandemic, California, Nevada, New Jersey, and the District of Columbia will proactively mail ballots to all registered voters in advance of the general election.  And five states—Colorado, Hawaii, Oregon, Washington, and Utah—will conduct their elections *primarily* by mail.[36]  In these eight states and the District of Columbia, approximately 52 million voters will automatically receive ballots in the mail this fall.

37.    Consequently, at least 83% of eligible voters—approximately 190 million people—will have the opportunity to vote by mail-in absentee ballot in the November 2020 election.[37]

38.    During the primaries, many of these states saw a record numbers of mail-in ballots and ballot requests.  In Wisconsin, where Plaintiff Aaron Carrel resides and votes, nearly one million voters submitted ballots by mail in the April 2020 primary election.  Other states saw dramatic spikes in the proportion of ballots submitted by mail in their primary elections as compared to 2016.  In New York, more than 1.7

---

[35] *Id.*

[36] Nat'l Conf. of State Legislatures, *VOPP: Table 18: States With All-Mail Elections* (Apr. 21, 2020), https://www.ncsl.org/research/elections-and-campaigns/vopp-table-18-states-with-all-mail-elections.aspx.

[37] Kate Rabinowitz & Brittany Renee Mayes, *At least 83% of American Voters Can Cast Ballots By Mail in the Fall*, Wash. Post (Aug. 20, 2020), https://www.washingtonpost.com/graphics/2020/politics/vote-by-mail-states/.

million people requested ballots by mail in the June 2020 primary election—a tenfold increase in absentee ballot requests relative to 2016.  And in Pennsylvania, approximately 1.9 million voters requested mail-in ballots—18 times more absentee ballots in the 2020 primary than for the 2016 primary election.

39.    Many states have recently expanded their use of mail-in ballots.  For the first time, California and the District of Columbia will automatically send a mail-in ballot to all registered active voters for the November 2020 general election.  In Pennsylvania and Delaware, all voters were given the option of voting by mail for the first time in the 2020 primary election.

40.    Based on recent election trends, experts conservatively predict "roughly 80 million mail ballots" will be submitted this fall, "more than double the number [of mail ballots] that were returned in 2016."[38]  Indeed, "[s]ome states anticipate 10 times the normal volume of election mail."[39]

38.    **The Trump Administration Has Repeatedly and Baselessly Attacked Mail**Thus, as a result of the pandemic and its restrictions on in-person voting, the demand for mail-in voting—which has existed in the United States for decades—has skyrocketed. According to polls conducted by the Pew Research Center, 46% of 2020 General Election voters

---

[38] Juliette Love, Matt Stevens, & Lazaro Gamio, *Where Americans Can Vote by Mail in the 2020 Election*, N.Y. Times (last updated Aug. 14, 2020), https://www.nytimes.com/interactive/2020/08/11/us/politics/vote-by-mail-us-states.html.

[39] Erin Cox, et al., *Postal Service Warns 46 States Their Voters Could Be Disenfranchised by Delayed Mail-In Ballots*, Wash. Post (Aug. 14, 2020), https://www.washingtonpost.com/local/md-politics/usps-states-delayed-mail-in-ballots/2020/08/14/64bf3c3c-dee7-11ea-8051-d5f887d73381_story.html (emphasis added).

voted by mail-in ballot.[40]  This shattered previous records, amounting to over 65 million

Americans voting by mail.[41]  As a result, USPS was called upon to deliver 543 million pieces of

Election Mail, representing a 96% increase over the amount of Election Mail it delivered in

2016.[42]  This included at least 135 million ballots in the course of the General Election.[43]

      39.    Millions of voters in Pennsylvania, New Mexico, and Texas were among those

who cast a mail-in ballot this fall.  In Pennsylvania, 2,640,405 voters voted by mail, a 1,161%

increase from 2016.[44]  In New Mexico, approximately 322,259 voters cast mail-in ballots.[45]

Even in Texas, which requires voters to provide an excuse to receive a mail-in ballot,

approximately 2,692,317 voters returned one.[46]

---

[40] *Sharp Divisions on Vote Counts, as Biden Gets High Marks for His Post-Election Conduct:
3. The Voting Experience in 2020*, Pew Rsch. Ctr. (Nov. 20, 2020),
https://www.pewresearch.org/politics/2020/11/20/the-voting-experience-in-2020/.

[41] *See* Lazaro Gamio et al., *Record-Setting Turnout: Tracking Early Voting in the 2020 Election*,
N.Y. Times (Nov. 12, 2020), https://nyti.ms/2LLL1v7.

[42] *2020 Post-Election Analysis: Delivering the Nation's Election Mail in an Extraordinary Year*,
USPS 18 (Dec. 28, 2020), https://about.usps.com/newsroom/national-
releases/2020/USPS_PostElectionAnalysis_12_28_20.pdf.

[43] *Id.* at 18–19.

[44] *Pennsylvania Election Results 2020*, NBC News (Jan. 28, 2021),
https://www.nbcnews.com/politics/2020-elections/pennsylvania-results.

[45] *New Mexico Election Results 2020*, NBC News (Jan. 27, 2021),
https://www.nbcnews.com/politics/2020-elections/new-mexico-results.  Forty-two percent of the
total mail-in and early in-person ballots were mail-in ballots, or approximately 322,259 ballots.
*See id.*

[46] *Texas Election Results 2020*, NBC News (Jan. 27, 2021),
https://www.nbcnews.com/politics/2020-elections/texas-results.  Twenty-eight percent of the
total mail-in and early in-person ballots returned were mail-in ballots, or approximately
2,692,317.  *See id.*

40.     With the public health and safety need for voting by mail as clear as ever, there is every reason to expect that the demand for mail-in voting in the 2021 Elections will remain at historic heights.

### ~~B.~~C.   **Voters in the Upcoming 2021 Elections Will Once Again Depend on Mail-In Voting.**

41.     ~~In~~Amidst the ~~lead-up~~ongoing pandemic and a surge in mail-in voting, crucial primary and special elections in Pennsylvania, New Mexico, and Texas loom.

#### 1.     **Pennsylvania**

42.     In 2021, Pennsylvania will hold statewide primary and general elections to fill Chief Justice Thomas Saylor's seat on the ~~2020~~ Pennsylvania Supreme Court, Judge Susan Gantman's seat on the Superior Court, and two openings on the Commonwealth Court, as well as general retention elections for two more Superior Court and two more Commonwealth Court seats.[47]  The primary elections will take place on Tuesday, May 18, 2021, and the general election is scheduled for Tuesday, November 2, 2021.[48]

43.     Pennsylvania will also hold special elections coinciding with the May 18 primary elections to fill vacant seats in the General Assembly previously held by Commonwealth Senator

---

[47] Stephen Caruso, *With One Supreme Court Seat Up for Grabs, Pa.'s 2021 Judicial Elections Start to Take Shape*, Pa. Capital-Star (Feb. 12, 2021), https://www.penncapital-star.com/government-politics/with-one-supreme-court-seat-up-for-grabs-pa-s-2021-judicial-elections-start-to-take-shape/.

[48] *Upcoming Elections*, Votes PA, https://www.votespa.com/About-Elections/Pages/Upcoming-Elections.aspx (last visited Mar. 4, 2021).

John Blake (District 22),[49] the late Commonwealth Senator David Arnold (District 48),[50] and the late Commonwealth Representative Mike Reese (District 59).[51]

44.      Approximately 172,842 voters are currently registered to vote in District 22 and 174,817 in District 48.[52]  Approximately 43,562 voters are currently registered in District 59.[53] Pennsylvania allows no-excuse absentee voting, 25 Pa. Stat. §§ 2602(w), 3146.1, 3150.11, and a significant proportion of its voters will likely opt to vote by mail in 2021.  In the 2020 General Election, approximately 38% of Pennsylvania voters cast a mail-in ballot.[54]

45.      To be counted, all civilian mail-in ballots must be received by the county Board of Elections no later than 8 p.m. on Election Day (*i.e.*, May 18, 2021, for ballots in the primary and special elections, and November 2, 2021, for ballots in the general election).  *Id.* §§ 3146.6(a), 3150.16(a).  Ballots postmarked by Election Day but not yet received by election

---

[49] Borys Krawczeniuk, *Process for Replacing Sen. John Blake Unfolding*, Citizens' Voice (Mar. 1, 2021), https://www.citizensvoice.com/news/process-for-replacing-sen-john-blake-unfolding/article_1550723e-a384-5d73-903a-6dabe45c5696.html.

[50] Jan Murphy, *Special Election Date Set to Fill Seat Left Vacant by Sen. Dave Arnold's Death*, Pa. Live (Jan. 25, 2021), https://www.pennlive.com/news/2021/01/special-election-date-set-to-fill-seat-left-vacant-by-sen-dave-arnolds-death.html.

[51] Press Release, *Speaker Announces Special Election for the 59th District*, 59th Legis. Dist. (Jan. 12, 2021), http://www.repreese.com/News/18924/Latest-News/Speaker-Announces-Special-Election-for-the-59th-District-.

[52] *Voter Registration Statistics by Senate District*, Pa. Dep't of State, https://www.dos.pa.gov/VotingElections/OtherServicesEvents/VotingElectionStatistics/Documents/current%20VoterRegStatsBySenatorialDistricts.xlsx (last visited Mar. 4, 2021).

[53] *Voter Registration Statistics by House District*, Pa. Dep't of State, https://www.dos.pa.gov/VotingElections/OtherServicesEvents/VotingElectionStatistics/Documents/current%20VoterRegStatsByLegislativeDistricts.xlsx (last visited Mar. 4, 2021).

[54] *See Pennsylvania Election Results 2020*, NBC News (Jan. 28, 2021), https://www.nbcnews.com/politics/2020-elections/pennsylvania-results.  There were 6,838,186 ballots cast in the presidential election.  *See id.*  If approximately 2,640,405 of these voted by mail, that suggests approximately 38.6% of voters cast mail-in ballots.  *See id.*

officials will not be counted.  Unlike in the November 2020 general election, no extension currently applies to mail-in ballots in the 2021 Pennsylvania elections.[55]  Thus, any delays caused by USPS's Late/Extra Trip policy or ballot processing practices could result in a ballot's rejection.

### 2.    New Mexico

46.    New Mexico will likely hold its own special election to replace United States Representative Deb Haaland (District 1), who President ~~Trump~~Biden has ~~repeatedly asserted,~~selected to serve as U.S. Secretary of the Interior and who will resign from her House seat if confirmed.[56]  Within ten days of Representative Haaland's vacancy, the governor must call for a special election that itself must be scheduled for no less than 77 days or more than 91 days after the vacancy date.  N.M. Stat. § 1-15-18.1.  There are approximately 437,379 registered voters eligible to vote in this District election.[57]  In the November 2020 election, approximately 35% of New Mexico voters cast a mail-in ballot.[58]

---

[55] *Mail-in and Absentee Ballot*, Votes PA, https://www.votespa.com/Voting-in-PA/Pages/Mail-and-Absentee-Ballot.aspx (last visited Mar. 4, 2021) (noting the ballot return date as May 18, 2021 for the primary election and stating that "postmarks are not enough").

[56] *See* Nancy Cordes et al., *Biden Taps Deb Haaland to Be First Native American Interior Secretary*, CBS News (Dec. 17, 2020), https://www.cbsnews.com/news/deb-haaland-biden-interior-secretary-native-american/.

[57] *New Mexico Voter Registration Statistics by Congressional District*, N.M. Sec'y of State (Jan. 29, 2021), http://sos.state.nm.us/voting-and-elections/data-and-maps/voter-registration-statistics/2020-voter-registration-statistics/.

[58] *See New Mexico Election Results 2020*, NBC News (Jan. 27, 2021), https://www.nbcnews.com/politics/2020-elections/new-mexico-results.  There were 903,508 voters who cast a ballot in the presidential election.  *See id.*  If approximately 322,259 of these voters cast mail in ballots, *see supra* note 37, that suggests approximately 35.6% of voters cast mail-in ballots.  *See id.*

47.     New Mexico also allows no-excuse absentee voting.  N.M. Stat. § 1-6-3.  To be counted, ballots must be received by 7 p.m. on Election Day.  *Id.* §§ 1-6-10(c), 1-12-8.2(A).  As in Pennsylvania, ballots received by USPS by this date, but not by the county clerk's office, will not be counted.  Even the shortest of USPS delays could therefore lead to a ballot's rejection.

### 3.     Texas

48.     Finally, in Texas, a special election will be held on May 1, 2021, to fill a vacancy in the United States House of Representatives left by the late Representative Ron Wright (District 6).[59]  *See* Tex. Const. art. XI, § 11 (vacancies must be filled within 120 days after the vacancy occurs); Tex. Elec. Code § 204.021.  In the November 2020 election, 339,992 voters cast ballots in District 6.[60]  Approximately 24% of Texans cast mail-in ballots in the 2020 General Election.[61]

49.     Texas requires an excuse for a voter to use a mail-in ballot.  In particular, to vote by mail, a voter must:  have a sickness or disability that prevents the voter from appearing at the polls on Election Day without ~~evidence, that voting by mail will lead to millions of~~

---

[59] *See* Letter from Tex. Gov. Greg Abbott to Tex. Sec'y of State Ruth Hughs (Feb. 23, 2021), https://gov.texas.gov/uploads/files/press/PROC_CD_06_Wright_replacement_election_IMAGE_02-23-2021.pdf; Patrick Svitek, *Gov. Greg Abbott Sets May 1 Special Election to Fill Seat of Late U.S. Rep. Ron Wright*, Tex. Tribune (Feb. 23, 2021), https://www.texastribune.org/2021/02/23/ron-wright-special-election-tx-6/.

[60] *Texas Election Results: Sixth Congressional District*, N.Y. Times (last updated Feb. 22, 2021), https://www.nytimes.com/interactive/2020/11/03/us/elections/results-texas-house-district-6.html.

[61] *See Texas Election Results 2020*, NBC News (Jan. 27, 2021), https://www.nbcnews.com/politics/2020-elections/texas-results.  There were 11,149,473 ballots cast in the presidential election.  *See id.*  If approximately 2,692,317 of those were mail-in ballots, *see supra* note 38, that suggests approximately 24.1% of voters cast mail-in ballots.  *See id.*

~~fraudulent ballots being cast and will delegitimize the election outcome.[62]  His assault on voting by mail has been relentless, with over 70 distinct attacks on mail voting.[63]  And the President has openly stated that the motivation for refusing to fund USPS as part of the COVID-19 stimulus packages is to frustrate~~ a likelihood of needing personal assistance or injuring the voter's health; expect to be confined on Election Day due to childbirth; be 65 or older on Election Day; be confined in jail and not otherwise disqualified from voting; be a participant in a confidentiality program for domestic violence victims; or expect to be absent from her county of residence on Election Day and during the entirety of the early voting period that remains after her ballot application is submitted.  Tex. Elec. Code §§ 82.001–.004.  Thus, the Texas voters who rely on USPS are frequently those for whom in-person voting poses the greatest threat.

50.     To be counted, Texas voters' ~~ability~~ mail-in ballots must be postmarked by 7 p.m. on Election Day and must arrive by 5 p.m. the day after the election or, if that date falls on a weekend or holiday, the next regular business day (*i.e.*, Monday, May 3, 2021, for an election held on Saturday, May 1, 2021).  *Id.*, §§ 86.006–.007.  Ballots received after this date are not counted.  As a result, and despite the one-business day extension, any delays resulting from USPS's Late/Extra Trip Policy or ballot processing practices will result in otherwise on-time ballots not being counted.

~~41.~~ 51.  With these critical elections ahead, and the pandemic still surging, we can expect tens of thousands of voters to once again seek to cast their ballots by mail.  And given these

---

~~[62] *See generally* Amy Gardner, Josh Dawsey, & Paul Kane, *Trump Opposes Election Aid for States and Postal Service Bailout, Threatening Nov. 3 Vote*, Wash. Post (Aug. 13, 2020), https://www.washingtonpost.com/politics/trump-mail-voting/2020/08/13/3eb9ae62-dd70-11ea-809e-b8be57ba616e_story.html.~~
~~[63] *Id.*~~

states' stringent ballot deadlines, voters will have to rely on USPS to ensure those ballots are delivered on time.

42.     During a March 30, 2020 interview on Fox & Friends regarding the Democrats' COVID-19 stimulus bill, which would provide funding for election administration and USPS to facilitate voters' ability to cast their ballots safely from home during the pandemic, President Trump stated that a Congressional stimulus bill's funding for voting by mail would promote "levels of voting that, if you ever agreed to it, you'd never have a Republican elected in this country again."[64]

43.     On August 13, 2020, in a subsequent Fox Business Network interview about the stimulus bill, President Trump further clarified his views, stating:  "They want three and a half billion dollars for the mail-in votes.  Universal mail-in ballots.  They want $25 billion, billion, for the Post Office.  Now they need that money in order to make the Post Office work so it can take all of these millions and millions of ballots. . . . But if they don't get those two items that means you can't have universal mail-in voting because you [sic] they're not equipped to have it."[65]

44.     In the midst of President Trump's war on voting by mail, DeJoy—"a Republican Party and Trump campaign megadonor"—was appointed Postmaster General, just months before the November presidential election.[66]

---

[64] Aaron Blake, *Trump Blurts out His True Motive on Mail-in Voting*, Wash. Post (Aug. 13, 2020), https://www.washingtonpost.com/politics/2020/08/13/trump-blurts-out-his-true-motive-blocking-post-office-funding-mail-in-voting/.

[65] Ellie Kaufman et al., *Trump says he opposes funding USPS because of mail-in voting*, CNN (Aug. 13, 2020), https://www.cnn.com/2020/08/13/politics/trump-usps-funding-comments-2020-election/index.html.

[66] Lucy Tompkins, *Who Is Postmaster General Louis Dejoy?* N.Y. Times (Aug. 24, 2020), https://www.nytimes.com/article/general-louis-dejoy-postmaster.html.

II. **USPS Has a Statutory** ~~Obligations Safeguard USPS's Responsibility to Promote Efficient~~**Obligation to Ensure Timely Delivery of Election Mail** ~~from Political Influence~~.

A. **USPS Mandate and Operations**

~~45.~~ 52. USPS operates as "an independent establishment of the executive branch of the Government of the United States" that is overseen by a Board of Governors, including the Postmaster General. 39 U.S.C. §§ 201, 202(a)–(d). USPS and its Board of Governors are responsible for "maintain[ing] an efficient system of collection, sorting, and delivery of the mail nationwide." ~~39 U.S.C. §~~ *Id.* § 403(b)(1).

~~46.~~ 53. By statutory mandate, USPS must ~~be "operated as a basic and fundamental service provided to the people by the Government of the United States, authorized by the Constitution, created by Act of Congress, and supported by the people," and must~~ "provide prompt, reliable, and efficient services to patrons~~[.]" 39 U.S.C. § 101(a). And,~~," and the costs of "maintaining the Postal Service shall not be apportioned to impair the overall value of such service to the people." *Id.* § 101(a).

~~47.~~ 54. On average, USPS processes and delivers 472.1 million pieces of mail every day.[67] Most incoming mail is processed by postal workers at mail processing facilities ("processing plants"). Processing mail involves sorting the mail for transportation and delivery and, for certain types of mail, applying a postmark. Processed mail is dispatched in trucks from the processing plants to (a) non-local destinations, where it will undergo further processing, or (b) to delivery units, such as a post office or carrier station, for delivery to local destinations.

---

[67] *One Day in the Life of the U.S. Postal Service*, USPS Postal Facts ~~(last visited Aug. 27, 2020),~~, https://rb.gy/8tx3vm (last visited Mar. 4, 2021).

48.55.  When processed mail arrives at the delivery unit from the processing plant, clerks and carriers complete any final sequencing as needed, and carriers then deliver the processed mail and collect new mail on foot or by vehicle in a prescribed area.

49.56.  Mail can be collected in either of two ways:  a carrier collects the mail on her route, or a clerk collects the mail at the post office.  The mail collected by carriers and clerks is dispatched by truck from the delivery unit to the processing plant, where the cycle begins again.

50.57.  To ensure that every piece of mail goes out of the plant or delivery unit every day, late trips (trips taken later than initially scheduled) or extra trips (trips taken in addition to regularly- scheduled trips) are frequently necessary.  This is true for deliveries from the delivery unit to the processing plant, from the processing plant to the delivery unit, and, in certain circumstances, from the delivery unit to the recipient of the mail.

