## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

VOTE FORWARD, *et al.*,

                *Plaintiffs*,

v.

LOUIS DEJOY, in his official capacity as the Postmaster General; and the
UNITED STATES POSTAL SERVICE,

                *Defendants*.

Civil Case No. 1:20-cv-02405

## PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR
## SECOND MOTION FOR PRELIMINARY INJUNCTION

Robert D. Fram
COVINGTON & BURLING LLP
Salesforce Tower
415 Mission Street, Suite 5400
San Francisco, CA 94105-2533
(415) 591-6000
rfram@cov.com

Shankar Duraiswamy
Daniel Auten
L. Brady Bender
Sarah Suwanda
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001-4956
(202) 662-6000
sduraiswamy@cov.com
dauten@cov.com
bbender@cov.com
ssuwanda@cov.com

*Counsel for Plaintiffs*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. iii

INTRODUCTION ............................................................................................................... 1

STATEMENT OF FACTS ................................................................................................... 3

I.     Defendants' Timely Delivery of Mail Ballots Is Critical to Protecting the Right to
Vote in 2021. ........................................................................................................... 3

     A.     The Upcoming 2021 Elections Will Likely Feature High Rates of Mail-in
Voting. ........................................................................................................... 3

     B.     USPS's Continuing Inability to Ensure Timely Mail Delivery Threatens to
Disenfranchise Voters in Upcoming Elections. ....................................... 6

II.     Defendants' Pre-Georgia Runoff Ballot Processing Practices Resulted in the
Untimely Delivery of Mail Ballots. ....................................................................... 9

     A.     Following Court Pressure, USPS Instituted Certain Measures to Speed
Ballot Delivery in the November 2020 General Election. ........................ 9

     B.     The November Measures Improved the Timely Delivery of Mail Ballots,
but Still Left Many Voters Disenfranchised Due to Postal Delays. ........ 11

     C.     The Parties Agreed to Additional Measures To Address Ballot Delivery
Delays For the Georgia Runoff Election. .................................................. 15

III.     Defendants Have Refused to Commit to Implementing Critical Ballot Handling
Practices for Upcoming Elections. ......................................................................... 20

ARGUMENT ........................................................................................................................ 22

I.     Plaintiffs Are Likely to Succeed on the Merits of Their Claim That USPS's
Refusal to Take the Agreed-To Measures During the Upcoming Elections
Unconstitutionally Burdens the Right to Vote. ..................................................... 23

     A.     The *Anderson-Burdick* Framework Applies to USPS Policies and Practices
That Burden the Right to Vote. ................................................................... 23

     B.     Absent the Agreed-To Measures, Defendants' Ballot Processing Practices
Severely Burden the Right to Vote. ........................................................... 25

     C.     Defendants' Interests in Not Implementing the Agreed-To Measures Do
Not Justify the Burden Imposed on Voters. .............................................. 29

II.     Plaintiffs Will Suffer Irreparable Harm Absent a Preliminary Injunction. .......... 30

A.      The Individual Plaintiffs Will Suffer Irreparable Injury Absent an Injunction. ........................................................................................31

B.      Plaintiff Vote Forward Will Suffer Irreparable Injury Absent an Injunction. ........................................................................................34

III.    The Public Interest and the Balance of Equities Weigh in Favor of a Preliminary Injunction..................................................................................36

CONCLUSION ....................................................................................37

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anderson v. Celebrezze,*
   460 U.S. 780 (1983) ................................................................................24, 25, 29

*Burdick v. Takushi,*
   504 U.S. 428 (1992) ................................................................................24, 25, 29

*Gallagher v. N.Y. State Bd. of Elections,*
   477 F. Supp. 3d 19 (S.D.N.Y. 2020) ...............................................................28

*Jubilant DraxImage Inc. v. United States Int'l Trade Comm'n,*
   396 F. Supp. 3d 113 (D.D.C. 2019) .................................................................23

*League of Women Voters of the U.S. v. Newby,*
   838 F.3d 1 (D.C. Cir. 2016) .......................................................................31, 35

*Nken v. Holder,*
   556 U.S. 418 (2009) ..........................................................................................36

*Reynolds v. Sims,*
   377 U.S. 533 (1964) .....................................................................................23, 26

*Vote Forward v. DeJoy,*
   No. 20-2405 (EGS), 2020 WL 5763869 (D.D.C. Sept. 28, 2020) ..............*passim*

*Winter v. Nat'l Res. Def. Council, Inc.,*
   555 U.S. 7 (2008) ..............................................................................................36

**Statutes**

N.M. Stat. § 1-6-10(c) ..............................................................................................8

N.M. Stat. § 1-12-8.2(A) ..........................................................................................8

Pa. Stat. § 3146.6(a) .................................................................................................8

Pa. Stat. § 3150.16(a) ...............................................................................................8

Tex. Elec. Code §§ 86.006–.007 .............................................................................8

**Regulation**

39 C.F.R. § 121.1 .....................................................................................................6

## INTRODUCTION

The right to vote is as sacred in off-year elections as it is in Presidential elections. Indeed, four years ago, one such election was decided by a single vote.[1] But with the glare of the 2020 election cycle behind them, Defendants have evidently turned a blind eye to what the Court has identified as their "unique role in election administration." As a series of statewide and federal special elections rapidly approach, mail-in voting remains critical to effectuating the right to vote, and USPS's historically poor delivery performance continues to threaten the timely delivery of mail ballots. Yet Defendants have refused to commit to *any* measures to support the timely delivery of mail, both in response to Plaintiffs' repeated inquiries and in public statements. Indeed, just days ago, Postmaster General DeJoy released a long-term strategic plan for USPS that made no mention of election mail at all, despite Defendants' earlier boasting to the Court about USPS's "longstanding commitment to the timely delivery of Election Mail." And just a few weeks ago, Postmaster General DeJoy rebuffed specific entreaties to continue the basic ballot-handling measures that USPS adopted (albeit only in the face of judicial pressure) for the November general election. Regrettably, in the absence of judicial intervention, it appears that Defendants are unwilling to take seriously their central role in safeguarding the right to vote. And so, once again, Plaintiffs are compelled to seek preliminary injunctive relief from the Court, this time for a wave of elections scheduled to occur in May and June.

Shortly after Postmaster General DeJoy's tenure began in June 2020, USPS saw a precipitous drop in the timely delivery of mail. In the face of this sharp decline in performance,

---

[1] *See* Will Houp, *Essentially, A Coin Flip May Determine Only 3rd Power Shift for Virginia House in Modern History*, Virginian-Pilot (Dec. 22, 2017), https://www.pilotonline.com/government/virginia/article_10789d91-69c8-5306-9c16-18fd602cc091.html.

and particularly in light of an impending election in which tens of millions of voters would cast their ballots by mail, lawsuits were filed across to the country to roll back Postmaster General DeJoy's policy changes. Those lawsuits, including this action, led to a series of measures that USPS implemented for the November 2020 general election that mitigated the effect of USPS's broader service failures on the timely delivery of election ballots. However, even those measures were insufficient to prevent thousands of voters from being disenfranchised because of USPS's delays in processing mail. Consequently, Plaintiffs and Defendants negotiated an agreement, subsequently entered as a Court order, for USPS to take additional measures to ensure the timely delivery of mail ballots for the January 5, 2021 Senate runoff elections in Georgia. Discovery in this case has confirmed that these measures were critical to protecting the right to vote.

Two-and-a-half months later, USPS continues to struggle to deliver mail in a timely fashion, with nearly one in five pieces of First-Class Mail delivered late, as of the week of March 7, 2021. Meanwhile, in a broad a slate of elections, the right to vote for millions of voters will once again depend on USPS's ability to timely deliver their ballots. Most immediately, in May and June, a number of states, including Pennsylvania, Texas, and New Mexico, will hold important primary and special elections to fill statewide judicial, federal Congressional, and state legislative seats and, in Pennsylvania, to vote on critical statewide ballot initiatives on civil rights and emergency powers (the "2021 Elections"). With voters increasingly relying on mail-in voting, particularly as the pandemic continues to claim nearly 1,000 lives per day (a higher rate than in the fall), the right to vote in these states will continue to depend upon USPS's ability to timely deliver ballots. Because these states only count mail-in ballots received by election day or, in the case of Texas, the next business day, any delay in ballot delivery will disenfranchise mail voters.

Nonetheless, Defendants have steadfastly refused to commit to implementing any of the measures utilized in 2020 to ensure the timely delivery of election ballots in these upcoming elections—neither those that were adopted for the November 2020 election nor those that were agreed to for the Georgia runoff elections. Because Defendants' knowing refusal to commit to any steps that would protect mail ballots from USPS's historically poor delivery performance unreasonably burdens the right to vote, Plaintiffs respectfully move the Court to issue a preliminary injunction requiring Defendants to implement the measures that they agreed to adopt for the Georgia Senate runoff elections in the upcoming elections in Pennsylvania, Texas, and New Mexico.

## STATEMENT OF FACTS

### I. Defendants' Timely Delivery of Mail Ballots Is Critical to Protecting the Right to Vote in 2021.

The use of mail-in voting in the upcoming May and June elections is likely to be quite high, both because of the ongoing COVID-19 pandemic and because of a broader shift towards mail balloting. At the same time, the precipitous drop in timely mail delivery that began last summer has not abated—and, if anything, has worsened.

