**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

VOTE FORWARD, *et al.*,

          Plaintiffs,

v.

LOUIS DEJOY, in his official
capacity as the Postmaster General, *et al.*,

          Defendants.

Case No. 20-cv-2405 (EGS)

**DEFENDANTS' OPPOSITION TO PLAINTIFFS'**
**SECOND MOTION FOR A PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................... 1

BACKGROUND ................................................................................................... 5

I.      PROCEDURAL HISTORY ......................................................................... 5

II.     USPS'S HANDLING OF ELECTION MAIL FOR THE NOVEMBER GENERAL ELECTION AND THE GEORGIA SENATE RUN-OFF ELECTION ......... 7

III.    USPS'S CONTINUED COMMITMENT TO PRIORITIZATION OF ELECTION MAIL FOR OFF-CYCLE ELECTIONS ................................................... 8

LEGAL STANDARD .......................................................................................... 11

ARGUMENT ....................................................................................................... 13

I.      PLAINTIFFS ARE NOT LIKELY TO SUCCEED ON THE MERITS OF THEIR CLAIMS ......................................................................................... 13

      A.     Plaintiffs Lack Article III Standing ........................................... 13

            1.     Vote Forward Cannot Establish Standing to Sue in Its Own Right .......... 14

            2.     The Individual Plaintiffs Cannot Establish Standing ............................... 22

      B.     Plaintiffs Are Unlikely to Succeed on the Merits of Their Anderson-Burdick Right-to-Vote Claim ............................... 25

            1.     *Anderson-Burdick* Applies Only to Election Laws, Not Internal Government Operations That Have Only an Incidental Effect on Voters .................. 26

            2.     Even *if Anderson-Burdick Applies*, Defendants Have Satisfied Its Requirements .................................. 30

                  i.     The challenged policy imposes only an indirect and minimal burden, if any burden at all, on plaintiffs voting rights ........... 31

                  ii.    USPS's regulatory interests outweigh any burdens that exist here. ............ 34

II.     PLAINTIFFS HAVE NOT ESTABLISHED IRREPARABLE HARM ......................... 40

III.   THE BALANCE OF THE EQUITIES DOES NOT JUSTIFY RELIEF. ........................ 42

CONCLUSION ..................................................................................................... 44

# TABLE OF AUTHORITIES

## CASES

*Al-Aulaqui v. Obama*,
727 F. Supp. 2d 1 (D.D.C. 2010) ............................................................................ 21

*\*Anderson v. Celebrezze*,
460 U.S. 780 (1983) .................................................................................... *passim*

*Arpaio v. Obama*,
797 F.3d 11 (D.C. Cir. 2015) ................................................................................... 13

*Belbacha v. Bush*,
520 F.3d 452 (D.C. Cir. 2008) ................................................................................. 16

*Berrigan v. Sigler*,
499 F.2d 514 (D.C. Cir. 1974) ................................................................................. 16

*Black Voters Matter Fund v. Raffensperger*,
478 F. Supp. 3d 1278 (N.D. Ga. 2020) .................................................................... 32

*Buckley v. Valeo*,
424 U.S. 1 (1976) ...................................................................................................... 32

*\*Burdick v. Takushi*,
504 U.S. 428 (1992) ...................................................................................... *passim*

*Chaplaincy of Full Gospel Churches v. England*,
454 F.3d 290 (D.C. Cir. 2006) ................................................................................. 40

*CityFed Fin. Corp. v. Office of Thrift Supervision*,
58 F.3d 738 (D.C. Cir. 1995) ................................................................................... 12

*\*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013) ...................................................................................... *passim*

*Cobell v. Norton*,
391 F.3d 251 (D.C. Cir. 2004) ................................................................................. 11

*Common Cause v. Lawson*,
977 F.3d 633 (7th Cir. 2020) ................................................................................... 33

*ConverDyn v. Moniz*,
68 F. Supp. 3d 34 (D.D.C. 2014) ...................................................................... 13, 40

*Ctr. for Reprod. Law & Policy v. Bush*,
204 F.3d 183 (2d Cir. 2002) ..................................................................................... 22

*Dallas Safari Club v. Bernhardt,*
    453 F. Supp. 3d 391 (D.D.C. 2020) .......................................................... 12, 40, 42

*Democratic Exec. Comm. of Fla. v. Lee,*
    915 F.3d 1312 (11th Cir. 2019) .......................................................................... 30

*Elec. Priv. Info Ctr. v. Dep't of Justice,*
    15 Supp. 3d 32 (D.D.C. 2014) ............................................................................ 12

*Env't Working Grp. v. FDA,*
    301 F. Supp. 3d 165 (D.D.C. 2018) .................................................................... 20

*Food & Water Watch, Inc. v. Vilsack,*
    808 F.3d 905 (D.C. Cir. 2015) ...................................................................... 13, 14

*Gottlieb v. Lamont,*
    465 F. Supp. 3d 41 (D. Conn. 2020) .................................................................. 31

*Havens Realty Corp. v. Coleman,*
    455 U.S. 363 (1982) ............................................................................................ 14

*Holmes v. FEC,*
    71 F. Supp. 3d 178 (D.D.C. 2014) ................................................................. 12-13

*Hussey v. City of Portland,*
    64 F.3d 1260 (9th Cir. 1995) ....................................................................... 27, 28

*Jack's Canoes & Kayaks, LLC v. Nat'l Park Serv.,*
    933 F. Supp. 2d 58 (D.D.C. 2013) ............................................................... 11, 12

*Kondapally v. U.S. Citizenship & Immigr. Servs.,*
    Civ. A. No. 20-00920 (BAH), 2020 WL 5061735 (D.D.C. Aug. 27, 2020)............................ 12

*Libertarian Party of Ky. v. Grimes,*
    835 F.3d 570 (6th Cir. 2016) .............................................................................. 31

*\*Libertarian Party v. D.C. Bd. of Elections & Ethics,*
    682 F.3d 72 (D.C Cir. 2012) ...................................................................... *passim*

*Lujan v. Defs. of Wildlife,*
    504 U.S. 555 (1992) ............................................................................................ 13

*Mays v. LaRose,*
    951 F.3d 775 (6th Cir. 2020) .............................................................................. 33

*McInteyre v. Ohio Elections Commission,*
    514 U.S. 334 (1995) ............................................................................................ 32

*Memphis A. Phillip Randolph Inst. v. Hargett,*
  485 F. Supp. 3d 959 (M.D. Tenn. 2020) ................................................................. 32

*Monserrate v. N.Y. State Senate,*
  599 F.3d 148 (2d Cir. 2010) ....................................................................... 27, 28

*Moya v. U.S. Dep't of Homeland Sec.,*
  975 F.3d 120 (2d Cir. 2020) ............................................................................ 21

*Munro v. Socialist Workers Party,*
  479 U.S. 189 (1986) ........................................................................................ 37

*Nat'l Mining Ass'n v. Jackson,*
  768 F. Supp. 2d 34 (D.D.C. 2011) ................................................................. 40

*Nat'l Taxpayers Union, Inc. v. United States,*
  68 F.3d 1428 (D.C. Cir. 1995) ....................................................................... 14

*Nat'l Urban League v. DeJoy,*
  Civ. A., No. GLR-20-2391, 2020 WL 6363959 (D. Md. Oct. 29, 2020) ............................ 38-39

*New Ga Project v. Raffensperger,*
  976 F.3d 1278 (11th Cir. 2020) ............................................................. 31, 32, 34

*New York v. Trump,*
  No. 20-CV-2340 (EGS), 590 F. Supp. 3d 225, (D.D.C. 2020), .................................. 16, 22, 41

*Nken v. Holder,*
  556 U.S. 418 (2009) ................................................................................ 12, 42

*Norman v. Reed,*
  502 U.S. 279 (1992) ........................................................................................ 31

*Norton v. S. Utah Wilderness All.,*
  542 U.S. 55 (2004) .......................................................................................... 43

*Ohio Democratic Party v. Husted,*
  834 F.3d 620 (6th Cir. 2016) ......................................................................... 37

*Omega World Travel Inc. v. Trans World Airlines,*
  111 F.3d 14 (4th Cir. 1997) ........................................................................... 21

*Org. for Black Struggle v. Ashcroft,*
  978 F.3d 603 (8th Cir. 2020) ......................................................................... 34

*Pac. Radiation Oncology, LLC v. Queen's Med. Ctr.,*
  810 F.3d 631 (9th Cir. 2015) ......................................................................... 21

*Peeper v. Callaway Cnty Ambulance Dist.*,
  122 F.3d 619 (8th Cir. 1997) .................................................................... 27, 28

*Power Mobility Coal. v. Leavitt*,
  404 F. Supp. 2d 190 (D.D.C. 2005) ............................................................ 40, 41

*Raines v. Byrd*,
  521 U.S. 811 (1997) ........................................................................................ 14

*Rosario v. Rockefeller*,
  410 U.S. 752 (1973) ................................................................................... 31, 33

*Sierra Club v. Morton*,
  405 U.S. 727 (1972) ........................................................................................ 14

*Simon v. E. Ky. Welfare Rights Org.*,
  426 U.S. 26 (1976) .......................................................................................... 13

*Singh v. Carter*,
  185 F. Supp. 3d 11 (D.D.C. 2016) .................................................................. 12

*Spann v. Colonial Vill., Inc.*,
  899 F.2d 24 (D.C. Cir. 1990) ......................................................................... 14

*Storer v. Brown*,
  415 U.S. 724 (1974) ........................................................................................ 33

*Summers v. Earth Island Inst.*,
  555 U.S. 488 (2009) ........................................................................................ 19

*Timmons v. Twin Cities Area New Party*,
  520 U.S. 351 (1997) ................................................................................... 26, 37

*Turner v. D.C. Bd. of Elections & Ethics*,
  77 F. Supp. 2d 25 (D.D.C. 1999) .................................................................. 27

*Twin Rivers Paper Co. LLC v. SEC*,
  934 F.3d 607 (D.C. Cir. 2019) ....................................................................... 13

*Vote Forward v. DeJoy*,
  490 F. Supp. 3d 110, 2020 WL 5763869 (D.D.C. Sept. 28, 2020) .................. *passim*

*Wash. State Grange v. Wash. State Republican Party*,
  552 U.S. 442 (2008) ........................................................................................ 26

*Whitmore v. Arkansas*,
  495 U.S. 149 (1990) ........................................................................................ 14

*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008) .................................................................................. 11, 12, 40, 42

*Wis. Gas Co. v. FERC*,
  758 F.2d 669 (D.C. Cir. 1985) ........................................................................ 40

**FEDERAL RULES**

Fed. R. Civ. P. 65 .......................................................................................... 43

## INTRODUCTION

After filing this case in August 2020, Plaintiffs sought preliminary injunctive relief based on the theory that the November 2020 general election was, in many ways, unique, in light of the massive numbers of individuals who were predicted to vote by mail in that election and the threat posed by Covid-19.  Plaintiffs asked the Court to intervene to stop a specific action allegedly taken by the Defendants that, in Plaintiffs' view, was similarly unique—the alleged "late and extra trips policy" that was purportedly prompted by "the President's political calculations" about his potential reelection in the then-upcoming general election.  *See* Pls.' Mem. of Law in Supp. of Their Mot. for Prelim. Inj., at 30, ECF No. 16-1.

