

# Transcript of Robert Justin Glass, Designated Representative

**Date:** December 15, 2020
**Case:** Vote Forward, et al. -v- Dejoy, et al.

**Planet Depos**
**Phone:** 888.433.3767
**Email::** transcripts@planetdepos.com
www.planetdepos.com

Transcript of Robert Justin Glass, Designated Representative    1 (1 to 4)
Conducted on December 15, 2020

```
                                                          1
 1         IN THE UNITED STATES DISTRICT COURT
 2             FOR THE DISTRICT OF COLUMBIA
 3
 4   VOTE FORWARD, et al,
 5             Plaintiffs,
 6     vs.                Case No. 1:20-cv-02405
 7   LOUIS DEJOY, in his official
 8   capacity as the Postmaster
 9   General, and the UNITED
10   STATES POSTAL SERVICE,
11             Defendants.
12   _____
13
14     30(b)(6) DEPOSITION OF UNITED STATES POSTAL SERVICE
15       through its representative ROBERT JUSTIN GLASS
16                    via videoconference
17              Tuesday, December 15, 2020
18                    10:07 a.m. EST
19   Job No.:  341375
20   Pages:  1 - 297
21   Stenographically Reported By:
22   Alison C. Webster, CSR-6266, RPR, RMR, CRR, RDR
```

```
                                                          2
 1              A P P E A R A N C E S
 2
 3   ON BEHALF OF THE VOTE FORWARD PLAINTIFFS
 4       SARAH SUWANDA, ESQUIRE
 5       MEGAN C. KEENAN, ESQUIRE
 6       SHANKAR DURAISWAMY, ESQUIRE
 7       Covington & Burling, LLP
 8       850 Tenth Street, NW
 9       One CityCenter
10       Washington D.C. 20001
11       202.662.5619
12       ssuwanda@cov.com
13       mkeenan@cov.com
14       sduraiswamy@cov.com
15   ON BEHALF OF THE VOTE FORWARD PLAINTIFFS
16       ROBERT D. FRAM, ESQUIRE
17       Covington & Burling, LLP
18       415 Mission Street
19       Suite 5400
20       San Francisco, California 94105
21       415.591.6000
22       rfram@cov.com
```

```
                                                          3
 1          A P P E A R A N C E S   C O N T I N U E D
 2
 3   ON BEHALF OF THE NAACP PLAINTIFFS
 4       SAMUEL SPITAL
 5       NAACP Legal Defense & Educational Fund, Inc.
 6       700 14th Street N.W.
 7       Suite 600
 8       Washington, D.C. 20005
 9       202.682.1300
10       sspital@naacpldf.org
11
12   ON BEHALF OF THE NAACP PLAINTIFFS
13       ALLISON M. ZIEVE
14       Public Citizen Litigation Group
15       215 Pennsylvania Avenue SE
16       Washington, D.C. 20003
17       202.546.4996
18       azieve@citizen.org
```

```
                                                          4
 1          A P P E A R A N C E S   C O N T I N U E D
 2
 3   ON BEHALF OF THE DEFENDANTS
 4       JENNIFER B. DICKEY, ESQUIRE
 5       JOSHUA GARDNER, ESQUIRE
 6       ALEXIS ECHOLS, ESQUIRE
 7       JOHN ROBINSON, ESQUIRE
 8       KUNTAL CHOLERA, ESQUIRE
 9       U.S. Department of Justice
10       Civil Division
11       950 Pennsylvania Avenue NW
12       Arlington, Virginia 20530
13       703.305.0289
14       jennifer.b.diskey@usdoj.gob
15       joshua.e.gardner@usdoj.gov
16       alexis.j.echols@usdoj.gov
17       john.j.robinson@usdoj.gov
18       kuntal.cholera@usdoj.gov
```

---

Page 5

```
 1         APPEARANCES CONTINUED
 2  ON BEHALF OF THE DEFENDANTS
 3      CAROLINE BROWNLIE, ESQUIRE
 4      WENDY HARRIS, ESQUIRE
 5      ALICE COVINGTON, ESQUIRE
 6      MICHAEL WEAVER, ESQUIRE
 7      STEPHAN BOARDMAN, ESQUIRE
 8      United States Postal Service
 9      475 L'Enfant Plaza SW
10      Washington, D.C. 20590
11      800.275.8777
12      caroline.r.brownlie@usps.gov
13      wendy.a.harris@usps.gov
14      alice.l.covington@usps.gov
15      michael.d.weaver@usps.gov
16      stephan.j.boardman@usps.gov
17
18
19  ALSO PRESENT:
20  Morenike Fajana, Esquire
21  Bronwyn James, Esquire
22  Andrew Whitner, video technician
```

