**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| VOTE FORWARD, *et al.*,<br><br>          Plaintiffs,<br><br>v.<br><br>LOUIS DEJOY, in his official capacity as the Postmaster General; and the UNITED STATES POSTAL SERVICE,<br><br>          Defendants. | Civ. Action No. 20-2405 (EGS) |

<u>**MEMORANDUM OPINION**</u>

Pending before the Court is Plaintiffs' Second Motion for a Preliminary Injunction. *See* Pls.' Mem. Law Supp. Second Mot. Prelim. Inj. ("Pl.'s Mot."), ECF No. 175.[1] Upon consideration of Plaintiffs' motion, the response and the reply thereto, the applicable law, and the entire record, the Court **DENIES** Plaintiffs' motion.

**I. Background**

  **A. Factual Background**

    **1. The COVID-19 Pandemic**

It is undisputed that the COVID-19 pandemic increased reliance on mail delivered by the U.S. Postal Service ("USPS") during the November 2020 general election. *See* Pls.' Mot., ECF

---

[1] When citing electronic filings throughout this Opinion, the Court cites to the ECF page number, not the page number of the filed document.

No. 175-1 at 9; Defs.' Opp'n Pls.' Second Mot. Prelim. Inj.
("Defs.' Opp'n"), ECF No. 177 at 15. At the time, several states
adjusted their election procedures to allow for all eligible
voters to vote by mail-in ballot in the November 2020 election,
resulting in approximately 83% of all eligible voters having the
opportunity to vote using this method. *See* Mem. Op., ECF No. 32
at 2. And many voters chose to do so: between September 1, 2020
through November 3, 2020 alone, USPS processed approximately 134
million Election Mail[2] pieces that had barcodes enabling
tracking.[3] *See* Audit Report: Service Performance of Election and
Political Mail During the November 2020 General Election, USPS
Off. of Inspector General ("USPS OIG Election Report") at 3
(Mar. 5, 2021),
https://www.uspsoig.gov/sites/default/files/document-library-
files/2021/20-318-R21.pdf.

Since the November general election, millions of
individuals have received a dose of one of the COVID-19 vaccines

---

[2] "Election Mail is any mailpiece that an authorized election
official creates for voters participating in the election
process and includes ballots and voter registration materials."
USPS OIG Election Report at 1.
[3] The actual number is likely higher. "[E]lection boards
individually determine whether to integrate the use of barcodes
in their mailing processes and . . . the Postal Service can
currently only track the performance of processed mailpieces
(i.e., sorted, transported, and delivered) if they have barcode
mail tracking technology and receive required processing scans.
The total number of ballots processed without a barcode is
unknown." USPS OIG Election Report at 1.

available in the United States, and their numbers are growing. *See* COVID Data Tracker, Centers for Disease Control & Prevention (last visited May 18, 2021), https://covid.cdc.gov/covid-data-tracker/#datatracker-home. However, nationwide averages regarding the number of new COVID-19 infections and the nationwide COVID-19 death rate remain high—indeed, higher than in September or October 2020 or August 2020, respectively. *See* Pls.' Mot., ECF No. 175-1 at 7-8. Plaintiffs assert that, because of the continued prevalence and impact of the COVID-19 pandemic nationwide, voters' reliance on using mail-in ballots delivered by the USPS in lieu of voting via other methods is as critical as ever. *Id.*

## 2. The First Preliminary Injunction Enjoining the Late/Extra Trips Policy

On July 10, 2020, the USPS announced an "operational pivot" in services, which Plaintiffs asserted caused an overall decline in USPS service scores. Mem. Op., ECF No. 32 at 3. Among other things, the document detailing the changes in operations stated that: (1) "[a]ll trips will depart on time (Network, Plant and Delivery); late trips are no longer authorized or accepted"; (2) "[e]xtra trips are no longer authorized or accepted"; (3) "[c]arriers must begin on time, leave for the street on time, and return on time"; and (4) "no additional transportation will be authorized to dispatch mail to the Plant after the intended

3

dispatch" (collectively, the "Late/Extra Trips Policy"). *Id.*
After the USPS policy took effect, USPS eliminated a substantial
number of extra or late trips per week. *Id.* ("Since the USPS
policy took effect, USPS has eliminated an average of 32,900
extra or late trips per week, Grimmer Decl., ECF No. 16-11 ¶¶
10-11, or a 75% drop in the number of both types of trips, Pls.'
Reply, ECF No. 24 at 11."). The USPS policy changes stood in
contrast with prior practices that allowed postal workers to
conduct late trips or extra trips "to delay or supplement their
scheduled deliveries to ensure that they have collected and
transported all outstanding mail at any given facility." *Id.*
(quoting Pls.' Mot., ECF No. 16-1 at 10).