### B.    Procedural Requirements for Enacting Changes to USPS Services

51.58.  Congress has charged USPS with the responsibility to "plan, develop, promote, and provide adequate and efficient postal services at fair and reasonable rates and fees." 39 U.S.C. § *Id.* § 403(a); *see also* 39 U.S.C. § *id.* § 3661(a) ("The Postal Service shall develop and promote adequate and efficient postal services.").

52.59.  When "determining all policies for postal services, the Postal Service shall give the highest consideration to the requirement for the most expeditious collection, transportation, and delivery of important letter mail." 39 U.S.C. § *Id.* § 101(e).

53.60.  Before enacting any policies that have a nationwide impact on postal services, USPS has a statutory obligation to submit a proposal to the Postal Regulatory Commission. 39 U.S.C. § 3661.  The Postal Regulatory Commission was created by the Postal Reorganization Act, Pub. L. No. 91-375, 84, *id.* § 3661, an "independent establishment of the executive branch" that Stat. 719, which was designed "to increase the efficiency of the

~~Postal Service and reduce political influences on its operations." *U.S. Postal Serv. v.*~~

~~*Flamingo Indus. (USA) Ltd.*, 540 U.S. 736, 740 (2004). Like USPS, the Commission~~

~~serves as an "independent establishment of the executive branch." 39 U.S.C. § 501. The~~

~~Commission~~ is "composed of 5 Commissioners, appointed by the President, by and with the

advice and consent of the Senate~~.~~"." *id.* §§ 501, 502(a). ~~*Id.* § 502(a). "The Commissioners~~

~~shall be chosen solely on the basis of their technical qualification, professional standing,~~

~~and demonstrated expertise in economics, accounting, law, or public administration,~~

~~and may be removed by the President only for cause." *Id.*~~

~~54.~~ ~~Pursuant~~In particular, pursuant to the Postal Reorganization Act, "[w]hen the

Postal Service determines that there should be a change in the nature of postal services [that] will

generally affect service on a nationwide or substantially nationwide basis," it must "submit a

proposal, within a reasonable time prior to the effective date of such proposal, to the Postal

Regulatory Commission requesting an advisory opinion on the change." *Id.* §_3661(b).

~~55~~61.   Under the Commission's Rules of Practice and Procedure, ~~USPS is required to~~

~~submit a proposed change in the nature of postal services to the Postal Regulatory~~

~~Commission~~this time period should be "not less than 90 days before the proposed effective date

of the change in the nature of postal services involved." 39 C.F.R. §_3020.112.

~~56~~62.   After USPS submits a request to the Postal Regulatory Commission, the

Commission must provide "an opportunity for hearing on the record under sections 556 and 557

of [the Administrative Procedure Act] ~~. . .~~ . . . to the Postal Service, users of the mail, and an

officer of the Commission who shall be required to represent the interests of the general public."

39 U.S.C. § 3661(c).  The public is entitled to submit comments in proceedings before the

Commission.  ~~39 C.F.R. § 3661(c).~~*Id.*

57 63.  After the hearing, the Commission must provide an advisory opinion that "shall be in writing and shall include a certification by each Commissioner agreeing with the opinion that in his judgment the opinion conforms to the policies established under this title." *Id.* § 3661(c).

58 64.  Consistent with Section 3661's requirements, USPS has previously submitted proposed changes affecting the nature of postal services to the Commission within a reasonable time before the effective date of the proposal and has requested an advisory opinion from the Commission.[68]

**C.** **USPS Has Traditionally Issued and Followed Policies Consistent with Its USPS's Critical Role in Facilitating the Right to Vote.**

59 65.  Since its earliest days, our Nation's postal system has enabled Americans to participate in electoral democracy.

60 66.  During the Civil War, nearly 150,000 Union soldiers relied on the postal system to deliver ballots in the 1864 presidential election.[69]  In the midst of World War II, U.S. soldiers depended on the postal system to cast their votes in the 1944 presidential election.[70]  And in elections in between and since, soldiers stationed around the world have relied on postal voting to participate in elections at home.

---

[68] *See, e.g.*, Postal Reg. Comm'n, *Advisory Op. Opinion on Mail Processing Network Rationalization Service Changes, Op. Postal Reg. Comm'n* N2012-1 (Sept. 28, 2012), https://www.apwu.org/sites/apwu/files/resource-files/PRC%20advisory%20opinion%20on%20network%20rationaliztion%20plan.pdf.

[69] Alex Seitz-Wald, *How Do You Know Voting by Mail Works?  The U.S. Military's Done It Since the Civil War*, NBC News (Apr. 19, 2020), https://www.nbcnews.com/politics/2020-election/how-do-you-know-voting-mail-works-u-s-military-n1186926.

[70] *Id.*

61.67.  So too have civilians.  As explained above, fivesome 65 million Americans cast their vote by mail in the November 2020 General Election.  Five states hold elections primarily by mail,[71] an additional 34 states and Washington, D.C-., allow residents to vote by mail regardless of their reasons for doing so,[72] and every other state permits voting by mail under some circumstances, such as for those with physical illness or disabilities that prevent a trip to the polling place or those who expect to work a shift of 10 hours or more on Election Day.[73] Postal voting is now and has been integral to American elections for decades.

62.68.  "In determining all policies for postal services," USPS has a statutory obligation to provide "the highest consideration to the requirement for the most expeditious collection, transportation, and delivery of important letter mail."  39 U.S.C. §-101(e).  Consistent with that legal duty and its integral role in facilitating the vote-by-mail process, USPS has traditionally promulgated and upheld policies thatmust treat Election Mail—including both the ballots sent from the state to the voter, and the completed ballots returned by the voter to the state—as important letter mail.

---

[71] *See* Colo. Rev. Stat. § 1-5-401; Haw. Stat. §-11-101; Or. Rev. Stat. §-254.465; Wash. Rev. Code §-29A.40.010; Utah Code Ann-§- § 20A-3-302.

[72] *See* Alaska Stat. §-15.20.010; Ariz. Rev. Stat. §-16-541; Cal. Elec, Code §-3003; D.C. Mun. Regs. Tittit. 3, §-720; Fla. Stat. § 101.62; Ga. Code §-21-2-380; Idaho Code §-34-1001; 10 ILS Ill. Comp. Stat. 5/19-1; Iowa Code §-53.1; Kan. Stat. Ann. §-25-1119(a); Me. Stat. tit. 21-A MEa, § -Rev. Stat. § 751; Md. Elec. Law §-9-304; M.C.L.A. §Mich. Comp. Laws § 168.759; Minn. Stat. §-203B.02; Mont. Code §-13-13-201; Neb. Rev. Stat. Ann. §-32-938; Nev. Rev. Stat. §NRS § 293.313; N.J. Rev. Stat. §-19:63-3; N.M. Stat. §-1-6-3; N.C. Gen. Stat. §-163-226; N.D. Cent. Code §-16.1-07-01; Ohio Rev. Code §-3509.02; 26 Okla. Stat. §-26-14-105; 25 P.S. §Pa. Cons. Stat. § 3150.11; R.I. Gen, Laws §-17-20-2; S.D. Cod. Laws §-12-19-1; 17 VSA §-Vt. Stat. Ann. tit. 17, § 2531; Va. Code Ann. §-24.2-700; Wis. Stat. §-6.86(1)(ac); Wyo. Stat. §-22-9-102.

[73] *See, e.g.*, Ala. Sec'y of State, *Absentee Voting Information*, Ala. Sec'y of State, https://www.sos.alabama.gov/alabama-votes/voter/absentee-voting- (last visited Mar. 4, 2021).

63.     For example, USPS has formally adopted several classes of mail, including First-Class Mail and Marketing Mail, which are transported with different delivery standards and with different postage rates.  USPS regulations provide that the expected delivery time for most First-Class Mail delivered within the 48 contiguous states is 1–3 days,[74] while Nonprofit Marketing Mail has a slower delivery standard of 3–10 days.[75] In line with its statutory obligation, in prior years USPS has "treat[ed] Election and Political Mail as First-Class Mail," regardless of whether the election authority paid for First-Class service or the less expensive Nonprofit Marketing service.[76]

64.     USPS also traditionally takes steps to "provide greater visibility to Election Mail as it is processed."[77]  This includes "encourag[ing] election officials to use" specialized tags to identify Election Mail, such as the green Tag 191 for "Domestic and International Mail Ballots" and Tag 57 for Political Campaign Mailing,[78] and asking

---

[74] The Code of Federal Regulations prescribes a 1–3 day timeframe for most mail delivered within the 48 contiguous states, 39 C.F.R. § 121.1, and recent USPS statements indicate that this regulatory requirement may in fact be carried out in practice.  *See Service Standards Maps*, USPS PostalPro (July 1, 2020), https://postalpro.usps.com/ppro-tools/service-standards-maps. Notwithstanding the delivery timeline set forth in USPS regulations, however, a recent USPS OIG report suggests that Election Mail treated as First-Class Mail would be subject to a 2–5 day delivery standard.  *See* Ex. 1, USPS OIG, *Processing Readiness of Election and Political Mail During the 2020 General Elections* (Aug. 31, 2020).

[75] USPS, *Official Election Mail: State and Local Election Mail—User's Guide* (Jan. 2020), https://about.usps.com/publications/pub632.pdf; *see also* USPS, *Postal Pro: Service Standards Maps* (last visited Aug. 27, 2020), https://postalpro.usps.com/ppro-tools/service-standards-maps.

[76] USPS Office of the Inspector General, *Audit Report, a Service Performance of Election and Political Mail During the 2018 Midterm and Special Elections* at 7 (Nov. 4, 2019), https://www.uspsoig.gov/sites/default/files/document-library-files/2019/19XG010NO000.pdf ("OIG 2019 Report") (USPS Office of the Inspector General "concluded that this was how [Election Mail] was generally handled.").

[77] OIG 2019 Report, Appendix B (letter from USPS Acting Vice President, Processing and Maintenance to OIG).

[78] *Id.*

personnel to "identify and separate Election and Political from other mail at the facility to improve processing in accordance with standard operating procedures."[79]

65.     USPS has also developed an Official Election Mail logo, a unique registered trademark that may be "used on any mailpiece created by an election official that is mailed to or from a citizen of the United States for the purpose of participating in the voting process." This logo similarly "serves to identify [Official Election Mail] for Postal Service workers and distinguish it from the thousands of other mailpieces that are processed daily." USPS has historically provided detailed information to state and local election officials, including specifications about the Official Election Mail logo and information about obtaining postage discounts.[80]

66.     In prior years, USPS has also issued guidance expressly directing employees to afford the highest priority to absentee ballots in the months preceding a presidential election. For example, on August 14, 2008, USPS issued a Postal Bulletin stating: "*Employees need to be aware that absentee balloting materials are handled differently than other unpaid or short-paid mailpieces. **ABSENTEE BALLOTING MATERIALS ARE NOT TO BE RETURNED FOR ADDITIONAL POSTAGE OR DETAINED!** The postage is collected from the election office. Any delay of absentee ballots is a violation of Postal Service policy.*" The bulletin explained that it is "critical

---

[79] *Id.* at 6.

[80] USPS, *Postal Bulletin 22239, Field Information Kit: Election Mail—2008, Publications 631 and 632* (2008), https://about.usps.com/postal-bulletin/2008/html/pb22239/html/ElectMailkit_006.html.

that this mail is handled correctly to avoid any negative impact on election results or the Postal Service."[81]

67.     The USPS Office of the Inspector General ("OIG") conducted an audit of the 2018 Midterm and Special Elections and concluded that "timely delivery of Election and Political Mail is necessary to ensure the integrity of the U.S. election process."[82]  To ensure timely delivery of Election Mail, the USPS OIG recommended that USPS management take several key steps, including "[e]nsur[ing] sufficient mail processing staff are assigned to appropriately process peak Election and Political Mail volume."[83]

## III.   Defendants Disregarded Procedural Safeguards and Implemented Policy Changes That Impaired USPS's Ability toHave Repeatedly Shirked Their Obligation to Ensure Timely DeliverDelivery of Election Mail.

68.69.  Upon being appointed Postmaster General, DeJoy immediately took action that diminished USPS's effectiveness in processing mail ballots—despite an imminent election that would involve unprecedented rates of mail voting.  Specifically, DeJoy promulgated the Late/Extra Trip Policy that restricted postal workers' ability to make additional or late trips to ensure prompt delivery of late-arriving mail.  And DeJoy implemented this new Policy without any regard for the procedural requirements to enact changes to USPS services.  Even after this Court preliminarily enjoined the Policy, Defendants did not take timely action in response, changing course only when this Court entered a subsequent order compelling compliance.  *See*

---

[81] USPS Postal Bulletin (PB 22239) (Aug. 14, 2008) (emphasis in original); *see also* USPS Postal Bulletin (PB 22342) (July 26, 2012) ("[S]hort paid and unpaid absentee balloting materials must never be returned to the voter for additional postage.  Postage is collected from the election office upon delivery or at a later date.").

[82] OIG 2019 Report at 2.

[83] *Id.*

Min. Order (Oct. 27, 2020).  Even after that point, internal documents indicate that the Policy was only suspended.[84]

~~69.     DeJoy implemented these new policies without any regard for the procedural requirements to enact changes to USPS services.~~

~~70.     After a substantial public outcry and a series of congressional inquiries about DeJoy's changes to USPS operations in the months preceding the November 2020 election, DeJoy purported to suspend some of the "longstanding operational initiatives" that "predate[d] [his] arrival" at USPS until after the election.  But his purported rescission is facially incomplete and imprecise.  DeJoy made no attempt to assert that he will suspend any of the policies that he personally orchestrated, and expressly testified before the Senate that some of his policies that have impaired and continue to impair the delivery of mail ballots will remain in place.~~

70.     ~~Without Following Statutory Procedures, Postmaster General DeJoy~~ Although the Court's injunction of the Late/Extra Trip Policy reduced the extent of election ballot delays and USPS belatedly took measures to improve its delivery speed, many ballots were still delivered after Election Day in the November 2020 General Election due to USPS's ballot processing failures.  For example, USPS data indicates that in the Central Pennsylvania District alone, more than a thousand ballots were placed in the mail on or before the Saturday before Election Day but were not received until after Election Day.  In Pennsylvania, an extended postmark deadline that was in place only for the November 2020 General Election allowed some of those ballots to be counted, but in 2021, none of those ballots will be counted.

---

[84] *See Deployment of Operational Changes,* USPS OIG 21 (Nov. 6, 2020), https://www.uspsoig.gov/sites/default/files/document-library-files/2020/21-014-R21.pdf ("OIG Report").

71.    Despite those failures, when the Georgia Runoff approached, Defendants initially did not adjust course or improve their efforts.  Instead, they opted to again issue belated guidance substantially similar to that which proved inadequate in November, thus again risking the rejection of thousands of voters' ballots.

A.    Prior to the November 2020 General Election, Defendants Disregarded Procedural Requirements and **Implemented a Nationwide Late/Extra Trip Policy** ~~that Impairs the Right~~That Impaired USPS's Ability **to** ~~Vote.~~

~~71.    On May 6, 2020, Louis DeJoy was appointed the new Postmaster General and CEO of USPS.[85]~~

~~72.~~A.   ~~Prior to his appointment, DeJoy worked as Chair and CEO of New Breed Logistics (later merged with and renamed XPO Logistics), a warehousing and distribution company, and longtime contractor with USPS.[86]  He is the first postmaster general in over two decades to have never worked at USPS~~Timely Deliver Election Mail.

~~73.~~    On July 10, 2020, USPS released a document entitled "Mandatory Stand-Up Talk: All Employees" that unveiled DeJoy's "operational pivot" and prescribed numerous and "immediate" changes to long-standing USPS practice.[87]

~~74.    The document describes these changes as "immediate, lasting, and impactful," and it explained that "every single employee will receive this information, no matter what job they perform."[88]~~

---

[85] ~~Press Release, *Board of Governors Announces Selection of Louis DeJoy to Serve as Nation's 75th Postmaster General*, USPS (May 6, 2020), https://about.usps.com/newsroom/national-releases/2020/0506-bog-announces-selection-of-louis-dejoy-to-serve-as-nations-75th-postmaster-general.htm.~~

[86] ~~*Id.*~~

[87] Ex. 1, ~~USPS~~, *Mandatory Stand-Up Talk: All Employees*, USPS (July 10, 2020), https://www.washingtonpost.com/context/internal-usps-document-tells-employees-to-leave-mail-at-distributioncenters/175dd1ae-e202-4777-877c-33442338d1cc/.

[88] ~~*Id.*~~

75.72.   Specifically, the document listed the following nationwide policy changes:  (i) all "Network, Plant, and Delivery" trips must "depart on time"; (ii) late trips are "no longer authorized or accepted"; (iii) extra trips are "no longer authorized or accepted"; (iv) carriers "must begin on time, leave for the street on time, and return on time;"; and (v) "no additional transportation will be authorized to dispatch mail to the plant after the intended dispatch" (collectively, the "Late/Extra Trip Policy").[89]

76.73.  This Late/Extra Trip Policy runsran contrary to prior USPS policies, which instructed postal workers *not* to leave letters behind and to make multiple trips as needed to ensure that mail is timely delivered.[90]

77.74.  Notably, the document detailing the Late/Extra Trip Policy statesstated:  "[o]ne aspect of these changes that may be difficult for employees is that—temporarily—we may see mail left behind or on the workroom floor or docks."[91]

78.   On July 14, 2020, a USPS PowerPoint presentation entitled "PMGs expectations and plan" reaffirmed the Late/Extra Trip Policy.  It states that "plants are not to send mail late," and if the "plants are not on time they will hold the mail for the next day."92  The presentation also details the policy of curtailing late trips by mail carriers, stating that carriers will not start "any later" than "0900" (9:00 am), and that if

---

[89] *Id.*

[90] Jacob Bogage, *Postal Service Memos Detail "Difficult" Changes, Including Slower Mail Delivery*, Wash. Post (July 14, 2020), https://www.washingtonpost.com/ business/2020/07/14/postal-service-trump-dejoy-delay-mail/.

[91] Ex. 1, USPS, *Mandatory Stand-Up Talk: All Employees*, USPS (July 10, 2020).

92 *Leaked USPS PowerPoint indicates PMG DeJoy Focus on Getting Operating Costs Under Control*, Alliance of Nonprofit Mailers (July 14, 2020), https://www.nonprofitmailers.org/leaked-usps-powerpoint-indicates-pmg-dejoy-focus-on-getting-operating-costs-under-control/ ("July 14 USPS PMG Presentation").

the delivery units "get mail late and your carriers are gone and you cannot get the mail out without [overtime] it will remain for the next day."[93]

79.     In a letter to members of Congress dated August 6, 2020, USPS Chief Operating Officer David Williams confirmed that, at DeJoy's direction, USPS had taken "immediate steps" geared toward "improving our transportation efficiency" by, among other things, "working to eliminate extra and late trips" and reducing "unnecessary" and "unauthorized" overtime."[94]  DeJoy likewise confirmed these changes in his opening remarks before the USPS Board of Governors on August 7, 2020.[95]

80.     In an internal USPS memorandum dated August 13, 2020, DeJoy again confirmed the changes to longstanding USPS policy.[96]  Specifically, he highlighted that USPS "began those efforts right away," and as a result, extra trips had already been reduced by 71%.[97]

81. 75.  In enacting these dramatic policy changes on a nationwide basis, DeJoy and USPS completely ignored the statutory requirement to submit a proposal to the Postal Regulatory Commission.  Defendants wholly disregarded the statutory approval process and failed to obtain

[93] Id.

[94] See Letter from David Williams to Senator Gary Peters et al. (Aug. 6, 2020), https://www.hsgac.senate.gov/imo/media/doc/20200806_USPS%20Response%20to%20Peters%20et%20al%20Jul%2030%20Ltr.pdf.

[95] See USPS, Postmaster General Louis DeJoy's Opening Remarks for the USPS Board of Governors Aug. 7 Meeting (Aug. 7, 2020), https://about.usps.com/newsroom/national-releases/2020/0807-pmg-bog-meeting-comments.htm.

[96] See USPS, Path Forward: PMG Addresses Restructuring (Aug. 13, 2020), https://link.usps.com/2020/08/13/path-forward-2/.

[97] Id.

an advisory opinion from the Postal Regulatory Commission prior to instituting these policy changes.