#### A. The Upcoming 2021 Elections Will Likely Feature High Rates of Mail-in Voting.

As the 2021 Elections approach, the risks posed by the global COVID-19 pandemic have not faded. As of today, the nationwide COVID-19 death rate continues to hover close to 1,000 per day—*higher* than during any period in September or October of 2020.[2] Likewise, the average number of new COVID-19 infections over the past week (approximately 58,500) is

---

[2] *More Than 547,000 People Have Died from Coronavirus in the U.S.*, Wash. Post, https://www.washingtonpost.com/graphics/2020/national/coronavirus-us-cases-deaths/ (last updated Mar. 25, 2021).

3

higher than it was when this suit was first filed (approximately 42,000).[3] The states that will be holding elections within the next two months are no exception to these trends. In Pennsylvania, New Mexico, and Texas, the most recent seven-day average for COVID-19 deaths matches or exceeds the numbers seen at any time in October.[4] In Pennsylvania, average infection rates are now *five times higher* than in late August, while in New Mexico, they are nearly 50 percent higher.[5] And in Texas, there are almost 3,500 new COVID-19 cases per day—nearly as many as in August.[6] As these figures show, increased vaccination rates have not yet proven to be a panacea for the pandemic's impact. Indeed, experts advise that even when fully vaccinated, Americans should still avoid medium or large gatherings.[7] With the pandemic threatening the health and well-being of the American people, there is every reason to expect that demand for mail-in voting will remain high.

---

[3] *Coronavirus in the U.S.: Latest Map and Case Count*, NY Times, https://www.nytimes.com/interactive/2020/us/coronavirus-us-cases.html (last updated Mar. 26, 2021) (comparing seven-day average for March 25, 2021, and August 28, 2020).

[4] *More Than 547,000 People Have Died from Coronavirus in the U.S.*, *supra* note 2.

[5] *Pennsylvania Coronavirus Map and Case Count*, NY Times, https://www.nytimes.com/interactive/2020/us/pennsylvania-coronavirus-cases.html (last updated Mar. 25, 2021) (showing current seven-day average infection rate of 3,264, compared to 623 on August 28, 2020); New Mexico Coronavirus Map and Case Count, NY Times, https://www.nytimes.com/interactive/2020/us/new-mexico-coronavirus-cases.html (last updated Mar. 25, 2021) (showing current seven-day average infection rate of 195, compared to 135 on August 28, 2020).

[6] *Texas Coronavirus Map and Case Count*, NY Times, https://www.nytimes.com/interactive/2020/us/texas-coronavirus-cases.html (last updated Mar. 25, 2021) (showing current seven-day average infection rate of 3,401, compared to 5,012 on August 28, 2020).

[7] *When You've Been Fully Vaccinated*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/vaccines/fully-vaccinated.html (last updated Mar. 23, 2021).

Even beyond the effects of the pandemic, evidence suggests that increased mail-in voting is "the new normal."[8]  USPS itself has acknowledged that the November 2020 general election was not an aberration, but part of a broader trend, noting that "states have tended over time to expand access to mail-in voting" and that "[t]his trend continued in the leadup to the 2020 election, even before the COVID-19 pandemic."[9]  USPS concluded that "[o]ver the past decade, the percentage of voters casting their ballots in person on election day has steadily declined, with more states expanding alternatives and more voters choosing a mail-in voting option."[10]  This accords with general research on voters' use of various voting methods: "[d]ata shows that the growing use of voting by mail for the 2020 elections follows the upward trend of voters turning toward mail or absentee voting over the last decade."[11]  In light of these trends, Defendants' role in 2021 elections will be just as significant, if not more so, than in 2020.

---

[8] Oversight of the U.S. Postal Service: Hearing Before the Subcomm. on Financial Servs. & Gen. Gov't of the House Comm. on Appropriations, 117th Cong. (Mar. 12, 2021) [hereinafter "House Appropriations Committee Hr'g"] (statement of Rep. Rosa DeLauro); see also Patrick Howell O'Neill, The 2020 Election Could Permanently Change How America Votes, MIT Tech. R. (Oct. 20, 2020) (noting that "America's top election official," Chairman Benjamin Hovland of the Election Assistance Commission, "says that the shift to early and mail-in voting could be permanent—even when the pandemic is over"); Charles Stewart III, How We Voted in 2020: A First Look at the Survey of the Performance of American Elections 10–11, MIT Election Data & Sci. Lab (Dec. 15, 2020), http://electionlab.mit.edu/sites/default/files/2020-12/How-we-voted-in-2020-v01.pdf ("On the issue of voting by mail in the future, 60% of all mail voters said they were very likely to vote by mail in the future, while 21% said they were somewhat likely. . . . These results suggest that the shift to voting by mail in 2020 will have permanent repercussions for the administration of elections in the US[.]").

[9] 2020 Post-Election Analysis: Delivering the Nation's Election Mail in an Extraordinary Year, USPS 4–5 (Jan. 21, 2021), https://about.usps.com/newsroom/national-releases/2021/usps_postelectionanalysis_1-12-21_georgia.pdf.

[10] Id.

[11] Vote by Mail Trends and Turnout in Six Election Cycles: 2008-2018, U.S. Election Assistance Comm'n (Oct. 22, 2020), https://www.eac.gov/vote-mail-trends-and-turnout-six-election-cycles-2008-2018; see also Drew DeSilver, Mail-in Voting Became Much More Common in 2020 Primaries as COVID-19 Spread, Pew Rsch. Ctr. (Oct. 13, 2020), https://www.pewresearch.org/fact-tank/2020/10/13/mail-in-voting-became-much-more-common-

**B.      USPS's Continuing Inability to Ensure Timely Mail Delivery Threatens to Disenfranchise Voters in Upcoming Elections.**

At the same time that voters are likely to rely heavily on mail balloting in upcoming elections, USPS continues to be mired in a period of poor service performance that dates back to July 2020. Shortly after Postmaster General DeJoy's tenure began, USPS experienced a precipitous decline in service scores—a measure of the percentage of mail that is delivered within the service standard, which is defined by regulation as 1-3 days for the continental United States.[12] That drop-off in performance has yet to recover.[13] As of March 7, USPS's weekly on-time service score for all First-Class Mail was just 83 percent, meaning that ***nearly one out of every five pieces of mail is being delivered late***.[14] This is almost 10 percent lower than it was at the same time in both 2019 and 2020, and even lower than the service scores at the time that this case was first filed and in the weeks surrounding the November general election.[15] As one

---

in-2020-primaries-as-covid-19-spread/; *Voting By Mail and Absentee Voting*, MIT Election Data & Sci. Lab, https://electionlab.mit.edu/research/voting-mail-and-absentee-voting (last updated Mar. 16, 2021) (providing chart depicting the fall in Election Day voting compared to a rise in mail/absentee voting).

[12] Jacob Bogage, *USPS Chief DeJoy Cuts Post Office Hours, Lengthens Delivery Times in New 10-year Plan*, Wash. Post (Mar. 23, 2021), https://www.washingtonpost.com/business/2021/03/22/usps-dejoy-plan/ ("[USPS] metrics remain well short of the agency's marks from before DeJoy took over in June. The week before DeJoy implemented his midsummer changes, the Postal Service delivered 90.6 percent of first-class mail on time. It hasn't reached 90 percent in the eight months since."); 39 C.F.R. § 121.1.

[13] Bogage, *supra* note 12.

[14] Press Release, *Overall USPS Mail Delivery Performance Recovers from Severe Winter Storms; Peak Holiday Demand*, USPS (Mar. 18, 2021), https://about.usps.com/newsroom/national-releases/2021/0318-service-performance-rebounds-at-usps.htm.

[15] Letter to Judge Victor Marrerro from Rebecca S. Tinio (Jan. 8, 2021), Ex. 1, USPS FY20 Q2 - FY21 Q2 To-Date Service Performance for Market Dominant Products: Nation - By Week, Jones v. U.S. Post. Serv., No. 1:20-cv-06516-VM (S.D.N.Y. Jan. 8, 2021), ECF No. 111-1 (showing 92.4% service score for week of Mar. 7, 2020, 88.04% service score for week of August 29, 2020, 84.61% for the week of October 31, 2020, and 85.40% for the week of November 7, 2020); FY20 Chairman's Information Request No. 6, Ques. 6 Response,

industry observer recently noted, "it hasn't really gotten better as much as we would have hoped at this point."[16]

This ongoing performance failure threatens to disenfranchise voters in upcoming elections in Pennsylvania, Texas, and New Mexico, as those voters face strict deadlines requiring delivery of their mail-in ballots by election day or shortly thereafter:

- On May 18, Pennsylvania will hold a statewide primary election to fill seats on the Pennsylvania Supreme, Superior, and Commonwealth Courts.[17] Pennsylvania will also have several initiatives on the ballot on that date, including three proposed state constitutional amendments: (i) to prohibit the restriction or denial of an individual's equal rights under Pennsylvania law because of race or ethnicity; (ii) to allow the General Assembly to terminate or extend a disaster emergency declaration without needing the Governor's approval; and (iii) to incorporate disaster emergency declaration and

---

https://drive.google.com/file/d/1eGExU3TbRXRktCHfC__NBW1QT7cC8hG2/view (showing 91.43% service score for week of Mar. 2, 2019); *see also* ACR2020: Responses of the United States Postal Service to Questions 1-7, 10-20 of Chairman's Information Request No. 6, Postal Regul. Comm'n (Feb. 4, 2021), https://www.prc.gov/dockets/document/115971 (USPS provides data set in response to Question 6).