The general election, and its associated run-off elections, have now come and gone. Plaintiffs, however, again seek emergency relief, and this time it is not simply to preserve the *status quo*.  The action that Plaintiffs had identified as the source of the asserted delays in the delivery of the mail—the purported late and extra trips policy—had been enjoined by this Court at Plaintiffs' request and remains enjoined by separate court orders.  But because Plaintiffs believe general mail delivery times remain inadequate, they seek a mandatory injunction requiring the Postal Service to create and implement a system of extraordinary measures for various upcoming state and local elections.

Unlike Plaintiffs' prior request for an injunction, the current request is not unique to these elections.  Plaintiffs contend that the Constitution apparently requires the Postal Service to adopt these measures in *every* election moving forward, regardless of necessity, risk, or cost, and regardless of the professional judgment of Postal Service employees or state and local election officials about whether these efforts make sense in the context of a particular election.  Indeed, Plaintiffs argue, the Constitution requires these extraordinary measures even if there are

alternatives to both in-person voting *and* vote-by-mail, such as dropping ballots at drop-boxes or at boards of elections (with help from others, if necessary).  Courts have not recognized such a right, nor have they provided such a remedy, and this Court should not be the first—particularly in the context of this extraordinary request for a mandatory injunction.

But the Court need not reach the constitutional question, because Plaintiffs fail to establish that they have standing to assert their new claim.  The organizational plaintiff, Vote Forward, alleges that USPS's failure to implement the measures they demand will "reduce the efficacy" of its letter-writing campaign by requiring it to recommend that its volunteers send letters two weeks before the election, rather than one.  And Vote Forward says it "expects" to "again" divert resources to answer voter questions about mail delays.  But those allegations are not sufficient to establish standing under this Court's decision on Plaintiffs' prior motion.  In that decision, this Court assumed for purposes of the motion that Vote Forward's actions were necessitated by the purported action of the Defendants—*i.e.*, the purported late and extra trips policy—which this Court found threatened the on-time delivery of the mail because the "policy changes in July coincided with a significant decline in USPS on-time service scores."  *Vote Forward v. DeJoy*, 490 F. Supp. 3d 110, 2020 WL 5763869, at *5 (D.D.C. Sept. 28, 2020), *appeal dismissed*, 2021 WL 672395 (D.C. Cir. Feb. 10, 2021).  But that purported policy was originally enjoined in this case and continues to be enjoined by separate court order.  Although Vote Forward continues to contend that mail delivery is slow, it does not (and could not) point to USPS's "failure to implement" the extraordinary measures that it adopted in the Georgia runoff election as the cause.  Vote Forward's expected actions will therefore be undertaken as a direct result of unidentified policies allegedly slowing down the mail *that have nothing to do with* the Georgia measures.  Vote Forward might speculate that the extraordinary measures they seek are perhaps a more effective

solution to speed up the mail just prior to the election, and they are free, consistent with their mission, to advocate for their permanent adoption by the Postal Service.  But their decisions to recommend that their volunteers send get-out-the-vote letters earlier, or to divert resources to answer questions about mail delays, are not necessitated by their absence.  After all, the measures they are requesting here, if comparable to the Georgia measures, would largely not be in place until much closer to the elections at issue.  Moreover, those measures only applied to ballots, not other mail (such as get-out-the-vote letters) actually sent by Vote Forward.  In the meantime, Vote Forward will still face questions from individuals about mail-in elections, and they will have to decide whether to send their mailings two weeks in advance, rather than one, regardless of the implementation of the extraordinary measures.

The allegations of the individual voters suffer from the same problems.  Plaintiffs suggest that they want to vote "close" to the election deadline, but offer no indication about when they will actually vote, which makes it impossible to judge whether the relief they seek will be effective. Nor do they indicate why they must mail their ballots at all, as opposed to, for example, dropping their ballots at a drop-box or local board of election, or even casting their ballot in person, should their circumstances change with respect to the pandemic (such as receiving a vaccination that is fully effective by Election Day).

Even if Plaintiffs surmount Article III's jurisdictional bar, they have not shown they are likely to succeed on the merits.  Plaintiffs rely exclusively on the *Anderson-Burdick* framework, which courts have applied to evaluate the constitutionality of election laws, *e.g.*, laws affecting voter registration and eligibility, candidate selection, or the voting process itself.  But the policies that Plaintiffs demand USPS adopt simply are not election laws measured by that standard.  In its first preliminary injunction opinion, the Court expressed concern that Defendants were arguing

that *Anderson-Burdick* would not apply even to federal election laws, such as those regulating the District of Columbia.  Defendants clarify that is not their position.  Rather, *Anderson-Burdick* simply does not apply outside the context of election-related laws.  And even if *Anderson-Burdick* does apply, the Postal Service easily surmounts its restrictions.  Here, despite Plaintiffs' claims to the contrary, there is no "severe burden"—Plaintiffs can vote in person, by mail, or by hand delivery.  Rather, they claim a right to be able to vote by mail the weekend before an election.  But as the Supreme Court and numerous appellate courts have explained, deadlines that require voters to vote early are generally constitutional.  And the Postal Service has good reason for not implementing Plaintiffs' preferred measures in all elections:  changing the normal procedure introduces risk and cost into the process, while potentially frustrating the plans and coordination between Postal Service employees and state and local election officials, that outweighs any potential benefit.

Finally, Plaintiffs fail to establish irreparable injury, *i.e.*, injury that is "certain and great," and, in the context of a mandatory injunction, that "extreme or very serious damage will result" if the injunction does not issue.  Vote Forward asserts only speculative and equivocal injury, and the individual voters cannot show that they will suffer extreme injury simply by casting a mail-ballot a few days before the election, particularly when they have made no serious effort to show that alternatives are unavailable to them or particularly burdensome.  And the public interest does not support appointing Plaintiffs as the director of the Postal Service's election efforts, while requiring the Court to manage the day-to-day operations of the Postal Service in a way this Court has specifically disclaimed.  Nor does it counsel overriding and preempting conversations and context-specific arrangements that are made between local postal officials and local government personnel.

Plaintiffs in this case originally challenged one particular purported policy relating to late and extra trips and sought preliminary injunctive relief relating to the November 2020 general election.  They have now gone further, asking this Court to hold, in effect, that for every national, state, and local election, the Postal Service's voluntary decision to take measures that are, by their very nature, "extraordinary" is constitutionally required.  Defendants are prepared to litigate that issue on summary judgment, which is the proper vehicle for deciding these questions.  This Court should not provide the extraordinary, mandatory relief that Plaintiffs seek here.

## BACKGROUND

### I.    PROCEDURAL HISTORY

In August 2020, a group of individuals and organizations filed suit seeking to overturn alleged policies they asserted "undermined USPS's ability to ensure the on-time delivery of mail ballots," including a policy purportedly prohibiting or restricting late or extra trips.  Am. Compl. ¶ 4, ECF No. 15.  The individual plaintiffs were all individual voters who planned to vote this past November, but feared their ballots would not be delivered on time.  *See id.* ¶¶ 13-22.  The organizational plaintiffs alleged that they would have to divert organizational resources in order to educate the public about voting-by-mail.  *See id.* ¶¶ 12, 23-25.  Those activities—and the increase in voting-by-mail for a national, presidential election that formed the core of the plaintiffs' suit— was based on the ongoing COVID-19 pandemic, *see, e.g., id.* ¶ 35.  Plaintiffs claimed that, by adopting these purported policies, USPS had violated their constitutional right to vote, as well as 39 U.S.C. § 3661's requirement that USPS seek an advisory opinion from the Postal Regulatory Commission (PRC).  *Id.* ¶¶ 159-180.

On September 8, 2020, the plaintiffs sought a preliminary injunction premised solely on their right to vote in the November 2020 election.  *See* Pls.' Mot. for Prelim. Inj., ECF No. 16;

Mem. Supp. Prelim. Inj., ECF No. 16-1.   Over Defendants' opposition, the Court granted the motion for preliminary injunction, Mem. Op., ECF No. 32.   Further, in the lead up to the general election, this Court held several hearings and issued several orders focused on the timely delivery of ballots.   *See*, *e.g.,* ECF Nos. 39-113.   On the parties' joint motion, the Court dissolved the preliminary injunction after the November election.   J. Mot. to Dissolve the Prelim. Inj., ECF No. 168; Minute Order (Feb. 11, 2021).

On January 15, 2021, Defendants moved to dismiss the amended complaint on the grounds that the alleged injuries, as well as the lawsuit, were rendered moot following the election.   Mem. in Supp. of Defs.' Mot. to Dismiss the Am. Compl., ECF No. 165-1.   Plaintiffs then amended their complaint a second time to add a challenge to "Defendants' refusal to implement for the upcoming 2021 elections the extraordinary ballot handling policies and practices that were utilized in the Georgia Senate Runoff Elections."   Consent Mot. for Leave to File Pls.' 2d Am. Comp., at 1, ECF No. 170.   Specifically, the Second Amended Complaint calls for intervention with respect to upcoming state and special elections in Pennsylvania, Texas, and New Mexico.   *Id.* The Second Amended Complaint also added new individual plaintiffs and allegations related to their alleged injury.   *Id.*  On March 26, 2021, Plaintiffs moved for a second preliminary injunction "requiring Defendants to implement the measures that they agreed to adopt for the Georgia Senate runoff elections in the upcoming elections in Pennsylvania, Texas, and New Mexico."   Pls.' Mem. of Law in Supp. of their Second Mot. for Prelim. Inj., ECF No. 175-1, at 3 ("Mot.").

## II.     USPS'S HANDLING OF ELECTION MAIL FOR THE NOVEMBER GENERAL ELECTION AND THE GEORGIA SENATE RUN-OFF ELECTION

On March 5, 2021, the Office of Inspector General (OIG)[1] issued an audit report concerning USPS's service performance during the November 2020 general election and the January 2021 Georgia Senate runoff election.  USPS OIG Audit Report No. 20-318-R21, "Service Performance of Election and Political Mail During the November 2020 General Election" (Mar. 5, 2021) (attached as Ex. 1) at 1.  OIG found that the Postal Service prioritized processing of Election Mail and significantly improved timelines, "even with significantly increased volumes of Election Mail in the mailstream." *Id.* at 1.  Further, OIG found that the Postal Service "leveraged high-cost efforts such as extra transportation and overtime to improve delivery performance." *Id.* at 1.  While recognizing judicial mandates to commit additional resources and undertake extraordinary measures through the election, OIG emphasized that the Postal Service has historically processed Election Mail consistent with the court-ordered requirements. *Id.* at 2.

From September 1 through November 3, 2020, USPS processed nearly 134 million Election Mail pieces, only counting those Election Mail pieces with barcodes enabling tracking. *Id.* at 3.  USPS processed Election Mail in time to meets its service standard 93.8 percent of the time. *Id.* at 3.  Although below the on-time goal[2] of 96 percent during this period, USPS's handling of Election Mail was significantly improved from its 2018 benchmark and exceeded all other First-Class Mail processed on time by 5.6 percent, clearly demonstrating USPS's prioritization of

---

[1] The USPS Office of Inspector General is an independent agency created by Congress to ensure efficiency, accountability, and integrity in the Postal Service.

[2] On-time performance goals are not routinely met. *See, e.g.*, Ex. 1, OIG Audit Report (Mar. 5, 2021), at 3 (noting that "the Postal Service has not met its First-Class Mail service goal in five years").

Election Mail.  *Id.* at 3.  Indeed, "[d]uring the week of the general election, 98.1 percent of identifiable ballots were processed in time to meet [USPS's] service standard."  *Id.* at 3.