Page 6

```
 1              TABLE OF CONTENTS
 2
 3  Witness                                Page
 4  ROBERT JUSTIN GLASS
 5
 6  EXAMINATION
 7  BY MS. SUWANDA:                         11
 8  EXAMINATION
 9  BY MS. KEENAN:                         160
10  EXAMINATION
11  BY MR. SPITAL:                         273
12  EXAMINATION
13  BY MS. DICKEY:                         289
14  RE-EXAMINATION
15  BY MS. KEENAN:                         292
16  RE-EXAMINATION
17  BY MR. SPITAL:                         292
```

Page 7

```
 1                  EXHIBITS
 2
 3  Exhibit                                Page
 4
 5  (Exhibits attached to transcript.)
 6
 7  EXHIBIT 1                               15
 8  Plaintiffs' Notice of 30(b)(6)
 9  Deposition of United States Postal
10  Service Polices Impacting The Delivery
11  of Georgia Election Mail
12  EXHIBIT 2                               34
13  ECF 149.2 data
14  EXHIBIT 3                               39
15  ECF 149.3 data
16  EXHIBIT 4                               41
17  ECF 149.4 data
18  EXHIBIT 5                               41
19  USPS letter, Subject: Supplemental
20  Guidance Memorandum, VF200015
```

Page 8

```
 1          EXHIBITS CONTINUED
 2  EXHIBIT 6                               98
 3  Subject: Extraordinary Measures -
 4  Return Ballot Mail Processing Policy
 5  for the last week of the 2020 Election
 6  EXHIBIT 7                              121
 7  ECF 149.4 data
 8  EXHIBIT 8                              137
 9  USPS letter, Subject: Extraordinary
10  Measures Memorandum, VF200030
11  EXHIBIT 9                              163
12  ECF 152.4 data
13  EXHIBIT 10                             180
14  ECF 149.4 data
15  EXHIBIT 11                             192
16  Email, Extraordinary Measures - Georgia
17  Senate Runoff Elections
18  EXHIBIT 12                             228
19  Email, Georgia Runoff Extraordinary
20  Measures Letter and Priority Express
21  EXHIBIT 13                             247
22  USPS Variance Sorted data
```

Page 9

```
1        EXHIBITS CONTINUED
2  EXHIBIT 14                                255
3  Email, FW: Georgia Elections
4  EXHIBIT 15                                271
5  Fact sheets
6  EXHIBIT 16                                282
7  Election Inbound ballots - On or after
8  10/24/2020 - No Destination Processing
```

Page 10

```
1         DEPOSITION OF ROBERT JUSTIN GLASS
2              Tuesday, December 15, 2020
3
4         STENOGRAPHER:  The attorneys participating
5  in this deposition acknowledge that I will be
6  reporting this deposition remotely and that the
7  witness has verified that he is Robert Justin Glass.
8  In lieu of an oath administered in person, the witness
9  will verbally declare his testimony in this matter is
10 under penalty of perjury.
11        The parties and their counsel consent to
12 this arrangement and waive any objections to this
13 manner of reporting or admissibility of the
14 transcript.
15        Would lead counsel please indicate their
16 agreement by stating your name and your agreement on
17 the record, starting with scheduling counsel.
18        MS. SUWANDA:  Sarah Suwanda, for the Vote
19 Forward plaintiffs.  We agree.
20        MS. DICKEY:  Jennifer Dickey, for the
21 defendants.  We agree.
22        STENOGRAPHER:  All right.  Mr. Glass, would
```