On September 8, 2020, Plaintiffs moved for a preliminary
injunction requesting that the Court enjoin Defendants and their
agents from implementing the USPS policy changes above.
Approximately three weeks later, USPS issued "Operational
Instructions" providing that "transportation, in the form of
late or extra trips that are reasonably necessary to complete
timely mail delivery, is not to be unreasonably restricted or
prohibited. Managers are authorized to use their best business
judgment to meet our service commitments." *See* Ex. 1 to Notice
Suppl. Material, ECF No. 30-1 at 4.

The Court granted Plaintiffs' motion on September 28, 2020,
and issued an Order enjoining Defendants "from enforcing the

Late/Extra Trips Policy." *See* Order, ECF No. 31; Mem. Op., ECF No. 32 at 43-44.[4]

### 3. The November Measures

Following the Court's entry of a preliminary injunction enjoining enforcement of the Late/Extra Trips Policy, Plaintiffs assert that USPS continued to suffer from poor service performance. Pls.' Mot., ECF No. 175-1 at 10 (citing a Washington Post news report[5] stating that, as of March 2021, USPS metrics remained lower than the agency's scores prior to the announcement of the July 2020 policy changes). To improve on-time election mail delivery, USPS implemented further measures for the November 2020 general election ("November Measures"). Pls.' Mot., ECF No. 175-1 at 13.

The November Measures included the following: (1) allowing processing plants to pull identified ballots out of the processing system so that they could be placed in a bin for delivery to a board of elections the following day; (2) authorizing delivery units to use Express Mail to deliver

---

[4] The Court granted the parties' joint motion to dissolve the preliminary injunction on February 11, 2021. *See* Min. Order (Feb. 11, 2021).

[5] The Court takes judicial notice of the existence of the news article. *See Washington Post v. Robinson*, 935 F.2d 282, 291 (D.C. Cir. 1991) ("[A] court may take judicial notice of the existence of newspaper articles in the Washington, D.C., area that publicized" certain facts); *Agee v. Muskie*, 629 F.2d 80, 81 n.1, 90 (D.C. Cir. 1980) (taking judicial notice of facts generally known as a result of newspaper articles).

ballots to boards of elections; (3) authorizing local delivery units to postmark and deliver ballots directly to boards of elections; (4) authorizing local retail units to schedule drivers to deliver ballots directly to the relevant board; and (5) requiring all facilities to perform a daily "all clear" check and certify that the facilities were clear of election mail by 10:00 a.m. *See id.* at 13-14.

Following implementation of the November Measures, "the service score for all election mail exceeded the service score for all First-Class Mail by five percent." *Id.* at 15. Nonetheless, the USPS Office of Inspector General reported that thousands of pieces of election mail did not make it to their intended destination in time to be counted in the November general election. *See* USPS OIG Election Report at 13.

### 4. The December Measures and the Georgia Measures

After the November general election, the Georgia Senate runoff election was set for January 5, 2021. In preparation for the runoff election, Defendants issued further guidance to USPS personnel on December 8, 2020, and December 14, 2020, authorizing facilities to implement measures similar to the November Measures ("December Measures"). *See* Ex. 9 to Pls.' Mot., ECF No. 175-11; Ex. 10 to Pls.' Mot., ECF No. 175-12. Despite the December Measures, USPS data indicated that

processing scores of ballots did not meet USPS's service
standards. *See* Pls.' Mot., ECF No. 175-1 at 20.