82.76.   Furthermore, although the operational pivot ~~is~~was purportedly designed to target "soaring costs" and improve operational efficiency, it ~~fails~~failed to explain how the new policies effectuate those goals.[98]

83.77.   In practice, the Late/Extra Trip Policy ~~can cause~~threatened to create a chain of compounding delays at every step of the ballot delivery process.  ~~This can~~These delays could affect both the mailing of ballots from the state elections office to the voter and from the voter back to the elections office.

84.78.   *Delays inflicted on the mailing of blank ballots from the elections office to the voter.*  There are three potential points where the Late/Extra Trip Policy ~~can~~could cause at least one day of delay in the delivery of ballots from the elections office to the voter.

85.79.   First, once the blank ballot is delivered to the local post office, a mail handler has to deliver that ballot to a processing plant.  But if the ballot arrives at the local post office after the mail handler left for the processing plant, the Late/Extra Trip Policy ~~will~~would not allow the mail handler to make an extra trip to deliver the blank ballot.  The mail handler must instead wait to deliver the blank ballot to the processing plant until the next day—creating the risk of a one-day delay.

86.80.   Second, after the processing plant receives and sorts the mail shipment that contains the blank ballot, the ballot must be placed on the mail handler's truck for delivery from the processing plant back to the voter's local post office.  But if the blank ballot is not processed in time for the mail handler's scheduled delivery from the processing plant to the post office, the

---

[98] ~~Ex. 1, USPS, *Mandatory Stand Up Talk: All Employees* (July 10, 2020).~~ *Id.*

Late/Extra Trip Policy requires the ballot to remain at the processing plant until the next day—creating the risk of a second one-day delay.

87. 81.  Third, once the blank ballot makes it back to the voter's local post office, a carrier has to deliver it to the voter.  However, the Late/Extra Trip Policy forbids the carrier from beginning her delivery route late.  Thus, if the blank ballot arrives at the voter's local post office after the carrier's trip has begun, the Late/Extra Trip Policy requires the carrier to wait to deliver the blank ballot until the next day—creating the risk of a third one-day delay.

88. 82.  These delays are were compounded for ballots being shipped to non-local destinations, which must go through more than one processing center in order for the ballot to travel from an election office to a voter.  *See supra,* section II.A.

89. 83.  *Delays inflicted on the delivery of completed ballots from the voter to the elections office.*  This process then repeats itself (in reverse) once the voter completes the ballot and attempts to mail it back to the election office—creating another three opportunities for delay.  Each point of delay is would be caused by the Late/Extra Trip Policy, which (for the reasons set forth above) bar bars the additional trips needed to complete the delivery of mail from one point in the chain to the next.  In particular:  First, there is the risk of a one-day delay in the transmission of the ballot from the local delivery unit to the processing plant.  Second, there is the risk of a one-day delay once the mail is processed at the plant before it is delivered back to the local delivery unit.  Third, there is a further risk of a one-day delay when the mail is then transported from the local delivery unit to the elections office.

90. 84.  As DeJoy has twice acknowledged in his testimony to the House Oversight Committee on August 24, 2020, these delays are not simply theoretical.  On August 24, 2020, DeJoy testified that these policies were directly responsible for delays in delivery, and

"expose[d] a need to realign some of [USPS's] processing and scheduling that caused mail to

miss the scheduled transportation . . . ."[.]"[99]  He reiterated this point in testimony before the

Committee on February 24, 2021.[100]  And data from an August 12, 2020 USPS document titled

"Service Performance Measurement: PMG Briefing" showed more than an 8% decrease in on-

time first-class mailFirst-Class Mail delivery, and similar declines for marketing mail and

periodicals.[101]

 91.85.  The Late/Extra Trip Policy has beenwas implemented under the adverse

conditions of the COVID-19 pandemic, which magnifiesmagnified the impact of that policy.  In

particular, COVID-19 has caused staffing shortages at USPS, especially among letter carriers.

ApproximatelyAs of August 2020, approximately 40,000 postal workers have had to

quarantine, over 6,000 havehad tested positive for COVID-19, and 83 havehad died from

contracting COVID-19.[102]  When letter carriers are sick, quarantining, dealing with the absence

of child care, or otherwise unable to complete their routes, the need for other carriers to make

extra and off-shift trips to ensure that the mail is delivered is at its greatest.

---

[99] *See* Press Release, *Statement of Postmaster General and Chief Executive Officer Louis DeJoy before the House Committee on Oversight and Reform*, USPS (Aug. 24, 2020), https://about.usps.com/newsroom/testimony-speeches/082420-pmg-statement.htm.

[100] *See* USPSPress Release, *Statement of Postmaster General and Chief Executive Officer Louis DeJoy beforeBefore the House Committee on Oversight and Reform* (Aug, USPS (Feb. 24, 20202021), https://about.usps.com/newsroom/testimony-speeches/082420-pmg022421-statement-of-pmg-louis-dejoy-on-oversight-and-reform.htm. ("Feb. 24 House Testimony").

[101] *Service Performance Measurement: PMG Briefing*, USPS (Aug. 12, 2020), https://oversight.house.gov/sites/democrats.oversight.house.gov/files/documents/PMG%20Briefing_Service%20Performance%20Management_08_12_2020.pdf.

[102] *Postmaster General Louis DeJoy Testimony Transcript August 24: House Oversight Hearing* at 4:57:39–4:57:55, Rev (Aug. 24, 2020), https://www.rev.com/blog/transcripts/postmaster-general-louis-dejoy-testimony-transcript-august-24-house-oversight-hearing.

92 86.  The imminent general election2020 General Election, which is projected to have saw the highest number of mail-in ballots cast of all time, has[103] as well as the 2021 Georgia Runoff Election, further increased the need for late, extra, and off-shift trips.  The combination of the sheer expansion of mail-in ballots for the general election General Election and the critical importance of timely delivery of Election Mail has heightened the importance of ensuring that postal workers have the flexibility and extended hours necessary to complete deliveries on schedule.

### B.1.   The Specific Impact of the Delays Inflicted by the Late/Extra Trip Policy

93 87.  Currently, as set forth in Exhibit 2, 28Twenty-eight states, including Pennsylvania and New Mexico, currently have receipt-by-Election-Day deadlines, which require completed ballots to be *received* by election officials on or before Election Day.[104] Even.[105]  In these states, even if a returned ballot is postmarked (*i.e.*, marked as received by USPS) on or before Election Day, it will not be counted unless it is *received by election officials* prior to or on Election Day.

94 88.  Defendants' Late/Extra Trip Policy impactswould impact voters in the 28 states with receipt-by-Election-Day deadlines, or deadlines soon after Election Day by compressing the timeline in which a voter must mail her completed ballot to ensure that her vote is counted.

---

[103] Drew DeSilver, *Most Mail and Provisional Ballots Got Counted in Past U.S. Elections - But Many Did Not*, Pew Rsch. Ctr. (Nov. 10, 2020), https://www.pewresearch.org/fact-tank/2020/11/10/most-mail-and-provisional-ballots-got-counted-in-past-u-s-elections-but-many-did-not/.

[104] *See* Ex. 2, Chart of States Where Voters' Mail-in Ballots Are Impacted By Defendants' Delays.

[105] *See Processing Readiness of Election and Political Mail During the 2020 General Election*, Report No. 20-225-R20, USPS OIG 23 (Aug. 31, 2020), https://www.oversight.gov/sites/default/files/oig-reports/20-225-R20.pdf.

95 89.  A simple example highlights the risks associated with this delay.  ~~Assume again that~~The 2021 statewide primary election in Pennsylvania will take place on Tuesday, May 18.  If a voter ~~in Colorado—where Plaintiffs Voces Unidas, COLOR, and Padres & Jóvenes Unidos strive to engage Latinx voters, and where thousands of members of COLOR and Padres & Jóvenes Unidos reside and vote—submits~~put her completed ballot ~~by First-Class Mail, which~~in the ~~ordinary course could~~mail on Saturday, May 15, ordinarily it would be delivered in 1–3 days~~.  The~~ and would therefore be received by the state's Election Day deadline.  However, the additional delay (conservatively estimated to be up to three days) ~~engendered~~caused by the Late/Extra Trip Policy~~, however,~~ would preclude voters from voting by mail on the Saturday before the election.  Put another way, any completed ballots mailed on ~~October 31~~Saturday, May 15, or later, would be at a substantial risk of not ~~be~~being received by the local election office by Election Day—thus rendering any such completed ballot invalid.

96 90.  Defendants' admissions are consistent with this timeline.  In letters that USPS sent to state election officials on July 29, 2020, Defendants ~~have~~ stated that completed ballots ~~must be~~for the 2020 General Election needed to be mailed by ~~voters on~~October 27~~if they are~~, 2020 in order to be received by Election Day.  The need for a full week reflects the additional risk of a delay (on top of the normal First-Class standard of service) created by the Late/Extra Trip Policy.[106]

---

[106] *See, e.g.*, Ex. ~~3, USPS~~2, Letter from ~~T~~Thomas J. Marshall, USPS, to Sec'y Kathy Boockvar, Pa. 2 (July 29, 2020).

97.    Voters in Alabama and Indiana are especially likely to suffer severe impacts attributable to Defendants' policies because their ballots must be received *by noon* on Election Day,[107] and in Louisiana, on the day *before* the election.[108]

98.91.   There are some voters in states with "postmark deadlines" of three days or fewer who face a similar risk of disenfranchisement due to Defendants' policies.  In these handful of statesTexas, a completed ballot will be counted by election officials if it is postmarked on or before Election Day at 7 p.m. *and* received within three days, or fewer (depending onby 5 p.m. the state),day after Election Day.[109]  Those small extensions dothe election.  Tex. Elec. Code § 86.007(a), (d-1)–(f); *id.* § 86.006(a), (a-1).  This limited, one-day extension does not remove the risk of late delivery.

99.92.  Finally, among the 28 states with receipt-by-Election-Day deadlines, there are some voters in 15 out of those 28 states whoPennsylvania and New Mexico may not even receive their ballots until the Saturday before an election.  In Pennsylvania, voters can request an absentee ballot through 5 p.m. the Tuesday before the election.[110]  (*i.e.*, Tuesday, May 11 for the May 18 primary and special elections and Tuesday, October 26 for the November 2 general election).  25 Pa. Stat. § 3146.2a(a), (a.3); *id.* § 3150.12a(a).  And in New Mexico, voters can

---

[107] Ala. Code § 17-11-18; Ind. Code Ann. § 3-11.5-4-7.

[108] La. Rev. Stat. 18:1308 (mailed ballots must be received by day before election at 4:30 p.m.).

[109] *See* Ex. 2, Chart of States Where Voters' Mail-in Ballots Are Impacted By Defendants' Delays.  These states include Texas (counts ballots received one day after Election Day); New Jersey (counts ballots received two days after Election Day); and Georgia, Kansas, Kentucky, Massachusetts, North Carolina, and Virginia (counts ballots received up to three days after Election Day).  *Id.*

[110] There are 15 states with Application Deadlines that fall close to Election Day.  Those states include Arkansas, Oklahoma, Pennsylvania, and Tennessee (Application Deadline of October 27); Alabama, Maine, and Wisconsin (Application Deadline of October 29); Louisiana, Michigan, and South Carolina (Application Deadline of October 30); and Connecticut, Delaware, New Hampshire, South Dakota, and Wyoming (Application Deadline of November 2).

request an absentee ballot through the Thursday immediately before the election.  N.M. Stat. § 1-6-5(F).   Given delays in both receiving blank and sending completed ballots associated with Defendants' Late/Extra Trip Policy (compounded by ~~the pandemic, the volume of Election Mail, and Defendants' additional policies) similarly threatens to disenfranchise voters who receive their ballot on the Saturday before Election Day, and who, but for Defendants' delay, would~~ Defendants' deficient ballot processing practices), these voters could altogether miss the opportunity to have their mail-in votes counted.

~~100.   For example, in Wisconsin, where Plaintiff Aaron Carrel resides and votes, an individual may apply for an absentee ballot up until October 29.  Assume that the election official receives the voter's application on October 29 and mails out a blank ballot to the voter that same day, and that the Defendants provide First-Class treatment (1–3 days) to the blank ballot.  If one then assumes the fastest First-Class delivery of one day, the additional delay of *at least one day*, would mean that the blank ballot would be received on Saturday, October 31 *at the earliest*.  Thus, voters in these 15 states face the same potential injury as described above:  the Late/Extra Trip Policy will likely ensure that a voter who receives her ballot on the Saturday before the election is at risk of having her vote not counted.~~

~~101.~~ 93.   As set forth in Exhibit 2, in the nearly 50 letters that USPS General Counsel Thomas Marshall mailed to state election officials, Defendants ~~admit~~admitted that their policies ~~will~~would cause delays that ~~may~~could disenfranchise voters who ~~apply~~applied for absentee ballots as described.  Specifically, USPS advised election officials prior to the November 2020 General Election that "if a voter submits a request [for an absentee ballot] at or near [October 27, 2020], and the ballot is transmitted to the voter by mail, there is a *significant risk* that the voter will not have sufficient time to complete and mail the completed ballot back to

election officials in time for it to arrive by the state's return deadline."[111]  Yet despite recognizing the "significant risk" of disenfranchisement, Defendants ~~continue~~continued to implement policies that delay the delivery of First-Class Mail, including Election Mail, and—in the same breath—~~admit~~admitted that USPS "cannot adjust its delivery standards to accommodate the requirements of state election law."[112]

~~102.~~94.        This position is all the more alarming given that Defendants' policy changes were instituted in violation of their statutory obligation to submit proposals to the Postal Regulatory Commission before implementation.  *See supra*, ~~sections~~section II.~~B & III~~.A.

~~103.~~95.        In light of the ongoing pandemic, swarms of voters ~~have~~in both the November 2020 General and Georgia Runoff Elections opted to forgo voting in person in favor of voting by mail.  Many will likewise rely on mail-in voting in upcoming elections in 2021. Consequently, Defendants' Late/Extra Trip Policy—~~which was implemented in the midst of this pandemic, following numerous reports of ballots being rejected for untimeliness through no fault of the voter—threatens~~ threatened and continues to threaten to disenfranchise voters *en masse*.

~~104.~~Put simply, under the Late/Extra Trip Policy, voters who follow the rules are "set up for failure," based on policies ~~implemented by Defendants that are~~beyond ~~Plaintiffs'~~their control.[113]

---

[111] *~~See, e.g., Ex. 3, USPS Letter to Pennsylvania at 2~~Id.* (emphasis added).

[112] *Id.*

[113] Pam Fessler & Elena Moore, *Signed, Sealed, Undelivered: Thousands Of Mail-In Ballots Rejected for Tardiness*, NPR (July 13, 2020), https://www.npr.org/2020/07/13/889751095/signed-sealed-undelivered-thousands-of-mail-in-ballots-rejected-for-tardiness.

## IV.     DeJoy's Refusal to Restore Sorting Machines Has Burdened the Right to Vote.

105.     The decommissioning and destruction of sorting machines has accelerated under DeJoy's tenure.[114] While USPS has similarly decommissioned such machines before, the current rate of decommissioning far exceeds that of years past.  For example, USPS decommissioned roughly 3% of sorting machines in 2018, and 5% of sorting machines in 2019.[115] In 2020, the number of machines USPS has removed or decommissioned amounts to a 260% increase in the rate of machines decommissioned the year before.[116]

106.     Specifically, Postmaster General DeJoy moved to decommission one of every ten USPS mail sorting machines in USPS's inventory,[117] including one of every seven Delivery Barcode Sorter (DBCS) machines.[118] DBCS machines make up the bulk of USPS's mail sorting operation and are used to sort envelope mail, such as letters,

---

[114] Jacob Bogage & Christopher Ingraham, *Here's Why the Postal Service Wanted to Remove Hundreds of Mail Sorting Machines*, Wash. Post (Aug. 20, 2020), https://www.washingtonpost.com/business/2020/08/20/postal-service-mail-sorters-removals/.

[115] *Id.*

[116] *Id.*

[117] Cox, *supra* note 12.

[118] Paul P. Murphy & Curt Devine, *Internal USPS Documents Raise Questions About Effectiveness of Sorting Machines Removal Order*, CNN (last updated Aug. 16, 2020), https://www.cnn.com/2020/08/16/politics/usps-documents-sorting-machine-removal-order/index.html.

postcards, and—critically—ballots.[119]  DBCS machines are capable of sorting through 35,000 pieces of mail per hour.[120]

107.    USPS planning documents reflect that, in June and July, USPS planned to remove 746 letter sorting machines, including both DBCS and other machines.[121]  Since then, it has been reported that subsequent additional USPS internal documents reflected that "USPS planned to remove 502 DBCS (Delivery Barcode Sorter) machines, or 13.2% of its total inventory by September 30," and that "nearly 95%, or 475, of those were scheduled to be removed by the end of July."[122]  The nationwide loss of 475 DBCS machines is equivalent to losing the ability to process *16,625,000 ballots an hour*.

108.    As sorting machines have been decommissioned or removed, postal workers have reported massive backlogs of mail to be processed.  In Wisconsin, where Plaintiff Aaron Carrel resides and votes, USPS has closed several local distribution centers in recent years, forcing postal workers to route ballots mailed by election officials out of town to one of the few remaining distribution centers.  Despite the added stress that the closure of distribution centers places on the remaining facilities to process mail for large populations around the state, the USPS planning documents reflected that 12 DBCS machines would be decommissioned in Wisconsin by the end of

[119] Aaron Gordon, *The Post Office Is Deactivating Mail Sorting Machines Ahead of the Election*, Vice (Aug. 13, 2020), https://www.vice.com/en_us/article/n7wk9z/the-post-office-is-deactivating-mail-sorting-machines-ahead-of-the-election.

[120] *Id.*

[121] *USPS Equipment Reduction Plan*, 21st Century Postal Worker (July 9, 2020), https://www.21cpw.com/usps-equipment-reduction-plan/.

[122] Murphy & Devine, *supra* note 63; Paul P. Murphy, *These are the Sorting Machines USPS Removed that Would Handle Mail and Election Ballots*, CNN (Aug. 21, 2020), https://www.cnn.com/2020/08/21/politics/usps-mail-sorting-machines-photos-trnd/index.html.

July.[123]  This includes the decommissioning of two sorting machines in Madison,[124] where Plaintiff Aaron Carrel resides and votes, which threatens to delay the sorting (and, thereby, the delivery) of ballots to Carrel and other voters.

109.    The Washington Post published a map detailing which areas have seen reduced sorting capacity using data obtained from USPS:



[125]

110.    DeJoy has made clear that he has no intention of replacing or reconnecting the sorting machines that were decommissioned or dismantled at an accelerated pace under his tenure.  Following a conversation with DeJoy, House Speaker Nancy Pelosi released a statement saying DeJoy "frankly admitted that he had no intention of

---

[123] *USPS Equipment Reduction Plan*, 21st Century Postal Worker (July 9, 2020), https://www.21cpw.com/usps-equipment-reduction-plan/.

[124] *Id.*

[125] *See* Bogage, *supra* note 59.

replacing the sorting machines."[126] And when Senator Gary Peters asked DeJoy if he intended to replace the sorting machines that had already been removed, DeJoy testified: "There is no intention to do that. They're not needed, sir."[127]

111.   DeJoy's failure to restore the decommissioned sorting machines will impact USPS's timeliness in delivering Election Mail. For example, USPS representatives have also reported that sorting machines have been removed in Colorado.[128] These removals will lead to delays in postmarking and delivery of ballots due to the increased load on the few remaining sorting machines. This will significantly burden the right to vote in light of the fact that Colorado's elections are carried out primarily by mail.

112.   Because this additional sorting capacity was eliminated in the months leading up to an election with record-breaking numbers of individuals who need to vote by mail, DeJoy's refusal to restore the decommissioned sorting machines will surely delay the processing of ballots for people who vote in the weeks leading up to the election, and will consequently disenfranchise voters across the country.

---

[126] Press Release, Nancy Pelosi, Speaker, House of Representatives, *Pelosi Statement After Conversation with Postmaster General* (Aug. 19, 2020), https://rb.gy/xwd0cx.

[127] *Senate Hearing with Postmaster General Louis DeJoy August 21 Transcript* at 34:16, Rev (Aug. 21, 2020), https://www.rev.com/blog/transcripts/senate-hearing-with-postmaster-general-louis-dejoy-august-21-transcript.

[128] Sonia Gutierrez, *Denver Area Post Office Employees Call for Changes*, 9News (last updated Aug. 27, 2020), https://rb.gy/1j6tbr.