[16] Hailey Fuchs, *Postal Service Struggles to Speed Up Delivery, Compounding Its Troubles*, NY Times (Mar. 21, 2021), https://www.nytimes.com/2021/03/21/us/politics/postal-service-mail-delivery.html.

[17] Mark Scolforo, High Court Opening Tops Pennsylvania's 2021 Judicial Races, AP (Dec. 22, 2020), https://apnews.com/article/pennsylvania-coronavirus-pandemic-elections-bcb740a5de7dc1804f75ee865784d2f1; *see also Unofficial Candidate Listing - Pre Ballot Lottery*, Pa. Dep't of State, https://www.pavoterservices.pa.gov/ElectionInfo/FooterLinkReport.aspx?ID=1028 (last visited Mar. 26, 2021) (listing primary candidates for Pennsylvania Supreme, Superior, and Commonwealth Courts).

management powers directly into the Constitution.[18]   In order to be counted, all ballots must be received by the relevant board of elections no later than 8 p.m. that day.[19]

- Texas's special election to fill the late U.S. Representative Ron Wright's seat in the Sixth Congressional District takes place May 1.[20]  To be counted, Texas voters' mail-in ballots must be postmarked by 7 p.m. on election day and must arrive by 5 p.m. on the next regular business day (*i.e.*, Monday, May 3, 2021).[21]

- Following the confirmation of former U.S. Representative Deb Haaland as Secretary of the Interior, New Mexico will hold a special election on June 1 to fill her now-vacant seat in New Mexico's First Congressional District.[22]  All absentee ballots must be received by the relevant board of elections no later than 7:00 p.m. that day, or they will not be counted.[23]

Just one month remains before the first of these elections is scheduled to take place.  But despite the strict ballot-receipt deadlines in these states and their continued poor service performance, Defendants have steadfastly refused to adopt any measures to ensure the timely delivery of mail ballots in these elections.

---

[18] *Proposed Amendments to the Constitution of Pennsylvania*, Pa. Dep't of State, https://www.dos.pa.gov/VotingElections/Pages/Joint-Resolution-2021-1.aspx#:~:text=Joint%20Resolution%20No.%202021%2D1%2C%20if%20approved%20by%20the,because%20of%20race%20or%20ethnicity (last visited Mar. 25, 2021).

[19] 25 Pa. Stat. §§ 3146.6(a), 3150.16(a).

[20] Patrick Svitek, *23 Candidates Join the Race to Replace Late U.S. Rep. Ron Wright*, Tex. Tribune (Mar. 3, 2021), https://www.texastribune.org/2021/03/03/ron-wright-special-election-filing/.

[21] Tex. Elec. Code §§ 86.006–.007.

[22] *Special Election Set for June 1 to Fill Vacated House Seat*, AP (Mar. 18, 2021), https://apnews.com/article/cabinets-general-elections-elections-house-elections-new-mexico-5e8e3bd61b73edff2ef53633d7717330.

[23] N.M. Stat. §§ 1-6-10(c), 1-12-8.2(A).

II.     **Defendants' Pre-Georgia Runoff Ballot Processing Practices Resulted in the Untimely Delivery of Mail Ballots.**

The evidence is clear that, in the face of their ongoing poor service performance, Defendants cannot ensure timely ballot delivery without the measures adopted for the Georgia Senate runoff elections.

A.     **Following Court Pressure, USPS Instituted Certain Measures to Speed Ballot Delivery in the November 2020 General Election.**

Following action by this Court and others in litigation pertaining to USPS ballot delivery practices, USPS belatedly implemented certain measures to improve on-time ballot delivery for the November 2020 general election (the "November Measures"). According to Kevin Bray, the USPS employee who oversaw election mail processing for the 2020 general election, the November Measures were put in place "because we were under some heat from the courts."[24] Mr. Bray was told that "we're going to have to do everything, move heaven and earth to deliver ballot mail," because "[w]e don't want the courts to come back and say we didn't do everything we could."[25]

The November Measures included the following steps to accelerate the processing time for election ballots at USPS's processing facilities:

- *The Holdout System.* Beginning October 30, 2020, processing plants were to identify ballots early in the sorting process and pull them out of the processing system, allowing them to skip additional rounds of sorting and processing and instead be placed in a bin for delivery to a board of elections the next day.[26]

---

[24] Ex. 1, Hr'g Tr. (Nov. 4, 2020), at 111:19–21.

[25] *Id.* at 112:1–4.

[26] Ex. 2, Oct. 28 Mem., at 2–3; Ex. 3, Glass Dep. Tr., at 102:2–17, 108:10–13.

- *Express Mail.* Beginning the Friday before election day, delivery units were "authorized" to use Express Mail to deliver completed ballots to boards of elections.[27]

Defendants also adopted measures authorizing—but not requiring—local delivery units to bypass processing facilities altogether:

- *Local turnaround.* Local delivery units that collect a ballot destined for a board of elections that they also serviced were "authorized"—but not mandated—to postmark and deliver it directly to the board without sending it to a processing facility.[28]

- *The Hub-and-Spoke Process.* Starting the day before the election, local retail units servicing or in close proximity to a board of elections were authorized to schedule drivers to deliver ballots directly to the local board.[29] They were to implement the same process to deliver ballots to non-local boards of elections on election day.[30]

In addition to these operational steps, USPS required all facilities to perform a daily check to ensure that they were "all clear" of election mail and that any election mail was properly scheduled for delivery.[31] On Monday, November 3, processing plants were required to certify that they were clear of ballot mail by 10 a.m.[32]

---

[27] Ex. 4, Oct. 20 Mem., at 3.

[28] *Id.* at 2.

[29] *Id.* at 3.

[30] *Id.*

[31] Ex. 5, Oct. 13 Mem., at 2 ("Daily 'all clears' should be used . . . .").

[32] Ex. 2, Oct. 28 Mem., at 2.

**B.    The November Measures Improved the Timely Delivery of Mail Ballots, but Still Left Many Voters Disenfranchised Due to Postal Delays.**

The November Measures were partially effective in ensuring the timely delivery of mail ballots. In the weeks leading up to election day, the service score for all election mail exceeded the service score for all First-Class Mail by five percent.[33]

USPS officials have confirmed the critical importance of the November Measures. For example, Kristin Seaver, USPS's Chief Retail and Delivery Officer, testified that "we know we can't turn those ballots around in time for [the] Tuesday election depending on the service standard" without expanding operations the weekend prior to election day.[34] And Michael Barber, USPS's Vice President of Processing and Maintenance Operation, explained that "if [ballots] were left to go through the regular and normal process" the weekend before a Tuesday election, "they would be at risk of not making it to their destination timely."[35] Postmaster General DeJoy himself acknowledged, in testimony before Congress, that the November Measures were put in place "to ensure that the ballots reached their destination in time."[36] Likewise, the USPS Office of the Inspector General ("OIG") attributed USPS's ability to deliver over 94 percent of the "28,172 ballots [that] were sent to voters from election offices within 4 days of the election" to the November Measures.[37]

---

[33] *Service Performance of Election and Political Mail During the November 2020 General Election* 11, USPS OIG (Mar. 5, 2021), https://www.uspsoig.gov/sites/default/files/document-library-files/2021/20-318-R21.pdf [hereinafter "OIG Election Report"].

[34] Ex. 6, Hr'g Tr. (Oct. 30, 2020), at 15:12–16.

[35] Ex. 7, Hr'g Tr. (Oct. 31, 2020, 3pm) at 9:19–24.

[36] Press Release, *Statement of Postmaster General and Chief Executive Officer Louis DeJoy Before the House Appropriations Subcommittee on Financial Services and General Government*, USPS (Mar. 11, 2021), https://about.usps.com/newsroom/testimony-speeches/031121-pmg-statement-before-the-house-appropriations-subcommittee.htm.

[37] OIG Election Report, *supra* note 33, at 11.

But while the November Measures were positive steps, they proved insufficient to avoid disenfranchising voters. As Mr. Robert Justin Glass, Manager of Operations Industrial Engineering at USPS's Washington, D.C. Headquarters, succinctly put it, "ballots that were mailed on time did not make it" during the November 2020 general election.[38] This was largely attributable to continued delays at USPS processing facilities, which are responsible for receiving mail from local delivery units, sorting it, and staging it for delivery back to the destination delivery unit. Indeed, in an audit, the OIG found thousands of pieces of delayed election mail waiting in processing facilities in the lead-up to the November 2020 general election, as shown in the table below:

**Table 4. Delayed Election Mail Identified at Mail Processing Facilities During our Pre-Election Observations**

| Date of Observation | Mail Processing Facility | Delayed Election Mailpieces | Total Letters Processed |
|---|---|---|---|
| 10/7/2020 | Harrisburg, PA | 1,818 | 3,353,243 |
| 10/8/2020 | Des Moines, IA | 4,848 | 1,895,594 |
| 10/10/2020 | Missoula, MT | 3,000 | 395,105 |
| 10/13/2020 | Detroit, MI | 1,515 | 3,904,854 |
| 10/14/2020 | Salt Lake City, UT | 3,333 | 2,306,020 |
| 10/15/2020 | Cleveland, OH | 2,400 | 4,114,351 |
| Various | 15 Other Facilities | 371 | 61,310,803 |
| **Total** | | **17,285** | **77,279,970** |

Source: OIG observations.