After the November general election, Plaintiffs turned their attention to the January Georgia Senate runoff election.  In order to avoid the burden imposed on the Postal Service by continued, seriatim motions briefing, Defendants agreed with Plaintiffs to detail the Postal Service's efforts to support mail-in voting for the Georgia election.  Notice of J. Agreement, ECF No. 162-1.  The terms of the agreement were incorporated into a minute order issued by the Court on December 24, 2020.  Min. Or. (Dec. 24, 2020).  By the agreement, Defendants memorialized USPS's commitment to implement the same measures taken for the November general election, tailoring requirements to suit the Georgia election and the litigation.  Fundamentally, none of the measures taken for the Georgia election were implemented for the first time due to this litigation.  Although some compliance issues were noted, OIG found that "[o]verall, the Postal Service performed well during the Georgia Senate runoff election."  Ex. 1, OIG Audit Report (Mar. 5, 2021), at 21.

## III.   USPS'S CONTINUED COMMITMENT TO PRIORITIZATION OF ELECTION MAIL FOR OFF-CYCLE ELECTIONS

Historically, USPS has not taken a "one size fits all," top-down approach to managing how its vast network handles election-related mail for off-cycle state and local elections like those at issue in Plaintiffs' motion.  USPS assigns talented, experienced employees to serve as local Political and Election Mail Coordinators, who are responsible for communicating with local government and election officials and Mail Service Providers to coordinate mailing and delivery of ballots.  Lamb Decl. ¶ 2 (attached as Ex. 5); Cook Decl. ¶ 4 (attached as Ex. 6); Hand Decl. ¶ 4 (attached as Ex. 7).

In order to facilitate the timely delivery of ballots, Political and Election Mail Coordinators meet regularly to work with local stakeholders, including Secretaries of State and boards of election.  Ex. 5, Lamb Decl. ¶ 3; Ex. 6, Cook Decl. ¶ 6; Ex. 7, Hand Decl. ¶¶ 4-5.  This outreach helps USPS understand and respond to the unique needs of the local community and develop a tailored approach to meeting those needs where possible.  Ex. 5, Lamb Decl. ¶ 3.  For example, some boards of elections may arrange for pick-up of ballots, while others request delivery by USPS on the day of election.  Ex. 6, Cook Decl. ¶ 6.

Among other factors, Political and Election Mail Coordinators take into account whether local policies and practices are able to timely deliver ballots, whether changing normal processes create a risk that would impede timely delivery, and whether the cost associated with implementing a different policy or practice is warranted in light of mail volumes and the distance which mail must travel.  Ex. 5, Lamb Decl. ¶ 3.  The plan developed through local outreach is then passed along to processing plants so that the proper systems are in place to log ballots received and sent downstream for delivery, where possible. Ex. 6, Cook Decl. ¶ 7.

The most effective way to ensure ballots that enter the Postal network are timely delivered is to follow USPS's longstanding policies and practices for doing so.  Tr. of Oct. 31, 2020 Status Conf. (Testimony of Mr. Barber), ECF No. 133, at 40:5–9.  Sweeping changes, particularly those made without consideration of the unique needs of specific localities, introduces unnecessary operational risk.  Ex. 6, Cook Decl. ¶ 8.  There is a concern with such changes that "somebody is not going to follow th[e] new process correctly, and . . . introduces new confusion into the step." Glass Dep. Tr. 118:12–22, 209:17–22 (attached as Exhibit 3).   Such changes also frustrate operations by "taking people away from their normal jobs . . . , which could introduce risk in other ways."  *Id.* at 213:11–16; *see also* Tr. of Oct. 31, 2020 Status Conf. (Testimony of Mr. Barber), at

40:5–9; *id.* at 41:24-42:3 ("[O]ur best opportunity to get the ballots to their destination timely is to use our time tested processes and procedures. Anytime we change out of that process that we've been doing adds risk."). Furthermore, extraordinary measures that take mailpieces out of the normal processing mailstream pose a problem because that mail can no longer be tracked to ensure proper handling and timely delivery. *See id.* 41:24-42:3; Glass Decl. ¶¶ 13-14 (attached as Ex. 4).

USPS has determined that the risks associated with taking Election Mail out of the normal mail process are outweighed by the potential benefits for national elections due to the scale of the effort. Ex. 6, Cook Decl. ¶ 9. It is not the case that the same measures should be taken as a matter of course for off-cycle state and local elections due to the lower mail volume or the specific circumstances of the election. *Id.* The extraordinary measures taken ordinarily for national elections "may lead to inefficiencies, proving very costly, while providing little to no benefit" for off-cycle state and local elections. *Id.*

For this reason, USPS has left decisions regarding the measures that should be taken for off-cycle elections to local facilities and coordinators who are best suited to conduct the necessary risk assessment. *Id.* In addition to mitigating risk, this community-based approach allows local offices to respond better to the needs of their communities. For example, in one Pennsylvania district, when ballots were required to be in-hand by 8:00 p.m. on election day, USPS made additional deliveries to the Board of Election or the Board of Election's Post Office Box, depending on the Board's direction. Ex. 7, Hand Decl. ¶ 6.

As another example, for New Mexico's June 1 special election, the Secretary of State has announced that he will contact the Postal Service in the coming weeks to discuss New Mexico-specific requirements for the mailing and delivery of ballots. Ex. 5, Lamb Decl. ¶ 5. Samantha Lamb, the USPS Political and Election Mail Coordinator for New Mexico, will then coordinate

with the state to determine how best to meet those requirements, as they do for every election. *Id.* at 6. "Typically, such arrangements are made closer in time to the election during ongoing discussions with the local election officials." *Id.*

The measures taken for the November general election will not be necessary for the New Mexico special election. Ex. 5, Lamb Decl. ¶ 7. Because the election only impacts a few counties, the vast majority of Election Mail will be local delivery, between Mail Service Providers or local election officials and residents of the five impacted counties. *Id.* Such a limited pool of voters and relatively small volume of mailpieces do not require broad-scale delivery coordination across the state. *Id.* Further, unlike in the November general election, most polling places will be open with a voting period lasting almost an entire month, *id.* and voters may use drop boxes to return their ballots. *See* Returning Your Absentee Ballot, https://www.sos.state.nm.us/voting-and-elections/voter-information-portal/returning-your-absentee-ballot.

By continuing its longstanding Election Mail practices, including the commitment of discretion to local management, USPS is poised to meet the demands of the upcoming elections in Texas, Pennsylvania, and New Mexico.

## LEGAL STANDARD

"The standard for issuance of the extraordinary and drastic remedy of a temporary restraining order or a preliminary injunction is very high." *Jack's Canoes & Kayaks, LLC v. Nat'l Park Serv.*, 933 F. Supp. 2d 58, 75 (D.D.C. 2013) (citation omitted). An interim injunction is "never awarded as of right," *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008), and "should be granted only when the party seeking the relief, by a clear showing, carries the burden of persuasion," *Cobell v. Norton*, 391 F.3d 251, 258 (D.C. Cir. 2004). The movant's burden is even higher where, as here, Plaintiffs' requested "injunction is mandatory—that is, . . . its terms

would alter, rather than preserve, the *status quo* by commanding some positive act." *Singh v. Carter*, 185 F. Supp. 3d 11, 17 (D.D.C. 2016) (quoting *Elec. Priv. Info Ctr. v. Dep't of Justice*, 15 Supp. 3d 32, 39 (D.D.C. 2014)). Such mandatory injunctions "are disfavored as an even more extraordinary remedy than the typical preliminary injunction, . . . especially when directed at the United States Government." *Kondapally v. U.S. Citizenship & Immigr. Servs.*, Civ. A. No. 20-00920 (BAH), 2020 WL 5061735, at *3 (D.D.C. Aug. 27, 2020) (citations omitted). "Plaintiffs seeking this type of relief face an additional hurdle when proving their entitlement to relief, . . . and courts exercise extreme caution in assessing such motions." *Id.* (alterations and citations omitted). Indeed, as a rule, when a mandatory preliminary injunction is requested, the district should deny such relief unless the moving party "show[s] clearly that he or she is entitled to relief or that extreme or very serious damage will result from the denial of the injunction." *Dallas Safari Club v. Bernhardt*, 453 F. Supp. 3d 391, 398 (D.D.C. 2020) (quoting *Singh*, 185 F. Supp. 3d at 17).

Of course, a party moving for a mandatory preliminary injunction must also demonstrate all of the traditional preliminary injunction factors: "(1) a substantial likelihood of success on the merits, (2) that it would suffer irreparable injury if the injunction is not granted, (3) that an injunction would not substantially injure other interested parties, and (4) that the public interest would be furthered by the injunction.'" *Jack's Canoes*, 933 F. Supp. 2d at 75-76 (quoting *CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 746 (D.C. Cir. 1995)). When, as here, the government is opposing a motion for a preliminary injunction, the third and fourth factors merge. *See Nken v. Holder*, 556 U.S. 418, 435 (2009).[3]

---

[3] "In the wake of the Supreme Court's decision in *Winter v. Natural Resources Defense Council*, 555 U.S. 7 (2008), 'the D.C. Circuit has suggested that a positive showing on all four preliminary injunction factors may be required.'" *Vote Forward*, 2020 WL 5763869, at *3 (quoting *Holmes*

## ARGUMENT

### I.    PLAINTIFFS ARE NOT LIKELY TO SUCCEED ON THE MERITS OF THEIR CLAIMS.

#### A.    Plaintiffs Lack Article III Standing

As the parties "invoking the court's subject matter jurisdiction," Plaintiffs "bear[] the burden of . . . establishing the elements of standing." *Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015).   To meet that burden, Plaintiffs must establish three such elements: (i) a concrete and particularized injury-in-fact, either actual or imminent; (ii) a causal connection between the injury and defendants' challenged conduct, such that the injury is "fairly . . . trace[able] to the challenged action of the defendant"; and (iii) a likelihood that the injury suffered will be redressed by a favorable decision.  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992) (quoting *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 41-32 (1976)).   Plaintiffs "cannot rest on abstract, or conclusory assertions of injury, . . .  but must point to specific, concrete facts demonstrating harm." *Twin Rivers Paper Co. LLC v. SEC*, 934 F.3d 607, 612–13 (D.C. Cir. 2019) (citations omitted). At the preliminary injunction stage, Plaintiffs must show "a substantial likelihood of standing." *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 913 (D.C. Cir. 2015) (citation omitted).

The Court's standing inquiry here is more rigorous than in most other cases, for two reasons.   *First*, Plaintiffs "bear[] 'a more rigorous burden'" than usual "to establish standing" because they "rest [their] claims for declaratory and injunctive relief on predicted *future* injury." *Arpaio*, 797 F.3d at 21 (emphasis added).   Plaintiffs thus must show that their alleged future injury is "*certainly* impending," and "'[a]llegations of *possible* future injury' are not sufficient." *Clapper*

---

*v. FEC*, 71 F. Supp. 3d 178, 183 n.4 (D.D.C. 2014)).   "Nonetheless, 'the Circuit has had no occasion to decide this question because it has not yet encountered a post-*Winter* case where a preliminary injunction motion survived the less rigorous sliding-scale analysis.'"  *Id.* (quoting *ConverDyn v. Moniz*, 68 F. Supp. 3d 34, 46 n.2 (D.D.C. 2014)).

*v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)). *Second*, the Court's "standing inquiry" is also "especially rigorous" because "reaching the merits of the dispute would force [the Court] to decide whether an action taken by one of the other two branches of the Federal Government was unconstitutional." *Id.* at 408 (quoting *Raines v. Byrd*, 521 U.S. 811, 819-20 (1997)). Plaintiffs have not satisfied this rigorous burden here.