Page 11

```
1  you please raise your right hand?
2         Do you swear or affirm the testimony you
3  are about to give in this matter will be the truth,
4  the whole truth, and nothing but the truth?
5         MR. GLASS:  Yes, I do.
6         STENOGRAPHER:  Thank you.
7         You may proceed.
8         ROBERT JUSTIN GLASS,
9  was thereupon called as a witness herein, and after
10 having first been duly sworn to testify to the truth,
11 the whole truth and nothing but the truth, was
12 examined and testified as follows:
13                    EXAMINATION
14 BY MS. SUWANDA:
15 Q.  Good morning, Mr. Glass.
16 A.  Good morning.
17 Q.  My name is Sarah Suwanda.  I work for the law firm of
18     Covington & Burling, and my office represents the Vote
19     Forward plaintiffs in Vote Forward v. Dejoy, et al.,
20     20-cv-02405, in the District of Columbia.
21         Myself and my colleague, Megan Keenan, will
22     be the primary persons questioning you today.
```

Page 12

```
1     Specifically, I will cover questions related to the
2     November 2020 election.  Before we start your
3     testimony, I'm going to mention a few ground rules.
4         First, you were just sworn in and are under
5     oath today.  Any willful misstatement by you may
6     constitute perjury.
7         Second, we have a court reporter
8     participating by video who is transcribing our
9     conversation.  The reporter can't record nonverbal
10    gestures, such as nodding or shaking your head, so
11    please answer all questions verbally.  Does that make
12    sense?
13 A.  Yes, it does.
14 Q.  Please let me finish each question before you begin
15    your answer, and I will allow you to finish your
16    answer before asking my next question.
17        If you need to take a break, just let me
18    know.  If there's a question pending, I will ask that
19    you answer the question before we take the break.
20    Does that make sense?
21 A.  Yes, it does.
22 Q.  If you do not understand a question, please let me
```

**Page 117**

1  this holdout measure before then?
2  A. Because we wanted to keep, for efficiency sake, and
3  for doing the -- the -- I think this -- and one thing
4  I would kind of highlight is, this is not very
5  efficient. Our normal process is to take everything
6  through what we call delivery point sequencing, which
7  puts it in block sequence order for the local carrier.
8      What we're doing here is, then, taking
9  their mail that would normally be in block sequence
10 and we're pulling it out. So until then, that volume
11 was still getting delivered. It was getting delivered
12 on the normal route, as it would be.
13     But because we were coming out of that
14 weekend, and if we went into delivery point sequencing
15 at -- and that extra day, it takes this from being,
16 you know, an overnight, like we could do, as you
17 mentioned, when we do a holdout to a two-day process
18 in a local environment. We did not want that -- if
19 you -- whatever you collect on Monday, you know, under
20 that, would typically be delivered on Wednesday.
21     We could not do that for the election.
22 Whatever we collected on Monday needed to be delivered

**Page 118**

1  on Tuesday, so we went into the weekend and saying,
2  you know, we will no longer DPS this mail, delivery
3  point sequence this mail, starting this weekend, so
4  that we could ensure that ballots aren't added an
5  extra day to meet our service standard. We actually
6  want to advance above the service standard because of
7  that Tuesday implication.
8  Q. So the reason for implementing the holdout at the
9  processing facility closer to the Election Day is
10 because it would otherwise be burdensome to do so
11 earlier; is that right?
12 A. Yes. The other thing I would mention is, when you
13 change a process, it does introduce an element of
14 risk. You want -- you want to keep processes
15 consistent. And so we kept our consistent process
16 that we do 360 -- or 350 days a year, because we don't
17 delivery point sequence on Saturday or Sunday or do
18 that next pass.
19     So what we do, on a normal basis, we wanted
20 to keep that until we could not, because then the risk
21 of doing your normal process means that those ballots
22 may not make it in time. So that's why it changed,

**Page 119**

1  and we changed it as close to that date as we could so
2  that we keep the normal process in place as long as we
3  could.
4  Q. So let's talk about holdouts as applied to Georgia.
5  Did the facilities in Georgia implement the holdout
6  measures by the --
7  A. Yes.
8  Q. -- 30th?
9  A. Yes.
10 Q. Did they implement it before?
11 A. They were done by the 30th. They were done by the
12 30th.
13 Q. Do you know when, specifically, they were done?
14 A. No.
15 Q. Did you talk to anyone at those facilities about when
16 they were done?
17 A. About this specific date? No.
18 Q. Did you talk to them about implementing the holdout
19 measure?
20 A. Between myself and Kevin Bray, everyone was talked to
21 and it was -- and everyone certified that they were
22 complete by Friday, October 30th.