Due to the low processing scores and Defendants'
inclination to avoid "continued, seriatim motions briefing," the
parties entered into a joint agreement on December 23, 2020,
for the USPS to implement further measures specific to the
Georgia Senate runoff election ("Georgia Measures"). *See* Pls.'
Mot., ECF No. 175-1 at 20; Defs.' Opp'n, ECF No. 177 at 15. The
Court incorporated the terms of the agreement into a Minute
Order the following day. *See* Min. Order (Dec. 24, 2020).

The Georgia Measures "included all prior measures
implemented and several supplemental provisions, principally
designed to bypass processing facilities, provide for earlier
implementation, and ensure compliance." Pls.' Mot., ECF No. 175-
1 at 20. The Georgia Measures included the following:

> *Mandatory    Local    Turnaround*.   Beginning
> immediately and continuing through election
> day, all Atlanta District post offices were
> required to postmark and deliver ballots
> directly to the relevant board of elections,
> rather than placing them into the automation
> flow.
>
> *Early  Implementation  of  Hub-and-Spoke
> Processes*. On Saturday, January 2, post
> offices and local delivery units in close
> proximity to Atlanta District boards of
> elections were required to implement a hub-
> and-spoke process to deliver ballots to the
> local boards. And on Monday, January 4, post
> offices and local delivery units in the
> Atlanta District were required to implement a

hub-and-spoke process to transport ballots to non-local boards of elections, when delivery was possible before the board closing.

*Use of the Express Mail Network*. From January 2 through January 4, USPS was required to place all ballots identified in any processing plant that were subject to a three-day service standard directly into the Express Mail Network.

*Ballot Sweeps and All-Clear Certification*. Beginning December 28, processing facilities serving Georgia ZIP codes were required to perform morning sweeps to ensure all Inbound Ballots were expedited for delivery; on January 4 and 5, they were also required to perform an afternoon sweep. Following these sweeps, facilities were to report to Headquarters the number of ballots identified and confirm that they were expedited for delivery. Likewise, beginning on December 29, these processing facilities were also required to certify that they were all clear of election mail by 10 a.m. daily.

*Coordination with Georgia Boards of Elections*. USPS was further required to coordinate with Georgia boards of elections to ensure all Inbound Ballots were delivered by 7 p.m. on January 5.

*Investigation of Delayed Ballots*. Finally, USPS was required to investigate reports of delayed ballots and make best efforts to ensure the reported ballots were delivered on time.

*Id.*

While USPS's performance and compliance with election procedures for the Georgia Senate runoff election was not perfect, the USPS Office of the Inspector General reported that USPS had "performed well" overall. *See* USPS OIG Election Report

at 21. The non-compliance issues observed included "delayed election mail, not completing daily all-clear checks, not maintaining election and political mail logs, and not postmarking as required." *Id.*

### 5. **The Upcoming Elections in Texas, New Mexico, and Pennsylvania**

Though the November general election and Georgia Senate runoff election have passed, Plaintiffs remain concerned about the USPS's ability to deliver ballots in a timely manner during future elections. Plaintiffs assert that, despite continued delays in mail delivery, Defendants have not taken any measures to resolve the delays, including implementing the Georgia Measures, for the May 1, 2021 special election in Texas to fill the late U.S. Representative Ron Wright's seat in the Sixth Congressional District[6]; the May 18, 2021 statewide election in Pennsylvania regarding various initiatives and to fill seats on the state's Supreme, Superior, and Commonwealth Courts[7]; and the June 1, 2021 special election in New Mexico to fill the seat of former U.S. Representative Deb Haaland—now the Secretary of the United States Department of the Interior—in the state's First

---

[6] Mail-in ballots must be postmarked by 7:00 p.m. on May 1, 2021 and must arrive by 5:00 p.m. the next business day in order to be counted in Texas. Tex. Elec. Code §§ 86.006-.007.

[7] All ballots must be received by no later than 8:00 p.m. on May 18, 2021 in order to be counted in Pennsylvania. 25 Pa. Stat. §§ 3146.6(a), 3150.16(a).

Congressional District.[8] *See* Pls.' Mot., ECF No. 175-1 at 11-12. Plaintiffs allege that because Defendants have failed to implement any measures aimed at speeding Election Mail for the elections in Texas, Pennsylvania, and New Mexico, "voters will be subjected to a substantial risk that their ballots will be delivered too late to count." *Id.* at 26.