V.     DeJoy's Purported Backtracking Under Immense Public Pressure in
       Advance of the 2020 Election Did Not Eliminate the Challenged
       Policies' Burden on the Right to Vote.

113.    The Challenged Policies took place in the context of a broader set of

circumstances and actions by USPS that impaired the ability to vote by mail—all of

which were met with intense public pressure.

114.    For example, in this same time period, USPS issued inconsistent

statements regarding the availability of overtime.  The July 14, 2020 USPS PowerPoint

presentation entitled "PMGs expectations and plans" stated that both overtime and paid

overtime "will be eliminated."[129]  Since that letter, it has been reported that overtime has

been "drastically reduced."[130]

115.    According to data from the American Postal Workers Union, almost 20%

of all work done by USPS mail handlers, delivery drivers, and city carriers was done in

overtime.[131]  USPS employees use overtime "to handle surges in mail—including mail-in

ballots."[132]

---

[129] July 14 USPS PMG Presentation, *supra* note 39.  DeJoy testified before the Senate Homeland
Security and Governmental Affairs Committee on August 21, 2020, and stated that USPS has
"never eliminated overtime."  *See Senate Hearing with Postmaster General Louis DeJoy August
21 Transcript* at 33:13, Rev (Aug. 21, 2020), https://www.rev.com/blog/transcripts/senate-
hearing-with-postmaster-general-louis-dejoy-august-21-transcript.

[130] *See* Cox, *supra* note 12.

[131] Nicole Goodkind, *Trump-Backed Postmaster General Plans to Slow Mail Delivery, Fortune*,
Fortune (July 24, 2020), https://rb.gy/11qwen.

[132] Letter from House Speaker Nancy Pelosi and Senate Minority Leader Charles Schumer to
Postmaster Gen. Louis DeJoy, at 5 (Aug. 14, 2020), https://rb.gy/f8wrhi.

116.   Postal workers in California reported that, upon DeJoy's decision to restrict overtime, "the [processing] facility was in chaos . . . [w]ithin days."[133]  One visitor stated the facility's "parking lot was crammed with semi-trailers piled high with unsorted mail; the warehouse-like facility was packed 'wall to wall' with mail."[134]

117.   This all occurred at the same time as USPS statements calling into question the First-Class status traditionally afforded to Election Mail,[135] the now-paused removal of mail collection boxes,[136] and the implementation of the Expedited to Street/Afternoon Sortation ("ESAS") pilot program that further restricted mail sorting and delivery practices.[137]

118.   The convergence of these practices—in the middle of a pandemic and in the months preceding the presidential election—was followed by widespread public

---

[133] Laura J. Nelson & Maya Lau, *"Like Armageddon": Rotting Food, Dead Animals and Chaos at Postal Facilities Amid Cutbacks*, L.A. Times (Aug. 20, 2020), https://www.latimes.com/california/story/2020-08-20/usps-cutbacks-post-office-chaos.

[134] *Id.*

[135] *See, e.g.*, Luke Broadwater & Hailey Fuchs, *A New Clash Over Mail Voting: The Cost of the Postage*, N.Y. Times (last updated Aug. 18, 2020), https://www.nytimes.com/2020/08/11/us/politics/post-office-mail-in-voting.html; Jacob Bogage, *Trump Says Postal Service Needs Money for Mail-In Voting, But He'll Keep Blocking Funding*, Wash. Post (Aug. 12, 2020), https://www.washingtonpost.com/business/2020/08/12/postal-service-ballots-dejoy/.

[136] *See, e.g.*, Jacob Bogage, *Postal Service Will Stop Removing Mailboxes*, Wash. Post (Aug. 14, 2020), https://www.washingtonpost.com/business/2020/08/14/people-are-freaking-out-about-mailbox-removals-postal-service-says-its-routine/.

[137] *See, e.g.*, David Ewing Duncan, *"It Looks Like They're Targeting Blue Urban Areas": New Postal Service Plan Is Setting Off Election Alarms*, Vanity Fair (Aug. 21, 2020), https://www.vanityfair.com/news/2020/08/new-postal-service-plan-is-setting-off-election-alarms; *USPS Announces New ESAS Delivery Initiative Test*, Nat'l Assoc. Letter Carriers (July 21, 2020), https://www.nalc.org/news/nalc-updates/usps-announces-new-esas-delivery-initiative-test.

~~outcry from thousands of protesters nationwide, including those who participated in the more than 800 demonstrations at post offices that took place on August 22, 2020.[138]~~

~~119.   On August 18, 2020, DeJoy released a public statement purporting to suspend certain of these changes that had been implemented pursuant to "longstanding operational initiatives" that "predate my arrival at the Postal Service."[139]~~

~~120.   Critically, DeJoy's statement did not purport to suspend the *new* changes implemented at his direction—including the Late/Extra Trip Policy announced in the July 10 operational pivot directing reductions in service.  And in his testimony before the House and Senate, DeJoy reaffirmed that he did not intend to suspend the Late/Extra Trip Policy.[140]~~

---

~~[138] Emily Davies, *'Save the Post Office Saturday' draws thousands of protesters nationwide*, Wash. Post (Aug. 22, 2020), https://www.washingtonpost.com/local/save-the-post-office-saturday-draws-thousands-of-protesters-nationwide/2020/08/22/ee09d094-e4b8-11ea-8dd2-d07812bf00f7_story.html.~~

~~[139] Press Release, Postmaster General Louis DeJoy Statement, USPS (Aug. 18,2020), https://about.usps.com/newsroom/national-releases/2020/0818-postmaster-general-louis-dejoy-statement.pdf; *see also Statement of Postmaster General and Chief Executive Officer Louis DeJoy before the House Committee on Oversight and Reform*, USPS (Aug. 24, 2020) (purporting to pause removal of sorting machines and collection boxes, and to walk back ESAS program and questioning of first-class mail status), https://about.usps.com/newsroom/testimony-speeches/082420-pmg-statement.htm.~~

~~[140] *Senate Hearing with Postmaster General Louis DeJoy August 21 Transcript* at 32:28–33:00, Rev (Aug. 21, 2020), https://www.rev.com/blog/transcripts/senate-hearing-with-postmaster-general-louis-dejoy-august-21-transcript ("Senator Peters:  . . . Are you suspending your policy eliminating extra trips?  Yes or no?  Louis DeJoy:  No.  First of all, the policy was not to eliminate extra trips.  It was to mitigate extra trips.  Senator Peters:  Okay. So no to that."); *CQ Congressional Transcripts, House Oversight and Reform Committee Holds Hearing on Postal Service Operational Changes* (Aug. 24, 2020), https://plus.cq.com/alertmatch/45415249%20&deliveryId=64929757&uid=congressionaltranscripts-5991590&utm_medium=alertemail&utm_source=alert&openinplus=true ("The change I made was asked the team to run the trucks, transportation on time and mitigate extra trips . . . I would not know how to reverse that now.  Am I to say don't run the trucks on time?  Is that the answer that we're looking to get me to say here today?").~~

121. DeJoy's August 18 statement did not address the specific points articulated in the "PMGs expectations and plan" PowerPoint related to the Late Trip Policy other than to say that "overtime has, and will continue to be, approved as needed."[141] The statement does not purport to rescind the policy that, if postal workers "get mail late and [their] carriers are gone and [they] cannot get the mail out without [overtime] it will remain for the next day.[142] Nor does it rescind the policy of curtailing late trips by mail carriers and stating that "plants are not to send mail late."[143]

122. Unlike the PowerPoint, which referenced both paid overtime and overtime, DeJoy's statement does not specify whether he is lifting the suspension of overtime *pay* or overtime *hours*. And, because the Late/Extra Trip Policy banning late and extra network, plant, and delivery trips remains in place, the supposed availability of overtime may be an illusion—if late trips and post-shift work are forbidden, then there is no work involving the transportation of mail for which overtime could be authorized.

123. And although DeJoy has now *paused* certain of the programs that started before his tenure, DeJoy has since made clear that he has no intention of replacing or reconnecting the decommissioned machines, even though their removal was accelerated during his time as Postmaster General.[144] This distinction is critical, because the various

---

[141] July 14 USPS PMG Presentation, *supra* note 39.

[142] *Id.*

[143] *Id.*

[144] *Senate Hearing with Postmaster General Louis DeJoy August 21 Transcript* at 34:16, Rev (Aug. 21, 2020), https://www.rev.com/blog/transcripts/senate-hearing-with-postmaster-general-louis-dejoy-august-21-transcript.

internal USPS planning documents indicated that, by the time DeJoy issued his statement on August 18, USPS was set to have already decommissioned *more than 95%* of the sorting machines that were scheduled to be removed.[145]

**VI.    Defendants' Policies Will Delay the Delivery of Election Mail.**

**A.    The Delay Inflicted on All Voters**

~~124.~~96.         A delay in delivery can mean that a "voter's right to vote ~~. . .~~ may hinge on random chance," ~~with~~such that if two ballots are mailed at the same time, at different post offices, whether either vote is counted depends "entirely on the speed at which their local post office delivered their votes." *Gallagher v. ~~New York~~N.Y. State Bd. of Elections*, ~~No. 20 CIV. 5504 (AT), 2020 WL 4496849, at *20~~477 F. Supp. 3d 19, 48 (S.D.N.Y. ~~Aug. 3,~~ 2020). The government cannot overlook or dismiss a "systemic problem that arbitrarily renders [thousands of] ballots invalid." *Id.* at ~~*17~~45.

~~125.    The Challenged Policies individually and collectively inject an intolerable risk of delay into the 2020 election.~~

~~126.~~97.         USPS data ~~shows~~confirms that "the risk of delays caused by the Late/Extra Trip Policy is not merely theoretical.  Indeed, internal USPS documents show that

---

[145] Murphy & Devine, *supra* note 63 (95% of target decommissioned by August 16, 2020); https://www.21cpw.com/usps-equipment-reduction-plan/ (100% of target decommissioned by July 28).

there ~~has been~~ was "a significant drop in service standards across the board ~~since~~"[146] after the beginning of July— "including in First-Class, Marketing, Periodicals, and Priority Mail":[147]

---

[146] The Code of Federal Regulations prescribes a 1–3 day timeframe for most mail delivered within the 48 contiguous states, 39 C.F.R. § 121.1, and recent USPS statements indicate that this regulatory requirement is carried out in practice. *See* Service Standards Maps, USPS PostalPro (July 1, 2020), https://postalpro.usps.com/ppro-tools/service-standards-maps.  However, at USPS's 30(b)(6) deposition regarding the delivery of Georgia Election Mail, USPS's Mr. Robert Justin Glass, Manager of Operations Industrial Engineering at USPS's Washington, D.C. Headquarters, indicated that the service standard for the lower 48 states is 2–3 days.  Ex. 3, Robert Justin Glass Dep. Tr. (Dec. 15, 2020) (hereinafter "Glass Dep. Tr."), at 28:4–7.

[147] ~~House Committee on Oversight and Reform~~ Press Release, *New Postal Service Documents Show Nationwide Delays Far Worse Than Postal Service Has Acknowledged*, House Committee on Oversight and Reform (Aug. 22, 2020), https://oversight.house.gov/news/press-releases/new-postal-service-documents-show-nationwide-delays-far-worse-than-postal.





---

148 ~~House Committee on Oversight and Reform,~~ *USPS Service Performance Measurement, PMG Briefing,* USPS (Aug. 12, 2020),
https://oversight.house.gov/sites/democrats.oversight.house.gov/files/documents/PMG%20Briefing_Service%20Performance%20Management_08_12_2020.pdf.

127.98.        As the above chart highlights, ~~since~~from the time DeJoy took over as Postmaster General through August 2020, USPS service scores ~~are~~were 8.10% lower than baseline.  And the majority of that drop resulted from a delay in processing—the service performance from USPS possession to last processing scan ~~is 7.96% lower than baseline.[149]~~was 7.96% lower than baseline.[150]  A subsequent November 6, 2020 report by the USPS Office of the Inspector General ("OIG") showed even greater drops, with service scores for First-Class Single Piece mail declining 10.4%, from 90.1% to 79.7%—well below "the target of 96[%]."[151]  Scores for First-Class Presort mail declined 9.3% from 92.2% to 82.9%, again well below the 96% target.[152]

---

[149] *Id.*

[150] *Id.*

[151] OIG Report, *supra* note 61, at 9.

[152] *Id.*

128 99.     The following chart, based on USPS data from the Eastern seaboard, shows a similar dramatic drop-off in timely deliveries in the immediate aftermath of the July 10 Late/Extra Trip Policy:



| District | WK 43 | RK | QTD | RK | YTD | RK | District | WK 43 | RK | QTD | RK | YTD | RK |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Appalachian | 84.96 | 41 | 89.11 | 15 | 92.98 | 5 | South Jersey | 86.99 | 25 | 88.01 | 28 | 91.82 | 20 |
| Central Pennsylvania | 72.86 | 63 | 79.47 | 65 | 90.91 | 42 | Tennessee | 82.48 | 52 | 85.83 | 43 | 91.47 | 27 |
| Kentuckiana | 85.13 | 38 | 87.12 | 32 | 92.00 | 17 | Western New York | 86.00 | 31 | 88.59 | 22 | 93.15 | 4 |
| Northern Ohio | 68.31 | 65 | 81.17 | 62 | 91.25 | 34 | Western Pennsylvania | 90.01 | 5 | 90.50 | 6 | 93.60 | 1 |
| Ohio Valley | 71.08 | 64 | 80.77 | 63 | 90.35 | 49 | Eastern | 79.07 | 7 | 84.60 | 6 | 91.59 | 2 |
| Philadelphia Metropo | 85.68 | 33 | 86.68 | 38 | 91.23 | 36 | National Total | 84.23 | | 86.26 | | 90.76 | |

*Eastern Area First Class Composite*

129 100.     Delays have The November 6, 2020 OIG Report noted that "[d]elayed mail reported in Postal Service systems for mail processing facilities increased 21 percent, from 2 billion pieces for the week ending July 10, 2020 to 2.4 billion pieces for the week ending July 31, 2020."[154]  Likewise, delayed mail at post offices "increased 143 percent, from 4.7 million for

[153] USPS, *Eastern Area AIM Meeting - Service Update*, USPS (Aug. 4, 2020), https://postalpro.usps.com/node/8407 (including Figures 1 and 2).  For Figures 1 to 4, "SPYL" refers to "same period last year."  Additionally, FY2020 started on October 1, 2019, for the U.S. Postal Service. USPS.  Accordingly, Week 41 corresponds to the week of July 5.

[154] OIG Report, *supra* note 61, at 2.

the week ending July 10, 2020, to 11.4 million for the week ending July 31, 2020."[155]  Delays

persisted through August, as reflected by the data USPS released on August 31, 2020.[156]

130.101.      The cause of this deterioration in service has beenwas identified by the

Postmaster General himself in his Congressional testimony.  In DeJoy's words, he only made

"one change" in this time period that accounted for the drop-off in early July:  he "asked the

team to run the transportation on time and mitigate extra trips" in July 2020—*i.e.*, the Late/Extra

Trip Policy—and then the service scores significantly declined.[157]

131.   As David Williams, former Vice Chair of the USPS Board of Governors, has

explained, these "service scores are probably the best objective measure and those are

significantly off."[158]  Williams also explained that this data is especially striking because

of the decline in mail volume during the COVID-19 pandemic, "where even though

there's less mail, it's moving more slowly—much more slowly."[159]

132.   Nor can the fall in service scores be attributed to personnel shortages

caused by the pandemic.  It is notable that, through the early months of the pandemic,

there was no appreciable drop in such scores.  They only collapsed following the

announcement of DeJoy's Late/Extra Trip Policy on July 10, 2020.

---

[155] *Id.*

[156] *USPS, Congressional Briefing: Transportation & Service Performance Updates* at, USPS 4 (Aug. 31, 2020), https://rb.gy/zpiomk.

[157] *Postmaster General Louis DeJoy Testimony Transcript August 24: House Oversight Hearing* at 3:49:09, Rev (Aug. 24, 2020), https://www.rev.com/blog/transcripts/postmaster-general-louis-dejoy-testimony-transcript-august-24-house-oversight-hearing.

[158] Congressional Progressive Caucus, *CPC Hearing on Attacks on the US Postal Service* at 1:29:14–1:29:25 (Aug. 20, 2020), https://www.facebook.com/USProgressives/videos/cpc-hearing-on-attacks-on-the-us-postal-service/1147601832293608/ (testimony of David Williams).

[159] *Id.*

133.102.    The USPS data released on August 31, 2020, helps to quantify the loss of capacity that the Late/Extra Trip Policy has caused.  SinceWhen the nationwide Late/Extra Trip Policy took effect, the USPS has dropped from an average of 4,193 late trips per day to an average of 1,147 late trips per day, and from an average of 2,260 extra trips per day to average of 606 extra trips per day.  In other words, *every day*, USPS iswas conducting 4,700 fewer late and extra trips than usual.[160]

134.103.    SinceFollowing DeJoy's "operational pivot," additional anecdotal reports of substantial delays and disruptions in mail service have accumulated nationwide.  According to postal workers, DeJoy's policies are already resultingresulted in "delivery delays of *at least two days* across the country."[161]

135.    Multiple postal worker unions have affirmed that DeJoy's new policies are severely limitinglimited mail transportation and causingcaused mail to be left at sorting plants for days longer than typical.[162]  The American Postal Workers Union, "which represents more than 200,000 Postal Service employees and retirees, has. . . received a number of reports from postal workers and customers" from mid-July to early August "that mail delivery hasha[d] slowed and 'degraded.'"[163]

---

[160] USPS, *Congressional Briefing: Transportation & Service Performance Updates at 4*, USPS (Aug. 31, 2020), https://rb.gy/zpiomk.

[161] Jessica Dean, Jessica Schneider, & Caroline Kelly, et al., *Postal Service Says it has "Ample Capacity" to Handle Election After Trump Casts Doubt*, CNN (Aug. 3, 2020), https://www.cnn.com/2020/08/03/politics/postal-service-ample-capacity-election-trump/index.html (emphasis added).

[162] Russell Berman, *What Really Scares Voting Experts About the Postal Service*, The Atlantic (Aug. 14, 2020), https://www.theatlantic.com/politics/archive/2020/08/how-postal-service-preparing-election/615271/.

[163] Dean, et al., *supra* note 97-89161.

136.104.     On August 7, 2020, a "postmaster in upstate New York . . . told their union that the regular mail was two days behind and, for the first time in their career, Express Priority Mail was not going out on time."164  Similarly, Mark Dimondstein, the President of the American Postal Workers Union, reported that he has heard from several postal workers "who saysa[id] Monday mail isn't going out until Wednesday and that in some jurisdictions on some days, mail isn't going out at all."165  Dimondstein makesmade clear the cause of the delays:_ "They're ordering workers to leave mail for another day."166  Indeed, at one post office, a postal clerk reportsreported that under these new policies, "some mail is arriving a day later at the processing facility, where it could be delayed again."167

137.     USPS employees and union representatives have expressed serious concerns about the impact of the recent changes on their ability to process and deliver mail in a timely manner.  In Maine, postal workers reported leaving 80,000 letters behind because they were not permitted to wait 10 minutes for them to be processed.168 In Washington, D.C., hundreds of residents went two weeks without receiving any

---

164 See Adam Clark Estes, *What's Wrong With the Mail*, Vox (Aug. 7, 2020), https://www.vox.com/recode/2020/8/7/21358946/postal-service-mail-delays-election-trump-mail-in-ballots.

165 Berman, *supra* note 9790.

166 *Id.*

167 Nelson, *supra* note 78.  Laura J. Nelson & Maya Lau, *"Like Armageddon": Rotting Food, Dead Animals and Chaos at Postal Facilities Amid Cutbacks*, L.A. Times (Aug. 20, 2020), https://www.latimes.com/california/story/2020-08-20/usps-cutbacks-post-office-chaos.