[39]

The data Defendants provided in the course of this litigation paints a similar picture, revealing that in the days before the November general election, thousands of Inbound Ballots

---

[38] Ex. 3, Glass Dep. Tr., at 128:8–10.

[39] OIG Election Report, *supra* note 33, at 13.

(*i.e.*, completed ballots destined for boards of elections) were funneled through backlogged and underperforming processing facilities. For example, facilities processing ballots that originated in or were destined for the Central Pennsylvania District consistently failed to process tens of thousands of ballots within the 1–3 day service standard in the week leading up to election day:

| Date | Area | District | Measured Volume: Inbound Ballot | Processing Score: Inbound Ballot | Processing Score Plus 1: Inbound Ballot | Processing Score Plus 2: Inbound Ballot | Processing Score Plus 3: Inbound Ballot |
|---|---|---|---|---|---|---|---|
| 10/24/2020 | Eastern | Central Pennsylvania | 28343 | 78.46% | 90.50% | 98.91% | 99.36% |
| 10/26/2020 | Eastern | Central Pennsylvania | 53224 | 78.76% | 92.10% | 99.30% | 99.49% |
| 10/27/2020 | Eastern | Central Pennsylvania | 15329 | 56.14% | 95.72% | 97.88% | 99.20% |
| 10/28/2020 | Eastern | Central Pennsylvania | 37818 | 83.25% | 83.76% | 98.90% | 99.44% |
| 10/29/2020 | Eastern | Central Pennsylvania | 40279 | 69.17% | 96.93% | 97.19% | 99.51% |
| 10/30/2020 | Eastern | Central Pennsylvania | 21604 | 64.02% | 93.53% | 97.49% | 97.82% |
| 10/31/2020 | Eastern | Central Pennsylvania | 15375 | 52.21% | 90.66% | 97.59% | 98.95% |
| 11/2/2020 | Eastern | Central Pennsylvania | 26141 | 68.85% | 89.79% | 93.94% | 95.10% |
| 11/3/2020 | Eastern | Central Pennsylvania | 9905 | 60.05% | 88.97% | 97.38% | 98.70% |

[40]

As a result, many ballots that should have been delivered by election day, based on the 1–3 day service standard, were not delivered until after election day.[41] As Professor Grimmer explains, in the Central Pennsylvania District alone—where processing scores were consistently below 70 percent—approximately 1,100 ballots were put in the mail on or before the Saturday before election day, but delivered after election day. Ex. 8, Grimmer Decl., ¶ 11. Likewise, in the Philadelphia District, approximately 435 ballots were put in the mail on or before the

---

[40] *See* Notice of Data in Response to the Court's Oct. 27, 2020 and Oct. 30, 2020 Orders, Ex. 4, ECF No. 95.4 (pulling data for the Central Pennsylvania District).

[41] Notably, the OIG reports that "[d]uring the week of the election (November 2 through November 4, 2020, we conducted 81 mail processing observations at 27 facilities and 169 delivery/retail unit observations at 56 units, for a total of 250 observations. While compliance issues still existed, we only identified 760 delayed Election Mail mailpieces, all of which were delivered to election offices on or before election day." OIG Election Report, *supra* note 33, at 4. But this only accounts for the facilities observed, where the OIG brought the delayed mail to the attention of USPS employees to address. *Id.* The data reports from USPS show a fuller picture.

Saturday before election day, but not delivered until after election day. *Id.* ¶ 13. Another approximately 160 ballots suffered the same fate in the Western Pennsylvania District. *Id.* ¶ 12.

And these numbers necessarily understate the number of delayed ballots. They do not include ballots that could not be identified as ballots by the USPS processing system; ballots that may have been delivered even later than November 7; or ballots that might have received an exit scan at a processing facility, but not yet been delivered, as of election day.[42] Ex. 8, Grimmer Decl., ¶¶ 15–17.

The cause of some of these failures is clear: many of the November Measures were merely "authorized," and not mandatory, and others were implemented too late to ensure their effectiveness. In particular, the volume of ballots moving through USPS processing facilities, which were plagued by delays, suggests that USPS facilities did not consistently adopt the local turnaround and hub-and-spoke practices that would bypass the processing facilities to ensure timely mail delivery.

But delivery delays were also apparently due, in part, to the failure to consistently and clearly implement the November Measures in the field. In the weeks before the November 2020 general election, the OIG reported, there were "issues with mail processing facilities and delivery/retail units complying with election procedures[.]"[43] In particular, the OIG saw issues in 29% of mail processing facility observations, including election mail remaining at the facility

---

[42] Ballots with return envelopes designed in accordance with USPS recommendations—those with an Intelligent Mail® barcode ("IMb"), the correct content identifier number ("CIN"), and the correct facing identification mark ("FIM")—should be tracked in the processing scores that USPS publishes. Ex. 3, Glass Dep. Tr., at 246:19–247:12. Ballots without these characteristics are not tracked in USPS data. *See id.* at 79:17–22; 80:1–6 (stating that ballots without a barcode will not be scanned when they arrive in a processing facility).

[43] OIG Election Report, *supra* note 33, at 3.

even though it was committed for delivery that day, failures to complete daily all-clear checks, failures to ensure ballots were postmarked, and failures to set up an election/political mail staging area.[44]  The OIG also observed issues in about 14% of delivery/retail unit observations, including election mail committed for delivery that day remaining at the unit, failures to complete all-clear checks, failures to postmark ballots, and failures to complete an election/political mail log.[45]  USPS's issues with all-clear checks in particular are unsurprising: although each plant was supposed to have a plan in place to conduct these sweeps on election day, Mr. Bray testified that USPS did not have any written documentation requiring such a plan.[46]  And despite his role in overseeing election mail procedures, he did not verify whether any such plans were in place.[47]

> ### C.     The Parties Agreed to Additional Measures To Address Ballot Delivery Delays For the Georgia Runoff Election.

Leading up to the Georgia Senate runoff elections, Defendants issued two memoranda in December that detailed measures to be taken in those elections that were strikingly similar to the November Measures.[48]  These measures suffered from the same shortcomings that undermined their effectiveness in the November general election—they were merely authorized where they should have been mandatory, and they were implemented too late.

Predictably, USPS's performance continued to lag well below its service standards, and thousands of ballots were once again pushed through backlogged and underperforming

---

[44] *Id.*

[45] *Id.* at 3–4.

[46] Ex. 1, Hr'g Tr. (Nov. 4, 2020), at 82:9–11.

[47] *Id.* at 82:12–14.

[48] Ex. 9, Dec. 8 Mem., at 3; Ex. 10, Dec. 14 Mem., at 2–4.

processing plants, as demonstrated in the "Processing Score: Inbound Ballots" column of the chart below:

| Date | District | Measured Volume: Inbound Ballots | Processing Score: Inbound Ballots | 1 Extra Day: Inbound Ballots | 2 Extra Days: Inbound Ballots | 3 Extra Days: Inbound Ballots |
|---|---|---|---|---|---|---|
| 12/8/2020 | ATLANTA | 11723 | 46.40% | 99.31% | 99.56% | 99.56% |
| 12/9/2020 | ATLANTA | 13586 | 86.29% | 86.29% | 99.00% | 99.07% |
| 12/10/2020 | ATLANTA | 12965 | 49.13% | 95.77% | 95.77% | 98.12% |
| 12/11/2020 | ATLANTA | 15670 | 67.96% | 91.31% | 98.44% | 98.44% |
| 12/12/2020 | ATLANTA | 10521 | 62.85% | 73.22% | 82.39% | 98.84% |
| 12/14/2020 | ATLANTA | 8564 | 68.88% | 89.62% | 92.60% | 96.80% |
| 12/15/2020 | ATLANTA | 6544 | 77.51% | 95.48% | 97.94% | 98.14% |
| 12/16/2020 | ATLANTA | 4604 | 94.09% | 94.09% | 97.52% | 98.15% |
| 12/17/2020 | ATLANTA | 4084 | 73.41% | 98.70% | 98.75% | 99.31% |
| 12/18/2020 | ATLANTA | 8750 | 67.33% | 95.97% | 99.28% | 99.28% |
| 12/19/2020 | ATLANTA | 3686 | 74.91% | 80.03% | 95.93% | 97.23% |
| 12/21/2020 | ATLANTA | 7464 | 79.39% | 90.57% | 94.65% | 98.49% |
| 12/22/2020 | ATLANTA | 4338 | 79.35% | 93.13% | 96.04% | 96.43% |
| 12/23/2020 | ATLANTA | 3876 | 90.09% | 90.20% | 94.35% | 97.24% |

[49]

On December 23, 2020, spurred by persistently poor processing scores, particularly in Atlanta, the parties reached an agreement to implement all of the measures outlined in USPS's earlier December memoranda and add further measures targeted to ensure the timely delivery of election mail (together, the "Agreed-To Measures").[50] The Agreed-To Measures thus included all prior measures implemented and several supplemental provisions, principally designed to bypass processing facilities, provide for earlier implementation, and ensure compliance:

- *Mandatory Local Turnaround*. Beginning immediately and continuing through election day, all Atlanta District post offices were required to postmark and deliver

---

[49] Ex. 11, USPS Inbound Election Mail Service Scores - Destined to GA (Jan. 12, 2021) (ballots destinating in Atlanta District for December 8 through 23).