### 1.   Vote Forward Cannot Establish Standing to Sue in Its Own Right

To establish standing as an organization, Vote Forward must "meet[] the same standing test that applies to individuals." *Spann v. Colonial Vill., Inc.*, 899 F.2d 24, 27 (D.C. Cir. 1990). That is, Vote Forward must show "actual or threatened injury in fact that is fairly traceable to the alleged illegal action and likely to be redressed by a favorable court decision." *Id.*  As with individuals, an organization's "mere 'interest in a problem'" is not enough to confer standing, "no matter how longstanding the interest and no matter how qualified the organization is in evaluating the problem." *Sierra Club v. Morton*, 405 U.S. 727, 739 (1972).  "An organization must allege more than a frustration of its purpose because frustration of an organization's objectives 'is the type of abstract concern that does not impart standing.'" *Food & Water Watch, Inc.*, 808 F.3d at 919 (quoting *Nat'l Taxpayers Union, Inc. v. United States*, 68 F.3d 1428, 1433 (D.C. Cir. 1995)). Rather, the challenged conduct must "perceptibly impair[]" the "organization's *activities*," with a "consequent drain on the organization's resources." *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982) (emphasis added).

Thus, to establish standing to bring the claims in its Second Amended Complaint, Vote Forward must show a substantial likelihood that it will suffer certain and imminent harm that is traceable to the absence of all extraordinary measures that USPS implemented in the Georgia runoff election. To try and meet that standard, Vote Forward attempts to recycle prior allegations of injury that it asserted in support of its prior preliminary injunction motion. First, Vote Forward

argues that USPS's "failure to implement" the Georgia measures will "reduce the efficacy of Vote Forward's letter-writing campaign by making it necessary to send [get-out-the-vote] letters early in order to ensure they arrive in time for voters to cast their ballots by mail and have them counted." Mot. 35 (citing Vote Forward Decl., ECF No. 175-25, ¶¶ 7-8).  Second, Vote Forward alleges that it had to "divert its . . . resources" to respond to volunteer questions during the November 2020 election and "expects to incur similar costs again." *Id.* (citing Vote Forward Decl. ¶¶ 11–13).

This Court's decision on standing with respect to Vote Forward's first preliminary injunction motion, however, demonstrates precisely why Vote Forward has failed to satisfy its burden here.  The Court's prior decision concerned the separate issue of whether Vote Forward likely had standing to bring claims in its First Amended Complaint challenging certain alleged nationwide "Postal Policy Changes" in the lead-up to the November 2020 election.  *See Vote Forward*, 2020 WL 5763869, at *2.  In concluding that Vote Forward likely had standing, the Court reasoned that Plaintiffs had adequately shown that the alleged policy changes—and in particular an alleged ban on "late" and "extra trips"—"led to nationwide delays" that "continue[d] to have a nationwide impact." *Id.*

Here, by contrast, Plaintiffs do not seek to enjoin the Postal Policy Changes that USPS announced last fall, but rather seek a mandatory injunction requiring USPS to adopt certain measures implemented in the U.S. Senate runoff in Georgia in three upcoming elections in Pennsylvania, Texas, and New Mexico.  To the extent the Court's decision addresses that question at all, it demonstrates why Vote Forward *lacks* standing to assert a claim seeking to mandate the Georgia measures.[4]

---

[4] While the Court's decision on Plaintiffs' first motion for a preliminary injunction "does not constitute the law of the case," it is relevant as persuasive authority to the extent it addresses

*First*, and fundamentally, Vote Forward's alleged injuries simply are not traceable to any decision by USPS not to implement the Georgia measures for the three upcoming elections.  The Court's prior opinion concluded that Vote Forward's alleged injuries—which are the same injuries it asserts here—were traceable to "the implementation of the USPS policy changes in July," which the Court concluded led to "a significant decline in USPS on-time service scores."  *Vote Forward*, 2020 WL 5763869, at *5.  But the USPS policy changes have been and remain enjoined.  *See New York v. Trump*, No. 20-CV-2340 (EGS), 590 F. Supp. 3d 225, 2020 WL 5763775, at *1 (D.D.C. Sept. 27, 2020), *appeal dismissed*, 2021 WL 672390 (D.C. Cir. Feb. 10, 2021).  And although Vote Forward continues to allege that mail is delayed, it does not (and cannot) point to an alleged failure to implement the Georgia measures as a cause of mail delays.  The Georgia measures were exclusively applicable to the treatment of ballot mail and would not impact mail sent as part of Vote Forward's letter writing campaigns.  If Vote Forward thus decides to recommend that its volunteers send letters earlier, or reallocates resources to answer volunteers' questions, *see* Mot. 35, those actions will not be caused by, or traceable to, a failure to implement the Georgia measures.

*Second*, even if Vote Forward could somehow establish that its alleged injuries are traceable to a failure to implement the Georgia measures, Vote Forward has not met its burden of showing that a court order requiring USPS to adopt the Georgia measures would redress those alleged injuries.  First, because those extraordinary measures are applicable to ballot mail only and implemented only in the last few days before an election, the effectiveness of those measures will not be known until after Vote Forward's volunteers send get-out-the-vote letters.  Vote Forward's

---

issues relevant to the present motion.  *Belbacha v. Bush*, 520 F.3d 452, 458 (D.C. Cir. 2008) (quoting *Berrigan v. Sigler*, 499 F.2d 514, 518 (D.C. Cir. 1974)).

theory of redress nonetheless assumes that a court order mandating the Georgia measures would allow Vote Forward to "recommend" that its volunteers send get-out-the-vote letters one week later, which Vote Forward contends would be more "eff[ective]" than if they are sent a week earlier.  Mot. 35.  But Vote Forward cites no evidence to support this assumption.  Second, although Vote Forward's declaration states that get-out-the-vote letters sent "too early" are "usually" ineffective at increasing turnout, the declaration does not define "too early" or cite any research on this issue.  Vote Forward Decl. ¶ 6.  And while the declaration states that letters sent during the week before an election "are effective," it conspicuously does *not* assert that letters sent two weeks before the election would be ineffective.  *See id*.  Indeed, Vote Forward's own website claims that "Vote Forward letters sent *three weeks* before Election Day can be *more effective* than letters sent later."[5] (emphasis added).  In a recent study in Florida's 15th congressional district in which some letters were sent three weeks early and other letters were sent one week early, Vote Forward "found that only the [three week] early letters had a significant impact on voter turnout."[6] Thus, not only has Vote Forward not come forward with any evidence to support its assumption that sending letters two weeks early would be less effective, but its own website suggests that sending letters at that time may be *more* effective than sending letters in the week before an election.

Nor has Vote Forward even attempted to show that a court order mandating the Georgia measures would redress Vote Forward's alleged harm of having to "answer[] volunteer and voter questions about mail delays."  Mot. 35.  Again, Vote Forward has consistently alleged throughout this litigation that those alleged harms are caused by mail delays that resulted from USPS policy

---

[5] *See* Vote Forward, Florida CD-15 2020, http://www.votefwd.org/posts/Florida-CD-15-2020 (last accessed Apr. 8, 2021).

[6] *Id.*

changes, and Vote Forward cannot allege that those delays are caused by a failure to implement extraordinary measures that would not be implemented in any event until the days immediately preceding the election. *See Vote Forward*, 2020 WL 5763869 (discussing Vote Forward allegation that "Defendant's policy changes"—and specifically the alleged ban on late and extra trips— caused Vote Forward "to divert resources 'to respond to an influx of inquiries from volunteers regarding USPS's mailing delays'" (quoting Pls.' First Mot. for Prelim. Inj., ECF No. 16-1, at 42)). Thus, even under Vote Forward's speculative theory of injury, there is nothing this Court could order to mandate the Georgia measures that would alleviate its alleged harm of having to answer questions about mail delays.

*Third*, in addition to all of the problems identified above, Vote Forward cites no evidence suggesting that the Georgia measures would actually help, rather than hurt, the Postal Service's efforts to ensure that all ballots are delivered on time. Vote Forward cites the USPS OIG's recent report on election mail, but nothing in that report suggests that the Georgia measures were necessary to ensure the delivery on Election Mail in the Georgia runoff, let alone that such measures are necessary for other elections in other states at other times. Ex. 1, OIG Audit Report (Mar. 5, 2021), at 21–22. Indeed, the OIG report makes a number of recommendations for future elections, but none of those recommendations includes mandating the extraordinary measures in all elections, let alone the Georgia measures in particular. *See id.* at 16. While USPS may determine in its discretion that some of the measures may be appropriate in specific circumstances, Plaintiffs have not demonstrated that the measures necessarily improve on-time delivery rates or would redress Plaintiffs' alleged injuries *in these specific elections*. The decisions about which measures may or may not be appropriate in the days immediately leading up to an election are best left to local election officials, working in coordination with the USPS local managers on the ground

who observe mail conditions on a daily basis and can respond with the measures that they deem

are most appropriate based on their professional judgment and experience. *See* Ex. 5, Lamb Decl.

¶ 3; Ex. 6, Cook Decl. ¶¶ 6-9.

Moreover, as USPS's director of this past election season explained during his deposition,

changing mail processes "introduce[s] an element of risk" that "somebody is not going to follow

th[e] new process correctly, and . . . introduces new confusion into the step." Ex. 3, Glass Dep.

Tr. 118:12–22, 209:17–22.  It also diverts resources, "taking people away from their normal

jobs . . . , which could introduce risk in other ways." *Id.* at 213:11–16; *see also* Tr. of Oct. 31,

2020 Status Conf. (Testimony of Mr. Barber) at 40:5–9 ("I can tell you that our normal process, a

well established process is our most effective and assured way to ensure that ballots that entered

the Postal Service timely get delivered timely.  The additional efforts do add risks to the ballots."),

ECF No. 133; *id.* at 41:24-42-3 ("[O]ur best opportunity to get the ballots to their destination

timely is to use our time tested processes and procedures.  Anytime we change out of that process

that we've been doing adds risk.").  Plaintiffs have made no attempt to demonstrate—empirically

or otherwise—that the potential benefits of implementing the Georgia measures specifically

outweigh these risks.  Accordingly, Vote Forward has not met its burden to show that it will suffer

a certain and imminent harm that is traceable to the absence of the Georgia measures and would

be redressed by a favorable decision.

Vote Forward cannot cure this speculation by asserting that "[d]uring the prior election

season," it "had to divert its limited resources to addressing issues that arose from ballot delays."