**Page 120**

1  Q. So between you and Kevin Bray, you covered the Georgia
2  facilities on the holdout measure?
3  A. Everybody was covered, yes.
4  Q. And how did you certify that? And how was that
5  certified?
6  A. They gave certification to Kevin.
7  Q. What kind of certification?
8  A. Through -- in responding to him. But, also, he could
9  go in and see these dates of the -- of the sort
10 programs to see that they were updated.
11 Q. So was there, otherwise, some sort of record, like an
12 email or a log, that was submitted for the facilities?
13 A. I don't have a log [audio disruption].
14 Q. So no written correspondence on this?
15 A. Huh-uh.
16 Q. So the way that Mr. Bray would identify this is
17 looking at the sort machines?
18 A. At the dates of the sort programs, yes.
19 Q. So theoretically, for Georgia, we could identify when
20 the holdout measure was implemented based on the
21 sorting machine data?
22     MS. DICKEY: Objection. Speculation.

**Page 209**

1  there were ballots that were collected more than two
2  days before the election that, ultimately, were not
3  delivered until after November 3rd; isn't that right?
4  A. Yes.
5  Q. If the December 8th memo has the same instruction as
6     the November election, is there any reason to believe
7     we're not going to have that same problem for the
8     January runoff?
9         MS. DICKEY: Objection. Form.
10 A. You will have ballots that get delivered after
11    Election Day because none of our -- none of our
12    systems are perfect. Our goal is to minimize that.
13    We don't accept the fact that any of them will be, so
14    we're trying to go after that. But the assumption
15    that a hub-and-spoke process will automatically mean
16    that those ballots make it is a false assumption.
17        This doesn't mean that all the ballots will
18    make it on time. As I've mentioned before, when we
19    change processes, we introduce a risk of failure. We
20    introduce a risk that somebody is not going to follow
21    that new process correctly, and it -- it introduces
22    new confusion into the step.

**Page 210**

1         What we have to do is balance that with the
2  fact that, if we don't do that on Monday and Tuesday,
3  those ballots aren't going to make it because of the
4  way our service standards work. If voters choose to
5  wait until Monday or Tuesday to enter their ballot in,
6  not understanding how the Postal Service works, those
7  ballots would all be scheduled for delivery after.
8         So why we make those changes is because we
9  understand that people don't realize that, or even
10 that they're -- they're just gonna wait that long, and
11 it is not acceptable to us to just follow our normal
12 process and allow those votes to get delivered later.
13 So we are changing our process and introducing that
14 risk in the hopes of being able to capture as much as
15 we possibly can and help out.
16        Again, the hub-and-spoke is -- it doesn't
17 solve all the delivery issues. In fact, it can create
18 its own issues. But it's a risk we are willing to
19 take to help solve that Monday/Tuesday paradigm where,
20 if it goes through our normal processes, it will, more
21 than likely, not make it in time because our normal
22 service standard would not have that mail to the BOE,

**Page 211**

1  even if it's local, until Wednesday, at the earliest.
2  BY MS. KEENAN:
3  Q. Sure. And I'm not asking if hub-and-spoke would make
4     it perfect. But -- but, yes or no, are you doing
5     anything new to minimize the risk that those ballots
6     will be late using the hub-and-spoke process?
7  A. Actually, yes, we are doing something different.
8  Q. And is that that you're making it mandatory or is
9     there something substantively different about what
10    you're doing?
11 A. Not that we're making it mandatory. But to build off
12    of the conversation we've been having, due to some of
13    the backups that we have due to peak season in our
14    processing facilities, with the packages taking up so
15    much space, the 57 offices that serve BOEs in the
16    Atlanta district have started the local turnaround
17    process this week in order to try to help keep some of
18    that out of the plant at this time.
19        So we have already started taking actions
20    to be able to try to help these plants out where
21    they're already dealing with a lot.
22 Q. Okay. And when you say, the local turnaround started

**Page 212**

1  this week, was that Monday of this week or is that
2  today?
3  A. Yes, that was yesterday.
4  Q. Okay.
5  A. Uh-huh.
6  Q. I want to go to that next bullet. It's about the
7     hub-and-spoke for the nonlocal BOEs. And just the
8     same question. Is this measure any different than
9     what you were doing in the November election or is it
10    the same?
11 A. It's the same.
12 Q. Is there anything earlier, like what's happening with
13    the local turnaround for the nonlocal BOEs, or is that
14    actually starting on January 5th, as the memo states?
15 A. No, this is -- this is staying -- this is kind of
16    staying how it was. Again, the processes are in
17    place. There's no delay on our collection side and
18    getting that out to the -- like we did the example
19    from North Metro down to Macon, and we will continue
20    to do these things as we're doing the local holdouts
21    in the plants to be able to expedite.
22        The one thing I would say before we -- as