## B. Procedural History

Plaintiffs filed this lawsuit on August 28, 2020. *See* Compl., ECF No. 1. On September 8, 2020, Plaintiffs filed an amended complaint against Defendants, *see* Am. Compl., ECF No. 15, and subsequently filed a motion for a preliminary injunction requesting that the Court enjoin Defendants and their agents from implementing the USPS policy changes, *see* Pls.' Mot. Prelim. Inj., ECF No. 16. Defendants filed their opposition on September 15, 2020. *See* Defs.' Resp. Pls.' Mot. Prelim. Inj., ECF No. 21; and Plaintiffs filed their reply brief on September 20, 2020, *see* Pls.' Reply Supp. Mot. Prelim. Inj., ECF No. 24.

The Court granted Plaintiffs' motion for a preliminary injunction on September 28, 2020, enjoining Defendants "from enforcing the Late/Extra Trips Policy." *See* Order, ECF No. 31; Mem. Op., ECF No. 32 at 43-44. However, following completion of

---

[8] All absentee ballots must be received by no later than 7:00 p.m. on June 1, 2021 in order to be counted in New Mexico. N.M. Stat. §§ 1-6-10(c), 1-12-8.2(A).

the November general election and the Georgia Senate runoff
election, the Court granted the parties' joint motion to
dissolve the preliminary injunction on February 11, 2021. *See*
Min. Order (Feb. 11, 2021).

Defendants moved to dismiss Plaintiffs' amended complaint
on January 15, 2021, on grounds that Plaintiffs' lawsuit was
moot following the November general election. *See* Defs.' Mot.
Dismiss, ECF No. 165-1. Prior to the Court ruling on the motion,
Plaintiffs filed their second amended complaint on March 9,
2021. *See* Second Am. Compl., ECF No. 173. Plaintiffs' second
amended complaint included additional plaintiffs and new
allegations relating to the upcoming elections in Texas,
Pennsylvania, and New Mexico. *See id.*

On March 26, 2021, Plaintiffs filed their Second Motion for
Preliminary Injunction, requesting that the Court "requir[e]
Defendants to implement the measures that they agreed to adopt
for the Georgia Senate runoff elections in the upcoming
elections in Pennsylvania, Texas, and New Mexico." *See* Pls.'
Mot., ECF No. 175-1 at 3. Defendants opposed Plaintiffs' motion
on April 9, 2021, *see* Defs.' Opp'n, ECF No. 177; and Plaintiffs
replied on April 16, 2021, *see* Pls.' Reply, ECF No. 179.[9]

---

[9] Plaintiffs attached a series of new declarations to their reply
brief, and moved for leave to file the supplemental declarations
on March 26, 2021. *See* Pls.' Mot. Leave File Suppl. Decls., ECF
No. 180; *see also* L. Civ. R. 65.1(c). Defendants opposed

The motion is now ripe for adjudication.[10]

## II. Legal Standard

"A plaintiff seeking a preliminary injunction must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest.'" *Aamer v. Obama*, 742 F.3d 1023, 1038 (D.C. Cir. 2014) (alteration in original) (quoting *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011)). Where the federal government is the opposing

---

Plaintiffs' request on April 28, 2021, arguing that the supplemental declarations were procedurally improper. Defs.' Response Mot. Leave File Suppl. Decls., ECF No. 181. Because the Court granted Defendants an opportunity to respond to the declarations, the Court finds that Defendants are not prejudiced by the admission of the supplemental filings. Accordingly, the Court, in its discretion, grants Plaintiffs' motion to consider the supplemental declarations in resolving their motion for a preliminary injunction. *See Lewis v. Bay Indus., Inc.*, 51 F. Supp. 3d 846, 852-53 (E.D. Wis. 2014) (concluding that granting a motion for leave to file supplemental declarations "was appropriate, as striking the declarations would be an unduly harsh sanction" where defendant suffered no prejudice and plaintiff obtained supplemental declarations promptly).