168 See Alison Durkee, *Postmaster General Acknowledges 'Unintended Consequences' of USPS Changes Causing Mail Delays*, Forbes (Aug. 14, 2020), https://www.forbes.com/sites/alisondurkee/2020/08/14/postmaster-general-louis-dejoy-acknowledges-unintended-consequences-of-usps-postal-service-changes-mail-delays/#764bfdf46052.

mail.[169]  And in New York, the president of a local chapter of the American Postal Workers Union reported that, as a result of the changes in service, "we've had entire towns that didn't get their mail that day," including "some of the bigger ones—East Aurora, Lancaster."[170]  There have been similar reports of delays in mail service throughout the country, including in Alabama, California, Colorado, Connecticut, Illinois, Maryland, Michigan, Minnesota, Missouri, Nevada, New Mexico, Ohio, Oregon, Pennsylvania, Rhode Island, South Carolina, Texas, Utah, Vermont, Washington, Wisconsin, and Virginia.[171]

---

[169] Kelbie Satterfield, *Southwest DC Residents Go Weeks Without Mail Being Delivered*, WUSA9 (Aug. 13, 2020), https://www.wusa9.com/article/news/local/dc/two-weeks-no-mail-in-southeast-dc-neighborhood/65-31535798-3e83-45f8-b0e4-775ee6d6e8f8.

[170] Jerry Zremski, *Mail Delays, Days With No Delivery Prompt Rising Concern In WHY* (Aug 13. 2020), https://buffalonews.com/news/national/govt-and-politics/mail-delays-days-with-no-delivery-prompt-rising-concern-in-wny/article_d9944036-dd92-11ea-8f15-778f24015679.html.

[171] *See, e.g.*, *State of Washington v. Trump*, No. 1:20-cv-03127 (E.D. Wash. Aug. 8, 2020), https://agportal-s3bucket.s3.amazonaws.com/001_ComplaintUSPS.pdf; Andrew Brown & Andrew Miller, *Some SC Businesses Say They are Experiencing Delays Because of US Postal Service Changes*, The Post and Courier, (Aug. 14, 2020), https://www.postandcourier.com/business/some-sc-businesses-say-they-are-experiencing-delays-because-of-us-postal-servicechanges/article_e8716d38-dd6d-11ea-9e9e-a79f1e82e446.html; Ellie Rushing, *Mail Delays are Frustrating Philly Residents, and A Short-Staffed Postal Service is Struggling to Keep Up*, Philadelphia Inquirer (Aug. 2, 2020), https://www.inquirer.com/news/philadelphia/usps-tracking-in-transit-late-mail-delivery-philadelphia-packages-postal-service-20200802.html; Lauren Walsh, *Central Alabama Experiences Some Mail, Package Delays as USPS, UPS Feel COVID-19 Impact*, ABC33/40 News (Aug. 12, 2020), https://abc3340.com/news/local/central-alabama-experiences-some-mail-package-delays-as-usps-ups-feel-covid-19-impact; Ron Trevino, *USPS Delivery Delays Leave 82-year-old Texas Man Without Heart Medication for a Week*, WBNS (Aug. 17, 2020), https://www.10tv.com/article/news/nation-world/usps-delays-leave-humble-man-withoutheart-medication/285-49815193-bf3d-4b45-a1a5-b0afe16236f7; David Manoucheri, *People Wait Weeks, Months for Packages to be Delivered*, KCRA, (Aug. 15, 2020), https://www.kcra.com/article/people-wait-weeks-months-for-packages-to-be-delivered/33606613; Ginna Roe, Utah Diabetic Waiting for More Than a Week For Supplies By Mail, KUTV, (Aug. 17, 2020); https://kutv.com/news/local/utah-diabetic-waiting-more-than-a-week-for-supplies-by-mail.

138.105.        USPS hasUSPS publicly acknowledged its own fears regarding its

capabilityability to handle on-time delivery of Election Mail submitted close to Election Day.

On July 29, 2020, after DeJoy's policies went into effect and noticeable service delays took

place, USPS sent letters to 46 states and the District of Columbia, expressly stating that USPS

"cannot guarantee all ballots cast by mail for the November election will arrive in time to be

counted."[172]

139.106.        The July 29 letters warned that "there is a significant risk that, at least in

certain circumstances, ballots may be requested in a manner that is consistent with your election

rules and returned promptly, and yet not be returned in time to be counted."[173]  To account for

that risk, USPS "recommend[ed] that election officials use First-Class Mail to transmit blank

ballots and allow 1 week for delivery to voters," even though many states' election laws permit

voters to request a ballot within one week of Election Day.[174]  These letters makemade clear the

"grim possibility for the tens of millions of Americans eligible for a mail-in ballot this fall: Even

if people follow all of their state's election rules, the pace of USPS delivery may disqualify their

votes."[175]

140.107.        On July 30, 2020, USPS spokesperson David Partenheimer

acknowledged in a statement to the Washington Post that USPS's recent changes have

---

[172] Cox, *supra* note 12 (noting that USPS has "no objection" to the mail-in ballot plans of four states: Nevada, New Mexico, Rhode Island, and Oregon). Erin Cox et al., *Postal Service Warns 46 States Their Voters Could Be Disenfranchised by Delayed Mail-In Ballots*, Wash. Post (Aug. 14, 2020), https://www.washingtonpost.com/local/md-politics/usps-states-delayed-mail-in-ballots/2020/08/14/64bf3c3c-dcc7-11ea-8051-d5f887d73381_story.html.

[173] Ex. 2, Letter from Thomas J. Marshall, USPS, to Sec'y Kathy Boockvar, Pa. 2 (July 29, 2020) (emphasis added).

[174] *Id.*

[175] *Id.* Cox, *supra* note 95.

resulted in "service impacts."[176]  And in In a subsequent letter to USPS workers on August 13, 2020, DeJoy himself acknowledged that delivery slowdowns were "unintended consequences" of his new policies.[177]  Critically, it is was "not entirely clear how temporary the delays will be."[178] And for now, the delays have continued.  In particular, because of the Late/Extra Trip Policy, numerous pieces of mail are were left behind at both processing plants and delivery centers, while the unavailability of overtime has left workers with insufficient hours to process and deliver mail, leading to larger and larger piles of left-behind mail.[179]

141.   In a hearing before the Senate Homeland Security and Governmental Affairs Committee on August 21, 2020, DeJoy again admitted that his recent changes are responsible for these delays across the United States: "Unfortunately, some mail did not . . . Our production processing within the plants was not fully aligned with this established schedule.  So we had some delays in the mail.  And our recovery process in this should have been a few days and it's mounted to be a few weeks."[180]

---

[176] Jacob Bogage, *Top Democrats Say Postmaster General Acknowledged New Policies That Workers Say Are Delaying Mail*, Wash. Post (Aug. 6, 2020), https://www.washingtonpost.com/politics/2020/08/06/top-democrats-say-postmaster-general-acknowledged-new-policies-that-workers-say-are-delaying-mail/.

[177] Cox, *supra* note 12. *Id.*

[178] Estes, *supra* note 100.  See Adam Clark Estes, *What's Wrong With the Mail*, Vox (Aug. 7, 2020), https://www.vox.com/recode/2020/8/7/21358946/postal-service-mail-delayselection-trump-mail-in-ballots.

[179] *See* Michael Sainato, *Postmaster General's Changes Causing Mail Delays, USPS Workers Say*, The Guardian (Aug. 16, 2020), https://www.theguardian.com/business/2020/aug/16/usps-mail-delays-postmaster-general-changes-workers; *see also* James Doubek, *Postal Workers Decry Changes And Cost-Cutting Measures*, KUOW (Aug. 11, 2020), https://kuow.org/stories/postal-workers-decry-changes-and-cost-cutting-measures.

[180] *See* Sam Levine, *USPS Chief Concedes Changes Causing Delays But Won't Restore Sorting Machines*, The Guardian (Aug. 21, 2020), https://www.theguardian.com/us-news/2020/aug/21/usps-louis-dejoy-senate-hearing-mail-in-voting; *see also Senate Hearing with*

142.   In discussing his implementation of the Late/Extra Trip Policy, DeJoy testified before the Senate that "[i]n transition there would be an issue"; that "certainly there was a slowdown in the mail — when our production did not meet the schedule"; that "we feel bad about what the dip in our service, the level has been"; and that "we did not [do] as great a job as we should" in recovering from the "imbalances" created by the transition.[181]

143.   On August 24, 2020, DeJoy confirmed in his testimony before the House that, because "production schedules within the plants were not aligned with the transportation schedules going out," "about 10% of the mail was not aligned," which meant "[t]he production plants were getting done late, and the trucks were leaving."[182]

**B.   Defendants' Policies Have a Disparate Impact on Certain Categories of Voters Who Have No Reasonable Alternative Method of Voting Than By Mail.**

**2.   Because of the risks of This Court Found That the Late/Extra Trip Policy Unduly Burdened Plaintiffs' Right to Vote.**

108.   On August 28, 2020, Plaintiffs brought suit on the grounds that Postmaster General DeJoy's policies, including the Late/Extra Trip Policy, injected an intolerable risk of delay into the 2020 election and unconstitutionally burdened the right to vote.

---

*Postmaster General Louis DeJoy August 21 Transcript* at 25:52–26:54, Rev (Aug. 21, 2020), https://www.rev.com/blog/transcripts/senate-hearing-with-postmaster-general-louis-dejoy-august-21-transcript.

[181] *See generally Senate Hearing with Postmaster General Louis DeJoy August 21 Transcript*, Rev (Aug. 21, 2020), https://www.rev.com/blog/transcripts/senate-hearing-with-postmaster-general-louis-dejoy-august-21-transcript.

[182] *Postmaster General Louis DeJoy Testimony Transcript August 24: House Oversight Hearing* at 4:48:14, Rev (Aug. 24, 2020), https://www.rev.com/blog/transcripts/postmaster-general-louis-dejoy-testimony-transcript-august-24-house-oversight-hearing.

109.    On September 8, 2020, Plaintiffs filed a motion for preliminary injunction, requesting that the Court enjoin Defendants from enforcing the Late/Extra Trip Policy on the grounds that the Policy risked disenfranchising thousands of voters without serving any legitimate government interest.  Indeed, the Policy actually undermined USPS's statutory mission of providing prompt, reliable, and efficient service.  And any justification based on cost was belied by the relatively small impact on the public fisc and Defendants' own insistence that they had no need for additional funding.

110.    On September 28, 2020, this Court granted Plaintiffs' motion for a preliminary injunction, finding that the July 2020 Policy Changes imposed undue burdens on the individual Plaintiffs' and other voters' right to vote, and that absent injunctive relief, Plaintiffs faced irreparable harm.[183]

111.    Accordingly, the Court unequivocally "ORDERED that pursuant to the Order, Defendants are HEREBY ENJOINED from enforcing the Late/Extra Trip Policy[.]"[184]

### 3.    Defendants Failed to Adequately Respond to the Court's Order.

112.    Even after this Court entered a preliminary injunction, Defendants failed to take *any* action in response for several weeks, because they believed "there wasn't anything to change."[185]

113.    Following this inaction, USPS's weekly on-time service scores for First-Class Mail dropped even lower—to 86.15% on October 3, 85.58% on October 10, and 80.85% on

---

[183] *See Vote Forward v. DeJoy*, No. 20-2405, 2020 WL 5763869 (D.D.C. Sept. 28, 2020).

[184] Order 1 (Sept. 28, 2020), ECF No. 31.

[185] Robert Cintron Dep. Tr. (Oct. 15, 2020), at 158:24–159:15, ECF No. 33-4.

October 17.[186]  And the number of late and extra trips during this period remained depressed, far below the levels that predated the July 2020 Policy.[187]

114.    As a result of Defendants' failure to comply with the Court's Order, Plaintiffs on October 22, 2020 filed an emergency motion to enforce and monitor compliance with the preliminary injunction.[188]

115.    On October 27, 2020, the Court granted Plaintiffs' emergency motion.  Among other things, the Court ordered Defendants to explicitly notify relevant USPS personnel that the July 14, 2020 guidelines on the use of late and extra trips were rescinded and to file with the Court each morning:  (1) daily data on the number of late and extra trips performed the preceding day; (2) updated data on the percentage of on-time deliveries; and (3) any other reports generated and produced to Congress, other courts, or other litigants.[189]

116.    Following the Court's Order, Defendants' service scores for First-Class Mail began to improve, rising from 81.57% on October 24 to 84.61% on October 31, and 85.40% on November 7.[190]  However, those scores were still well below USPS's service standard of 96%.

---

[186] USPS FY20 Q2 - FY 21 Q1 To-Date Service Performance For Market-Dominant Products 1 (Nov. 18, 2020), ECF No. 118-6.

[187] Late & Extra Trips Report (Nov. 18, 2020), ECF No. 118-1.

[188] Pls.' Mot. to Enforce, ECF No. 33.

[189] Min. Order (Oct. 27, 2020).

[190] USPS FY20 Q2 - FY 21 Q1 To-Date Service Performance For Market-Dominant Products (Nov. 18, 2020), ECF No. 118-6, at 1.

### 4.     Defendants' Inadequate Ballot Processing Practices

117.    During the 2020 election cycle, Defendants—pursuant to court orders in other jurisdictions—belatedly issued memoranda on October 13, 20, and 28 that outlined the following extraordinary measures to improve the timely delivery of Election Mail.

118.    *Late and Extra Trips Statement.*  USPS's October 13 Memorandum "reiterate[d]" that "late and extra trips are not banned."[191]  However, this memorandum failed to state that the July 2020 guidelines were rescinded, revoked, or suspended.

119.    *The Hub-and-Spoke System.*  USPS's October 20 Memorandum established a "hub-and-spoke" system intended to speed up the delivery of ballots to local and non-local Boards of Election by at least one day by eliminating their trip to the processing plant and scheduling drivers to deliver ballots directly from the delivery unit to the appropriate Board of Elections.[192]

120.    To implement the hub-and-spoke system, multiple delivery units were directed to use one central office as a "hub" for all of the ballots received by those delivery units, with the hub then scheduling drivers to deliver (or "spoke") ballots directly from the hub to the appropriate Board of Elections.[193]

121.    However, implementation of the hub-and-spoke system did not begin until the day before the election, and the system did not take full effect until Election Day.[194]  Under the schedule laid out in the memorandum, ballots destined for local Boards of Elections would begin

---

[191] Ex. 4, Oct. 13 Mem., at 3.

[192] Ex. 5, Oct. 20 Mem., at 3; Glass Dep. Tr. at 207:14–208:1.

[193] *See* Glass Dep. Tr. at 140:17–21.

[194] Ex. 5, Oct. 20 Mem., at 3.

delivery using the hub-and-spoke system on November 2, 2020.[195]  For ballots being delivered to non-local Boards of Elections, the hub-and-spoke system did not begin until Election Day, November 3.[196]  As a result, all ballots sent more than two days before the election were still at risk of late delivery because they had to travel through the underperforming processing plants. And non-local ballots were at risk even if they were sent the day before the election.

122.     *The Local Turnaround Option.*  USPS's October 20 Memorandum also established a "local turnaround" option, which could be requested by a local delivery unit.[197] Under this option, if a ballot was received by a local delivery unit that also serviced the Board of Elections for which it was destined, the delivery unit could postmark and mail that ballot directly to the Board of Elections without ever entering the ballot into the processing plant system.[198]  By avoiding the processing plant, this option "would make delivery faster by at least one day."[199]

123.     Still, the local turnaround process only applied when the relevant voter and the Board of Elections to which she sent her ballot were both serviced by the same delivery unit. The fact that this option was *authorized* but not *mandatory* created the risk that a voter's completed ballot may not be expedited through the local turnaround option.[200]

124.     *The "Holdout" System at Processing Plants.*  USPS's October 28 Memorandum established a "direct holdout" process to be implemented at processing plants by October 30,

---

[195] *Id.*

[196] *Id.*

[197] *Id.* at 2.

[198] Glass Dep. Tr. at 146:17–147:5, 147:13–148:1.

[199] *Id.* at 220:4–10.

[200] *Id.* at 146:17–147:5; Ex. 5, Oct. 20 Mem., at 2.

2020—four days before the election.[201]  Under this process, instead of sending the ballots through the entirety of the normal processing system, processing plants would identify ballots early in the sorting process and place the ballots in a bin corresponding to the Board of Elections to which they should be delivered.[202]

125.    The direct holdout process was intended to cut down on processing time by skipping additional rounds of sorting and allowing processing plants to submit a ballot to the Board of Elections the day after receiving it.[203]  Ballots with return envelopes designed in accordance with USPS recommendations—that is, those with an Intelligent Mail® barcode ("IMb"), the correct content identifier number ("CIN"), and the correct facing identification mark ("FIM")—should be tracked in the processing scores that USPS publishes, even if they were "held out."[204]  Thus, USPS processing scores should improve if the holdout process is effective in reducing processing time.[205]

126.    Altogether, many of the measures called for by these memoranda were merely "authorized," rather than required, thus leaving the rights of voters up to the whims of USPS personnel.  Other measures were implemented too late to stop many ballots from being funneled into the underperforming processing system, thus delaying ballot delivery.  USPS itself recognized the necessity of consistent and early implementation of extraordinary measures.

---

[201] Ex. 6, Oct. 28 Mem., at 2–3.

[202] Glass Dep. Tr. at 102:2–17.

[203] *Id.* at 102:2–17, 108:10–13.

[204] *Id.* at 246:19–247:12.

[205] *Id.*

Indeed, USPS leadership repeatedly acknowledged that extraordinary measures were necessary to ensure that mail-in ballots were delivered on time.

127.    In testimony before this Court, Kristin Seaver, USPS's Chief Retail and Delivery Officer, said that without expanding operations the weekend prior to Election Day, "we know we can't turn those ballots around in time for that Tuesday election depending on the service standard."[206]  These expanded operations include conducting pick-ups from blue USPS boxes on Sunday, running additional transportation from post offices to processing plants on Sunday, and requiring plants to process outgoing mail on Sunday.[207]

128.    Michael Barber, USPS's Vice President of Processing and Maintenance Operation, likewise testified that "if [ballots] were left to go through the regular and normal process" the weekend before a Tuesday election, "they would be at risk of not making it to their destination timely."[208]  In order to combat this risk, Mr. Barber suggested that USPS had to take measures including:  "manual[ly] sort[ing]" local ballots at processing facilities and "expedit[ing them] to a Board of Election or a post office that serves a Board of Elections," identifying non-local ballots and placing them in the Express Mail network, implementing "additional transportation," and adding standby resources including "maximizing the full use of any overtime usage."[209]

---

[206] Ex. 7, Hr'g Tr. (Oct. 30, 2020), at 15:12–16.

[207] *Id.* at 12:10–13:13.

[208] Ex. 8, Hr'g Tr. (Oct. 31, 2020, 3pm) at 9:19–24.

[209] *Id.* at 10:5–12, 11:2–6, 12:20–14:1; *see also id.* at 13:23–14:10, 20:23 (testifying that extraordinary measures were required because ballots collected the day before an election and bound for a local BOE would not necessarily be delivered on time if USPS implemented "its regular sortation").

129.    And USPS's Regional Vice President of Processing Operations, Dane Coleman, testified that "all available resources" are necessary to ensure Election Mail is delivered in a timely manner in the days prior to an election, including "utiliz[ing] as much overtime as necessary to get the job done."[210]

130.    Yet USPS did not implement those extraordinary measures simply because they thought those measures necessary.  Kevin Bray, a USPS employee who oversaw mail processing for the 2020 General Election, testified that the October 20 Memorandum and the measures it put forward "[were] being done because we were under some heat from the courts."[211]  Indeed, he was told that "we're going to have to do everything, move heaven and earth to deliver ballot mail," because "[w]e don't want the courts to come back and say we didn't do everything we could."[212]

131.    In particular, Bray testified that USPS thought it necessary to require processing facilities to conduct daily ballot sweeps and certify that they were "All Clear" of Election Mail because ballots could be found in unexpected places, sorted incorrectly, or sent to the wrong destination.[213]  Given the importance of these sweeps, each plant was supposed to have a plan in place to conduct sweeps on Election Day.[214]  However, Mr. Bray acknowledged that USPS did not have any written documentation requiring that plan, nor did he verify whether plans were indeed in place.[215]

---

[210] *Id.* at 49:22–50:5.

[211] Ex. 9, Hr'g Tr. (Nov. 4, 2020) at 111:19–21.

[212] *Id.* at 112:1–4.

[213] *Id.* at 67:4–21, 77:6–9.

[214] *Id.* at 82:1–8.

[215] *Id.* at 82:9–14.