[50] Notice of Joint Agreement, Ex. A, ¶ 1, ECF No. 162.1 (providing that "USPS shall implement the policies articulated in the memoranda issued by USPS on December 8 and December 14 . . . for the Georgia Runoff Elections" and take additional measures discussed therein).

16

ballots directly to the relevant board of elections, rather than placing them into the automation flow.[51]

- *Early Implementation of Hub-and-Spoke Processes.* On Saturday, January 2, post offices and local delivery units in close proximity to Atlanta District boards of elections were required to implement a hub-and-spoke process to deliver ballots to the local boards.[52] And on Monday, January 4, post offices and local delivery units in the Atlanta District were required to implement a hub-and-spoke process to transport ballots to non-local boards of elections, when delivery was possible before the board closing.[53]

- *Use of the Express Mail Network.* From January 2 through January 4, USPS was required to place all ballots identified in any processing plant that were subject to a three-day service standard directly into the Express Mail Network.[54]

- *Ballot Sweeps and All-Clear Certification.* Beginning December 28, processing facilities serving Georgia ZIP codes were required to perform morning sweeps to ensure all Inbound Ballots were expedited for delivery; on January 4 and 5, they were also required to perform an afternoon sweep.[55] Following these sweeps, facilities were to report to Headquarters the number of ballots identified and confirm that they were expedited for delivery.[56] Likewise, beginning on December 29, these

---

[51] *Id.* ¶ 3(b).

[52] *Id.* ¶ 3(c).

[53] *Id.* ¶ 3(d).

[54] *Id.* ¶ 3(a).

[55] *Id.* ¶¶ 4(a)–(b).

[56] *Id.* ¶ 4(c).

processing facilities were also required to certify that they were all clear of election mail by 10 a.m. daily.[57]

- *Coordination with Georgia Boards of Elections.*  USPS was further required to coordinate with Georgia boards of elections to ensure all Inbound Ballots were delivered by 7 p.m. on January 5.[58]

- *Investigation of Delayed Ballots.*  Finally, USPS was required to investigate reports of delayed ballots and make best efforts to ensure the reported ballots were delivered on time.[59]

Following the parties' filing of this agreement, on December 24, 2020, the Court integrated the agreement's terms into a binding court order.[60]  Together, these measures allowed more ballots to bypass backlogged processing plants, where "[m]ost of the delayed Election Mail" was found; reduced the likelihood of those backlogs by decreasing ballot volume at processing plants; and strengthened accountability for election mail procedures, thus ensuring more timely ballot delivery.[61]

Under the parties' agreement, Atlanta District post offices were mandated—rather than simply authorized—to engage in local turnaround beginning December 23 and to implement hub-and-spoke processes one to two days earlier than previously planned.  These measures were critical because they allowed local ballots to bypass the processing plants, thereby directly

---

[57] *Id.* ¶ 4(d).

[58] *Id.* ¶ 5.

[59] *Id.* ¶ 7.

[60] Min. Order (Dec. 24, 2020).

[61] OIG Election Report, *supra* note 33, at 22.

reducing delivery time by at least one day and reducing the volume of ballots that had to travel through the underperforming processing plants that were a substantial cause of delivery delays.[62] The agreement also allowed more non-local ballots to be expedited through use of Express Mail, saving one to two days' delivery time and thereby enabling ballots sent the weekend before a Tuesday election to make it to the board of elections on time.[63]

Finally, in light of clear compliance issues, the agreement provided additional accountability for the measures USPS put in place. For example, USPS's OIG report suggests that facilities had not been implementing all-clear checks consistently,[64] and USPS's own witness testimony suggests that USPS had not held its employees accountable for developing and implementing a plan for those checks.[65] The agreement's focus on these requirements, along with the provisions for reporting the results of all-clear certifications and ballot sweeps, ensured accountability for their implementation.

Although the Agreed-To Measures promised to improve ballot delivery in the Georgia runoff election, they are not in place for future elections because the parties' agreement, and the related court order, applied only to the Georgia runoff elections.[66] Likewise, the measures adopted pursuant to Defendants' earlier memoranda were limited to the November general and

---

[62] Ex. 3, Glass Dep. Tr., at 207:14–208:1, 220:4–10; OIG Election Report, *supra* note 33, at 22.

[63] Ex. 3, Glass Dep. Tr., at 78:13–15.

[64] OIG Election Report, *supra* note 33, at 3–4.

[65] Ex. 1, Hr'g Tr. (Nov. 4, 2020), at 82:9–14.

[66] Notice of Joint Agreement, Ex. A at ¶¶ 1–3, ECF No. 162.1 (noting that measures are in place "for the Georgia Runoff Elections").

Georgia runoff elections.[67]   Accordingly, Defendants were not required to implement these measures in any future election—and they have made no move to do so.

### III.   Defendants Have Refused to Commit to Implementing Critical Ballot Handling Practices for Upcoming Elections.

With the 2021 Elections approaching, Plaintiffs sent a letter to Defendants on February 15, 2021, asking Defendants if they were committed to implementing the Agreed-To Measures in preparation for upcoming elections.[68]   Defendants rebuffed Plaintiffs' request, instead stating only that "the Postal Service is committed to the efficient delivery of the mail, and has placed particular importance on election mail.   There is no reason to believe that this approach will change for future elections."[69]  But this vague, non-committal response gives every reason to believe that Defendants are *not* committed to efficiently delivering mail ballots in the 2021 elections.   Indeed, as Mr. Bray testified, Defendants' implementation of the November Measures was driven in large part by judicial intervention and the pressure of litigation.

Evidently, similar judicial intervention is once again required.   Just two weeks ago, Plaintiffs wrote to Defendants again to clarify what measures they would implement to ensure timely ballot delivery in the 2021 Elections.[70]   Defendants responded that "Headquarters is not aware of any written guidance issued at this time at the national or local level concerning the

---

[67] Ex. 9, Dec. 8 Mem., at 1; Ex. 10, Dec. 14 Mem., at 1; Ex. 5, Oct. 13 Mem., at 2; Ex. 4, Oct. 20 Mem., at 1; Ex. 2, Oct. 28 Mem., at 2.

[68] Ex. 12, Letter from Shankar Duraiswamy, Counsel for Plaintiffs, to Joseph E. Borson, Counsel for Defendants (Feb. 15, 2021).

[69] Ex. 13, Email from Kuntal Cholera, Counsel for Defendants, to Shankar Duraiswamy, Counsel for Plaintiffs (Feb. 19, 2021).

[70] Ex. 14, Letter from Shankar Duraiswamy, Counsel for Plaintiffs, to Joseph Borson, Counsel for Defendants (Mar. 12, 2021).

local elections in Pennsylvania, Texas, and New Mexico."[71]  Defendants' response suggests that, absent court compulsion, they will not implement *any* of the previous measures that they have acknowledged are necessary for on-time delivery of election mail.

Even when pressed by Congress, Defendants refused to commit that they would implement even the more limited November Measures in future elections.  In a hearing before the House Appropriations Committee on March 12, 2021, Chair Rosa DeLauro noted that USPS's efforts to timely deliver election mail in the November 2020 general election "relied heavily on 'extraordinary measures' like extra transportation and overtime to handle the surge."[72] She asked Postmaster General DeJoy whether USPS's then-forthcoming ten-year strategic plan "include[s] changes that will allow the Postal Service to better scale its operations" to accommodate "the new normal" of "increased use of mail-in voting."[73]  Mr. DeJoy skirted the question, averring that USPS had the capacity to handle mail-in voting, and that its recent performance in the 2020 election cycle demonstrated as much.[74]  But of course, Defendants' performance in the 2020 election cycle depended on the very measures that Defendants will not commit to implementing again, and that Plaintiffs seek here.

Indeed, Defendants appear to be moving in the wrong direction.  In their recently released ten-year strategic plan, Defendants announced their intention to move from a one- to three-day service standard for First-Class Mail to a one- to five-day standard, which would shift fully 30

---

[71] Ex. 15, Email from Joseph Borson, Counsel for Defendants, to Shankar Duraiswamy, Counsel for Plaintiffs (Mar. 19, 2021).

[72] House Appropriations Committee Hr'g.

[73] *Id.*

[74] *See id.*

percent of First-Class Mail volume to an extended delivery standard.[75] And remarkably, despite USPS's "unique role within the electoral process" and their previously claimed "longstanding commitment to the timely delivery of Election Mail," the plan was completely silent on *any* measures to ensure the timely delivery of election mail or prioritize mail ballots. *Vote Forward v. DeJoy*, No. 20-2405 (EGS), 2020 WL 5763869, at *7 (D.D.C. Sept. 28, 2020) (quoting Defs.' Opp'n, ECF No. 21 at 13).[76]

Altogether, Defendants' continued resistance to implementing measures to ensure the timely delivery of election mail in future elections provides every reason to expect that they plan to forgo those measures in the 2021 Elections. And the overwhelming evidence marshaled in this case—including testimony from USPS officials and USPS's own performance data—demonstrates that, absent those measures, voters will be subjected to a substantial risk that their ballots will be delivered too late to count. This unduly burdens the right to vote, in violation of the First and Fifth Amendments.