Mot. 35.  That allegation "relates to past injury rather than imminent future injury that is sought to

be enjoined." *Summers v. Earth Island Inst.*, 555 U.S. 488, 495 (2009).  As to future injury, Vote

Forward makes only a one-sentence conclusory assertion that "[s]hould USPS fail to implement

the Agreed-To Measures, . . . Vote Forward *expects* to face a similar circumstance in which it must

reallocate existing resources to respond to the fallout of USPS delays."  Vote Forward Decl. ¶ 13

(emphasis added).  But, as noted, it is unclear why Vote Forward expects the same injury when

the two were allegedly the product of different causes.  In the November election, Vote Forward

argued that it suffered these very injuries as a result of the purported late and extra trip policy, not

the absence of the extraordinary measures.  And in the November election, the extraordinary

measures *were in fact in place*, demonstrating that this injury has no connection whatsoever to the

existence of those measures.[7]

And even if Vote Forward had demonstrated a real likelihood that it plans to reallocate

resources as a result of USPS's "failure to implement" the Georgia measures, Plaintiffs "cannot

manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical

future harm that is not certainly impending."  *Clapper*, 568 U.S. at 409.  Here, as explained above,

unlike in its prior motion for a preliminary injunction, Vote Forward cannot argue that its alleged

injuries are traceable to any challenged action by USPS or would be redressed by a favorable

decision.   Unlike the prior motion, Vote Forward cannot demonstrate here "that its

expenditures . . . were undertaken to directly counteract the harms caused by Defendants' actions,"

*Vote Forward*, 2020 WL 5763869, at *5, because Vote Forward has not (and cannot) contend that

the failure to implement the Georgia measures has contributed to the mail delays it contends are

---

[7] Moreover, the "resources" that Vote Forward alleges that it had to reallocate in the past (and allegedly "expects" to reallocate in the future) involved employees having to "respond[] to volunteers' inquiries regarding when they should mail out their" get-out-the-vote letters and "answering volunteer and voter questions about mail delays."  Vote Forward Decl. ¶¶ 12-13.  But Vote Forward is a voting-rights organization, and Courts have routinely rejected organizational plaintiffs' efforts to assert injury based on activities that the organization would have done anyway as part of their mission.  *See, e.g.*, *Env't Working Grp. V. FDA*, 301 F. Supp. 3d 165, 172 (D.D.C. 2018).

the source of its harms.  Thus, Vote Forward cannot establish standing by relying on a potential "reallocat[ion] [of] resources," Vote Forward Decl. ¶ 12, to prevent a harm that has nothing to do with the Georgia measures.  "If the law were otherwise, an enterprising plaintiff would be able to secure a lower standard for Article III standing simply by making an expenditure based on a nonparanoid fear." *Clapper*, 568 U.S. at 409.

Finally, even if Vote Forward could establish some injury that is traceable to the Georgia measures and would be redressed by a favorable decision, Vote Forward cannot establish third-party standing to bring the only claim on which it bases its motion:  that USPS's failure to implement the Georgia measures burdens citizens' right to vote. *See Al-Aulaqui v. Obama*, 727 F. Supp. 2d 1, 23 (D.D.C. 2010).  While Vote Forward has argued previously that it "need not establish" third-party standing if it can establish organizational standing, *see* ECF No. 24, Vote Forward must establish standing to bring the claim on which its motion is based. *See Omega World Travel Inc. v. Trans World Airlines*, 111 F.3d 14, 16 (4th Cir. 1997) ("[A] party moving for a preliminary injunction must necessarily establish a relationship between the injury claimed in the party's motion and the conduct asserted in the complaint." (citation omitted)); *see also Pac. Radiation Oncology, LLC v. Queen's Med. Ctr.*, 810 F.3d 631, 636 (9th Cir. 2015) (collecting cases).  Because Vote Forward has not established standing to bring a right-to-vote claim on behalf of third parties, and because it does not assert a harm to its own interest in voting, it cannot pursue a preliminary injunction based on its right-to-vote claim. *See Moya v. U.S. Dep't of Homeland Sec.*, 975 F.3d 120, 133 (2d Cir. 2020) (organizational plaintiff must establish harm to its "own interest" under constitution and cannot simply allege harm that is "'derivative' of the harm suffered by third-part[ies]" (quoting *Ctr. for Reprod. Law & Policy v. Bush*, 204 F.3d 183, 195–96 (2d Cir. 2002)).

## 2. The Individual Plaintiffs Cannot Establish Standing

Nor have the individual plaintiffs established standing to pursue their claim that USPS is constitutionally required to adopt the measures it used in the Georgia runoff for the upcoming elections in Texas, Pennsylvania, and New Mexico. *See* Mot. 31–34. Again, the question is not whether Plaintiffs can show that the "Postal Policy Changes" announced last fall have contributed to mail delays that could put their ballots at risk. Those changes remain enjoined, *New York*, 2020 WL 5763775, at *1, and Plaintiffs do not seek to challenge them here. Rather, the question is whether Plaintiffs have shown that they will suffer a certain and imminent injury unless USPS implements the Georgia measures in each of the three upcoming elections.

The individual plaintiffs' theory of standing suffers from all the same traceability and redressability flaws identified above. Like Vote Forward, the individual plaintiffs allege that they are harmed by mail delays, but plaintiffs do not argue that those delays are caused by or traceable to USPS's failure to implement the Georgia measures. Similarly, the individual plaintiffs have not met their burden to establish a favorable decision would redress their alleged harms, as plaintiffs have made no attempt to demonstrate that their ballots will not be counted but for the mandatory implementation of the Georgia measures.

In any event, even if the individual plaintiffs had somehow identified a causal connection between their allegations and the Georgia measures, their allegations would still be insufficient to establish standing. As an initial matter, none of the individual plaintiffs allege that they are residents of or registered voters in Texas. Thus, none of the individual plaintiffs has standing to seek to require USPS to adopt the Georgia measures for the upcoming May 1 election in Texas. As to the elections in Pennsylvania and New Mexico, the individual plaintiffs rely on the theory that "USPS's failure to implement the Agreed-To Measures create a substantial risk that their completed ballots may not be counted." Mot. 31. But Plaintiffs do not come close to meeting

their burden of demonstrating a "substantial likelihood" that any of their ballots will not be counted. The individual plaintiffs' theory "relies on a highly attenuated chain of possibilities" that cannot establish a certainly impending injury. *Clapper*, 568 U.S. at 410.

*First*, there is no indication that any of the individual plaintiffs will delay requesting their ballots or returning them to their election officials, such that a delay may prevent their vote from being counted. Although these plaintiffs vaguely suggest that they may submit their ballots "close to the[] deadline," *see, e.g.*, Gasparro Decl. ¶ 6, ECF No. 175-19, they do not say with any specificity when they actually plan to mail in their ballots—whether that be a week before the election, days before the election, or the day of the election itself. The absence of such allegations undercuts Plaintiffs' ability to demonstrate a certainly impending injury. If Plaintiffs plan to send their ballots a week ahead of time, for example, there is an exceedingly small chance that they would not arrive in time to be counted. But if Plaintiffs plan to wait until the last possible moment, they would be self-inflicting their own injuries and thus would lack standing on that basis. *See Clapper*, 568 U.S. at 416 (plaintiffs "cannot manufacture standing merely by inflicting harm on themselves"). Absent any concrete allegations about when they plan to mail their ballots, Plaintiffs cannot establish an injury that is "*certainly* impending." *Id.* at 409.

*Second*, the individual plaintiffs have not established that the means of voting available to them are insufficient to enable them to cast a ballot. While Plaintiffs insist that they need maximum time to vet candidates, they can request their ballot as early as possible, and those who will be present in the state in which they are voting can drop their ballots off at a drop-box to ensure they are counted.[8] If they have a medical condition that prevents them from dropping off

---

[8] Both Pennsylvania and New Mexico provide for both in-person drop off (with the assistance of another individual, if necessary) and drop-boxes. *See* Votes PA, *Where do I return my ballot or vote in person?* ("Pennsylvania voters have options on how to return their mail ballot: by mail, at

their ballots at a drop-box, they can request assistance with that process.  Any allegation that they would nonetheless delay *and then* vote by mail instead of using a drop box, despite their speculative fears about the potential consequences, would be a self-inflicted injury that fails to establish standing.  *See Clapper*, 568 U.S. at 416.  Moreover, to the extent the individual plaintiffs will not be present in the state in which they are voting on or near Election Day, the extraordinary measures they seek—which are focused on ballots that are deposited locally (*i.e.*, by allowing for local turnaround or hub-and-spoke of locally-mailed ballots)—would in no way remedy their purported, self-inflicted injury.

*Third*, even if the individual plaintiffs mail their ballots at or near the deadline, there is no indication that the delivery of *their* ballots in particular will be delayed unless USPS adopts the Georgia measures.  Mot. 31.  As explained above, Plaintiffs cite no evidence suggesting that the potential benefits of implementing the Georgia measures specifically in all future elections outweigh their risks.  And even assuming that the measures may speed up delivery of some ballots in some circumstances, the individual plaintiffs have not even attempted to show that the measures would affect all (or even most) Election Mail.  If a voter chooses to wait until the day a ballot is due, for example, even the Georgia measures would not necessarily ensure that the ballot is delivered on time to be counted.  *See, e.g.*, Tr. of Oct. 30, 2020 Status Conf. (Testimony of Ms. Seaver), ECF No. 131, 20:17-23.  Accordingly, the individual plaintiffs' injury theory relies upon a "speculative chain of possibilities" (*i.e.*, that they will request their ballot late, return it late, face

---

a drop box, at their county election board, or other officially designated location."), https://www.votespa.com/Voting-in-PA/pages/drop-box.aspx (last accessed Apr. 8, 2021); Returning Your Absentee Ballot (New Mexico voters can return their ballots by mail, by hand delivery, or by drop box), https://www.sos.state.nm.us/voting-and-elections/voter-information-portal/returning-your-absentee-ballot/ (last accessed Apr. 8, 2021).  Plaintiffs put forward no evidence that they cannot avail themselves of these facilities.

a mail delay caused by the failure to implement the Georgia measures, and have their ballot rejected due to the delay) that is insufficient for standing. *Clapper*, 568 U.S. at 414.

### B.  Plaintiffs Are Unlikely to Succeed on the Merits of Their *Anderson-Burdick* Right-to-Vote Claim

Should this Court reach the merits, Plaintiffs assert a remarkable new constitutional theory in their most recent motion.  In their view, the U.S. Constitution requires USPS to implement a host of additional measures in the last few days before *every* local, state, and federal election— including a parallel ballot delivery system in the last four days before an election, which bypasses the ordinary, established, and auditable processes.  The Constitution, Plaintiffs say, requires this regardless of the cost or risk involved in order to protect voters who mail their ballots immediately before the deadline for their ballot's receipt.  But Plaintiffs are not challenging a decision that directly interferes with their right to vote, nor have they alleged that USPS is acting (or failing to act) with the intent to interfere with that right.  Plaintiffs have no support for their exceptional claim, which would fundamentally change the way that the Postal Service has historically operated, effectively establishing an entirely new category of mail by judicial order, rather than the process that Congress established.  This Court should decline their invitation to create a new, undefined, constitutional right in the context of a mandatory preliminary injunction.

To begin, Plaintiffs fail to establish that the Supreme Court's *Anderson-Burdick* framework, which courts have used to evaluate the constitutionality of state election laws, applies to federal policies and practices (or the lack thereof) that may indirectly affect state or local election laws.  It does not, as such a result would lead to perverse results that would submit any number of routine federal activities to constitutional scrutiny simply because they might have an incidental effect on individuals who are voting.  Precedent does not support such a conclusion.  But even if *Anderson-Burdick* does apply, USPS easily satisfies it.

1.   ***Anderson-Burdick*** **Applies Only to Election Laws, Not Internal Government Operations That Have Only an Incidental Effect on Voters**

The *Anderson-Burdick* test arises from a body of precedent concerning the constitutionality of state election laws.  Although the legal bases for an *Anderson-Burdick* claim are the First and Fourteenth Amendments, the test eschews the standard analyses applicable to claims under these provisions.  *See Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997).  Instead, the test generally requires the Court to "weigh the 'character and magnitude' of the burden [a] State's rule imposes on those rights against the interests the State contends justify that burden."  *Id.* (quoting *Burdick v. Takushi*, 504 U.S. 428, 434 (1992)).