**Page 213**

1  we get into that, I know we're looking at a different
2  one. You know, we are opening up that ability for
3  them to utilize the Express mail network as early as
4  they need to to be able to make that happen, but, no,
5  this -- the nonlocal, as we do this hub down to that
6  far, would be just for Tuesday.
7  Q.  And -- and just like the others, that could be
8  implemented earlier, if you chose to do it on the
9  Tuesday; is that right?
10         MS. DICKEY: Objection. Form.
11 A.  It could be. What -- you've got to look -- it's the
12  resources and you're taking people away from their
13  normal jobs and you're taking managers to do this and
14  they would no longer be managing their processes,
15  which could introduce risk in other ways. So I don't
16  know if it would be recommended, but it could be done.
17 BY MS. KEENAN:
18 Q.  Okay. That next bullet, on page 3, instructs that,
19  from December 28th to January 5th, offices servicing
20  Georgia should utilize Express mail handoff to move
21  mis-sent ballots with tracking. Is that the
22  utilization of the Express mail that you were just

**Page 214**

1  talking about or is the mis-sent ballot with tracking
2  a special process?
3  A.  It's -- it's similar. If a delivery unit received a
4  ballot for a wrong BOE, they would get that to the
5  correct BOE utilizing Express mail. That's what
6  that -- so they're typically putting that in an
7  Express mail envelope, or something like that, getting
8  the tracking number and tracking it.
9  Q.  And when this instruction says that they should use
10  the Express mail network or other transportation
11  options, if faster, what are those other
12  transportation options that might be faster?
13 A.  Driving it to another office themselves.
14 Q.  And how do they make the determination of whether to
15  drive it or whether to use Express mail?
16 A.  What makes it to them, if -- if you're gonna have to
17  drive six hours, you know, to do something, it might
18  not make sense. You know, you might want to express
19  that. If you've got to drive 45 minutes to do
20  something, it might be worth it. It really depends on
21  what that distance is and if they feel that they can
22  make that in the course of -- if it's reasonable -- or

**Page 215**

1  not an unreasonable thing for them to drive it or
2  something like that.
3  Q.  Do you know whether those other transportation options
4  are being used, at this point, in Georgia?
5  A.  At this point, I don't believe so. I don't know. But
6  at this point, there would be time to get this back
7  through our normal mis-sent channels and -- or even
8  through the Express, like this, and not having to go
9  drive it all the way through.
10        Where you get that urgency was -- as you
11  are there on that Monday, Tuesday, and, you know, you
12  kind of make that decision to do things a little bit
13  on a grander scale the closer you get to the election.
14 Q.  So is the Express mail or the other faster
15  transportation being utilized for ballots prior to
16  December 28th?
17 A.  If needed. To give you an example, we are -- so we
18  talked about Fort Orange, the Fort Orange Press, that
19  they supply two counties in Georgia. Because it is a
20  surface network pair, it comes out of Albany,
21  New York -- I was about to say Albany, Georgia, but
22  that's -- there is an Albany, Georgia, but that's the

**Page 216**

1  wrong one.
2         Albany, New York, down to Atlanta is,
3  actually, a surface -- it's a payer. Because of the
4  impacts we've had on our surface network due to peak,
5  we have made the decision that anything coming out of
6  Fort Orange Press, in Albany, is moving via the
7  Express mail network to be able to reach Georgia,
8  outside of that surface, and get behind the surface
9  backlog.
10 Q.  Okay. And is there -- even for the other ballots,
11  let's say it's not one where -- you said -- as needed,
12  I think, was the phrase you used. What is the
13  downside to using Express mail to get all mis-sent
14  ballots to their destination?
15 A.  Sometimes -- it depends on -- sometimes you lose
16  visibility. You know, if -- you know, again, we talk
17  about that Election Mail logo. When that mail [sic]
18  is on a piece, we talked about how we typically did
19  that first-class delivery standard.
20        One thing I will tell you is, we treat that
21  Election Mail logo, like any piece with that, like,
22  better than any other piece of mail that we have.