[10] In accord with the parties' agreed-upon briefing schedule, Plaintiffs' Second Motion for a Preliminary Injunction, ECF No. 175, became ripe on March 26, 2021—or, 21 days after the motion was filed. *See* Pls.' Mot., ECF No. 175 (filed on March 26, 2021); Pls.' Reply, ECF No. 179 (filed on April 16, 2021). In addition, Plaintiffs' Motion for Leave to File Supplemental Declarations, ECF No. 180, became ripe on May 5, 2021. Accordingly, the Court finds that the parties are not prejudiced by not having a hearing on Plaintiffs' Second Motion for a Preliminary Injunction within 21 days after its filing. *See* L. Civ. R. 65.1(d).

party, the balance of equities and public interest factors merge. *See Nken v. Holder*, 556 U.S. 418, 435 (2009). A preliminary injunction is an "extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) (citation omitted). "The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Tex. v. Camenisch,* 451 U.S. 390, 395 (1981). In this Circuit, the four factors have typically been evaluated on a "sliding scale," such that if "the movant makes an unusually strong showing on one of the factors, then it does not necessarily have to make as strong a showing on another factor." *Davis v. Pension Benefit Guar. Corp.,* 571 F.3d 1288, 1291-92 (D.C. Cir. 2009).

In the wake of the Supreme Court's decision in *Winter v. Natural Resources Defense Council,* 555 U.S. 7 (2008), "the D.C. Circuit has suggested that a positive showing on all four preliminary injunction factors may be required." *Holmes v. FEC,* 71 F. Supp. 3d 178, 183 n.4 (D.D.C. 2014); *see also Sherley,* 644 F.3d at 393 ("[W]e read *Winter* at least to suggest if not to hold that a likelihood of success is an independent, free-standing requirement for a preliminary injunction." (citation and quotation marks omitted)). Nonetheless, "the Circuit has had

no occasion to decide this question because it has not yet encountered a post-*Winter* case where a preliminary injunction motion survived the less rigorous sliding-scale analysis." *ConverDyn v. Moniz,* 68 F. Supp. 3d 34, 46 n.2 (D.D.C. 2014).

## III. Analysis

### A. Plaintiffs Are Not Likely to Succeed on the Merits of their Constitutional Claim

#### 1. Plaintiffs Likely Do Not Have Standing to Bring Their Constitutional Claim

Defendants argue that Plaintiffs cannot establish that they are likely to succeed on the merits because Plaintiff Vote Forward and the individual Plaintiffs lack standing in this case. *See* Defs.' Opp'n, ECF No. 177 at 21, 29. The Court agrees. Plaintiffs have failed to show that their alleged injuries are the result of Defendants' actions, and the redress Plaintiffs seek is too speculative to support their invocation of federal court jurisdiction.

To establish standing, "a plaintiff must show (1) an 'injury in fact,' (2) a sufficient 'causal connection between the injury and the conduct complained of,' and (3) a 'likel[ihood]' that the injury 'will be redressed by a favorable decision.'" *Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2341 (2014) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992)). These requirements also apply to organizations, whether they assert standing to sue on their own behalf, or on

14

behalf of its members. *Nat'l Treasury Emps. Union v. United States*, 101 F.3d 1423, 1427 (D.C. Cir. 1996) (citing *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378 (1982)).

"The party invoking federal jurisdiction bears the burden of establishing these elements." *Lujan*, 504 U.S. at 561 (citations omitted). "Since they are not mere pleading requirements but rather an indispensable part of the plaintiff's case, each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.,* with the manner and degree of evidence required at the successive stages of the litigation." *Id.*

"Standing to seek . . . forward-looking injunctive relief requires [the plaintiff] to show that it is suffering an ongoing injury or faces an immediate threat of injury. For a future injury, that means submitting evidence showing that there is a substantial risk that the harm will recur." *Narragansett Indian Tribal Historic Pres. Office v. FERC*, 949 F.3d 8, 13 (D.C. Cir. 2020) (internal quotation marks, citations, and alterations in original omitted). However, only one plaintiff needs standing in order for a claim to go forward. *See Carpenters Indus. Council v. Zinke*, 854 F.3d 1, 9 (D.C. Cir. 2017) (citing *Mountain States Legal Found. v. Glickman*, 92 F.3d 1228, 1232 (D.C. Cir. 1996)).