132.    In practice, USPS's data confirms that numerous ballots continued to go through processing plants with "unacceptable" processing scores in the lead-up to the November 2020 General Election.[216]  For example, consider the number of ballots funneled through the Atlanta and Central Pennsylvania District processing plants, where the processing scores regularly fell well below USPS's 96% service score standard:

| Date | Area | District | Measured Volume: Inbound Ballot | Processing Score: Inbound Ballot | Processing Score Plus 1: Inbound Ballot | Processing Score Plus 2: Inbound Ballot | Processing Score Plus 3: Inbound Ballot |
|---|---|---|---|---|---|---|---|
| 10/24/2020 | Capital Metro | Atlanta | 17326 | 84.89% | 95.35% | 98.71% | 98.92% |
| 10/26/2020 | Capital Metro | Atlanta | 18003 | 89.44% | 94.66% | 97.46% | 98.51% |
| 10/27/2020 | Capital Metro | Atlanta | 10334 | 39.68% | 97.78% | 98.72% | 99.20% |
| 10/28/2020 | Capital Metro | Atlanta | 18106 | 94.97% | 96.49% | 98.98% | 99.24% |
| 10/29/2020 | Capital Metro | Atlanta | 15279 | 93.10% | 94.59% | 95.20% | 96.52% |
| 10/30/2020 | Capital Metro | Atlanta | 8218 | 78.23% | 93.25% | 94.03% | 94.50% |
| 10/31/2020 | Capital Metro | Atlanta | 7681 | 57.09% | 94.88% | 98.27% | 98.27% |
| 11/2/2020 | Capital Metro | Atlanta | 6550 | 61.47% | 89.40% | 94.79% | 95.63% |
| 11/3/2020 | Capital Metro | Atlanta | 1713 | 81.03% | 91.13% | 94.75% | 96.32% |

[217]

| Date | Area | District | Measured Volume: Inbound Ballot | Processing Score: Inbound Ballot | Processing Score Plus 1: Inbound Ballot | Processing Score Plus 2: Inbound Ballot | Processing Score Plus 3: Inbound Ballot |
|---|---|---|---|---|---|---|---|
| 10/24/2020 | Eastern | Central Pennsylvania | 28343 | 78.46% | 90.50% | 98.91% | 99.36% |
| 10/26/2020 | Eastern | Central Pennsylvania | 53224 | 78.76% | 92.10% | 99.30% | 99.49% |
| 10/27/2020 | Eastern | Central Pennsylvania | 15329 | 56.14% | 95.72% | 97.88% | 99.20% |
| 10/28/2020 | Eastern | Central Pennsylvania | 37818 | 83.25% | 83.76% | 98.90% | 99.44% |
| 10/29/2020 | Eastern | Central Pennsylvania | 40279 | 69.17% | 96.93% | 97.19% | 99.51% |
| 10/30/2020 | Eastern | Central Pennsylvania | 21604 | 64.02% | 93.53% | 97.49% | 97.82% |
| 10/31/2020 | Eastern | Central Pennsylvania | 15375 | 52.21% | 90.66% | 97.59% | 98.95% |
| 11/2/2020 | Eastern | Central Pennsylvania | 26141 | 68.85% | 89.79% | 93.94% | 95.10% |
| 11/3/2020 | Eastern | Central Pennsylvania | 9905 | 60.05% | 88.97% | 97.38% | 98.70% |

[218]

---

[216] Glass Dep. Tr. at 250:9–17.

[217] Ex. 10, USPS Variance Data Sorted by District 8 (Nov. 6, 2020).

[218] *Id.* at 14.

133.    As a result, ballots in these districts were delayed.  Mr. Bray himself recognized that, even with the October Memoranda's measures in place, approximately 1,400 ballots delivered on Election Day in the Central Pennsylvania District were delivered outside of USPS's service standard.[219]  He acknowledged that this should not have happened "based on the extraordinary measures that were put in place."[220]  Likewise, at USPS's 30(b)(6) deposition regarding the delivery of Georgia Election Mail, USPS's Mr. Robert Justin Glass, Manager of Operations Industrial Engineering at USPS's Washington, D.C. Headquarters, admitted that some "ballots that were mailed on time did not make it" during the November 2020 General Election, as USPS's performance was "by no means, perfect."[221]

134.    After reviewing USPS's low processing scores, this Court ordered that USPS facilities in Districts "whose Election Mail processing scores for completed ballots returned by voters (Inbound Ballots) were below 90 percent for at least two days from October 26 to 28" must "implement the 'Delivery' measures outlined in USPS's 'Extraordinary Measures Memorandum' dated October 20, 2020 unless the implementation of any of the extraordinary measures, at a district or facility level, would create a significant risk of reducing the timely delivery of Inbound Ballots."[222]  On November 1, the Court entered an order requiring USPS to, among other things:  redistribute its October 28 Memorandum with the instruction that "special procedures must be put in place to ensure we deliver every ballot possible by the cutoff time on Election Day"; use the Express Mail network to expedite ballots; clear all ballots with local

---

[219] Ex. 9, Hr'g Tr. (Nov. 4, 2020) at 93:15–24.

[220] *Id.* at 93:19–24; *see also id.* at 94:6–7 ("I don't know why [these ballots were delivered late] and there's no excuse.  It should never have happened.").

[221] Glass Dep. Tr. at 128:8–10.

[222] Min. Order (Oct. 30, 2020).

destinations the same day or by the next morning; and ensure that post offices and processing plants were postmarking all ballots.[223]

**B.     USPS Policies Failed To Ensure Timely Ballot Delivery Prior to the Parties' December 23 Agreement.**

135.    The November 2020 General Election passed, but voters' need to vote by mail did not.  Neither did USPS's obligation to those voters.  And so, in recognition of Defendants' prior reluctance to comply with this Court's orders and its continued poor performance in the Atlanta District in particular, Plaintiffs sought this Court's leave to conduct discovery related to the impending Georgia Runoff Election.[224]  This Court granted that leave on November 19, 2020, and Plaintiffs served their discovery requests and Rule 30(b)(6) deposition notice the next day.

136.    Georgia Boards of Elections began mailing absentee ballots to voters on November 18,[225] and by December 4, more than a million Georgians had requested an absentee ballot and more than 60,000 had cast their ballot.[226]  With the November 2020 General Election behind them, Defendants should have been poised to execute their learnings and improve on their performance in the fast-approaching January Runoff Election.

137.    Yet for weeks, Defendants put off issuing guidance for the January Runoff.  And their efforts to prepare for the Runoff Election were insufficient in other respects, too.  At USPS's 30(b)(6) deposition, Robert Justin Glass agreed that "processing scores for inbound

---

[223] Order 1–2 (Nov. 1, 2020), ECF No. 66.

[224] *See* Notice of Pls.' Proposal for Further Proceedings & Proposed Order, ECF No. 113.

[225] Stephanie Saul, *With All Eyes on Senate Runoff in Georgia, Here's How Residents Can Vote*, N.Y. Times (Nov. 17, 2020), https://www.nytimes.com/2020/11/17/us/politics/georgia-senate-runoff-voting.html.

[226] Georgia Votes, https://www.georgiavotes.com/index-apps.php (last updated Jan. 5, 2021).

[ballots] in Atlanta [we]re consistently below national averages" and were "unacceptable."[227]  However, despite this assessment and USPS's poor performance in Georgia generally, he did not discuss the source of ballot delays with Georgia personnel.[228]  Nor did he perform "any specific analysis on why Atlanta's processing score was under" any other District's scores.  And he further acknowledged that because he had "not done anything to investigate that specifically," he did not know any "reasons why Atlanta [wa]s underperforming the national average."[229]

### 1.    USPS Guidance for the Georgia Runoff Substantially Mirrored Its Guidance That Had Proven Ineffective in Atlanta in November.

138.    Finally, in December, USPS issued its guidance for the Georgia Runoff.  But despite the demonstrated failure of USPS's October guidance in Atlanta during the November 2020 General Election, the persistence of the COVID-19 pandemic, the added challenges of processing and delivering Election Mail during USPS's peak season, and the time taken to develop it, the guidance Defendants issued substantially mirrored that issued during the November election.

139.    In particular, Defendants issued two memoranda in preparation for the Georgia Runoff:  a December 8 Memorandum that corresponded to the October 20 Memorandum, and a December 14 Memorandum that corresponded to the October 28 Memorandum.[230]

140.    The December 8 Memorandum stated that it was provided to "ensure that Retail and Delivery Units in and serving the State of Georgia will deploy the *same extraordinary*

---

[227] Glass Dep. Tr. at 248:21–249:2, 250:17.

[228] *Id.* at 131:13–132:4.

[229] *Id.* at 249:6–20.

[230] *See id.* at 139:12–20, 230:4–231:6.

*measures* that [they] deployed for the November 3, 2020, general election."[231]  This included the following.

141.    *The January 4 "Local" Hub-and-Spoke System.*  As a result of various court orders, the hub-and-spoke system became mandatory.[232]  Accordingly, beginning January 4, "all offices that service or are in close proximity to a local BOE in Georgia" were required to "establish a 'hub and spoke' process for running ballots to the local BOE.  Ballots [we]re to be postmarked in the local retail unit, then hubbed to the BOE, so that they arrive[d] prior to the cut-off for the day and no later than 7:00 p.m. on Tuesday, January 5."[233]  Mr. Glass explained that this instruction was meant to "mandate[] the delivery units [to] speed up delivery by cutting out the trips to the processing plant," and speed up the delivery process by at least one day.[234]

142.    *The January 5 "Non-Local" Hub-and-Spoke System.*  The memoranda also required USPS to implement a "non-local" hub-and-spoke system starting January 5, wherein "carriers will pull ballots from their collection mail and hand them over to their supervisor.  Supervisors will exchange ballots around the city, and after the exchange, a designated supervisor [will] make[] delivery to the BOE no later than 7:00 p.m.," using "pre-identified drivers and vehicles staged to run trips."[235]

143.    *The Local Turnaround Option.*  As in November, the December 8 Memorandum also included a local turnaround option, instructing that "[l]ocal offices that serve or are in close

[231] Ex. 11, Dec. 8 Mem., at 1 (emphasis added).

[232] Glass Dep. Tr. at 194:7–17.

[233] Ex. 11, Dec. 8 Mem., at 3.

[234] Glass Dep. Tr. at 207:14–19.

[235] Ex. 11, Dec. 8 Mem., at 3; *see also* Glass Dep. Tr. at 152:2–21.

proximity to a [Board of Elections] in Georgia are authorized to postmark . . . and deliver ballots rather than having ballots placed into the automation flow."[236]  This local turnaround process started taking place on Monday, December 14, but it was merely "authorized" to be used, rather than made mandatory.[237]  Moreover, delivery units that did not serve or were not in close proximity to Boards of Election were not required to participate.  Consequently, large numbers of ballots continued to be sent through the underperforming plant system.[238]

144.     *The Holdout Process at Processing Plants.*  The December 14 Memorandum focused on the direct holdout process.  In general, Mr. Glass testified, processing plants were "following . . . the same procedures" and had not made "any changes from what was done in November to what [wa]s being done in preparation for the January Runoff for processing."[239] The "only additional [processing] measure that [was] in place concerning Election Mail at this time," he said, was the use of Express Mail to deliver ballots from Fort Orange Press in Albany, New York to Georgia for use in the Runoff.[240]

145.     *Additional Measures to Address the High Volume of Packages During the Holiday Peak Season.*  Mr. Glass also testified about certain measures that USPS was implementing at that time in response to its "peak season" (from Thanksgiving to New Year's), which overlapped with mail balloting for the Georgia Runoff Election.[241]  To accommodate the

---

[236] Ex. 11, Dec. 8 Mem., at 3.

[237] *Id.*; Glass Dep. Tr. at 211:22–212:3.

[238] *See* Ex. 12, USPS Election Mail Service Scores by Origin District 6–7 (Dec. 22, 2020) (ballots originating from Atlanta District through December 21).

[239] Glass Dep. Tr. at 174:10–15.

[240] *Id.* at 260:17–261:4.

[241] *See id.* at 187:18–188:7, 258:10–11.

influx of mailpieces and the resultant congestion during peak season, USPS was performing "some Sunday collections" as part of normal peak season practices and making additional late and extra trips to accommodate the season's "gargantuan load," especially because "the packages have never been higher due to COVID."[242]

### 2. USPS's Ballot Processing Practices Threatened to Disenfranchise Georgia Runoff Voters.

146.    Thus, in the midst of a spike in coronavirus infection rates in Georgia, despite the poor processing scores and late ballots in Georgia in the November 2020 General Election, and despite the added burden of peak season in the middle of the Georgia Runoff, USPS largely reissued its prior guidance, which had resulted in the late delivery of ballots.

---

[242] *Id.* at 204:20–22, 262:4–20, 264:8–9.

147.    Predictably, as was the case after similar guidance was issued in November, the

processing scores for Inbound Ballots in the Georgia Districts continued to fall well below

USPS's standard for the timely delivery of mail, as shown in the Atlanta District numbers below:

| Date | District | Measured Volume: Inbound Ballots | Processing Score: Inbound Ballots | 1 Extra Day: Inbound Ballots | 2 Extra Days: Inbound Ballots | 3 Extra Days: Inbound Ballots |
|---|---|---|---|---|---|---|
| 12/8/2020 | ATLANTA | 11723 | 46.40% | 99.31% | 99.56% | 99.56% |
| 12/9/2020 | ATLANTA | 13586 | 86.29% | 86.29% | 99.00% | 99.07% |
| 12/10/2020 | ATLANTA | 12965 | 49.13% | 95.77% | 95.77% | 98.12% |
| 12/11/2020 | ATLANTA | 15670 | 67.96% | 91.31% | 98.44% | 98.44% |
| 12/12/2020 | ATLANTA | 10521 | 62.85% | 73.22% | 82.39% | 98.84% |
| 12/14/2020 | ATLANTA | 8564 | 68.88% | 89.62% | 92.60% | 96.80% |
| 12/15/2020 | ATLANTA | 6544 | 77.51% | 95.48% | 97.94% | 98.14% |
| 12/16/2020 | ATLANTA | 4604 | 94.09% | 94.09% | 97.52% | 98.15% |
| 12/17/2020 | ATLANTA | 4084 | 73.41% | 98.70% | 98.75% | 99.31% |
| 12/18/2020 | ATLANTA | 8750 | 67.33% | 95.97% | 99.28% | 99.28% |
| 12/19/2020 | ATLANTA | 3686 | 74.91% | 80.03% | 95.93% | 97.23% |
| 12/21/2020 | ATLANTA | 7464 | 79.39% | 90.57% | 94.65% | 98.49% |
| 12/22/2020 | ATLANTA | 4338 | 79.35% | 93.13% | 96.04% | 96.43% |
| 12/23/2020 | ATLANTA | 3876 | 90.09% | 90.20% | 94.35% | 97.24% |

[243]

148.    USPS claimed that, during this period, all offices serving a Board of Elections had

been authorized to begin using the "local turnaround" process.  However, USPS's own data

shows that thousands of ballots were still going through the backlogged processing plants during

that same time period.[244]

149.    This backlog posed a material threat to timely delivery of ballots in the January

Runoff.  In Georgia, as in the Pennsylvania and New Mexico elections, mail-in ballots must

---

[243] Ex. 13, USPS Inbound Election Mail Service Scores - Destined to GA (Jan. 12, 2021) (ballots destinating in Atlanta District for December 8 through 23).

[244] Ex. 12, USPS Election Mail Service Scores by Origin District 6–7 (Dec. 22, 2020) (ballots originating from Atlanta District through December 21).

arrive at county Boards of Election by the close of polls on Election Day to be counted—and thus were due on January 5, 2021.[245]

150.    Like the Late/Extra Trip Policy before them, Defendants' deficient ballot processing practices thus threatened to impact all Georgia voters who voted by mail by compressing the timeline in which a voter had to mail her completed ballot to ensure that her vote was counted.  This was particularly true for voters who sought to vote on the basis of information available as of the weekend before Election Day.

151.    An example demonstrates the risks caused by this delay.  By Defendants' own admission, routing ballots into processing facilities adds at least one additional day to ballot delivery that could be saved by using either the hub-and-spoke system or local turnaround.[246] Assume that a voter in Atlanta, Georgia had submitted her completed ballot by First-Class Mail on Saturday, January 2.  In the ordinary course, that ballot, having been mailed prior to the implementation of the hub-and-spoke system, would have gone to a processing plant.  Under USPS's own expected delivery and processing standards, that ballot could have been delivered in 1–3 days, *i.e.*, by January 5 (Election Day).  However, the processing scores in the Atlanta District for completed ballots sent from the voter to the Board of Elections ("Inbound Ballots") demonstrated that there was a serious risk that her ballot would not be delivered within the 1–3 day service standard.  If that ballot was one of the substantial percentage of ballots for which USPS did not meet its service standard, that ballot would have been delivered on January 6 or later.  Put another way, there was a substantial risk that any completed ballots mailed on January

---

[245] Ga. Code Ann. § 21-2-386(a)(1)(F).

[246] Glass Dep. Tr. at 207:14–208:1; 220:4–10.

2 or later would not be received by the local election office by Election Day—*thus rendering those ballots invalid.*

### 3. The Parties Agreed to Additional Measures Targeted to Address Delayed Ballot Delivery.

152.    On December 23, 2020, the parties reached an agreement to make the measures discussed in the December 8 and 14 Memoranda mandatory and to add additional measures targeted to address USPS's deficient performance in the Atlanta District.[247]  Those measures included:

153.    *Early Use of the Express Mail Network.*  In the three days prior to the Runoff Election—January 2 through 4—USPS was required to place all ballots that were subject to a three-day service standard into the Express Mail network.[248]  When ballots are treated as Express Mail, they are subject to a one- or two-day delivery standard,[249] and this measure can thus save one to two days' delivery time, enabling ballots sent on the Saturday or even Monday before a Tuesday election to make it to the Board of Elections on time.  This improved upon the December Memoranda, which required use of Express Mail only for missent ballots, blank ballots, or ballots destined outside the local service area and not projected for on-time delivery.[250]

154.    *Mandatory Local Turnaround.*  All post offices in the Atlanta District that served a Georgia Board of Elections were now required, rather than merely authorized, to participate in

---

[247] *See* Notice of Joint Agreement, Ex. A, ECF No. 162.1 (hereinafter "Dec. 23 Agreement"); *id.* ¶ 1.

[248] *Id.* ¶ 3(a).

[249] Glass Dep. Tr. at 78:13–15.

[250] *See* Ex. 11, Dec. 8 Mem., at 3; Ex. 14, Dec. 14 Mem., at 6.

local turnaround—that is, to postmark and deliver ballots directly to the relevant BOE, rather than placing them in the automation flow—beginning December 23.[251]  On dates when USPS was not operating or the BOE was not open, post offices were to deliver ballots the next day on which both USPS and the relevant BOE were open.  *Id.*  Implementation of local turnaround allows ballots to avoid processing plants and thus "make[s] delivery faster by at least one day."[252]

155.    *Early Implementation of Local Hub-and-Spoke.*  Rather than wait until the day before Election Day, beginning on Saturday, January 2, post offices and delivery units servicing or in close proximity to a BOE in the Atlanta District were required to implement a hub-and-spoke system to deliver Inbound Ballots to any open local BOEs.[253]  This agreed-to measure improved upon the December Memoranda by adding an extra day of local hub-and-spoke implementation in the Atlanta District, thus "mandat[ing] the delivery units [to] speed up delivery by cutting out the trips to the processing plant," and speeding up the delivery process by at least one day.[254]

156.    *Early Implementation of Non-Local Hub-and-Spoke.*  Likewise, rather than wait until Election Day, beginning on Monday, January 4, post offices and delivery units in the Atlanta District were to implement a non-local hub-and-spoke system to transport ballots to Boards of Elections using pre-identified drivers and vehicles staged to run trips.[255]  Defendants

---

[251] Dec. 23 Agreement ¶ 3(b); Ex. 11, Dec. 8 Mem., at 4.

[252] Glass Dep. Tr. at 220:4–10.

[253] Dec. 23 Agreement ¶ 3(c).

[254] Glass Dep. Tr. at 207:14–19.