## ARGUMENT

In the face of USPS's unwillingness to commit to *any* measures to ensure the timely delivery of mail ballots in upcoming elections, Plaintiffs must again call upon the Court to require that action. "To secure a preliminary injunction, a plaintiff 'must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of

---

[75] *Delivering for America: Our Vision and Ten-Year Plan to Achieve Financial Sustainability and Service Excellence* 26, USPS (Mar. 23, 2021), https://about.usps.com/what/strategic-plans/delivering-for-america/assets/USPS_Delivering-For-America.pdf.

[76] *See also* Press Release, *Statement of Postmaster General and Chief Executive Officer Louis DeJoy Before the House Committee on Oversight and Reform*, USPS (Feb. 24, 2021), https://about.usps.com/newsroom/testimony-speeches/022421-statement-of-pmg-louis-dejoy-on-oversight-and-reform.htm ("The wide-ranging Election Mail efforts and achievements documented in our report demonstrate that the Postal Service continues to play an indispensable role in the lives of the American public and in the life of the nation.").

preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest.'" *Jubilant DraxImage Inc. v. United States Int'l Trade Comm'n*, 396 F. Supp. 3d 113, 119–20 (D.D.C. 2019) (quoting *Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). Each of these factors weighs in Plaintiffs' favor, and the Court should therefore enjoin Defendants from processing ballots without the Agreed-To Measures in place in any USPS District where a relevant election is taking place.

I. **Plaintiffs Are Likely to Succeed on the Merits of Their Claim That USPS's Refusal to Take the Agreed-To Measures During the Upcoming Elections Unconstitutionally Burdens the Right to Vote.**

It is fundamental that "all qualified voters have a constitutionally protected right to vote . . . and to have their votes counted." *Reynolds v. Sims*, 377 U.S. 533, 554 (1964). Defendants' failure to implement the Agreed-To Measures unconstitutionally burdens the right to vote by creating a substantial risk that voters' ballots in Pennsylvania, New Mexico, and Texas will not be counted. And USPS has a reasonable alternative that does not similarly burden the right to vote: it can simply implement the Agreed-To Measures to ensure that those ballots are timely delivered. USPS's refusal to do so cannot be justified by the government's interests in efficiency and cost savings, particularly where, as here, Defendants apparently have not even analyzed the costs or benefits of their policy.

A. **The *Anderson-Burdick* Framework Applies to USPS Policies and Practices That Burden the Right to Vote.**

Like Defendants' policies previously considered by the Court, the constitutionality of USPS's current ballot delivery practices must be considered under the framework laid out in *Anderson v. Celebrezze*, 460 U.S. 780 (1983), and *Burdick v. Takushi*, 504 U.S. 428 (1992). This Court has already concluded that the *Anderson-Burdick* framework applies to challenges to "federal government actions." *Vote Forward*, 2020 WL 5763869, at *8. This Court has

similarly concluded that the *Anderson-Burdick* framework applies to USPS policies and practices that burden the right to vote. *Id.* at *7–8. This is because USPS's relationship with the electoral process "suggests a strong connection with the protection of voters' rights"—a role Defendants cannot and do not dispute. *Id.* at *7. In particular, USPS's policies—like traditional election laws—determine whether or not votes are counted, because they "directly affect how Election Mail is handled and the speed with which Election Mail arrives at its intended destination." *Id.* at *8. Thus, in its September 28, 2020 decision, the Court rejected "Defendants' claim that the policy changes implemented by USPS only inadvertently or indirectly affect voting rights" as "unpersuasive." *Id.* at *7. "USPS policy . . . directly impacts and controls" citizens' ability "to have their vote counted" by determining whether a ballot is delivered in time to count—especially during a pandemic. *Id.*

As the Court well knows, the *Anderson-Burdick* framework requires courts to evaluate the constitutionality of a restriction on voting rights by weighing "the character and magnitude of the asserted injury" to the right to vote against "the precise interests put forward by the [government] as justifications for the burden imposed by its rule," including "the legitimacy and strength of each of those interests" and "the extent to which those interests make it necessary to burden the plaintiff's rights." *Anderson*, 460 U.S. at 789. If a policy severely restricts voters' rights, it must meet strict scrutiny—that is, it "must be 'narrowly drawn to advance a state interest of compelling importance.'" *Burdick*, 504 U.S. at 434 (quoting *Norman v. Reed*, 502 U.S. 279, 289 (1992)). By contrast, if a policy subjects voters' rights to only "'reasonable, nondiscriminatory restrictions[,]' . . . 'the State's important regulatory interests are generally sufficient to justify' the restrictions." *Id.* (quoting *Anderson*, 460 U.S. at 788). The *Anderson-Burdick* analysis is more flexible in between these two extremes, where "the more severe the

burden, the more compelling the [government]'s interest must be." *Vote Forward*, 2020 WL 5763869, at *5 (alteration in original) (quoting *Soltysik v. Padilla*, 910 F.3d 438, 444 (9th Cir. 2018)). In this case, the severity of the burden Defendants' ballot delivery practices imposes on voters' rights requires that the Court subject them to strict—or, at minimum, heightened— scrutiny.

### B.    Absent the Agreed-To Measures, Defendants' Ballot Delivery Practices Severely Burden the Right to Vote.

Defendants have refused to commit to implementing the Agreed-To Measures or, indeed, *any* of the measures to expedite ballot delivery which proved necessary during the November and Georgia runoff elections. Thus, without intervention from the Court, scores of voters' ballots will be at risk of rejection due to Defendants' ongoing failure to ensure timely mail delivery—imposing a severe burden on voters' "constitutionally protected right to vote . . . and to have their votes counted." *Reynolds*, 377 U.S. at 554.

The threat Defendants' delay poses to voters' ballots is clear. If USPS met its ordinary 1–3 day service standard, voters who place their ballots in the mail three days before election day (on Saturday for a Tuesday election) could depend on their vote being counted. However, in light of USPS's ongoing poor service performance, voters can depend on no such thing. The most recent USPS service scores suggest that nearly one out of every five pieces of First-Class Mail is delivered late, outside of USPS's 1–3 day service standard.[77] Thus, absent any measures to accelerate the delivery of election ballots, there is a substantial risk that *20 percent* of ballots put in the mail four days before the election will arrive after election day—leading to certain disenfranchisement in Pennsylvania and New Mexico and potential disenfranchisement in Texas.

---

[77] *Overall USPS Mail Delivery Performance Recovers from Severe Winter Storms; Peak Holiday Demand*, *supra* note 14.

In light of this, USPS's refusal to commit to *any* measures to accelerate delivery times for election mail plainly imposes a severe burden on voting rights. Indeed, the evidence conclusively demonstrates that even the November Measures are inadequate to overcome USPS's ongoing service performance failures, as many voters were disenfranchised due to delays at USPS processing facilities.[78] As discussed above, it is conservatively estimated that close to 1,700 ballots, across three different Pennsylvania postal districts, that were mailed on or before the Saturday before election day were not actually delivered until after election day because of USPS processing delays. Ex. 8, Grimmer Decl., ¶¶ 11–13.

The Agreed-To Measures, by contrast, substantially increase a ballot's chances of making it to the board of elections on time. In particular, early and mandatory implementation of local turnaround and hub-and-spoke processes speed ballot delivery by allowing ballots to avoid backlogged processing plants—such as the Central Pennsylvania facilities, where processing scores fell below 70 percent in six of the seven days leading up to election day.

Defendants have conceded that such measures reduce delivery time by at least a day by bypassing processing plants altogether.[79] These measures further prevent compounding delays evidenced by the poor processing scores of ballots that traveled through USPS plants in the November 2020 general and Georgia runoff elections.[80] Moreover, the Agreed-To Measures also expand use of Express Mail to include all ballots subject to a three-day service standard in

---

[78] While ballots in Pennsylvania could be accepted the day after the November 2020 Election due to an extended postmark deadline then in place, no such extension protects Plaintiffs Kelley Ewing, Robert Gasparro, Sebastian Immonen, James McKay, Ashley Misner, Mary Walton, or thousands of other voters like them this spring.

[79] Ex. 3, Glass Dep. Tr., at 207:14–208:1, 220:4–10.

[80] *See supra* Facts Section II.A–B.

plants the weekend before an election; because ballots sent by Express Mail are now subject to a one- to two-day service standard,[81] this can also decrease delivery times by one or two days.

Defendants' failure to implement the Agreed-To Measures will "place an especially severe burden on those who have no other reasonable choice than to vote by mail," including "those who are not physically able to travel to the polls due to disability" and "those who may be at a high risk of developing an especially severe case of COVID-19 should they become exposed to the virus at the polling place." *Vote Forward*, 2020 WL 5763869, at *9. This includes Plaintiffs Kelley Ewing and Robert Gasparro.[82]   As the Court has recognized, these voters face a difficult choice: "either to vote by mail-in-ballot or . . . not vote at all." *Id.* at *7. Defendants' failure to take steps to protect these voters' mail-in ballots from USPS's poor service performance will effectively deny their right to vote.