Multiple cases, including *Anderson* and *Burdick*, confirm that this test applies only to election laws; *e.g.*, laws which "govern[] the registration and qualifications of voters, the selection and eligibility of candidates, or the voting process itself."  *Anderson v. Celebrezze*, 460 U.S. 780, 788 (1983).  *Anderson* expressly indicated that its balancing test applies to "Constitutional challenges to specific provisions of *a State's election laws*."  *Id.* at 789 (emphasis added).  Likewise, *Burdick v. Takushi* confirmed that the test set forth in *Anderson* applies when "[a] court [is] considering a challenge to *a state election law*."  504 U.S. 428, 434 (1992) (emphasis added); *see also id.* (quoting *Anderson* balancing test, and noting that "[u]nder this standard," the Court "inquir[es] into the propriety of *a state election law*." (emphasis added)).  The Supreme Court has repeatedly indicated that this test applies to actual election laws.  *See*, *e.g.*, *Timmons*, 520 U.S. at 358; *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 451–52 (2008).

In its order granting the first preliminary injunction, the Court noted that "[w]hether . . . [it] should consider Plaintiffs' claim under the *Anderson-Burdick* framework is not so straightforwardly dismissed."  *Vote Forward*, 2020 WL 5763869, at *7.  The Court, nonetheless, concluded that the framework applied.  Defendants respectfully submit that this Court's September

26

2020 conclusion ought not apply here.  First, the Court noted that courts have applied *Anderson-Burdick* to challenges to the District of Columbia's voting practices.  *See, e.g.*, *id.* at *7 (citing *Libertarian Party v. D.C. Bd. of Elections & Ethics*, 682 F.3d 72, 73-74 (D.C Cir. 2012); *Turner v. D.C. Bd. of Elections & Ethics*, 77 F. Supp. 2d 25, 20 (D.D.C. 1999)).  But both of these cases involved direct election regulations: whether the total number of votes received by a candidate must be released, as in *Libertarian Party*, or whether the District could be barred from certifying the results of a local referendum, as in *Turner*.  Defendants do not dispute that *Anderson-Burdick* may apply to federal laws so long as they are *election* laws—laws that "govern[] the registration and qualifications of voters, the selection and eligibility of candidates, or the voting process itself." *Anderson*, 460 U.S. at 788.

This Court further noted that "[c]ourts have also applied the *Anderson-Burdick* balancing test in the context of non-election laws."  *Vote Forward*, 2020 WL 5763869, at *7 (citing *Monserrate v. N.Y. State Senate*, 599 F.3d 148 (2d Cir. 2010); *Peeper v. Callaway Cnty Ambulance Dist.*, 122 F.3d 619 (8th Cir. 1997); *Hussey v. City of Portland*, 64 F.3d 1260 (9th Cir. 1995)).  But none of the cases cited by the Court supports the application of *Anderson-Burdick* in the context presented by this case: whether USPS is required to adopt *additional policies* that might apply to mailed ballots, rather than actions that were intended to govern the right to vote directly.  Indeed, all three cases fit comfortably within *Anderson-Burdick*'s framework.  *Monserrate* involved voters who were challenging a State's decision to expel a candidate that they had voted for, *see* 599 F.3d at 153-154—it was a law "govern[ing] . . . the . . . eligibility of candidates," and thus constituted an election law, *Anderson*, 460 U.S. at 788.  Moreover, the Second Circuit did *not* hold that *Anderson-Burdick* applied in all cases involving elections, even tangentially; rather, it merely held that "[t]he district court did not err in declining to apply strict scrutiny," and noted that the

framework could apply in both "pre-vote" and "post-vote" cases.  *Monserrate*, 599 F.3d at 154-55.  Defendants contest neither conclusion here.  *Peeper* involved a candidate restriction, *see Peeper*, 122 F.3d at 622-23, which similarly implicates *Anderson*'s candidate eligibility restriction. And *Hussey* involved a requirement that "non-residents consent to [municipal] annexation [i.e., cast their vote in a certain way] as a condition of receiving a subsidy," which the Ninth Circuit found was the "constitutional equivalent" of a restriction on voting.  *Hussey*, 64 F.3d at 1262, 1264.  In other words, *Hussey* involved a straightforward restriction on voting, in the form of a benefit (a subsidy) that was conditioned on voting in a certain way, which is a restriction on an individual's freedom to cast their vote that is clearly within the core of *Anderson-Burdick*.

This case does not involve a comparable restriction on candidacy or voting; indeed it does not implicate any decision intended to govern the right to vote or means of voting.  Nor do Plaintiffs cite any cases that apply *Anderson-Burdick* to non-election operations of the sort at issue here.  In holding that *Anderson-Burdick* applied, this Court noted earlier that the previous USPS policy "will invariably impose some burden upon individual voters," *Vote Forward*, 2020 WL 5763869, at *8 (quoting *Libertarian Party*, 682 F.3d at 73-74).  But, respectfully, this standard, which derives from a sentence in *Burdick* noting that *all* election laws impose some burden on voters, *see Burdick*, 504 U.S. at 433-34, proves too much.  Plaintiffs' theory would mean that *any* deficiency in USPS service could give rise to a constitutional voting rights claim.  Additionally, many other governmental policies may have an indirect impact on elections.  A federal policy that limits transit subsidies may impede persons' ability to travel to the polls; a zoning restriction may inhibit certain persons' ability to live closer to a polling station; inadequate government health care policy may ultimately preclude someone from voting either in-person *or* by mail due to an illness.

Taking the analysis to yet another extreme, Plaintiffs now suggest not only that an agency policy may be unconstitutional if it directly or indirectly burdens voting, but also that an agency may violate the constitution if it fails to adopt *new policies* if they would *help facilitate* voting. The potential impacts of such a conclusion are legion—and Plaintiffs suggest no limiting principle. Is it unconstitutional for the Postal Service to not provide same-day courier service, to allow ballots to be cast by mail at the last possible date?  Must the Postal Service stop processing other mail and focus on Election Mail to avoid a constitutional violation?   Are all public employers constitutionally required to give their employees Election Day off so they may vote? Are public authorities required to adopt a policy prohibiting road construction on Election Day, for fear that they might delay a voter's ride to the polls?  Certainly, the Postal Service is not the only agency— federal or state—that can adopt measures that facilitate voters' ability to cast a ballot under the available means of doing so. Accordingly, the *Anderson-Burdick* framework does not, and cannot, apply in the broad manner proffered by Plaintiffs, lest the exceptional application of the test becomes the norm.

To be clear, this is not to say that there is no potential constitutional remedy.  USPS is still subject to the First and Fifth Amendments.[9]  However, Plaintiffs have made no attempt to establish a standalone claim under either provision.  They have tried only to establish a claim under the *Anderson-Burdick* framework.  And this distinction is not just a formality.  There are meaningful differences between *Anderson-Burdick* and the standard requirements for First Amendment and equal protection claims.  *See*, *e.g.*, *Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1319 n.9 (11th Cir. 2019) ("Under *Anderson-Burdick*, it is not necessary for a plaintiff to show

---

[9] A claim against the federal government would proceed under the Fifth Amendment's equal protection component. *See Libertarian Party*, 682 F.3d at 73 (citing First and Fifth Amendments in applying *Anderson-Burdick*, because case involved District of Columbia instead of a State).

discriminatory intent," but "a traditional Equal Protection Clause claim is cognizable in the voting context" only "if the plaintiff alleges that discriminatory animus motivated the legislature to enact a voting law."), *denying mot. to vacate*,  *Democratic Exec. Comm of Fl. V. Nat'l Republican Senatorial Comm.* 950 F.3d 790 (11th Cir. 2020).

Accordingly, since this case does not concern any law that directly regulates elections, Plaintiffs' claim fails.  The only relevant "election laws" here are those of the States that set deadlines for the receipt of mail-in ballots for a date that is on or before Election Day.  If Plaintiffs believe that these election systems may compromise persons' ability to vote due to alleged deficiencies in Postal Service performance, Plaintiffs could bring claims against these State governments, seeking an extension of the ballot receipt deadline, or broader, alternative means of voting (*e.g.*, drop boxes or ballot pick-up services).  The remedy is not, however, to mandate that USPS take additional actions to compensate for what Plaintiffs believe may be inadequate procedures in those states.

## 2.   Even if *Anderson-Burdick* Applies, Defendants Have Satisfied Its Requirements

When applying the *Anderson-Burdick* balancing framework, the Court must "first consider the character and magnitude of the asserted injury to the rights . . . that the plaintiff seeks to vindicate." *Anderson*, 460 U.S. at 789.  The "rigorousness of [the Court's] inquiry into the propriety of a state election law"— assuming, *arguendo*, that USPS policy changes may somehow constitute "election law[s]"—"depends upon the extent to which the challenged regulation burdens First and Fourteenth Amendment rights."  *Burdick*, 504 U.S. at 434.  Defendant must establish a compelling government interest only if plaintiffs' "rights are subjected to 'severe' restrictions," *id.* (quoting *Norman v. Reed*, 502 U.S. 279, 289 (1992)), such as those that effectively "disenfranchise [a] class" of persons, *Rosario v. Rockefeller*, 410 U.S. 752, 757 (1973).  Otherwise, for minimal,

"nondiscriminatory restrictions," the defendant need only establish an "important regulatory interest[]." *Burdick*, 504 U.S. at 434 (citation omitted).

### i. The challenged policy imposes only an indirect and minimal burden, if any burden at all, on plaintiffs voting rights

Plaintiffs argue that the Postal Service's practices "severely burden the right to vote." Mot. at 25. But this argument lacks merit, as it ignores the fact that a "severe burden" is one that places onerous burdens on plaintiffs' right to vote. *See, e.g.*, *Gottlieb v. Lamont*, 465 F. Supp. 3d 41, 48 (D. Conn. 2020) (describing a severe burden as something that amounts to the plaintiffs' "exclusion or virtual exclusion from the ballot") (quoting *Libertarian Party of Ky. v. Grimes*, 835 F.3d 570, 574 (6th Cir. 2016)), *denying reconsideration* 2020 WL 6557952 (D. Conn. July 2, 2020).

Here, the fact that the Postal Service is not complying with Plaintiffs' demands for a mandatory, parallel Election Mail delivery system does amount to a severe burden on the right to vote. Plaintiffs can vote in person, a burden that may be lighter in May or June 2021 than it was in October 2020. Even if the pandemic remains a concern, the individual plaintiffs can also cast their ballots by returning them to the county boards of elections or by returning their ballots to a drop box or drop-off site, without reliance on USPS.[10] *See, e.g.*, *New Ga Project v. Raffensperger*, 976 F.3d 1278, 1281 (11th Cir. 2020) (rejecting the conclusion that there was a severe burden on the right to vote because "Georgia has provided numerous avenues to mitigate chances that voters will be unable to cast their ballots," including "return[ing] their ballots through the mail, hand-delivery, or a drop box"); *Black Voters Matter Fund v. Raffensperger*, 478 F. Supp. 3d 1278, 1323 (N.D. Ga. 2020) (restriction is not severe if there are "potential alternatives"), *appeal filed*, *Black*

---

[10] As noted, both Pennsylvania and New Mexico provide for both in-person drop off (with the assistance of another individual, if necessary) and drop-boxes.