Although the risk of disenfranchisement may qualify as an injury in fact,[11] Plaintiffs have not submitted sufficient evidence establishing a substantial likelihood of causation or redressability.

Regarding causation, Plaintiffs must show "a causal connection between the injury and the conduct complained of." *Lujan*, 504 U.S. at 560. The injury must be "fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court." *Id.* (cleaned up). Plaintiffs have not shown they are more likely than not to meet this standard.

Plaintiffs contend that "mail ballot delays are traceable to USPS's knowing refusal to implement *any* measures that would expedite ballot delivery in the face of those delays." Pls.' Reply, ECF No. 179 at 12 (citing Pls.' Mot., ECF No. 175-1 at 7); *see also id.* at 13 ("But for Defendants' utter failure to take any measures to combat their consistently delayed ballot delivery and ensure timely delivery in the upcoming elections,

---

[11] Even so, none of the Individual Plaintiffs attest that they reside in Texas or intend to cast their ballot in the Texas election. In addition, Vote Forward's letter-writing campaign—in which the organization sends out "get out the vote" letters to eligible voters close to election day—in Texas concluded prior to completion of briefing on Plaintiffs' two motions. *See* Defs.' Response Mot. Leave File Suppl. Decls., ECF No. 181 at 4. Thus, Plaintiffs have not established an impending or ongoing injury-in-fact with regard to the Texas election.

the Individual Plaintiffs would be able to mail their ballots back three days before an election without risk of rejection"); *id.* at 16 ("Vote Forward's instant injuries—like those of the Individual Plaintiffs—are traceable to USPS's failure to take any steps to expedite mail ballots in the wake of this poor service performance.").

However, Plaintiffs' claim is contradicted by the record. Defendants have submitted three declarations by USPS officials in Texas, New Mexico, and Pennsylvania rebutting the assertion that the Postal Service has categorically refused to take "*any* measures." For example, in Pennsylvania, USPS anticipates utilizing the following measures, in line with previous practice: (1) "reach[ing] out, as is done for every election, to the [boards of elections] to discuss any specific needs to ensure that Election Mail is timely delivered," Hand Decl., ECF No. 177-8 ¶ 4; (2) "hav[ing] carriers do daily checks with all [boards of elections] in the District to confirm that they are clear of any outgoing ballots," *id.* ¶ 5; (3) prioritize[ing] ballots mailed from voters to the board of election to ensure that they arrive by the deadline set by the state, *id.* ¶ 6; and (4) conduct[ing] additional deliveries on the election day, as necessary, *id.* And in New Mexico, USPS has plans in place to discuss with state officials any potential measures to be implemented for the delivery of ballots as the election date

17

draws closer, further casting doubt on Plaintiffs' assertion that USPS knowingly refuses to treat ballot mail any differently in the upcoming election. *See* Lamb Decl., ECF No. 177-6 ¶ 5; *id.* ¶ 3 (stating that New Mexico USPS officials "work individually with the Secretaries of State and boards at the local level to determine the best solutions" given that the "needs of the different boards are often different from one another"); *see also* Cook Decl., ECF No. 177-7 ¶ 6 (stating that Texas political and election mail coordinators have "regular meetings" with Secretaries of State and other officials to discuss arrangements for the delivery of ballots, noting that, for example, "[s]ome boards may arrange for pick-up of ballots, while others request delivery on the day of the election").

While the anticipated measures may be arranged locally, rather than nationally, and though USPS does not suggest that any implemented measures would be as extensive as the Georgia Measures, at no point does USPS suggest that the USPS district managers in the relevant regions have decided that operations must remain static throughout the election. In view of such anticipated state-level election plans, the Court does not agree that USPS has "knowing[ly] refus[ed] to implement *any* measures that would expedite ballot delivery," as Plaintiffs assert. Pls.' Reply, ECF No. 179 at 12 (citing Pls.' Mot., ECF No. 175-1 at 7). Furthermore, Plaintiffs do not attempt to connect delays

in mail delivery with the absence of the Georgia Measures because, as Plaintiffs clarify, they do not contend that "Defendants' failure to implement the Georgia measures *by itself* cause[d] their injuries." Pls.' Reply, ECF No. 179 at 12. Thus, in view of USPS's sworn declarations indicating that the Postal Service does anticipate implementing some measures at the discretion of the local and regional offices, the Court cannot find that Plaintiffs have established causation.