[255] Dec. 23 Agreement ¶ 3(e).

were required to ensure that all post offices and delivery units in the Atlanta District were prepared to implement if it was reasonably possible to deliver ballots prior to BOE closure on January 4 and identify to Plaintiffs any facilities that were unable to participate and why.[256] This improved upon the December Memoranda by adding an extra day of non-local hub-and-spoke implementation in the Atlanta District, again decreasing delivery time for all captured ballots by at least a day.[257]

157.    *Mandatory Ballot Sweeps and All-Clear Certifications.*  From December 28 through January 5, each processing facility serving a Georgia ZIP code was required to implement a daily morning sweep of the facility to identify any Inbound Ballots and ensure they were dispatched or staged for expedited delivery.[258] On January 4 and 5, each facility was also to conduct an afternoon sweep to identify any Inbound Ballots and ensure they were expedited for delivery.[259] On January 5, this sweep was to take place at a time sufficient for ballots to be delivered to the BOEs by 7 p.m.[260] After every sweep, processing plants were required to report to USPS Headquarters the total number of ballots identified and confirm that they had been expedited for delivery.[261] From December 29 to January 5, each processing facility serving Georgia ZIP codes was also required to clear its local ballots daily and provide an "All Clear"

---

[256] *Id.* ¶ 3(f).

[257] Glass Dep. Tr. at 207:14–19.

[258] Dec. 23 Agreement ¶ 4(a).

[259] *Id.* ¶ 4(b).

[260] *Id.*

[261] *Id.* ¶ 4(c).

certification by 10 a.m.[262]  Defendants then provided the number of ballots identified in the sweeps and documentation of the All-Clear certifications to Plaintiffs.[263]

158.    These measures provided important additional accountability mechanisms.  While USPS had previously employed ballot sweeps and All-Clear certifications, internal USPS reports indicate that they were not always used consistently.[264]  In August 2020, OIG reported that five of seven USPS processing facilities audited in the lead-up to the spring 2020 primaries either did not complete, improperly completed, or delayed completion of All-Clear certification requirements; two of seven certified that they were clear of Election and Political Mail when they were not; and zero of seven used the proper checklists to ensure their ballot sweeps were thorough.[265]  Requiring additional internal and external reporting of ballots located and certifications completed fostered stronger accountability for these necessary practices.

159.    *Mandatory Ballot Delivery Coordination with Georgia BOEs.*  USPS was also required to make arrangements with BOEs to deliver all Inbound Ballots by 7 p.m. on January 5.[266]  Defendants were to provide Plaintiffs with documentation of the details of these arrangements.[267]  These arrangements were not specifically called for by the December Memoranda.

---

[262] *Id.* ¶ 4(d).

[263] *Id.* ¶¶ 4(c)–(d).

[264] *See Processing Readiness of Election and Political Mail During the 2020 General Elections,* Report No. 20-225-R20, USPS OIG (Aug. 31, 2020), https://www.oversight.gov/sites/default/files/oig-reports/20-225-R20.pdf.

[265] *Id.*

[266] Dec. 23 Agreement ¶ 5.

[267] *Id.*

160.     *Investigation of Delayed Ballots.*  USPS was required to promptly investigate all plausible reports of delayed ballots and make their best effort to expedite any delayed ballots for delivery by 7 p.m. on January 5.[268]  This, too, was not specifically called for by the December Memoranda.

161.     *Communication of Agreement Requirements.*  USPS was to communicate the agreement's requirements in writing and orally to managerial and supervisory personnel at facilities serving Georgia ZIP codes and to other necessary USPS personnel.[269]  USPS then provided Plaintiffs with the required written communications.[270]

162.     This Court incorporated the terms of the parties' agreement into a binding Court order.[271]

163.     These measures kept many ballots out of underperforming processing plants and ensured that they were timely delivered to Boards of Elections.  Together, the measures could speed delivery times by two or more days, thus allowing weekend voters whose ballots might previously have been denied to have their vote counted.

**IV.     Defendants Refuse To Implement Practices Necessary To the Timely Delivery of Election Mail.**

164.     With elections again approaching, voters' rights once more hinge on USPS's timely delivery of ballots.  But now there are far fewer measures in place to ensure that timely delivery.  While the Late/Extra Trip Policy was suspended under this Court's preliminary injunction order, that order has now been dissolved, and Defendants may—and indeed, appear

---

[268] *Id.* ¶ 7.

[269] *Id.* ¶ 6.

[270] *Id.*

[271] Min. Order (Dec. 24, 2020).

poised to—reinstate that Policy.  Likewise, while the Agreed-To Measures outlined in the December 23 Agreement and incorporated in this Court's subsequent order were in place for the Georgia Runoff, Defendants have refused Plaintiffs' request to reinstitute those measures in the lead-up to the 2021 elections.

165.    In keeping with their concern about the impact USPS's ballot delivery practices had on voters' rights in the November General and Georgia Runoff Elections, Plaintiffs sent a letter to Defendants on February 15, 2021, requesting that they implement constitutionally necessary practices in the lead-up to the 2021 elections.[272]  In particular, Plaintiffs underscored that consistent implementation of late and extra trips and the measures agreed to in the December 23 Agreement prior to these elections had previously proven necessary to ensure that USPS did not unduly burden the right to vote.[273]  Plaintiffs thus asked Defendants to commit not to reinstate their Late/Extra Trip Policy and to continue implementation of the Agreed-To Measures in upcoming elections.[274]

166.    On February 19, 2021, Defendants responded, indicating that they would not comply with Plaintiffs' request.[275]

167.    Moreover, Postmaster DeJoy's recent public statements indicate that USPS anticipates reinstating its Late/Extra Trip Policy in some form.  In a statement before the House Committee on Oversight and Reform on February 24, 2021, DeJoy reiterated his support for the

---

[272] *See* Ex. 15, Letter from Shankar Duraiswamy, Counsel for Plaintiffs, to Joseph E. Borson, Counsel for Defendants (Feb. 15, 2021) ("February 15 Letter").

[273] *Id.*

[274] *Id.*

[275] *See* Ex. 16, Email from Kuntal Cholera, Counsel for Defendants, to Shankar Duraiswamy, Counsel for Plaintiffs, (Feb. 19, 2021).

Late/Extra Trip Policy.[276]  He noted that he started his tenure at USPS by "directing that we be more disciplined by running our trucks on time and on schedule, and that we should eliminate unnecessary extra trips."[277]  And despite acknowledging that the Late/Extra Trip Policy "temporarily impacted mail and package service performance," he emphasized that "[r]unning on time and on schedule is the only way that our network can work in the manner that is intended[.]"[278]  At no point did DeJoy suggest that USPS ever suspended its Late/Extra Trip Policy, modified its approach to late or extra trips, or relinquished its commitment to this Policy.

168.    USPS's recent organizational operations also demonstrate its continued commitment to the Late/Extra Trip Policy.  On November 6, 2020, the USPS OIG released a report evaluating operational changes within USPS.[279]  It noted that after his appointment, Postmaster General DeJoy implemented three operational and organizational changes, including an initiative to "eliminate all late and extra trips outside of regularly scheduled transportation service" that began on July 10, 2020—the Late/Extra Trip Policy.[280]  The OIG Report concluded that these changes "resulted in a significant drop in the quality and timeliness of mail delivery" and were "[i]mplemented without completing a study or analysis of the impact of the changes on mail service, even though critical employee availability issues were being felt as pandemic cases

---

[276] Feb. 24 House Testimony, *supra* note 68.

[277] *Id.*

[278] *Id.*

[279] *See* OIG Report, *supra* note 61.

[280] *Id.* at 1.

rose following the July 4 holiday weekend."[281]  Despite this evaluation, the report noted that the

Policy was merely "suspended."[282]

169.     And USPS is apparently taking steps to ensure that late and extra trips are, at

minimum, infrequently used.  On January 11, 2021, the OIG released reports auditing the use of

late and extra trips at USPS processing centers in Los Angeles, California and Richmond,

Virginia.[283]  The OIG stated that it "conducted th[ese] audit[s] to provide U.S. Postal Service

management with timely information on operational risks" and in response to the Postmaster

General's "eliminat[ion of] unnecessary late and extra trips outside of regularly scheduled

transportation service."[284]  While USPS management objected that late and extra trips were not

banned or organizational changes mandated, the OIG maintained that it merely repeated "what

management stated in their comments"—namely, that "the Postal Service would eliminate

unnecessary late and extra trips outside of regularly scheduled transportation service."[285]

170.     More broadly, far from committing to take necessary measures to ensure the

timely delivery of Election Mail, Defendants evidently intend to further slow the delivery of all

mail under a forthcoming ten-year strategic plan designed to cut costs within USPS.  On

February 24, 2021, Postmaster DeJoy confirmed in testimony before the House Oversight

---

[281] *Id.*

[282] *Id.* at 21.

[283] *See Late and Extra Trips at the Los Angeles, CA, Processing and Distribution Center*, USPS OIG (Jan. 11, 2021), https://www.uspsoig.gov/sites/default/files/document-library-files/2021/21-028-R21.pdf ("Los Angeles Audit Report"); *Late and Extra Trips at the Richmond, VA, Processing and Distribution Center*, USPS OIG (Jan. 11, 2021), https://www.uspsoig.gov/sites/default/files/document-library-files/2021/21-029-R21.pdf ("Richmond Audit Report").

[284] Los Angeles Audit Report at 1; Richmond Audit Report at 1.

[285] Richmond Audit Report at 8, 10.

Committee that this plan includes reductions in air transport of mail.[286]  It also includes changes to First-Class Mail service standards, including cutting back on the two-day service standard for local mail.[287]  According to reports, the plan would eliminate the two-day service standard for letters and envelopes sent locally by First-Class Mail and instead apply the three-to-five day service standard currently applicable to non-local mail.[288]

171.   Moreover, Defendants have issued no further guidance on any extraordinary measures in place for elections beyond the Georgia Runoff—though such elections are rapidly approaching.  Thus, at best, Defendants seem prepared to implement only their deficient November ballot processing practices; worse, they may plan to implement no extraordinary measures whatsoever.

---

[286] Jacob Bogage, *DeJoy Confirms his USPS Plan May Include Slower First-Class Mail*, Wash. Post (Feb. 24, 2021 at 1:32 p.m.), https://www.washingtonpost.com/business/2021/02/24/dejoy-hearing-usps-live-updates/ (quoting DeJoy's statement that "[i]f we in fact get the relief that we need in terms of time, we will put more mail on the ground"); *see also* Feb. 24 House Testimony, *supra* note 68100 (indicating that the plan will include solutions to "the reliability of air transportation[, which] is subject to a number of factors outside of the Postal Service's control. Surface transportation is more reliable and cost-effective . . . .").

[287] Bogage, *supra* note 206 (quoting DeJoy's confirmation that USPS was "evaluating all service standards" and that the plan would include two-day mail but "some percentage of where the reach is right now may change"); *see also* Feb. 24 House Testimony, *supra* note 68100 (noting that the "persistent gap between actual service performance and the service targets for First-Class Mail . . . is also a consequence of establishing service standards that are not achievable through efficient and effective operations, and an organizational reluctance to change those service standards to be more realistic in the face of past political resistance to operational changes").

[288] Jacob Bogage & Hannah Denham, *Postmaster General's New Plan for USPS is Said to Include Slower Mail and Higher Prices*, Wash. Post (Feb. 24, 2021 at 11:19 a.m.), https://www.washingtonpost.com/business/2021/02/24/dejoy-hearing-usps-live-updates/.

A.    **Defendants' Refusal to Implement Measures Necessary to the Timely Delivery of Election Mail Unduly Burdens the Right to Vote.**

172.    Defendants' apparent commitment to reinstating the Late/Extra Trip Policy flies in the face of this Court's previous determination that Plaintiffs are likely to succeed in showing the Policy unduly burdens the right to vote.  Defendants' return to deficient ballot processing practices implemented prior to the parties' December 23 Agreement similarly imposes an unconstitutional burden.

173.    In the midst of the ongoing COVID-19 pandemic, and in light of emerging variants of the virus and the country's slow vaccination progress, the public health and safety need for **voting** by mail remains.

174.    USPS has already tested its Late/Extra Trip Policy and its typical ballot processing practices in similar moments.  That Policy and those practices proved insufficient to meet voters' demand for mail balloting.  Under the Late/Extra Trip Policy, millions of mail pieces were left behind and USPS's service scores declined precipitously.[289]  Under USPS's typical ballot processing practices, thousands of ballots were channeled into backlogged and underperforming processing facilities, subjecting them to needless delay.  *See supra* section III.A.4.

175.    The delays created by this Policy and these practices pose a severe threat to the timely delivery of ballots in the upcoming Pennsylvania, New Mexico, and Texas elections.

176.    In particular, sending ballots through overwhelmed processing plants, rather than implementing mandatory local turnaround and early hub-and-spoke processes, creates a concrete

---

[289] OIG Report, *supra* note 61**84**, at 2 (noting that "[d]elayed mail reported in Postal Service systems for mail processing facilities increased 21 percent" following implementation of the Late/Extra Trip Policy "from 2 billion pieces for the week ending July 10, 2020 to 2.4 billion pieces for the week ending July 31, 2020").

and impending risk that Saturday voters' ballots will not make it through the processing plants in time for delivery on these states' Election Days.

177.    This problem can be avoided through full implementation of late and extra trips and mandatory implementation of the Agreed-To Measures.  Full implementation of late and extra trips can reduce ballot delivery times by up to three days.  And mandatory implementation of the December 23 measures can save at least an additional day by enabling Saturday voters' ballots to avoid the processing plant through implementation of local turnaround or hub-and-spoke processes or even an additional one to two days through use of the Express Mail network—thus enabling Saturday voters' ballots be delivered on time.

~~144.~~178.    Instead, Defendants' anticipated measures force voters to make a choice: vote by mail and risk their ballots not being counted due to untimely USPS delivery or vote in person during the midst of the COVID-19 pandemic~~, burdens on the ability to vote by mail~~. Both options impose ~~a burden on all voters~~severe burdens on voters.  And as this Court has recognized, in the context of the COVID-19 pandemic, many others face an even starker choice: "either to vote by mail-in-ballot or . . . not vote at all." *Vote Forward*, 2020 WL 5763869, at *7. In particular, Defendants' ballot processing practices and Late/Extra Trips Policy "place an especially severe burden on those who have no other reasonable choice than to vote by mail, such as those who may be at a high risk of developing a severe case of COVID-19 should they become exposed to the virus at the polling place, and those who are not physically able to travel to the polls due to disability." *Id.* at *9.  If they wish to vote at all, these voters have no option but to chance a mail-in ballot's late delivery.

~~145.    Still, some voters are more affected by the policies than others.  In particular, DeJoy's policies will have a disparate impact on certain categories of voters who have no way to effectuate their right to vote other than by use of USPS's services.~~

146.   First, voters for whom COVID-19 poses an especially high health risk—and, in turn, for whom voting in person poses a risk of serious illness or death—have no alternative to effectuate their right to vote.  This includes older voters, voters with underlying medical conditions, and voters from racial and ethnic minority groups that the CDC has found have a disproportionately high incidence of such co-morbidities.

147.   Second, certain voters with disabilities cannot physically get to the polls at all, and would thereby rely on mail-in ballots even outside the strictures of the pandemic.  These voters have no alternative to effectuate their right to vote.

179.   And no matter the context, Defendants' Policy ensures that all those who choose to vote by mail are subjected to the burdens of a system in which their ballot may be counted, or may not, based on such arbitrary factors as the processing facility their ballot is routed through—or whether it is routed through one at all.  *See Gallagher*, 477 F. Supp. 3d at 47 (rejecting as unconstitutional a policy that meant that "[w]hether an individual's vote will be counted . . . depend[s] on something completely arbitrary—their place of residence and by extension, the mailbox or post office where they dropped off their ballot").  As this Court has recognized, "where a policy creates a situation where '[a] large number of ballots will be invalidated, and consequently, not counted based on circumstances entirely out of voters' control,' the 'burden [on the right to vote] is exceptionally severe.'"  *Vote Forward*, 2020 WL 5763869, at *8 (alterations in original) (quoting *Gallagher*, 477 F. Supp. 3d at 43).

**VII.B.Defendants Have Failed to Assert a Plausible Interest That Would Justify the Policy Changes.Their Refusal to Take Measures Necessary to Timely Ballot Delivery.**

148.   DeJoy has repeatedly reiterated two justifications for the policy changes: efficiency and cost.  Neither supplies a justification sufficient to outweigh the burden that Defendants' policies impose on the right to vote in the month preceding the election

100

on November 3, 2020. Moreover, the policy justifications appear to have been pretextual.

### A.    The Purported Justifications Cannot Withstand Scrutiny.

149.    In his Senate testimony, DeJoy repeatedly described the purpose of his measures as improving service and increasing the number of deliveries made on time.[290] For example, in response to questioning by Senator Rosen, DeJoy described the Late/Extra Trip Policy as follows: "The only change that I made ma'am was that the trucks leave on time. *Theoretically*, everyone should have got their mail faster. . . . The analysis that we did was that if we move the mail on schedule that all late deliveries would have been improved."[291]

150.    As Senator Rosen responded, "Obviously, that isn't the case."[292] The USPS service scores charts pictured above highlight that delivery delays increased dramatically in the immediate aftermath of the Late/Extra Trip Policy. *See supra*,

---

[290] *See, e.g.*, *Senate Hearing with Postmaster General Louis DeJoy August 21 Transcript*, Rev (Aug. 21, 2020), https://www.rev.com/blog/transcripts/senate-hearing-with-postmaster-general-louis-dejoy-august-21-transcript ("But the change that I made was run to our schedule, run to our transportation schedule. . . . Once we get all the mail on those trucks, that 97% to 98% of the mail that we move around the country will be getting to its destination point on time."); *id.* ("We're considering dramatic changes to improve the service to the American people."); *id.* ("I worked with the existing management team to create a new organization that would look to move forward and give us self-help and drive improvements in our service, drive cost out of the system, and grow revenues."); *id.* ("The analysis that we did was that if we move the mail on schedule that all late deliveries would have been improved."); *id.* ("And if we adhere to our schedules, that will improve performance."); *see also* https://www.politico.com/news/2020/08/21/louis-dejoys-opening-statement-senate-hearing-399941 ("While the improvements are dramatic, this effort did expose a need to realign some of our processing and scheduling that caused mail to miss the scheduled transportation, and has temporarily impacted mail and package service performance.").

[291] *Id.* (emphasis added).

[292] *Id.*

101

section VI.A.  DeJoy's efficiency justification is further undermined by the ensuing reports of delays in mail service in Alabama, Colorado, Connecticut, District of Columbia, Illinois, Maine, Maryland, Michigan, Minnesota, Missouri, Nevada, New Mexico, New York, Ohio, Oregon, Pennsylvania, Rhode Island, South Carolina, Texas, Utah, Vermont, Washington, Wisconsin, and Virginia.  *See supra*, section III.C.

151.   DeJoy himself acknowledged as much in his testimony before the Senate, conceding that "[i]n transition there would be an issue"; that "certainly there was a slowdown in the mail when—our production did not meet the schedule"; that "we feel bad about what the dip in our service, the level has been"; and that "we did not [do] as great a job as we should" in recovering from the "imbalances" created by the transition.[293]

152.   This rationale is equally deficient with respect to the sorting machines—though DeJoy asserted they "are not needed," his assertion is belied by the fact that delays are already soaring and the need for fast-paced sorting will only increase as the election draws nearer.

153.   Even if DeJoy's policies would generate "longterm improvement" in efficiency,[294] that justification cannot support continuation of the policy in the month prior to the November election  There are only 68 days remaining until Election Day.  The month prior to a presidential election that will be overwhelmingly carried out by

[293] *Senate Hearing with Postmaster General Louis DeJoy August 21 Transcript*, Rev (Aug. 21, 2020), https://www.rev.com/blog/transcripts/senate-hearing-with-postmaster-general-louis-dejoy-august-21-transcript.

[294] *Id.* (statement of Sen. Johnson).