The fact that some, and not all, voters will have their ballots delivered late does not lessen the severity of the burden on the right to vote. To the contrary, it only exacerbates it, by subjecting mail voters to the vagaries of a system in which their ballot may or may not be counted, based on such arbitrary factors as the processing facility through which their ballot is routed. *See Gallagher v. N.Y. State Bd. of Elections*, 477 F. Supp. 3d 19, 47 (S.D.N.Y. 2020) (rejecting as unconstitutional a policy that meant that "[w]hether an individual's vote will be counted . . . depend[s] in part on something completely arbitrary—their place of residence and by extension, the mailbox or post office where they dropped off their ballot"). As the Supreme Court has explained (and the Court has underscored), "[h]aving once granted the right to vote on equal terms, the [government] may not, by later arbitrary and disparate treatment, value one

---

[81] Ex. 3, Glass Dep. Tr., at 78:13–15.

[82] Ex. 16, K. Ewing Decl., ¶ 4; Ex. 17, R. Gasparro Decl., ¶ 4; *see also infra* Argument Section II.A.

person's vote over that of another." *Vote Forward*, 2020 WL 5763869, at *9 (quoting *Bush v. Gore*, 531 U.S. 98, 104–05 (2000)).  By exposing certain Pennsylvania, New Mexico, and Texas voters to undue risk of ballot delay and rejection, USPS does exactly that: it impairs their "right to full and effective participation" in political processes "relative to that of both in-state and out-of-state voters with access to USPS branches functioning effectively." *Id.* (quoting *Jones*, 2020 WL 5627002, at *21 (internal quotations omitted)).  "[W]here a policy creates a situation where '[a] large number of ballots will be invalidated, and consequently, not counted based on circumstances entirely out of voters' control,' the 'burden [on the right to vote] is exceptionally severe.'" *Id.* at *8 (alterations in original) (quoting *Gallagher*, 477 F. Supp. 3d at 43).

And as the Court has already found, it is no response for Defendants to assert—as they did in response to Plaintiffs' earlier motion for a preliminary injunction—that their ballot delivery practices impose no burden at all because voters can avoid the risks associated with USPS delay by mailing their ballots back early.  Voters have a constitutionally protected interest in being able to vote the Saturday before the election.  As the Court previously explained, "[i]n suggesting that voters should cast their ballots earlier than required, Defendants ignore Plaintiffs' 'essential' interest in making 'informed choices among candidates for office.'" *Id.* at *9 (quoting *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 346–47 (1995)).  This is especially true where voters, as in Pennsylvania, must assess a range of judicial candidates and ballot initiatives.  In the 2021 elections, as in any other, "the candidates and the issues simply do not remain static over time," and voters have a right to cast their ballot with full information.  *Anderson*, 460 U.S. at 790.  Requiring voters to mail ballots back several days before elections in order to ensure they are counted wholly undermines that right.

### C.   Defendants' Interests in Not Implementing the Agreed-To Measures Do Not Justify the Burden Imposed on Voters.

Given the severe burden imposed by Defendants' ballot delivery practices, the Court should apply strict scrutiny and ask whether those policies and practices are "narrowly drawn to advance a state interest of compelling importance." *Burdick*, 504 U.S. at 434 (quoting *Norman*, 502 U.S. at 289). But even if the Court applies only heightened scrutiny, Defendants' practices still fail. While Postmaster General DeJoy recently noted that any effort to ensure timely ballot delivery "brings with it . . . cost," this does not justify simply accepting the burden that USPS's poor service performance has placed on the right to vote.[83]

As an initial matter, USPS has not provided any evidence that they have even assessed the costs and benefits of the November and Agreed-To Measures. To the contrary, when USPS's 30(b)(6) deposition witness was asked in December if "he, or anyone in his office, has actually done a cost-benefit analysis using data to determine what the costs [of implementing additional measures] would be," he replied, "I don't know if that has been done. I haven't been shared what the individual cost would be."[84] Moreover, Defendants were clearly able to finance the implementation of specific ballot-handling measures in the midst of the November 2020 general and Georgia runoff elections. The November Measures were implemented on a nationwide basis, far broader in scope than what the instant motion seeks. And Defendants themselves agreed to implement the Agreed-To Measures, suggesting that they were well within Defendants' capacity to finance.

---

[83] Press Release, *Statement of Postmaster General and Chief Executive Officer Louis DeJoy Before the House Appropriations Subcommittee on Financial Services and General Government*, USPS (Mar. 11, 2021), https://about.usps.com/newsroom/testimony-speeches/031121-pmg-statement-before-the-house-appropriations-subcommittee.htm.

[84] Ex. 3, Glass Dep. Tr., at 200:10–14.

Regardless, the Government's interest in preserving—or improving—the public fisc cannot justify burdening voting rights. As the Court previously determined, "Defendants' reasons for administrative cost savings are insufficient: as the Supreme Court has explained, the 'vindication of conceded constitutional rights cannot be made dependent upon any theory that it is less expensive to deny than to afford them.'" *Vote Forward*, 2020 WL 5763869, at *10 (quoting *Watson v. City of Memphis*, 373 U.S. 526, 537 (1963)). That is no less true for off-year elections than for Presidential elections.

## II.   Plaintiffs Will Suffer Irreparable Harm Absent a Preliminary Injunction.

Plaintiffs in this case will suffer irreparable harm if Defendants are permitted to proceed without the Agreed-To Measures. Plaintiffs suffer irreparable harm if a harm is "certain and great," "'actual and not theoretical,' and 'so imminen[t] that there is a clear and present need for equitable relief to prevent irreparable harm.'" *League of Women Voters of the U.S. v. Newby*, 838 F.3d 1, 7–8 (D.C. Cir. 2016) (quoting *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2016)). That harm must also be "beyond remediation." *Id.*

This Court has already determined that similarly situated plaintiffs would suffer irreparable harm without a preliminary injunction prior to the November 2020 general election, and for good reason. A concrete threat to the right to vote constitutes irreparable injury to individual plaintiffs. Here, Defendants' own data demonstrates that the threat is concrete. USPS's most recent service scores are woefully and historically low, with nearly one in five pieces of First-Class Mail delivered late. That performance is even worse than it was in the weeks surrounding the November 2020 general election. And as outlined in Facts Section II.A, the measures implemented by Defendants for that general election were insufficient to ensure timely delivery of ballots. Thus, anything less than implementing the Agreed-To Measures will result in irreparable harm in the upcoming 2021 elections. If Defendants are permitted to go

forward without implementing *any* extraordinary measures to ensure timely ballot delivery in the 2021 Elections, that harm will be all the greater.

### A.     The Individual Plaintiffs Will Suffer Irreparable Injury Absent an Injunction.

For the Individual Plaintiffs, this harm is all too real.  Both Pennsylvania and New Mexico have strict election day ballot-receipt deadlines for the upcoming 2021 Elections, and Texas's deadline falls just after election day at 5 p.m. on Monday, May 3.  Thus, any delays caused by USPS's failure to implement the Agreed-To Measures create a substantial risk that their completed ballots may not be counted.  Absent an injunction, Defendants' refusal to implement the Agreed-To Measures will result in the irreparable harm of an undue burden on their constitutional right to vote.

*Plaintiff Kelley Ewing Jr.* is a resident and registered voter of Pennsylvania.  Ex. 16, K. Ewing Decl. He will vote by mail in the upcoming 2021 elections because he has multiple health conditions that, in light of the COVID-19 pandemic, put him at serious risk of illness and make it difficult for him to travel to the polls.  *Id.* ¶ 4.  For Mr. Ewing, voting by mail is thus the only safe option.  *Id.*  He usually returns his ballot close to election day so that he can sift through reports and information about the candidates throughout the campaign season and ensure he has all late-breaking news before casting his vote.  *Id.* ¶ 5.  He plans to do the same in the upcoming election, and will thus drop his ballot off at a USPS mailbox close to election day.  *Id.*  USPS delays caused by the absence of the Agreed-To Measures therefore create the very real possibility that his ballot will be delivered after the election day deadline and rejected as a result.

*Plaintiff Robert Gasparro* is a resident and registered voter of Pennsylvania.  Ex. 17, R. Gasparro Decl. He plans to vote by mail in the upcoming 2021 Election.  *Id.* ¶ 3.  Given his age, he votes by mail in order to minimize his exposure to COVID-19.  *Id.* ¶ 4.  Mr. Gasparro tends to

return his ballot close to election day, because he follows news reports and ongoing investigations regarding potential candidates and reserves his decision until close to the election deadlines. *Id*. ¶ 5. He plans to cast his ballot by mail in the few days leading up to election day for the upcoming election. *Id*. ¶ 4. Consequently, if the USPS delays result in his ballot arriving after election day, his vote will not be counted.

    *Plaintiff Sebastian Immonen* is a registered voter of Pennsylvania living in Rhode Island, where he currently attends college. Ex. 18, S. Immonen Decl. During the 2020 general election, uncertainty about where he would be living in the midst of the COVID-19 pandemic prevented him from requesting and returning his mail-in ballot earlier, which resulted in him casting his ballot close to the election day deadline. *Id*. ¶¶ 4-5. If not for Pennsylvania's temporary ballot receipt deadline extension—which is not in place for the 2021 Election—he believes his ballot would not have counted. *Id*. ¶ 5. Mr. Immonen similarly intends to vote by mail in the upcoming election because he will be away at school. *Id*. ¶ 6. He also plans to vote close to the election day deadline so he can gather information about the candidates. *Id*. ¶ 5. If USPS delays cause his ballot to arrive after the election day deadline, it will be rejected.