*Voters Matter Fund v. Sec'y of State*, No. 20-13414 (11th Cir. Sept. 9, 2020); *Memphis A. Phillip Randolph Inst. v. Hargett*, 485 F. Supp. 3d 959, 987 (M.D. Tenn. 2020) (burden is not severe if there are alternative voting procedures to the one challenged), *appeal filed*, No. 20-6141 (6th Cir. 2020).   And, of course, plaintiffs can simply mail their ballots slightly earlier if they are worried about a potential mail delay.   *See New Ga. Project*, 976 F.3d 1282 ("Voters must simply take reasonable steps and exert some effort to ensure that their ballots are submitted on time, whether through absentee or in-person voting.").

Plaintiffs' sole theory for why USPS's failure to accede to their demands constitutes a severe burden is that "[v]oters have a constitutionally protected interest in being able to vote the Saturday before the election."  Mot. at 28.  There is no authority for such a claim.  They cite *McInteyre v. Ohio Elections Commission*, 514 U.S. 334, 346-47 (1995), which noted only that "the ability of the citizenry to make informed choices among candidates for office is essential . . . ."  *Id.* at 346-47 (quoting *Buckley v. Valeo*, 424 U.S. 1, 14-15 (1976)).  But this proposition was in the context of a regulation of pure political speech; it had nothing to do with the timing of voting. Plaintiffs also rely on *Anderson*, where the Supreme Court noted that "[i]n election campaigns, particularly those which are national in scope, the candidates and the issues simply do not remain static over time."  *Anderson*, 460 U.S. at 790.  But this was in the context of a national (*i.e.,* Presidential campaign), not a more localized election, as here, and *Anderson* concerned a filing deadline that was nearly *eight months* before an election.  It said nothing about when a voter's right to cast a ballot in the few days leading up to the election might be implicated.  There is thus no authority supporting the proposition that Plaintiffs have a constitutional right to cast their ballots by mail the Saturday before a Tuesday election.

Rather, all available authority supports the opposite conclusion: that there is no such right to expect an absentee ballot will be counted contrary to state law regardless of how soon it was mailed before an election.  In *Burdick*, the Supreme Court noted that a restriction on write-in candidates was a "very limited" burden" because there remained "easy access to the ballot [through a petition process] until the cutoff date for the filing of nominating petitions, two months before the primary.  Consequently, any burden on voters' freedom of choice and association is borne only by those who fail to identify their candidate of choice until days before the primary." *Burdick*, 504 U.S. at 436-37 (quoting *Storer v. Brown*, 415 U.S. 724, 736 (1974)).  Indeed, those who wait to "mak[e] a late rather than an early decision" are entitled to "little weight." *Id.* at 437 (quoting *Storer v. Brown*, 415 U.S. 724, 436 (1974)); *see also id.* at 438 ("Reasonable regulation of elections . . . *does* require [voters] to act in a timely fashion if they wish to express their views in the voting booth."); *Rosario*, 410 U.S. at 758 (failure to comply with state voting deadline was not caused by deadline but "by their own failure to take timely steps to effect their enrollment.").

Indeed, multiple Circuit courts have recently rejected similar theories suggesting that voters have a right to request and mail a ballot at any particular time, and have expressly affirmed voting deadlines that require an earlier vote.  *See*, *e.g.*, *Common Cause v. Lawson*,  977 F.3d 633, 664-65 (7th Cir. 2020) (rejecting the theory "that the Constitution entitles all persons who cast absentee ballots to be free of any risk that the ballot will not count, even if they mail their ballots close to Election Day," and noting that "[p]eople who worry that mail will be delayed during the pandemic can protect themselves by using early in-person voting or posting their ballots early"); *Mays v. LaRose*, 951 F.3d 775, 792 (6th Cir. 2020) (rejecting theory that Ohio must allow for mail-in voting registration fewer than three days before the election since "there is no constitutional right to an absentee ballot," "Ohio's deadline . . . is nondiscriminatory," and although "this law

may eliminate opportunities to vote for electors who fail to register before the deadline," it "imposes only a minimal burden on the right to vote"); *Org. for Black Struggle v. Ashcroft*, 978 F.3d 603, 608 (8th Cir. 2020) (rejecting challenge to Missouri law that required mail-in ballots to be sent via USPS, concluding that it "impose[d] a de minimis burden on voters if they are concerned that their ballots will not be received by the election board on time" since "they simply may make arrangements to put completed ballots in the mail earlier"); *New Ga. Project*, 976 F.3d at 1281–82 (rejecting challenge to Georgia's ballot-receipt deadline because, regardless of "delays in the postal service," voters "receive the ballots as early as 49 days before the election" and "can return their ballots through the mail, hand-delivery, or a drop box," and so the law required "[v]oters" to "simply take reasonable steps and exert some effort to ensure that their ballots are submitted on time").

Accordingly, USPS's failure to adopt extraordinary election mail procedures for every election does not impose a severe burden on the right to vote. Indeed, as the above cases—which all involve claims against state and local officials—illustrate, the proper defendant in such an action would be the state or local entity that is administering the election, not USPS, and the proper target would be the ballot receipt deadline, not USPS's alleged failure not to affirmatively enact extraordinary measures to accommodate the various policy choices of the states.

### ii. USPS's regulatory interests outweigh any burdens that exist here.

"[W]hen a state election law provision imposes only 'reasonable, nondiscriminatory restrictions' upon the First and Fourteen Amendment rights of voters," in contrast to a severe restriction, "'the State's important regulatory interests are generally sufficient to justify' the restrictions." *Burdick*, 504 U.S. at 434 (quoting *Anderson*, 460 U.S. at 788); *see also Libertarian Party*, 682 F.3d at 74 (drawing contrast between laws that subject voters rights to "severe restrictions" and those impose only "reasonable, nondiscriminatory and need only be justified by

34

the government's "important regulatory interests").  USPS's determination may therefore survive an *Anderson-Burdick* inquiry if justified by "general regulatory interests," which includes a desire to minimize "administrative costs." *Libertarian Party*, 682 F.3d at 77.  This is true even if the plaintiff might "benefit" from the challenged policy being removed.  *See id.* at 75 (noting that a minor party "would benefit from knowing how many people voted for its candidate," but the District's refusal to provide such vote was merely "inconvenient" and thus subject to the "important regulatory interest" standard).  Indeed, there are multiple reasons why the Postal Service's interests justify its chosen course of action.

*First*, Plaintiffs' proposal introduces risk into the Election Mail system.  Rather than using standard Postal Service processing and delivery procedures, including the use of machines that can track mail, regular routes, and other well-established procedures, Plaintiffs ask this Court to require the Postal Service to jettison those practices and instead use a hub-and-spoke system (where relevant personnel hand cull and carry ballots outside of the existing, trackable system) or engage in local turnaround (where individual offices store and deliver mail to election officials directly, rather than routing it through the normal processing system).  Moreover, existing procedures are easily auditable; *ad hoc* practices that go outside the norm are not.  *See, e.g.*, Ex. 1, OIG Audit Report (Mar. 5, 2021), at 1 (noting that USPS can only track ballots "if they have barcode mail tracking technology and receive required processing scans").  Bypassing normal procedures introduces the risk that ballots will be lost during that process.  *See, e.g.*, Tr. of Oct. 31, 2020 Status Conf. (Testimony of Mr. Barber) at 40:5-9 ("I can tell you that our normal process, a well-established process is our most effective and assured way to ensure that ballots that entered the Postal Service timely get delivered timely.  The additional efforts do add risks to the ballots."); *id.* at 41:24-42:3 ("[O]ur best opportunity to get the ballots to their destination timely is to use our

time tested processes and procedures.  Anytime we change out of that process that we've been doing adds risk.").

The Postal Service has a concrete interest in avoiding unnecessary risk to the mail, including Election Mail.  To be clear, there may be individual circumstances where such measures may or may not be appropriate (based on the expected volume of ballots, the scope of geographic delivery, or even on more mundane factors, such as when local boards of election are open).  *See, e.g.*, Ex. 5, Lamb Decl. ¶ 7 (noting reasons why the same level of extraordinary measures are not anticipated to be necessary for the New Mexico Special Election).  However, the Postal Service should be permitted to implement such measures when the career professionals deem those appropriate; they should not be imposed at Plaintiffs' request on a blanket basis.  *See, e.g.*, Order, at 6, ECF No. 88 (Apr. 3, 2021), *New York v. Trump*, No. 20-cv-2340-EGS (D.D.C.) ("Congress did not intend for the courts to micromanage the operations of the USPS.").  Moreover, USPS does not implement election protocols in a vacuum, they are implemented based on communication with local boards of election, and USPS "do[es] [its] best to work with them to provide timely delivery of ballots according to their needs and [its] ability."  Ex. 5, Lamb. Decl. ¶ 3; *see also id.* ("The needs of different boards are often different from one another so that a 'one size fits all' way of handling ballot delivery often is not a satisfactory way of addressing timely mail delivery.  We have to work individually with Secretaries of State and boards at the local level to determine the best solutions.").  Plaintiffs' proposal would override the judgments of *both* the USPS and its state and local partners about what measures are most appropriate.

*Second*, Plaintiffs' proposal invites significant burden as well as costs.  *See, e.g.*, Ex. 1, OIG Audit Report (Mar. 5, 2021), at 1 (noting that USPS had leveraged "high-cost efforts such as extra transportation and overtime" during the 2020 election").  Here, there are burdens associated

with the extraordinary measures, such as the need to modify relevant schedules for each facility, additional training, adjustment of machine requirements, and pulling personnel from other critical tasks.  *See* Ex. 4, Glass Decl. ¶¶ 13-14; Ex. 6, Cook Decl. ¶ 8.  Indeed, some of the requirements that Plaintiffs seek may simply be impossible to administer.  For example, they seek to require that "[b]eginning three days before a relevant election, USPS shall place all ballots identified in any processing plant that are subject to a three-day service standard directly into the Express Mail Network."  Mot. at 2.  But how are plant employees going to know what is a "relevant election"— this would require them to identify not only that a ballot is a piece of Election Mail (which can be visually identified by the Election Mail logo), but that it is going to a specific jurisdiction that is having an election within three days.  Given the number of facilities throughout the country, the number of elections, and the diversity of mailpiece design, this is an impossible requirement to do with the certainty required to comply with an injunction.

In response, Plaintiffs first argue that the Postal Service has not provided an in-depth cost-benefit analysis.  But this level of proof is not required.  Rather, "[f]or regulations that are not unduly burdensome, the *Anderson-Burdick* analysis never requires a state to actually *prove* 'the sufficiency of the evidence.'"  *Ohio Democratic Party v. Husted*, 834 F.3d 620, 632 (6th Cir. 2016) (quoting *Munro v. Socialist Workers Party*, 479 U.S. 189, 195 (1986)); *see also Timmons*, 520 U.S. at 364 ("Nor do we require elaborate, empirical verification of the weightiness of the State's asserted justifications.").  Regardless, the declaration from J. Michael Cook indicates "in off-cycle election years, . . . extraordinary measures may lead to inefficiencies, proving to be very costly, while providing little to no benefit."  Cook Decl. ¶ 9.  While Plaintiffs argue that the Postal Service adopted these measures before; *e.g.*, before the Georgia runoff elections in January 2021, that does

not mean that the measures impose no significant burden, and it certainly does not mean the Postal Service can (and must) keep bearing these costs for each subsequent election.