Next, regarding redressability, a plaintiff must show that it is "'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'" *Lujan*, 504 U.S. at 561 (quoting *Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26, 38, 43 (1976)).

Here, Plaintiffs have not demonstrated that an order requiring USPS to implement the Georgia Measures is substantially likely to redress alleged injuries in Pennsylvania, Texas, and New Mexico. Plaintiffs argue that their motion "details exactly how and why these measures will reduce delays by up to two days." Pls.' Mot., ECF No. 179 at 14. However, the evidence Plaintiffs rely on does not support a finding that the mandatory implementation of the Georgia Measures outside of Georgia would reduce ballot delays.

First, Plaintiffs contend that they have established that the local turnaround and hub-and-spoke processes reduce delivery

19

time by at least one day, and that Express Mail can decrease delivery times by one or two days. Pls.' Reply, ECF No. 179 at 14. In support of their contention, Plaintiffs cite to statements by the USPS operations industrial engineering manager describing the intended effect of such measures either in general terms or in the context of the Georgia Senate runoff election. *See* Pls.' Reply, ECF No. 179 at 22-23, 30-31. While such statements may be helpful to understand the mechanics of many of the proposed measures, none of the statements indicate whether the Georgia Measures would be successful in the context of different types of elections, including those involving only a subset of counties within a state, or different geographic locations. *See Swanson Grp. Mfg. LLC v. Jewell*, 790 F.3d 235, 242 (D.C. Cir. 2015) (finding plaintiffs lacked standing where the allegations were "conclusory or silent with respect to their claims of causation and redressability").

Plaintiffs' citations to the USPS OIG Election Report are similarly unhelpful. The audit report provides only a high-level analysis of USPS's handling of Election Mail during the Georgia Senate runoff election from December 1, 2020 to January 6, 2021. *See* USPS OIG Election Report at 21. The Court acknowledges that the audit report indicated that USPS "performed well" during the runoff election, but the report provides no indication as to whether the Georgia Measures were integral to the Postal

Service's success. *Id.* Indeed, despite the success, the audit report states that USPS still suffered from compliance issues during the runoff election, including a lack of understanding of requirements for daily all-clear certifications and postmarking.[12] *Id.*

Second, Plaintiffs assert that "Defendants' own 30(b)(6) witness has confirmed that [the Georgia Measures] speed ballot delivery," and that "Defendants' own officials have conceded their importance in ensuring ballots arrive on time." Pls.' Reply, ECF No. 179 at 14. As stated above, however, such statements do not concern whether the Georgia Measures would be effective when implemented on a national level to ensure the speedy delivery of ballots at a local level. Furthermore, the 30(b)(6) witness also emphasized that any change of procedures in the run-up to an election "introduce[s] a risk of failure." *See* Ex. 3 to Pls.' Mot., ECF No. 175-6 at 209:17-22 ("[T]he assumption that a hub-and-spoke process will automatically mean that those ballots make it is a false assumption. This doesn't mean that all the ballots will make it on time. As I've

---

[12] Because the USPS OIG Election Report gives only a high-level account of USPS performance during the Georgia Senate runoff election, it is unclear whether these compliance issues occurred primarily before or after the agreed-upon Georgia Measures were implemented on December 23, 2020. Thus, it is unclear whether the Georgia Measures resolved such noncompliance, as Plaintiffs argue. *See* Pls.' Mot., ECF No. 175-1 at 22-23.

mentioned before, when we change processes, we introduce a risk
of failure. We introduce a risk that somebody is not going to
follow that new process correctly, and it -- it introduces new
confusion into the step."). In addition, "[i]t also diverts
resources, 'taking people away from their normal jobs . . . ,
which could introduce risk in other ways.'" Defs.' Opp'n, ECF
No. 177 at 26 (quoting Ex. 3 to Pls.' Mot., ECF No. 175-6 at
213:11-16. These risks may be outweighed by other factors in
some elections, such as the November general election, but
Plaintiffs have not provided any evidence that the risks are
outweighed in the specific elections at issue here. And while
Plaintiffs argue that Defendants "do not offer any facts
suggesting that [the Georgia Measures]" would not be
"appropriate" in Texas, New Mexico, or Pennsylvania, it is
Plaintiffs' burden to establish redressability. *See Lujan*, 504
U.S. at 561.