~~mail is not the time to test run a new policy or the elimination of infrastructure and hope the kinks will iron out in time.~~

~~154.   The remaining justification DeJoy offers is cost.[295]  This justification fails to support the continued enforcement of the Late/Extra Trip Policy because it is overbroad.  USPS's desire to implement cost-cutting measures from October 15 through November 15 is not justified by its need to effectuate a certain annualized savings.  USPS could still cut costs by implementing these policies *after* the election, when they would not endanger the right to vote.~~

~~180.   Because the burden on the Plaintiffs' right to vote is at its zenith in the month before the election—when most people are submitting their ballots and the risk of delay becomes more likely to result in the ballot not being counted—USPS's limited fiscal savings in one month's time cannot justify the infringement on Plaintiffs' right to vote.~~Defendants have provided no legitimate interest to justify their refusal to implement the Agreed-To Measures or commit not to reinstate the Late/Extra Trip Policy.  And they cannot.  Historically, Defendants have relied upon three rationales to justify their actions:  (1) the purported risk to the efficient delivery of ballots that arises upon any change of policy; (2) a desire to contain costs; and (3) the alleged efficacy of their existing measures.  These

---

~~[295] *See, e.g., id.* ("And together, we reorganized the organization to move forward on process improvements, improving service and garnering new business, new revenue and costs."); *id.* ("Late deliveries, late dispatch, extra trips, and all the time and costs associated around this that approximated $4 billion. We were facing, this was before we had the note, I had $13 billion in cash and $12.5 billion of payments to make in the next nine months. And no help insight. We had no help in sight. So I needed to look at a positive impact on cost savings that improved the business."); *see also* https://www.politico.com/news/2020/08/21/louis-dejoys-opening-statement-senate-hearing 399941 ("Some may ask, why does the Postal Service need to transform? To that question, I say that while I am optimistic about the future of the Postal Service, I am also a realist, and am keenly aware of the magnitude of the financial challenges we face.").~~

justifications cannot withstand scrutiny, and none outweighs the burden that Defendants' actions impose on the right to vote.

181.    *Efficiency Rationale.*  In his 30(b)(6) deposition, Mr. Glass explained that USPS originally chose not to implement the hub-and-spoke process on the early date later called for by the parties' December 23 Agreement because "when we change processes, we introduce a risk of failure.  We introduce a risk that somebody is not going to follow that new process correctly," thus "introduc[ing] new confusion into the step."[296]  Defendants cannot now claim this same concern justifies their Late/Extra Trip Policy or ballot processing practices.  Indeed, the Late/Extra Trip Policy is itself a change from the status quo.  And Defendants have already implemented the Agreed-to Measures in the Georgia Runoff Election that Plaintiffs now seek to implement again.  Moreover, the Agreed-to Measures are simply extensions of the measures already used by USPS—none are "new," and none can introduce "new confusion."

~~155.~~182.    *Cost Rationale.*  With respect to any alleged cost justification, it bears emphasizing that the government cannot preserve the fiscal integrity of its programs at the expense of citizens' constitutional rights.  *See, e.g.*, *Shapiro v. Thompson*, 394 U.S. 618, 633 (1969) (although the government "has a valid interest in preserving the fiscal integrity of its programs," it "may not accomplish such a purpose by" violating its citizens' fundamental rights); *Frontiero v. Richardson,* 411 U.S. 677, 690 (1973) ("[A]lthough efficacious administration of governmental programs is not without some importance, 'the Constitution recognizes higher values than speed and efficiency.'").  And regarding the implementation of extraordinary measures, Mr. Glass admitted that he "d[idn't] know" if "he, or anyone in his office has actually

---

[296] Glass Dep. Tr. at 209:18–22.

done a cost-benefit analysis using data to determine what the costs [of taking additional measures] would be."[297]  Defendants cannot claim that the burdens imposed by their Policy and practices are justified by cost considerations when Defendants themselves have not even considered whether the benefits of the Policy and practices outweigh the risks.

**B.     The Purported Justifications Are Pretextual.**

183.    ~~DeJoy's justifications are pretextual.  As noted above, the President's own statement makes clear~~*Efficacy*.  Defendants have also at points claimed that the ~~real~~ measures Plaintiffs call for are not necessary to ensure timely delivery, or even that the Late/Extra Trip Policy and USPS's typical ballot processing practices are themselves necessary to timely delivery.  Their own data and statements demonstrate otherwise.

184.    In his Congressional testimony, DeJoy has repeatedly described the purpose of ~~the Challenged Policies is to frustrate~~ his Late/Extra Trip Policy as improving service and increasing the number of deliveries made on time.[298]  But the USPS OIG found that USPS "did

---

[297] *Id.* at 200:10–14.

[298] *See, e.g., Senate Hearing with Postmaster General Louis DeJoy August 21 Transcript,* Rev (Aug. 21, 2020), https://www.rev.com/blog/transcripts/senate-hearing-with-postmaster-general-louis-dejoy-august-21-transcript ("But the change that I made was run to our schedule, run to our transportation schedule. . . . Once we get all the mail on those trucks, that 97% to 98% of the mail that we move around the country will be getting to its destination point on time."); *id.* ("We're considering dramatic changes to improve the service to the American people."); *id.* ("I worked with the existing management team to create a new organization that would look to move forward and give us self-help and drive improvements in our service, drive cost out of the system, and grow revenues."); *id.* ("The analysis that we did was that if we move the mail on schedule that all late deliveries would have been improved."); *id.* ("And if we adhere to our schedules, that will improve performance."); *see also Read: Louis DeJoy's Opening Statement at Today's Senate Committee Hearing,* Politico (Aug. 21, 2020), https://www.politico.com/news/2020/08/21/louis-dejoys-opening-statement-senate-hearing-399941 ("While the improvements are dramatic, this effort did expose a need to realign some of our processing and scheduling that caused mail to miss the scheduled transportation, and has temporarily impacted mail and package service performance.").

not conduct an analysis of the impact of the operational initiatives," including that Policy, "on mail ~~balloting.  While President Trump's statements~~ service performance."[299]  Likewise, it "did not pilot test or otherwise consider the impact of the changes even though critical employee availability issues were ~~made~~ being felt as pandemic cases rose following the July 4 holiday weekend."[300]  Any claim that USPS may make about that Policy's necessity is unmoored from evidence.

185.    Indeed, it is contrary to the evidence.  The USPS service score data discussed previously shows that delivery delays increased dramatically in the ~~context of~~ immediate aftermath of the Late/Extra Trip Policy.  *See supra*, section III.A.1.  And DeJoy himself has acknowledged as much in his Congressional testimony, conceding that "certainly there was a ~~dispute regarding funding USPS, he expressly linked that lack of funds to USPS's inability to handle the volume of~~ slowdown in the mail when-- our production did not meet the schedule,"[301] and that his change to late and extra trips practices "temporarily impacted mail and package service performance."[302]  This by itself demonstrates that these processes are insufficient to ensure timely ballot delivery.

~~156.~~186.    When asked in his deposition if USPS has "any data to show that the mail will be slowed down if you implement these [extraordinary] measures" sooner, Mr. Glass

---

[299] OIG Report, *supra* note 61, at 8.

[300] *Id.*

[301] *Senate Hearing with Postmaster General Louis DeJoy August 21 Transcript*, Rev (Aug. 21, 2020), https://www.rev.com/blog/transcripts/senate-hearing-with-postmaster-general-louis-dejoy-august-21-transcript.

[302] Feb. 24 House Testimony, *supra* note 68100.

admitted that he did not.[303]  And Mr. Glass further acknowledged that "in November, there were ballots that ~~are anticipated in the November~~ were collected more than two days before the election that, ultimately, were not delivered until after November 3rd," when they could no longer be counted.[304]

157.    ~~Although the USPS has sought to justify the Challenged Policies by contending that it has insufficient funds, the President has stated both (a) that he opposes any increase in funding, and (b) that *the consequence* of the funding deficit will be the frustration of mail balloting.  When one adds the voluminous evidence of President Trump's opposition to mail balloting, it is reasonable to infer that *the reason* he has opposed an increase in funding for USPS is to effectuate his goal of blocking mail balloting.~~

158.    ~~DeJoy's own statements also support a finding of pretext.  After vigorously defending his policy changes on fiscal grounds, DeJoy curiously diverted from the cost rationale in one specific context:  the very funding from Congress that the President opposes.  Senator Scott asked DeJoy:  "do you feel like you need a massive federal bailout [to] be able to deliver the mail on Election Day?"  DeJoy said:  "No. I do not need a massive—I don't need anything to deliver mail on—election night."[305]  Turning down~~

---

[303] Glass Dep. Tr. at 201:15–22.

[304] ~~Ellie Kaufman et al., *Trump says he opposes funding USPS because of mail-in voting*, CNN (Aug. 13, 2020), https://www.cnn.com/2020/08/13/politics/trump-usps-funding-comments-2020-election/index.html (emphasis added) ("But if they don't get those two items that means you can't have universal mail-in voting because you *[sic]* they're not equipped to have it.").~~ *Id.* at 208:22–209:4.

[305] ~~*Senate Homeland Security and Governmental Affairs Committee Hearing on USPS Operations During COVID-19 and the Elections*, CQ Congressional Transcripts, (Aug. 21, 2020),~~

~~an alternative source of funding that would impose no burden on the right to vote~~
~~indicates that the policies are *designed* to impose a burden on voting rights and not to~~
~~stabilize USPS's finances.~~

187.     Because Defendants' Policy and practices impose a severe burden on voting rights that cannot be justified by any possible interest, they are unconstitutional.

### C.     Defendants' Failure to Comply with Statutory Requirements in Formulating the Late/Extra Trip Policy Would Infect Efforts to Reinstate It.

188.     Finally, even if Defendants could show that their Late/Extra Trip Policy does not unconstitutionally burden the right to vote—which they cannot—the reinstatement of that Policy would suffer from the same infirmities as its promulgation.  Namely, absent any effort by USPS to comply with the commands of 39 U.S.C. § 3661, implementation of that Policy is in violation of law.

## CAUSES OF ACTION

## COUNT I

### (*Ultra Vires* Agency Action — Violating the Clear Command of Section 3661 of the Postal Reorganization Act)

~~159.~~189.     Plaintiffs re-allege and incorporate by reference each allegation contained in the preceding paragraphs as though fully set forth herein.

~~160.~~190.     USPS has a clear, indisputable, and non-discretionary duty to request an advisory opinion from the Postal Regulatory Commission before making "any change in the nature of postal services which will generally affect service on a nationwide or substantially nationwide basis."  39 U.S.C. § 3661(b) ("When the Postal Service determines that there should be a change in the nature of postal services which will generally affect service on a nationwide or

substantially nationwide basis, it shall submit a proposal, within a reasonable time prior to the effective date of such proposal, to the Postal Regulatory Commission requesting an advisory opinion on the change.").

161.191.        USPS's discharge of its duty to request an advisory opinion, initiates a notice and comment period.  After USPS's request, the Commission must offer "an opportunity for hearing on the record," under the process established by the Administrative Procedure Act, for the benefit of and to receive comments on the proposal from "the Postal Service, users of the mail, and an officer of the Commission who shall be required to represent the interests of the general public."  39 U.S.C.Id. § 3661(c).

162.192.        Plaintiffs are "users of the mail" under 39 U.S.C. §_3661(c).

163.193.        Defendants' Late/Extra Trip Policy has affected and will affect postal services on a nationwide or substantially nationwide basis.  Moreover, Defendants have refused to commit not to reinstate this Policy and have expressly left open the option that they will do so.

164.194.        Defendants did not request of the Postal Regulatory Commission an advisory opinion "prior to" implementing the Late/Extra Trip Policy described herein that has affected or will affect postal services on a nationwide or substantially nationwide basis, violating the clear and indisputable command of §_3661.

165.195.        Defendants acted *ultra vires* when they issued the Late/Extra Trip Policy described herein without abiding the clear and indisputable command of § 3661.

196.    Defendants' failure to comply with § 3661 in the formulation of this Policy infects any effort they have made and may make to reinstate it without first requesting an advisory opinion from the Postal Regulatory Commission.  Moreover, Defendants' threat to

reinstitute the Policy without submitting it to the Postal Regulatory Commission for notice and comment constitutes an ongoing violation of § 3661.

166.197.    As users of the mail, Plaintiffs have a clear and indisputable right to Defendants' compliance with the requirements of § 3661.

167.198.    Because of Defendants' actions in violation of §- 3661, Plaintiffs have been denied the opportunity to comment during a hearing under procedures required by § 3661(c) on the Late/Extra Trip Policy and other changes affecting postal services on a nationwide or substantially nationwide basis, as described herein, before their implementation.

168.199.    Nonstatutory judicial review is available in this Court.[306]

169.200.    The Postal Regulatory Commission may receive complaints about Defendants' failure to comply with §- 3661.  However, §- 3661 sets out no requirement that a user of the mail pursue relief before the Commission prior to filing suit.  Moreover, this Court's review would forestall irreparable injury to Plaintiffs because the election in which they plan to vote by mail will occur in 68 days, but the Commission is under no obligation to resolve complaints until they have been pending for at least 90 days.  *See* 2939 U.S.C. §- 3662(ab)(1).  This Court's review would thus forestall irreparable injury to voters because the Pennsylvania primary and special elections are only 75 days away, and the Texas special election only 58 days away.  This Court's review is also warranted and required because it can offer remedies not available before the Commission and for reasons of judicial economy.

---

[306] There is no possibility for judicial review by this Court or another Court under the Administrative Procedure Act or any other specific or general statutory review provision.  *See Mittleman v. Postal Reg. Comm'n*, 757 F.3d 300, 305 (D.C. Cir. 2014) ("[W]e have observed that the Postal Service is exempt from review under the Administrative Procedure Act." (quotation marks omitted)).

170 201.        Plaintiffs will suffer irreparable injury if the changes described herein take effect without Defendants' compliance with §_3661.

171 202.        The public interest favors declaring unlawful the changes to postal services that Defendants have implemented without observing the requirement of §_3661.

172 203.        For these reasons, Plaintiffs are entitled to (1) a declaration that Defendants acted unlawfully by adopting changes in violation of § 3661; (2) an order directing Defendants to "submit a proposal . . . to the Postal Regulatory Commission requesting an advisory opinion on the" changes described herein; and (3) an injunction barring Defendants and their agents from implementing the Late/Extra Trip Policy without first receiving an advisory opinion from the Postal Regulatory Commission.

## COUNT II

### (Undue Burden on the Right to Vote in Violation of the U.S. Constitution)

173 204.        Plaintiffs re-allege and incorporate by reference each allegation contained in the preceding paragraphs as though fully set forth herein.

174 205.        The United States Constitution guarantees that "all qualified voters have a constitutionally protected right to vote . . . and to have their votes counted." *Reynolds v. Sims*, 377 U.S. 533, 554 (1964).

175 206.        This fundamental right to vote is rooted in "the right of individuals to associate for the advancement of political beliefs, and the right of qualified voters, regardless of their political persuasion, to cast their votes effectively." *Williams v. Rhodes*, 393 U.S. 23, 30 (1968). These protections are typically articulated as First and Fourteenth Amendment rights in suits against state actors. *Anderson v. Celebrezze*, 460 U.S. 780, 787 (1983); *Burdick v. Takushi*, 504 U.S. 428, 434 (1992). Here, the First and Fifth Amendments provide the same guarantees and forbid the federal government from imposing undue burdens on the right to vote.

111

176.207.      Under the *Anderson-Burdick* line of cases, the government cannot

unreasonably burden the right to vote—if the character and magnitude of the injury inflicted

upon voting rights outweighs the state interests justifying the challenged restriction, then the

restriction is unconstitutional.  This Court has already determined that the *Anderson-Burdick*

framework applies to Plaintiffs' constitutional claim in this case.  *Vote Forward*, 2020 WL

5763869, at *8.

177.208.      Defendants' actions, as described herein, including the Challenged

Policiestheir threatened reimplementation of the Late/Extra Trip Policy and other

changesrefusal to USPS capacity since DeJoy was appointed Postmaster General, will

and haveimplement the Agreed-To Measures, unreasonably and severely burdened

Plaintiffs'burden the right to vote and will continue to do so by causing delays that effectively

disenfranchise voters.

178.209.      In evaluating burdens on the right to vote, a "majority of the *Crawford*

Court determined that '[i]t matters . . .   whether the effects of a facially neutral and

nondiscriminatory law are unevenly distributed across identifiable groups.'" *League of Women*

*Voters of Fla., Inc., v. Detzner*, 314 F. Supp. 3d 1205, 1216 (N.D. Fla. 2018).[307]

179.210.      The burden imposed by the Challenged PoliciesLate/Extra Trip Policy

and the lack of Agreed-To Measures is especially severe for individuals who have no reasonable

alternative method to exercise their right to vote, including (i) voters with disabilities who cannot

physically get to their polling place; and (ii) voters who face increased risk of serious illness or

death from voting during the COVID-19 pandemic, such as voters with underlying medical

---

[307] *See also Weinberger v. Wiesenfeld*, 420 U.S. 636, 638 n.2 (1975) (explaining that Supreme
Court's "approach to Fifth Amendment equal protection claims has always been precisely the
same as to equal protection claims under the Fourteenth Amendment").

conditions, older voters, and voters from racial and ethnic minority groups. Many of these voters remain unvaccinated.

180.211.     Defendants' actions are not justified by any legitimate governmental interest.  As a result of the actions described herein, Defendants have violated and continue to violate the U.S. Constitution's protections against undue burdens on the right to vote.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs request that this Court enter a judgment against Defendants and award Plaintiffs the following relief:

    A.  A declaration that USPS has violated the requirements of 39 U.S.C. §_3661 by making a change or changes "in the nature of postal services which will generally affect service on a nationwide or substantially nationwide basis," as described herein, without first requesting an advisory opinion of the Postal Regulatory Commission, thereby denying "users of the mail" the opportunity to participate in a "hearing on the record" before the Postal Regulatory Commission about the proposed changes before implementation;

    B.  An order compelling USPS to discharge its duty to request an advisory opinion of the Postal Regulatory Commission on any and all proposed "changes in the nature of postal services which will generally affect service on a nationwide or substantially nationwide basis," as described herein, before implementing any such proposed changes;

    C.  Preliminary and permanent injunctions barring Defendants and their agents, officers, employees, and successors, and all persons acting in concert with each or any of them or under their direction from implementing any and all "changes in the nature of postal services which will generally affect service on a nationwide or substantially nationwide basis" that are planned, were adopted, and/or have been implemented without the Postal Service discharging its duty to request an advisory opinion of the Postal Regulatory Commission regarding any such proposed changes;

D.  Vacatur of any agency action, order, notice, decision, or policy statement issued by Defendants or their agents, officers, employees, and successors, or any persons acting in concert with each or any of them or acting under their direction that implement or purport to implement any and all "changes in the nature of postal services which will generally affect service on a nationwide or substantially nationwide basis," as described herein, that are planned, were adopted, and/or have been implemented without USPS discharging its duty to request an advisory opinion of the Postal Regulatory Commission regarding such proposed changes;

E.  A declaration that Defendants' ~~actions~~Late/Extra Trip Policy and ballot processing practices in the absence of the Agreed-To Measures, as described herein, ~~violated~~violate the First Amendment to the United States Constitution.

F.  A declaration that Defendants' ~~actions~~Late/Extra Trip Policy and ballot processing practices in the absence of the Agreed-To Measures, as described herein, ~~violated~~violate the Fifth Amendment to the United States Constitution.

G.  Preliminary and permanent injunctions barring Defendants and their agents, officers, employees, and successors, and all persons acting in concert with each or any of them or under their direction from ~~enforcing any policies that unreasonably burden~~implementing the ~~fundamental right to vote, including~~Late/Extra Trip Policy and enjoining USPS from processing election ballots without the ~~Challenged Policies~~Agreed-to Measures in place in any district where a relevant election is taking place;

H.  Appointment of an independent monitor to oversee Defendants' compliance with the terms of the Court's order;

I.   Award Plaintiffs reasonable costs, including reasonable attorneys' fees; and

J.   Any and all additional relief that this Court deems just and proper.


Respectfully submitted,

*/s Shankar Duraiswamy*

Shankar Duraiswamy (D.C. Bar No. 501702)
~~Megan C. Keenan~~Daniel Auten (D.C. Bar No. ~~1672508~~1614072)
Sarah Suwanda (D.C. Bar No. 1685531)
~~Virginia Williamson (D.C. Bar No. 187220)~~
~~James M. Smith (D.C. Bar No. 987082)~~
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001-4956
(202) 662-6000
sduraiswamy@cov.com
~~mkeenan~~dauten@cov.com
ssuwanda@cov.com
~~vwilliamson@cov.com~~
~~jmsmith@cov.com~~


Robert D. Fram
~~Diane Ramirez~~
COVINGTON & BURLING LLP
Salesforce Tower
415 Mission Street, Suite 5400
San Francisco, CA 94105-2533
(415) 591-6000
rfram@cov.com
~~dramirez@cov.com~~

~~John Fraser~~
~~COVINGTON & BURLING LLP~~
~~The New York Times Building~~
~~620 Eighth Avenue~~
~~New York, NY 10018-1405~~
~~(212) 841-1000~~
~~jfraser@cov.com~~

Date:  ~~September 8, 2020~~March 9, 2021