    *Plaintiff James McKay* is a resident and registered voter in Pennsylvania. Ex. 19, J. McKay Decl. He intends to vote by mail in the upcoming election due to health concerns. *Id*. ¶ 3. He contracted COVID-19 and exhausted his Families First Coronavirus Response Act ("FFCRA") leave at work, so he would no longer have leave or financial support if he were to fall ill again. *Id*. ¶ 4. Mr. McKay usually returns his ballot close to the election day deadline so he can research the candidates and process any late-breaking news before casting his vote. *Id*. ¶ 5. He similarly intends to return his ballot a few days before the election deadline in the

upcoming 2021 Election.  *Id*.  His ballot will be rejected if the USPS delays result in his ballot arriving after the election day deadline.

*Plaintiff Ashley Misner* is a resident and registered voter in Pennsylvania.  Ex. 20, A. Misner Decl.  She intends to vote by mail in the upcoming election because she is a mother to a young child and her husband works in the Intensive Care Unit.  *Id*. ¶¶ 3–4.  Voting by mail is a safer option for her family because it allows her to avoid places with crowds who could expose her to COVID-19.  *Id*. ¶ 4.  In the November 2020 general election, she returned her ballot close to the deadline, and she anticipates doing the same in the upcoming election.  *Id*. ¶¶ 5–6.  Ms. Misner's commitments as a parent, her husband's unpredictable work schedule, and her desire to research the candidates make it challenging for her to vote early.  *Id*. ¶ 5.  Consequently, she expects to return her ballot by mail a few days before the deadline.  *Id*.  USPS delays could result in her ballot arriving after the election day deadline, and ultimately, lead to her ballot's rejection.

*Plaintiff Mary Walton* is a resident and registered voter of Pennsylvania.  Ex. 21, M. Walton Decl.  She votes by mail because it is a safer alternative to voting in person.  *Id*. ¶ 4.  She is a former reporter, and she follows news and ongoing investigations about the candidates closely before making a decision.  *Id*. ¶ 5.  This usually results in her voting close to election day.  *Id*.  Ms. Walton intends to cast her ballot by mail close to the election deadlines for the upcoming election as well.  *Id*.  If USPS delays cause her ballot to arrive after the deadline, her ballot will not count.

*Plaintiff LaDonna Hopkins* is a resident and registered voter of New Mexico.  Ex. 22, L. Hopkins Decl.  She plans to vote by mail in the upcoming special election in the First Congressional District because she anticipates she will be out of state visiting her daughter and granddaughter around that time.  *Id*. ¶¶ 2, 4.  She usually votes close to election day because she

does not vote by political party and needs time to research all the candidates before making her decision. *Id.* ¶ 5. Because the field of candidates has yet to be narrowed, there are ten candidates running in the upcoming special election.[85] Consequently, Ms. Hopkins has not yet decided who she will vote for. Ex. 22, L. Hopkins Decl., ¶ 6. She intends to make her decision and return her ballot by mail close to election day. *Id.* ¶ 7. If the USPS delays cause her ballot to be returned after election day deadlines, her ballot will not count.

### B.   Plaintiff Vote Forward Will Suffer Irreparable Injury Absent an Injunction.

Plaintiff Vote Forward, too, will suffer irreparable harm unless an injunction is entered. An organization is irreparably harmed if (1) the "actions taken by [the defendant] have 'perceptibly impaired' the [organization's] programs," and (2) "the defendant's actions 'directly conflict with the organization's mission." *Newby*, 838 F.3d at 8 (alterations in original) (first quoting *Fair Emp't Council of Greater Wash., Inc. v. BMC Mktg. Corp.*, 28 F.3d 1268, 1276 (D.C. Cir. 1994); and then quoting *Nat'l Treasury Emps. Union v. United States*, 101 F.3d 1423, 1430 (D.C. Cir. 1996)).

Vote Forward is a non-profit organization whose core mission is to empower grassroots volunteers to help register voters from traditionally underrepresented communities and encourage them to vote, in part by sending get-out-the-vote ("GOTV") letters to voters prior to elections. Ex. 23, Vote Forward Decl. ¶¶ 3–4. In recognition of the importance of the upcoming 2021 Elections, Vote Forward's volunteers will send letters to potential voters in Pennsylvania, New Mexico, and Texas—just as they did during the 2020 election season—to encourage turnout in those states. *Id.* ¶ 9.

---

[85] *Congressional Race to Succeed Deb Haaland Takes Shape*, AP (Mar. 16, 2021), https://www.usnews.com/news/best-states/new-mexico/articles/2021-03-16/congressional-race-to-succeed-deb-haaland-takes-shape.

Defendants' failure to implement the Agreed-To Measures directly frustrates Vote Forward's missions, goals, and GOTV programs. *Id.* ¶¶ 7-8. In particular, USPS's failure to implement those measures reduces the efficacy of Vote Forward's letter-writing campaign by making it necessary to send GOTV letters early in order to ensure they arrive in time for voters to cast their ballots by mail and have them counted. *Id.* ¶ 8. Vote Forward's mailing campaign centers on sending GOTV letters close to election day because prior experiments have shown that GOTV messages are not effective at increasing voter turnout if sent too early in the election cycle. *Id.* ¶ 6. The delays caused by USPS policies however, frustrated Vote Forward's mission of increasing voter turnout by forcing it to move up its timeline for mailing GOTV letters in 2020. *Id.* ¶ 8. Similar to the prior timeline adjustments, USPS delays in the lead-up to the 2021 Elections will again force Vote Forward to ask volunteers to mail their GOTV letters earlier than planned, risking the effectiveness of the letter-writing campaign. *Id.* ¶ 10.

During the prior election season, Vote Forward also had to divert its limited resources to addressing issues that arose from ballot delays, causing significant resource constraints. These resources were diverted to: (1) respond to volunteer and voter questions and complaints caused by mail delays, (2) track USPS mail delays, and (3) assess whether sending "Please Vote!" letters much earlier than planned could negatively impact the effectiveness of its volunteers' GOTV letters on voter turnout. *Id.* ¶ 11. In particular, Vote Forward had to shift an employee's time from managing its letter-writing campaign to answering volunteer and voter questions about mail delays and compiling a list of voter complaints regarding mail delays. *Id.* ¶ 12. If USPS fails to implement the Agreed-To Measures in advance of the upcoming 2021 Elections, Vote Forward expects to incur similar costs again. *Id.* ¶¶ 12–13.

35

### III.    The Public Interest and the Balance of Equities Weigh in Favor of a Preliminary Injunction.

Finally, before granting a preliminary injunction, a court "must balanc[e] the competing claims of injury and must consider the effect on each party of granting or withholding the requested relief." *Winter*, 555 U.S. at 24 (quoting *Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 542 (1987)).  In doing so, it must give particular regard to the public consequences of granting an injunction.  *Id.*  These factors "merge" when the government is the party opposing an injunction.  *Nken v. Holder*, 556 U.S. 418, 435 (2009).

Considering first the potential harm to Plaintiffs from withholding the requested relief, if not enjoined, USPS's action could result in the disenfranchisement of scores of voters because their ballots are delivered to boards of elections too late to be counted and could prompt scores more to vote in person and expose themselves to COVID-19 infection to ensure their ballot counts.  By contrast, the most serious injury that Defendants may suffer is the minor, yet-uncalculated cost of implementing the requested relief.  The weight of this balance clearly falls on Plaintiffs' side.  Issuance of a preliminary injunction will preserve the relative positions of the parties by ensuring that Plaintiffs are not deprived of fundamental voting rights, while imposing only minimal additional burden on Defendants.

In considering this balance, the Court must also be mindful of the public interest.  "By definition," that interest "favors permitting as many qualified voters to vote as possible." *League of Women Voters of N.C.*, 769 F.3d at 247–48 (quoting *Husted*, 697 F.3d at 437).  Moreover, as the Court has previously found, "[i]t is also clearly in the public interest to require that USPS implement policies that do not infringe upon constitutional rights." *Vote Forward*, 2020 WL 5763869, at *13 (citing *League of Women Voters*, 838 F.3d at 12 ("There is generally no public

interest in the perpetuation of unlawful agency action.")).  Together, these two factors weigh decisively in Plaintiffs' favor.

## CONCLUSION

For the reasons stated, Plaintiffs respectfully request that the Court issue a preliminary injunction ordering Defendants to process mail ballots for the Pennsylvania election taking place May 18, 2021; the Texas election taking place May 1, 2021; and the New Mexico election taking place June 1, 2021, consistent with the Agreed-To Measures.

Date: March 26, 2021

| | |
|---|---|
| Robert D. Fram | */s Shankar Duraiswamy* |
| COVINGTON & BURLING LLP | Shankar Duraiswamy (D.C. Bar No. 501702) |
| Salesforce Tower | Daniel Auten (D.C. Bar No. 1614072) |
| 415 Mission Street, Suite 5400 | L. Brady Bender (D.C. Bar No. 1615749) |
| San Francisco, CA 94105-2533 | Sarah Suwanda (D.C. Bar No. 1685531) |
| (415) 591-6000 | COVINGTON & BURLING LLP |
| rfram@cov.com | One CityCenter |
| | 850 Tenth Street, NW |
| | Washington, DC 20001-4956 |
| | (202) 662-6000 |
| | sduraiswamy@cov.com |
| | dauten@cov.com |
| | bbender@cov.com |
| | ssuwanda@cov.com |