Ultimately, there is no limiting principle to Plaintiffs' current legal position, either in terms of what elections require these measures, or under what circumstances. Plaintiffs do not specify which elections they claim require these additional measures by Constitutional fiat.[11]  But there are hundreds, if not thousands, of state and local elections throughout the year.[12]  Requiring these measures in *all* of these elections would, in effect, require that these special procedures be in place almost every week, in different geographic regions and under different timing constraints. Indeed, as discussed above, it would potentially require all ballots be sent via Express Mail, since there is no obvious way to know if any particular ballot is being mailed within three-days of a state or local election. Such a decision would, in effect, create an entirely separate category of mail, without coordination with the Postal Regulatory Commission, the Postal Service's regulator, or the Congress.

Nor is it clear what the "trigger" for such a requirement would be. Plaintiffs point to the Postal Service's service performance scores, stating that "nearly one in five pieces of First-Class mail [is] delivered late." Mot at 30. But the Postal Service does not (and cannot) guarantee that every piece of mail is delivered on time; such a promise would be an impossibility given the size of the Postal Service's network. *See Nat'l Urban League v. DeJoy*, Civ. A. No. GLR-20-2391, 2020 WL 6363959, at *9 (D. Md. Oct. 29, 2020) ("The Court could no sooner order Defendants to restore on-time performance to 93.88% . . . than it could order a baseball player to achieve a

---

[11] Indeed, under Plaintiffs' theory, if there is a constitutional right to vote absentee as late as possible, that would presumably apply to every election.

[12] *See, e.g.*, Elections Calendar, https://ballotpedia.org/Elections_calendar#Upcoming_election_dates (last accessed Apr. 8, 2021).

.300 batting average over his next several games.  USPS's on-time performance score is an holistic measure that reflects the result of a combination of a host of factors, some internal to and controllable by USPS, and some external and outside of USPS's control.  The Court cannot require a party to meet a measure it can only partially control.").

Rather, service performance targets (such as 96 percent of First-Class Mail being delivered on time) are just that –a target or goal—not a legal requirement.  *See, e.g.*, Ex. 1, OIG Audit Report (Mar. 5, 2021), at 3 (noting that "the Postal Service has not met its First-Class Mail service goal in five years").  Moreover, ballots which often (but not always) can be tracked separately from other pieces of First-Class Mail, have historically had a higher service performance standard than regular First-Class Mail, including in the 2020 General Election.  *See id.*  Would the standard for triggering a constitutional remedial obligation be any ballots that could be delayed (*i.e.*, a service performance score of less than 100 percent)?  Would it be a service performance score lower than the stated goal (*i.e.*, 96 percent)?  Would it be a standard lower than the week of the Georgia Runoffs (63.9 percent)?  *See* USPS Service Performance for Market Dominant Products (Jan. 1, 2020 through Apr. 4, 2021) (attached as Ex. 2) at 4.  Would it be the "nearly one-in-five letters" standard, *i.e.*, (80 percent), that Plaintiffs put forward in their briefs?  Plaintiffs do not say.  Indeed, in the most recent week available, the service performance score for First-Class Mail was 87.19 percent.  *Id.*  Plaintiffs provide no guidance on how the Postal Service is to know when performance reaches a level that constitutionally requires it to impose these additional practices, which invites severe concerns about practicability.

Accordingly, the reasons for the USPS policy at issue are sufficient to justify the indirect, minimal burden it may impose on voters.  Plaintiffs are therefore unlikely to prevail on their *Anderson-Burdick* claim.[13]

## II.     PLAINTIFFS HAVE NOT ESTABLISHED IRREPARABLE HARM

Regardless of the merits of their claims, Plaintiffs cannot obtain an injunction without establishing that they are "likely to suffer irreparable harm in the absence of preliminary relief." *Winter*, 555 U.S. at 20.  This showing is not optional: "[t]he failure to demonstrate irreparable harm is 'grounds for refusing to issue a preliminary injunction, even if the other three factors . . . merit such relief.'"  *Nat'l Mining Ass'n v. Jackson*, 768 F. Supp. 2d 34, 50 (D.D.C. 2011) (quoting *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006)).  "In this Circuit, a litigant seeking a preliminary injunction must satisfy 'a high standard' for irreparable injury." *ConverDyn v. Moniz*, 68 F. Supp. 3d 34, 46 (D.D.C. 2014) (quoting *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297).  Plaintiffs must demonstrate that they face an injury that is "both certain and great; it must be actual and not theoretical."  *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985); *see also Power Mobility Coal. v. Leavitt*, 404 F. Supp. 2d 190, 203 (D.D.C. 2005) (plaintiff must show that injury is "imminent, certain and irreparable").  And because Plaintiffs are seeking a mandatory injunction that would alter the *status quo*, Plaintiffs must "show[] clearly that [they are] entitled to relief or that extreme or very serious damage will result from the denial of the injunction."  *Dallas Safari Club*, 453 F. Supp. 3d at 398 (citation omitted).  Plaintiffs have not made that showing here.

---

[13] This brief addresses the appropriate analysis of the facts of this case under the *Anderson-Burdick* test.  The Department of Justice reserves comment on whether any other law, practice, or procedure, in this jurisdiction or elsewhere, meets the *Anderson-Burdick* test or complies with federal statutes designed to protect the right to vote, such as the Voting Rights Act.

Again, the Court's conclusion that Plaintiffs demonstrated irreparable harm in their prior motion for a preliminary injunction is not controlling.  That decision concerned USPS's alleged "Postal Policy Changes" in the lead-up to the November 2020 national election.  *Vote Forward*, 2020 WL 5763869, at *10.  The Court concluded that Plaintiffs had provided sufficient evidence that the changes led to "delays in the delivery of mail" that created a "substantial risk that Plaintiffs will suffer an undue burden on their constitutional right to vote." *Id.* at *11.  Those changes remain enjoined, *see New York*, 2020 WL 5763775, at *2, and Plaintiffs now seek instead a mandatory injunction requiring USPS to adopt the Georgia measures in upcoming elections in Texas, Pennsylvania, and New Mexico.  Thus, they must demonstrate that the Georgia measures themselves are necessary to prevent an "imminent, certain, and irreparable" injury.  *Power Mobility Coal.*, 404 F. Supp. 2d at 203.

Plaintiffs do not come close to making such a showing.  As explained above, Plaintiffs have failed to show a substantial likelihood that they will suffer any harm at all, let alone a harm that is "imminent, certain, and irreparable." *See supra* Section I.A.1.  Vote Forward maintains that it will suffer irreparable injury unless USPS adopts the Georgia measures because otherwise it will need to "send [get-out-the-vote] letters early in order to ensure they arrive in time for voters to cast their ballots by mail and have them counted."  Mot. at 35.  But even assuming that Vote Forward has established a non-speculative likelihood of such injury that is traceable to the extraordinary measures (which it has not), the fact that Vote Forward might need to send mailings one week earlier, or answer questions from voters, could hardly be described as irreparable, much less certain and great.  Vote Forward itself has no right to vote, let alone a right that is threatened by the actions (or inactions) of the Postal Service that are at issue in the present motion. *See* Mot. at 35; *supra* Section I.A.1.

The individual plaintiffs fare no better at establishing an "imminent, certain, and irreparable" injury. Again, the individual plaintiffs have not established a substantial likelihood that they will suffer any harm, much less irreparable harm. *See supra* Section I.A.2. Because none of the individual plaintiffs resides or intends to vote in Texas, the individual plaintiffs cannot show any irreparable injury related to that election. And, like Vote Forward, the individual plaintiffs' theory of injury as to the other two states relies on a series of assumptions that Plaintiffs have not established through allegations or evidence. The individual plaintiffs have not established that they will delay requesting and returning their ballots to such an extent that their ballots will be at risk of not being counted; nor have they established why they need to wait to the last minute to vote by mail. Even if the individual plaintiffs had made those showings, they have not presented evidence that their ballots in particular will be delayed unless USPS adopts the Georgia measures. *See supra* Section I.A.2. And even if Plaintiffs had established all of the above, they have made no attempt to show that having to send their ballots in a few days earlier amounts to the kind of "extreme or very serious damage" that would warrant this Court entering a mandatory injunction ordering USPS to adopt Plaintiffs' preferred measures. *Dallas Safari Club*, 453 F. Supp. 3d at 398 (citation omitted). Accordingly, none of the Plaintiffs has established a likelihood of any harm, let alone irreparable harm.

## III.    THE BALANCE OF THE EQUITIES DOES NOT JUSTIFY RELIEF.

A preliminary injunction is also not appropriate because the balance of the equities and public interest weigh in Defendants' favor. A party seeking a temporary restraining order or preliminary injunction must demonstrate "that the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Winter*, 555 U.S. at 20. "These factors merge when the Government is the opposing party." *Nken*, 556 U.S. at 435.

Here, the public interest is not served by Plaintiffs' proposed mandatory injunction. Plaintiffs seek to interpose themselves as the directors of the Postal Service's election policies, without any demonstrated expertise, and to enlist this Court as a manager of the Postal Service's day-to-day operations. This is improper, as this Court has recognized. *See, e.g., Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 66-67 (2004) (noting the importance of "protect[ing] agencies from undue judicial interference with their lawful discretion, and to avoid judicial entanglement in abstract policy disagreements which courts lack both expertise and information to resolve."); *see also Vote Forward*, 2020 WL 5763869, at *13 (noting that previous injunction does not "contemplate that the Court would become involved in overseeing the day-to-day operations of the USPS."); Order, at 6, ECF No. 88 (Apr. 3, 2021), *New York v. Trump*, No. 20-cv-2340-EGS (D.D.C.) ("Congress did not intend for the courts to micromanage the operations of the USPS."). Moreover, Plaintiffs' proposal is not without consequence—it would introduce risk into the Postal Service's processing of Election Mail, potentially threatening the votes of third-parties not before this Court in a circumstance where the Postal Service had already determined the measures to be unnecessary. It would also override and preempt conversations and context-specific arrangements that are made between local postal officials and local government personnel. *See, e.g.*, Ex. 5, Lamb Decl. ¶¶ 6-7. This Court should decline Plaintiffs' invitation to fashion their own postal operations in the days before upcoming elections.[14]

---

[14] Plaintiffs' proposed order fails to comply with Federal Rule of Civil Procedure 65. Rather, it seeks to require the Postal Service to process ballots "consistent with the Agreed-To Measures, as defined in Plaintiffs' Motion." *See* Proposed Order, ECF No. 175-26. Such an order does not comply with Rule 65(d)(1)(C), which requires an order to "describe in reasonable detail—*and not by referring to the complaint or other document*—the act or acts restrained ore required." Fed. R. Civ. P. 65(d)(1)(C) (emphasis added). Nor does a reference to actions that are "consistent with" those measures provide adequate specificity to provide clear guidance on proper actions. *See* Fed. R. Civ. P. 65(d)(1)(B) (preliminary injunction order must "state its terms specifically").

## CONCLUSION

The Court should deny Plaintiffs' motion for a preliminary injunction.


Dated:  April 9, 2020                    Respectfully submitted,

                                         BRIAN M. BOYNTON
                                         Acting Assistant Attorney General

                                         ERIC R. WOMACK
                                         Assistant Director, Federal Programs Branch

                                         */s/ Joseph E. Borson*
                                         JOSEPH E. BORSON (Va. Bar No. 85519)
                                         KUNTAL CHOLERA
                                         ALEXIS J. ECHOLS
                                         DENA M. ROTH
                                         JOHN ROBINSON
                                         Trial Attorneys
                                         U.S. Department of Justice
                                         Civil Division, Federal Programs Branch
                                         1100 L. Street, NW
                                         Washington D.C. 20005
                                         (202) 514-1944
                                         Joseph.Borson@usdoj.gov

                                         *Attorneys for Defendants*