Third, Plaintiffs argue that "Defendants' own data confirms
their effectiveness in the November general and Georgia runoff
elections." Pls.' Reply, ECF No. 179 at 14. However, in the
November general election, the measures at issue were not
mandatory. Rather, USPS only "authorized" certain steps, such as
using Express Mail to deliver ballots, utilizing local
turnaround, and utilizing the hub-and-spoke process. *See* Pls.'
Mot., ECF No. 175-1 at 14. As such, the record is unclear

regarding the extent to which USPS facilities across the country implemented the measures at that time.

Regarding the Georgia Senate runoff election data, Plaintiffs provide these numbers without context. For example, Plaintiffs do not provide additional data detailing the processing scores for inbound ballots in the relevant districts during any previous statewide elections. Without such a comparison tool, the Court is unable to conclude whether the Georgia Measures were helpful, harmful, or neutral during the runoff election. The Court also declines to compare the Georgia Senate runoff election data to the wealth of November general election data currently available on the Court's docket. *See, e.g.*, ECF Nos. 149-59. Plaintiffs do not ask the Court to undertake such an analysis, and the Court is not persuaded that such a comparison would be appropriate given that two elections diverge greatly in terms of total ballots processed and in geographic scope. And even if the Court did compare November general election data to Georgia Senate runoff election data, it is not apparent that such an analysis would support Plaintiffs' position. *Compare* Ex. 11 to Pls.' Mot., ECF No. 175-13 (listing the processing scores for Tennessee from December 29, 2020 to January 6, 2021 as: 96.90%; 88.00%; 95.86%; 75.44%; 94.38%; 80%; and 80%), *with* Notice of Data, ECF No. 159 (listing the processing scores for Tennessee from October 27, 2020 through

November 3, 2020[13] as 91.97%; 94.09%; 96.43%; 91.43%; 84.13%; 88.06%; and 78.58%).

Finally, there is another reason to doubt whether Plaintiffs' harms would be redressed by a favorable decision: "Defendants have once again curtailed the use of extra trips to rates similar to those in place before the Court's earlier ruling, and USPS's performance remains substantially below its pre-July 2020 baseline." Pls.' Reply, ECF No. 179 at 16. As this Court previously found in granting Plaintiffs' first preliminary injunction on September 28, 2020, USPS's policy change resulting in a reduction in transportation and extra trips coincided with a significant decline in USPS on-time service scores. Mem. Op., ECF No. 32 at 14-15. Given the correlation between low service scores and fewer late/extra trips, as well as the fact that the Georgia Measures do not include any provisions regarding late/extra trips, it is unclear whether implementation of the Georgia Measures would improve ballot delivery times in the face of such curtailment.

Thus, in view of USPS's intention to implement the measures described *supra* to ensure the timely delivery of ballots, as well as the lack of evidence demonstrating that the Georgia Measures would redress Plaintiffs' alleged injuries, the Court

---

[13] Data for November 1, 2020 was not included.

declines to override the judgment and expertise of USPS managers overseeing the day-to-day postal operations in their locality. *See* Lamb Decl., ECF No. 177-6 ¶ 3 ("Unlike the recent National Election where Headquarters provided extensive guidance vis-à-vis extraordinary measures for us to follow, in state and local elections, there is greater discretion at the local level to deal with the best way of delivering ballots."). The Court, however, does not foreclose the possibility that Plaintiffs may successfully establish standing at later stages in this litigation.

## IV. Conclusion

For the foregoing reasons, the Court **DENIES** Plaintiffs' Second Motion for a Preliminary Injunction, ECF No. 175. An appropriate Order accompanies this Memorandum Opinion.

**SO ORDERED.**

**Signed:    Emmet G. Sullivan**
**United States District Judge**
**May 18, 2021**